UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



07 CIV 6767

THOMAS H. LEE EQUITY FUND V, L.P.,
THOMAS H. LEE PARALLEL FUND V, L.P.,
and THOMAS H. LEE EQUITY (CAYMAN)
FUND V, L.P.,

                                        Plaintiffs,

                    v.

MAYER, BROWN, ROWE & MAW LLP,

                                        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
x

07 Civ. _____

<u>COMPLAINT</u>

JURY TRIAL DEMANDED

RECEIVED

JUL 2 6 2007

U.S.D.C. S.D. N.Y.
CASHIERS

       Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V,

L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds" or

"Plaintiffs"), by and through their undersigned counsel, for their complaint against Mayer,

Brown, Rowe & Maw LLP ("Mayer, Brown" or "Defendant"), allege on information and belief,

except as to those allegations describing their own actions, as follows:

<h3 style="text-align:center"><u>INTRODUCTION</u></h3>

      1.     This is an action, brought for violation, alternatively, of the Securities

Exchange Act of 1934 or the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

and for violations of state law, to recover damages that the THL Funds suffered as a result of

repeated material misrepresentations and omissions by Mayer, Brown, one of the largest law

firms in the world, which represented Refco Group Ltd., LLC, Refco's former CEO Phillip

Bennett ("Bennett"), and Bennett's personal holding company Refco Group Holdings, Inc.

("RGHI") in connection with the THL Funds' $452 million purchase of a majority interest in
Refco in 2004 (the "2004 Purchase").[1]

   2.   As set forth below, Mayer, Brown, in furtherance of a long-running
scheme masterminded by Bennett and others and designed (among other things) to conceal large
losses and facilitate the ultimate sale of all or part of Refco, repeatedly misled the THL Funds in
connection with the 2004 Purchase, by both hiding, and denying the existence of, a series of
virtually identical sham related-party transactions, which Bennett and others orchestrated, and
which Mayer, Brown negotiated, documented, and provided material assistance with respect to
over a 5-year period on 17 separate occasions. These sham transactions, which were in
themselves related-party transactions, were designed to defraud potential purchasers (such as
Plaintiffs), lenders, and potential lenders by concealing Refco's true financial condition,
including the existence of a receivable owed to Refco by RGHI, a company controlled by
Bennett that was used to "park" substantial uncollectible debts owed to Refco and certain
expenses (the "RGHI Receivable").

   3.   In making the 2004 Purchase, the THL Funds received and relied upon
explicit representations concerning the absence of related-party transactions. These
representations were false and Mayer, Brown – that had negotiated, documented and provided
material assistance with respect to 17 related-party transactions for Refco, each designed to
conceal the RGHI related-party receivable – knew they were false. Mayer, Brown's conduct
here goes well beyond the zealous representation of a client. For example, at precisely the same
time that Mayer, Brown was preparing documentation to transfer the RGHI related-party

---

[1] Refco Group Ltd., LLC and Refco Inc. and their wholly owned subsidiaries and predecessors
are collectively referred to herein as "Refco" or the "Company," unless reference to a specific
Refco entity is made. RGHI is excluded from this definition of Refco.

receivable off Refco's books for some ten days (while Refco's quarterly financial statements were being prepared to reflect the absence of these related-party transactions between RGHI and Refco) and subsequently while that round-trip loan transaction was in place, Mayer, Brown sent draft disclosure schedules to the THL Funds that did not disclose the existence of that round-trip loan transaction, and sent drafts of the Purchase Agreement to counsel for Plaintiffs containing representations that no related-party transactions existed between RGHI and Refco.

4.      According to the latest indictment filed by the United States Attorney's Office, Bennett and his co-conspirators directed over time that a group of largely worthless receivables, bad debts, and questionable obligations incurred by Refco be transferred to RGHI, thereby first creating and then increasing the RGHI Receivable.[2] In order to hide this related-party receivable and the bad debts it represented, Bennett and his co-conspirators directed that the RGHI Receivable be concealed by temporarily transferring it – immediately before the end of each Refco financial reporting period – to one or more unaffiliated third parties in a series of sham loan transactions.  Then, immediately after the end of each reporting period, the Receivable was rebooked to RGHI, and the unaffiliated entities were compensated for their role in the scheme.

5.      According to the Refco Bankruptcy Examiner, from 2000 to 2005, Mayer, Brown attorneys were involved in every facet of 17 separate sham round-trip loan transactions, all but one of which straddled Refco's fiscal year end or quarter end, and all of which were designed to temporarily transfer to an unaffiliated third-party customer, and thereby conceal from others reviewing Refco's financial statements, the RGHI Receivable.

---

[2] See U.S. v. Bennett, et al., S3 05 Cr. 1192 (NRB), filed on or about January 16, 2007.

