Room or are being produced in response to the requests in Exhibit C to the Letter of Intent." As Collins knew, this statement was false because none of the documents relating to the sham round-trip loan transactions were included in the data room or otherwise disclosed to the THL Funds.

48.    In a second e-mailed memorandum addressed to WGM, also dated May 6, 2004, Collins represented that "[w]e have been advised by Refco that there are no significant indemnification obligations which have not been disclosed already." Collins knew that this statement was false because none of the sham round-trip loan transactions – each of which contained indemnification obligations on the part of Refco – had been disclosed to the THL Funds or their representatives.

**The False and Misleading Equity Purchase Agreement**

49.    In addition, Mayer, Brown hid the sham round-trip loan transactions from the THL Funds in other ways, in particular by negotiating and preparing documents that contained representations that they knew to be false and misleading.

50.    Given the importance of related-party transactions to the THL Funds, Plaintiffs negotiated for, and obtained from the sellers, a series of contractual representations in the Agreement, executed on June 8, 2004, that Refco's financial statements were accurate and that there were no related-party transactions. These representations were critical to the THL Funds' decision to proceed with the transaction. Mayer, Brown handled the negotiating and drafting of the Agreement for Refco, RGHI, and Bennett.

51.    Although fully aware of the sham loan transactions and the materiality of the hidden related-party transactions, Mayer, Brown and Collins negotiated, drafted, and reviewed the Agreement, which contained the following representations and warranties, among others:

(a)     That Refco's books and records had been maintained in accordance with applicable accounting requirements, reflected only bona fide transactions, and were complete and correct;

(b)     That Refco's financial statements "present fairly in all material respects the consolidated financial position, results of operations and cash flows" and "are in conformity with" GAAP;

(c)     That, except for certain operating guarantees of obligations of subsidiaries made in the ordinary course of business, Refco did not have any undisclosed debt, guaranty, liability, claim or obligation of any nature;

(d)     That, except as disclosed on Schedule 3.10, Refco did not have any liabilities or obligations that should have been shown on a balance sheet;

(e)     That, except as disclosed on Schedule 3.12, "since March 1, 2003, no officer, manager, director or member of the Company or any Subsidiary, or any Affiliate of any such officer, director, member or other equity holder has had, either directly or indirectly, a material interest in any contract or agreement to which the Company or any Subsidiary is a party or by which any of their properties or assets may be bound or affected except for employment contracts entered into on an arm's length basis"; and

(f)     That, except as set forth on Schedule 3.15, Refco was not a party to or bound by any agreement or indenture with any third party imposing a Lien on any of the Company's or any Subsidiary's assets or relating to the incurrence, assumption or guarantee of any indebtedness for borrowed money, except for indebtedness for borrowed money for an amount less than $1,000,000.

The disclosure schedules accompanying the Agreement – including Schedules 3.10, 3.12 and 3.15 – did not disclose any of the sham loan transactions, even though their disclosure was plainly required by the Agreement.

52.     From the very outset of the negotiations, Mayer, Brown misled the THL Funds; in fact, Mayer, Brown prepared the first draft of the Agreement which contained a representation that stated no officer (or any affiliate thereof) "has had, directly or indirectly, a material interest in any contract or agreement to which the Company … is a party or by which any of their properties or assets may be bound or affected, except for contracts entered into on an

arm's-length basis and on terms and conditions customary in the market." Mayer, Brown knew

that these representations were false because they had drafted and negotiated the round trip

transactions in which Refco was a party and RGHI, a Bennett affiliate, had a material interest.

53.    In connection with the Agreement, at the direction of Bennett, Mayer,

Brown used the interstate wires, transmitting numerous drafts of the Agreements containing false

and misleading representations to the THL Funds and their representatives, including on the

following dates:

(a)    On May 7, 2004 at 9:02 p.m., a Mayer, Brown partner circulated a

revised draft of the Agreement by e-mail to multiple WGM attorneys as well as to 8 other

Mayer, Brown attorneys, including Collins, reflecting Mayer, Brown's comments on the

draft previously sent by WGM;

(b)    On May 25, 2004 at 11:19 a.m., a Mayer, Brown partner circulated

another mark-up of the Agreement draft by e-mail to multiple WGM attorneys with

copies to Bennett, Trosten, and 15 other Mayer, Brown attorneys, including Collins and

Koury;

(c)    On May 25, 2004 at 4:40 p.m., a Mayer, Brown partner distributed

additional comments on the draft Agreement to multiple WGM attorneys with copies to

Bennett, Trosten and 15 other Mayer, Brown attorneys, including Collins and Koury; and

(d)    On May 30, 2004 at 8:56 p.m., a Mayer, Brown partner circulated

an updated draft of the Equity Purchase and Merger Agreement to multiple WGM

attorneys, Bennett, Trosten and 17 other Mayer, Brown attorneys, including Collins and

Koury stemming from a telephone conference earlier that day.

