UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                             :

THOMAS H. LEE EQUITY FUND V, L.P.,    :     07 Civ. 6767 (GEL)
THOMAS H. LEE PARALLEL FUND V, L.P., :
and THOMAS H. LEE EQUITY (CAYMAN)  :
FUND V, L.P.,                      :
                             :
             Plaintiffs,    :
      v.                    :
                             :
MAYER, BROWN, ROWE & MAW LLP,    :
                             :
            Defendant.    :
                             :
------------------------------------------------------------x

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF
## MAYER BROWN LLP, AN ILLINOIS LIMITED LIABILITY PARTNERSHIP

**WILLIAMS & CONNOLLY LLP**
725 Twelfth St., N.W.
Washington, DC  20005
Tel:   (202) 434-5000
Fax:  (202) 434-5029
*Attorneys for Mayer Brown LLP,*
*An Illinois Limited Liability*
*Partnership*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

FACTUAL BACKGROUND AND THE ALLEGATIONS IN THE COMPLAINT ................... 1

ARGUMENT ............................................................................................................ 6

I.      THE ALLEGED COMBINATION OF TWO LIMITED LIABILITY
        PARTNERSHIPS IS NOT A PROPER DEFENDANT ...................................... 7

II.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES
        FRAUD. ........................................................................................... 8

        A.      Count II Should Be Dismissed Because Plaintiffs Have Not Alleged
                Any Misrepresentations Made by Mayer Brown. ............................. 8

        B.      Plaintiffs' Claim Of "Scheme" Liability Cannot Salvage Their
                Securities Fraud Claims. ............................................................ 12

                1.      Plaintiffs' Claims of Material Omissions and
                        Misrepresentations Cannot Be Pled as a Violation of Rule 10b-
                        5(a) and (c). ................................................................ 13

                2.      Mayer Brown's Conduct in Documenting the Back-To-Back
                        Loans Cannot Give Rise to a Claim for Scheme Liability ........ 15

                3.      Count I Should Be Dismissed Under this Circuit's Cases
                        Regarding Scheme Liability. ........................................... 17

        C.      Plaintiffs Have Failed To Allege Facts Giving Rise to a Strong
                Inference of Scienter as to Any Mayer Brown Lawyer. ................. 20

        D.      Plaintiffs Have Not Properly Pled Reliance ................................. 25

III.    THE RICO CLAIM IS BARRED BY THE PSLRA. .................................. 27

IV.     THE RICO CLAIM IN ANY EVENT FAILS AS A MATTER OF LAW ........... 31

        A.      Plaintiffs Have Not Pleaded Agreement. ...................................... 32

        B.      Plaintiffs' RICO Conspiracy Claim Fails Because They Have Not
                Adequately Pleaded an Underlying RICO Violation. ...................... 34

V.      THE NEGLIGENT MISREPRESENTATION CLAIM IS BARRED BY THE
        MARTIN ACT AND IN ANY EVENT FAILS TO STATE A CLAIM. ............... 37

VI.     PLAINTIFFS' COMMON LAW FRAUD CLAIM UNDER NEW YORK
        LAW SHOULD BE DISMISSED. ................................................................................ 39

CONCLUSION ............................................................................................................................. 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..........18, 20, 26

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005)...............................14

*Bailey v. United States*, 516 U.S. 137 (1995) .............................................................................17

*Ballard v. Savage*, No. 92-840 JM (AJB), 1997 U.S. Dist. LEXIS 24013
    (S.D. Cal. Nov. 10, 1997) ...............................................................................34

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)........................................................................12, 25

*Berk v. Moore, Clayton & Co., Inc.*, No. 06 Civ. 2716 (LLS), 2006 WL 3616961
    (S.D.N.Y. Dec. 11, 2006).................................................................................38

*In re Carter-Wallace, Inc., Securities Litigation*, 220 F.3d 36 (2d Cir. 2000) ............................23

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001)...........................................38

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164
    (1994)................................................................................................... Passim

*Chanayil v. Gulati*, 169 F.3d 168 (2d Cir. 1999).......................................................................39

*In re Charter Communications, Inc. , Securities Litigation*, 443 F.3d 987 (8th Cir. 2006),
    *cert. granted sub nom. Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc.*,
    127 S. Ct. 1873...............................................................................................16

*Chill v. General Electric Co.*, 101 F.3d 263, 269 (2d Cir. 1996) ...............................................23

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999).............34, 35, 36

*Condict v. Condict*, 826 F.2d 923 (10th Cir. 1987) ....................................................................34

*Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435
    (E.D.N.Y. 1997)..............................................................................................34

*Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548
    (S.D.N.Y. Sept. 19, 2001)................................................................................38

*Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303 (S.D.N.Y. 2006) ...........................38, 39, 40

*Doehla v. Wathne Limited, Inc.*, No. 98 Civ. 6087 CSH, 1999 WL 566311
(S.D.N.Y. Aug. 3, 1999) ..................................................................................39

*In re Dynegy, Inc., Securities Litigation*, 339 F. Supp. 2d 804 (S.D. Tex. 2004).......................14

*Edmondson & Gallagher v. Alban Towers Tenants Assoc.*, 48 F.3d 1260 (D.C. Cir. 1995) ........36

*Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999) ...............................22

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189
(2d Cir. 2003)..................................................................................................26

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 236 F.R.D. 313 (S.D.
Tex. 2006), *rev'd, Regents of the Univ. of Cal. v. Credit Suisse First Boston
(USA), Inc.*, 482 F.3d 372 (5th Cir. 2007) ......................................................16

*In re Enron Corp. Securities, Derivative, & "ERISA" Litigation*, 284 F. Supp. 2d 511
(S.D. Tex. 2003)...............................................................................................31

*Fezzani v. Bear, Stearns & Co., Inc.*, No. 99 Civ. 0793 (RCC), 2005 WL 500377
(S.D.N.Y. Mar. 2, 2005) .............................................................................30, 31

*First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).........35, 36

*First Equity Corp. of Florida v. Standard & Poor's Corp.*, 690 F. Supp. 256
(S.D.N.Y. 1988)...............................................................................................21

*GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463 (2d Cir. 1995)................36

*In re Global Crossing Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004).........14, 15, 18

*Goren v. New Vision International, Inc.*, 156 F.3d 721 (7th Cir. 1998)......................................33

*Granite Partners, LP v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998)...........37

*H.J., Inc. v. Nw. Bell Telegraph Co.*, 492 U.S. 229 (1989) ........................................................35

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)....................................................................25

*Hemispherx Biopharma, Inc. v. Asensio*, No. Civ. A. 98 5204, 1999 WL 144109
(E.D. Pa. Mar. 15, 1999)..................................................................................31

*Hexagon Packaging Corp. v. Manny Gutterman & Assocs.*, Nos. 96 C 4356, 99 C 5493,
2000 WL 226396 (N.D. Ill. Feb. 17, 2000) ....................................................34

*Hollinger International, Inc. v. Hollinger Inc.*, No. 04 C 698, 2004 WL 2278545
(N.D. Ill. Oct. 8, 2004) ........................................................................................31

*Howard v. AOL*, 208 F.3d 741 (9th Cir.), *cert. denied*, 531 U.S. 828 (2000) ........................28, 34

*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933
(2d Cir. 1998) ....................................................................................................39

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ....................................................................22

*Kinsey v. Cendant Corp.*, No. 04 Civ 0582 (RWS), 2004 WL 2591946
(S.D.N.Y. Nov. 16, 2004) ..................................................................................21

*Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557 (S.D.N.Y. 1996) ................................................35

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ..........................................9, 10

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir.), *cert. denied*, 126 S. Ct. 421
(2005) ................................................................................................................13

*Leung v. Law*, 387 F. Supp. 2d 105 (E.D.N.Y. 2005) ................................................................35

*Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998) ..............................................................33

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006) ............................................................1

*Marcus v. Frome*, 329 F. Supp. 2d 464 (S.D.N.Y. 2004) ......................................................38, 40

*Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 126 S. Ct. 1503 (2006) ............................29, 30

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992) ............................................................34

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) ....................................................12

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ........................................................35

*Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC*, 2003 WL 22052894
(S.D.N.Y. Sept. 2, 2003) ....................................................................................38

*OSRecovery, Inc. v. One Groupe International, Inc.*, 354 F. Supp. 2d 357
(S.D.N.Y. 2005) ................................................................................................30

*In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ..............................14

*In re Parmalat Securities Litigation*, 383 F. Supp. 2d 616 (S.D.N.Y. 2005) ..............................19

*Payton v. Flynn*, No. 06-C-465, 2006 WL 3087075 (N.D. Ill. Oct. 26, 2006) ........................29, 31

*Pennsylvania Association of Edwards Heirs v. Rightenour*, 235 F.3d 839 (3d Cir. 2000) ..........37

*In re Philip Services Corp. Securities Litigation*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004) .............22

*Press v. Chemical Investment Services Corp.*, 166 F.3d 529 (2d Cir. 1999) .................................20

*Pro Bono Investments, Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787
  (S.D.N.Y. Sept. 20, 2005) ...........................................................................................................38

*In re Refco, Inc. Securities Litigation*, __ F. Supp. 2d __, 2007 WL 1280649
  (S.D.N.Y. Apr. 30, 2007) ............................................................................................................24

*Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th
  Cir. 2007) ....................................................................................................................................16

*Renner v. Chase Manhattan Bank*, No. 98 Civ 926 (CSH), 1999 WL 47239
  (S.D.N.Y. Feb. 3, 1999) ..............................................................................................................30

*Republic of Colombia v. Diageo North America Inc.*, No. 04-CV-4372 (NGG), 2007 WL
  1813744 (E.D.N.Y. June 19, 2007) ............................................................................................33

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ...........................................................................32

*Roby v. Corp. of Lloyd's*, 796 F. Supp. 103 (S.D.N.Y. 1992) .......................................................7

*In re Royal Dutch/Shell Transport Securities Litigation*, No. 04-374 (JAP), 2006 WL
  2355402 (D.N.J. Aug. 14, 2006) .................................................................................................14

*Salinas v. United States*, 522 U.S. 52 (1997) ........................................................................32, 34

*In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) ........................19

*Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991), *cert. denied*, 503 U.S. 936 (1992) ..............12

