"Person" means and includes an individual, a partnership, a corporation, a limited liability company, a trust, a joint venture, an unincorporated organization, an association, a joint stock company and any Governmental Authority or Self-Regulatory Organization.

"Post Closing Earn-Out Amounts" means any amounts that are required to be paid following the Closing by the Company or any of the Subsidiaries that represent any deferred (whether or not contingent) obligation to pay purchase price or other consideration in connection with any acquisition of a business or any business combination transaction (provided that such payment obligation arises from a contractual obligation incurred by the Company or any of the Subsidiaries prior to the Closing).

"RGHI Equity Portion" means the number of the Voting Membership Interests other than BAWAG Transferred Interests held by RGHI that must be converted into Class A Common Units in order that the total number of Class A Common Units that are issued to RGHI pursuant to the Merger (including Class A Common Units that are issued to RGHI on account of the conversion of BAWAG Transferred Interests) will represent 43% of the total Class A Common Units that will be issued and outstanding immediately following the Merger.

"SEC" means the Securities and Exchange Commission.

"Self-Regulatory Organization" means the National Association of Securities Dealers, Inc., the American Stock Exchange, the National Futures Association, the Chicago Mercantile Exchange, the Chicago Board of Trade, the New York Stock Exchange, Inc., any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), any other securities exchange, futures exchange, contract market, commodities market, any other such exchange, clearinghouse or corporation or other similar federal, state or foreign self-regulatory body or organization.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by the Company.

"Taxes" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i) and (iii) any liability in respect of any items described in clause (i) or (ii) as a successor, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any other Law) or as an indemnitor, guarantor, surety or in a similar capacity under any contract, arrangement, agreement, understanding or commitment (whether oral or written).

MB02055061

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means collectively, all designs, formulae, algorithms, procedures, methods, techniques, know-how, research and development, technical data, computer programs, whether in source code or object code, databases, compilations, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all associated documentation, apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

**Section 9.12    Obligations for Indemnification.**    From and following the Closing, each of Phillip R. Bennett and Tone Grant hereby (i) guarantees the obligations of RGHI under Section 2.4, Section 5.13 and Article 8 (provided, that each such party guarantees only 50% of such obligations of RGHI) and (ii) warrants and covenants that, at the time the Closing is to occur, the statements and covenants in Section 10.10 of the Securityholders Agreement will be accurate and will not have been violated.    The guarantees set forth in this Section 9.12 are unconditional and shall survive any amendment or modification of the terms of this Agreement or the Securityholders Agreement.

MB02055062

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

IN WITNESS WHEREOF, each of the Parties has caused this Equity Purchase and Merger Agreement to be duly executed on its behalf as of the day and year first above written.

REFCO GROUP LTD., LLC

By: _____

Name: _____

Title: _____


REFCO GROUP HOLDINGS, INC.

By: _____

Name: _____

Title: _____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055063

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

THL REFCO ACQUISITION PARTNERS

By:  THL Refco GP LLC, a general partner

By: _____
Name: Scott Schoen
Title:  President

MB02055064

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

REFCO MERGER LLC

By: _Scott Schoen_
Name: Scott Schoen
Title:   President

MB02055065

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of Section 5.13:

ALINEA HOLDING GMBH

By: _____

Name: JOHANN MAUTLER    FROTHES JUSTG

Title: _____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MEMBER AGREEMENT

MB02055066

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of Section 9.12:

PHILIP R. BENNETT

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055067

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of <u>Section 9.12</u>:

TONE GRANT

_____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055068

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

07-0065-cv
Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: May 21, 2007)           Decided: September 7, 2007)

Docket No. 07-0065-cv

KARAHA BODAS COMPANY, L.L.C.,

          *Petitioner-Appellee*,

     v.

PERUSAHAAN PERTAMBANGAN MINYAK DAN GAS BUMI NEGARA,

          *Respondent-Appellant*,

MINISTRY OF FINANCE OF THE REPUBLIC OF INDONESIA,

          *Interested-Party*.

Before: WALKER and CABRANES, *Circuit Judges*, and BERMAN,[*] *District Judge*.

Respondent appeals from a judgment of the United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*) enjoining it from pursuing foreign litigation that the District Court determined would undermine federal judgments confirming and enforcing a foreign arbitration award against respondent. Enforcement proceedings in the United States took place pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). Respondent argues that the District Court used the wrong legal standard to determine whether a foreign anti-suit injunction should issue and that, under the proper

---

[*] The Honorable Richard M. Berman, United States District Judge for the Southern District of New York, sitting by designation.

1

legal standard, the injunction should not have been granted.  Respondent also argues that once it satisfied the federal money judgment that had been entered against it, the District Court lacked jurisdiction to maintain the injunction.

Notwithstanding the District Court's legal error regarding the appropriate test for determining whether to enjoin foreign proceedings, we affirm its judgment with minor modifications.  We conclude that: (1) the test set forth in *China Trade & Development Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987), rather than the "more lenient" test used by the District Court, applies to the anti-suit injunction; (2) the injunction was appropriate under the *China Trade* test; and (3) the District Court maintains jurisdiction to protect its judgments even after the money judgment against appellant was satisfied.  We also modify the judgment slightly to clarify that the injunction does not prohibit foreign confirmation proceedings contemplated by the New York Convention.

> CRAIG D. SINGER Williams & Connolly LLP, Washington, DC, (Henry Weisburg, Shearman & Sterling LLP, New York, NY; David E. Kendall, Thomas J. Roberts, Katherine M. Turner, and John S. Williams, Williams & Connolly LLP, Washington, DC, *on the brief*), *for Respondent-Appellant.*
>
> CHRISTOPHER S. DUGAN (James E. Berger, Danielle W. Pierce, and Kaycee Sullivan, *on the brief*), Paul, Hastings, Janofsky & Walker LLP, New York, NY, *for Petitioner-Appellee.*

JOSÉ A. CABRANES, *Circuit Judge*:

This case requires us to consider the circumstances under which a federal court may enjoin foreign judicial proceedings that threaten to undermine federal judgments confirming and enforcing a foreign arbitral award.  The United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*) enjoined appellant Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina") from pursuing foreign litigation that would undermine federal judgments enforcing a foreign arbitral award that appellee Karaha Bodas Company, L.L.C. ("KBC") had

2

obtained in Switzerland and enforced in the United States pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention" or "Convention"), *implemented at* 9 U.S.C. §§ 201-208. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 465 F. Supp. 2d 283 (S.D.N.Y. 2006) ("*District Court Opinion*"). The District Court issued the anti-foreign-suit injunction upon learning that Pertamina had initiated a suit in the Cayman Islands that sought, *inter alia*, to "vitiate" the foreign arbitral award and obtain return of funds that had been paid over pursuant to the award.

Pertamina argues on appeal that the District Court used the wrong legal standard to determine whether an anti-foreign-suit injunction should issue against it and that, under the proper legal standard, the injunction should not have been granted. Pertamina also argues that, in any event, the District Court lacked jurisdiction to maintain the injunction once the federal money judgment against it was satisfied.

Although we find that the District Court did not apply the correct legal standard, we affirm its judgment with minor modifications. We conclude that: (1) the test set forth in *China Trade & Development Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987), applies to the anti-suit injunction; (2) the injunction was justified under the *China Trade* test; and (3) the District Court maintains jurisdiction to protect the federal judgments even after the money judgment against appellant was satisfied. We also modify the scope of the injunction to clarify that the injunction does not prohibit foreign confirmation proceedings contemplated by the New York Convention.

