# EXHIBIT C

No. 06-43

# In the Supreme Court of the United States

STONERIDGE INVESTMENT PARTNERS, LLC,
PETITIONER

*v.*

SCIENTIFIC-ATLANTA, INC., ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT*

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING AFFIRMANCE**

PAUL D. CLEMENT
  *Solicitor General
    Counsel of Record*

THOMAS G. HUNGAR
  *Deputy Solicitor General*

KANNON K. SHANMUGAM
  *Assistant to the Solicitor
    General
  Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2217*

## QUESTION PRESENTED

Whether a person may be liable in a private action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) and (c), for engaging in a transaction with the issuer of a security on the ground that the transaction constituted "deceptive" conduct, when the plaintiff did not rely on that conduct but at most relied only on a subsequent misstatement by the issuer concerning the transaction.

# TABLE OF CONTENTS

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Argument:
    The court of appeals correctly held that respondents
    cannot be held liable in a private action under Section
    10(b) and Rule 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    A.   The phrase "deceptive device or contrivance," as
        used in Section 10(b), encompasses deceptive
        conduct as well as misstatements (and omissions
        by parties with a duty to disclose) . . . . . . . . . . . . . . . 11
    B.   Because petitioner failed sufficiently to allege
        reliance, the court of appeals correctly upheld
        the dismissal of petitioner's complaint . . . . . . . . . . . 17
    C.   Allowing the complaint in this case to proceed
        would dramatically broaden the inferred right of
        action in Section 10(b) and Rule 10b-5 . . . . . . . . . . . 26
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

Cases:

    *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128
        (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 24
    *Alexander* v. *Sandoval*, 532 U.S. 275 (2001) . . . . . . . . 27, 30
    *Anixter* v. *Home-Stake Prod. Co.*, 77 F.3d 1215
        (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) . . . . . . 18, 24, 25
    *Central Bank of Denver, N.A.* v. *First Interstate*
        *Bank of Denver, N.A.*, 511 U.S. 164 (1994) . . . . . *passim*

(III)

IV

Cases—Continued:                                               Page

*Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61
(2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336
(2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18, 23, 25

*Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976) . . . . 12, 17

*Fidel* v. *Farley*, 392 F.3d 220 (6th Cir. 2004) . . . . . . . . . . 21

*Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657
(5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*J.I. Case Co.* v. *Borak*, 377 U.S. 426 (1964) . . . . . . . . . . . . 27

*Klein* v. *Boyd*, No. 97-1143 (3d Cir.) . . . . . . . . . . . . . . . . . . 21

*Lampf, Pleva, Lipkind, Prupis & Petigrow* v.
*Gilbertson*, 501 U.S. 350 (1991) . . . . . . . . . . . . . . . . . . . . 28

*Pinter* v. *Dahl*, 486 U.S. 622 (1988) . . . . . . . . . . . . . . . . . . 29

*Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148
(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Regents of the Univ. of Cal.* v. *Credit Suisse First*
*Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007),
petition for cert. pending, No. 06-1341 (filed Mar. 5,
2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462
(1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374
(2d Cir. 1974), cert. denied, 421 U.S. 976 (1975) . . . 18, 19

*Schweiker* v. *Chilicky*, 487 U.S. 412 (1988) . . . . . . . . . . . . 27

*SEC* v. *Edwards*, 540 U.S. 389 (2004) . . . . . . . . . . . . . . . . 15

*SEC* v. *Zandford*, 535 U.S. 813 (2002) . . . . . . . . . . . . . . . . 10

*Shapiro* v. *Cantor*, 123 F.3d 717 (2d Cir. 1997) . . . . . . . . . 21

V

Cases—Continued:                                           Page

*Simpson* v. *AOL Time Warner Inc.*, 452 F.3d 1040
    (9th Cir. 2006), petition for cert. pending, No.
    06-560 (filed Oct. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . 23

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . 27

*Superintendent of Ins.* v. *Bankers Life & Cas. Co.*,
    404 U.S. 6 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 27

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Nobles*, 422 U.S. 225 (1975) . . . . . . . . . . 25

*United States* v. *O'Hagan*, 521 U.S. 642 (1997) . . . . . . 15, 16

*United States* v. *Russo*, 74 F.3d 1383 (2d Cir.), cert.
    denied, 519 U.S. 927 (1996) . . . . . . . . . . . . . . . . . . . . . . 16

*Wilkie* v. *Robbins*, 127 S. Ct. 2588 (2007) . . . . . . . . . . . . . 27

*Wright* v. *Ernst & Young LLP*, 152 F.3d 169 (2d Cir.
    1998), cert. denied, 525 U.S. 1104 (1999) . . . . . . . . . . . 21

*Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir.
    2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Statutes, regulation and rule:

Private Securities Litigation Reform Act of 1995, Pub.
    L. No. 104-67, § 201, 109 Stat. 758 . . . . . . . . . . . . . . . . 13

Securities Act of 1933, 15 U.S.C. 77a *et seq.*:
    15 U.S.C. 77b(a)(11) (§ 2(a)(11)) . . . . . . . . . . . . . . . . . . 29
    15 U.S.C. 77*l*(1) (§ 12(1)) . . . . . . . . . . . . . . . . . . . . . . . 29

Securities Exchange Act of 1934, 15 U.S.C. 78a
    *et seq.*:
    15 U.S.C. 78j(a) (§ 10(a)) . . . . . . . . . . . . . . . . . . . . . . . . 13
    15 U.S.C. 78j(b) (§ 10(b)) . . . . . . . . . . . . . . . . . . . . *passim*
    15 U.S.C. 78r(a) (§ 18(a)) . . . . . . . . . . . . . . . . . . . . . . . . 29

VI

Statutes, regulation and rule—Continued:                    Page

  15 U.S.C. 78t(a) (§ 20(a))  . . . . . . . . . . . . . . . . . . . . . . . . 29

  15 U.S.C. 78t(e) (§ 20(e))  . . . . . . . . . . . . . . . . . . . . 26, 29

  15 U.S.C. 78u-4(b)(4) (§ 21D(b)(4))  . . . . . . . . . . . . . . . 25

  15 U.S.C. 78u-4(f)(2)(A) (§ 21D(f)(2)(A))  . . . . . . . . . . . 28

  15 U.S.C. 78u-4(f)(3)(C) (§ 21D(f)(3)(C))  . . . . . . . . . . . 28

  15 U.S.C. 78u-4(f)(10)(A) (§ 21D(f)(10)(A))  . . . . . . . . . 13

17 C.F.R.:

  Section 240.10b-5 (Rule 10b-5)  . . . . . . . . . . . . . . . *passim*

  Section 240.10b-5(a) (Rule 10b-5(a))  . . . . . . . . . . 5, 11, 13

  Section 240.10b-5(b) (Rule 10b-5(b))  . . . . . . . . . . . 5, 13

  Section 240.10b-5(c) (Rule 10b-5(c))  . . . . . . . . . . 5, 11, 13

  Fed. R. Civ. P. 23(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Miscellaneous:

  *Black's Law Dictionary* (3d ed. 1933) . . . . . . . . . . . . . . . . 14

  *Bouvier's Law Dictionary* (1928)  . . . . . . . . . . . . . . . . . . . 14

  *Charter Commc'ns, Inc., In re,* Exchange Act Release
   No. 50,098 (July 27, 2004) <http://sec.gov/
   litigation/admin/34-50098.htm>  . . . . . . . . . . . . . . . . . . . . 4

  Restatement (Second) of Torts (1977)  . . . . . . . . . . . . 18, 19

  S. Rep. No. 792, 73d Cong., 2d Sess. (1934)  . . . . . . . . . . . 13

  S. Rep. No. 98, 104th Cong., 1st Sess. (1995)  . . . . . . . . . . 26

  *Webster's New International Dictionary* (2d ed.
   1934)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

# In the Supreme Court of the United States

---

No. 06-43

STONERIDGE INVESTMENT PARTNERS, LLC,
PETITIONER

*v.*

SCIENTIFIC-ATLANTA, INC., ET AL.

