UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
:
THOMAS H. LEE EQUITY FUND V, L.P.,            :
THOMAS H. LEE PARALLEL FUND V, L.P.,          :
and THOMAS H. LEE EQUITY (CAYMAN)             :        07 Civ. 6767 (GEL)
FUND V, L.P.,                                 :
:
                              Plaintiffs,     :
                                              :
            v.                                :
                                              :
MAYER, BROWN, ROWE & MAW LLP,                 :
                                              :
                              Defendant.      :
                                              :
---------------------------------------------------------------x

### PLAINTIFFS' MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS

Mark C. Hansen                    Greg A. Danilow (GD-1621)
Silvija A. Strikis                Paul Dutka (PD-2568)
James M. Webster III              Christopher R.J. Pace (CP-0001)
Rebecca A. Beynon                 Seth Goodchild (SG-2296)
KELLOGG, HUBER, HANSEN, TODD,     WEIL, GOTSHAL & MANGES LLP
  EVANS & FIGEL P.L.L.C.          767 Fifth Avenue
Sumner Square                     New York, NY  10153
1615 M Street, N.W., Suite 400    Tel.:  (212) 310-8000
Washington, D.C. 20036
Tel.:  (202) 326-7900
                                  *Attorneys for Plaintiffs Thomas H. Lee
                                  Equity Fund V, L.P., Thomas H. Lee
                                  Parallel Fund V, L.P., and Thomas H. Lee
                                  Equity (Cayman) Fund V, L.P.*

Dated: November 9, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 6

ARGUMENT ............................................................................................................... 12

I.      THE COMPLAINT STATES A FEDERAL SECURITIES LAW CLAIM ................. 12

      A.    Mayer Brown Is Liable As A Primary Violator Of Section 10(b) And Rule 10b-5(b) For Its Material Misstatements And Omissions To Plaintiffs ...... 12

      B.    Plaintiffs' Factual Allegations State A Claim For "Scheme Liability" Under Section 10(b) And Rule 10b-5(a) & (c) ...................................................... 20

      C.    Plaintiffs Have Alleged Particularized Facts Giving Rise To A Strong Inference Of Scienter ........................................................................................ 25

      D.    Mayer Brown's "No Reliance" Argument Is Fatally Flawed .............................. 31

II.     THE COMPLAINT STATES A RICO CLAIM .......................................................... 36

      A.    The PSLRA Does Not Bar The RICO Claim ...................................................... 36

      B.    The Complaint Adequately Pleads Agreement ................................................... 44

      C.    The Complaint Adequately Pleads A Violation Of § 1962(c) ........................... 48

III.   PLAINTIFFS HAVE STATED CLAIMS FOR COMMON-LAW FRAUD AND NEGLIGENT MISREPRESENTATION ...................................................................... 53

      A.    Plaintiffs Have Stated A Claim For Common-Law Fraud ................................... 53

      B.    Plaintiffs' Negligent Misrepresentation Claim Should Not Be Dismissed Under The Martin Act ......................................................................................... 53

      C.    Assuming New York Law Applies, Plaintiffs Have Satisfied The Requirement Of Showing Near Privity ............................................................... 55

CONCLUSION ............................................................................................................. 57

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s):**

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    357 F. Supp. 2d 712 (S.D.N.Y. 2005)........................................................................34, 35

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d. Cir. 2007).............................................................................................34

Abry Partners V, L.P. v. F&W Acquisition L.L.C.,
    891 A.2d 1032 (Del. Ch. 2006).......................................................................................35

Ackerman v. Schwartz,
    947 F.2d 841 (7th Cir. 1991) ....................................................................................15, 18

Adelphia Commc'ns v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),
    2007 WL 2403553 (Bankr. S.D.N.Y. Aug. 17, 2007) .......................................................49

Affiliated Ute Citizens of Utah v. United States,
    406 U.S. 128 (1972)........................................................................................................35

Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.,
    944 F. Supp. 240 (S.D.N.Y. 1996) .................................................................................45

Am. Tobacco Co. v. Patterson,
    456 U.S. 63 (1982)..........................................................................................................43

Baisch v. Gallina,
    346 F.3d 366 (2d Cir. 2003)............................................................................................45

Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,
    189 F.3d 321 (3d Cir. 1999)...............................................................................37, 38, 39

Barnhart v. Sigmon Coal Co.,
    534 U.S. 438 (2002)........................................................................................................43

Bates v. Southgate,
    31 N.E.2d 551 (Mass. 1941) ...........................................................................................35

Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,
    36 F. Supp. 2d 560 (E.D.N.Y. 1999) ..............................................................................42

Blythe v. Deutsche Bank AG,
    399 F. Supp. 2d 274 (S.D.N.Y. 2005)..............................................................................37

Bonavire v. Wampler,
    779 F.2d 1011 (4th Cir. 1985) ....................................................................19

Caiola v. Citibank, N.A.,
    295 F.3d 312 (2d Cir. 2002).......................................................................14

In re Charter Commc'ns, Inc., Sec. Litig., 443 F.3d 987 (8th Cir. 2006), cert. granted,
    Stoneridge Inv. Partners L.L.C. v. Scientific-Atlanta, Inc., 127 S. Ct. 1873 (2007).........25

Compose v. INS,
    961 F.2d 309 (1st Cir. 1992).......................................................................43

Castellano v. Young & Rubic, Inc.,
    257 F.3d 171 (2d Cir. 2001).......................................................................55

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
    511 U.S. 164 (1994)..................................................................................13

In re Crude Oil Commodity Litig.,
    2007 WL 1946553 (S.D.N.Y. June 28, 2007) ................................................52

DeFalco v. Bernas,
    244 F.3d 286 (2d Cir. 2001).......................................................................52

DeLuca v. Jordan,
    781 N.E.2d 849 (Mass. App. Ct. 2003) .......................................................57

Dimon, Inc. v. Folium, Inc.,
    48 F. Supp. 2d 359 (S.D.N.Y. 1999)...........................................................35

Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter, Co.,
    2007 WL 2572258 (S.D. Ohio Sept. 4, 2007) ...............................................18

Doehla v. Wathne Ltd., Inc.,
    1999 WL 566311 (S.D.N.Y. Aug. 3, 1996)...................................................56

Emergent Capital Inv. Mgmt., L.L.C. v. Stonepath Group, Inc.,
    343 F.3d 189 (2d Cir 2003).......................................................................34

In re Enron Corp. Sec., Derivative & ERISA Litig.,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ........................................................18

In re Enron Corp. Sec., Derivative & ERISA Litig.,
    310 F. Supp. 2d 819 (S.D. Tex. 2004) ........................................................23

In re Enron Corp. Sec., Derivative & ERISA Litig.,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) ...........................................................................41

Fenton v. Bryan,
    604 N.E.2d 56 (Mass. App. Ct. 1992) .............................................................................1

Fezzani v. Bear, Stearns & Co.,
    2005 WL 500377 (S.D.N.Y. Mar. 2, 2005) ...............................................................40, 41

First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,
    385 F.3d 159 (2d Cir. 2004)..........................................................................................50

Fleet Nat'l Bank v. Boyle,
    2005 WL 2455673 (E.D. Pa. Sept. 12, 2005) ................................................................37

Gaetano Assocs. Ltd. v. Artee Collections, Inc.,
    2006 WL 330322 (S.D.N.Y. Feb. 14, 2006) ..................................................................54

Gen. Accident Ins. Co. v. Fidelity & Deposit Co.,
    598 F. Supp. 1223 (E.D. Pa. 1984) ...............................................................................55

Gilmore v. Berg,
    761 F. Supp. 358 (D.N.J. 1991) ....................................................................................18

In re Global Crossing Ltd. Sec. Litig.,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)....................................................5, 17, 21, 22, 25

Globalnet Financial.com, Inc. v. Frank Crystal & Co.,
    449 F.3d 377 (2d Cir. 2006)..........................................................................................54

Goren v. New Vision Int'l, Inc.,
    156 F.3d 721 (7th Cir. 1998) ........................................................................................47

H.J. Inc. v. Nw. Bell Tel. Co.,
    492 U.S. 229 (1989)................................................................................................49, 50

Harbourvest v. Axent Technologies, Inc.,
    2000 WL 1466096 (Mass. Super. Aug. 31, 2000) ........................................................54

Harsco Corp. v. Segui,
    91 F.3d 337 (2d Cir. 1996)...........................................................................................34

Hecht v. Commerce Clearing House, Inc.,
    897 F.2d 21 (2d Cir. 1990)...........................................................................................45

Henry v. Daytop Vill., Inc.,
    42 F.3d 89 (2d Cir. 1994)................................................................36