6. Mayer, Brown's involvement in Bennett's scheme did not end there. Members of the same team of Mayer, Brown lawyers, led by Mayer, Brown senior partner Joseph P. Collins ("Collins"), that materially assisted in these sham loan transactions also represented RGHI, Bennett, and Refco Group in connection with the THL Funds' 2004 Purchase. Those lawyers were heavily involved in drafting, negotiating, coordinating, and structuring the transaction documents and in responding to the THL Funds' extensive diligence requests, and they communicated directly with the THL Funds' representatives almost daily as the closing of the 2004 Purchase approached. Despite the THL Funds' repeated requests for information concerning all dealings between Refco and any related-party, including RGHI and Bennett, and despite the THL Funds' insistence that any related-party obligations be eliminated on the closing of the 2004 Purchase (which Mayer, Brown knew Bennett had agreed to), Mayer, Brown – throughout the diligence period and even after the 2004 Purchase – participated in and furthered Bennett's scheme by continuing to negotiate, coordinate and provide material assistance on additional sham loan transactions, all the while concealing those transactions from the THL Funds and repeatedly assuring the THL Funds and their representatives that no undisclosed related-party transactions existed.

7. Indeed, at precisely the same time the THL Funds were finalizing the negotiations of the purchase agreement for the 2004 Purchase, Mayer, Brown materially assisted in the second largest sham round-trip loan transaction – for $700 million. And in March 2004, shortly after the largest sham round-trip loan transaction – for $720 million – had been unwound and the RGHI Receivable had been rebooked to RGHI, Collins falsely informed a representative of the THL Funds that Bennett had confirmed that no undisclosed related-party transactions existed involving RGHI and Refco. And the very Mayer, Brown associate who worked on most

of the sham round-trip loan transactions – including the $700 million transaction – transmitted disclosure schedules to the THL Funds stating that no undisclosed related-party transactions existed.

8.    The 2004 Purchase closed on August 5, 2004. The THL Funds made the 2004 Purchase only after completing an exhaustive and extensive due diligence process, undertaken with the help of numerous professional advisors over the course of nine months. In addition to the intensive diligence conducted by Thomas H. Lee Partners L.P. ("THL Partners") personnel, the THL Funds engaged a number of professional advisors to assist them, including KPMG LLP to conduct accounting due diligence, Weil, Gotshal & Manges LLP ("WGM") to perform legal and regulatory diligence, McKinsey & Company to conduct customer surveys across Refco's business lines and to analyze and forecast industry growth, Sandler O'Neill to analyze Refco's position within the market, Marsh & McLennan to assess risk management and the adequacy of insurance, and Mercer Human Resource Consulting to review human resource issues.

9.    In early October 2005, Refco's Board of Directors, which included designees of the THL Funds, learned for the first time of the fraudulent activities by Bennett and his co-conspirators. On October 10, 2005, Refco, at the direction of its Board of Directors, issued a press release disclosing the discovery of an approximately $430 million receivable owed to Refco by RGHI. The Audit Committee of the Board of Directors immediately commenced an internal investigation of the facts and circumstances surrounding Bennett's actions, retaining independent counsel and a forensic accounting firm to explore the true extent of the fraudulent scheme. The Company requested that Mr. Bennett take a leave of absence and further contacted the SEC, CFTC and other regulatory bodies to report the wrongdoing. Federal authorities shortly

thereafter arrested Bennett for his role in this conspiracy to defraud. Refco's stock price plummeted, losing over $1 billion in market capitalization. Within a week of Refco's press release, it commenced a bankruptcy case under Chapter 11 of title 11 of the United States Code, and the interests acquired by the THL Funds from RGHI in the 2004 Purchase became worthless.

10.     In this action, Plaintiffs seek to recover the losses they have suffered as a result of the scheme and conspiracy in which Bennett and Mayer, Brown participated, alternatively under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, or under 18 U.S.C. § 1962(d) (for a conspiracy to violate 18 U.S.C. § 1962(c)) thereunder, as well as under a number of state law claims pleaded below.[3]

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over the First and Second Claims for Relief under 15 U.S.C. § 78aa. The Court has jurisdiction over the Third Claim for Relief under 18 U.S.C. § 1964. The Court has supplemental jurisdiction over the remaining Claims for Relief under 28 U.S.C. § 1367.

12.     Venue is proper in this Court under 18 U.S.C. § 1965 (a) and 15 U.S.C. § 78aa.

## PARTIES

13.     Plaintiff Thomas H. Lee Equity Fund V, L.P. is a Delaware limited partnership.

14.     Plaintiff Thomas H. Lee Parallel Fund V, L.P. is a Delaware limited partnership.

---

[3] Should the Court conclude that (a) the interests acquired by the THL Funds in the 2004 Purchase are securities and (b) Mayer, Brown can be held liable under Section 10(b) and Rule 10b-5, then under 18 U.S.C. § 1964(c), the RICO claim should be dismissed.