54.    Similarly, the final Refco Disclosure Schedules, prepared by Refco and Mayer, Brown, that accompanied the executed copy of the Agreement did not disclose the sham round-trip loan transactions, although they were sent to the THL Funds by Koury, the very same Mayer, Brown associate who was then handling the round-trip loan transactions. Indeed, the final version of Schedule 3.12, which was supposed to list all related-party transactions and arrangements, contained only the single word "none."

55.    While drafting the Disclosure Schedules at the direction of Bennett, Mayer, Brown used the interstate wires, transmitting numerous drafts of the Schedules – none of which accurately disclosed the RGHI Receivable or the sham loan transactions – to the THL Funds by e-mail, including Disclosure Schedules that were transmitted to Plaintiffs on the following dates that did not include any mention of the round-trip loan transactions:

(a)    On May 25, 2004 at 9:42 p.m., Paul Koury sent an e-mail attaching Mayer, Brown's initial draft of the Disclosure Schedules to multiple WGM attorneys as well as to Bennett, Trosten and 16 other Mayer, Brown attorneys, including Collins, stating: "Attached please find our initial draft of the Schedules to the Equity Purchase Agreement. Please note that these Schedules are being delivered simultaneously to our client and internally at MBR&M for reviewed [sic] and are therefore subject to further comment";

(b)    On May 28, 2004 at 8:45 a.m., Paul Koury sent an e-mail attaching another draft of the Disclosure Schedules to multiple WGM attorneys as well as to Bennett, Trosten and 16 other Mayer, Brown attorneys, including Collins;

(c)    On June 2, 2004 at 9:32 p.m., Paul Koury sent an e-mail attaching another draft of the disclosure schedules to multiple WGM lawyers, as well as to Bennett,

Trosten, 16 other Mayer, Brown attorneys, including Collins, as well as counsel for the

banks negotiating the credit agreement and the initial purchasers of the Rule 144A bonds

to be issued in connection with the 2004 Purchase;

       (d)    On June 4, 2004 at 11:15 p.m., Paul Koury distributed an updated

draft of the Disclosure Schedules by e-mail to multiple WGM attorneys as well as to

Bennett, Trosten and 17 other Mayer, Brown attorneys, including Collins, as well as

counsel for the banks and the initial purchasers;

       (e)    On June 7, 2004 at 5:23 p.m., Paul Koury circulated an updated

draft of the Disclosure Schedules by e-mail to multiple WGM attorneys as well as to

Bennett, Trosten and 17 other Mayer, Brown attorneys, including Collins, as well as

counsel for the banks and the initial purchasers;;

       (f)    On June 8, 2004 at 9:42 a.m., Paul Koury distributed revised

"Final Schedules" by e-mail to multiple WGM attorneys as well as other Mayer, Brown

attorneys; and

       (g)    On June 8, 2004 at 12:16 p.m., Paul Koury sent a Dallas-based

WGM associate another version of the Final Disclosure Schedules by e-mail.

## The False and Misleading Offering Circular

    56.    Attorneys from Mayer, Brown played a substantial role in drafting the

Offering Circular for the bond offering that raised $600 million in connection with the THL

Funds' financing of the 2004 Purchase.  Mayer, Brown drafted the regulatory section of the

Offering Circular and commented on various other sections of the Offering Circular and

participated in drafting sessions at which the disclosures contained in the Offering Circular were

discussed and prepared.  Mayer, Brown was aware that the Offering Circular included customary

related party transaction and management sections which were intended to include disclosure

regarding transactions between Refco, its named executive officers and their respective affiliates. In addition, Mayer Brown was involved in the diligence conducted by the initial purchasers and other participants in the offering process conducted and was aware that the diligence materials provided to the THL Funds and their representatives were shared with the initial purchasers and their counsel.

57.     The round-trip loan transactions described above rendered portions of the Offering Circular false and misleading, including the financial statements contained therein. But during the preparation of the Offering Circular Mayer, Brown never disclosed to the THL Funds, the initial purchasers or their counsel the related-party transactions in which it had materially assisted, or otherwise that the firm possessed knowledge and information to the effect that the Offering Circular was false and misleading. By remaining silent throughout the drafting of the Offering Circular, Mayer, Brown misled the THL Funds.