*SEC v. First Jersey Securities*, 101 F.3d 1450 (2d Cir. 1996), *cert. denied*, 522 U.S. 812
  (1997) ..........................................................................................................................................18

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) ..........................................................14

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) .....................................................................9, 16

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir. 1994) ................................................20

*Simpson v. AOL Time Warner*, 452 F.3d 1040 (9th Cir. 2006), *petition for cert. filed* (Oct. 19, 2006) ................................................................................................16

*Southland Sec. Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ..........21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ...........................................21

*Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) ............................................................................34

*United Mine Workers of America v. Coronado Coal Co.*, 259 U.S. 344 (1922) ............................7

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998), *cert. denied*, 525 U.S. 1104 (1999) ....................................................................................................................9

*Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004) ................................................................................................32

## STATE CASES

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 842 N.E.2d 471 (N.Y. 2005) ................................................................................................39

*CPC International Inc. v. McKesson Corporation*, 514 N.E.2d 116 (N.Y. 1987) .......................37

*Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218 (App Div 1992) .........................................37

*Gouldsbury v. Dan's Supreme Market, Inc.*, 546 N.Y.S.2d 379 (App. Div. 1989) ......................39

*Horn v. 440 East 57th Co.*, 547 N.Y.S.2d 1 (App. Div. 1989) ......................................................37

*Rego Park Gardens Owners v. Rego Park Gardens Assoc.*, 595 N.Y.S.2d 492 (App. Div. 1993) ................................................................................................37

*Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (App. Div. 2001) ....................................37

## DOCKETED CASES

*Stoneridge Investment Partners LLC v. Scientific-Atlanta, Inc.*, No. 06-43 (Sup. Ct.) ................13

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, No. 06-2902-cv ................................................................................................22

*Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL) ......4, 19, 24

## FEDERAL STATUTES, REGULATIONS, RULES & LEGISLATIVE MATERIALS

15 U.S.C. § 78j(b) ....................................................................................................17

15 U.S.C. § 78u-4(b) ......................................................................................8, 14, 20

18 U.S.C. § 1962(a), (b) ...................................................................................32, 34

18 U.S.C. § 1962(c) .................................................................................................32

18 U.S.C. § 1962(d) ...........................................................................................Passim

18 U.S.C. § 1964(c) .................................................................................................27

17 C.F.R. § 240.10b-5(a) & (c) ...............................................................................12

Federal Rule of Civil Procedure 9(b) ................................................20, 35, 36, 40

141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) ...................................................28

H.R. Conf. Rep. No. 104-369, at 47 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 746 ..............28

## STATE STATUTES

New York's Martin Act, N.Y. Gen. Bus. Law § 352 *et seq* .........................................37

Defendant Mayer Brown LLP, formerly known as Mayer, Brown, Rowe & Maw LLP, an

Illinois limited liability partnership,[1] respectfully submits the following Memorandum in support

of its Motion to Dismiss Plaintiffs' Complaint for failure to state a claim under any of the causes

of action alleged – under Section 10(b) of the Securities Exchange Act of 1934, under the

Racketeer Influenced and Corrupt Practices Act ("RICO"), or under New York state law – and

failure to meet the heightened pleading requirements applicable to virtually all of those claims.

## FACTUAL BACKGROUND AND THE ALLEGATIONS IN THE COMPLAINT

Refco was a commodities and futures brokerage company. In the fall of 2003, Plaintiffs

began to explore the possibility of purchasing an interest in Refco. Thomas H. Lee Partners, L.P.

("THL Partners") "performed intensive due diligence," as did professional advisors hired by

Plaintiffs for that purpose, including the law firm of Weil Gotshal & Manges LLP ("Weil

Gotshal"). Complaint ¶¶ 33-34.

Following the completion of due diligence, on June 8, 2004, Plaintiffs entered into an

agreement to purchase a majority equity interest in Refco for $ 452 million (the "Purchase

Agreement").[2] *Id.* ¶ 1. The Purchase Agreement contained specific representations and

warranties, an integration clause (Section 9.1), and a common provision (Section 3.27) explicitly

designed to eliminate the possibility that any subsequent claims would be asserted based on

---

[1]    In their Complaint, Plaintiffs describe Mayer Brown as a "combination" of two legal
entities – an Illinois limited liability partnership and a limited liability partnership formed under
English law. Complaint ¶ 16. For the reasons discussed in Section I below, there is no such
single entity. The instant Motion is brought on behalf of the Illinois limited liability partnership,
Mayer Brown LLP. Mayer Brown International LLP, the limited liability partnership
incorporated in England and Wales, is filing a separate motion to dismiss on the ground that
neither it nor its lawyers are alleged to have played any role in the events at issue here.

[2]    A copy of the Purchase Agreement is attached to the Declaration of Thomas G. Ward
filed in support of Mayer Brown's motion to dismiss ("Ward Decl.") as Exhibit A. The Court
may consider the Agreement on this Motion because it was referred to and relied on in the
Complaint. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).

alleged misstatements made during the course of the lengthy due diligence process.  In Section

3.27, entitled "Exclusivity of Representations and Warranties," the parties agreed that the only

representations and warranties that had been made in connection with the sale were those

expressly contained in the agreement:

> THE REPRESENTATIONS AND WARRANTIES MADE IN THIS
> AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER
> REPRESENTATIONS AND WARRANTIES.  RGHI HEREBY DISCLAIMS ANY
> SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES,
> NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS
> OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIONS
> [sic] OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING
> ANY FINANCIAL PROJECTIONS OR OTHER DATA).

The purchase closed on August 5, 2004.  A year later, Refco launched its initial public offering

("IPO"), enabling Plaintiffs to recoup $207 million of their initial $452 million investment.

A few months after the IPO was completed, it is alleged, Refco's Board of Directors

learned that Bennett's "personal holding company," Refco Group Holdings, Inc. ("RGHI") owed

$430 million to Refco that had never been disclosed in Refco's financial statements.  Complaint

¶¶ 1, 62.  Plaintiffs allege that this "RGHI Receivable"[3] can be traced back to undisclosed losses

Refco had suffered in the late 1990s as a result of (among other things) millions of dollars of

unpaid customer loans and Refco's own proprietary trading losses.  *Id.* ¶¶ 19-20.  Rather than

writing off the uncollectible accounts, Bennett allegedly caused Refco to transfer them to RGHI

in return for the RGHI Receivable.  *Id.* ¶ 21.  Starting as early as 1998, Bennett allegedly

directed a series of short-term loan transactions that allowed RGHI to temporarily pay down its

Receivable around the end of Refco's fiscal year.  *Id.* ¶¶ 22, 24.  In 2000, Bennett

"orchestrate[d]" transactions in which a Refco company loaned money to a Refco customer,

---

[3]    In fact, there was no single "RGHI Receivable."  According to the Complaint, money
owed by RGHI was reflected in debit balances held at three separate Refco accounts.  *Id.* ¶ 21.

which then loaned the same amount of money to RGHI. *Id.* ¶¶ 25-26.  Then, in the "third leg" of the transaction, RGHI would temporarily pay down its debt to Refco.[4]  *Id.*  After this paydown, Refco's books would reflect a loan to the customer rather than a receivable from RGHI.  *Id.* Plaintiffs allege that Refco arranged for these loans to be made just before the end of an accounting period so that the RGHI Receivable would not appear on the financial statements; shortly after the end of the fiscal year or quarter, the loans would be repaid and the RGHI Receivable would reappear on Refco's books.  *Id.* ¶¶ 25, 28.  Plaintiffs describe these transactions as the "round trip loan transactions."[5]  These loans were just part of Bennett's orchestrations; he also allegedly used end-of-year loans with BAWAG to hide the RGHI Receivable.  *Id.* ¶ 24.  The BAWAG loans were undocumented and Plaintiffs do not allege Mayer Brown was aware that they existed.  *See id.*

After the transactions were revealed, Refco's stock price dropped and it quickly petitioned for bankruptcy.  *Id.* ¶ 9.  Bennett and two other Refco insiders were subsequently indicted for fraud.  *Id.*  Plaintiffs allege that, as a result of Refco's collapse, the remaining Refco securities they acquired as a result of the 2004 purchase (for which they paid $245 million) are now worthless.  *Id.* ¶ 64.

---

[4]     A diagram showing the structure of these loan transactions based on Plaintiffs' allegations is attached to the Ward Declaration (Ex. B).  While the Complaint alleges that Mayer Brown attorneys worked on the loan documentation for the first two legs of the transaction, *see id.* ¶ 30, the Complaint does not allege any facts from which the Court could infer that any Mayer Brown attorney had knowledge of or involvement in the "third leg" – the RGHI Receivable paydown, which is the crux of Plaintiffs' theory of the Refco fraud.

[5]     Plaintiffs presumably use the term "round-trip loan transactions" because they include the "third leg" of the transaction.  *See id.* ¶ 26.  For reasons previously stated, this term rests on a mischaracterization of Mayer Brown's knowledge and involvement.  Mayer Brown therefore uses the term "back-to-back" loans to describe the first two legs of the transactions, for which it provided legal services.

On November 14, 2005, Plaintiffs filed a complaint in this Court against RGHI, Bennett and two other former Refco officers (Santo Maggio and Tone Grant), accusing them of securities fraud, common law fraud, negligent misrepresentation, and breach of contract. Complaint, *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL). Plaintiffs filed the instant Complaint on July 26, 2007, claiming that Mayer Brown, which had served as Refco's principal outside counsel during the period in question, had assisted Refco insiders in perpetrating a fraud.

Under various legal theories – including all three subsections of Rule 10b-5, as well as RICO, and several common-law theories – the Complaint seeks to hold Mayer Brown liable for its client's fraud. Simply put, the gravamen of the fraud claim is that because Mayer Brown "handled" the first two legs of the loans in question, it necessarily "knew" that Refco's financial statements were fraudulent. Thus, under Plaintiffs' theory, when Mayer Brown passed along statements from Bennett to THL Partners' lawyers, Mayer Brown lawyers were participating in securities fraud.