## BACKGROUND

The dispute between the parties has been litigated extensively in several countries and two federal circuits for almost ten years. We set forth only those facts relevant to the disposition of the appeal.

A.    **The Project and Arbitration Award**

In 1994, KBC, a Cayman Islands limited liability company owned by American power companies and other investors, and Pertamina, an oil and gas company owned and controlled by the Republic of Indonesia, entered into a joint venture for a project to explore and develop certain geothermal energy resources in Indonesia (the "Project"). *See District Court Opinion*, 465 F. Supp. 2d at 284. The parties agreed to settle any disputes between them by binding arbitration in Geneva, Switzerland, under the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL"). The parties further agreed that their contractual relationship would be governed by Indonesian law.

By 1998, the Indonesian government had suspended the Project. In 1998, KBC initiated arbitration proceedings in Switzerland in which it contended that the Indonesian government's actions caused it over $600 million in damages and lost profits. During the arbitration, the parties contested the potential yield of the geothermal resources KBC had contracted to develop with Pertamina and the validity of KBC's projections concerning the facilities it could develop to tap those resources. Pertamina contended that the geothermal resource and development estimates put forward by KBC when entering into the Project were "sham[s]," and that KBC had "no *bona fide* intention" to develop the energy-generating facilities proposed in its documents. The Swiss arbitral tribunal rejected Pertamina's allegations "about the genuineness" of the information provided by KBC in support of its claims, but acknowledged the possibility that KBC's projections may have been "overestimate[s]." On December 18, 2000, the arbitral panel issued a final decision (the "Award") awarding KBC more than $261 million in damages, lost profits, and costs of arbitration, plus 4% interest per annum from January 1, 2001, until the date of full payment. In February 2001, Pertamina filed a petition challenging the Award in the Supreme Court of Switzerland. This challenge was dismissed in April 2001 because Pertamina failed to pay court fees on a timely basis.

4

*District Court Opinion*, 465 F. Supp. 2d at 284-85. The dismissal became final in August 2001 when
the Supreme Court of Switzerland denied Pertamina's request for reconsideration.

**B.    Fifth Circuit Litigation**

In early 2001, KBC initiated proceedings in the United States District Court for the Southern
District of Texas ("Texas District Court") to confirm the Award pursuant to the New York
Convention. The Texas District Court entered a judgment in December 2001 confirming the
Award in the amount of $261 million plus interest. *See Karaha Bodas Co. v. Perusahaan Pertambangan
Minyak Dan Gas Bumi Negara*, 190 F. Supp. 2d 936 (S.D. Tex. 2001) ("*Texas Confirmation Opinion*").

While the Texas District Court judgment confirming the Award was on appeal to the Fifth
Circuit, Pertamina filed an action in a Jakarta, Indonesia, trial court in March 2002 seeking to
collaterally attack the Award and enjoin KBC from enforcing the Award. KBC obtained a
temporary restraining order from the Texas District Court prohibiting Pertamina from pursuing
injunctive relief against KBC in Indonesia while the Texas District Court considered whether the
Indonesian action impinged on its judgment and "upon KBC's legitimate efforts to enforce [KBC's]
rights thereunder." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 264 F.
Supp. 2d 470, 474 (S.D. Tex. 2002) ("*Texas Injunction Opinion*"), *rev'd*, 335 F.3d 357 (5th Cir. 2003)
("*Fifth Circuit Injunction Opinion*"). Despite the Texas District Court's temporary restraining order,
Pertamina obtained an injunction from the Indonesian trial court prohibiting KBC from enforcing
the Award and imposing on KBC "the obligation to pay enforcement money in the amount of
US$500,000.00 for each day this order is contravened, which amount must be paid promptly and
fully to . . . Pertamina." *Texas Injunction Opinion*, 264 F. Supp. 2d at 474 n.3 (quoting Indonesian
injunction). The Indonesian trial court also issued an order annulling the Award. *See Fifth Circuit
Injunction Opinion*, 335 F.3d at 363. Following entry of the Indonesian injunction, the Texas District
Court issued a preliminary injunction prohibiting Pertamina from enforcing the Indonesian

5

injunction or collecting penalties that might be imposed on KBC under the Indonesian injunction.

*See Texas Injunction Opinion*, 264 F. Supp. 2d at 483.

While the Indonesian trial court's decision was on appeal to the Indonesian Supreme Court, the Fifth Circuit vacated the preliminary anti-suit injunction issued by the Texas District Court. *See Fifth Circuit Injunction Opinion*, 335 F.3d at 360. In its decision, the Fifth Circuit determined that, "as the Convention already provides for multiple simultaneous proceedings, it is difficult to envision how court proceedings in Indonesia could amount to an inequitable hardship" sufficient to support an anti-suit injunction against the Indonesian proceedings. *Id.* at 368. The Fifth Circuit concluded that, in any event,

> as a court of secondary jurisdiction under the New York Convention,[1] charged only with enforcing or refusing to enforce a foreign arbitral award, it is not the district court's burden or ours to protect KBC from all the legal hardships it might undergo in a foreign country as a result of this foreign arbitration or the international commercial dispute that spawned it.

*Id.* at 369.

In March 2004, the Indonesian Supreme Court vacated the Indonesian trial court's order annulling the Award and issuing the anti-suit injunction. In the ruling, the Indonesian Supreme

---

[1] Under the New York Convention, "'the country in which, or under the [arbitration] law of which, [an] award was made' is said to have *primary* jurisdiction over the arbitration award. All other signatory States are *secondary* jurisdictions, in which parties can only contest whether that State should enforce the arbitral award." *Fifth Circuit Injunction Opinion*, 335 F.3d at 364 (quoting New York Convention art. V(1)(e)). As explained by the Fifth Circuit, the Convention assigns

> different roles to national courts to carry out the aims of the treaty. Articles IV and V of the Convention specify the procedures for courts of secondary jurisdictions to follow when deciding whether to enforce a foreign arbitral award. Article IV provides that a party can obtain enforcement of its award by furnishing to the putative enforcement court the authenticated award and the original arbitration agreement (or a certified copy of both). Article V, in turn, enumerates specific grounds on which the court *may* refuse enforcement if the party contesting enforcement provides proof sufficient to meet one of the bases for refusal.
>
> In contrast to the limited authority of secondary-jurisdiction courts to review the arbitral award, courts of primary jurisdiction, usually the courts of the country of the arbitral situs, have much broader discretion to set aside an award. By its silence on the matter, the Convention does not restrict the grounds on which primary-jurisdiction courts may annul an award, thereby leaving to a primary jurisdiction's local law the decision whether to set aside an award. Consequently, even though courts of a *primary* jurisdiction may apply their own domestic law when evaluating an attempt to annul or set aside an arbitral award, courts in countries of *secondary* jurisdiction may refuse enforcement only on the limited grounds specified in Article V.

*Id.* at 368 (footnotes omitted).

Court concluded that only a Swiss court had power to annul the Award. Later that month, the Fifth Circuit affirmed the Texas District Court's confirmation of the Award. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 282 (5th Cir.) ("*Fifth Circuit Confirmation Opinion*"), *cert. denied*, 543 U.S. 917-18 (2004).[3] In doing so, the Fifth Circuit concluded (as had the Supreme Court of Indonesia, unbeknownst to the Fifth Circuit) that, because only a Swiss court could annul the award under the New York Convention, the Indonesian annulment order did not require vacating the judgment confirming the Award in the United States. *See id.* at 308-10.