---

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE EIGHTH CIRCUIT*

---

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING AFFIRMANCE**

---

### INTEREST OF THE UNITED STATES

The United States administers and enforces the federal securities laws. The question in this case concerns the scope of liability in private actions under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b). Meritorious private actions are an essential supplement to criminal prosecutions and civil enforcement actions brought by the government. At the same time, private securities actions can be abused in ways that impose substantial costs on companies that have fully complied with the applicable laws. The United States also has responsibility, through, *inter alia*, the federal banking agencies, for ensuring that entities providing services to publicly traded companies are not subject to inappropriate secondary liability. The United States thus has a strong interest in seeing that the principles applied in private actions

(1)

2

promote the purposes of the securities laws and other important federal laws, and has previously participated as an amicus curiae in cases involving those principles.

## STATEMENT

1.  This case involves a claim of securities fraud against respondents Scientific-Atlanta, Inc., and Motorola, Inc., which manufacture digital set-top boxes used by cable-television subscribers.  As alleged in the amended complaint, the facts are as follows.  Respondents supplied set-top boxes to Charter Communications, Inc. (Charter), one of the Nation's largest cable-television operators.  In August 2000, Charter realized that it was unlikely to meet its annual target for operating cash flow.  Charter decided to ask respondents to enter into "wash" transactions, whereby Charter would pay respondents additional amounts for the set-top boxes they supplied and respondents would use those amounts to "purchase" advertising on Charter's cable channels.  In effect, those transactions would entitle respondents to receive the advertising for free. Scientific-Atlanta Br. in Opp. App. 31-32.

In order for Charter to improve its operating cash flow as a result of those transactions, it needed to capitalize the payments to respondents (on the theory that they were for the purchase of equipment) while treating the return payments from respondents as revenue (on the theory that they were for the purchase of advertising).  Before entering into the transactions, Charter discussed them with Arthur Andersen, its outside accountant.  Arthur Andersen advised Charter that it could not recognize the advertising payments as revenue if they were integrally related to the payments to respondents, but that it could do so if the two sets of payments were unrelated to each other, negotiated at least one month apart, and made at fair market value.  Charter informed Arthur Andersen that it would undertake to satisfy those conditions.  In

3

late September 2000, Charter and each respondent entered into separate agreements for the price increase in the set-top boxes and for the advertising; the agreements concerning the set-top boxes, however, were backdated to August 2000. Scientific-Atlanta Br. in Opp. App. 32-34.

The proposed second amended complaint, based on information obtained in discovery, contains more detailed allegations concerning the transactions.[1]  It alleges that Charter instructed Scientific-Atlanta to notify Charter that it was raising the price of set-top boxes that Charter had already agreed to purchase, and further instructed Scientific-Atlanta to cite higher manufacturing costs as the reason for the increase.  Scientific-Atlanta followed Charter's instructions, even though it knew that the stated reason for the increase was false.  The parties later entered into an agreement under which Charter would pay an extra $20 for each set-top box it had already agreed to purchase (totaling $6.73 million in excess payments).  The parties simultaneously entered into a separate agreement in which Scientific-Atlanta agreed to purchase $6.73 million in advertising from Charter (at rates four to five times higher than those paid by other advertisers).  J.A. 53a-59a.

The proposed second amended complaint also alleges that Charter entered into an agreement with Motorola to purchase 540,000 set-top boxes by December 31, 2000, even though Charter had no present need for the Motorola boxes (and thus no intention of buying them).  The agreement contained a provision requiring Charter to pay Motorola $20 per box in liquidated damages (totaling $10.8 million) if it did not pur-

---

[1]  After the district court had dismissed the claim against respondents, petitioner filed a motion for leave to file the proposed second amended complaint.  The district court denied the motion in relevant part, concluding that, in light of its reasoning in dismissing the claim, "amending the complaint would be futile."  Pet. App. 28a.

4

chase the boxes by the specified date. The parties entered into a separate agreement in which Motorola agreed to purchase $10.8 million in advertising from Charter (again at rates four to five times higher than those paid by other advertisers). J.A. 53a, 56a-59a.

The proposed second amended complaint alleges that respondents knew that Charter intended to use the transactions artificially to inflate its operating cash flow. It also alleges that the backdating of the contracts for the set-top boxes was indicative of "[respondents'] scienter and complicity in efforts to mislead Charter's auditors." J.A. 53a, 55a, 58a-60a.

Charter subsequently informed Arthur Andersen that the agreements had been negotiated a month apart from each other, and Arthur Andersen duly advised Charter that it could recognize the advertising payments as revenue. Charter did so in its financial statements for the fourth quarter of 2000, thereby increasing its operating cash flow by at least $17 million to a total of $433.2 million (and $1.56 billion for the entire year). But for its accounting of the transactions with respondents, Charter would not have met analysts' projections for its operating cash flow. Charter continued to report increases in cash flow throughout 2001 and the first quarter of 2002. On April 1, 2003, however, Charter issued a comprehensive restatement of its financial reports in which, *inter alia*, it reduced its operating cash flow for 2000 by $195 million and its operating cash flow for 2001 by $292 million. Scientific-Atlanta Br. in Opp. App. 33-34, 47, 49-60, 66.[2]

---

[2] The Securities and Exchange Commission (SEC) subsequently brought administrative proceedings against Charter; in its order instituting the proceedings, the SEC alleged that, as a result of the transactions at issue in this case, Charter had committed numerous reporting, books and records, and accounting control violations. See *In re Charter Commc'ns, Inc.*, Exchange Act Release No. 50,098 (July 27, 2004) <http://sec.gov/litigation/admin/34-50098.htm>. Charter settled the proceedings without admitting or denying any securities violations.