Hemispherx Biopharma, Inc. v. Asensio,
    1999 WL 144109 (E.D. Pa. Mar. 15, 1999)................................41

Hollinger Int'l, Inc. v. Hollinger Inc.,
    2004 WL 2278545 (N.D. Ill. Oct. 8, 2004)................................41

Howard v. AOL Inc.,
    208 F.3d 741 (9th Cir. 2000) ........................................................41

Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,
    159 F.3d 723 (2d Cir. 1998)..........................................................16

Jama v. Immigration & Customs Enforcement,
    543 U.S. 335 (2005)........................................................................42

In re JP Morgan Chase Sec. Litig.,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)..........................................30

Jones v. Deustche Bank AG,
    2005 WL 1683614 (N.D. Cal. July 19, 2005)................................37

Kehr Packages, Inc. v. Fidelcor, Inc,
    926 F.2d 1406 (3d Cir. 1991)........................................................49

Kennedy v. Miller,
    582 N.E.2d 200 (Ill. App. Ct. 1991) ..............................................1

Kirkland Constr. Co. v. James,
    658 N.E.2d 699 (Mass. App. Ct. 1995) ........................................57

Kline v. First W. Gov't Sec., Inc.,
    24 F.3d 480 (3d Cir. 1994)................................15, 16, 17, 18, 19

Knoll v. Schectman,
    2006 WL 839428 (W.D.N.Y. Mar. 28, 2006)................................44

Landers-Scelfo v. Corporate Office Sys., Inc.,
    827 N.E.2d 1051 (Ill. App. Ct. 2005) ............................................1

Lattanzio v. Deloitte & Touche L.L.P.,
    476 F.3d 147 (2d Cir. 2007)..............................................4, 13, 14

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir.), cert. denied, 564 U.S. 935 (2005) ................................................21

In re Lernout& Hauspie Sec. Litig.,
    236 F. Supp. 2d 161 (D. Mass. 2003) ........................................................................21, 23

Levin v. Dalva Bros.,
    495 F.3d 68 (1st Cir. 2006) ......................................................................................53

Lippe v. Bairnco Corp.,
    218 B.R. 294 (S.D.N.Y. 1998)...................................................................................47

M'Baye v. New Jersey Sports Prod., Inc.,
    2007 WL 431881 (S.D.N.Y. Feb 7, 2007) ........................................................................49

In re MarketXT Holdings Corp.,
    2006 WL 2864963 (Bankr. S.D.N.Y. Sept. 29, 2006).............................................................35

Marram v. Kobrick Offshore Fund, Ltd.,
    809 N.E.2d 1017 (Mass. 2004) ..................................................................................54

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
    547 U.S. 71 (2006) .............................................................................................38

Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006)............................................................................47

Ne. Women's Ctr., Inc. v. McMonagle,
    868 F.2d 1342 (3d Cir. 1989)....................................................................................42

Norton v. Drepanos,
    1994 WL 902881 (Mass. Super. Sept. 13, 1994).................................................................34

OSRecovery, Inc. v. One Group Int'l, Inc.,
    354 F. Supp. 2d 357 (S.D.N.Y. 2005) ...........................................................................40

Overton v. Todman & Co., CPAs, P.C.,
    478 F.3d 479 (2d Cir. 2007).....................................................................................14

In re Parmalat Sec. Litig.,
    383 F. Supp. 2d 616 (S.D.N.Y. 2005)........................................................................23, 24

Payton v. Flynn,
    2006 WL 3087075 (N.D. Ill. Oct. 26, 2006).....................................................................40

Powers v. Wells Fargo Bank NA,
    439 F.3d 1043 (9th Cir.),cert. denied, 127 S. Ct. 437 (2006) ...........................................38

Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood,
    80 N.Y.2d 377 (1992) ...........................................................................................55

Quaak v. Dexia, S.A.,
    357 F. Supp. 2d 330 (D. Mass. 2005) ........................................................21, 23

In re Refco, Inc. Sec. Litig.,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)..............................................9, 25, 30, 31

Renner v. Chase Manhattan Bank,
    1999 WL 47239 (S.D.N.Y. Feb. 3, 1999) .....................................................40

Republic of Colombia v. Diageo N. Am. Inc.,
    2007 WL 1813744 (E.D.N.Y. June 19, 2007) ..........................................45, 47

Resolution Trust Corp. v. Latham & Watkins,
    909 F. Supp. 923 (S.D.N.Y. 1995) ...............................................................16

Rogers v. Grimaldi,
    875 F.2d 994 (2d Cir. 1989)...........................................................................53

Rose v. Bartle,
    871 F.2d 331 (3d Cir. 1989)....................................................................45, 47

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000)............................................................................25

In re Royal Ahold N.V. Sec. & ERISA Litig.,
    351 F. Supp. 2d 334 (D. Md. 2004) ..............................................................25

Rubin v. Schottenstein, Zox & Dunn,
    143 F.3d 263 (6th Cir. 1998) ..........................................................15, 17, 18

Rudin v. Dow Jones & Co.,
    510 F. Supp. 210 (S.D.N.Y. 1981) ..........................................................54, 55

SEC v. U.S. Envtl., Inc.,
    155 F.3d 107 (2d Cir. 1998).................................................................5, 22, 23

Salinas v. United States,
    522 U.S. 52 (1997)........................................................................................44

Schatz v. Rosenberg,
   943 F.2d 485 (4th Cir. 1991) ................................................................................19

Sedima, S.P.L.R. v. Imrex Co.,
   473 U.S. 479 (1985)................................................................................42, 43

Shapiro v. Cantor,
   123 F.3d 717 (2d Cir. 1997)................................................................4, 13, 14

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,
   365 F.3d 353 (5th Cir. 2004) ................................................................30

Spira v. Nick,
   876 F. Supp. 553 (S.D.N.Y. 1995) ................................................................49

State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.,
   375 F. Supp. 2d 141 (E.D.N.Y. 2005) ................................................................45

Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,
   2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)................................................................54

Sterling v. Sterling,
   800 N.Y.S.2d 463 (App. Div. 2005) ................................................................1

Sterling Interiors Groups, Inc. v. Haworth, Inc.,
   1996 WL 426379 (S.D.N.Y. July 30, 1996) ................................................................52

Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.,
   2001 WL 282687 (S.D.N.Y. Mar. 22, 2001) ................................................................51

Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
   250 F.3d 87 (2d Cir. 2001)................................................................55

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
   127 S. Ct. 2499 (2007)................................................................27

Trust Co. of Louisiana v. N.N.P. Inc.,
   104 F.3d 1478 (5th Cir. 1997) ................................................................15

United States v. Aulicino,
   44 F.3d 1102 (2d Cir. 1995)................................................................53

United States v. Regan,
   937 F.2d 823 (2d Cir. 1991)................................................................23

United States v. Zichettello,
   208 F.3d 72, 99 (2d Cir.2000)...................................................................45

Wittenberg v. Robinov,
   9 N.Y.2d 261 (N.Y. 1961) .........................................................................34

In re WorldCom, Inc.,
   374 B.R. 94 (Bankr. S.D.N.Y. 2007)........................................................33

In re Worldcom, Inc. Sec. Litig.,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005).......................................................30

Wright v. Ernst & Young, L.L.P.,
   152 F.3d 169 (2d Cir. 1998)............................................................4, 13, 14

Zito v. Leasecomm Corp.,
   2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003).......................................50

Zito v. Leasecomm Corp.,
   2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004)..........................................51

**Statutes & Rules:**

18 U.S.C. § 1962(c) ......................................................................4, 6, 44, 47

18 U.S.C. § 1962(d) ..............................................................4, 6, 36, 44, 47

18 U.S.C. § 1964(c) ..................................................................36, 38, 42, 43

Fed. R. Civ. P. 8(e)(2) .......................................................................................36

Fed. R. Civ. P. 12(b)(6)........................................................................................1

**Other Authorities:**

141 Cong. Rec. H2760 (daily ed. Mar. 7, 1995)....................................................39

Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 947
   (1970)...................................................................................................42

Prepared Testimony of Arthur Levitt, Chairman, SEC, Before the H. Subcomm. on
   Telecomms. & Fin. Comm. on Commerce, 104th Cong. (Feb. 10, 1995).........................39

RESTATEMENT (THIRD) OF AGENCY § 6.01 cmt. d(1) (2006).........................................34

Plaintiffs Thomas H. Lee Equity Fund V, L.P.; Thomas H. Lee Parallel Fund V,

L.P.; and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, "Plaintiffs") respectfully

submit this memorandum of law in opposition to the motions to dismiss the Complaint