15.    Plaintiff Thomas H. Lee Equity (Cayman) Fund V, L.P. is a Cayman Islands limited partnership.

16.    Defendant Mayer, Brown, Rowe and Maw LLP is among the largest law firms in the world, with more than 1,500 lawyers operating in 14 major cities worldwide, including New York. Mayer, Brown is the combination of two limited liability partnerships, each named Mayer, Brown, Rowe and Maw LLP, one established in the State of Illinois and one in England. Mayer, Brown is liable for the wrongful acts and omissions of the individual lawyers who performed the work described herein.

17.    Before Refco's collapse, Mayer, Brown had long been Refco's primary outside counsel, handling most of its significant legal matters, including regulatory and compliance issues and important corporate work. Mayer, Brown senior partner Collins, at the time of the 2004 Purchase, had worked with Refco for many years, developing a close relationship with Bennett, who had assumed control of Refco in September 1998. Refco was Collins's most significant client, and Mayer, Brown's total Refco billings between 2000 and 2005 exceeded $23 million. Indeed, a former Refco employee was quoted in press accounts as describing Collins as Refco's "go-to-guy," reporting that all important transactions and deals involving the brokerage were first cleared through Collins or one of his colleagues at Mayer, Brown. Mayer, Brown was intimately familiar with Refco's business, finances, operations and corporate structure.

## FACTUAL BACKGROUND

18.    Until the revelation of the fraud perpetrated by Bennett and his co-conspirators, Refco had been a leading provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets.

**The Fraudulent Scheme of Bennett and His Co-Conspirators**

19.    According to the latest superseding indictment issued by a grand jury sitting in the United States District Court for the Southern District of New York (the "Indictment"), starting in the late 1990s, Bennett and certain other former Refco officers and shareholders schemed to hide the true financial health of Refco from investors, lenders, regulators and the public. Bennett and his co-conspirators did so in order to sell the Company, in whole or in part, for their own benefit. As detailed therein, their conduct included orchestrating a series of sham loan transactions designed to hide customer and proprietary trading losses and otherwise mask Refco's true financial condition. These transactions rendered Refco's financial statements for the relevant periods materially false and misleading.

20.    According to the Indictment, in the 1990s Refco directly and indirectly incurred a series of substantial trading losses. In addition to proprietary trading losses, certain Refco customers to which Refco had extended credit incurred hundreds of millions of dollars of losses in their Refco accounts. When the customers could not repay the loans that Refco had extended, rather than disclosing all these proprietary and customer trading losses, and writing them off as required, Bennett embarked on a fraudulent scheme to hide them and thereby mask Refco's true financial condition.

21.    The first step in the fraudulent scheme involved removing these uncollectible receivables from Refco's books by transferring them to RGHI, thereby creating the RGHI Receivable – a large receivable that RGHI owed to Refco and that at times totaled more than $1 billion. The RGHI Receivable was composed of the debit balances in three Refco accounts:  RGHI's accounts at Refco Capital Markets, Ltd. ("RCM") and at Refco Capital Corporation (later, Refco Capital LLC) ("RCC") and the RCM account of Refco Global Finance ("RGF").

22.     In order to make the RGHI Receivable appear on Refco's financial statements to be a good and valuable receivable from an unaffiliated third-party customer, Bennett directed others to "hide" the RGHI Receivable by carrying out a series of sham transactions, with one or more entities not affiliated with Bennett or Refco, just before and then just after the close of each of Refco's financial reporting periods. As detailed in the Indictment, Bennett caused the reduction of the RGHI Receivable in this manner at every fiscal year-end from at least February 28, 1998 and at every fiscal quarter-end from May 2004 through August 2005.

23.     These sham transactions rendered Refco's financial statements and books and records materially false and misleading. These transactions lacked economic substance and were undertaken by Bennett and his co-conspirators solely in furtherance of an illegal scheme to defraud investors, financial institutions, regulators and the public so that they could eventually reap millions of dollars from the sale of all or part of Refco. These transactions and the RGHI Receivable were related-party transactions and material contracts and, because of guarantees made by Refco, obligations of Refco, both of which were, as Mayer, Brown knew, required to be disclosed to Plaintiffs before the 2004 Purchase, but they were not.

**The Sham Round-Trip Loans and the Material Assistance Provided by Mayer, Brown**

24.     The first sham transactions orchestrated by Bennett occurred in 1998 and 1999 and entailed a series of loans effected by wire transfers from unaffiliated third parties to RGHI in late February of each year immediately before the end of Refco's fiscal year. These loans were repaid shortly after the close of Refco's fiscal year. Each of these transactions was accomplished, and furthered, by the use of interstate or foreign wires. Bennett and his co-conspirators also caused Refco to engage in undocumented yearly transactions from February

2000 through February 2005 with an Austrian bank, BAWAG, that were used to pay down the

RGHI Receivable at the end of Refco's fiscal year. Each of these transactions was

accomplished, and furthered by, the use of interstate or foreign wires.