**The 2004 Purchase Closes**

58.     Following completion of the THL Funds' due diligence efforts, on August 5, 2004, the 2004 Purchase closed and the THL Funds acquired from RGHI approximately a majority of the equity interests in Refco, for approximately $452 million in cash.

59.     During the course of the transaction, and at the time of the closing, the THL Funds were not aware of, and could not with reasonable diligence have learned of, the fraudulent actions of Bennett, Mayer, Brown, and others. The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them by Mayer, Brown and Collins during the due diligence process in deciding whether to proceed with the 2004 Purchase and invest $452 million in Refco. Had truthful and

complete information been provided by Mayer, Brown, the THL Funds would not have proceeded with the 2004 Purchase.

60.    Mayer, Brown's deception continued after the 2004 Purchase closed. Mayer, Brown was involved in both the spring 2005 registered Exchange Offer relating to the bonds issued in connection with the 2004 Purchase and Refco's August 2005 IPO.  Mayer, Brown was aware that the Offering materials included related party transaction and management sections which were intended to include disclosure regarding transactions between Refco, its named executive officers and their respective affiliates.  Although Bennett continued to orchestrate, and Mayer, Brown continued to provide material assistance with respect to, these sham round-trip loan transactions, at no time did Mayer, Brown:  (a) disclose the existence of the RGHI Receivable or the sham round-trip loan transactions, or (b) advise the THL Funds, the Company's Board of Directors, its public investors, or the other participants in these offerings that the offering materials were false and misleading because they did not disclose, or take into account, the existence of the very round-trip loan transactions Mayer, Brown was documenting for Refco.

61.    Rather, Mayer, Brown continued to conceal the round-trip loan transactions, remaining silent throughout this time period, allowing the Company to file with the Securities and Exchange Commission ("SEC") and otherwise publicly disseminate what Mayer, Brown knew to be false and misleading materials.  By remaining silent throughout the drafting of these filings, Mayer, Brown misled the THL Funds, the Company's public investors and others.

**The Fraud is Revealed**

62.    In early October 2005, members of the Board of Directors of Refco Inc. (including the THL Funds' designees) learned for the first time of the existence of an approximately $430 million obligation that RGHI owed to Refco.  The Audit Committee of the

Board of Directors immediately began an internal investigation into Bennett's actions, retaining independent counsel and a forensic accounting firm. The Company also contacted the SEC, CFTC and other regulatory bodies to report the wrongdoing. Although Mayer, Brown was counsel to the Company, Mayer, Brown concealed from its client what it knew about the sham loan transactions and the related-party transactions.

63.     On October 10, 2005, Refco issued a press release announcing Bennett's manipulation of the Company's financial statements. After the Audit Committee consulted Refco's independent accountants, Refco further announced that the Company's financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005 and May 31, 2005, taken as a whole, should no longer be relied upon. Shortly thereafter, Bennett was arrested and Trosten and former Refco executive Tone Grant have since been indicted in connection with the scheme.

64.     After these developments, Refco's stock price declined precipitously and the NYSE ultimately halted trading. On October 17, 2005, Refco and certain of its subsidiaries or affiliates filed for Chapter 11 bankruptcy protection. Refco's common stock has been delisted and the securities purchased by the THL Funds in the 2004 Purchase are now worthless. As a result of Mayer, Brown's actions, the THL Funds have suffered actual damages in an amount to be determined at trial, including, but not limited to, the $245 million dollars they have already lost on the 2004 Purchase.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

65.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 64 inclusive, as if fully set forth herein.

66.     Mayer, Brown carried out, by use of instrumentalities of interstate commerce and/or of the mails, a plan, scheme and course of conduct, pursuant to which it intended to deceive the THL Funds by concealing adverse material information about the business, operations and future prospects of Refco in connection with the Plaintiffs' acquisition and purchase of Refco Group securities. In furtherance of this plan, scheme and course of conduct, Mayer, Brown took the actions described at length above.

67.     Mayer, Brown, employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the THL Funds in order to defraud and mislead the THL Funds as to Refco's true financial condition and thereby induce the Plaintiffs to acquire and purchase Refco securities in the 2004 Purchase at an artificially inflated price.