The Complaint apparently seeks to hold Mayer Brown liable for misstatements made by Refco insiders during the course of due diligence as well as for alleged misrepresentations in the Purchase Agreement. *See* Complaint ¶¶ 43, 49-57. Plaintiffs point to three occasions on which Joseph Collins, the Mayer Brown partner who was responsible for the Refco relationship and who represented the Refco sellers, passed along representations made by Bennett and Refco management. *See id.* ¶ 46 (Collins tells Plaintiffs' counsel that "he had confirmed with Bennett that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI or other affiliates"); ¶ 47 ("'[w]e were advised by Refco Management that all material contracts were either in the Data Room or are

4

being produced . . .'"); ¶ 48 ("'[w]e have been advised by Refco that there are no significant indemnification obligations which have not been disclosed already").

The Complaint, however, does not allege a number of pivotal facts that one would expect to find given Plaintiffs' theory of the case:

- Plaintiffs do not allege that Mayer Brown ever vouched for the accuracy of any representations made by Refco insiders (including those that Collins allegedly conveyed to Plaintiffs' counsel), either during due diligence or in the Purchase Agreement.

- The Complaint is devoid of any specific facts which, if proven true, establish that Collins in fact *knew* about Bennett's alleged fraud. It merely suggests that Collins must have known of the fraud because he, or some other Mayer Brown lawyers, had worked on loans that effectuated portions of the transactions. This knowledge is the linchpin of the fraud theory.

- Plaintiffs allege only in conclusory fashion that any Mayer Brown attorney knew about the "RGHI Receivable," understood that the "round-trip loans" were being used to hide any such receivable, or that the loans had been concealed during the due diligence process and should have been, but were not, disclosed in the Purchase Agreement.

- Plaintiffs allege no facts to suggest that any Mayer Brown attorney was aware of how Bennett and other Refco insiders were using the proceeds of the back-to-back loans, that is, that RGHI was using the funds to temporarily pay down receivables owed to Refco. This deficiency is vital because it was this "third leg" of the transaction that allowed Refco to misstate its financial statements.

- Nor are there any facts alleged to suggest that Collins or any Mayer Brown lawyer knew which documents Refco had placed, *or not placed*, in the data room for THL Partners' review during the due diligence process or was aware of everything that Refco had or had not provided to Plaintiffs' advisers during the course of due diligence. Thus, even assuming that Collins was aware that the firm was continuing to document back-to-back loans for Refco at this time,[6] there are no facts alleged to support an inference that he knew the Refco insiders (i) had deliberately concealed those documents and (ii) were lying when they told Collins that all of the relevant documents had been disclosed.

- Plaintiffs allege no facts suggesting any motive for any Mayer Brown lawyer to engage in fraud, including no facts showing any personal interest in the transactions at issue and no facts showing that Mayer Brown was paid anything other than normal and customary hourly rates for its work. In fact, the circumstances of the Plaintiffs' purchase of the majority interest in

---

[6]    Plaintiffs allege that Collins was copied on letters describing how the February 2000 and 2001 transactions were structured. *Id.* ¶ 31(a), (b), & (d). Notably, however, Plaintiffs do not, because they cannot, allege that these letters describe the third leg of the transactions.

Refco negate any possible inference that Mayer Brown's lawyers had an incentive to commit fraud to complete the transaction; the transaction involved the sale of a client to a buyer who could be expected to (and did) transfer the bulk of the company's legal work to its usual outside counsel – Weil Gotshal.

In short, Plaintiffs' theory of fraud is essentially that Mayer Brown is liable for passing along, unendorsed, statements from Bennett because, Plaintiffs assert, Mayer Brown *knew* that Bennett's statements were untrue.  There is, however, no well-pled allegation of fact from which the Court may conclude that any individual lawyer at Mayer Brown had the requisite knowledge/ scienter.  A fortiori, no such knowledge could be imputed to Mayer Brown as an entity.

## ARGUMENT

### Summary of Argument

In Section I below, we demonstrate that the entity Plaintiffs purport to sue, a "combination" of two limited liability partnerships, is not a legally recognized entity and therefore cannot be sued.

Section II.A shows that Plaintiffs' claim for alleged misrepresentations under Rule 10b-5(b) is simply a disguised claim for aiding and abetting barred under the Supreme Court's *Central Bank* decision.  In Section II.B, the same point is made regarding Plaintiff's claim of "scheme" liability under Rule 10b-5(a) & (c).  Plaintiffs cannot so easily evade the strictures of *Central Bank* here because the thrust of their case is based on misrepresentations and omissions, to which subsection (a) and (c) do not apply; and because the non-speaking conduct of Mayer Brown lawyers does not fall within the proper scope of primary liability.  Section II.C demonstrates that, in any event, Plaintiffs' federal securities claims should be dismissed because Plaintiffs have failed to meet their heavy burden of alleging particularized facts sufficient to give rise to a strong inference that any Mayer Brown lawyer acted with the required scienter.  In Section II.D, as yet another independent ground for dismissal of Plaintiffs' Section 10(b) claims,

we establish that Plaintiffs cannot, in light of the terms of the purchase agreement they entered into, claim to have relied on any statements Mayer Brown lawyers made, nor can they show that they relied in any way on Mayer Brown's conduct.

Sections III and IV address Plaintiffs' alternative RICO claim.  In Section III below, we show that Plaintiffs' attempt to plead a claim for conspiracy under RICO, 18 U.S.C. Section 1962(d), is barred by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which expressly precludes the assertion of RICO claims in a case like this.  Section IV establishes that, in any event, the Complaint fails to allege sufficient facts to support the allegation that Mayer Brown joined a RICO conspiracy or even that there was an underlying RICO violation.

Section V shows that Plaintiffs' claim for negligent misrepresentation is barred by New York's Martin Act and in any event is legally insufficient, because Plaintiffs do not and cannot allege that Mayer Brown was in privity or anything approaching privity with them.

Section VI demonstrates that Plaintiffs' claim for common-law fraud fails as a matter of law.

## I.    THE ALLEGED COMBINATION OF TWO LIMITED LIABILITY PARTNERSHIPS IS NOT A PROPER DEFENDANT.

Plaintiffs purport to sue a single defendant named Mayer, Brown, Rowe & Maw LLP, which they define as a "combination of two limited liability partnerships."  Complaint ¶ 16.  However, no such entity exists.  "It is well settled that it must appear that an association, if it is not a corporation, has received by appropriate legislation a legal status before it, or its members, may be sued in the name of the group."  *Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 110-11 (S.D.N.Y. 1992); *see also United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 351 (1922).  A "combination" between two limited liability partnerships has no such legal status.  Accordingly, to the extent the Complaint seeks to assert claims against a single entity comprising

both the Illinois and United Kingdom entities, which are now named Mayer Brown LLP and Mayer Brown International LLP, respectively, it should be dismissed.

## II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES FRAUD.

### A.    Count II Should Be Dismissed Because Plaintiffs Have Not Alleged Any Misrepresentations Made by Mayer Brown.

In Count II of their Complaint, Plaintiffs allege that Mayer Brown violated Section 10(b) and Rule 10b-5(b) by making material misstatements in connection with their purchase of Refco securities. In order to properly plead a material misstatement under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading" and explain "the reason or reasons why" the statement was misleading at the time it was made. 15 U.S.C. § 78u-4(b)(1). In this case, Plaintiffs have alleged a variety of misstatements made to them directly by Refco insiders, as well as statements passed on by Mayer Brown lawyers. Plaintiffs have not bothered to explain which statements are the subject of their claims in Count II. No matter which statements Plaintiffs claim to have relied upon, however, under controlling Second Circuit authority following *Central Bank*, Mayer Brown cannot be held liable for *any* of the misstatements alleged in the Complaint.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court held that a plaintiff in a suit brought under Section 10(b) and Rule 10b-5 may sue only a primary violator and cannot seek damages from a secondary actor for allegedly aiding and abetting the fraud. As the Court explained:

> As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act.

*Id.* at 177.  Following *Central Bank,* the Second Circuit, in *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997), adopted a "bright line" test for defining the scope of primary liability, holding that a secondary actor cannot be held liable under Section 10(b) for alleged misstatements unless he "actually ma[de]" a false or misleading statement.  As the court explained,

> If *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).  *Id.*

In subsequent decisions, the Second Circuit has adhered to the bright line test.  In *Wright v. Ernst & Young LLP*, 152 F.3d 169, 174 (2d Cir. 1998), *cert. denied*, 525 U.S. 1104 (1999), the Second Circuit rejected the Ninth Circuit's "substantial participation" test for primary liability, holding that accountants (or lawyers) could not be held liable for "statements made by others" even if they had been "'intricately involved' in the creation of false documents."  *See* 152 F.3d at 175-76.  In *Wright*, the Second Circuit also rejected the argument that an accounting firm could be held liable for unaudited financial results issued by its client on the ground that the market understood that the accounting firm had "reviewed and approved" those results.  *See id.*  Again drawing a bright line, the Court held that "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination."  *Id.*

The Second Circuit recently reaffirmed and extended its reasoning in *Wright* in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007).  The issue in *Lattanzio* was whether an outside auditor could be held liable under Section 10(b) for helping to compile and review its client's allegedly misleading interim financial statements.  Although Deloitte had not issued an audit report opining on those financial statements, the plaintiffs argued that new SEC regulations requiring an outside auditor to review such statements "associated Deloitte with those statements

to such a degree that they became Deloitte's statements." *Id.* at 155. Alternatively, plaintiffs

argued that the SEC regulations imposed on Deloitte a duty to correct misstatements in the

client's interim financial statements, a breach of which was actionable under Section 10(b). The

Second Circuit rejected both of these arguments. First, the Court held that it is not enough that

investors *believe* the secondary actor has endorsed the statement in question; in addition, the

secondary actor must have actually "articulated" its endorsement:

> Public understanding that an accountant is at work behind the
> scenes does not create an exception to the requirement that an
> actionable misstatement be made by the accountant . . . . Unless the
> public's understanding is based on the accountant's articulated
> statement, the source for that understanding – whether it be a
> regulation, an accounting practice, or something else – does not
> matter.

*Id.* Second, the Court rejected the argument that a secondary actor could be held liable for

failing to correct its client's misstatements. As the court observed, "'[i]t is inconsistent with

settled methodology in Section 10(b) cases to extend liability beyond the scope of conduct

prohibited by the statutory text.'" *Id.* at 156 (quoting *Central Bank*, 511 U.S. at 177). Because

Section 10(b) does not make it unlawful for an accountant to stand silent in the face of

misstatements made by its client, it necessarily follows that the accountant cannot be held

primarily liable under Section 10(b) for failing to correct such a misstatement.