## C.    Other Confirmation and Enforcement Proceedings

Pursuant to the New York Convention, KBC also sought to confirm and enforce the Award against Pertamina in Hong Kong, Singapore, and Canada. Those efforts yielded approximately $900,000 to be applied to the amount owed by Pertamina under the Award. *See District Court Opinion*, 465 F. Supp. 2d at 286.[4]

## D.    Second Circuit Litigation

### 1.    Enforcement Proceedings

When Pertamina appealed the Texas District Court's judgment to the Fifth Circuit, it declined to post a supersedeas bond in order to obtain a stay of judgment pending appeal. *See* Fed. R. Civ. P. 62(d) ("When an appeal is taken the appellant by giving a supersedeas bond may obtain a

---

[3] The appeal was not heard until after Judge Griesa had considered and rejected Pertamina's post-judgment motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b)(2) (providing for relief from judgment on the basis of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial") and Fed. R. Civ. P. 60(b)(5) (providing for relief from judgment if, *inter alia*, "a prior judgment on which it is based has been reversed or otherwise vacated"). Pertamina argued that newly-discovered evidence that some of KBC's investors had received payments pursuant to a political risk insurance policy supported relief under Rule 60(b)(2), and that the Indonesian trial court's order annulling the award supported relief under Rule 60(b)(5). *See Fifth Circuit Confirmation Opinion*, 364 F.3d at 286.

[4] KBC confirmed its award in Hong Kong and Canada but obtained funds from Pertamina only in Hong Kong. *Id.* KBC voluntarily dismissed its action in Singapore. *Id.*

7

stay . . . ."). This permitted KBC to seek registration and enforcement of the Texas District Court's

judgment in the Southern District of New York, where Pertamina maintained several bank accounts

in its name that held hundreds of millions of dollars in assets. *See* 28 U.S.C. § 1963 (providing for

registration of federal judgments in other districts);[5] *District Court Opinion*, 465 F. Supp. 2d at 286,

291. KBC registered the Texas judgment confirming the Award with the District Court on February

22, 2002, and immediately commenced execution proceedings against Pertamina. *See id.* at 286.

The parties then engaged in heated litigation concerning ownership of the assets in the New

York bank accounts held in Pertamina's name. Pertamina contended that the Indonesian

government was the actual owner of the funds in the New York bank accounts. On an

interlocutory appeal certified pursuant to 28 U.S.C. § 1292(b), we determined that both Pertamina

and the Indonesian government owned some part of the funds in the accounts; and that KBC was

entitled to satisfy its judgment against Pertamina out of the portion of the funds owned by

Pertamina. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70,

75, 92-93 (2d Cir. 2002), *cert. denied*, 539 U.S. 904 (2003). The District Court ultimately ordered

Pertamina to turn over to KBC the entire amount of the Award (by this time valued at roughly $319

million, including interest on the award)—less the $900,000 already recovered by KBC in Hong

Kong—out of the Pertamina-owned funds in the New York bank accounts. *See District Court*

*Decision*, 465 F. Supp. 2d at 291. We affirmed this order in March 2006. *See Karaha Bodas Co. v.*

---

[5] 28 U.S.C. § 1963 states, in relevant part:

A judgment in an action for the recovery of money or property entered in any court of appeals, district court, bankruptcy court, or in the Court of International Trade may be registered by filing a certified copy of the judgment in any other district . . . when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown. . . . A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.

. . . .

The procedure prescribed under this section is in addition to other procedures provided by law for the enforcement of judgments.

8

*Ministry of Finance of the Republic of Indonesia*, Nos. 04-6551-cv, 04-6672-cv, 2006 WL 565694, at *2 (2d Cir. Mar. 9, 2006). Pertamina, seeking review of our decision, petitioned the United States Supreme Court for a writ of certiorari.

## 2.    The Anti-Suit Injunction

While Pertamina's petition for a writ of certiorari was pending before the Supreme Court, the District Court asked Pertamina whether, if the Supreme Court denied certiorari, Pertamina would finally consent to pay the remainder of the judgment against it, thus ending the litigation between the parties. *See District Court Opinion*, 465 F. Supp. 2d at 288. In a letter to the District Court dated August 28, 2006, Pertamina stated that if certiorari were denied, it would "not object before this Court to the payment of the judgment." *Id.* This statement was technically accurate. The Supreme Court denied certiorari on October 2, 2006, see 127 S. Ct. 129 (2006), and on October 10, 2006, almost all of the remainder of the $319 million payment was turned over to KBC.[6] In the meanwhile, however, Pertamina filed a new action in the Cayman Islands (the "Cayman Islands action").

The Cayman Islands action, filed on September 15, 2006, was based on the theory that the Award was procured by fraud. Pertamina sought damages in the amount of the Award against KBC along with a variety of ancillary remedies. *See District Court Opinion*, 465 F. Supp. 2d at 288-89. Specifically, Pertamina alleged in a supporting affidavit that, in August 2005, Pertamina's "advisors" discovered documents that "KBC had left behind when it ceased its operations and left Indonesia some time around 2002," which "revealed that KBC had committed a fraud on Pertamina" by creating fraudulent resource and development estimates for the Project. Pertamina further alleged that the fraud associated with these estimates was "such as to vitiate the Arbitral Award." *District*

---

[6] "A small portion of the funds were not turned over until November 29, 2006, when the final turnover calculation was made." Appellee's Br. 13 n. 7.

*Court Opinion*, 465 F. Supp. 2d at 289 (internal quotation marks omitted). Accordingly, Pertamina

sought damages, an accounting, and restitution from KBC for the alleged fraud, including

"[r]estitution and/or equitable compensation and/or repayment of . . . all sums received by [KBC]

pursuant to the Arbitral Award (and its enforcement)." *See id.*[7] Pertamina also sought a "*Mareva*

injunction"[8] prohibiting KBC from disposing of any funds obtained pursuant to the Award,

including "any sums received or to be received by [KBC] pursuant to any order of the United States

District Court for the Southern District of New York . . . pursuant to proceedings . . . directed to

enforcing the [Award] in favour of [KBC]." *See District Court Opinion*, 465 F. Supp. 2d at 289-90.

In response to the Cayman Islands action, KBC moved in the Southern District of New

York for an injunction prohibiting Pertamina from (1) maintaining the Cayman Islands action, or

any similar action anywhere, and (2) restraining KBC from disposing of funds obtained from

Pertamina. The District Court granted KBC's application for an anti-suit injunction. It found that

the Cayman Islands action was intended to undo the Award and, furthermore, "ha[d] the obvious

purpose of nullifying the judgment[s] of the federal court in Texas . . . [and] the Southern District of

New York." *District Court Opinion*, 465 F. Supp. 2d at 292-93. After noting that it "ha[d] the power,

and indeed the duty, to deal with abusive litigation tactics used by a party before it," the District

Court concluded that Pertamina had engaged in abusive litigation tactics by deciding to file suit in

the Cayman Islands rather than seek relief using means available to it under federal law.[9] *See id.* at

---

[7] These allegations and claims were renewed in an Amended Writ of Summons filed on October 6, 2006, after the United States Supreme Court had denied Pertamina's petition for a writ of certiorari.

[8] Injunctions that prohibit a party from transferring assets pending resolution of an action in order to "ensure the effectiveness of an ultimate remedy . . . [are] known as 'Mareva injunctions' for the second English case to issue one, *see Mareva Compania Naviera S.A. v. Int'l Bulkcarriers S.A.*, (1975) 2 Lloyd's Rep. 509." *SEC v. Cavanagh*, 445 F.3d 105, 117 & n.27 (2d Cir. 2006). Though these injunctions are "available in equity in England and Canada, among other places," *id.* at n.27, federal courts lack power to issue them. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 328-29 (1999); *Cavanagh*, 445 F.3d at 117-18.