5

2.  As is relevant here, petitioner, an investment firm, filed a class action against respondents in the United States District Court for the Eastern District of Missouri on behalf of all purchasers of Charter securities between November 8, 1999, and July 17, 2002, alleging that respondents had engaged in fraudulent conduct in violation of Section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) and (c).[3]  Petitioner also brought claims against Charter and its executives, contending that Charter had engaged in numerous fraudulent acts to misrepresent its revenues and costs and to inflate its customer growth rate, and against Arthur Andersen, contending that Arthur Andersen had acted fraudulently in auditing Charter's financial statements.  Scientific-Atlanta Br. in Opp. App. 1-88.[4]

Respondents filed motions to dismiss, contending, *inter alia*, that the complaint failed to allege actionable misstatements or omissions by respondents, and also failed to allege that petitioner had relied on respondents' alleged deceptions. The district court granted the motions.  Pet. App. 30a-71a. The court held that "[petitioner's] claims against [respondents] amount to claims for aiding and abetting liability under § 10(b) and Rule 10b-5," and were therefore barred by *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that a private party may not pursue a Section 10(b) action on a theory of aiding and

---

[3]  Petitioner originally also alleged that respondents had made misstatements in violation of Rule 10b-5(b), 17 C.F.R. 240.10b-5(b), see Scientific-Atlanta Br. in Opp. App. 80, but dropped that claim in its second amended complaint, see J.A. 110a.

[4]  Charter and its executives entered into a settlement.  Arthur Andersen moved to dismiss the claim against it, contending that the complaint did not sufficiently allege scienter, but the district court denied the motion.  Pet. App. 47a-64a.  Arthur Andersen subsequently also entered into a settlement.

6

abetting liability. Pet. App. 39a. The district court reasoned that "[petitioner] do[es] not assert that [respondents] made any statement, omission or action at issue or that [petitioner] relied on any statement, omission or action made by either of them." *Id.* at 41a. Instead, the court noted, "[petitioner] contend[s] that [respondents] are liable to Charter's investors on the basis that they engaged in a business transaction that Charter purportedly improperly accounted for." *Ibid.* The court stated that it could "find no precedent" for the proposition that a company could violate Section 10(b) and Rule 10b-5 simply "by virtue of engaging in a business enterprise with a company such as Charter, the entity purported to have made the statements at issue." *Id.* at 41a-42a.

3. The court of appeals affirmed. Pet. App. 1a-11a. At the outset, the court of appeals stated that, in *Central Bank*, this Court "confirmed that § 10(b) prohibits only 'manipulative or deceptive' devices or contrivances," and that, in earlier cases, the Court "held that 'deceptive' conduct involves either a misstatement or a failure to disclose by one who has a duty to disclose." *Id.* at 4a-5a (citation omitted). The court of appeals further noted that, in *Central Bank*, this Court held that "Rule 10b-5 does not reach those who only aid or abet a violation of § 10(b)." *Id.* at 5a.

The court of appeals rejected petitioner's contention that it had "properly alleged a *primary* violation of the securities laws within the meaning of *Central Bank* because [respondents] violated Rule 10b-5(a) and (c)," Pet. App. 8a, which prohibit "employ[ing] [a] device, scheme, or artifice to defraud" or "engag[ing] in [an] act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." The court reasoned that "*Central Bank* and the earlier cases on which it relied stand for three governing principles." *Ibid.* First, the court explained, "a private plaintiff may not bring a 10b-5 suit against a defendant for

7

acts not prohibited by the text of § 10(b)." *Ibid.* (internal quotation marks and citation omitted). Second, the court contended, "[a] device or contrivance is not 'deceptive,' within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose." *Ibid.* (citation omitted). Third, the court noted, "[t]he term 'manipulative' in § 10(b) has [a] limited contextual meaning." *Ibid.* (citation omitted). Based on those principles, the court held that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Id.* at 9a.

Applying that holding, the court of appeals determined that petitioner's complaint failed to state a claim against respondents. Pet. App. 9a-10a. The court reasoned that "the focus of [petitioner's] § 10(b) and Rule 10b-5 claims was deception" by Charter, and that "neither Motorola nor Scientific-Atlanta was alleged to have engaged in any * * * deceptive act." *Ibid.* In addition, the court held that respondents "did not issue any misstatement relied upon by the investing public, nor were they under a duty to Charter investors and analysts to disclose information useful in evaluating Charter's true financial condition." *Id.* at 10a. The court thus concluded that "the district court properly dismissed the claims against [respondents] as nothing more than claims, barred by *Central Bank*, that [respondents] knowingly aided and abetted the Charter defendants in deceiving the investor [class]." *Ibid.*

The court of appeals stated that it was "aware of no case imposing § 10(b) or Rule 10b-5 liability on a business that entered into an arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts." Pet. App. 10a. Imposing liability in those circumstances, the court

8

concluded, "would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings," and "[d]ecisions of this magnitude should be made by Congress." *Ibid.*

## SUMMARY OF ARGUMENT

A.  The court of appeals in this case erred to the extent it held that Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), reaches only misstatements, omissions made while under a duty to disclose, or manipulative trading practices.  The plain language of Section 10(b) demonstrates that it potentially reaches *all* conduct that is "manipulative" or "deceptive." That interpretation is consistent both with the legislative history of the 1934 Act and with the contemporaneous understanding of the term "deceptive."  This Court's cases provide no support for the conclusion that non-verbal deceptive conduct is somehow beyond the reach of Section 10(b).

Properly understood, a person engages in "deceptive" conduct for purposes of Section 10(b) when the conduct by its nature is objectively likely to mislead another person, *e.g.*, when it has the effect of conveying a false appearance of material fact to an observer (assuming, of course, that the defendant possessed the requisite mental state in engaging in the conduct).  Respondents' alleged conduct constituted a "deceptive device or contrivance" because it not only was likely to, but allegedly did, mislead Charter's outside accountant, Arthur Andersen, about the nature of the transactions into which respondents had entered.  Such a reading of Section 10(b) does not nullify this Court's holding in *Central Bank* that aiding and abetting liability is not available in a private Section 10(b) action, because a person cannot be liable as a primary violator unless it *itself* engages in deceptive conduct—and, critically, unless the other elements of primary liability under Section 10(b) are also established.

9

B.  Although the court of appeals erred by concluding that petitioner had failed to satisfy Section 10(b)'s deception requirement, it nevertheless correctly upheld the district court's dismissal of petitioner's complaint, because petitioner did not sufficiently plead reliance on respondents' deceptive conduct.  Petitioner does not allege that it was even aware of the transactions that respondents executed with Charter; at most, petitioner relied on *Charter's* misstatements in purchasing Charter stock.  Petitioner does not dispute that Charter independently decided to make the misrepresentations in its financial statements, and does not contend that respondents drafted or otherwise created those misstatements.  Accordingly, the causal connection between respondents' conduct and petitioner's stock transactions is simply too attenuated to satisfy the reliance requirement.  That is particularly true because respondents' alleged conduct relates to only one aspect of Charter's fraudulent scheme, and has no connection with the publicly disseminated misstatements relating to numerous other, contemporaneous fraudulent acts in which Charter allegedly engaged.  For similar reasons, petitioner has also failed sufficiently to allege the related element of loss causation.