("Compl."), pursuant to Federal Rule of Civil Procedure 12(b)(6), by defendant Mayer, Brown,

Rowe & Maw LLP ("Mayer Brown").[1]

## PRELIMINARY STATEMENT

In its motion to dismiss, Mayer Brown argues that it has been sued for rendering

legal services indistinguishable from those rendered every day by law firms across the United

States — that "the work done by Mayer Brown was typical of the work done by corporate

lawyers on routine transactions," and that Mayer Brown was just a scrivener, "[m]erely drafting

---

[1] Mayer Brown's second motion to dismiss is devoted exclusively to asking this Court to draw a distinction – that Mayer Brown nowhere else draws – between the firm's United States and UK branches. The Complaint tracks the description of Mayer Brown that was on the firm's website at the time, which held the firm out as the "combination of two limited liability partnerships, each named Mayer, Brown, Rowe and Maw LLP, one established in the State of Illinois and one in England." Compl. ¶ 16. The firm (which has since changed its name) continues to hold itself out – on its single website – as a single entity that is a "combination" of two partnerships and "among the largest law practices in the world." See http://www.mayerbrown.com/overview/index.asp (visited on November 9, 2007). If the Court determines that the Complaint's allegations in this respect are insufficient, Plaintiffs respectfully request leave to replead additional facts regarding Mayer Brown. The paragraphs that Plaintiffs would add by amendment are attached hereto as Exhibit A to the Declaration of Seth Goodchild, Esq., submitted herewith. These additional facts more completely establish that Mayer Brown has held itself out as a single (global) partnership. See, e.g., Sterling v. Sterling, 800 N.Y.S.2d 463, 465 (App. Div. 2005) (partnership formed when parties "exercise joint control and management of the business and . . . share its profits and losses" and combine their skills and knowledge); Fenton v. Bryan, 604 N.E.2d 56, 58 (Mass. App. Ct. 1992) (partnership exists when parties share profits and losses, jointly participate in the control or management of an enterprise and have agreement manifesting intention to associate in a partnership); Landers-Scelfo v. Corp. Office Sys., Inc., 827 N.E.2d 1051, 1057 (Ill. App. Ct. 2005 (a "'partnership arises . . . when the parties . . . join together to carry on a venture for their common benefit, each contributing property or services and having a community of interest in the profits of the venture'") (quoting Kennedy v. Miller, 582 N.E.2d 200 (Ill. App. Ct. 1991)).

loan documents." Inveighing against the Complaint, Mayer Brown protests that it is being unfairly called to account for its clients' alleged misdeeds.

But even a cursory examination of the Complaint's well-pleaded and particularized allegations shatters Mayer Brown's story line. The Complaint explicitly alleges that Mayer Brown crossed well over the divide between rendering legal services and actively participating in illegal conduct.

As described in more detail below, starting in February 2000, Mayer Brown was involved in devising, effectuating, and concealing a financial shell game, conceived by Phillip Bennett ("Bennett"), Refco's then CEO, and others, to hide Refco's huge losses and related-party transactions, whose disclosure would have had disastrous consequences on any effort to sell the company. The shell game involved converting Refco's losses into (uncollectible) receivables owed to Refco by related parties (most notably, by Bennett's company RGHI), and then using transactions negotiated, coordinated, and documented by Mayer Brown to move the receivables off Refco's books for a very short time just before the end of every financial reporting period. This was achieved by Refco "lending" funds to a customer that then immediately "lent" the same funds to RGHI that in turn used the funds to "eliminate" its debt to Refco. Just after the end of every financial reporting period, the transactions were unwound: Refco returned the funds to RGHI that paid off the customer loan so the customer could pay off the Refco loan, with the net result that the related-party receivables reappeared on Refco's books. Bennett stood on both sides of each transaction in this shell game, signing documents on behalf of (a) Refco that not only indemnified the customer but also, in a classic related-party transaction, had Refco guaranteeing RGHI's repayment of the "loan," and (b) RGHI that undertook to repay the loan.

2

The customers bore no risk at all in these transactions, and no money actually changed hands except for interest payments to the customers for participating in the shell game.

To effectuate the scheme, Bennett turned to Joseph Collins, a senior partner at Mayer Brown. Refco was Collins's key client and a large client for Mayer Brown. As the Complaint pleads with particularity, Mayer Brown helped effectuate 17 of the sham transactions described above between 2000 and 2005. Mayer Brown's bald assertions to the contrary notwithstanding, these sham transactions — which had no valid business purpose, which were timed to straddle Refco's financial reporting periods, and which doled out risk-free returns to the Refco customers willing to participate in the shell game — bore no resemblance to "routine transactions," and Mayer Brown's pivotal role in drafting and negotiating the sham transactions was by no means "typical of the work done by corporate lawyers on routine transactions."

But the Complaint alleges much more. The same team at Mayer Brown — led by senior partner Collins — responsible for helping Bennett and others effectuate their scheme was also in charge of responding to Plaintiffs' due diligence requests in connection with their 2004 purchase of a majority interest in Refco (the "2004 Purchase"), and negotiating that transaction. In that role, Mayer Brown actively participated in concealing the existence of the scheme.

In responding to Plaintiffs' due diligence requests and in negotiating the 2004 Purchase, Mayer Brown worked to hide the existence of the scheme by repeatedly and materially lying to Plaintiffs and their representatives. The sham transactions in which Mayer Brown played such a key role were related-party transactions. Discovering and eliminating related-party transactions was — as Collins and Mayer Brown well knew — so important that Plaintiffs insisted on making it a closing condition to their obligation to invest in Refco. Yet Collins and his Mayer Brown colleagues repeatedly, and with knowledge that they were speaking falsely,

assured Plaintiffs there were no such transactions — while simultaneously playing a key role in effecting those transactions.  For example, literally the day after Mayer Brown's Paul Koury helped effect the second largest sham loan transaction — for $700 million — which involved a related-party transaction between Refco and RGHI, Koury sent Plaintiffs a draft disclosure schedule representing that no such related-party transaction existed, and during the period that the sham loan remained in place, Koury prepared and sent several more disclosure schedules with the same denial, a denial Mayer Brown knew was false.

The Complaint pleads claims for violations of Section 10(b) of the Securities Exchange Act; Rules 10b-5(a), (b), and (c); and state law.  Alternatively, if the Court concludes that Plaintiffs may not pursue federal securities fraud claims because, for example, the interests that Plaintiffs purchased are not securities (an issue that Plaintiffs respectfully submit cannot be decided on this motion to dismiss), the Complaint pleads that Mayer Brown violated 18 U.S.C. § 1962(d) by conspiring with Bennett and others to violate 18 U.S.C. § 1962(c).

Mayer Brown unfurls a litany of arguments in its motion to dismiss and often resorts to rewriting the Complaint in an effort to conjure up a basis for dismissal when none exists:

- The Complaint's securities fraud claims do not seek to hold Mayer Brown responsible for its clients' alleged fraud.  Rather, those claims seek to hold Mayer Brown responsible for its own oral and written material misstatements and omissions to Plaintiffs, and for its direct involvement in its clients' scheme to defraud Plaintiffs. (See pages 12 to 13, below.)

- The Complaint's 10b-5(b) claim is not barred by Lattanzio v. Deloitte & Touche L.L.P., 476 F.3d 147 (2d Cir. 2007); Wright v. Ernst & Young, L.L.P., 152 F.3d 169 (2d Cir. 1998); and Shapiro v. Cantor, 124 F.3d 717 (2d Cir. 1997).  In all those cases, investors sought to hold auditors liable for the issuers' false financial statements, arguing that the falsehoods should be attributed to the auditors.  Here, Mayer

Brown is being called to account for its own misstatements and omissions — no one else's. (<u>See</u> pages 13 to 14, below.)

- Mayer Brown cannot escape liability because Collins was careful enough to say that he was basing his statements on information from Refco or Bennett. Mayer Brown's position reduces to the argument that it could lie with impunity so long as it disclaimed being the originator of the lie. Having chosen to speak, Mayer Brown was obligated to speak truthfully and completely. (<u>See</u> pages 15 to 20, below.)

- The Complaint does not attempt to impose on Mayer Brown a duty to correct its clients' misstatements. Again, Mayer Brown is being called to account for its own misstatements and omissions — no one else's. (<u>See</u> pages 15 to 16, below.)

- Plaintiffs' scheme claims, for violations of 10b-5(a) and (c), are not dressed-up 10b-5(b) misrepresentation claims. Indeed, Mayer Brown's conduct is precisely the type of conduct that this Court found supported a scheme liability claim in <u>In re Global Crossing Ltd. Sec. Litig.</u>, 322 F. Supp. 2d 319 (S.D.N.Y. 2004). (<u>See</u> pages 20 to 22, below.)