25.    In February 2000, Bennett also began to orchestrate a series of 18 round-

trip loan transactions with unrelated entities to hide the RGHI Receivable. As set forth in more

detail below, Mayer, Brown provided material assistance in connection with 17 of these round-

trip loan transactions.

26.    Each of the 17 sham round-trip loan transactions followed a similar

pattern. A Refco entity, generally RCM, would make a loan to an unaffiliated customer.

Simultaneously, the customer would make a loan in the same amount to RGHI, which funds

RGHI would use to pay down its obligation to Refco. Refco Group unconditionally and

absolutely guaranteed the prompt and complete performance of all of RGHI's obligations and

liabilities under the loan agreement, including repayment. As a result of these "loans," Refco's

financial statements did not reflect related-party transactions from RGHI, but instead reflected

receivables in those amounts from third parties unaffiliated with Refco, Bennett, or RGHI. In

addition, Refco's financial statements never revealed the existence of the related-party guarantee

by Refco of RGHI's obligations created pursuant to the documents drafted by Mayer, Brown.

27.    To enable the customers to profit from this arrangement, the interest rate

that RGHI paid the customers for their "loans" was between 15 and 100 basis points higher than

the interest rate that the customers paid Refco on the Refco "loans." The net profit made by the

customers on each transaction ranged from $1,500 to almost $200,000, depending on the amount

loaned, the interest spread, and the duration of the transaction. Although characterized as loans,

generally no funds were actually transferred other than the customer's profit from the interest spread.

28.     A few days after the end of each Refco financial reporting period, the transactions were unwound. Refco would lend the money back to RGHI (thus increasing the amount owed by RGHI to Refco), which RGHI then used to pay back the unrelated customer the full amount of the loan.

29.     Not only were these loans unwound within days of the end of Refco's financial reporting period, but in each instance the third-party customer was insulated from any economic risk. Refco Group unconditionally and absolutely guaranteed all of RGHI's obligations and liabilities to the customer under the loan documents, including the obligation to pay principal and interest. In addition, Refco Group agreed to defend, indemnify, and hold harmless the third-party customer from and against, among other things, any claims, losses, or liabilities imposed upon or suffered by the customer as a result of any claim of a third party arising out of or based on the loan transactions. Bennett stood on both sides of each transaction: on behalf of RGHI, he signed the documentation for each loan to RGHI and, with one exception, on behalf of Refco Group, he also signed the guarantees and indemnities. The corresponding RCM loans to the customer were generally executed by Maggio, although Bennett executed one, and several were executed by another Refco executive.

30.     Between 2000 and 2005 – which included the period during which the THL Funds conducted due diligence and completed the 2004 Purchase – Mayer, Brown was involved in multiple facets of the 17 sham round-trip loan transactions that Bennett orchestrated to hide the RGHI Receivable and misrepresent Refco's true financial condition. Mayer, Brown partners and associates created and shaped the underlying documentation, negotiated the terms of

the loan documents with the loan participants or their counsel, transmitted the documents to Refco and to the loan participants, and retained and distributed copies of the executed loan documents. On at least two separate occasions, Mayer, Brown sent the loan participants confirmations that the loans had been unwound, endorsing the promissory notes as "paid in full." The work performed by these Mayer, Brown attorneys was undertaken in the ordinary course of their employment at Mayer, Brown and in furtherance of Mayer, Brown's business.

       31.    The following summarizes the 17 sham round-trip loan transactions that Refco engaged in with unrelated entities to hide the RGHI Receivable and thereby mask Refco's true financial condition from financial institution lenders, regulators, potential investors (such as the THL Funds) and the public, and provides examples of the material assistance that Mayer, Brown provided in connection therewith. Each of these transactions was structured as described in ¶¶ 26-29, above:

       (a)    On or about February 25, 2000, Bennett, Refco Chief Financial Officer Rob Trosten ("Trosten") and/or Refco Executive Vice President Santo Maggio ("Maggio") caused Refco to engage in a $150 million sham loan transaction with CIM Ventures, Inc. ("CIM Ventures"), an Ingram Micro, Inc. ("Ingram") subsidiary, which was unwound on March 9, 2000. A Mayer, Brown lawyer prepared and sent to Ingram's corporate treasurer on February 4, 2000 drafts of the loan agreements and an indemnity letter from RGHI, prepared and forwarded to Ingram on February 11, 2000 revised drafts reflecting Ingram's comments, communicated with Ingram and Refco concerning the transaction and, in connection with the unwinding of the loans, transmitted the original promissory note that the customer had signed, which the Mayer, Brown lawyer endorsed as "paid in full." Mayer, Brown plainly understood the mechanics of the transaction – on

February 22, 2000, Ingram sent the Mayer, Brown lawyer a letter summarizing and detailing how the transaction was to work. Collins was also involved in the transaction, discussing with Refco officials the nature and form of the loans and working with his Mayer, Brown colleague on the loan documents.