68.     Mayer, Brown knew and intended that the THL Funds would rely, and had a right to rely, on the repeated statements of material facts and omission of material facts, and false statements provided in the course of the diligence process, and knew that they were material and essential to the THL Funds' decision to make the investment. Mayer, Brown knew, based on its work on the sham round-trip loan transactions and on its access to Refco information, that the information Mayer, Brown provided to the THL Funds for their guidance and benefit in connection with the 2004 Purchase was materially false and misleading.

69.     Mayer, Brown engaged in the conduct described above knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs.

70.     Plaintiffs reasonably and justifiably relied on the integrity of the financial and business information provided by Mayer, Brown – and to their detriment – entered into the

2004 Purchase, investing $452 million in Refco. If Plaintiffs had known of the falsity of the

material facts represented to them or of the information intentionally withheld from them, or had

the fraudulent conduct engaged in by Mayer, Brown not occurred, they would not have so acted.

71.    Upon the disclosure of the true facts which had been misrepresented or

concealed as alleged herein, Refco's stock price declined precipitously, losing over $1 billion in

market capitalization.

72.    By virtue of the foregoing, Mayer, Brown knowingly or recklessly

violated, and is liable as a primary violator under Section 10(b) of the Exchange Act and Rules

10b-5(a) and 10b-5(c) promulgated thereunder in that it employed devices, schemes and artifices

to defraud and engaged in practices and a course of business that operated as a fraud or deceit

upon Plaintiffs.

73.    As a direct and proximate result of the wrongful conduct of Mayer,

Brown, Plaintiffs have suffered actual economic loss, incurring monetary damages in connection

with the 2004 Purchase in an amount to be determined at trial, but that is in excess of $245

million, plus interest.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

74.    Plaintiffs repeat and reallege each of the allegations contained in

paragraphs 1 through 73 inclusive, as if fully set forth herein.

75.    Mayer, Brown made untrue statements of material fact or omitted to state

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, by use of instrumentalities of interstate commerce

and/or of the mails, in order to allow Refco securities to be sold at an artificially inflated price.

76.    Mayer, Brown knowingly or recklessly made false and misleading statements of material fact or omitted to state material facts which it knew, or was reckless in failing to know, were false and misleading or were rendered misleading and inaccurate by the failure to disclose material information or provided, prepared or directed the provision of information during the due diligence process that was materially false or misleading and failed to disclose material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in order to defraud and mislead the THL Funds as to Refco's true financial condition and thereby induce the Plaintiffs to acquire and purchase Refco securities from RGHI in the 2004 Purchase.

77.    Mayer, Brown knew and intended that the THL Funds would rely, and had a right to rely, on the repeated statements of material facts and omission of material facts, and false statements provided in the course of the diligence process, and knew that they were material and essential to the THL Funds' decision to make the investment. Mayer, Brown knew based on the material assistance it provided in connection with the sham round-trip loan transactions and based on its access to Refco information that the information Mayer, Brown provided to the THL Funds for their guidance and benefit in connection with the 2004 Purchase was materially false and misleading.

78.    Mayer, Brown engaged in the conduct described above knowingly or intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs.

79.    When the foregoing representations were made, and the misleading financial statements and information provided, the Plaintiffs believed them to be true and complete in all material respects, and acted reasonably and justifiably in reliance thereon – and to

their detriment – entered into the 2004 Purchase, investing $452 million in Refco.  If Plaintiffs had known of the falsity of the material facts represented to them or of the information intentionally withheld from them, or had the fraudulent conduct engaged in by Mayer, Brown not occurred, they would not have so acted.

80.    Upon the disclosure of the true facts which had been misrepresented or concealed as alleged herein, Refco's stock price declined precipitously, losing over $1 billion in market capitalization.

81.    By virtue of the foregoing, Mayer, Brown knowingly or recklessly violated, and is liable as a primary violator under, Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that it made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

82.    As a direct and proximate result of the wrongful conduct of Mayer, Brown, Plaintiffs have suffered actual economic loss, incurring monetary damages in connection with the 2004 Purchase in an amount to be determined at trial, but that is in excess of $245 million, plus interest.

### THIRD CLAIM FOR RELIEF
### (RICO – Conspiracy to violate 18 U.S.C. §1962(c),
### in violation of 18 U.S.C. §1962(d))

83.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 64 inclusive, as if fully set forth herein.