These settled principles preclude any claim against Mayer Brown based on the

misstatements alleged in the Complaint. Mayer Brown cannot be held liable for the various

alleged misstatements made directly by Refco insiders during the course of due diligence or for

the alleged misrepresentations made by the sellers in the Purchase Agreement. That is true even

if Mayer Brown was "intricately involved" in both the due diligence process and the drafting of

the Purchase Agreement. Under the case law described above, the representations in question

were made by Refco insiders, not by Mayer Brown, and hence cannot provide a basis for any claim against Mayer Brown.

The same analysis applies to the few statements allegedly made by Collins. In each one of those statements, Collins was simply passing along representations that were being made by Refco insiders. *See* Complaint ¶ 46 (during a phone conversation in March 2004, Collins told Weil Gotshal partner Jay Tabor that "*he had confirmed with Bennett* that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI or other affiliates") (emphasis added); Complaint ¶ 47 (on May 6, 2004, in response to a request from the THL Funds, "Collins sent by e-mail a memorandum, addressed to Weil Gotshal stating that '[*w*]*e were advised by Refco Management* that all material contracts were either in the Data Room or are being produced'") (emphasis added); Complaint ¶ 48 ("Collins represented that '[*w*]*e have been advised by Refco* that there are no significant indemnification obligations which have not been disclosed already'") (emphasis added). There is no allegation that Collins ever expressly endorsed or offered any opinion on the accuracy of those statements. Because there is no claim that the statements were ever attributed to Mayer Brown, *Wright* and *Lattanzio* make clear that Mayer Brown cannot be held liable for them.

That is true even if, as Plaintiffs now claim, they believed that during the due diligence process Mayer Brown would not be serving "merely as a conduit for information from Refco management and Bennett, but would be drawing from its own extensive knowledge and information built up over the many years that Collins and his Mayer Brown colleagues had been working with Refco." Complaint ¶ 36. As in *Lattanzio*, in the absence of an "articulated" endorsement by Mayer Brown of the statements made by Bennett and other Refco insiders, Mayer Brown cannot be held liable under Section 10(b) merely for passing along statements

11

made by others. *See, e.g., Schatz v. Rosenberg*, 943 F.2d 485, 494-95 (4th Cir. 1991) (affirming dismissal of claim against law firm that delivered documents from client that contained false statements, holding that "lawyers do not vouch for the probity of their clients when they draft documents reflecting their clients' promises, statements, or warranties"), *cert. denied*, 503 U.S. 936 (1992).

Finally, Plaintiffs cannot base a Section 10(b) claim against Mayer Brown on any claimed duty to correct false statements made by its clients. As the Second Circuit recognized in *Lattanzio*, imposing a duty to correct an issuer's statements on its accountants, lawyers or other professionals would effectively overrule *Central Bank*, making them virtual guarantors of the veracity of their clients' statements. Moreover, it has long been held that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *accord Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 580 (S.D.N.Y. 2007). In their Complaint, Plaintiffs have not alleged any fiduciary relationship or other relationship of trust and confidence that would have imposed any duty to speak on Mayer Brown.

### B.   Plaintiffs' Claim Of "Scheme" Liability Cannot Salvage Their Securities Fraud Claims.

Unable to point to any actionable statements by Mayer Brown, Plaintiffs try to circumvent *Central Bank* in Count I of their Complaint by claiming that Mayer Brown can be held liable for supposedly participating in a "scheme" to defraud them. Plaintiffs contend that Mayer Brown violated SEC Rule 10b-5(a) and (c), which make it unlawful, "in connection with the purchase or sale of any security," to (a) "employ any device, scheme, or artifice to defraud"; and (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a) & (c). In Count I, as in Count II, Plaintiffs do not bother to articulate precisely what conduct they are claiming exposes Mayer

Brown to liability under their "scheme" theory. As demonstrated below, however, Plaintiffs cannot use that theory to hold Mayer Brown liable for the alleged misstatements that induced them to purchase Refco securities. Nor can they rely on Mayer Brown's conduct in documenting the back-to-back loans as the kind of "manipulative or deceptive" act necessary to state a claim against it for primary liability. That is true regardless of how the Supreme Court rules on the viability of scheme liability in *Stoneridge Investment Partners LLC v. Scientific-Atlanta, Inc.*, No. 06-43, *cert. granted*, 127 S.Ct. 1873 (Mar. 26, 2007) (oral argument calendared for October 9, 2007).[7]

**1.    Plaintiffs' Claims of Material Omissions and Misrepresentations Cannot Be Pled as a Violation of Rule 10b-5(a) and (c).**

The Second Circuit has held that, where the sole bases for a claim under Section 10(b) are misrepresentations or omissions, a plaintiff cannot make out a claim under Rule 10b-5(a) or (c), because those subsections address conduct that does not involve speaking. For example, in *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177-78 (2d Cir.), *cert. denied*, 126 S. Ct. 421 (2005), investors sued a brokerage house and its former analyst alleging (among other things) that they engaged in a scheme to defraud investors by issuing research reports that deceived the market, causing stock prices to be artificially inflated. The Second Circuit upheld dismissal of plaintiffs' scheme liability claim on the ground that a "scheme to defraud" that consisted "'largely of an aggregation of material misrepresentations'" did not state a claim under Rule 10b-5(a) & (c). *Id.*

Other courts in the Southern District have agreed that claims based upon alleged misrepresentations and omissions cannot be cast as claims under Rule 10b-5(a) & (c). *See In re*

---

[7]    In *Stoneridge*, the Court will settle a conflict in the Circuits and rule whether scheme liability is a viable theory to hold a counterparty liable for engaging in transactions that an issuer later used to misrepresent its financial statements.

*Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) ("a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made."); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377 (S.D.N.Y. 2006) ("The SEC does not posit how, in any concrete manner, the misstatements it alleges could be construed as a device or scheme."); *In re Global Crossing Secs. Litig.*, 322 F. Supp. 2d 319, 337, n.17 (S.D.N.Y. 2004) (defendant can be held liable only for "specific false statements to the extent that it can be said to have made those statements under Rule 10b-5(b)"); *In re Parmalat Secs. Litig.,* 376 F. Supp. 2d  472, 503 (S.D.N.Y. 2005) (Subsections (a) and (c) of Rule 10b-5 do not provide "a backdoor into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5.").  As the court observed in *In re Royal Dutch/Shell Transport Securities Litigation*, No. 04-374(JAP), 2006 WL 2355402 (D.N.J. Aug. 14, 2006), to allow a claim for misrepresentations to go forward under a scheme liability theory would not only "permit a plaintiff to evade the pleading requirements of 15 U.S.C. § 78u-4(b)(1) that are imposed in misrepresentation cases, but it would also permit a plaintiff to 'circumvent *Central Bank's* limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements.'"  *Id.* at *8 (quoting *In re Dynegy, Inc., Secs. Litig.*, 339 F. Supp. 2d 804, 916 (S.D. Tex. 2004)).

Here, Plaintiffs' claims are based entirely on alleged misrepresentations and omissions in the disclosures that were made to them.  Thus, in the very first paragraph of their Complaint, Plaintiffs state that they seek "to recover damages that the THL Funds suffered as a result of repeated material *misrepresentations and omissions*."  (Emphasis added).  And in Count I itself, alleging liability under Rule 10b-5(a) & (c), Plaintiffs claim that Mayer Brown participated in a

fraudulent scheme by making material misrepresentations and concealing adverse material information. *See, e.g., id.* ¶¶ 68, 70. Although Plaintiffs also cite Mayer Brown's "course of conduct," the only conduct alleged in the Complaint is the firm's work on the back-to-back loan transactions. But those transactions are not alleged to have affected Plaintiffs directly. Instead, it was the failure to disclose those transactions and Refco's use of them to "render[] Refco's financial statements and books and records materially false and misleading" that constituted the alleged "deceptive or manipulative" act in connection with the sale of Refco securities. *Id.* ¶ 23. Under those circumstances, Plaintiffs have no separate claim for "scheme" liability, but only an utterly deficient claim for alleged misrepresentations.

### 2.    Mayer Brown's Conduct in Documenting the Back-To-Back Loans Cannot Give Rise to a Claim for Scheme Liability.

The lower courts agree that under *Central Bank*, a secondary actor cannot be held primarily liable under Section 10(b) unless (i) the actor himself committed a deceptive or manipulative act that violates Section 10(b) and (ii) the plaintiff relied on that conduct in purchasing or selling the securities in question. *Central Bank*, 511 U.S. at 177 (§ 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act"); *see also, e.g., In re Global Crossing Secs. Litig.*, 322 F. Supp. 2d at 336 (to state a claim under Rule 10b-5(a) & (c), plaintiffs must allege both a manipulative or deceptive act and reliance on that conduct). Some courts have held that a defendant who enters into transactions with an issuer for the sole purpose of enabling the issuer to misstate its financial results can be deemed to have committed a deceptive or manipulative act and therefore may be held primarily liable under Section 10(b). *See, e.g., In re Enron Corp. Secs., Deriv. & "ERISA" Litig.*, 236 F.R.D. 313 (S.D. Tex. 2006), *rev'd, Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *petition for cert. filed* (Apr. 5, 2007) (No. 06-

1341). Two of the three courts of appeals that have addressed the issue, however, have held that such claims are merely claims for aiding and abetting and thus barred under *Central Bank*.[8]  The Supreme Court granted certiorari in *Stoneridge* to resolve the conflict.  If the Court in *Stoneridge* agrees that a counterparty to a transaction that is used to manipulate the issuer's financial statements cannot be deemed a primary violator, then it necessarily follows that Plaintiffs' theory of scheme liability in this case would fail as well.  But even if the Supreme Court were to come out the other way, a law firm's actions in merely documenting transactions that were part of the issuer's alleged scheme to inflate its financial results would still not rise above the level of aiding and abetting.

That is certainly true in this case.  The Complaint charges that "in furtherance of a long-running scheme masterminded by Bennett and others," Complaint ¶ 2, Mayer Brown "handled" the loan transaction documents, ¶ 31(b)-(q); and that Mayer Brown's contribution to the loan documents constituted "material assistance" to the fraudulent scheme, *e.g.*, ¶¶ 6, 7, 25, 31, 32.  This is nothing more than an old-fashioned, legally inadequate claim for aiding and abetting.  As the Second Circuit observed in *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997), "[a]llegations of 'assisting,' 'participating in,' 'complicity in,' and similar synonyms used throughout the complaint all fall within the prohibitive bar of *Central Bank*."