[9] The District Court noted that Pertamina could have sought relief from the federal judgments confirming and enforcing the award in federal court through Fed. R. Civ. P. 60(b)(3), which permits a motion seeking relief from judgment to be brought (1) on the basis of "fraud (whether heretofore denominated intrinsic or extrinsic),

300. Accordingly, the District Court (1) made the injunction permanent and (2) issued a declaratory judgment "declaring that the funds recovered by KBC pursuant to the judgments in this matter are the property of KBC, that KBC has full right to dispose of such funds as KBC sees fit, and that, in the event that Pertamina should for some reason obtain an order of the Cayman Islands court or any other court, based upon matters relating to the Arbitral Award, purporting to interfere with KBC's rights to dispose of the funds, KBC has no obligation to comply with such order." *Id.* at 301. Finally, pending appeal, it stayed its decision authorizing KBC to dispose of funds obtained pursuant to its earlier judgments.

### 3.     Subsequent Developments

While Pertamina's appeal from the District Court's anti-suit injunction was being briefed, KBC moved us to lift the stay entered by the District Court, thereby authorizing it to distribute to its shareholders the $263 million it had obtained from Pertamina. We granted KBC's motion on February 13, 2007. On February 15, 2007, Pertamina's motion for an emergency stay before the United States Supreme Court was denied. At oral argument for the instant appeal, we were informed by KBC that, following the lifting of the stay, KBC distributed substantially all of the remaining Pertamina funds to its shareholders and was thus no longer in possession of any of the assets that would be the subject of the *Mareva* injunction sought by Pertamina in the Cayman Islands.[10] Following oral argument, we ordered the parties to submit supplemental letter briefs addressing whether the satisfaction of the money judgment against Pertamina affected the District Court's jurisdiction to maintain the injunction.

---

misrepresentation, or other misconduct of an adverse party," or (2) through "an independent action" alleging fraud. *See* 465 F. Supp. 2d at 293-94; *see also* Fed. R. Civ. P. 60(b) (noting that courts may "entertain an independent action to relieve a party from a judgment, order, or proceeding, . . . or to set aside a judgment for fraud upon the court").

[10] On April 30, 2007, KBC obtained an order sanctioning Pertamina for bad-faith litigation conduct. The District Court found that a Pertamina witness had lied in a deposition in an effort to frustrate the District Court from accurately ruling on the ownership of funds in New York bank accounts. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, No. 21-98, 2007 WL 1284903 at *6 (S.D.N.Y. Apr. 30, 2007).

DISCUSSION

A.     **Standard of Review**

The standard of review for the grant of a permanent injunction, including an anti-suit

injunction, is abuse of discretion. *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech.,*

*Inc.,* 369 F.3d 645, 651 (2d Cir. 2004); *China Trade,* 837 F.2d at 37. We will find such an abuse of

discretion if the district court "applies legal standards incorrectly or relies upon clearly erroneous

findings of fact, or proceed[s] on the basis of an erroneous view of the applicable law." *Register.com,*

*Inc. v. Verio, Inc.,* 356 F.3d 393, 398 (2d Cir. 2004) (citation omitted); *see also Zervos v. Verizon N.Y.,*

*Inc.,* 252 F.3d 163, 169 (2d Cir. 2001) ("error of law" constitutes "abuse of discretion").

B.     **The *China Trade* Test Applies to, and Supports Entry of, the Anti-Suit Injunction**

1.     **The *China Trade* Test**

In *China Trade*, we adopted a test governing the circumstances under which a federal district

court could issue an anti-foreign-suit injunction. Under the *China Trade* test, an anti-suit injunction

against foreign litigation may be imposed only if two threshold requirements are met: "(A) the

parties are the same in both matters, and (B) resolution of the case before the enjoining court is

dispositive of the action to be enjoined." *Paramedics,* 369 F.3d at 652 (citing *China Trade,* 837 F.2d at

35). If these two threshold requirements are satisfied, "courts are directed to consider a number of

additional factors," *id.,* including whether the parallel litigation would:

> (1) frustrat[e] . . . a policy in the enjoining forum; (2) . . . be vexatious; (3) . . . threat[en] . . .
> the issuing court's in rem or quasi in rem jurisdiction; (4) . . . prejudice other equitable
> considerations; or (5) . . . result in delay, inconvenience, expense, inconsistency, or a race to
> judgment.

*Ibeto Petrochemical Industries Ltd. v. M/T Beffen,* 475 F.3d 56, 64 (2d Cir. 2007) (quoting *China Trade,* 837

F.2d at 35). *China Trade* instructed that two of these factors should be accorded "greater

significance": whether the foreign action threatens the enjoining forum's jurisdiction or its "strong

public policies." 837 F.2d at 36. However, we have reiterated that *all* of the additional factors

should be considered when determining whether an anti-suit injunction is warranted. *See Ibeto*

*Petrochemical*, 475 F.3d at 64 (disagreeing with courts and commentators that "have erroneously

interpreted *China Trade* to say that we consider *only* these two [more significant] factors"). *China*

*Trade* also states that "principles of comity counsel that injunctions restraining foreign litigation be

'used sparingly' and 'granted only with care and great restraint.'" *Paramedics*, 369 F.3d at 652 (quoting

*China Trade*, 837 F.2d at 36)).

> 2.     The *China Trade* Test Applies to the Anti-Suit Injunction

*China Trade* involved an anti-suit injunction prohibiting a foreign defendant from pursuing a

parallel proceeding in a foreign forum *while a proceeding was pending* in the Southern District of New

York. The District Court, noting that judgment had already been entered in American courts, did

not apply the *China Trade* test. Relying on *dicta* in a district court decision that had been affirmed by

our Court in a brief published *per curiam* opinion, the District Court concluded that a "more lenient

standard" applied to injunctions intended to prevent an abusive effort to evade a domestic

judgment. *See District Court Opinion*, 465 F. Supp. 2d at 294-95 (quoting *Farrell Lines Inc. v. Columbus*

*Cello-Poly Corp.*, 32 F. Supp. 2d 118, 131 (S.D.N.Y. 1997), *aff'd sub nom*, *Farrell Lines Inc. v. Ceres*

*Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998)).[11]

In the instant case, Pertamina argues that the District Court committed legal error in

concluding that KBC did not have to satisfy the *China Trade* test in order to obtain an anti-suit

injunction against it. It notes that the *China Trade* test has been applied by our Court for twenty

---

[11] In *Farrell Lines*, the district court held that the plaintiff *had* satisfied the "strict" *China Trade* standard before proceeding to note that a "more lenient" standard *should* apply where the domestic forum had already decided the merits of the claim being relitigated in a foreign forum. *See Farrell Lines*, 32 F. Supp. 2d at 130-31. *Farrell Lines* derived the "more lenient standard" from the District of Columbia Circuit's decision in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984), which stated that when "the [anti-foreign-suit] injunction is requested after a previous judgment on the merits, . . . a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation." *Id.* at 928; *see Farrell Lines*, 32 F. Supp. 2d at 131.

years, and that we applied the *China Trade* test to an anti-foreign-suit injunction in *Paramedics* even though a "judgment ha[d] been rendered" in that case. 369 F.3d at 651, 653-54.