C.  Allowing liability for a primary violation under the circumstances presented here would constitute a sweeping expansion of the judicially inferred private right of action in Section 10(b) and Rule 10b-5, potentially exposing customers, vendors, and other actors far removed from the market to billions of dollars in liability when issuers of securities make misstatements to the market.  It would be particularly inappropriate to allow private liability under these circumstances in light of Congress's rejection of a private right of action for aiding and abetting liability under Section 10(b) in the wake of *Central Bank* (and Congress's creation of much narrower private rights of action in other provisions of the securities

10

laws). Congress consciously struck a balance between exposure to aiding-and-abetting liability and complete immunity by empowering the Securities and Exchange Commission alone to pursue cases of aiding and abetting. Petitioner's proposed rule would upset that congressional choice and vastly expand liability in unpredictable ways. Such a radical expansion of liability is a task for Congress, not the courts.

## ARGUMENT

### THE COURT OF APPEALS CORRECTLY HELD THAT RESPONDENTS CANNOT BE HELD LIABLE IN A PRIVATE ACTION UNDER SECTION 10(b) AND RULE 10b-5

Section 10(b) of the Securities Exchange Act of 1934 (1934 Act) makes it unlawful for "any person" "directly or indirectly" to "use or employ, in connection with the purchase or sale of any security  *  *  * , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission (SEC)] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78j(b). The SEC's Rule 10b-5 implements Section 10(b) by declaring it unlawful, "in connection with the purchase or sale of any security," to (a) "employ any device, scheme, or artifice to defraud"; (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made  *  *  * not misleading"; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. 240.10b-5. This Court has noted that the scope of Rule 10b-5 is "coextensive" with that of Section 10(b). *SEC* v. *Zandford*, 535 U.S. 813, 816 n.1 (2002). And for violations of Section 10(b) and Rule 10b-5, courts have inferred a private right of action that "resembles, but is not identical to, common-law tort actions for deceit and misrepresentation."

11

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 341 (2005).

The question presented in this case is whether a person may be liable in a private action under Section 10(b) and Rule 10b-5(a) and (c) for engaging in a transaction with the issuer of a security on the ground that the transaction constituted "deceptive" conduct, when the plaintiff did not rely on that conduct but at most relied only on subsequent misstatements by the issuer concerning the transaction. Contrary to the view seemingly expressed by the court of appeals, Section 10(b)'s prohibition against deception is not limited to actual misstatements or omissions, but encompasses non-verbal deceptive conduct as well. For the reasons set forth below, however, the district court correctly dismissed the complaint for failure to allege that petitioner relied on respondents' deceptive conduct, and the judgment of the court of appeals should therefore be affirmed.

### A. The Phrase "Deceptive Device Or Contrivance," As Used In Section 10(b), Encompasses Deceptive Conduct As Well As Misstatements (And Omissions By Parties With A Duty To Disclose)

The court of appeals categorically stated that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." Pet. App. 9a. The court of appeals thereby appeared to foreclose the possibility that non-verbal deceptive conduct—*i.e.*, deceptive conduct other than misstatements or omissions—could give rise to a violation of Section 10(b). The court erred in its analysis in that regard, because a defendant may employ a "deceptive

12

device or contrivance" within the meaning of Section 10(b) by engaging in non-verbal deceptive conduct.[5]

1. The text of Section 10(b) unambiguously reaches non-verbal deceptive conduct, in addition to misstatements and omissions. Section 10(b) renders it unlawful for "any person" "directly or indirectly" to "use or employ" "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. 78j(b). This Court has previously addressed the meaning of the critical terms "device" and "contrivance." In *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976), the Court, quoting from a contemporaneous dictionary, defined "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," and defined "contrivance" as "[a] thing contrived or used in contriving; a scheme, plan, or artifice." *Id.* at 199 n.20 (second brackets in original) (quoting *Webster's New International Dictionary* 580, 713 (2d ed. 1934)). The breadth of those terms demonstrates that Section 10(b) reaches *all* conduct that is "deceptive" or "manipulative" (assuming that the other statutory requirements are satisfied), not merely *verbal* conduct (*i.e.*, misstatements or omissions). Consistent with that interpretation, the SEC, in promulgating Rule 10b-5, pro-

---

[5] The court seemingly recognized that Section 10(b) reaches at least some non-verbal conduct: *viz.*, when the "scheme or contrivance" at issue is "manipulative," rather than "deceptive." See Pet. App. 9a (holding that Section 10(b) makes it unlawful for a defendant, *inter alia*, to "engage in manipulative securities trading *practices*") (emphasis added). The court was correct to recognize that "manipulative" conduct can be non-verbal, because the prototypical examples of "manipulative" conduct are such non-verbal actions as "wash sales, matched orders, or rigged prices." *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 476 (1977). As the court of appeals noted (Pet. App. 9a & n.2), however, "manipulative" has been viewed as a term of art denoting manipulation that operates on *markets*, see, *e.g.*, *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 199 & n.21 (1976), and it is therefore not at issue in this case.

13

scribed not only misstatements and omissions that render statements misleading (in Rule 10b-5(b)), but also "any device, scheme, or artifice to defraud" (in Rule 10b-5(a)) and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" (in Rule 10b-5(c)). The latter subparts of the rule would be rendered largely superfluous if Section 10(b) were construed to cover only misstatements and omissions.[6]

The legislative history of the 1934 Act confirms that Section 10(b) was intended to reach all forms of "deceptive" or "manipulative" conduct. The Senate Report indicated that Section 10, together with other sections of the 1934 Act, was "aimed at those manipulative and deceptive *practices* which have been demonstrated to fulfill no useful function," without distinguishing between verbal and non-verbal conduct. S. Rep. No. 792, 73d Cong., 2d Sess. 6 (1934) (emphasis added). And the Senate Report noted that, while Section 10(a) regulates short sales and stop-loss orders, Section 10(b) "authorizes the [SEC] by rules and regulations to prohibit or regulate the use of any other manipulative or deceptive *practices* which it finds detrimental to the interests of the investor," again without distinguishing between verbal and non-verbal conduct. *Id.* at 18 (emphasis added).

2. Nothing in the ordinary meaning of the word "deceptive" suggests that it limits the range of actionable "device[s] or contrivance[s]" to misstatements or omissions. To the contrary, contemporary dictionaries confirm that "deception" and

---

[6] Similarly, Section 21D(f)(10)(A) of the 1934 Act (which was added by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 201, 109 Stat. 758), in defining the circumstances under which a person "knowingly commits a violation of the securities laws" (and thus can be subject to joint and several liability), distinguishes between "an action that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading" and "an action that is based on any [other] conduct." 15 U.S.C. 78u-4(f)(10)(A).

14

"deceit" can arise from verbal and non-verbal conduct alike.
See, *e.g.*, *Black's Law Dictionary* 529 (3d ed. 1933) (defining
"deception" as, *inter alia*, "intentional misleading by false-
hood spoken or acted"); *Bouvier's Law Dictionary* 276 (1928)
(noting, in defining "deceit," that "[a] fraudulent misrepresen-
tation or contrivance  *  *  *  need not be made in words").