- Mayer Brown cannot escape scheme liability here because it was not the scheme's alleged "mastermind." In <u>SEC</u> v. <u>U.S. Environmental, Inc.</u>, 155 F.3d 107, 112 (2d Cir. 1998), the court found an account executive liable, holding that "[l]ike lawyers … who engage in fraudulent or deceptive practices at their clients' direction, [the account executive] is a primary violator despite the fact that someone else directed the market manipulation scheme." (<u>See</u> pages 22 to 23, below.)

- The Complaint more than adequately pleads scienter. The Complaint overflows with facts sufficient to support the conclusion that Mayer Brown consciously or recklessly lied to Plaintiffs. This Court has already concluded that for someone aware of the sham transactions — as Mayer Brown indisputably was — those transactions are "glaringly suggestive of fraud". (<u>See</u> pages 25 to 31, below.)

- The Complaint more than adequately pleads that Plaintiffs relied on Mayer Brown. Furthermore, Mayer Brown cannot itself rely on the "no-reliance" and "integration" clauses in the 2004 Purchase Agreement because it was not a party to that agreement. (<u>See</u> pages 31 to 36, below.)

- The PSLRA's RICO amendment does not bar Plaintiffs' RICO claim, which is pleaded in the alternative. Mayer Brown has the burden,

which it has not met, of showing that the interests Plaintiffs acquired are securities. In any event, if the Court concludes that the securities fraud claims against Mayer Brown cannot proceed, then the RICO claim should. (See pages 36 to 43, below.)

- The Complaint has properly pleaded a conspiracy under 18 U.S.C. § 1962(d), even accepting Mayer Brown's erroneous contention that Rule 9(b) applies to allegations of a conspiratorial agreement under that section. (See pages 44 to 47, below.)

- The Complaint pleads a predicate violation of 18 U.S.C. § 1962(c) and pleads with particularity the predicate acts outside the negotiation period of the Purchase Agreement. The Complaint adequately pleads a pattern of racketeering activity with both open-ended and closed-ended continuity. (See pages 48 to 53, below.)

Mayer Brown's motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

**The Parties**

Plaintiffs purchased a majority interest in Refco on August 5, 2004 for $452 million (the "2004 Purchase"). Compl. ¶ 1. Defendant Mayer Brown is among the largest law firms in the world and had long served as Refco's primary outside counsel. Id. ¶¶ 1, 16, 17. For many years prior, Mayer Brown had handled most of Refco's significant legal matters, including regulatory and compliance issues and important corporate work. Id. ¶ 17. In fact, Refco was the most significant client of Mayer Brown senior partner Joseph Collins, and Mayer Brown's total Refco billings between 2000 and 2005 exceeded $23 million. Id.

**Fraudulent Scheme Of Bennett And His Co-Conspirators**

According to the latest superseding indictment filed by the United States Attorneys' Office, starting in the 1990s, Refco's then-Chief Executive Officer Phillip Bennett and his co-conspirators (including Refco's then-Chief Financial Officer Robert Trosten and, as alleged in the Complaint, its then-Senior Vice President Santo Maggio), engaged in a fraudulent scheme designed to hide Refco's true financial position from investors, lenders, regulators, and

the public. Id. ¶¶ 19, 85. Refco had incurred a series of substantial losses in the 1990s, due both to its own unsuccessful proprietary trading and to uncollectible receivables (from customers to which Refco had extended loans that they could not repay). Id. ¶ 20. Rather than allowing Refco to write off these losses, as was required, Bennett and others embarked on a fraudulent scheme to hide them and thereby mask Refco's true financial condition. Id.

The scheme involved Refco "selling" these uncollectible losses on credit to Refco-related parties, most notably Refco Group Holdings, Inc. ("RGHI"), a company controlled by Bennett. Id. ¶¶ 2, 21. This transferred the losses off Refco's books and created a large receivable that the Refco-related parties owed to Refco. Id. ¶ 21. At times, the receivable totaled more than $1 billion (the "RGHI Receivable"). Id. Then, in order to make the RGHI Receivable appear to be a valuable receivable from an unaffiliated third-party customer on Refco's financial statements, Bennett, Mayer Brown and others carried out, with one or more unaffiliated customers, a series of sham short-term loan transactions straddling Refco's financial reporting periods that temporarily caused substantially all of the RGHI Receivable to be replaced by a like-sized receivable from the customers. Id. ¶ 22. The "round-trip loan" transactions began as early as February 1998 and continued through at least August 2005. Id. ¶ 22, 31.

The round-trip loans followed the same general pattern: (i) just before the close of the financial reporting period, a Refco entity, generally Refco Capital Markets, Ltd. ("RCM"), would make a "loan" to a third-party customer; (ii) simultaneously, the customer would make a "loan," which was unconditionally and absolutely guaranteed by Refco, in the exact same amount to RGHI; and (iii) RGHI would use these funds to pay down the RGHI Receivable. Id. ¶¶ 26, 31. As a result, Refco's books at the close of the reporting period would show a "loan" to the third-party customer, and the RGHI Receivable would be gone. Id. ¶ 26. These transactions

were then unwound just a few days later, after the close of the financial reporting period: (i) Refco would "lend" money back to RGHI in the amount of the RGHI Receivable; (ii) RGHI would pay off the full amount of its loan, plus interest, to the unrelated customer, and (iii) the customer would pay off the full amount of its loan, plus a lesser amount of interest, to Refco. Id. ¶ 28. Once this was completed, the RGHI Receivable would reappear on Refco's books and the customer "loan" would be gone. Id. ¶¶ 28, 32. The third-party customers were guaranteed a profit from the round-trip loans because the interest rate that RGHI paid them was between 15 and 100 basis points higher than the interest rate that the customers paid Refco. Id. ¶ 27. The customers, however, were never at risk: Refco unconditionally and absolutely guaranteed all of RGHI's obligations to the customers and indemnified them against all loss. Id. ¶ 29. Bennett stood on both sides of the transactions, signing the documentation for the loan on behalf of RGHI and, on all but one occasion, the guarantees and indemnities on behalf of Refco. Id.

These arrangements and their individual components (including the guarantees and indemnities provided by Refco) were related-party transactions, material contracts, and indemnification obligations of Refco and were required to be disclosed and described as such, but were not, in connection with the 2004 Purchase. Id. ¶¶ 23, 41.

**Mayer Brown's Direct And Continuous Involvement In The Fraudulent Scheme**

Between 2000 and 2005 – which included the period during which Plaintiffs conducted due diligence and completed the 2004 Purchase – Refco engaged in 18 sham round-trip loans, and Mayer Brown was involved in virtually every facet of 17 such loans for Refco. Id. ¶¶ 25, 30, 31. Specifically, Mayer Brown lawyers participated in these sham round-trip loans on 17 separate occasions, negotiating the terms of the loan documents with the loan participants or their counsel, drafting and revising the loan documents, transmitting the documents to Refco and the loan participants through interstate wires, and, on at least two separate occasions,

sending confirmations to loan participants that the loans had been unwound within days of having been made, endorsing the promissory notes as "paid in full." Id. ¶¶ 30, 31. Mayer Brown senior partner Collins was directly involved in the early sham round-trip loans, and while he handed off the direct work to Mayer Brown associate Paul Koury for later loans, Collins remained informed of Koury's work on the later sham round-trip loans. Id. ¶ 31.

Mayer Brown understood that the sham round-trip loans – many of which this Court has already concluded were "glaringly suggestive of fraud," In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 648-49 (S.D.N.Y. 2007) – affected Refco's financial statements, lacked any proper business purpose and were undisclosed related-party transactions. Id. ¶ 32. Indeed, Mayer Brown understood, inter alia, that "these round-trip loans, with one exception, were undertaken only at times that straddled Refco's financial reporting periods," "each [round-trip loan] entailed the short-term risk-free lending of hundreds of millions of dollars," and "these transactions caused the RGHI related-party receivable to be removed from Refco's books and records at the time that financial statements were being prepared and then to reappear immediately thereafter, only to disappear yet again at the time of the next annual audit or quarterly statement." Id.

## Mayer Brown's Central Role In Plaintiffs' Due Diligence

Before entering into the 2004 Purchase, Plaintiffs conducted due diligence for nine months with the assistance of a team of professional advisors. Id. ¶¶ 8, 33, 34. Mayer Brown represented not only Refco but also RGHI and Bennett in connection with this transaction. Id. ¶ 35. The very same Mayer Brown lawyers who had drafted the sham round-trip loans played a central role in the 2004 Purchase, both in responding to Plaintiffs' due diligence requests and in drafting and negotiating the transactional documents. See, e.g., id. ¶¶ 46-48 (Collins) & ¶ 54 (Koury).