(b)     On February 25, 2000, Bennett, Trosten and/or Maggio caused Refco to engage in a $110 million sham round-trip loan transaction with CS Land Management, LLC ("CS Land") that was unwound on March 3, 2000. The same Mayer, Brown lawyer again handled the transaction documents, sending drafts to the customer and its counsel on February 24, 2000 and the final executed versions four days later. On February 23, 2000, Collins discussed with Maggio and a Mayer, Brown colleague how to respond to CS Land's request for an enforceability opinion. As with the CIM Ventures round-trip transaction, after the close of Refco's reporting period, the same Mayer, Brown lawyer sent CS Land a copy of its note payable to RCM which he had endorsed as "Paid in Full – March 3, 2000."

(c)     On February 25, 2000, Bennett, Trosten and/or Maggio caused Refco to engage in a $50 million sham round-trip loan transaction with EMF Core Fund ("EMF") that was unwound on March 3, 2000. The transaction documents were handled by the same Mayer, Brown lawyer.

(d)     On February 23, 2001, Bennett, Trosten and/or Maggio caused Refco to engage in a $250 million sham round-trip loan transaction with CIM Ventures that was unwound on March 6, 2001. Once again, the same Mayer, Brown lawyer handled the transaction documents and negotiated terms with the customer's outside counsel. Collins understood how the transaction was to work. Indeed, on February 16,

2001, Ingram sent Collins a letter confirming the details and mechanics of the transaction. After the transaction was unwound, Collins was copied on the transmittal of the original promissory note to CIM Ventures marked "paid in full."

(e)    On February 26, 2001, Bennett, Trosten and/or Maggio caused Refco to engage in a $200 million round-trip loan transaction with Delta Flyer, Inc. ("Delta Flyer") that was unwound on March 2, 2001. Mayer, Brown associate Paul Koury, who would subsequently be involved in Mayer, Brown's representation of Refco in connection with the 2004 Purchase, negotiated and handled the transaction documents. Trosten executed the guaranty and indemnity on behalf of RGL.

(f)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $175 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2002. Koury handled the documentation and sent the final executed documents to Delta Flyer on February 26, 2002.

(g)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $125 million round-trip loan transaction with Beckenham Trading Company, Inc. ("Beckenham") that was unwound on March 4, 2002. Mayer, Brown's Koury drafted and handled the transaction documents and forwarded them to Beckenham for its review and execution using the interstate wires or mails.

(h)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $325 million round-trip loan transaction with Liberty Corner Capital Strategies, LLC ("Liberty Corner") that was unwound on March 4, 2002. This was the first of ten such round-trip loan transactions that Refco undertook with Liberty Corner. Maggio and another Refco employee approached Liberty Corner in early February 2002

about a round-trip loan transaction and directed Liberty Corner to Koury. Koury handled the documentation, e-mailing drafts to Liberty Corner on February 14, 2002. The documentation finally agreed upon for this transaction was used as a model for the subsequent Liberty Corner round-trip loans, most of which Koury handled. Although Koury was the principal Mayer, Brown attorney on these transactions, Collins knew of Koury's work on the round-trip loan transactions – for example: (i) on September 27, 2004, Collins sent Refco a bill for work performed during August 2004 which included "preparation of loan agreement, indemnification and guaranty for Liberty Corner," and (ii) Collins was copied on a May 20, 2005 Koury e-mail to Maggio attaching "documents for use in connection with the loans for" Liberty Corner. The e-mail's text included a brief list of the loan documents and the existence of the guaranty and indemnity letter as well.

       (i)      On February 21, 2003, Bennett, Trosten and/or Maggio caused Refco to engage in a $150 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2003. Koury again handled the loan documents.

       (j)      On or about February 21, 2003, Bennett, Trosten and/or Maggio caused Refco to engage in a $500 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2003. Mayer, Brown handled the loan documents.

       (k)      On February 20, 2004, Bennett, Trosten and/or Maggio caused Refco to engage in a $720 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2004. Mayer, Brown handled the loan documents.