84.    At all times relevant to this Complaint, Refco was an "enterprise" within the meaning of 18 U.S.C. §1961(4), as it was a Delaware corporation or Delaware limited liability company with its headquarters in New York City, New York.  Refco provided execution

and clearing services for exchange-traded derivatives to customers throughout and outside the United States, provided brokerage services in the fixed income and foreign exchange markets for customers throughout and outside the United States, and engaged in trading on its own behalf in the securities and instruments of or offered by entities throughout and outside the United States. As a result of these and other business activities of Refco, at all times relevant to this Complaint, Refco engaged in interstate and foreign commerce and its activities affected interstate and foreign commerce.

85.    At all times relevant to this Complaint, Bennett, Trosten and Maggio (the "Refco Operators") were "persons" within the meaning of 18 U.S.C. §1961(3) as they were individuals capable of holding a legal or beneficial interest in property. As alleged in greater detail in the preceding paragraphs, each Refco Operator was (a) employed by and associated with Refco and (b) conducted and participated in the conduct of Refco's affairs. For example, and without limiting the other allegations in this Complaint of their employment by, association with, and participation in the conduct of Refco:

(a)    At all times relevant to this Complaint, Bennett was the President and Chief Executive Officer of Refco and had a substantial indirect ownership interest in Refco. Through his formal positions with Refco and otherwise, Bennett was involved in managing Refco's affairs, including being directly involved in the loan transactions used to conceal the RGHI Receivable and in making false representations to the THL Funds about the related-party transactions between RGHI and Refco as well as the financial commitments and condition of Refco.

(b)    Trosten held positions at Refco from the 1990s through August 2004, including serving as Chief Financial Officer of Refco from in or about May 2001 until in

or about August 2004. Through his formal positions with Refco and otherwise, Trosten was involved in managing Refco's affairs, including being directly involved in the transactions used to conceal the RGHI Receivable and in making false representations to the THL Funds about the related-party transactions between RGHI and Refco as well as the financial commitments and condition of Refco.

(c) At all times relevant to this Complaint, Maggio was a Senior Vice President of Refco and the President and Chief Executive Officer of Refco's broker/dealer subsidiary, Refco Securities, LLC. Maggio also was President of another Refco subsidiary, Refco Capital Markets, from 2001 until in or about October 2005. Through his formal positions with Refco and otherwise, Maggio was involved in managing Refco's affairs, including being directly involved in the transactions used to conceal the RGHI Receivable and in making false representations to Plaintiffs about the related-party transactions between RGHI and Refco.

86.    As alleged in greater detail in the preceding paragraphs and as set forth in the Indictment against Bennett, Trosten and another Refco executive, each Refco Operator conducted and participated in the conduct of Refco's affairs through racketeering activities – namely, wire fraud in violation of 18 U.S.C. §1343, mail fraud in violation of 18 U.S.C. §1341, financial institutions fraud in violation of 18 U.S.C. §1344, and money laundering in violation of 18 U.S.C. § 1957. For example, and without limiting the other allegations in this Complaint of the Refco Operators' racketeering activities:

(a) The Refco Operators conceived of, negotiated, effectuated and directed others to effectuate the loan transactions for the purposes of concealing the RGHI Receivable from regulators and financial institutions and so that Refco's financial

statements, which the Refco Operators and their co-conspirators used to induce third parties such as the THL Funds to invest in Refco, would disguise the RGHI Receivable and Refco's true financial condition. These transactions were furthered by the use of the interstate and/or foreign wires, if not also the interstate and/or foreign mail, as documents relating to the transactions were communicated to the various participants through at least the interstate and/or foreign wires, if not also the interstate and/or foreign mail.

(b)  The Refco Operators transmitted or caused others to transmit the materially false financial statements that did not accurately reflect the RGHI Receivable and Refco's true financial condition (because of, among other things, the transactions) to third parties, including one or more financial institutions that loaned money to Refco and potential investors such as the THL Funds, through at least the interstate wires, if not also the interstate mail.

(c)  The Refco Operators transmitted or caused others to transmit through the interstate wires materially false information about the financial condition of Refco, Refco's related-party transactions, and the RGHI Receivable to the THL Funds or their representatives to induce the THL Funds to invest in Refco. They caused Refco's materially false financial statements to be transmitted to the THL Funds knowing that those statements did not accurately reflect (among other things) Refco's financial condition or the RGHI Receivable.

(d)  Each Refco Operator transmitted or caused to be transmitted to the THL Funds through the interstate wires an officer's questionnaire in which he falsely represented that he was not aware of any material fact concerning Refco's business and operations that was not accurately disclosed in specified offering materials while

knowing that those materials did not accurately disclose (among other things) the RGHI

Receivable or the related-party transactions in which Refco was involved.