Moreover, neither the text of Section 10(b) nor the language of sections (a) and (c) of Rule 10b-5 reach the conduct Plaintiffs allege in the Complaint.  Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in contravention of the SEC's rules.  15 U.S.C. § 78j(b).  The

---

[8]     *See Regents of the Univ. of Cal.*, 482 F.3d 372; *In re Charter Commc'ns, Inc., Secs. Litig.*, 443 F.3d 987 (8th Cir. 2006), *cert. granted sub nom. Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc.*, 127 S. Ct. 1873 (2007).  *But see Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006), *petition for cert. filed* (Oct. 19, 2006) (No. 06-560).

Supreme Court has held that the word "use" connotes "active employment." *Bailey v. United States*, 516 U.S. 137, 143 & 145 (1995). A law firm that drafts transactional loan documents does not "actively employ" either the loan documents or the transactions entered into by the parties; the firm's client does. As Plaintiffs themselves allege, it is Refco that "used" the back-to-back loans by taking the loan amount and paying down the RGHI Receivable and then in turn misstating its financial statements.

Plaintiffs' allegations also fall outside the bounds of the plain wording of Rule 10b-5(a) and (c), which make it unlawful, "in connection with the purchase or sale of any security," to (a) "employ any device, scheme, or artifice to defraud"; and (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a) & (c). For the same reasons that Mayer Brown did not "use" the back-to-back loan transactions, it did not "employ" them. Similarly, Mayer Brown did not "engage" in anything that "operate[d] or would operate as a fraud or deceit upon any person." Merely drafting loan documents – as opposed to being a party to the transaction and either lending or receiving money – is not "engaging" in the loans. And even if it were, the back-to-back loans were not themselves fraudulent: they were real loans involving actual third parties. Bennett and other Refco insiders took the proceeds from the back-to-back loans and allegedly used those proceeds to commit fraud through the third leg of the transactions. But the fraud they allegedly committed with the help of the back-to-back loans does not make the loan documents drafted by Mayer Brown themselves a deceptive device or a sham.

### 3.    Count I Should Be Dismissed Under this Circuit's Cases Regarding Scheme Liability.

The Second Circuit has not yet spoken directly on the viability of "scheme" liability. Its recent decision in *Lattanzio*, read against its historical observance of the bright line rules

described above, suggests strongly that the Second Circuit would now reject the principle.[9] There are, unquestionably, several decisions in the Southern District that have endorsed a narrow species of scheme liability where the non-speaking defendant orchestrated or masterminded the scheme; and it is conceivable that that jurisprudence would survive a more general rejection of scheme liability. As we demonstrate below, however, the Plaintiffs cannot shoehorn this case into the "mastermind" cases because Plaintiffs' factual allegations establish exactly the contrary: Bennett and other Refco insiders were the alleged masterminds of the fraud, not the lawyers. *See, e.g.*, ¶¶ 4, 19-30.

In *SEC v. First Jersey Securities*, 101 F.3d 1450 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997), for example, the Second Circuit held that the chief executive and sole shareholder of a discount broker-dealer could be held primarily liable for his role in causing his company to perpetrate a fraudulent scheme because he "orchestrated" the scheme. In *In re Global Crossing, Ltd. Securities Litigation*, this Court relied on *First Jersey* in holding that Arthur Andersen could be held primarily liable for unaudited financial statements issued by Global Crossing because plaintiffs' allegations against the auditor went "far beyond mere aiding and abetting." 322 F. Supp. 2d at 336. Plaintiffs there alleged that Andersen had "masterminded misleading accounting . . . and the subsequent sham swap transactions used to circumvent GAAP and inflate the Companies' revenues, that it actively participated in structuring each swap, and that it was intimately involved" in and "directly participated" in the creation of misleading "pro forma" numbers that concealed the fraud from investors. *Id.* This Court ruled that the allegedly "central role" of Anderson as "chief architect and executor" made it, like the executive in *First Jersey*, a

---

[9]     Although not squarely presenting the question of scheme liability, the Second Circuit's recent decision in *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), also suggests that the Court may be hostile to claims of scheme liability. *See id.* at 99-100.

primary violator rather than an alleged aider and abettor. *Id.* Similarly, in *In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004), this Court declined to dismiss a Section 10(b) claim against the CEO of Citigroup because the complaint "lays out a clear picture of [the CEO's] conduct as a central and knowing participant in, and possible orchestrator of, a scheme . . . . from which he would derive substantial personal benefits . . . ." *Id.* at 474 (highlighting allegations that CEO "effectively directly ordered a subordinate to issue false and misleading statements on behalf of the firm").

Here, by contrast, Plaintiffs do not allege that Mayer Brown was "the chief architect and executor" of the Refco fraud or that it "orchestrated" the fraud. To the contrary, they assert that *Bennett* was the prime mover and "orchestrator." *See, e.g.*, ¶ 30 (alleging that "Mayer, Brown was involved in multiple facets of the 17 round-trip loan transactions *that Bennett orchestrated* to hide the RGHI Receivable and misrepresent Refco's true financial condition"); *see also* Complaint ¶ 5, *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL) ("The fraud was cleverly carried out and concealed by Bennett (upon information and belief, with the knowing participation of Maggio) and withstood repeated and intensive review."). Furthermore, there is no allegation that Mayer Brown benefited in any way from the fraudulent scheme that Bennett masterminded. Instead, all of Plaintiffs' allegations are simply accusations that Mayer Brown aided and abetted Bennett's fraud.

This case also differs from *In re Parmalat Securities Litigation*, 383 F. Supp. 2d 616 (S.D.N.Y. 2005), where Judge Kaplan allowed some, but not all, of plaintiffs' scheme liability allegations to stand. In *Parmalat*, the court declined to dismiss plaintiffs' claims against a law firm, but only because the law firm moved beyond the provision of legal services and effectively became a party to allegedly fraudulent transactions, *see id.* at 626 & n.43, by creating and

controlling two shell companies (neither of which had any assets, and one of which had the same address as the law firm) that engaged in transactions designed to remove certain assets from Parmalat's books, *id.* at 620. Judge Kaplan made clear that "[e]ven if the underlying transactions were deceptive devices or contrivances, furnishing a legal opinion or legal advice without more at most would be aiding and abetting." *Id.* at 624-25 n.39.

### C. Plaintiffs Have Failed To Allege Facts Giving Rise to a Strong Inference of Scienter as to Any Mayer Brown Lawyer.

Counts I and II of the Complaint should also be dismissed for the separately dispositive reason that Plaintiffs have failed to meet their heavy burden under the PSLRA of pleading scienter. Even prior to the enactment of the PSLRA, the Second Circuit standard for pleading scienter, under Federal Rule of Civil Procedure 9(b), was a rigorous one, requiring the allegation of facts that "give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). In the PSLRA, Congress adopted a stringent nationwide standard, by requiring that in any private securities action in which the plaintiff must demonstrate that the defendant acted with a particular mental state, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2).[10] In this Circuit, a plaintiff may satisfy this requirement by alleging facts (1) showing that the defendant had both motive and opportunity to commit fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

---

[10]    In *Press v. Chemical Investment Services Corp.*, 166 F.3d 529 (2d Cir. 1999), the Second Circuit concluded that Congress, in the PSLRA, "heightened the requirement for pleading scienter to the level used by the Second Circuit." *Id.* at 537-38.

Recently, in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Supreme Court clarified what is required for a showing of scienter under the PSLRA's heightened pleading standard. The Court held that, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 2509. Accordingly, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 2510. Further, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – *it must be cogent and compelling, thus strong in light of other explanations.* A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (emphasis added).

In addition, many courts have held that scienter may be established as to an organization only if the individual official responsible for the alleged violation acted with scienter. The Fifth Circuit so held in *Southland Secs. Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("[f]or purposes of Rule 10b-5 scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge" of the corporation). A number of courts in this District have agreed. *See Kinsey v. Cendant Corp.*, No. 04 Civ 0582 (RWS), 2004 WL 2591946, at * 13 (S.D.N.Y. Nov. 16, 2004) ("[a] defendant corporation is deemed to have the requisite scienter . . . only if the individual . . . making the statement has the requisite level of scienter . . . ."); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) (in common-law fraud case, holding that "[a] corporation can be held to have a

particular state of mind only when that state of mind is possessed by a single individual").[11] Under this principle, Mayer Brown can be held to have acted with scienter only if an individual lawyer in the firm acted with scienter.

Plaintiffs have failed to meet their burden of pleading particular facts giving rise to a strong inference that any Mayer Brown lawyer acted with "an intent to deceive, manipulate, or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citation omitted). Plaintiffs do not seriously attempt to plead motive and opportunity, nor could they. Although the Complaint alleges that Refco was Collins' most significant client and that Mayer Brown billed Refco more than $23 million from 2000 to 2005, Complaint ¶ 17, such allegations have been repeatedly held insufficient to establish a motive to commit fraud. *See Kalnit*, 264 F.3d at 140 (2d Cir. 2001); *In re Philip Services Corp. Secs. Litig.*, 383 F. Supp. 2d 463, 469-71 (S.D.N.Y. 2004); *Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628, 639-40 (S.D.N.Y. 1999). The Complaint pleads no facts showing that any Mayer Brown lawyer had any personal interest in any of the transactions, or that the firm received anything other than routine compensation for its services. In fact, any notion that Mayer Brown lawyers had a motive to commit fraud to further the sale of Refco is belied by the fact that the sale could have been expected to (and did) result in the loss of most of Mayer Brown's Refco work to THL Partners' outside counsel, Weil Gotshal.

There are also no factual allegations that give rise to a strong inference that Mayer Brown lawyers engaged in conscious misbehavior, or even that they acted recklessly – that is, proceeded to make statements or engage in conduct even though it was obvious that the statements were materially misleading or the conduct was deceptive. *See In re Carter-Wallace, Inc., Secs. Litig.*,

---

[11]    We note that several courts in this District have reached a seemingly contrary conclusion, and that the Second Circuit is now considering the issue in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, No. 06-2902-CV. We respectfully suggest that the rule adopted by the cases cited in the text is correct.