We agree with Pertamina that, pursuant to our decision in *Paramedics*, the *China Trade* test applies to anti-foreign-suit injunctions intended to protect federal judgments. We note, however, that as discussed in *Paramedics*, the discretionary *China Trade* factors will tend to weigh in favor of an anti-foreign-suit injunction that is sought to protect a federal judgment. In *Paramedics*, we applied the *China Trade* test to an anti-foreign-suit injunction that was entered to protect a federal judgment compelling arbitration. *See* 369 F.3d at 653-54. In doing so, we explained that "'[t]here is less justification for permitting a second action,' as here, 'after a prior court has reached a judgment on the same issues," *id.* at 654 (quoting *Laker Airways*, 731 F.2d at 928 n.53), and that "[a]n anti-suit injunction may be needed to protect the court's jurisdiction once a judgment has been rendered," *id.* We also concluded that while "[p]rinciples of comity weigh heavily in the decision to impose a foreign anti-suit injunction . . . . where one court has already reached a judgment—on the same issues, involving the same parties—considerations of comity have diminished force." *Id.* at 654-55.

### 3.     The *China Trade* Test Is Satisfied

Despite the District Court's legal error in not applying the *China Trade* test, we do not think it necessary to vacate the injunction and remand for further proceedings given the particular circumstances of the instant case. The principal difference between the "more lenient" test applied by the District Court and the *China Trade* test lies in the threshold requirements that a party must surmount to obtain an injunction under the latter. Based on the extensive record developed in the District Court and in other United States and foreign courts, we conclude as a matter of law that those threshold requirements are met. Turning to the discretionary factors under *China Trade*, we find that the District Court properly considered these factors, albeit under a different rubric, and

14

found them supportive of injunctive relief.[12]

### a.    The Threshold Requirements Are Met

It is undisputed that the first threshold requirement of *China Trade* is satisfied; the parties are the same in both the proceedings before the District Court and in the Cayman Islands action. Application of the second threshold requirement of *China Trade*—that resolution of the case before the enjoining court is dispositive of the action to be enjoined, *see* 837 F.2d at 35—requires further analysis. First, we must determine the substance of the "case before the enjoining court." KBC obtained (1) a judgment from the Texas District Court confirming the Award and (2) judgments from the Southern District of New York enforcing the Texas District Court's judgment (collectively, the "federal judgments"). Pertamina asserts that the only "case before the enjoining court"—that is, the Southern District of New York—was the determination of whether certain funds located in New York could be used to satisfy a judgment against it. According to Pertamina, the proceedings before the Southern District of New York thus could not have been dispositive of the Cayman Islands action because the enforcement proceeding that took place there "in no way implicated—let alone was dispositive of—Pertamina's lawsuit for fraud in the Cayman Islands." Pertamina argues further that the Southern District of New York inappropriately "arrogated to itself the role of defending the judgment of the Southern District of Texas confirming the arbitration award."

This argument is without merit. When KBC registered the Texas District Court's judgment confirming the arbitration award in the Southern District of New York, that judgment had the same effect, and was entitled to the same protection, as if it had been entered in the Southern District of New York in the first instance. *See* 28 U.S.C. § 1963 (stating that a registered judgment "shall have the same effect as a judgment of the district court of the district where registered and may be

---

[12] We further note that the scope and duration of this litigation militate heavily in favor of a swift and definitive resolution of the dispute over the injunction.

enforced in like manner"). The Southern District of New York was therefore empowered to take any action to protect the judgment confirming the Award that the Texas District Court could have taken. KBC did not need to return to Texas in order to protect and enforce the judgment. *See Smith v. Woolsey*, 399 F.3d 428, 431-36 (2d Cir. 2005) (affirming anti-suit injunction issued by Connecticut federal court to protect judgment rendered by Pennsylvania federal court); *Covington Indus., Inc. v. Resintex A. G.*, 629 F.2d 730, 732 n.2 (2d Cir. 1980) (discussing power of court of registration to determine validity of judgment rendered in another federal district). Thus, we conclude that the "case before the enjoining court" includes all of the federal judgments related to the case, including (1) the Texas District Court judgment confirming the Award and (2) the judgments entered by the Southern District of New York enforcing the Texas District Court's judgment.

We also must examine whether the federal judgments that the Southern District of New York sought to protect were "dispositive" of the Cayman Islands action. We agree with KBC that the federal judgments satisfy the *China Trade* requirement because the Award, and the federal judgments confirming and enforcing it, actually decided the claims raised in the Cayman Islands action. We also conclude that the New York Convention permits the federal judgments to be treated as "dispositive" of the Cayman Islands action.

As discussed above, the Texas District Court confirmed, and the District Court enforced, an Award that was entered in a Swiss arbitration proceeding. These courts confirmed and enforced the Award against Pertamina even though, as discussed above, Pertamina had argued in the Swiss arbitration that the resource and development estimates prepared by KBC were fraudulent—the same allegation, though assertedly with new factual support, that Pertamina makes in the Cayman Islands action. Moreover, the Fifth Circuit, in affirming the Texas District Court's confirmation of the arbitration award, rejected Pertamina's argument that enforcement of the Award should be refused because it was procured by fraud. *See Fifth Circuit Confirmation Opinion*, 364 F.3d at 306-07

16

(noting that "[e]nforcement of an arbitration award may be refused . . . if the award was procured by fraud" and rejecting arguments that enforcement of the award against Pertamina should be refused on this basis).

Pertamina argues that the Cayman Islands action is a proceeding "separate and independent of the arbitration proceedings and award." We, however, conclude that this characterization is inconsistent with the nature of the Cayman Islands action. Beyond seeking to vitiate the Award, the Cayman Islands action seeks a (1) determination that the District Court wrongfully ordered almost $319 million to be paid to KBC pursuant to the federal judgments confirming and enforcing the Award, and (2) return of all funds obtained by KBC "pursuant to the Arbitral Award (and its enforcement)."[13] Although Pertamina makes new factual allegations in support of its claim that the Award should not have been enforced against it, these new factual allegations are not sufficient to undermine the preclusive effect of several earlier federal court decisions that (1) the Award should be enforced and (2) KBC is entitled to Pertamina's New York funds in an amount sufficient to satisfy the Award. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 661-63 (2d Cir. 1997) (holding that a district court properly dismissed, as barred by *res judicata*, an "independent action" for rescission of a prior judgment on the basis of fraud, where the plaintiff failed to mount "a viable direct attack" on the earlier judgment);[14] Restatement (Second) of Judgments § 27 (1982)

---

[13] We also note that, were the action brought in federal court, it would not have been characterized as an "independent" action. Because the action, if successful, would have the effect of vitiating the federal judgments, the action would have been treated as "ancillary" to the earlier federal proceedings—in essence, as "a continuation of the former suit" in federal court—even if it was formally denominated as an "independent action" for fraud. *United States v. Beggerly*, 524 U.S. 38, 45-46 (1998) (quoting *Pacific R.R. of Mo. v. Missouri Pacific Ry. Co.*, 111 U.S. 505, 522 (1884)).

[14] *Campaniello Imports* explained that claimants seeking to vitiate an earlier judgment through an independent action "must (1) show that they have no other available or adequate remedy; (2) demonstrate that movants' own fault, neglect, or carelessness did not create the situation for which they seek equitable relief; and (3) establish a recognized ground—such as fraud, accident, or mistake—for the equitable relief." 117 F.3d at 662. Pertamina does not even attempt to satisfy the first requirement; it does not seriously dispute the District Court's conclusion that there were remedies for the alleged fraud available to it under federal law in 2002, when it obtained the documents that serve as the basis for its allegedly "new" fraud claim, or in 2005, when it finally reviewed the documents and allegedly discovered the fraud.