   This Court's cases likewise provide no support for the
apparently contrary view of the court of appeals, which as-
serted that "[a] device or contrivance is not 'deceptive,' within
the meaning of § 10(b), absent some misstatement or a failure
to disclose by one who has a duty to disclose."  Pet. App. 8a;
see *id.* at 5a, 9a.  The court of appeals relied primarily on a
single sentence from *Central Bank of Denver, N.A.* v. *First
Interstate Bank of Denver,* 511 U.S. 164 (1994).  See Pet. App.
5a.  In that sentence, the Court stated that "the statute pro-
hibits only the making of a material misstatement (or omis-
sion) or the commission of a manipulative act."  *Central Bank*,
511 U.S. at 177; see *id.* at 191 (same).

   When that statement is read in context, it is clear that the
Court did not intend to exclude non-verbal deceptive conduct
from the reach of Section 10(b).  In the very next sentence
(and throughout the rest of the opinion), the Court used ge-
neric language indicating that the statute covers deceptive
conduct, without distinguishing between verbal or non-verbal
conduct.  See *Central Bank*, 511 U.S. at 177 (stating that
"[t]he proscription [in Section 10(b)] does not include giving
aid to a person who commits a manipulative or deceptive *act*")
(emphasis added); see also, *e.g.*, *id.* at 166 ("deceptive act");
*id.* at 167 ("deceptive practice"); *id.* at 170 ("deceptive act");
*id.* at 173 ("deceptive acts"); *id.* at 178 ("acts that are  *  *  *
deceptive"); *id.* at 183 ("deceptive conduct"); *id.* at 191 ("de-
ceptive act").  To the extent that the relevant sentence can be
read to have excluded non-verbal deceptive conduct, there-
fore, any such exclusion appears to have been inadvertent and

15

without significance.  Cf. *SEC* v. *Edwards*, 540 U.S. 389, 396 (2004) (stating that "we will not bind ourselves unnecessarily to passing dictum that would frustrate Congress' intent" under the securities laws).

The court of appeals also cited *United States* v. *O'Hagan*, 521 U.S. 642 (1997), and *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972) (see Pet. App. 5a), but those cases do not speak to the definition of "deceptive device or contrivance."  Instead, they involved collateral issues concerning the circumstances under which a defendant can be liable for engaging in deceptive conduct by means of an omission alone. See, *e.g.*, *O'Hagan*, 521 U.S. at 654 (stating that "[d]eception through nondisclosure is central to the theory of liability for which the Government seeks recognition"); *Affiliated Ute Citizens*, 406 U.S. at 153 (noting that the defendants had failed to "disclos[e] to [the plaintiffs] material facts that reasonably could have been expected to influence their decisions to sell").

In sum, "§ 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception," and "[n]ovel or atypical methods should not provide immunity from the securities laws." *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) (citation omitted); cf. *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 477 (1977) (concluding that "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices").  The court of appeals thus erred to the extent it excluded non-verbal deceptive conduct from the scope of Section 10(b).

3.  Because the court of appeals apparently concluded that only a misstatement or omission can constitute a "deceptive device or contrivance" for purposes of Section 10(b), it did

16

not attempt to elaborate on the circumstances under which other conduct could be "deceptive." The plain language of Section 10(b) provides substantial guidance on that issue. The same dictionary on which this Court relied in *Ernst & Ernst* in defining the statutory terms "manipulative," "device," and "contrivance" defines "deceptive" as "[t]ending to deceive" or "having power to mislead." *Webster's New International Dictionary* 679 (2d ed. 1934); see *ibid.* (defining "deceive" as "[t]o cause to believe the false, or disbelieve the truth"). It naturally follows that the phrase "deceptive device or contrivance" comprises any conduct that is committed with the requisite mental state and is objectively likely to mislead an observer: *e.g.*, conduct that has the effect of conveying a false appearance of material fact concerning a transaction into which the person has entered. Cf. *United States* v. *Russo*, 74 F.3d 1383, 1391 (2d Cir.) (concluding that trading scheme that "create[d] a false impression" of demand for stock constituted a "manipulative * * * device or contrivance" for purposes of Section 10(b)), cert. denied, 519 U.S. 927 (1996).[7]

When measured against the correct standard, respondents' alleged conduct in this case constituted a "deceptive device or contrivance." The parties are alleged to have deliberately backdated the agreements for the price increases in the set-top boxes, so as to make it appear that the parties had

---

[7] In order to satisfy the "deceptive device or contrivance" requirement, a plaintiff need only allege that the defendant engaged in conduct that was objectively likely to mislead *another person*. Insofar as unlawful conduct under Section 10(b) requires some nexus with an *investor*, that requirement is rooted not in the "deceptive device or contrivance" requirement, but rather in Section 10(b)'s separate "in connection with" requirement, and (with respect to private actions) in the reliance and loss-causation requirements. See, *e.g.*, *O'Hagan*, 521 U.S. at 656-657; see also pp. 17-26, *infra*. Respondents did not seek dismissal in the district court on the ground that the "in connection with" requirement was not satisfied, and neither of the courts below addressed that question.

17

entered into those agreements before the reciprocal advertising agreements.  See Scientific-Atlanta Br. in Opp. App. 33-34.  By entering into the backdated agreements, respondents conveyed a false appearance of material fact concerning the transactions into which they had entered:  *i.e.*, because their conduct not only was likely to, but in fact did, mislead Charter's outside accountant, Arthur Andersen, into believing that the two sets of transactions were discrete.  On those alleged facts, respondents' conduct could be found to constitute a "deceptive device or contrivance" under Section 10(b).[8]

**B.  Because Petitioner Failed Sufficiently To Allege Reliance, The Court Of Appeals Correctly Upheld The Dismissal Of Petitioner's Complaint**

In order to state a claim against a defendant as a primary violator of Section 10(b), a plaintiff not only must allege that the defendant engaged in "deceptive" or "manipulative" conduct, but also must satisfy "*all* of the [other] requirements for primary liability"—regardless of whether the defendant is itself the issuer of the relevant security or is a "secondary actor" (such as respondents).  *Central Bank*, 511 U.S. at 191.  Specifically, the plaintiff must allege that the defendant acted with the requisite scienter, see *Ernst & Ernst*, 425 U.S. at 194 n.12, and engaged in the requisite conduct "in connection with" the purchase or sale of a security, see *Dura Pharmaceuticals*, 544 U.S. at 341.  Those requirements are elements not only of private actions such as this one, but also of criminal prosecutions and civil enforcement actions for viola-

---

[8]  Indeed, it is unclear why the backdating does not constitute a misstatement that would satisfy even the court of appeals' erroneously restrictive view of Section 10(b).  To the extent that the court of appeals' test excludes even some material misstatements, it deviates even further from the proper scope of Section 10(b)'s prohibition on all deceptive conduct.

18

tions of Section 10(b) brought, respectively, by the Department of Justice and the SEC.