At the direction of, and in coordination with, Bennett and his co-conspirators, Mayer Brown lawyers – primarily Collins and Koury – communicated frequently with Plaintiffs and their counsel regarding the due diligence process. Id. ¶ 35. Mayer Brown coordinated Plaintiffs' access to the documents and information being provided by Refco, its affiliates and Bennett. Id. In this regard, the parties knew that Mayer Brown would provide information directly to Plaintiffs and their representatives and that Plaintiffs were entitled to rely on the information Mayer Brown provided in deciding whether to go forward with the 2004 Purchase. Id. ¶ 36. Mayer Brown "would not be serving merely as a conduit for information from Refco management and Bennett, but would be drawing from its own extensive knowledge and information built up over the many years that Collins and his Mayer Brown colleagues had been working with Refco." Id. Consistently with these understandings, Mayer Brown attorneys had extensive direct contact with Plaintiffs and their representatives, attending meetings and regularly participating in conference calls and e-mail communications with Plaintiffs and their counsel. Id. ¶ 37; see, e.g., ¶¶ 45-48.

"Of critical importance to [Plaintiffs] during the [due] diligence process was to identify and eliminate any related-party transactions and arrangements, in particular dealings between [Refco] and its senior management (and their affiliates)...." Id. ¶ 38. As a result, Plaintiffs repeatedly requested information on any related-party transactions as well as any material contracts of Refco and any agreements in which Refco had incurred indemnification obligations to third persons. Id. ¶ 41. "Mayer Brown and Collins at all times knew the importance that [Plaintiffs] placed on identifying and eliminating related-party transactions." Id. ¶ 40. Nonetheless, neither Mayer Brown nor anyone else on Refco's side of the transaction ever disclosed or provided Plaintiffs with the sham round-trip loan information and related

documentation even though the sham loans constituted related-party transactions and material contracts and contained Refco indemnification obligations, id. ¶ 41; to the contrary, Mayer Brown actively participated in hiding their existence by expressly representing that such transactions, contracts, and obligations did not exist. Id. ¶¶ 46-49, 51, 54-55.

## Mayer Brown's Misstatements And Omissions Of Material Facts To Plaintiffs

Mayer Brown made direct repeated misrepresentations, and omitted material facts, during face-to-face meetings and telephonic communications with Plaintiffs and their counsel and in written communications, including draft disclosure schedules, concerning Refco's related-party transactions, material contracts and indemnification obligations. See id. ¶¶ 46-48, 53-55. For example, during a March 2004 telephone conference, Collins represented to Plaintiffs' counsel Jay Tabor that "he had confirmed with Bennett that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI, or other affiliates." Id. ¶ 46 (emphasis added). Also, in two separate e-mails on May 6, 2004 addressed to Plaintiffs' counsel and responding to Plaintiffs' requests for information, Collins informed Plaintiffs' counsel that all material contracts and indemnification obligations had been disclosed to Plaintiffs. Id. ¶¶ 47-48. Collins knew that these statements were false because no information regarding the sham round-trip loans – which, in themselves, were related-party transactions and material contracts and involved indemnification obligations – had been provided to Plaintiffs. Id. ¶¶ 47-48. And Mayer Brown knew this because they prepared disclosure schedules that said "none" in answer to the question whether any related-party transactions existed. Id. ¶ 54. Additionally, Mayer Brown negotiated and prepared the Equity Purchase Agreement, dated June 8, 2004, which contained a series of material contractual representations that no such transactions existed. Id. ¶¶ 50-51. Mayer Brown prepared and delivered to Plaintiffs a disclosure schedule to the Equity Purchase Agreement stating that there

were no related-party transactions <u>at the very same time</u> that Mayer Brown was working on a

related party sham round-trip loan for Refco that put the lie to this representation. <u>Id.</u> ¶ 31(l).

**The Fraud Is Revealed**

   In early October 2005, Refco's Board of Directors, which included designees of

Plaintiffs, learned for the first time of the fraudulent activities by Bennett and his co-

conspirators. <u>Id.</u> ¶ 9. On October 10, 2005, Refco issued a press release disclosing the discovery

of an approximately $430 million receivable owed to Refco by RGHI. <u>Id.</u> As a result of the

fraud, the interests acquired by Plaintiffs became worthless, causing them losses of at least $245

million. <u>Id.</u> ¶¶ 73, 82, 92, 98, 108.

<strong>ARGUMENT</strong>

**I.  THE COMPLAINT STATES A FEDERAL SECURITIES LAW CLAIM**

  **A.  Mayer Brown Is Liable As A Primary Violator Of Section 10(b) And
     <u>Rule 10b-5(b) For Its Material Misstatements And Omissions To Plaintiffs</u>**

   Mayer Brown spills much ink arguing that the Complaint impermissibly attempts

to hold it liable under Rule 10b-5(b) for its clients' alleged fraud. Br. at 8-27. But that is not

Plaintiffs' Rule 10b-5(b) claim. Mayer Brown is being sued for its own fraudulent conduct. The

Complaint alleges that Mayer Brown made a number of knowingly false oral statements directly

to Plaintiffs and their counsel, such as informing Plaintiffs that "other than Bennett's

compensation arrangements, no other undisclosed contracts or arrangements existed between

Refco and Bennett, RGHI or other affiliates." Compl. ¶ 46; <u>see also id.</u> ¶¶ 47-48. This was a lie

because there were numerous related-party contracts and arrangements (including 17 sham

round-trip loans) – in which Mayer Brown played a material role – that were never disclosed to

Plaintiffs or their counsel. <u>See, e.g.,</u> Compl. ¶¶ 42, 46-48, 53-55. The Complaint also alleges

that Mayer Brown drafted and delivered to Plaintiffs and their counsel disclosure schedules and

other written statements confirming there were no related-party transactions. In fact, when

Mayer Brown communicated the initial disclosure schedules to Plaintiffs' counsel, it expressly

represented that it was delivering "<u>our</u> initial draft of the Schedules," which Mayer Brown was

also "deliver[ing] simultaneously to our clients." Compl. ¶ 55(a) (emphasis added). <u>See also id.</u>

¶¶ 51-55 and pages 10 to 11, above. These written statements also were lies because they

misrepresented that there were no related-party contracts or arrangements.

      Thus, Plaintiffs are not seeking to hold Mayer Brown liable under Rule 10b-5(b)

for the false statements of others that are merely attributed to Mayer Brown, but for material lies

told by Mayer Brown. Mayer Brown's conduct falls squarely within the reach of primary Rule

10b-5 liability for attorneys articulated by the Supreme Court in <u>Central Bank of Denver, N.A.</u> v.

<u>First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 191 (1994) (emphasis added):

> The absence of § 10(b) aiding and abetting liability does not mean that
> secondary actors in the securities markets are always free from liability
> under the securities Acts. <u>Any person or entity, including a lawyer,</u>
> accountant, or bank <u>who</u> employs a manipulative device or <u>makes a</u>
> <u>material misstatement (or omission) on which a purchaser or seller of</u>
> <u>securities relies may be liable as a primary violator</u> under 10b-5 ....

      These allegations also render inapposite Mayer Brown's heavy reliance (Br. at 9-

12) on <u>Lattanzio</u> v. <u>Deloitte & Touche L.L.P.</u>, 476 F.3d 147 (2d Cir. 2007); <u>Wright</u> v. <u>Ernst &</u>

<u>Young, L.L.P.</u>, 152 F.3d 169 (2d Cir. 1998); and <u>Shapiro</u> v. <u>Cantor</u>, 123 F.3d 717 (2d Cir. 1997).