(l)      On May 27, 2004, Bennett, Trosten and/or Maggio caused Refco to engage in a $700 million round-trip loan transaction with Liberty Corner that was unwound on June 7, 2004.  This transaction, which was handled by Koury, occurred simultaneously with the drafting and negotiating of the Equity Purchase and Merger Agreement (the "Agreement") for the 2004 Purchase by the THL Funds, which was executed on June 8, 2004.  At the same time that Mayer, Brown was handling this transaction, and during the ten-day period that this transaction was in place, Koury sent WGM draft disclosure schedules that did not disclose the existence of this $700 million round-trip loan transaction.  And other Mayer, Brown attorneys exchanged drafts of the Agreement with WGM that contained representations that no undisclosed related-party transactions or arrangements existed between Refco and RGHI.  These representations were false and misleading.  In fact, the very loan transactions that Koury was handling were themselves related-party transactions and rendered the draft schedules he was sending WGM false and misleading.

(m)      On August 25, 2004, Bennett and/or Maggio caused Refco to engage in a $485 million round-trip loan transaction with Liberty Corner that was unwound on September 7, 2004.  Mayer, Brown handled the loan documents.

(n)      On November 26, 2004, Bennett and/or Maggio caused Refco to engage in a $545 million round-trip loan transaction with Liberty Corner that was unwound on December 3, 2004.  Mayer, Brown handled the loan documents.

(o)      On December 30, 2004, Bennett and/or Maggio caused Refco to engage in a $550 million round-trip loan transaction with Liberty Corner that was unwound on or about January 5, 2005.  Mayer, Brown handled the loan documents.

(p)    On February 23, 2005, Bennett and/or Maggio caused Refco to engage in a $345 million round-trip loan transaction with Liberty Corner that was unwound on March 8, 2005.  Mayer, Brown handled the loan documents.

(q)    On May 25, 2005, Bennett and/or Maggio caused Refco to engage in a $450 million round-trip loan transaction with Liberty Corner that was unwound on or about June 6, 2005.  This transaction occurred as Refco was preparing for the Initial Public Offering of common stock (the "IPO").  Koury handled the loan documents and Collins received copies of the documents on May 20, 2005.

(r)    Each of the foregoing transactions involved, and was furthered by, at least the use of interstate or foreign wires, if not also the use of interstate or foreign mail, in order to transmit draft and final loan documentation, transmit comments on loan documentation, transfer funds and communicate about the transactions.

32.    Mayer, Brown understood that the round-trip loan transactions, for which it provided material assistance, affected Refco's financial statements, lacked any proper business purpose and were undisclosed related-party transactions because, among other things, Mayer, Brown:  (i) negotiated and drafted virtually all the documentation for the 17 round-trip loan transactions and understood that each entailed the short-term risk-free lending of hundreds of millions of dollars; (ii) knew that these round-trip loans, with one exception, were undertaken only at times that straddled Refco's financial reporting periods, and knew that these loans changed from being made annually to being made quarterly in anticipation of the 2004 Purchase so as to undertake the bond offering and comply with the covenants in the Agreement to supply certain quarterly information; (iii) understood that these transactions caused the RGHI related-party receivable to be removed from Refco's books and records at the time that financial

statements were being prepared and then to reappear immediately thereafter, only to disappear yet again at the time of the next annual audit or quarterly statement; (iv) was aware of Bennett's involvement on both sides of these transactions, signing the guarantee and indemnification on behalf of Refco and the loan documents on behalf of RGHI; and (v) knew that these transactions lacked any proper business purpose. Mayer, Brown witnesses interviewed by the Refco Bankruptcy Examiner stated that they were not aware of any business purpose for these transactions at the time they prepared the documentation, nor could they articulate one at the time of their interviews. And Mayer, Brown understood that the loans by which RGHI temporarily paid down its debt, the Refco corporate guarantees of the customer loans to RGHI, and the subsequent re-assumption of the debt by RGHI each constituted a related party transaction that needed to be disclosed, but was not.

**The THL Funds' Due Diligence**

33.    In or about the fall of 2003, Plaintiffs began to explore the possibility of purchasing an interest in Refco. In connection with this potential purchase, the THL Funds undertook an exhaustive due diligence process, with the assistance of their affiliates and numerous professional advisors over the course of more than nine months. Thomas H. Lee Partners L.P. ("THL Partners") personnel performed intensive due diligence for this investment, including dozens of meetings and conference calls with Company management and outside advisors. This effort was led by senior partners of THL Partners.