       (e) As set forth in the Indictment, Bennett and Trosten engaged or caused

others to engage in the wire fraud, financial institution fraud and money laundering

activities alleged therein.

       87.    As alleged in greater detail in the preceding paragraphs, the foregoing

racketeering activities by the Refco Operators constitutes a pattern of racketeering activity within

the meaning of 18 U.S.C. § 1961(5).  For example, and without limiting the other allegations in

this Complaint of the Refco Operators' pattern of racketeering activities:

       (a) The wire, mail, and financial institution fraud of the Refco Operators

alleged in the preceding paragraphs involved multiple acts of racketeering activity within

the past ten years.

       (b) The wire, mail, and financial institution fraud of the Refco Operators

alleged in the preceding paragraphs began as early as February 1998 and continued

through at least October 2005.

       (c) These acts of racketeering were the regular way of operating Refco by

the Refco Operators.  On an annual basis from February 1999 through February 2005,

and on a quarterly basis from May 2004 through August 2005, the Refco Operators

engaged in the loan transactions for the purpose of concealing the RGHI Receivable and

the true financial condition of Refco from others, including at various times the THL

Funds, regulators, financial institutions, and the investing public.  The Refco Operators

also regularly and repeatedly made and caused to be made false statements to the THL

Funds or their representatives about Refco's financial condition and the existence and size of the RGHI Receivable.

(d) The very nature of these acts of racketeering implied a threat of continued criminal activity. The Refco Operators were regularly engaged in making or causing others to make false statements about Refco's financial condition and the size of the RGHI Receivable starting as early as 1999 and continuing through the discovery of their fraud in October 2005, and these false statements would have continued had it not been for their discovery by someone outside the Refco Operators' conspiracy in October 2005.

(e) There were a number of participants in the Refco Operators' fraudulent schemes, including not only the Refco Operators, but also (without limitation) other Refco employees, BAWAG, and the third parties who engaged in round-trip and wire transfer loans with Refco and RGHI.

(f) There were a substantial number of victims of the Refco Operators' fraudulent schemes. In addition to the THL Funds, other victims include the financial institutions that lent money to Refco, the investors who purchased Refco's debt securities, and the investing public who purchased Refco's equity securities.

88.    In summary, the Refco Operators conducted and participated in the conduct of Refco's affairs through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c).

89.    At all times relevant to this Complaint, Mayer, Brown was a "person" within the meaning of 18 U.S.C. § 1961(3) as it was an entity capable of holding a legal or beneficial interest in property.

90.    As alleged in greater detail in the preceding paragraphs, Mayer, Brown conspired with the Refco Operators to violate 18 U.S.C. §1962(c), all in violation of 18 U.S.C. § 1962(d).  For example, and without limiting the other allegations in this Complaint of Mayer, Brown's conspiracy with the Refco Operators, in violation of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c):

(a)  Mayer, Brown negotiated, participated in, and/or coordinated 17 Refco round-trip loan transactions, knowing that they did not have a legitimate business purpose, lacked economic substance, and were used to move the RGHI Receivable off of Refco's financial statements at the end of financial reporting periods.

(b)  In connection with the 2004 Purchase, Mayer, Brown made material false representations, facilitated material false representations to be made, and failed to disclose material truthful information to the THL Funds and their representatives about Refco's related-party transactions (including the existence of the round-trip loan transactions), Refco's material contracts and Refco's indemnification obligations.  Mayer, Brown knew these misrepresentations were false and the THL Funds relied on the representations to be true in deciding to effect the 2004 Purchase.

(c)  In connection with the 2004 Purchase, Mayer, Brown drafted and negotiated documents that contained false representations about Refco's related-party transactions (including the existence of the round-trip loan transactions), Refco's material contracts and Refco's indemnification obligations.  Mayer, Brown knew the representations were false and the THL Funds relied on those representations to be true in deciding to invest in Refco.

(d) In fact, during the period of due diligence for the 2004 Purchase, Mayer, Brown was handling a $700 million round-trip loan transaction to take place at the end of Refco's next financial reporting period (May 2004). This transaction was conducted to conceal the RGHI Receivable and Refco's true financial position from the THL Funds and others. Mayer, Brown never disclosed this transaction or the other round-trip loan transactions to the THL Funds or their representatives during the due diligence process.