220 F.3d 36, 40 (2d Cir. 2000) (noting that "'egregious refusal to see the obvious'" can

constitute recklessness and finding standard not satisfied) (quoting *Chill v. Gen. Elec. Co.*, 101

F.3d 263, 269 (2d Cir. 1996).  As described above, there are no facts alleged from which the

Court could infer that any Mayer Brown lawyer considered the back-to-back loans to be

improper, knew that the loans were being used to hide the RGHI Receivable, or knew that Refco

had concealed information from THL Partners during the due diligence process.

    Plaintiffs insist that Mayer Brown lawyers must have known that the back-to-back loans

were being used to manipulate Refco's financial statements because (i) none of them could say,

in interviews with the Examiner, what the business purpose of the loans was and (ii) the loans –

with one exception – straddled the end of Refco's unorthodox accounting periods (Refco's fiscal

year ended in February).  Complaint ¶ 32.  But there is no allegation that any Mayer Brown

lawyer knew that the loans were being concealed from Refco's outside auditor or that any Mayer

Brown lawyer thought the timing suspicious.  Moreover, according to the Complaint, the back-

to-back loans involved six different and apparently unrelated Refco customers, and the work

done by Mayer Brown was typical of the work done by corporate lawyers on routine

transactions.  *See, e.g.*, Complaint ¶ 30 (alleging that Mayer Brown attorneys openly negotiated

deal terms with opposing counsel, transmitted documents in the ordinary course, and maintained

copies of final documents).

    Although Plaintiffs may claim that it should have been obvious to the lawyers that the

transactions were somehow being used to commit accounting fraud, that is nothing more than a

claim of fraud by hindsight.  Unlike the Refco executives for whom this Court has already found

sufficient allegations of scienter, the Complaint does not allege that Mayer Brown had access to

the day-to-day cash flows and financial records of RGHI, Refco, or its RCM subsidiary.  *See In*

re *Refco, Inc. Secs. Litig.*, __ F. Supp. 2d __, 2007 WL 1280649, at *29-*33 (S.D.N.Y. Apr. 30, 2007). With respect to the RGHI Receivable, for example, the Complaint alleges that it stemmed from proprietary trading losses and defaults by Refco customers and that it was buried in three debit balances held in accounts at various Refco subsidiaries. ¶¶ 20-21. Mayer Brown attorneys, as outside counsel to Refco, would not have known how successful Refco's proprietary trading was (if they knew about it at all), the extent of customer defaults, or the amounts that Refco ultimately recouped from such defaults. Nor would Mayer Brown lawyers have known the various accounts that RGHI held in Refco subsidiaries. Thus, it would not have been obvious to Mayer Brown attorneys that the transactions were being used to commit fraud. Indeed, as Plaintiffs have themselves alleged, Refco appeared to outsiders to be a thriving company "with a strong market position operating in an expanding market, . . . [and] generating significant free cash flow." Complaint ¶ 6, *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL). The more compelling inference to be drawn from the Complaint is that Mayer Brown attorneys did not suspect that the back-to-back loans were improper.

The Complaint also offers no factual allegations to support Plaintiffs' assertion that Collins was lying on the three occasions when he allegedly passed on information from Refco management to Plaintiffs' advisers. *See* Complaint ¶¶ 46-48. Plaintiffs do not claim that Refco management did not in fact make the representations allegedly reported by Collins. Moreover, all three statements relate to whether there were any arrangements or contracts other than those already disclosed by Refco during the due diligence process, and Plaintiffs do not allege any basis for the Court to infer that Collins knew or could have known what Refco had disclosed to Plaintiffs as of the time of the alleged misrepresentations, either through statements made directly to THL Partners, Weil Gotshal, or Plaintiffs, or through documents contained in the

"data room."[12]  Notably, Plaintiffs have not alleged that Mayer Brown compiled or reviewed the materials contained in the data room for THL Partners' due diligence.  Thus, there is no factual basis for drawing any inference – let alone the required strong inference – that Collins knew that Refco's management was lying when they said everything requested had been disclosed.

### D.    Plaintiffs Have Not Properly Pled Reliance.

In *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988), the Supreme Court held that reliance is an element of a private action under Section 10(b) and Rule 10b-5.  The Court explained that "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."  *Id.*  In *Central Bank*, the court rejected aiding and abetting claims in part on the ground that such claims would impose liability without any showing that the plaintiff relied upon the aider and abettor's statements or actions.  511 U.S. at 180.  In this case, Plaintiffs cannot show that they relied on anything that Mayer Brown said or did and accordingly their claims fail for that reason alone.

First, in light of the terms of the Purchase Agreement they signed, Plaintiffs cannot claim to have relied on any representations made to them during the many months the parties were engaged in due diligence.  As described above, the Purchase Agreement contains not only an integration clause (Section 9.1), but also an explicit "non-reliance" clause (Section 3.27), which provides that the only representations on which Plaintiffs may rely were those set forth in the Purchase Agreement itself and expressly disclaims any reliance on prior representations made during the course of due diligence.  In *Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996), the Second Circuit affirmed the dismissal of a securities fraud complaint under similar circumstances.  In that case, the purchase agreement contained an integration clause, fourteen

---

[12]    The Complaint cites instances in which Refco officers communicated directly with Plaintiffs without Collins's involvement.  *See* ¶ 43(e).

pages of representations and warranties, and a specific provision, like Section 3.27 here,

providing that the contractual representations were the *only* representations that had been made

by the sellers. When the disappointed purchaser sued for securities fraud after the sale closed

based on alleged misstatements made during due diligence that were not embodied in the final

contract, the Second Circuit upheld the dismissal of the complaint on the ground that the

plaintiffs could not have relied on those representations. *Id.* at 345-47; *Emergent Capital Inv.*

*Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003). The same reasoning

precludes reliance on representations made by a party's agent or representative. *ATSI*

*Commc'ns*, 493 F.3d at 107-08 (2d Cir. 2007) (dismissing claims based on alleged pre-

contractual, verbal misrepresentations made by individuals not party to the agreements).

The same analysis applies here. The parties involved in Plaintiffs' leveraged buyout of

Refco were sophisticated entities that hired a variety of sophisticated advisers and entered into a

contract that explicitly disclaimed all prior representations, whether oral or written, not contained

in the final contract. Under these circumstances, Plaintiffs cannot complain, as they do in ¶¶ 49-

57, that they were misled by draft representations that were exchanged during the course of

negotiations, but did not make it into the final Purchase Agreement. Nor can they complain of

oral assurances provided to them during the course of due diligence, such as the assurances

Refco communicated through Collins. Because Plaintiffs specifically agreed to rely upon only

the representations and warranties in the Purchase Agreement, those are the only representations

that can provide a basis for a claim of securities fraud. For all of the reasons outlined above in

Section II-A, Mayer Brown cannot be held primarily liable for any statements made by Refco

insiders in the Purchase Agreement.

Second, the absence of reliance also dooms Plaintiffs' scheme liability theory based on Mayer Brown's conduct in documenting the back-to-back loans. As noted above, in *Central Bank*, the Supreme Court made it clear that primary liability requires pleading and proof not only that the defendant committed a manipulative or deceptive act, but also that the plaintiff relied on that act in purchasing the securities in question. In this case, Plaintiffs cannot claim to have relied on Mayer Brown's conduct in documenting the back-to-back loans. Indeed, Plaintiffs claim that they had no knowledge whatsoever of those loans. *See Central Bank*, 511 U.S. at 180 ("A plaintiff must show reliance on *the defendant's* misstatement or omission . . . .") (emphasis added); *see also, e.g.*, Brief for the United States as Amicus Curiae Supporting Affirmance, at 17-23, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, No. 06-43 (Sup. Ct.) ("Because petitioner . . . at most relied only on Charter's misstatements, and not on respondents' apparently undisclosed deceptive conduct, petitioner has failed sufficiently to allege reliance for purposes of its claim against respondents.") (Ward Decl., Ex. C).

## III.    THE RICO CLAIM IS BARRED BY THE PSLRA.

Plaintiffs recognize that they cannot bring both a RICO claim and a securities fraud claim. Plaintiffs contend, however, that they can pursue a RICO claim if the Court decides that their securities fraud claim fails as a matter of law. Complaint ¶ 10 n.3. That argument should be rejected. Under the PSLRA, Plaintiffs' RICO claim is barred even if they cannot state a claim against Mayer Brown for securities fraud.

Prior to 1995, a private plaintiff could assert a RICO claim for securities violations that sounded in fraud. Because "fraud in the sales of securities" was a predicate offense, plaintiffs often added RICO claims to securities complaints, seeking lucrative treble damages awards. However, in the PSLRA, enacted in 1995, Congress amended RICO by limiting the conduct that would qualify as a predicate act. As amended, 18 U.S.C. § 1964(c) provides that

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.*

(Emphasis added).   The Conference Committee Report that accompanied the amendment stressed that it was enacted not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but to prevent a plaintiff from "plead[ing] other specified offenses, such as mail fraud or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104-369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746.

The legislative history of this provision makes it clear that Congress did not envision RICO as being an alternative cause of action, which a plaintiff could assert if its securities fraud claim failed to pass muster.  On the contrary, the provision's sponsor, Representative Christopher Cox, explained during the floor debate that the provision would ensure that private plaintiffs could not "bypass the carefully crafted liability provisions of the securities laws and thereby recover damages in cases in which Congress or the courts have determined that no recovery should be available." 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995).

By its plain language, the RICO exception for securities fraud precludes the assertion of a RICO claim in any case where the conduct alleged could be actionable as securities fraud -- regardless of whether the particular plaintiff could have brought a securities fraud claim against the defendant in question.  Thus, in *Howard v. AOL*, 208 F.3d 741, 749-50 (9th Cir.), *cert. denied*, 531 U.S. 828 (2000), the Ninth Circuit held that the fact that plaintiffs lacked standing to bring a securities fraud complaint – because they were customers of AOL, rather than purchasers

or sellers of its stock – did not give them the right to use alleged securities fraud as the predicate acts in a RICO claim against AOL. The court reasoned that Congress had precluded RICO claims based on any "conduct" that would have constituted securities fraud, regardless of whether the plaintiffs themselves could have brought a securities fraud claim based on that conduct.