("When an issue *of fact or law* is actually litigated and determined by a valid and final judgment, and

the determination is essential to the judgment, the determination is conclusive in a subsequent

action between the parties . . . ." (emphasis added)); *id.* cmt. c ("[I]f the party against whom

preclusion is sought did in fact litigate an issue of ultimate fact [*i.e.*, an issue requiring application of

law to fact] and suffered an adverse determination, new evidentiary facts may not be brought

forward to obtain a different determination of that ultimate fact . . . ."); *cf. Paramedics*, 369 F.3d at 653

(concluding, without considering the factual basis for foreign litigation, that a federal judgment

compelling arbitration was dispositive of foreign litigation because the foreign litigation

"concern[ed] issues that, by virtue of the district court's judgment, are reserved to arbitration").[15]

We also conclude that, under the New York Convention, the federal judgments to be

protected are "dispositive" of the Cayman Islands action.  Pertamina essentially argues that the

federal judgments could not be dispositive because (1) the federal courts involved in confirming and

enforcing the Award within the United States were only acting as "secondary-jurisdiction court[s]

under the Convention," Appellant's Br. 41 (quoting *Fifth Circuit Injunction Opinion*, 335 F.3d at 372

---

[15] Pertamina argues that the threshold requirements of the *China Trade* test should be read as coextensive with the test applicable to federal anti-suit injunctions precluding actions in state court.  A federal court has power under the Anti-Injunction Act, 28 U.S.C. § 2283, to issue an injunction "to protect . . . its judgments" from further litigation in state courts under the "relitigation exception" to the broad prohibition of the Anti-Injunction Act. *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988); *see also Smith*, 399 F.3d at 431.  *Choo* held that the "relitigation exception" only permits a federal court "to protect against relitigation of 'claims or issues' that 'actually have been decided by the federal court.'" *Smith*, 399 F.3d at 434 (quoting *Choo*, 486 U.S. at 148).  We noted in *Smith* that *Choo*,

> [b]y referring to both "claims" and "issues," . . . permitted the relitigation exception to be applied to protect a federal court[] judgment that would be entitled to more than the issue-preclusion effect of collateral estoppel. A judgment adjudicating a claim could also be protected. But by insisting that the "claims or issues . . . actually have been decided," *Choo*, 486 U.S. at 148, the Court was not permitting protection of the full *res judicata* effect of a judgment, *i.e.*, preclusion of claims that, while not litigated, arose from the same common nucleus of operative facts as the litigated claim.

*Smith*, 399 F.3d at 434 n.8.  We need not reach the question of whether the *China Trade* test would permit a federal court to protect the "full *res judicata* effect" of a federal judgment by enjoining claims that "while not litigated, arose from the same common nucleus of operative facts as the litigated claim," *id.*, because the claims raised in the Cayman Islands action concerning the validity of the Award and KBC's entitlement to Pertamina's funds have *actually been* litigated in the Southern District of Texas and the Southern District of New York, even if Pertamina seeks to offer new facts in the Cayman Islands action in support of its position.

n.59), and (2) secondary jurisdictions, under the New York Convention, are not entitled to protect judgments related to a foreign arbitral award from foreign interference  In doing so, it relies on the Fifth Circuit's earlier opinion vacating the Texas District Court's anti-suit injunction.  In that decision, the Fifth Circuit noted that, because the New York Convention contemplates multiple proceedings in several nations to procure and enforce a foreign arbitral award, it was not appropriate for a secondary-jurisdiction court "to protect KBC from all the legal hardships it might undergo in a foreign country as a result of this foreign arbitration or the international commercial dispute that spawned it." *Fifth Circuit Injunction Opinion*, 335 F.3d at 369.

 We agree with the Fifth Circuit that federal courts should not attempt to protect a party seeking enforcement of an award under the New York Convention "from *all* the legal hardships" associated with foreign litigation over the award.  But it does not follow, as Pertamina would have us hold, that a federal court cannot protect a party who is the beneficiary of a federal judgment enforcing a foreign arbitral award from *any* of the legal hardships that a party seeking to evade enforcement of that judgment might seek to impose.  Federal courts in which enforcement of a foreign arbitral award is sought cannot dictate to other "secondary" jurisdictions under the New York Convention whether the award should be confirmed or enforced in those jurisdictions.  *See id.* at 372 n.59 (noting that a federal judgment enforcing a foreign arbitral award under the New York Convention does "not automatically receive *res judicata* effect" in other jurisdictions in which enforcement is sought).  But federal courts *do* have inherent power to protect *their own* judgments from being undermined or vitiated by vexatious litigation in other jurisdictions.  *See Ibeto Petrochemical,* 475 F.3d at 64 (discussing whether "the foreign action would be vexatious" in affirming an anti-foreign-suit injunction); *Covanta Onondaga Ltd. P'ship v. Onondaga County Res. Recovery Agency,* 318 F.3d 392, 398 (2d Cir. 2003) (noting "a court's unquestioned authority to terminate and prevent the renewal of a protracted series of vexatious lawsuits filed by a litigant").  Moreover, "[e]ven in the

absence of a pattern of vexatious litigation . . . a district court that has adjudicated the merits of a case may have authority to prevent relitigation." *Covanta Onondaga*, 318 F.3d at 398. As the Fifth Circuit recognized, the New York Convention does not divest federal courts of this inherent power. *See Fifth Circuit Injunction Opinion*, 335 F.3d at 365 ("Given the absence of an express provision [in the New York Convention], we discern no authority for holding that the New York Convention divests the district court of its inherent authority to issue an antisuit injunction.").

In this case, the federal judgments reached a dispositive determination that KBC should be paid $319 million of Pertamina's funds, held in New York bank accounts, pursuant to the Award. This determination is entitled to protection from Pertamina's attempts to vitiate it through the Cayman Islands action. The existence of the federal judgments ordering Pertamina to turn over $319 million is one of the factors distinguishing the injunction issued by the District Court from the injunction against the Indonesian action, which was vacated by the Fifth Circuit in 2003. In 2003, the Texas District Court had only confirmed the Award, and there had been no definitive determination that KBC was entitled to the funds that Pertamina held in the New York bank accounts. By the time that the District Court entered the anti-suit injunction at issue in this appeal, however, additional federal judgments enforcing KBC's Award had been entered. As the District Court noted, those judgments "are not conditional, or qualified, or limited in any way as to KBC's rights with respect to the monies awarded" pursuant to the Award and the federal judgment confirming it. *District Court Opinion*, 465 F. Supp. 2d at 300.

The nature of the Cayman Islands action that the District Court sought to enjoin also distinguishes the injunction at issue here from the injunction that was vacated by the Fifth Circuit. When the Fifth Circuit vacated the anti-suit injunction prohibiting litigation in Indonesia, Pertamina had an arguable—though ultimately meritless—basis for claiming that the Indonesian proceedings were permissible under the New York Convention. Under the Convention, a jurisdiction may

20

decline to enforce a foreign arbitral award if it has "been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." New York Convention art. V(1)(e). Pertamina argued that, because Indonesian substantive law applied to the dispute between the parties, an Indonesian court had the power to set aside or suspend the Award. *See Fifth Circuit Confirmation Opinion*, 364 F.3d at 308 (noting that "Pertamina suggests that both Switzerland (the host country) and Indonesia (the country of governing law) have primary jurisdiction over the arbitration in this case" under Article V(1)(e) of the Convention); *see also* Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1069 (1961) (asserting that Article V(1)(e) "provides that when an award is rendered in one state under the law of a second state, the courts of that second state may set aside or suspend the award").[16] In 2004, after the Texas District Court's anti-suit injunction had been vacated, the Fifth Circuit concluded that only Switzerland had authority to set aside the Award in this case. *See Fifth Circuit Confirmation Opinion*, 364 F.3d at 308-10. But when it initiated proceedings in Indonesia in 2002, Pertamina at least had a colorable argument that Indonesian courts had a role to play in determining whether the Award should be enforced.