Critically for purposes of this case, however, in order to state a claim in a *private* action under Section 10(b) and Rule 10b-5, the plaintiff also must satisfy the requirements of reliance and loss causation. See *Dura Pharmaceuticals*, 544 U.S. at 341-342. Although petitioner sufficiently alleged that respondents had engaged in deceptive conduct for purposes of Section 10(b), petitioner did not sufficiently plead that it had relied on that conduct. The court of appeals' decision upholding the dismissal of petitioner's complaint should be affirmed on that basis.[9]

1. In *Basic Inc.* v. *Levinson*, 485 U.S. 224, 243 (1988), this Court expressly held that reliance is an element of a private action under Section 10(b) and Rule 10b-5. In so holding, the Court recognized that "reliance is and long has been an element of common-law fraud," *ibid.* (citing Restatement (Second) of Torts § 525 (1977)), and explained that "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Ibid.*; see *Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974) (reasoning that the element of reliance requires that the defendant's fraudulent conduct have "caused the

---

[9] The district court accepted respondents' contention that the complaint failed to allege reliance, noting that petitioner "do[es] not assert that * * * [it] relied on any statement, omission or action made by either of [respondents]." Pet. App. 41a. Respondents renewed that contention on appeal. See Scientific-Atlanta C.A. Br. 25-28; Motorola C.A. Br. 15-16. While the court of appeals did not address the reliance issue in detail, it appears to have endorsed the district court's resolution of that issue. See, *e.g.*, Pet. App. 7a (quoting the district court's ruling on reliance); *id.* at 10a (noting that respondents "did not issue any misstatement *relied upon* by the investing public") (emphasis added). In its brief before this Court, petitioner does not contend that the Court should not address the reliance issue, but instead contends only that reliance was sufficiently pleaded. See Br. 37-40.

19

[plaintiff] to engage in the transaction in question"), cert. denied, 421 U.S. 976 (1975). In *Central Bank*, the Court confirmed that reliance was "[an] element critical for recovery under Rule 10b-5," and that, in order to recover in a private action under Section 10(b) and Rule 10b-5, "[a] plaintiff must show reliance on the *defendant's* misstatement or omission" (or other deceptive conduct). 511 U.S. at 180 (emphasis added). Indeed, the importance of strict adherence to the reliance requirement in private actions against secondary actors was a key basis for this Court's rejection of aiding and abetting liability. "Were we to allow the aiding and abetting action proposed in this case," the Court reasoned, "the defendant could be liable without any showing that the plaintiff *relied upon the aider and abettor's statements or actions*." *Ibid.* (emphasis added).[10]

In this case, petitioner does not contend that it relied upon respondents' allegedly deceptive conduct (*i.e.*, the backdating of the contracts increasing the price of the set-top boxes) in engaging in the relevant transactions (*i.e.*, the purchase of Charter shares). In fact, petitioner does not contend that it (or the investing public) was even aware of the transactions that respondents executed with Charter. Instead, petitioner freely concedes that "[r]espondents did not themselves disseminate the false information to the securities market," Br. 38, and alleges only that the backdating of the contracts assisted *Charter* in mischaracterizing the payments from respondents as revenue (and thus in inflating its operating cash flow in its financial statements). See, *e.g.*, Scientific-Atlanta Br. in Opp. App. 33-34. Those allegations might rise to the

_____

[10] See Restatement (Second) of Torts § 537 (1977) (providing that "[t]he recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, * * * he relies on the misrepresentation in acting or refraining from action, and * * * his reliance is justifiable").

20

level of aiding and abetting Charter's misstatements, but they
fail to establish petitioner's reliance on respondents' miscon-
duct.[11] Because petitioner (and other investors) at most relied
only on Charter's misstatements, and not on respondents'
apparently undisclosed deceptive conduct, petitioner has
failed sufficiently to allege reliance for purposes of its claim
against respondents.  See *Central Bank*, 511 U.S. at 180.

Petitioner contends (Br. 38, 39) that reliance is neverthe-
less sufficiently alleged because, but for respondents' decep-
tive conduct, Charter could not have made the misstatements
on which it (and other investors) allegedly relied in purchas-
ing Charter stock.  But alleging "but-for" causation is no sub-
stitute for alleging reliance on respondents' own conduct.
"But-for" causation does not distinguish primary from sec-
ondary liability; alleged misconduct by secondary actors is
frequently necessary to fraudulent schemes (as the facts of
*Central Bank* illustrate), but that alone does not make those
actors primarily liable.  Petitioner does not dispute that Char-
ter independently decided to make the misrepresentations in
its financial statements; indeed, in its complaint, petitioner
seemingly recognizes that Charter could have accounted for
its transactions with respondents in a way that would have
rendered its financial statements accurate.  See Scientific-
Atlanta Br. in Opp. App. 4; cf. Pet. Br. 38 (alleging only that
Charter's misstatements "built upon" respondents' deceptive
conduct).  Conversely, Charter could have misrepresented its
operating cash flow in other respects without engaging in
these transactions.  The critical point is that it was Charter's

---

[11] As discussed above, reliance is not an element in an enforcement action
brought by the government under Section 10(b).  Accordingly, a defendant as
to whom reliance cannot be shown may nonetheless be liable in such an action,
either as a principal violator or as an aider and abettor, even though it would
be at most an aider and abettor (and therefore not liable) in the context of a
private action.

21

misrepresentation of its cash flow, not respondents' conduct, on which petitioner allegedly relied.

Petitioner, moreover, does not contend that respondents affirmatively induced Charter to make the misstatements or that respondents actually drafted, created, or otherwise made those misstatements themselves. As numerous courts of appeals have correctly held, a secondary actor cannot be held liable in a private securities action by virtue of a plaintiff's reliance on misstatements that were not "made" by the secondary actor. See, *e.g. Fidel* v. *Farley*, 392 F.3d 220, 235 (6th Cir. 2004) (holding that accounting firm could not be liable for failing to correct issuer's misleading financial statements because it "did not make a material misstatement or omission"); *Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194, 1205-1207 (11th Cir. 2001) (holding that, notwithstanding "allegations of substantial assistance in the alleged fraud," "no statements attributable to [defendant] were ever made to [p]laintiffs; therefore, [p]laintiffs could not have relied on [defendant] in making their investment decisions"); *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (noting that "[r]eliance only on representations made by others cannot itself form the basis of liability") (citation omitted; brackets in original), cert. denied, 525 U.S. 1104 (1999); *Shapiro* v. *Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) (stating that accountants "must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors" in order to be liable) (citation omitted); *Anixter* v. *Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) (same); see also SEC Br. at 17-18, *Klein* v. *Boyd*, No. 97-1143, 1998 WL 55245 (3d Cir. Feb. 12, 1998) <www.sec.gov/pdf/klein.pdf> (arguing that a person who "*creates* a misrepresentation * * * can be liable as a primary violator," but that

22

person who merely "knew of misrepresentations" but had not "created" them "would not be liable as a primary violator").[12]

This Court's decision in *Central Bank* is to the same effect. As the Court emphasized in that case, secondary actors may be held liable in a private action under Section 10(b), but only when, *inter alia*, reliance on *their* conduct has been demonstrated: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or *makes* a material misstatement (or omission) *on which a purchaser or seller relies* may be liable as a primary violator." 511 U.S. at 191 (emphases added). Words or actions by a secondary actor that facilitate an issuer's misstatement, but are not themselves communicated to investors, simply cannot give rise to reliance (and thus primary liability in a private action). That principle is at the heart of the distinction between primary liability and secondary liability of the kind rejected in *Central Bank*.