In these cases, investors sought to hold auditors liable for falsehoods communicated to investors

by companies in their financial statements, under the theory that the falsehoods, though spoken

by the companies, should also be attributed to their auditors. Plaintiffs do not seek to hold

Mayer Brown liable for someone else's words attributed to Mayer Brown, but to hold Mayer

Brown liable for its own words – i.e., for false representations Mayer Brown made directly, and

often face-to-face, to Plaintiffs and their counsel while contemporaneously engaging in

transactions that belied those very representations.  See Compl., e.g., ¶¶ 31(l), 44-48 (pages 11 to

12, above).[2]  The three cases above all recognize that a professional can be held liable for its own

false statements, see Lattanzio, 476 F.3d at 156; Wright, 152 F.3d at 175; Shapiro, 123 F.3d at

720, an indisputable proposition confirmed once again in the Second Circuit's most recent

auditor liability case, Overton v. Todman & Co., CPAs, P.C., 478 F.3d 479, 487 (2d Cir. 2007)

(holding that imposing primary Section 10(b) and Rule 10b-5 liability on an accountant for not

correcting a false or misleading statement in a certified opinion "remains true to the prohibition

on aiding and abetting liability because we require that an accountant make its own misleading

omission by failing to correct its certified opinion") (emphasis in original)).[3]

       Equally unavailing is Mayer Brown's effort to argue that imposing liability on it

would be tantamount to imposing on it a duty to correct false statements by its client, or to

disclose accurate facts when its client has made false statements.  Liability will be imposed on

Mayer Brown under Rule 10b-5(b) for false statements that Mayer Brown made.  The principle

of law here is clear:  Mayer Brown may not have been obligated to say anything to Plaintiffs,

even in the face of false statements by its client, but "upon choosing to speak, [it] must speak

truthfully about material issues."  Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002)

---

[2] These attribution cases may be relevant to Mayer Brown's defense to the securities class action complaints filed against it because Mayer Brown did not communicate directly with those purchasers of securities or their advisors.  The cases, however, have no relevance here because Mayer Brown communicated directly (and repeatedly) with Plaintiffs, and it was understood that Plaintiffs would be relying on these communications in deciding whether to proceed with the 2004 Purchase.  Compl. ¶ 36.

[3] Conspicuously, Mayer Brown fails to mention Overton.  In Overton, the court held that when an auditor "provides a certified opinion that is false or misleading when issued, subsequently learns or was reckless in not learning that the earlier statement was false or misleading, knows or should know that potential investors are relying on the opinion, yet fails to take reasonable steps to correct or withdraw its opinion and/or the underlying financial statements," the auditor "becomes primarily liable" under Section 10(b) and Rule 10b-5.  Id. at 480-81.

(citing Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 267-68 (6th Cir. 1998), and

Ackerman v. Schwartz, 947 F.2d 841, 848 (7th Cir. 1991), both of which held securities issuer

counsel liable to investors because, having decided to communicate with investors, they failed to

communicate the true facts that they knew).  A license to practice law simply is not a license to

lie.  See Rubin, 143 F.3d at 268; Ackerman, 947 F.2d at 848.[4]

Mayer Brown's next argument is that it cannot be liable under Rule 10b-5(b)

because Mayer Brown senior partner Collins was always clever enough to say that he was basing

his false statements on information given to him by Refco or Bennett.  Br. at 11.  In short, Mayer

Brown argues that it can make statements to others, in connection with the purchase or sale of a

security, that it knows are materially false as long as it disclaims being the original source of the

falsehoods.

This argument is meritless.  As a threshold (and dispositive) matter, this argument

flies in the face of the Complaint's factual allegations, which are presumed true on this motion.

Specifically, Complaint ¶ 36 alleges, "It was understood that during the diligence process Mayer

Brown and Collins would be providing information to the THL Funds upon which Plaintiffs

would rely in deciding whether to proceed with the 2004 Purchase.  In this capacity, Mayer

Brown would not be serving merely as a conduit for information from Refco management and

Bennett, but would be drawing from its own extensive knowledge and information built up over

the many years that Collins and his Mayer Brown colleagues had been working with Refco."

Furthermore, the courts have (not surprisingly) had little trouble rejecting this

"pass the buck" defense.  Squarely on point is the Third Circuit's decision in Kline v. First

---

[4] See also cases cited at pages 17-19, below; Trust Co. of Louisiana v. N.N.P. Inc., 104 F.3d 1478, 1490 (5th Cir. 1997) (affirming order holding attorney liable under Rule 10b-5 when attorney had intentionally misrepresented the status of investment vehicles to investors by failing to disclose that the investments were not properly collateralized).

Western Gov't Sec., Inc., 24 F.3d 480 (3d Cir. 1994).[5]  In Kline, the defendant law firm issued

three tax opinion letters in connection with "straddle transactions" being marketed by its client,

First Western Government Securities ("First Western").  Id. at 481-82.  The firm expressly based

its opinions on an assumed set of facts provided to it by First Western and expressly stated that

its opinion letters were "intended solely for the internal use of First Western and, accordingly, it

is not intended to be, and should not be, relied upon by any person other than First Western."  Id.

at 483.  After the transactions failed, investors sued the law firm, alleging the firm knew First

Western was distributing its opinion letters to investors and knew the letters' factual descriptions

were inaccurate.  Id. at 483-84.

      The Third Circuit affirmed the district court's denial of the law firm's summary

judgment motion, holding that "attorneys may be liable for both misrepresentations and

omissions where the result of either is to render an opinion letter materially inaccurate or

incomplete."  Id. at 485-86.  In so holding, the court rejected the law firm's argument that

"as a matter of law it cannot be held liable for an opinion letter in which it made explicit that it

was basing its opinion on an assumed set of facts represented to it by its client and that it had

conducted no independent investigation into whether those represented facts accurately reflected

reality."  Id. at 486.  According to the Third Circuit, "when a law firm knows or has good reason

to know that the factual description of a transaction provided by another is materially different

from the actual transaction, it cannot escape liability simply by including in its opinion letter a

---

[5] The Second Circuit and courts in this District have cited Kline with approval.  See, e.g., Hunt v.
Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 729-29 (2d Cir. 1998) (citing Kline for
the proposition that cautionary language must relate directly to the statement by which plaintiffs
claim to have been misled in order for the "bespeaks caution" doctrine to apply); Resolution
Trust Corp. v. Latham & Watkins, 909 F. Supp. 923, 934 (S.D.N.Y. 1995) (finding that a duty to
disclose material information arises when a law firm renders an opinion on behalf of a client, and
stating that "a law firm has the duty not to mislead").

statement that its opinion is based on provided facts." Id. at 487;[6] see also id. at 489 ("[the law firm's] statement that its opinion was based on facts represented to it by First Western also contained the implicit assertion that [the law firm] did not know the facts to be otherwise. It could not therefore have alerted [the securities purchasers] to the possibility that [the law firm] did know otherwise").[7]

Kline is in line with a plethora of federal cases holding that attorneys are not shielded from Rule 10b-5(b) liability when they knowingly communicate lies to investors (either orally or in writing), even though they also communicate that the lies originated with someone else. Among the cases in accord with Kline are:

- Rubin v. Schottenstein, Zox & Dunn,[8] 143 F.3d 263, 268 (6th Cir. 1998) (when issuer's attorney had "various meetings and telephone conversations" with investors during which attorney gave false and misleading oral assurances regarding the financial condition of his client's business, the attorney may be held primarily liable because, inter alia, the attorney failed to provide "complete and nonmisleading

---

[6] This rebuts Mayer Brown's argument, for which it draws inexplicable support from the inapposite auditor attribution cases, that it cannot be held liable because when Collins lied, he assiduously avoided "articulating" an "endorsement" of what Bennett or Refco said. Br. at 11-12. In any event, when a firm such as Mayer Brown sends out disclosure schedules as "an initial draft," subject to client comment (Compl. ¶ 55(a)), it is more than an endorsement, it is the firm's statement.

[7] Nothing in Kline can be read to restrict its reasoning to opinion letters. The Court stated that "'[a]n opinion or projection, like any other representation, will be deemed untrue for purposes of federal securities laws if it is issued without reasonable genuine belief or if it has no basis.'" 24 F.3d at 486 (citations omitted). Moreover, a rule permitting an issuer's counsel to lie to investors so long as it avoids doing so in the formal vehicle of an opinion letter would simply "place a premium on concealment and subterfuge rather than on compliance with the federal securities law," which is obviously an unacceptable outcome. In re Global Crossing Sec. Litig., 322 F. Supp. 2d 319, 333 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

[8] Both Rubin and Ackerman (see page 18 below) have been cited with approval by the Second Circuit. See pages 14-15, above.

information with respect to subjects on which he under[took] to speak," in violation of Rule 10b-5);[9]

- Ackerman v. Schwartz, 947 F.2d 841, 843, 848 (7th Cir. 1991) (attorney can be liable under Rule 10b-5 for misleading opinion letter, despite attorney's statements that he "relied on unnamed persons for unspecified facts" and did "not [make] an attempt to independently verify the various representations"; once an attorney has chosen to speak, Rule 10b-5 requires him to "tell the truth about material issues"; "Under Rule 10b-5 . . .the lack of an independent duty [  ] does not excuse a material lie.");

- Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter, Co., 2007 WL 2572258, at *18-19 (S.D. Ohio Sept. 4, 2007) (when lawyers for sellers of securities "met directly with [the purchaser of the securities] to discuss outstanding due diligence issues" and subsequently "drafted the Purchase Agreement, knowing that it contained material misrepresentations and omissions on the same matters ... about which [the lawyers] had prior contacts with [the purchaser]," lawyers faced primary liability under Rule 10b-5; the lawyers could not escape liability by claiming that the purchase agreement did not "belong" to them, but to their client) (relying on Rubin, 143 F.3d at 267-68, and Ackerman, 947 F.2d at 848);

- In re Enron Corp. Sec., Deriv. & ERISA Litig., 235 F. Supp. 2d 549, 610 (S.D. Tex. 2002) (lawyers, "when they take the affirmative step of speaking out, whether individually or as essentially an author or co-author in a statement or report, whether identified or not, about their client's financial condition, do have a duty to third parties not in privity not to knowingly or with severe recklessness issue materially misleading statements on which they intend or have reason to expect that those third parties will rely") (citing Rubin, 143 F.3d at 268);

- Gilmore v. Berg, 761 F. Supp. 358, 370 (D.N.J. 1991) ("a jury could find [the attorney's] statement [in a tax opinion letter] that 'the purchase price of $5.3 million reflects the fair market value of the property as determined by the general partner' is so grossly misleading

---

[9] Both Kline and Rubin also rejected the argument that the law firms were protected by principles of legal ethics. See Rubin, 143 F.3d at 269-70 ("It is perhaps symptomatic of the current debate over the state of legal ethics that the defendants would invoke the attorney's duty of confidentiality to justify what, if Rubin's and Weiss's affidavits are correct, amount to outright lies") ("Admission to the bar, if anything, imposes a heightened, not a lessened requirement of probity"); Kline, 24 F.3d at 492 ("The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will save him in the commission of a fraud will have no help from the law. He must let the truth be told.") (citation omitted).

as to constitute actionable fraud [under Rule 10b-5] in failing to
disclose important facts underlying the determination of fair market
value," when plaintiffs had "presented evidence that ... [the attorney]
knew that the fair market value of $5.3 million was insupportable").

The facts here are even more compelling than those in <u>Kline</u>. First, there was no

direct evidence in <u>Kline</u> that the law firm actually knew that its representations were false, <u>see</u>

<u>Kline</u>, 24 F.3d at 484, whereas here Mayer Brown worked directly on the very transactions

whose existence it denied. <u>See</u>, <u>e.g.</u>, Compl. ¶¶ 2, 3, 45. Second, Mayer Brown had greater

knowledge of its clients' business than did the law firm in <u>Kline</u>. Mayer Brown partner Collins

was "Refco's 'go-to-guy'" and "all important transactions and deals involving the brokerage

[Refco] were first cleared through" Mayer Brown. <u>Id.</u> ¶ 17. Third, unlike the <u>Kline</u> law firm,

Mayer Brown made its false statements directly to Plaintiffs and their counsel – with full

knowledge that Plaintiffs were relying on those statements. <u>Id.</u> ¶¶ 35-37.

In support of its "pass the buck" defense, Mayer Brown cites only <u>Schatz</u> v.

<u>Rosenberg</u>, 943 F.2d 485 (4th Cir. 1991), which is readily distinguishable. There, the parties

negotiated the transaction without counsel, while the lawyers acted as mere scriveners and did

not make any misrepresentations. <u>Id.</u> at 494 n.3 & 497. Here, Mayer Brown was involved in

negotiating the transaction, played a far greater role than as a mere scrivener, and did make

misrepresentations to Plaintiffs. Furthermore, <u>Schatz</u> recognized the continued vitality of

<u>Bonavire</u> v. <u>Wampler</u>, 779 F.2d 1011 (4th Cir. 1985), which is much closer to the facts here and

which imposed liability on the law firm. As the <u>Schatz</u> court explained, the lawyer in <u>Bonavire</u>

"made personal affirmative representations," "was actually involved in the deal," "participate[d]

in negotiation or solicitation," and made representations upon which "the plaintiffs ... clearly

relied ... in closing the deal." <u>Schatz</u>, 943 F.2d at 494 n.3.

In sum, contrary to Mayer Brown's arguments, Plaintiffs' Rule 10b-5(b) claim does not turn on whether Mayer Brown had a duty to disclose information to Plaintiffs, whether it had a duty to correct misstatements made by Bennett and Refco, or whether it can be held liable for the statements of others that are "attributed" to Mayer Brown. The Complaint alleges that <u>Mayer Brown</u> made repeated material misstatements and omissions to Plaintiffs – during face-to-face meetings and telephone calls and in documents drafted by Mayer Brown – that all material contracts, related-party transactions and indemnification obligations had been disclosed. <u>See</u>, <u>e.g.</u>, Compl. ¶¶ 46-48, 53-55.[10]  The Complaint thus pleads a primary violation by Mayer Brown of Rule 10b-5(b).

**B.      Plaintiffs' Factual Allegations State A Claim For "Scheme Liability" Under Section 10(b) And Rule 10b-5(a) & (c)**

Separately from Mayer Brown's actionable misstatements and omissions, Plaintiffs have also alleged that Mayer Brown engaged in a fraudulent scheme and employed manipulative devices. Specifically, the Complaint alleges that Bennett masterminded a long-running scheme designed (among other things) to conceal Refco's large losses and facilitate the ultimate sale of all or part of Refco. Mayer Brown furthered that scheme by negotiating, documenting, and being materially involved in 17 sham related-party loans over five years. <u>Id.</u> ¶¶ 30-31. These sham loans were designed to defraud potential purchasers (such as Plaintiffs), lenders, and potential lenders by concealing Refco's true financial condition. <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 2.

---

[10] Mayer Brown engages in obvious hyperbole when it suggests that this clear legal standard – that an issuer's counsel who communicates with investors has a duty not to communicate false material facts – will make all issuers' counsel guarantors of their client's deals. Counsel would not face liability if (a) it did not speak on certain subjects (since it would not be obligated to speak, even to correct a dishonest client), (b) it refused to communicate known lies, (c) it did not act with scienter, (d) investors did not rely on its communications, or (e) the other elements of a Rule 10b-5(b) claim cannot be proved.

Mayer Brown first contends that Plaintiffs' "scheme claims" are nothing more than reiterations of their Rule 10b-5(b) claim under the guise of Rule 10b-5(a) and (c). See Br. at 13-15. This argument is without merit. The authority on which Mayer Brown principally relies, Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir.), cert. denied, 546 U.S. 935 (2005), holds that a plaintiff's Rule 10b-5(a) and (c) claims are foreclosed only when they are based solely on misrepresentations or omissions by defendants to investors. See id. at 177. Plaintiffs have alleged, with the requisite level of specificity, that Mayer Brown both made material misrepresentations and omissions in violation of Rule 10b-5(b) and engaged in fraudulent conduct, separate from Mayer Brown's misrepresentations to Plaintiffs, in violation of Rule 10b-5(a) and (c).[11] This fraudulent conduct includes the work that Mayer Brown performed on 17 sham round-trip loans. See Compl. ¶¶ 30-31.

Mayer Brown's conduct is precisely the type of conduct that this Court found sufficient to support a "scheme liability" claim under Rule 10b-5(a) and (c) in In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319 (S.D.N.Y. 2004) (Lynch, J.), in which plaintiffs also stated a separate claim under Rule 10b-5(b). In Global Crossing, in addition to their separate claims under 10b-5(b), plaintiffs alleged that Arthur Andersen violated 10b-5(a) and (c) by playing a central role in devising and implementing a scheme involving the creation of "interrelated transactions . . . that had no economic substance but which were used to fool investors into believing that the industry and these companies were growing much faster than the

---

[11] It is well settled that scheme liability can attach to participants in the fraudulent scheme even when another participant's misrepresentations or omissions are integral to the scheme. See, e.g., Quaak v. Dexia, S.A., 357 F. Supp. 2d 330, 341-42 (D. Mass. 2005) (holding that a defendant can be liable as a primary violator of § 10(b) and Rule 10b-5 when the defendant "'substantially participate[d] in a manipulative or deceptive scheme . . . even if a material misstatement by another person creates the nexus between the scheme and the securities market'") (citing In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161, 173 (D. Mass. 2003)).

reality." <u>Id.</u> at 327.  The Court rejected Arthur Andersen's principal argument that plaintiffs'

scheme claim was "'a thinly disguised . . . aiding and abetting claim," <u>id.</u> at 335, emphasizing

that plaintiffs' allegations that Arthur Andersen "actively participated," "was intimately involved

in," and played a "central role in these schemes" easily established that Arthur Andersen had

"'committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud.'"