34.    In addition to dedicating personnel from THL Partners, a number of professional advisors were retained. KPMG LLP was engaged to conduct accounting due diligence, including an assessment of Refco's financial statements and a review of certain work papers of Grant Thornton, the Company's independent public accountants, and to perform

information technology-related diligence.  WGM was engaged to perform legal and regulatory

diligence, and McKinsey & Company was hired to conduct customer surveys across Refco's

business lines and to analyze and forecast industry growth.  Sandler O'Neill, an investment firm

specializing in financial services companies, analyzed Refco's position within the market, Marsh

& McLennan assessed risk management and the adequacy of insurance, and Mercer Human

Resource Consulting reviewed human resource issues.  And an investigative agency was

engaged to explore the backgrounds of Bennett and certain other members of Refco's senior

management so that they could be assured of their integrity and honesty.  The diligence took

some nine months. In performing that diligence, Plaintiffs and their advisors relied substantially

on the several years of Refco audited financial statements that Bennett and Trosten caused to be

provided to them.  These financial statements were materially false and misleading as a result of

the fraudulent schemes perpetrated by Bennett and his co-conspirators.

     35.     Mayer, Brown represented Refco Group, RGHI, and Bennett in

connection with the 2004 Purchase.  Among other things, Mayer, Brown handled the drafting

and negotiating of the transaction documents and played a central role in the extensive diligence

process undertaken by the THL Funds, providing information directly to the THL Funds and

their advisors and coordinating access to documents and information being provided by Refco

and its affiliates as well as Bennett.  At the direction of, and in coordination with Bennett and

Trosten, Mayer, Brown attorneys communicated frequently with the THL Funds' counsel

regarding the diligence process for the 2004 Purchase using interstate wires.

     36.     It was understood that during the diligence process Mayer, Brown and

Collins would be providing information to the THL Funds upon which Plaintiffs would rely in

deciding whether to proceed with the 2004 Purchase.  In this capacity, Mayer, Brown would not

be serving merely as a conduit for information from Refco management and Bennett, but would be drawing from its own extensive knowledge and information built up over the many years that Collins and his Mayer, Brown colleagues had been working with Refco.

37.   Consistently with these understandings, Mayer, Brown attorneys had extensive direct contact with the THL Funds and their representatives. For example, Collins attended two face-to-face meetings in New York with representatives of the THL Funds and WGM lawyers in April 2004 in connection with preparation of the Letter of Intent. And Collins and other Mayer, Brown attorneys participated regularly in conference calls and engaged in e-mail communications employing the interstate wires on an almost daily basis as the transaction neared closing.

**The THL Funds' Focus on Related-Party Transactions**

38.   Of critical importance to the THL Funds during the diligence process was to identify and eliminate any related-party transactions and arrangements, in particular dealings between the Company and its senior management (and their affiliates), which necessarily included RGHI. Early in the diligence process, Refco disclosed to the THL Funds that RGHI owed Refco approximately $108 million as a result of a loan made to RGHI by the Company. The THL Funds insisted that this loan be paid off before closing and specifically negotiated a mechanism to do so contained in the Letter of Intent. This was the only related-party transaction involving Bennett or RGHI that Refco or Mayer, Brown disclosed to the THL Funds.[4] Refco and Bennett, with Mayer, Brown's knowledge, agreed that the $108 million loan would be repaid and it was.

---

[4] References in this Complaint to the RGHI Receivable and to related-party transactions between RGHI and Refco do not include this $108 million shareholder loan.

39.    Bennett and the THL Funds addressed this matter during a face-to-face meeting held in New York City in April 2004. Collins attended this meeting, and represented Refco, RGHI, and Bennett in the subsequent drafting of the Letter of Intent, including the provision requiring the $108 million to be paid off before closing and the provision that no related-party transactions would remain at closing. Representatives of the THL Funds traveled to New York City from Boston for this meeting and two WGM partners traveled to the meeting, one from Dallas and one from Boston. This meeting followed another New York negotiating session attended by Collins, Bennett, WGM partners and representatives of the Plaintiffs.

40.    Mayer, Brown and Collins at all times knew the importance that the THL Funds placed on identifying and eliminating related-party transactions. The Letter of Intent, which Mayer, Brown negotiated on behalf of the sellers, specifically provided that Plaintiffs have "based [their] proposal on the following assumptions and understandings ... any existing shareholder loans will be terminated prior to Closing and funded with cash otherwise payable to the Sellers, and all existing agreements, contracts or arrangements between the Company and the Sellers or their affiliates will be terminated (other than employment obligations to [Bennett] and indemnification obligations owed to the Sellers in their capacities as directors or officers of the Company...." Collins himself was personally involved in reviewing and providing comments on drafts of the Letter of Intent, and personally negotiated its terms with the THL Funds and their counsel.

41.    In addition to requesting information and documentation concerning all related-party transactions or arrangements, particularly those involving RGHI and Bennett, from the very outset of the diligence process, the THL Funds also requested copies of all material contracts to which Refco was a party and any agreements under which Refco had incurred

indemnification obligations to other persons.  While they both constituted material contracts and contained Refco indemnification obligations, none of the sham round-trip loan transaction documents were ever provided.