91.    Through its participation in and facilitation of the racketeering activities of the Refco Operators, Mayer, Brown intended to further, agreed to further, and in fact did further the fraudulent schemes of the Refco Operators and was aware of the existence, if not the very identity, of the other participants in the fraudulent schemes and conspiracy.

92.    As alleged in greater detail in the preceding paragraphs, the THL Funds were directly injured in their business and property by reason of the violations of 18 U.S.C. § 1962 set forth above, and therefore are entitled under 18 U.S.C. § 1964(c) to damages in an amount to be determined, but that exceed $245 million, trebled, plus interest.

### FOURTH CLAIM FOR RELIEF
#### (Fraud)

93.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 82 inclusive, as if fully set forth herein.

94.    As set forth above, Mayer, Brown knowingly made untrue statements of material fact and/or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading and provided material false information to the THL Funds. Mayer, Brown knowingly failed to disclose to the THL Funds, despite repeated requests for such information, among other things, the existence of, and

the documentation relating to, the round-trip loan transactions and the underlying RGHI

Receivable. Having elected to speak, Mayer, Brown had a duty to tell the truth.

95.     Mayer, Brown acted intentionally with respect to these matters. Mayer,

Brown intended that the THL Funds rely on its statements and knew that they were material and

essential to the THL Funds' decision to proceed to close the August 2004 Purchase and these

statements were made for the purpose of inducing the THL Funds to make an equity investment

in Refco in August 2004.

96.     At the time the foregoing statements were made, and the information

provided the THL Funds believed them to be true and acted reasonably and justifiably in reliance

thereon to their detriment by entering into the 2004 Purchase. If the THL Funds had known of

the falsity of the material facts provided by Mayer, Brown, of the information Mayer, Brown

intentionally withheld despite requests for the information from the THL Funds or their

representatives, or the true state of Refco's financial affairs, they would not have so acted.

97.     Mayer, Brown's conduct caused the THL Funds actual injury, was

wrongful, without justification or excuse, and contrary to generally accepted standards of

morality. These acts and omissions were committed intentionally by Mayer, Brown with actual

malice, and with reckless, wanton, and willful disregard of the THL Funds' rights, representing

inequitable and unjustifiable conduct against which the public needs protection from similar acts.

98.     As a direct and proximate result of the fraud and deceit engaged in by

Mayer, Brown, and the THL Funds' justifiable reliance thereon, the THL Funds have suffered

monetary damages in an amount to be determined at trial, but that is in excess of $245 million,

plus interest.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

99.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 82 and 93 through 98 inclusive, as if fully set forth herein.

100.    At all relevant times, Mayer, Brown possessed a duty to act with due care, competence, fairly and in good faith toward the THL Funds in connection with its communications with the THL Funds and to completely, truthfully and accurately convey to Plaintiffs and their representatives material information and facts relating to Refco, including the existence of related-party transactions as requested by the THL Funds in the course of their due diligence as well as the existence of the RGHI Receivable. Having undertaken to provide the THL Funds with material information about such matters, Mayer, Brown had a duty to provide complete and truthful information and refrain from providing information it knew, or should have known, was false or misleading.

101.    Mayer, Brown, acting in the course of its business in connection with its work on the 2004 Purchase (for which Mayer, Brown was compensated and thereby possessed a pecuniary interest), provided the THL Funds with false and misleading information for the guidance and benefit of the THL Funds and failed to disclose to the THL Funds material information requested by the THL Funds or their representatives, all for the purpose of inducing the THL Funds to consummate the 2004 Purchase. Mayer, Brown failed to exercise reasonable care or competence in obtaining and communicating information to the THL Funds and in connection with their dealings with Plaintiffs and their representatives.

102.    Mayer, Brown's false and misleading statements were addressed directly to the THL Funds and their representatives, and were made without any disclaimers, assertions of privilege or other limitations. Mayer, Brown was aware that the information it provided

directly to the THL Funds and their representatives in the course of the transaction would be used by the THL Funds for the particular purpose of deciding whether to proceed with the 2004 Purchase, and that the THL Funds did in fact rely upon the oral and written representations described above in deciding to consummate the 2004 Purchase. The work performed by Collins, Koury, and others at Mayer, Brown on the sham round-trip loan transactions was within the scope and sphere of their authority as Mayer, Brown lawyers and was in furtherance of Mayer, Brown's business interests, and each had a duty to act upon and accurately report and disclose the information acquired during this work.