The same analysis applies here. Even though *Central Bank* precludes Plaintiffs from asserting a securities claim against Mayer Brown (because the most they have alleged is aiding and abetting), they still cannot bring a claim against Mayer Brown under RICO. In the PSLRA, Congress accepted the Supreme Court's view that private plaintiffs should not be able to bring claims for alleged aiding and abetting securities violations, but at the same time it amended the law to expressly permit the SEC alone to bring aiding and abetting claims. Thus, a claim for aiding and abetting securities fraud is precisely the kind of conduct that cannot provide the predicate offense for a RICO claim. *See Payton v. Flynn*, No. 06 C 465, 2006 WL 3087075, at *8 (N.D. Ill. Oct. 26, 2006) ("Aiding and abetting a violation of the federal securities laws is actionable. The fact that it is actionable by the SEC alone, and not by plaintiffs, does not affect the analysis . . . *the PSLRA bar is based on whether the conduct is actionable as securities fraud, not whether it is actionable by a particular plaintiff*." (citations omitted and emphasis added)). This conclusion is supported by the Supreme Court's recent decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81-89 (2006), where the Court held that SLUSA's prohibition on state law class actions alleging conduct that violates Section 10(b) applies to any

alleged conduct that would be actionable as securities fraud by someone – whether or not the particular plaintiff was able to bring a federal securities fraud action.[13]

Any other result would lead to absurd consequences. Under Plaintiffs' view of the law, they would be barred from asserting a RICO claim against the alleged primary wrongdoers in this case – RGHI, Bennett and other Refco insiders – but they would be able to pursue a RICO claim against a party like Mayer Brown, which is accused only of assisting in the fraud. Congress could not have intended to allow a RICO claim, with its treble damages and attorneys' fees provisions, to be asserted against a party who allegedly aided and abetted securities fraud, while the primary wrongdoer would face no RICO liability at all. That is particularly true since Congress made a conscious decision, when it enacted the PSLRA, not to overrule *Central Bank* to allow private plaintiffs to bring aiding and abetting actions under Section 10(b).

We recognize that two courts in the Southern District have taken a different view and have held that RICO claims survive when a securities fraud claim is not viable because the defendant was at most an aider and abettor. *See Renner v. Chase Manhattan Bank*, No. 98 Civ 926 (CSH), 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357 (S.D.N.Y. 2005). Those decisions, we submit, were wrongly decided. Neither court had the benefit of the Supreme Court's *Dabit* decision, and neither considered the fact that the conduct at issue could be "actionable" by someone other than the plaintiffs before them (e.g., the SEC). The better reasoned decision is that of the court in *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793 (RCC), 2005 WL 500377, *4-*5 (S.D.N.Y. Mar. 2, 2005). Holding that

---

[13]    In *Dabit*, the state court plaintiffs were not purchasers or sellers and therefore lacked standing to bring a federal securities law claim. They argued that their state law class action claim for fraud involving covered securities was therefore not precluded by SLUSA, which preempts state law class actions alleging Section 10(b) violations.

the RICO bar applies, notwithstanding the lack of a viable securities cause of action, the Court in

*Fezzani* observed as follows:

> Were courts to permit RICO claims whenever a plaintiff failed to state a cause of action for securities fraud against a particular defendant, plaintiffs would then have the incentive to present only those facts that, if taken as true (as they must be on a motion to dismiss), would not form the basis of a securities fraud claim. The plaintiff as master of the complaint . . . . could reap the benefits of a RICO claim complete with the threat of treble damages by merely failing to state a cause of action for securities fraud. . . . . Armed with the knowledge that aiding and abetting a manipulative or deceptive practice is insufficient under *Central Bank*, for example, a plaintiff could deliberately plead facts that established no more than that a particular defendant aided and abetted another's securities fraud. . . . Under Plaintiff's interpretation of the RICO amendment, such a plaintiff would be able to seek treble damages and easily avoid Congress's purpose in the PSLRA. *Id.* at *4-*5.

The *Fezzani* court's holding should be followed here, and is, indeed, the reasoning of all

other federal courts of which we are aware that have considered the issue. *See, e.g., In re Enron*

*Corp. Secs., Derivative, & ERISA Litig.*, 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) ("The RICO

Amendment bars claims based on conduct that could be actionable under the securities laws even

when the plaintiff, himself, cannot bring a cause of action under the securities laws. The

language of the statute does not require that the same plaintiff who sues under RICO must be the

one who can sue under the securities laws."); *see also Payton v. Flynn*, No. 06-C-465, 2006 WL

3087075, at *6 (N.D. Ill., Oct. 26, 2006); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 698,

2004 WL 2278545, at *7 (N.D. Ill. Oct. 8, 2004); *Hemispherx Biopharma, Inc. v. Asensio*, No.

Civ. A. 98 5204, 1999 WL 144109, at *4 (E.D. Pa. Mar. 15, 1999).

## IV.    THE RICO CLAIM IN ANY EVENT FAILS AS A MATTER OF LAW.

As this Court has stated, "Courts in this district, in agreement with the holdings of several

Courts of Appeals, have carefully scrutinized civil RICO claims at the dismissal stage, since the

statute was enacted expressly, as set forth in the preamble to the Act, to seek the eradication of organized crime in the United States and therefore mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants." *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2004 WL 2211650, at *6 (S.D.N.Y. Sept. 30, 2004) (internal quotations omitted).  In this case, even if Plaintiffs could assert a RICO claim, their attempt to use the RICO statute to reach the provision of routine corporate-law services by a law firm fails as a matter of law.  Congress never intended RICO to have such a broad reach.  As the Supreme Court recognized in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), "Congress did not intend RICO to extend beyond the acquisition or operation of an enterprise," *id.* at 182, and thus reach the conduct of outsiders, *id.* at 181-85.

A.     **Plaintiffs Have Not Pleaded Agreement.**

Plaintiffs seek to plead a conspiracy claim under 18 U.S.C. § 1962(d), which makes criminal any conspiracy to violate Section 1962(c).  Under Section 1962(c), in turn, it is a crime for a person employed by or associated with an enterprise to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering.  To state a claim for conspiracy under RICO, it must be alleged that the defendant knew about *and agreed* to facilitate a criminal scheme.  *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997).  Plaintiffs' claim under Section 1962(d) should be dismissed because it fails adequately to allege that Mayer Brown ever so agreed.

Conclusory allegations concerning a RICO conspiracy are insufficient.  In order to state a claim under Section 1962(d), "the complaint should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it."  *Republic of Colombia v. Diageo North America Inc.*, No. 04-CV-

4372 (NGG), 2007 WL 1813744, at *55 (E.D.N.Y. June 19, 2007) (quotation omitted). The Complaint here fails this standard.

Plaintiffs cannot rest on allegations regarding Mayer Brown's provision of legal services to an enterprise allegedly engaged in fraudulent activity to establish an agreement. It is well-established that even providing services essential to allegedly illegal activity does not give rise to the inference of agreement required for section 1962(d) liability. *See, e.g., Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 732-33 (7th Cir. 1998) ("Although these defendants are alleged to have performed certain services for New Vision and to have known that certain statements on the Wallach tape had 'no basis,' the complaint is utterly devoid of allegations indicating either a specific agreement by these defendants to participate in the affairs of the enterprise or an agreement to the commission of two specific predicate acts.").

A good example of this principle in action is provided by Judge Chin's decision in *Lippe v. Bairnco Corp.*, 218 B.R. 294, 300, 304 (S.D.N.Y. 1998). Plaintiffs in that case alleged that two outside law firms had engaged in a RICO conspiracy by drafting fraudulent disclosures and by assisting in structuring allegedly fraudulent transactions. The court held that "[t]he factual allegations and reasonable inferences of the allegations that do appear in the amended complaint . . . could not reasonably be interpreted as alleging that any of the professional defendants agreed to participate in predicate racketeering acts, that they agreed to pursue the same criminal objective, or that they knew that the general nature of the conspiracy extended beyond their individual roles."[14]

---

[14]    *See also Ballard v. Savage*, No. 92-840 JM(AJB), 1997 U.S. Dist. LEXIS 24013 at *34 (S.D. Cal. Nov. 10, 1997) ("Mere association with conspirators, even with the knowledge of their involvement in a crime, is insufficient to prove participation in a conspiracy. Similarly, evidence of 'mere negative acquiescence' is insufficient to raise a triable issue of fact." (internal quotation and citation omitted)); *Hexagon Packaging Corp. v. Manny Gutterman & Assocs.*, Nos. 96 C

Similarly, here, the Complaint fails because it does not allege any agreement by Mayer Brown to the commission of a substantive RICO violation, or any facts from which any agreement could be inferred.

### B.    Plaintiffs' RICO Conspiracy Claim Fails Because They Have Not Adequately Pleaded an Underlying RICO Violation.

While anyone who agrees to pursue the same unlawful objective can be held liable for a RICO violation, *Salinas v. United States*, 522 U.S. 52, 63-64 (1997), a conspirator must intend to further an endeavor which, if completed, would satisfy all the requirements of a RICO claim. *Id.* at 65. If a plaintiff has no viable claim under sections 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law. *See Howard v. AOL, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (RICO conspiracy claim will not stand unless plaintiff can sustain a viable claim under another subsection of § 1962); *Condict v. Condict*, 826 F.2d 923, 927 (10th Cir. 1987) ("[A]ny claim under § 1962(d) based on a conspiracy to violate the provisions of 18 U.S.C. § 1962(a), (b), or (c) must necessarily fall if the substantive claims are themselves deficient."); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244-45 (2d Cir. 1999) (reversing finding of liability under § 1962(d) because plaintiff had not proven a pattern of racketeering conduct under § 1962(c)). Here, Plaintiffs have failed to plead a Section 1962(c) violation because their allegations of a pattern of racketeering activity are insufficient.[15]

---

4356, 99 C 5493, 2000 WL 226396 (N.D. Ill. Feb. 17, 2000) ("negative acquiescence" does not demonstrate conspiracy); *Congregacion de la Mision Provincia de Venez. v. Curi*, 978 F. Supp. 435, 451 (E.D.N.Y. 1997) ("[M]ere knowledge of the scheme, even coupled with personal benefit, is not enough to impose liablity for a RICO conspiracy.").