Here, by contrast, the Cayman Islands has no arguable basis for jurisdiction to adjudicate rights and obligations of the parties with respect to the Award. Cayman Islands courts have no power to modify or annul the Award under the Convention; and Pertamina does not even attempt to argue that the Cayman Islands action is one that would be contemplated by the Convention. We conclude that in these circumstances the District Court had power to prevent Pertamina from engaging in litigation that would tend to undermine the regime established by the Convention for recognition and enforcement of arbitral awards. "[C]oncerns of international comity, respect for the

---

[16] We disagreed with this proposition in *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997) (expressing approval for the proposition that "only the state under whose procedural law the arbitration was conducted has jurisdiction under Art. V(1)(e) to vacate the award").

21

capacities of foreign and transnational tribunals, and sensitivity to the need of the international

commercial system for predictability in the resolution of disputes require that we enforce . . .

agreement[s]" to submit disputes to binding international arbitration. *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629 (1985). These considerations also require us to protect the

regime established by the Convention for enforcement of international arbitral awards, if necessary

by enjoining parties from engaging in foreign litigation that would undermine it.[17]

### b.  The Additional *China Trade* Factors Support Issuance of an Injunction

As discussed above, where an anti-foreign-suit injunction is sought to protect a federal

judgment, the additional *China Trade* factors will often favor issuance of an anti-suit injunction when

the threshold *China Trade* requirements are met. Despite adopting a "more lenient" test, the District

Court considered the discretionary factors set forth in *China Trade* and determined they warranted an

injunction. *See District Court Opinion*, 465 F. Supp. at 295-301. We agree.

We turn first to the two additional factors that have been described as having "greater

significance," *China Trade*, 837 F.3d at 36—namely, whether the foreign action threatens the

jurisdiction or the strong public policies of the enjoining forum. As in *Paramedics*, "[b]oth

considerations are salient in this case." 369 F.3d at 654. *China Trade* held that "an injunction may . .

. be necessary to protect the enjoining court's jurisdiction." 837 F.3d at 36; *see also Paramedics*, 369

F.3d at 654 ("An anti-suit injunction may be needed to protect the court's jurisdiction once a

judgment has been rendered."). Here, an injunction is necessary because the Cayman Islands action

threatens to undermine the federal judgments confirming and enforcing the Award against

---

[17] The Fifth Circuit expressed concern that permitting the Texas District Court's earlier injunction against
Pertamina's Indonesian action to stand "could set an undesirable precedent under the Convention, permitting a
secondary jurisdiction to impose penalties on a party when it disagrees with that party's attempt to challenge an award in
another country." *Fifth Circuit Injunction Opinion*, 335 F.3d at 373. We agree with the Fifth Circuit that no mere
disagreement with a party's approach to enforcing or attacking a foreign arbitral award under the Convention should
suffice to support an anti-foreign-suit injunction. But federal courts are not obligated to sit by idly when a party engages
in proceedings that undermine the regime governing enforcement of foreign arbitral awards established by the
Convention.

Pertamina, and may also undermine federal jurisdiction to determine whether prior federal judgments should be invalidated on the basis of the fraud alleged by Pertamina. *Cf. Campaniello Imports*, 117 F.3d at 661 ("Res judicata 'does not preclude a litigant from making a direct attack . . . upon the judgment *before the court which rendered it.*'" (emphasis added) (quoting *Weldon v. United States*, 70 F.3d 1, 5 (2d Cir. 1995)). The injunction is also supported by strong public policy considerations. We have noted "the strong public policy in favor of international arbitration," and the need for proceedings under the New York Convention "to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005) (internal quotation marks omitted). These important objectives would be undermined were we to permit Pertamina to proceed with protracted and expensive litigation that is intended to vitiate an international arbitral award that federal courts have confirmed and enforced.

We also conclude that one of the three remaining additional *China Trade* factors—whether the foreign action would be vexatious—counsels strongly in favor of the injunction. *China Trade* noted that vexatiousness is "likely to be present whenever parallel actions are proceeding concurrently," 837 F.2d at 36. Proceedings are apt to be especially vexatious, however, where a foreign proceeding threatens to undermine a federal judgment. Here, the District Court expressly (and properly) found that "the entire point of the fraud allegations [of the Cayman Islands action] is to show that the Arbitral Award must be deemed to be vitiated—*i.e.*, to be a nullity." *District Court Opinion*, 465 F.3d at 291. In other words, the District Court concluded that the subsequent litigation in this case, being aimed at the recovery by KBC in the federal courts, was entirely vexatious. As the District Court noted:

> [A]fter almost six years of litigation in district and appellate courts based on the Arbitral Award, the American courts had finally resolved all the issues presented to them about whether the Arbitral Award should be confirmed and about the method by which KBC

23

should recover the large amount due. Although procedures were available under federal law for Pertamina to make its claim of fraud and to seek to prevent KBC from recovering the $319 million, there was no attempt whatever by Pertamina to make use of such procedures. . . . Instead, Pertamina engaged in the six years of litigation in the United States without any mention of its claim of fraud. Finally, at the very moment when the litigation was to be legitimately ended, Pertamina brought the action in the Cayman Islands after engaging in literal subterfuge in dealing with the Court in New York. The purpose of this lawsuit is to effectively wipe out the effect of the United States judgments and to do this with as great an amount of delay as possible.

*Id.* at 300.[18] As indicated above, federal courts have the authority to restrain a party before it from engaging in vexatious litigation. *See, e.g., Covanta Onondaga*, 318 F.3d at 398. *China Trade* indicates that this authority should be exercised where, as here, other factors also counsel in favor of issuance of an injunction.

Finally, we note that comity considerations, though important, have "diminished force" when a court has already reached a judgment involving the same issues and parties. *Paramedics*, 369 F.3d at 655. Comity concerns have particular importance under the Convention; a federal court should be wary of entering injunctions that may prevent parties from engaging in post-award enforcement or annulment proceedings that are contemplated by the Convention. But comity concerns under the Convention have no bearing on our consideration of the Cayman Islands action, which is not a proceeding contemplated by the Convention and is, moreover, intended to undermine federal judgments. As we have stated, "orders of foreign courts are not entitled to comity if the litigants who procure them have 'deliberately courted legal impediments' to the enforcement of a federal court's orders." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting *Societe Internationale v. Rogers*, 357 U.S. 197, 208-09 (1958))); *see also id.* (noting that the District of Columbia Circuit, in *Laker Airways*, 731 F.2d at 939-40, refused to respect an English

---

[18] We note further that the Cayman Islands action follows what, by any account, is an extraordinarily complex and protracted series of proceedings. At oral argument, KBC informed the Court (and Pertamina did not dispute) that Pertamina's resistance to confirmation and enforcement of the Award has required KBC to appear in more than fifteen courts in seven nations over the past nine years, including five appearances in our Court alone, in support of its enforcement efforts.

court's order where the "defendants involved in the American suit had . . . gone into the English courts to generate interference with the American courts"). Accordingly, comity concerns do not weigh against entry of an anti-suit injunction in this case.

## C.    The District Court Maintains Jurisdiction to Enforce the Injunction

In a supplemental letter brief requested by the Court, Pertamina asserts that, regardless of whether the District Court had the authority to issue an anti-suit injunction in the first instance, it now lacks jurisdiction to maintain the injunction because Pertamina has paid the judgment against it. Pertamina relies primarily on two Supreme Court opinions describing the boundaries of "ancillary jurisdiction," *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375 (1994), and *Peacock v. Thomas*, 516 U.S. 349 (1996), as well as the Eighth Circuit's recent decision in *Goss International Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355 (8th Cir. 2007), which vacated an anti-foreign-suit injunction imposed to protect a federal money judgment once the judgment was satisfied, *see id.* at 369.