In this case, there is an additional reason to conclude that the complaint fails to satisfy the reliance requirement. While respondents' conduct allegedly related to Charter's statements inflating its operating cash flow by at least $17 million in the fourth quarter of 2000, petitioners allege that Charter also engaged in other, contemporaneous fraudulent acts to misrepresent its revenues and costs—thus raising the question whether the decision of petitioner (or any other investor) to purchase Charter stock, in reliance on Charter's rosy financial reports, could be connected even in an attenuated sense to respondents' conduct (which appears to have given rise

---

[12] The courts in *Ziemba*, 256 F.3d at 1205, and *Wright*, 152 F.3d at 175, also held that misstatements made by a secondary actor must be *publicly attributed* to the secondary actor before liability can attach in a private action. There is no need to consider the correctness of that requirement in this case, because no misstatements made by respondents were disseminated to investors, either with or without attribution.

23

only to a fraction of the total overstatement in operating cash flow).

For example, the complaint alleges that Charter engaged in a variety of practices that materially overstated its operating cash flow in 2000 (the year in which respondents' transactions occurred) by $195 million, and its operating cash flow for 2001 by $292 million. See Scientific-Atlanta Br. in Opp. App. 5, 66. But respondents' conduct could account for no more than $17.53 million of the overstatement, or less than 10% of the total for 2000. The complaint also alleges that Charter materially inflated its subscriber growth rate and misstated its expenses. *Id.* at 3, 38-40. Thus, even if this Court were to adopt petitioner's erroneous effort to equate reliance with mere "but-for" causation, but see *Dura Pharmaceuticals*, 544 U.S. at 344 (endorsing "the need to prove proximate causation"), it is difficult to see how petitioner could satisfy such a requirement, because, taking the facts as alleged in the complaint as true, there is no basis for concluding that, but for respondents' conduct, petitioner would not have purchased Charter stock. Under any standard for reliance, therefore, petitioner's complaint is deficient. Where a cause of action for aiding and abetting exists, an aider and abettor may be held accountable for losses resulting from the scheme it aided, but a theory of primary liability must focus on the actions of the defendant on which the plaintiff allegedly relied.[13]

---

[13] In *Simpson* v. *AOL Time Warner Inc.*, 452 F.3d 1040 (2006), petition for cert. pending, No. 06-560 (filed Oct. 19, 2006), the Ninth Circuit held that the reliance requirement would be satisfied as long as "the introduction of misleading statements into the securities market was the intended end result of a scheme to misrepresent revenue." *Id.* at 1051. In amicus briefs in that case, the SEC took the position that "[t]he reliance requirement is satisfied where a plaintiff relies on a material deception flowing from a defendant's deceptive act, even though the conduct of other participants in the fraudulent scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction." SEC Reply Br. at 12, *Simpson*, *supra* (No. 04-55665)

24

2.  Just as petitioner has failed sufficiently to allege that it actually relied on defendants' conduct in purchasing Charter stock, so too has petitioner failed to show that it is entitled to a presumption of reliance.[14]  This Court has recognized presumptions of reliance in only two contexts: first, when a defendant with a duty to disclose has made a material omission (and it would thus be impossible to show how the plaintiff would have acted if the omitted information had been disclosed), see *Affiliated Ute*, 406 U.S. at 153-154, and second, when a defendant commits "fraud on the market" by publicly making material misstatements concerning an efficiently traded security, see *Basic*, 485 U.S. at 241-247.

Petitioner suggests (Br. 38 & n.14; Scientific-Atlanta Br. in Opp. App. 72) that it can avail itself of the fraud-on-the-market presumption.  Even assuming, however, that the fraud-on-the-market presumption would be available in an action *against Charter* for its misstatements concerning the transactions with respondents, such a presumption could not assist petitioner in establishing reliance with respect to its claim against respondents.  By its very terms, the presump-

---

(Feb. 7, 2005) <http://www.sec.gov/litigation/briefs/homestore_020405.pdf>. The SEC's briefs, however, were filed without the involvement of the Solicitor General, and the position on reliance that was expressed in those briefs does not reflect the views of the United States.  For the reasons stated in text, that position, and the Ninth Circuit's holding on reliance in *Simpson*, are inconsistent with *Central Bank* (and with this Court's other cases concerning the reliance requirement).

[14] As a practical matter, without a presumption of reliance, petitioner would probably be unable to proceed with a class action, because the individualized issue of reliance would "overwhelm[]" any common issues (and thereby preclude class certification under Federal Rule of Civil Procedure 23(b)(3)). *Basic*, 485 U.S. at 242; see, *e.g.*, *Regents of the Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 394 (5th Cir. 2007) (holding that, because no presumption of reliance was available in a case involving similar allegations against secondary actors, the district court erred by granting class certification), petition for cert. pending, No. 06-1341 (filed Mar. 5, 2007).

25

tion applies only to publicly disseminated misrepresentations: "Because most *publicly available* information is reflected in market price, an investor's reliance on any *public* material misrepresentations * * * may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247 (emphases added). Petitioner's complaint does not identify any public statements or actions by respondents. Accordingly, petitioner cannot rely on the fraud-on-the-market theory to satisfy the reliance requirement here.

3. For many of the same reasons that the complaint does not satisfy the reliance (or transaction-causation) requirement, it also does not satisfy the related loss-causation requirement.[15] In order to show loss causation, a plaintiff must prove that the defendant's fraudulent conduct "proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals*, 544 U.S. at 346; see 15 U.S.C. 78u-4(b)(4) (codifying loss-causation requirement). In its complaint, petitioner alleges only that it purchased stock during a specified class period. See Scientific-Atlanta Br. in Opp. App. 2, 7. Petitioner does not allege that *respondents'* conduct caused its loss; indeed, petitioner does not even specifically allege how (and when) it was revealed that Charter had misrepresented its operating cash flow as it related to the transactions with respondents, much less that petitioner (or other class members) still held its

---

[15] Although respondents appear to have raised the loss-causation issue in the district court (see Scientific-Atlanta Mot. to Dismiss 20), they did not separately raise the issue in the court of appeals, and that court did not address it. Because of the purely legal nature of that issue, however, which is conceptually linked to the reliance issue (in that both address aspects of causation), and in view of the need for clarity and certainty regarding the scope of the implied private right of action under Section 10(b), the Court may wish to exercise its discretion to address that alternative ground for affirmance. See, *e.g.*, *United States* v. *Nobles*, 422 U.S. 225, 240 n.15 (1975).

26

Charter stock at the time that the revelation occurred.[16] Petitioner, moreover, does not allege that any injury it suffered from a decline in Charter's share price was attributable to the revelation that Charter had misrepresented its cash flow as it related to the transactions with respondents, as opposed to revelations concerning the numerous other fraudulent acts in which Charter allegedly engaged. See *id.* at 6 (generically alleging that Charter's share price fell during and after the class period as a result of "[i]ncreasing skepticism regarding the accuracy of [Charter's] prior disclosures" and "the disclosure of [a] [g]rand [j]ury [i]nvestigation" into Charter's accounting practices); cf. *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (requiring plaintiff to show that "there is a reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information"). Petitioner's complaint thus fails sufficiently to allege loss causation, as well as reliance.