<u>Id.</u> at 327, 336 (citation omitted).  In rejecting Arthur Andersen's argument, the Court

emphasized that "subsections (a) and (c) . . . encompass the use of  '<u>any</u> device, scheme or

artifice,' or '<u>any</u> act, practice, or course of business' used to perpetrate a fraud on investors."  <u>Id.</u>

at 336 (emphasis in original).

     Mayer Brown attempts to distinguish <u>Global Crossing</u> by pointing out that there,

Arthur Andersen was alleged to have "masterminded misleading accounting . . . and the

subsequent sham swap transactions," whereas here, Plaintiffs allege that "Bennett and other

Refco insiders were the alleged masterminds of the fraud, not the lawyers."  Br. at 18.  But

nothing in <u>Global Crossing</u> suggests that Plaintiffs' particularized allegations that Mayer Brown

was "involved in every facet of 17 separate sham round-trip loan transactions," "materially

assisted" in, and "participated in and furthered" the Refco scheme, <u>see</u> Compl. ¶¶ 5-7, 25, are

insufficient in the absence of an additional allegation that Mayer Brown was the "mastermind" of

the scheme.

     Contrary to Mayer Brown's categorical assertion that the Second Circuit "has not

yet spoken directly on the viability of 'scheme' liability" (Br. at 17), the Second Circuit in <u>SEC</u>

v. <u>U.S. Environmental, Inc.</u>, 155 F.3d 107, 110-12 (2d Cir. 1998), held that allegations that an

account executive knowingly or recklessly engaged in transactions in furtherance of a market

manipulation scheme fell "well within the boundaries of primary liability" under Rule 10b-5(a)

and (c), even though the account executive merely executed trades at the direction of the stock

manipulator and did not share the manipulator's ultimate purpose.  Id. at 110-11.  The court

emphasized that "[i]t is of no relevance that [another defendant], not [the broker], masterminded

the . . . stock manipulation and that [another defendant's] group 'directed' [the broker] to effect

the illegal trades."  Id. at 112.  "The Supreme Court in Central Bank never intended to restrict §

10(b) liability to supervisors or directors of securities fraud schemes while excluding from

liability subordinates who also violated the securities laws."  Id.[12]  Likewise, in United States v.

Regan, 937 F.2d 823, 829 (2d Cir. 1991), the Second Circuit held that a trader who sold stock

short was liable for "use of [a] device, scheme or artifice to defraud" even though he acted at the

direction of another who wanted to manipulate the stock's price.  Therefore, Mayer Brown's

"mastermind" argument conflicts with controlling authority and should be discarded.[13]

It is also telling that in the many pages that Mayer Brown devotes to Plaintiffs'

scheme liability claim, it glosses over Judge Kaplan's decision in In re Parmalat Sec. Litig., 383

F. Supp. 2d 616 (S.D.N.Y. 2005).  In Parmalat, the complaint alleged that Parmalat's outside

---

[12] See also Quaak, 357 F. Supp. at 342 (holding that allegations that defendants created and
used sham entities to create fraudulent licensing agreements for the purpose of inflating profits
were sufficient to state a claim for scheme liability); In re Enron Corp. Sec., Deriv. & ERISA
Litig., 310 F. Supp. 2d 819, 829 (S.D. Tex. 2004) (holding that Merrill Lynch's "substantial,
active role in major fraudulent transactions with no legitimate business purpose" was enough to
confer liability under Section 10(b)); In re Lernout, 236 F. Supp. 2d at 172 (recognized U.S.
Envtl. as holding "that a scheme claim under 10(b) need not allege orchestration by the
defendant").

[13] Mayer Brown also argues that it cannot be held liable under Rule 10b-5(a) or (c) because it
was not a lender or borrower in the sham round-trip loans; instead, it was Refco that was
"actively employ[ing]" the loans to manipulate its financial statements.  This argument, however,
simply misses the point:  Mayer Brown "participated in the fraudulent scheme," which is all that
is required, by participating in carrying out the sham loans.  U.S. Envtl., 155 F.3d at 112 (citation
omitted).  Indeed, this is why account executive Romano was held liable in U.S. Envtl.: "Like
lawyers … who engage in fraudulent or deceptive practices at their clients' direction, Romano is
a primary violator despite the fact that someone else directed the market manipulation scheme."
Id.

lawyers "arranged" sham transactions by creating shell corporations that Parmalat used to record multi-million dollar third-party receivables. Id. at 620. The court held that the sham transactions facilitated by the lawyers constituted deceptive devices or contrivances for purposes of Section 10(b) because they were "'inventions, projects, or schemes with the tendency to deceive [that] created the appearance of a conventional' sale and loan 'when, in fact, the reality was quite different.'" Id. at 626 (citation omitted).

Mayer Brown's fleeting attempts to distinguish Parmalat are unavailing. Br. at 19-20. First, the sham round-trip loans documented by Mayer Brown constitute deceptive devices or contrivances for purposes of Rule 10b-5(a) and (c), separately from Mayer Brown's misrepresentations about these transactions to Plaintiffs. Indeed, the round-trip loans, like the sham transactions in Parmalat, were "inventions, projects or schemes with the tendency to deceive" that masked the existence of the multi-million dollar related-party RGHI Receivable. Further, Mayer Brown's claim that it merely furnished legal advice (see Br. at 19-20) conflicts with the Complaint that alleges far more – that Mayer Brown negotiated, coordinated, and documented a series of deceptive arrangements designed to enable Refco to disguise its true financial condition and defraud lenders and potential purchasers, such as Plaintiffs. See Compl. ¶¶ 30, 32. Fairly read, the Complaint alleges that Mayer Brown did not merely provide dispassionate legal advice from a distance; it rolled up its sleeves and became a willing participant in the sham round-trip loans.[14]

---

[14] Surprisingly, Mayer Brown contends that "the back-to-back loans were not themselves fraudulent: they were real loans involving actual third parties." Br. at 17. These were anything but "real loans." Customers received interest on these "loans" even though they undertook no risk because of Refco's guarantees and indemnities. Compl. ¶¶ 27, 29. The "loans" were for very short durations, straddling Refco reporting periods. Id. ¶ 32. "Although characterized as loans, generally no funds were actually transferred other than the customer's profit from the interest spread." Id. ¶ 27. In any event, even if the round-trip loans could be mischaracterized as

In sum, Plaintiffs' allegations that Mayer Brown acted as a key participant in Bennett and Refco's scheme to hide the related-party RGHI Receivable by negotiating, coordinating and drafting the sham round-trip loans state a claim under Rule 10b-5(a) and (c), in addition to Plaintiffs' Rule 10b-5(b) claim based on Mayer Brown's repeated misrepresentations and omissions.  For the foregoing reasons, Mayer Brown's motion to dismiss Plaintiffs' Rule 10b-5(a) and (c) claims should be denied.[15]

### C.    Plaintiffs Have Alleged Particularized Facts Giving Rise To A Strong Inference Of Scienter

In the Second Circuit, a plaintiff may establish the required strong inference of scienter in either of two ways:  (1) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness; or (2) by alleging facts to show that defendant had both motive and opportunity to commit fraud.  See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 644 (citing Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)).  Mayer Brown argues that the Complaint has not sufficiently pleaded motive and opportunity.  Br. at 20-22.  But the Complaint overflows with facts sufficient to support the conclusion that Mayer Brown consciously or, at the very least recklessly, lied to Plaintiffs.

---

"real loans," that does not mean that they could not be used as part of a fraudulent scheme (just as "real stock" and "real assets" can be used in fraudulent schemes).  Indeed, scheme liability does not require that the underlying fraudulent conduct be per se illegal.  See, e.g., In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 372 (D. Md. 2004) ("There is no requirement that claims under Rule 10b-5(a) and (c) allege illegal trading or market manipulation by the defendants.  Instead, subsections (a) and (c) are far broader and 'encompass much more than illegal trading activity:  they encompass the use of "any device, scheme or artifice", or "any act, practice, or course of businesses used to perpetuate a fraud on investors"') (quoting Global Crossing, 322 F. Supp. 2d at 336) (emphasis omitted)).

[15] Mayer Brown refers to In re Charter Commc'ns, Inc., Sec. Litig., 443 F.3d 987 (8th Cir. 2006), cert. granted, Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc., 127 S. Ct. 1873 (Mar. 26, 2007).  There is no reason to believe the Supreme Court will upset the settled precedent of the Second Circuit and this Court establishing that Mayer Brown is subject to scheme liability here.