### Bennett and His Co-Conspirators Repeatedly Deceive the THL Funds

42.    Although disclosure of the loan transactions that Bennett was orchestrating were plainly called for by the THL Funds' requests for information, none of the transactions were disclosed to the THL Funds or their representatives.  In fact, none of the round-trip loan transaction documents that Mayer, Brown negotiated and prepared were included in the data room that was made available to the THL Funds during the diligence process.  Rather, Bennett, RGHI and others, including Trosten and Maggio, intentionally and deliberately concealed the existence of these sham transactions from the THL Funds and provided materially false and misleading information regarding Refco's financial condition and the accuracy of Refco's financial statements.  Bennett and his co-conspirators did so to induce the THL Funds to purchase a majority interest in Refco.

43.    In connection with the 2004 Purchase, Bennett, Trosten and Maggio, with the knowledge of Mayer, Brown, made repeated false and misleading statements to the THL Funds and omitted to state material facts, including the following:

a.    During the diligence process, Bennett and Trosten caused Refco's audited financial statements to be provided to Plaintiffs.  Those audited financial statements were false and misleading because, among other things, they failed to disclose or take into account the true nature of the RGHI Receivable, the round-trip loan transactions which Bennett was orchestrating and on which Mayer, Brown was providing material assistance, and the guarantees and indemnification obligations incurred by Refco in connection therewith.

b.    On or about July 9, 2004, Bennett executed and transmitted to Plaintiffs an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect material interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates or another entity which had been the subject of a guarantee by Refco.  These representations were false because they did not disclose or account for the existence of the sham loan transactions or the RGHI Receivable.  In addition, Bennett falsely certified that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Bennett knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed or taken into account in that document.  He further agreed that he would notify the THL Funds of any misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them.  Bennett never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

c.    On or about July 2, 2004, Trosten executed and transmitted to Plaintiffs an officer's questionnaire in which he falsely certified, among other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Trosten knew that the sham loan transactions and the RGHI Receivable had not been disclosed or taken into account in that document. He further agreed that he would notify the THL Funds of any misstatement or omission

of material fact contained in those materials as soon as practicable after reviewing them. Trosten never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

        d.      On or about July 6, 2004, Maggio provided the THL Funds with an officer's questionnaire in which he falsely certified, among other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Maggio knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed in that document. He further agreed that he would notify the THL Funds of any misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Maggio never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

        e.      On or about March 30, 2004, Bennett told WGM partner Jay Tabor, during a conference call in which Trosten also participated, that no contracts or arrangements existed between the Company and Bennett, RGHI or his affiliates other than regarding his compensation arrangements, which was false – and which both Bennett and Trosten knew was false – because it intentionally ignored the RGHI Receivable and the round-trip loan transactions.

**Mayer, Brown's Repeated Lies to the THL Funds**

        44.      Mayer, Brown was aware, at all times relevant to the 2004 Purchase, that Refco had engaged in, and was engaging in, numerous related-party transactions with RGHI and further that these arrangements represented material corporate contracts that imposed significant obligations upon the Company, including corporate guarantees of RGHI's obligations as well as

indemnification obligations to the counterparties.  Mayer, Brown knew that the round-trip loan

transactions: (a) were not arm's-length transactions, (b) were themselves related-party

transactions, (c) covered up other related-party transactions, and (d) needed to be reported and

disclosed.  Nevertheless, Mayer, Brown did not disclose these material facts to the THL Funds

and, in fact, made or joined in representations to the contrary.

      45.     At no time during the due diligence process, despite extensive direct

contact between Mayer, Brown and the THL Funds, did Collins, or any other Mayer, Brown

attorney disclose to the THL Funds or any of their representatives, the existence of either: (i) the

sham round-trip loan transactions that Mayer, Brown had negotiated and with respect to which

Mayer, Brown had provided material assistance, or (ii) the related-party RGHI Receivable.

Rather, Mayer, Brown repeated representations that Mayer, Brown knew were false to the THL

Funds and their representatives that no related-party transactions or arrangements existed

between Refco, Bennett, and his affiliates, including RGHI, and otherwise misled Plaintiffs.

      46.     During a telephone conference on due diligence issues in March 2004,

Collins represented to WGM partner Jay Tabor that he had confirmed with Bennett that, other

than Bennett's compensation arrangements, no other undisclosed contracts or arrangements

existed between Refco and Bennett, RGHI or other affiliates.  As Collins knew at the time, this

statement was false.  Nothing Bennett said to Collins could erase the fact that Mayer, Brown

knew about and directly participated in contracts and arrangements between Refco and RGHI

and that Mayer, Brown knew those transactions had not been disclosed.

      47.     On May 6, 2004, in response to the THL Funds' repeated requests for all

material contracts, Collins sent by e-mail a memorandum, addressed to WGM, stating that:

"[w]e were advised by Refco Management that all material contracts were either in the Data