103.    Mayer, Brown held itself out as an expert on all things Refco, and it was understood that Mayer, Brown had a particularly close and special relationship with both Bennett and Refco that far exceeded that of the typical attorney-client relationship. Both Bennett and Collins fostered this perception, not only in their dealings with the THL Funds, but throughout the industries in which Refco operated. Given its long history of representing Refco, Mayer, Brown possessed unique and specialized knowledge and expertise with respect to the subject matter of its communications with the THL Funds. Mayer, Brown had superior information about Refco at all relevant times and repeatedly vouched for the information it (along with its Refco-affiliated clients) provided concerning related-party transactions, knowing that this information was critical to the THL Funds' willingness to consummate the 2004 Purchase.

104.    The THL Funds relied on Mayer, Brown's expertise and Mayer, Brown's statements were made with full knowledge of the reliance the THL Funds placed on its expertise and intimate knowledge of Refco and Refco's business dealings. Mayer, Brown was at all times aware that the information it provided and the representations it made to the THL Funds and their representatives would be relied upon and employed by the THL Funds in deciding to

proceed with the 2004 Purchase.  By communicating with representatives of the THL Funds and directly addressing correspondence and memoranda to them, Mayer, Brown engaged in conduct which evinced its awareness and understanding that the THL Funds would rely on the information provided to them.  Mayer, Brown at all times was aware of the material nature of such information and the importance the THL Funds placed on identifying all Refco related-party transactions and arrangements involving Bennett-affiliated entities such as RGHI.

105.     Refco CEO Bennett and CFO Trosten knew and expected that Mayer, Brown would communicate with the THL Funds throughout the diligence process, and specifically, that Mayer, Brown would provide the THL Funds with false and misleading information regarding the existence of related-party transactions, material corporate contracts, and Refco's indemnification obligations.  Bennett and Trosten expected and anticipated that Mayer, Brown would make representations and provide information to the THL Funds on Refco's behalf and doing so was very much within the intended scope of Mayer, Brown's services to its clients.  Bennett and Trosten were aware and fully intended that the THL Funds would rely upon the representations made, and information provided, by Mayer, Brown in deciding whether to proceed with their investments in Refco.

106.     Mayer, Brown's clients had no reasonable expectation of confidentiality regarding the existence of the round-trip loan transactions given that the documents were provided to and executed by unaffiliated third parties, and therefore could not be protected from disclosure as privileged communications.  Mayer, Brown never advised the THL Funds that it was precluded from providing complete and accurate information concerning related-party transactions because of the attorney-client privilege or other confidentiality obligation to its clients.

107.    Mayer, Brown's false and misleading representations caused the THL Funds to suffer pecuniary loss.  These representations by Mayer, Brown were intended to, and did in fact, influence the THL Funds' decision to proceed with the 2004 Purchase and thereby substantially affected the rights of the THL Funds.  The THL Funds justifiably and reasonably relied upon the information and representations given by Mayer, Brown, and as a result of such reliance, suffered pecuniary injury.  At the time the foregoing misrepresentations were made, the THL Funds believed them to be true and acted reasonably and justifiably in reliance thereon by making the 2004 Purchase.  If the THL Funds had known of the falsity of the material facts that were represented, or were aware of the information withheld from them, they would not have so acted.

108.    As a direct and proximate result of Mayer, Brown's conduct, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

WHEREFORE, the THL Funds demand judgment against Mayer, Brown as follows:

(a)    On the First, Second, Fourth and Fifth Claims for Relief, awarding the THL Funds damages against Mayer, Brown in an amount not less than $245 million, plus interest, to be determined at trial;

(b)    on the Third Claim for Relief, awarding the THL Funds damages against Mayer, Brown in an amount not less than $245 million, trebled, plus interest and attorneys' fees, to be determined at trial;

(c)    awarding the THL Funds exemplary damages against Mayer, Brown in an amount to be determined at trial;

(d)    awarding the THL Funds the costs and disbursements incurred in prosecuting this action, including a reasonable allowance for the fees and expenses of their attorneys and experts; and

(e)    granting such other and further legal and equitable relief as the Court may deem just and proper in these circumstances.

The THL Funds demand trial by jury of any and all issues so triable.

Dated:    New York, New York                    WEIL, GOTSHAL & MANGES LLP
          July 26, 2007

                                                By: _____
                                                    Greg A. Danilow (GD – 1621)

                                                767 Fifth Avenue
                                                New York, New York 10153
                                                (212) 310-8000

                                                Attorneys for Plaintiffs