[15]    It is possible that Plaintiffs intended to plead that certain of Mayer Brown's own acts constituted predicate acts of wire fraud. Any such allegations would fail for reasons discussed above, as RICO claims based on wire fraud require both scienter and reliance. *See Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (scienter); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir. 1992) (reliance) (abrogated on other grounds).

In particular, Plaintiffs fail to meet RICO's "pattern" requirement. To establish a pattern of racketeering activity, Plaintiffs must plead predicate acts that "amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity" can take one of two forms – either "closed-ended" or "open-ended." *E.g.*, *Cofacredit*, 187 F.3d at 242. To the extent that Plaintiffs seek to allege predicate acts sounding in fraud, however, those predicate acts must be pled with particularity under Federal Rule of Civil Procedure 9(b). *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004). And any predicate acts not pled with particularity cannot be used to establish continuity. *Id.* at 178-79.

With the exception of money laundering, all of the predicate acts pled by Plaintiffs are subject to the heightened pleadings standards of Rule 9(b).[16] This means "[i]n the RICO context, . . . the complaint [must] specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) (internal quotation omitted). As a general matter, Plaintiffs must also identify the victims of the fraudulent acts. *See Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 568 (S.D.N.Y. 1996) ("At a bare minimum, plaintiffs must say who said what to whom."). Plaintiffs fail to meet Rule 9(b)'s pleading requirements for any predicate acts outside the time period in which the 2004 Purchase was being negotiated. The Complaint does not describe the content of the allegedly false financial statements, or when they

---

[16]    Although predicate acts of money laundering are not subject to Rule 9(b), a plaintiff still must plead all the necessary elements of the crime in its complaint. *Leung v. Law*, 387 F. Supp. 2d 105, 118 (E.D.N.Y. 2005). Plaintiffs have not done so in this Complaint.

were disseminated. Perhaps most glaringly, the Complaint does not describe with any particularity to whom the false statements were disseminated – i.e., who was defrauded.[17]

Thus, despite Plaintiffs' conclusory allegations that Bennett, Trosten, and Maggio "were regularly engaged in making or causing others to make false statements about Refco's financial condition" from 1999 to 2005, *id.* ¶ 87(d), the predicate acts described occurred over the span of less than a year, and were all directed at the single purpose of causing Plaintiffs to invest in Refco. Because the predicate acts span less than one year, Plaintiffs have failed to plead a "closed-ended continuity" pattern. *Cofacredit*, 187 F.3d at 244. Even assuming that the allegations in ¶¶ 43(a) and 86(b) sufficiently plead an instance of mail or wire fraud (despite Plaintiffs' failure to identify when the financial statements were transmitted), Plaintiffs themselves admit that their interest in Refco began no earlier than Fall 2003, ¶ 33, less than one year before the July 2004 statements described in ¶ 43.

Moreover, because Bennett, Trosten, and Maggio undertook the alleged predicate acts for the purpose of convincing Plaintiffs to invest in Refco, which they did in August 2004, their scheme was "inherently terminable" and thus not grounds for establishing "open-ended continuity." *Id.*; *First Capital Asset Mgmt.*, 385 F.3d at 180-81; *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263-65 (D.C. Cir. 1995) (concluding it is "virtually impossible" to state a RICO claim where scheme had but one purpose and harmed only a discrete set of victims). Plaintiffs therefore fail to allege an underlying violation of Section 1962(c) and,

---

[17] The Complaint, for example, is devoid of specific allegations regarding its allegations of financial institution fraud: it alleges nothing about who the victims of that fraud were, and how the victims were defrauded. Moreover, because Plaintiffs invested in Refco in August 2004, they have not pleaded how any predicate acts after that date could have caused damages.

thus, cannot state a claim against Mayer Brown for a conspiracy to violate that section under Section 1962(d).[18]

## V.    THE NEGLIGENT MISREPRESENTATION CLAIM IS BARRED BY THE MARTIN ACT AND IN ANY EVENT FAILS TO STATE A CLAIM.

Count V is based in negligence and charges that Mayer Brown "failed to exercise reasonable care or competence in obtaining and communicating information to the THL Funds and in connection with their dealings with Plaintiffs and their representatives." Complaint ¶ 101. However, a claim of negligent misrepresentation arising out of the sale of securities is barred under New York's Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.*

The Martin Act applies to claims in connection with fraudulent and deceitful practices in the purchase and sale of securities that do not require proof of intent to defraud or scienter. *See Granite Partners, LP v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998). Unlike the blue sky laws of other states, there is no private right of action under the New York statute. *See CPC Int'l Inc. v. McKesson Corp.*, 514 N.E.2d 116, 118 (N.Y. 1987) ("Under the Martin Act . . . no private action has been expressly authorized. A majority of this Court now holds that there is no cause of action impliedly created.").[19]  Only the Attorney General of the

---

[18]    Moreover, while we recognize the distinction between conspiracy claims and aiding and abetting claims, the Supreme Court's *Central Bank* decision precludes aiding and abetting claims, not only in a securities context, but in a RICO context as well. As the Third Circuit held in *Pennsylvania Association of Edwards Heirs v. Rightenour*, 235 F.3d 839 (3d Cir. 2000), "the text of [RICO] § 1962 itself contains no indication that Congress intended to impose private civil aiding and abetting liability under RICO." *Id.* at 843. It is clear, from a reading of the Complaint, that Plaintiffs' RICO conspiracy claim is nothing more than aiding and abetting, under a different name.

[19]    Most New York courts have held that the Martin Act precludes a private right of action for common law claims such as negligent misrepresentation. *See Horn v. 440 East 57th Co.*, 547 N.Y.S.2d 1 (App. Div. 1989); *Rego Park Gardens Owners v. Rego Park Gardens Assocs.*, 595 N.Y.S.2d 492 (App. Div. 1993); *Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218, 219 (App. Div. 1992). The only two cases to the contrary, *Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (App. Div. 2001), and *Cromer Finance Ltd. v. Berger*, No.00 Civ. 2498, 2001 WL

State of New York may bring an action under the statute for securities violations. *Id.* at 277.[20]

Both federal and state courts have held that state law claims for negligence and negligent

misrepresentations relating to the purchase and sale of securities are preempted by the statute.

*See Berk v. Moore, Clayton & Co., Inc.*, No. 06 Civ. 2716 (LLS),  2006 WL 3616961 at *6

(S.D.N.Y. Dec. 11, 2006) ("New York's Martin Act bars private claims of negligent

misrepresentation arising out of the sale of securities"); *Marcus v. Frome*, 329 F. Supp. 2d 464,

475-76 (S.D.N.Y. 2004) (dismissing state law claim for negligent misrepresentation on

preemption grounds). *Accord Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303 (S.D.N.Y.

2006); *Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787, at *16 (S.D.N.Y.

Sept. 20, 2005).

Even if the claims were not barred, Plaintiffs' Complaint fails to state a claim for

negligent misrepresentation.  Under New York law, the elements of a negligent

misrepresentation claim are " [a] carelessness in imparting words, upon which others were

expected to rely, upon which they did act or failed to act, to their damage, and the author must

express the words directly, with knowledge they will be acted upon, to one whom the author is

bound by some relation or duty of care." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d at 330

---

1112548 (S.D.N.Y. Sept. 19, 2001) "stand as solitary islands is a stream of contrary opinion."
*Pro Bono Invs., Inc. v. Gerry*,  No. 03 Civ. 4347 (JGK), 2005 WL 2429787, *16 (S.D.N.Y. Sept.
20, 2005), and the holdings cannot be reconciled with the Second Circuit's decision in
*Castellano*, 257 F.3d at 190-91.

[20]    *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (no implied
right of action under the Martin Act because it would be "inconsistent with the Attorney
General's exclusive enforcement powers); *Nanopierce Tech., Inc. v. Southridge Capital Mgmt.
LLC*, 2003 WL 22052894, at *2-*4 (S.D.N.Y. Sept, 2, 2003) ("allowing private litigants to press
common law claims 'covered' by the Martin Act would upset the Attorney General's exclusive
enforcement power in exactly the same way that it would upset the exclusive enforcement power
to allow private claims pleaded under the Martin Act itself.").

(citations omitted). As discussed above, these required elements, including reliance and a duty to disclose, have not been adequately alleged by Plaintiffs.

In cases involving attorneys in corporate transactions, New York courts have made clear that there can be no liability for negligent misrepresentation absent "actual privity or a relationship that otherwise closely resembles privity" between the attorney and the plaintiff. *See AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 842 N.E.2d 471, 478-79 (N.Y. 2005). Of course Plaintiffs and Mayer Brown are not alleged to have been in privity here, nor do Plaintiffs' allegations show any relationship approaching privity. *See Doehla v. Wathne Limited, Inc.*, No. 98 Civ. 6087 CSH, 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999) ("the only cases of which this Court is aware holding that an attorney had, or was properly alleged to have had, a relationship approaching privity with a third-party are those in which the attorney issued an 'opinion letter' to his client in connection with a transaction for the purpose of reliance by the third-party on its contents"). Accordingly, Plaintiffs have failed to properly plead negligent misrepresentation against Mayer Brown.

## VI.    PLAINTIFFS' COMMON LAW FRAUD CLAIM UNDER NEW YORK LAW SHOULD BE DISMISSED.

The elements of common law fraud in New York are "essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b-5." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006) (quotation omitted). To plead a claim for fraud in New York a plaintiff must establish, by clear and convincing proof, that (i) the defendant made a material misrepresentation; (ii) with knowledge of its falsity; (iii) with the intent to defraud plaintiff; (iv) on which the plaintiff reasonably relied; and (v) that caused damage to the plaintiff as a result. *See Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933 (2d Cir. 1998);

*Gouldsbury v. Dan's Supreme Market, Inc.*, 154 A.2d 509, 546 N.Y.S.2d 379, 381 (App. Div. 1989).  A claim for common law fraud in New York must also satisfy the heightened pleading requirements of Rule 9(b).  *Marcus*, 329 F. Supp. 2d at 475.  For the reasons outlined in the discussion of the securities fraud claims, *see* Section II, *supra*, Plaintiffs' common law fraud claims should also be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety for failure to state a claim against Mayer Brown.

Dated:  Washington, D.C.
        September 14, 2007

Respectfully submitted,

John K. Villa (admitted *pro hac vice*)
George A. Borden (GB-7019)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., NW
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (fax)

*Attorneys for Defendant Mayer Brown LLP*