"[T]he doctrine of ancillary jurisdiction . . . recognizes federal courts' jurisdiction over some matters *(otherwise beyond their competence)* that are incidental to other matters properly before them." *Kokkonen*, 511 U.S. at 378 (emphasis added). The Court, in *Kokonnen*, found that jurisdiction to maintain ancillary proceedings may be exercised

> for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees, *see, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (power to compel payment of opposing party's attorney's fees as sanction for misconduct); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (contempt power to maintain order during proceedings).

511 U.S. at 379-80. It also held that a federal court did not maintain ancillary jurisdiction to hear disputes over a settlement agreement that was not entered as an order of the court. *See id.* at 381-82. In *Peacock,* the Court observed that it had "approved the exercise of ancillary jurisdiction over a

broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances," *id.* at 356, but noted that "recognition of these supplementary proceedings has not . . . extended beyond attempts to execute, or to guarantee eventual executability of, a federal judgment," *id.* at 357.

*Goss* involved an anti-suit injunction that was entered to ensure satisfaction of an antidumping judgment against a Japanese company. 491 F.3d at 358-59. New federal legislation repealed the antidumping statute under which the plaintiff in *Goss* had recovered, but did so only prospectively; in response, Japan enacted a law, the "Special Measures Law," that was intended to permit the defendant in *Goss* to seek return of the award in Japanese courts. *See id.* The district court entered an anti-suit injunction prohibiting an action from being filed under the Special Measures Law; after the injunction was issued, the defendant paid the federal judgment in full. *See id.*

Noting that "there [wa]s no longer an outstanding judgment to protect," the Eighth Circuit concluded the relevant "jurisdictional circumstances and comity concerns" now weighed in favor of ending the injunction. *Id.* at 368. With respect to comity, the Eighth Circuit concluded that (1) federal courts no longer had any direct interest in the matter and (2) because the Japanese government had passed the Special Measures Law, Japanese courts should have an initial opportunity to determine the enforceability of the Special Measures Law. *See id.* at 366-68. With respect to jurisdiction, the Eighth Circuit reasoned that, under *Peacock*, the district court retained ancillary enforcement jurisdiction only "*until* satisfaction of the judgment." *Id.* at 365 (citing *Peacock*, 516 U.S. at 356-57). It also noted that the All Writs Act, 28 U.S.C. § 1651(a), which permits federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions," did not provide a source of jurisdiction to enter the anti-suit injunction. *See* 491 F.3d at 364-65; *see also*

26

*Syngenta Crop. Prot., Inc. v. Henson*, 537 U.S. 28, 33 (2002) (stating that "the All Writs Act does not confer jurisdiction on the federal courts"). Nor did the Eighth Circuit find any other source of jurisdiction to support the anti-suit injunction.

While "[t]he boundaries of ancillary jurisdiction are not easily defined and the cases addressing it are hardly a model of clarity," *Garcia v. Teitler*, 443 F.3d 202, 208 (2d Cir. 2006), we conclude that federal courts have continuing jurisdiction, grounded in the concepts of *res judicata* and collateral estoppel, to enjoin a party properly before them from relitigating issues in a non-federal forum that were already decided in federal court. This source of jurisdiction remains even after a judgment has been satisfied—regardless of whether (1) the judgment is one of dismissal or (2) the font of jurisdiction for such an injunction is characterized as "ancillary" or otherwise.[19] *See, e.g.*, *Choo*, 486 U.S. at 147 ("[A] federal court [may] prevent state litigation of an issue that previously was presented to and decided by the federal court. [This power] is founded in the well-recognized concepts of *res judicata* and collateral estoppel."); *id.* at 150-51 (affirming anti-suit injunction protecting from relitigation a ruling in earlier federal judgment of dismissal); *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934) ("That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled."); *Smith*, 399 F.3d at 431-36 (affirming anti-suit injunction based on judgment dismissing claims as time-barred); *Paramedics*, 369 F.3d at 654 ("An anti-suit injunction may be needed to protect the court's jurisdiction once a judgment has been rendered."); *see also Covanta Onondaga*, 318 F.3d at 398 ("Even in the absence of a pattern of vexatious litigation . . . a district court that has adjudicated the merits

---

[19] *Peacock*'s statement that federal courts' power to engage in "supplementary proceedings *involving third parties* to assist in the protection and enforcement of federal judgments" does not "extend[ ] beyond attempts to execute, or to guarantee eventual executability of, a federal judgment," 516 U.S. at 356-57 (emphasis added), does not affect our analysis. Pertamina is not a third party, and the injunction was not entered merely to facilitate execution of the federal judgment. Rather, the injunction was entered to *protect* the federal judgment from being undermined or vitiated in foreign proceedings *by a party before* the District Court.

27

of a case may have authority to prevent relitigation."); 18 James Wm. Moore, *Moore's Federal Practice* §
131.53 (perm. ed. 2006) (noting that "a district court retains jurisdiction to enforce the judgments it
enters"); 17A Charles Alan Wright et al., *Federal Practice & Procedure* § 4226 (perm. ed. 2007) ("No
independent basis of jurisdiction is required for a federal court to entertain an application to enjoin
relitigation in state court.").

    Accordingly, we conclude that the District Court retained—and retains—continuing
jurisdiction to maintain the anti-foreign-suit injunction even though the federal judgments against
Pertamina have been satisfied.  While an anti-foreign-suit injunction should not be made permanent
absent a need for such relief, *see, e.g.*, *Ibeto Petrochemical*, 475 F.3d at 65 (modifying injunction where
there was "no need for the permanent injunction that the District Court seems to have issued"),[20]
entry of a permanent injunction was fully justified in this case.  Were we to vacate the District
Court's injunction, Pertamina would be free to engage in vexatious proceedings that, as discussed,
are intended to undermine or vitiate federal judgments; the District Court did not err in determining
that a permanent injunction was necessary in these circumstances.

**D.      The Injunction Should Be Modified Slightly**

    Although the injunction could be read to bar any other action related to the Award, the
parties agree that the injunction does not bar confirmation proceedings currently underway in other
nations.  It would be inconsistent with our obligations under the Convention to bar good-faith
litigation over the Award in Switzerland, the jurisdiction with primary authority over the Award.[21]
Accordingly, we modify the injunction slightly to clarify that the injunction has no effect on

---

    [20] Moreover, as *Goss* suggests, a federal court may in some circumstances (not presented here) have a
diminished need for an anti-suit injunction to protect a judgment once ancillary proceedings to satisfy the judgment have
run their course.

    [21] While there is no indication that Pertamina could return to Switzerland in order to seek annulment of the
arbitration award, KBC could not say definitively at oral argument that Pertamina would be time-barred from seeking to
annul the Award in that jurisdiction on the basis of the alleged fraud. [Hr'g Tr. 53]

confirmation proceedings contemplated by the New York Convention in other jurisdictions, and moreover, permits Pertamina to return to the District Court to seek relief from the injunction in the event that it demonstrates its good faith in seeking an opportunity to challenge the Award in Switzerland. *Cf. Smith*, 399 F.3d at 436 (modifying anti-suit injunction to avoid having it "inadvertently sweep too broadly").

## CONCLUSION

For the reasons stated above, the judgment of the District Court is affirmed as modified.

29