### C. Allowing The Complaint In This Case To Proceed Would Dramatically Broaden The Inferred Right Of Action In Section 10(b) And Rule 10b-5

In the wake of this Court's decision in *Central Bank*, Congress considered, and rejected, a proposal to create an express private right of action for aiding and abetting under Section 10(b), and chose instead to authorize only the SEC to seek civil redress against aiders and abettors. See, *e.g.*, 15 U.S.C. 78t(e); S. Rep. No. 98, 104th Cong., 1st Sess. 19 (1995). Congress thus struck a careful and deliberate balance between open-ended secondary liability, on the one hand, and

---

[16] The amended complaint alleges only that, on June 18, 2002, an analyst expressed the view that Charter "ha[d] a more aggressive capitalization policy" than other cable operators (and that Charter "ha[d] done some marketing deals with equipment vendors"). Scientific-Atlanta Br. in Opp. App. 63-64.

27

impunity for aiders and abettors, on the other.  Allowing liability for a primary violation under the circumstances presented here would effectively circumvent that congressional judgment and would constitute a sweeping expansion of the judicially inferred private right of action in Section 10(b) and Rule 10b-5.

1.  This Court first recognized the existence of an inferred private right of action under Section 10(b) and Rule 10b-5 in *Bankers Life*, 404 U.S. at 13 n.9, at a time when the Court took the view that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute.  *J.I. Case Co.* v. *Borak*, 377 U.S. 426, 433 (1964).  Since that time, however, the Court has consistently warned against judicial inference of private rights of action not specifically authorized by Congress.  See, *e.g.*, *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 727 (2004); *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61, 67 & n.3 (2001); *Alexander* v. *Sandoval*, 532 U.S. 275, 287-288 (2001).  The Court has also repeatedly warned against extending preexisting inferred rights of action to new contexts.  See, *e.g.*, *Wilkie* v. *Robbins*, 127 S. Ct. 2588, 2604-2605 (2007); *Malesko*, 534 U.S. at 74; *Schweiker* v. *Chilicky*, 487 U.S. 412, 421 (1988).

It would greatly expand the inferred private right of action under Section 10(b) and Rule 10b-5 if "secondary actors" could be held primarily liable whenever they engage in allegedly deceptive conduct, even if investors do not rely on (and are not even aware of) that conduct.  Such a rule would expose not only accountants and lawyers who advise issuers of securities, but also vendors (such as respondents) and other firms that simply do business with issuers, to potentially billions of dollars in liability when those issuers make misrepresentations to the market.  Such a rule would thereby considerably widen the pool of deep-pocketed defendants that could be

28

sued for the misrepresentations of issuers, increasing the likelihood that the private right of action will be "employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). Moreover, extending liability to vendors could have the effect of substantially expanding liability for foreign companies that trade with publicly listed companies. Likewise, creating new and unpredictable liability for closely regulated entities like banks could create particular problems and greatly complicate the task of regulators. And the expansion of liability would raise difficult questions concerning the apportionment of liability where, as here, the conduct of the secondary actor relates only to a small part of a broader fraudulent scheme. See, *e.g.*, 15 U.S.C. 78u-4(f)(3)(C) (providing that, in apportioning liability, the trier of fact should consider "the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs" and "the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs").[17]

Permitting secondary actors to be held liable under these circumstances would also be inconsistent with the much narrower private rights of action that Congress expressly created in other provisions of the securities laws. This Court has repeatedly looked to those express rights of action in defining the contours of the inferred right of action in Section 10(b) and Rule 10b-5. See, *e.g.*, *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U.S. 350, 359-360 (1991). In construing those express rights of action, moreover, the Court has strictly defined the class of persons who can be held lia-

---

[17] Indeed, a rule that permitted secondary actors to be held liable would raise the specter of joint and several liability where such an actor was found to have "knowingly" violated the securities laws. See 15 U.S.C. 78u-4(f)(2)(A).

29

ble. For example, in *Pinter* v. *Dahl*, 486 U.S. 622 (1988), the Court rejected the proposition that Section 12(1) of the Securities Act of 1933, 15 U.S.C. 77*l*(1), which imposes liability on any person who "offers or sells" an unregistered security, reaches any person whose participation in the transaction was a "substantial factor" in the transaction's occurrence. *Pinter*, 486 U.S. at 649. Petitioner's proposed rule not only would be inconsistent with the Court's practice in construing *express* rights of action, but would threaten to swamp those rights of action by creating an all-encompassing inferred right of action under Section 10(b) and Rule 10b-5. See, *e.g.*, 15 U.S.C. 77b(a)(11), 78t(a) (imposing liability on secondary actors only to the extent that they "control" persons who violate the securities laws); 15 U.S.C. 78r(a) (imposing liability on parties that "cause to be made" a false statement in an SEC filing, where the plaintiff acted "in reliance upon such statement"); cf. *Central Bank*, 511 U.S. at 180 (noting that "it would be * * * anomalous to impute to Congress an intention in effect to expand the defendant class for 10b-5 actions beyond the bounds delineated for comparable express causes of action").

2. Moreover, at the same time that it refused to create an express *private* right of action for aiding and abetting under Section 10(b), Congress expressly authorized the SEC to pursue civil enforcement actions on a theory of aiding and abetting liability for violations of the 1934 Act. See 15 U.S.C. 78t(e). In such actions, a person may be liable as an aider and abettor if the person "knowingly provides substantial assistance" to a primary actor's violation of the securities laws. *Ibid.*; cf. *Central Bank*, 511 U.S. at 168 (listing elements of preexisting private action for aiding and abetting). The SEC therefore can take action not only against any party that itself engages in deceptive or manipulative conduct in violation of Section 10(b), but also against any party that knowingly facilitates *another* party's deceptive or manipulative conduct: *e.g.*,

30

when, as is alleged to have occurred here, a party enters into a deceptive transaction in the knowledge that the other party intends to make misrepresentations concerning that transaction to its investors.

More fundamentally, Congress's unwillingness to recognize a private right of action for aiding and abetting suggests that this Court should be loath to create the functional equivalent of such a right of action itself. Cf. *Alexander*, 532 U.S. at 290 (noting that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"). Such an action would upset the deliberate balance struck by Congress. Insofar as petitioner and its amici advance various policy arguments in favor of broad liability for secondary actors, there are ample policy arguments to the contrary (some of which apparently struck a chord when Congress last expressly addressed the issue). In any event, all of those policy arguments "are more appropriately addressed to Congress than to this Court." *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 156 n.12 (1976).

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

PAUL D. CLEMENT
  *Solicitor General*
THOMAS G. HUNGAR
  *Deputy Solicitor General*
KANNON K. SHANMUGAM
  *Assistant to the Solicitor
    General*

AUGUST 2007