The Complaint details how Mayer Brown lawyers falsely advised Plaintiffs that all related-party transactions, material contracts, and indemnification obligations had been disclosed although those very same lawyers knew – because they personally negotiated, coordinated, and drafted the sham round-trip loans – that no aspect of those loans in which they were involved had been disclosed to Plaintiffs. See, e.g., Compl. ¶¶ 44-48, 55. Indeed, Mayer Brown communicated to Plaintiffs that all related-party transactions had been disclosed during the same period that Mayer Brown was involved in the sham round-trip loans. Id. ¶ 31(l). As alleged in the Complaint, Mayer Brown's Paul Koury worked on a $700 million sham round-trip loan with Liberty Corner – which included a Refco indemnification and corporate guarantee, each of which was a material contract and related-party transaction – that was put in place on May 27, 2004 and unwound on June 7, 2004. Id. Yet on May 28, 2004, the very next day, Koury transmitted draft disclosure schedules to Plaintiffs that affirmatively represented that no related-party transactions existed and that did not include the Liberty Corner material contracts, indemnification, and guarantee as required. Id. ¶¶ 31(l), 54-55. In fact, during the 12 days that this sham round-trip loan was in place, Koury sent no less than four different versions of these disclosure schedules to Plaintiffs, not one of which disclosed the existence of the Liberty Corner transaction. Id. ¶ 55.

In light of these particularized allegations, Mayer Brown's contention that scienter has not been adequately pleaded because there supposedly are "no factual allegations" that give rise to a strong inference that any of its lawyers "proceeded to make statements or engage in conduct, even though it was obvious that the statements were materially misleading or the conduct was deceptive" (Br. at 22) – which is an unduly elevated standard for scienter in any event – is meritless. Nor can Mayer Brown shield itself from liability for such knowing

falsehoods by seeking refuge in <u>Tellabs, Inc.</u> v. <u>Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499,

2509-10 (2007). Br. at 21. <u>Tellabs</u> requires only that a court "consider plausible nonculpable

explanations" in determining whether "the inference of scienter [is] cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 2510. But

Mayer Brown has not offered any "plausible nonculpable explanation" that could possibly be

drawn from factual allegations that show Mayer Brown lawyers knew from their own conduct

that they were lying to Plaintiffs (they knew they were not telling Plaintiffs about related-party

transactions, material contracts, and indemnity obligations) and knew they were working on

sham "loans" that had no business purpose, straddled Refco reporting periods, and involved risk-

free returns for customers on the other side of Refco and RGHI in the transactions. <u>See</u> Compl. ¶

32 ("Mayer Brown witnesses interviewed by the Refco Bankruptcy Examiner stated that they

were not aware of any business purpose for these transactions at the time they prepared the

documentation, nor could they articulate one at the time of their interviews"). Mayer Brown's

silence is telling.

   Mayer Brown also argues that there can be no inference that it consciously or

recklessly lied to Plaintiffs because, though Plaintiffs allege that Mayer Brown knew Refco was

loaning money to certain of its customers and those customers, in turn, were loaning a like

amount of money to RGHI (the first two "legs" of the sham round-trip loan triangle), Plaintiffs

do not allege that Mayer Brown knew RGHI was using the customer loans to pay down its debt

to Refco temporarily, so that the debt would not appear on Refco's financial statements (the third

leg of the sham round-trip loan triangle). Br. at 3 n.4, 5, 23-24. This argument fails for at least

three reasons.

First, Mayer Brown is again attempting to rewrite the Complaint and is again ignoring the facts alleged. Plaintiffs specifically allege that Mayer Brown had knowledge of this so-called "third leg": "[Mayer Brown] understood that these transactions caused the RGHI related-party receivable to be removed from Refco's books and records at the time that financial statements were being prepared and then to reappear immediately thereafter, only to disappear yet again at the time of the next annual audit or quarterly statement." Compl. ¶ 32. Thus, Mayer Brown's entire premise is faulty.

Second, given the very nature of the first two "legs" of the sham round-trip loans, Mayer Brown's knowledge of those legs alone was enough for a reasonable person – let alone attorneys of Mayer Brown's sophistication – to know that the "third leg" was the inevitable consequence of the first two "legs" and thus part of a massive fraud. Rather than Refco loaning money to its related entity RGHI (both controlled by Bennett), Refco "lent" money to a customer which then immediately "lent" the same amount of money to RGHI. Id. ¶ 26. These "loans" were then unwound only days later: RGHI "repaid" the customer, which immediately "repaid" Refco. Id. ¶ 28. The matching loans were for short periods of time, they occurred at the very close of Refco's reporting periods, they were structured so that the customers were rewarded with interest without their having taken any risk, and Mayer Brown – even with its extensive knowledge of Refco's affairs – knew of no legitimate business purpose for the loans. Id. ¶¶ 29, 32. The "third leg" was glaring, especially to Mayer Brown.

Third, even if – contrary to the allegations in the Complaint and to the application of simple logic – Mayer Brown did not know or recklessly disregard the possibility that RGHI was using the customer loans to pay down its debt to Refco, this does not save Mayer Brown. The sham loans and corresponding legal documents Mayer Brown negotiated <u>were themselves</u>

material contracts, created material indemnity obligations for Refco, and constituted related-party transactions (because, for example, Refco was providing indemnities for RGHI loans). Id. ¶ 32, 41, 44-48. Mayer Brown also "at all times knew the importance [Plaintiffs] placed on identifying and eliminating related-party transactions." Id. ¶ 40. Thus, Mayer Brown could not omit these transactions from its disclosures and communications to Plaintiffs regardless of whether Mayer Brown knew (as it did) that the transactions also involved RGHI using the loans from Refco customers to pay down its debt to Refco.

Mayer Brown further argues that Plaintiffs have not alleged that Mayer Brown partner Collins knew his oral statements to Plaintiffs were false because those oral statements only asserted that there were no undisclosed material contracts or indemnification obligations, and it is possible Collins thought someone else had disclosed all of Refco's contracts or indemnification obligations to Plaintiffs. Br. at 24. This too ignores the allegations of the Complaint, which state that Collins knew that no one else had disclosed to Plaintiffs the contracts and indemnity obligations created by the sham round-trip loans. Compl. ¶¶ 44-48. Furthermore, it is highly improbable, if not simply impossible, to believe that Collins thought someone else disclosed the sham round-trip loans to Plaintiffs when Mayer Brown was solely responsible for drafting disclosure statements that should have, but did not, list these documents as material contracts, related-party transactions, or indemnity obligations. Finally, of course, this argument ignores the Complaint's allegations that Mayer Brown made numerous false and unqualified written statements directly to Plaintiffs and their counsel.

Mayer Brown knew all about Refco's sham round-trip loans, which it negotiated and for which it drafted the legal documentation, but it never disclosed these loans to Plaintiffs, either as material contracts of Refco, related-party transactions between Refco and RGHI, or

indemnification obligations of Refco.  Instead, it tried to thread the needle on several occasions,

orally telling Plaintiffs and their counsel "Bennett" had "confirmed," or "Refco" had "advised,"

that what Mayer Brown knew existed did not actually exist.  But the problem for Mayer Brown

is that this needle has no eye.  There is only one plausible inference from Mayer Brown's

conduct – it consciously (and at least recklessly) made false statements to Plaintiffs on a number

of occasions – false statements on which Plaintiffs relied to their substantial financial

detriment.[16]  See Compl. ¶¶ 68, 70, 77, 79.

       Finally, Mayer Brown attempts to distinguish itself from the individual Refco

executives who this Court has already found acted with scienter.  In re Refco, Inc. Sec. Litig.,

503 F. Supp. 2d at 648-49.[17]  According to Mayer Brown, it is situated differently because,

unlike these Refco executives, the Complaint "does not allege that Mayer Brown had access to

the day-to-day cash flows and financial records of RGHI, Refco, or its RCM subsidiary."  Br. at

---

[16] Citing primarily Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004), Mayer, Brown argues that it "can be held to have acted with scienter only if an individual lawyer in the firm acted with scienter." Br. at 21-22.  But the Complaint overflows with allegations that Collins and Koury acted with scienter.  See, e.g., Compl. ¶¶ 31-32, 44-48 (pages 11 to 12, 26, and 29, above).  Furthermore and as Mayer, Brown admits, several courts in this District have rejected the Southland rule and held that collective allegations of an organization's scienter are sufficient.  Br. at 22 n. 11; see In re Worldcom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (to show that a corporate defendant acted with scienter, "plaintiffs in securities fraud cases need not prove that any one individual employee . . . also acted with scienter"); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) ("[N]othing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.").  The Second Circuit will address the permissibility of pleading collective scienter in Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., No. 06-2902-CV. Regardless of how the Court of Appeals rules, Plaintiffs' allegations easily plead that Mayer, Brown had scienter under both the "collective scienter" standard and Southland.

[17] Unlike the executives for whom the Court could not infer knowledge of the sham round-trip loans without specific allegations that they had access to the books of RCM or RGHI, Mayer Brown actually drafted the sham round-trip loan documents, so it can hardly feign lack of knowledge by arguing that it lacked access to Refco's financials.  See In re Refco, Inc., 503 F. Supp. 2d at 650-51.

23. But Mayer Brown did not need access to Refco, RGHI, or RCM books to know about the sham round-trip loans: it worked directly on the loans and knew all about their badges of fraud.

Furthermore, Mayer Brown conspicuously ignores this Court's conclusion that scienter had been sufficiently alleged for Refco's general counsel Dennis Klejna. The Court did not rely on allegations about Klejna's knowledge of "cash flows" or "financial records" to find scienter. Id. at 652. Rather, the Court relied on allegations that Klejna knew about the sham round-trip loans from reviewing the legal bills of Mayer Brown to hold that scienter as to Klejna had been adequately pleaded. In the words of the Court:

> [T]he fraudulent transactions were allegedly orchestrated by one or more attorneys at an unnamed law firm. (Compl. ¶¶ 403-05.) The plaintiffs allege that Sherer, as CFO, and Klejna, as General Counsel, were responsible for receiving and authorizing the payment of bills from this firm that "described the legal work performed ... in connection with documenting the transactions." (Compl. ¶ 595.) It is of course possible that Bennett orchestrated the legal work without the help or knowledge of the corporate officers responsible for supervising the law firm, but the allegation that Sherer and Klejna stood between Bennett and the law firm in the relevant chain of command supports a strong inference that they were aware of the work being done. The size of the transactions, their recurrent nature, and their obvious lack of business purpose may not themselves be sufficient to support an inference of scienter, but together with the allegations concerning the roles and responsibilities of Silverman, Sherer, and Klejna, they suffice.

Id. at 652.

If receiving and paying Mayer Brown's legal bills is sufficient to support a strong inference of scienter against Klejna, who was not alleged to have direct knowledge of the sham round-trip loans, there can be no merit to any argument that Mayer Brown did not act with scienter.

**D.    Mayer Brown's "No Reliance" Argument Is Fatally Flawed**

In arguing that the Complaint fails to plead facts showing that Plaintiffs relied on anything Mayer Brown said or did (Br. at 25), Mayer Brown ignores the Complaint's explicitly

contrary allegations. For example, the Complaint alleges that: "[i]t was understood that during the diligence process Mayer Brown and Collins would be providing information to the THL Funds upon which Plaintiffs would rely in deciding whether to proceed with the 2004 Purchase." Compl. ¶ 36. See also, e.g., id. ¶ 59 ("The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them by Mayer, Brown and Collins during the due diligence process in deciding whether to proceed with the 2004 Purchase and invest $452 million in Refco. Had truthful and complete information been provided by Mayer, Brown, the THL Funds would not have proceeded with the 2004 Purchase").

In support of its position, Mayer Brown advances the argument that, although it is not a party to the Purchase Agreement between Plaintiffs and RGHI, it is protected by that Agreement's "non-reliance" and integration clauses. Br. at 25-26. As a threshold matter, Mayer Brown's position is breathtakingly inconsistent. The Purchase Agreement is riddled with false representations, false warranties, and false disclosure schedules. Compl. ¶ 51. On the one hand, Mayer Brown backpedals furiously in an attempt to avoid liability stemming from all these material lies in the Purchase Agreement, stating that it "cannot be held liable …for the alleged misrepresentations made by the sellers in the Purchase Agreement" (Br. at 10), while on the other hand, Mayer Brown embraces the Purchase Agreement and seeks its protection. Mayer Brown cannot have it both ways.

Furthermore, even a cursory examination of the non-reliance clause invoked by Mayer Brown, which is Section 3.27 of the Purchase Agreement, confirms that the clause benefits only RGHI. Section 3.27 states that:

> The representations and warranties made in this agreement are in lieu of and are exclusive of all other representations and warranties, including any implied warranties. RGHI hereby disclaims any such other or implied representations or warranties, notwithstanding the delivery of disclosure to buyer or its

officers, directors, employees, agents or representations of any documentation
or other information (including any financial projections or other supplemental
data).

See Ward Decl., Ex. A., at § 3.27 (emphasis added). The Purchase Agreement defines RGHI as

"Refco Group Holdings, Inc.," which is not defined to include any agents of RGHI. Also,

Section 3.27 appears in Article III of the Purchase Agreement, entitled "REPRESENTATIONS

AND WARRANTIES OF RGHI." Similarly, Section 9.1, the Agreement's integration clause,

by its express terms, only applies "among the parties" to the contract, i.e., Plaintiffs and RGHI.

See Ward Decl., Ex. A., at § 9.1.[18] This, of course, only makes sense: Plaintiffs could release

RGHI from prior representations because they had RGHI bound by the representations in the

Agreement (including that there were no undisclosed related-party transactions, material

contracts or indemnity obligations). But Plaintiffs would not have any reason to release other

persons from their representations if those other persons were not also bound by the Agreement's

representations.

        The foregoing is fatal to Mayer Brown's argument. New York and Massachusetts

courts have held that integration and merger clauses do not extend to non-contracting parties,

absent express language to the contrary. For example, in In re WorldCom, Inc., 374 B.R. 94

(Bankr. S.D.N.Y. 2007), the court rejected MCI's argument that claims arising out of its

allegedly fraudulent oral misrepresentations were barred by the integration clause in an Asset

Purchase Agreement to which it was not a party. See id. at 109 ("MCI cannot benefit from a

clause that binds only those parties to the agreement. The Integration Clause by its express terms

---

[18] See id. at § 9.1 ("This Agreement (a) constitutes the entire agreement among the Parties . . .
and supersedes all other prior agreements and understandings, both written and oral, among the
Parties . . .") (emphasis added).

only applies to the 'parties' and it does not state that it can be relied upon by non-contracting parties.").[19]

Furthermore, not one of the cases cited by Mayer Brown supports its argument. Neither Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996), nor Emergent Capital Investment Management, L.L.C. v. Stonepath Group, Inc., 343 F.3d 189 (2d Cir. 2003), Br. at 26, analyzed whether the fraudulent misrepresentations and omissions of a third-party agent not a party to the contract – like Mayer Brown – can be immunized by non-reliance or merger clauses. Similarly, while Mayer Brown suggests that the Second Circuit in ATSI Communications, Inc. v. The Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007), allowed an agent (CCM) to avoid liability by relying on a no-reliance provision in a registration rights agreement (Br. at 26), the court there merely stated, without analysis, that "[l]argely for the same reasons as above [in the opinion], the district court properly dismissed th[e] claims" against CCM. Id. at 108. The "reasons ... above" included not only that a party to the registration agreement could invoke its no-reliance provision (but be held accountable for the express representations in the agreement), but also that the plaintiff had not demonstrated falsity or loss causation. Id. at 107-08. The latter two reasons, not the no-reliance clause, were the bases for the District Court's dismissal: "[T]he securities claims against CCM and [another agent] fail for the reasons that the claim against [the investor defendants] fail – the Complaint fails adequately to allege falsity and loss causation." ATSI

---

[19] See also Wittenberg v. Robinov, 9 N.Y.2d 261, 263-64 (1961) (holding that a clause disclaiming reliance on all representations outside a contract did not bar an action for fraudulent inducement against the seller's real estate broker because "the disclaimer provision by its express language did not inure to [the agent's] benefit."); see also Norton v. Drepanos, 1994 WL 902881, at *1 (Mass. Super. Sept. 13, 1994) (finding that an integration clause "does not reach outside the contract to insulate non-parties"); RESTATEMENT (THIRD) OF AGENCY § 6.01 cmt. d(1) (2006) ("If an agent does not become a party to a contract and is not subject to liability on the contract as an individual, the agent should not be able to assert rights as an individual derived from the contract in the absence of indicia that the parties to the contract so intended").

Comm., Inc. v. The Shaar Fund, Ltd., 357 F. Supp. 2d 712, 717 (S.D.N.Y. 2005). In fact, CCM

never even invoked the no-reliance provision in the District Court or moved to dismiss the

complaint, but the District Court nevertheless disposed of the claims against CCM since the

complaint pled neither falsity nor loss causation. Id. Mayer Brown's effort to stretch ATSI to

support its "free pass to lie" defense shows only how unsupported, and unsupportable, the

defense is.[20]

      With respect to Plaintiffs' scheme liability claim, Mayer Brown's only argument

is that Plaintiffs cannot claim reliance on Mayer Brown's involvement in the round-trip loans

because Mayer Brown concealed the loans from Plaintiffs. See Br. at 27. But as the Supreme

Court held in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972), where,

as here, there is an omission of information, "positive proof of reliance is not a prerequisite to

recovery. All that is necessary is that the facts withheld be material ...." Nothing in Central

Bank overrules or modifies Affiliated Ute. Here, the Complaint pleads that what Mayer Brown

concealed was unquestionably material. See Compl. ¶¶ 38-40. Furthermore, the Complaint is

clear that the fraudulent scheme in which Mayer Brown participated enabled Refco to

manipulate its financial statements, and the Complaint is equally clear that Plaintiffs relied on

---

[20] Beyond this, even assuming that Mayer Brown could rely on these clauses, many courts have
refused to enforce such clauses where, as here, a party was fraudulently induced to enter into the
contract. Therefore, even if the clauses did apply to Mayer Brown – which they do not – they do
not protect Mayer Brown's knowing lies to Plaintiffs. See, e.g., In re MarketXT Holdings Corp.,
2006 WL 2864963, at *12-13 (Bankr. S.D.N.Y. Sept. 29, 2006) (parties cannot evade liability
based on merger and integration clauses when they concealed facts "peculiarly within [their]
knowledge" that could not have been discovered without "extraordinary effort or great
difficulty" (citing Dimon Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999))); Abry
Partners V, L.P. v. F&W Acquisition LLC, 891 A.2d 1032, 1034, 1063 (Del. Ch. 2006) (non-
reliance and other exculpation clauses are "unenforceable as a matter of public policy" "[t]o the
extent [they] purport[] to limit the Seller's exposure for its own conscious participation in the
communication of lies to the Buyer"); Bates v. Southgate, 31 N.E.2d 551, 558 (Mass. 1941)
("contracts or clauses attempting to protect a party against the consequences of his own fraud are
against public policy and void where fraud inducing the contract is shown").

those financial statements to be accurate in proceeding with the 2004 Purchase. See Compl.

¶¶ 2, 32, 42, 50. This is the definition of properly pleaded reliance.

## II.    THE COMPLAINT STATES A RICO CLAIM

### A.    The PSLRA Does Not Bar The RICO Claim

Mayer Brown urges that dismissal of the Plaintiffs' RICO claims is mandated

here because the RICO amendment to the PSLRA precludes the Plaintiffs from "rely[ing] upon

any conduct that would have been actionable as fraud . . . to establish a violation" of RICO.

18 U.S.C. § 1964(c). Mayer Brown argues that, although no private plaintiff may bring

securities fraud claims against the law firm, the conduct would nonetheless be "actionable" by

the SEC, which is authorized to "bring aiding and abetting claims." Br. at 29. Mayer Brown's

assertion that it is not a primary violator of the securities laws is wrong, see Points I(A) & (B),

above, and its reading of the RICO amendment of the PSLRA – that private remedies are

displaced by the RICO amendment to the PSLRA because the SEC may have claims against a

defendant under the securities laws – fails as a matter of law.

But the Court should not even reach this argument. Even if Mayer Brown's

strained reading of the RICO amendment were plausible, Plaintiffs have pleaded – in the

alternative – a RICO claim under 18 U.S.C. § 1962(d), if this Court concludes either that Mayer

Brown cannot "be held liable under Section 10(b) and Rule 10b-5" (e.g., because Mayer Brown

is not a primary violator of the securities laws) or that "the interests acquired by the THL Funds

in the 2004 Purchase are [not] securities." Compl. ¶ 10, n.3.[21]

---

[21] The Federal Rules of Civil Procedure expressly contemplate this type of alternative pleading.
See Fed. R. Civ. P. 8(e)(2) ("[a] party may set forth two or more statements of a claim or defense
alternately or hypothetically"); see also Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir.
1994) (under Rule 8(e)(2) "a plaintiff may plead two or more statements of a claim . . .
regardless of consistency"; "current federal rules are designed to afford greater flexibility than
their predecessors" with respect to alternative pleading).

Mayer Brown assiduously ignores the second issue – whether Plaintiffs purchased "securities" when they acquired interests in Refco – for good reason. If Plaintiffs did not purchase "securities" within the meaning of Section 10(b), they unquestionably may pursue RICO claims against Mayer Brown. See, e.g., Fleet Nat'l Bank v. Boyle, 2005 WL 2455673, at *4 (E.D. Pa. Sept. 12, 2005) (no authority for the view that a RICO claim by "a plaintiff who had not bought or sold securities" is "barred as securities fraud preempted by the PSLRA"). Accordingly, until Mayer Brown takes a position on this threshold point, and the parties have fully addressed the matter, dismissal of Plaintiffs' RICO claims would be inappropriate.[22]

In any event, Mayer Brown misapprehends the RICO amendment to the PSLRA. Congress intended the RICO amendment to address a narrow problem: the concern that private plaintiffs with otherwise actionable securities fraud claims would circumvent key PSLRA reforms (such as limits on attorneys' fees and a strict statute of limitations) by bringing RICO claims. See Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999) (noting that "[p]rior to 1995, a private plaintiff could assert a civil RICO claim for securities law violations sounding in . . . fraud" and that "plaintiffs regularly elevated fraud to RICO violations because RICO offered . . . treble damages"). The PSLRA thus provides that a person cannot "rely upon any conduct that would have been actionable as fraud in the purchase or sale of

---

[22] See Blythe v. Deutsche Bank AG, 399 F. Supp. 2d 274, 281 (S.D.N.Y. 2005) (declining to dismiss RICO claim based on defendant's argument that the claim was barred by the RICO amendment because "the complaint . . d[id] not provide enough information to determine whether 'the S corporation 'stocks' at issue constitute[d] securities'" and "[o]nce the record is more fully developed, [the defendant] may renew this argument on summary judgment.") (internal quotation marks and citations omitted); Jones v. Deutsche Bank AG, 2005 WL 1683614, at *3 (N.D. Cal. July 19, 2005) (declining to dismiss RICO claim based on defendant's argument that the claim was barred by the RICO amendment because the underlying transaction involved the "purchase or sale of securities," reasoning that "the complex nature of the . . . transaction and the limited facts before the Court make the issue more appropriately addressed in a summary judgment motion").

securities to establish a violation" of RICO.  18 U.S.C. § 1964(c); <u>Bald Eagle Area Sch. Dist.</u>,

189 F.3d at 327 (the RICO amendment "narrow[ed] the kind of conduct that could qualify as a

[RICO] predicate act," by precluding a plaintiff from pursuing RICO claims if the conduct upon

which those claims were predicated would also support the plaintiff's private action under

securities laws).

       The gist of Mayer Brown's theory (Br. at 28-29) is that, so long as the SEC could

bring an enforcement action against Mayer Brown based on the conduct alleged in the

Complaint, <u>no</u> private plaintiff may predicate a RICO claim on that conduct.  That view of the

statute is deeply flawed:  the very point of the RICO amendment was to eliminate redundant and

overlapping private remedies under securities laws and RICO – that is, the ability of a private

plaintiff to recover trebled damages under RICO for the same conduct that the plaintiff (or,

perhaps, another private plaintiff) could also obtain compensation under the securities laws.[23]

       As an initial matter, the statute's text forecloses Mayer Brown's argument that

Congress intended to strip private plaintiffs of remedies under both the federal securities and

RICO statutes because a federal agency might possibly pursue aiding-and-abetting claims.  By its

plain terms, the provision applies solely to conduct that "would have been actionable as fraud"

but for a plaintiff's decision to plead a RICO violation instead of a securities fraud claim.  <u>See</u>

<u>Powers</u> v. <u>Wells Fargo Bank NA</u>, 439 F.3d 1043, 1045 n.2 (9th Cir.), <u>cert. denied</u>, 127 S. Ct. 437

(2006)) (Congress's aim in enacting the RICO amendment was to "prevent[] class action suits

---

[23] Contrary to Mayer Brown's suggestion (Br. at 29-30), the Supreme Court's interpretation of the statutory phrase "in connection with" the purchase or sale of securities under SLUSA in <u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u> v. <u>Dabit</u>, 547 U.S. 71, 74-78 (2006), neither controls the proper construction here of the PSLRA's amendment to RICO nor suggests that Plaintiffs cannot sue Mayer Brown under RICO for the misrepresentations it made to Plaintiffs because other plaintiffs might be able to sue Mayer Brown under the securities laws for <u>separate</u> misrepresentations made to them.

asserting RICO claims that should have been presented as securities claims"); Bald Eagle Area Sch. Dist., 189 F.3d at 330 ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses . . . if the conduct giving rise to those predicate offenses amounts to securities fraud. Allowing such surgical presentation of the cause of action . . . would undermine the congressional intent behind the RICO Amendment.").

The legislative history of the PSLRA reinforces the conclusion that the possibility that the SEC could bring aiding-and-abetting claims against Mayer Brown does not preclude Plaintiffs from maintaining RICO claims. Congress was concerned only with the potential for duplicative private securities law and RICO actions. As Representative Fields explained, "[a]lmost every claim that a plaintiff alleges as a violation of securities laws may also be pled as a RICO violation. Plaintiffs' attorneys can easily allege both the enterprise and the pattern elements necessary to turn a securities action into a RICO claim." 141 Cong. Rec. H2760, 2775 (daily ed. Mar. 7, 1995) (statement of Rep. Fields) (emphasis added); see also id. at H2772 (statement of Rep. Cox) (citing SEC testimony that it is necessary to "eliminate the overlap between the private remedies under RICO and under the Federal securities laws.") (emphasis added).[24]

In keeping with the statute's text and legislative history, two courts in the Southern District of New York have squarely rejected Mayer Brown's theory and hold that, if

---

[24] As Arthur Levitt (then Chairman of the SEC) likewise emphasized to Congress, "the [SEC] has consistently stressed the importance of private remedies against securities fraud." Prepared Testimony of Arthur Levitt, Chairman, SEC, Before the H. Subcomm. on Telecomms. & Fin. Comm. on Commerce, 104th Cong. at 1 (Feb. 10, 1995) (emphasis added). With respect to the RICO amendment, Chairman Levitt explained that "the [SEC] has supported legislation to eliminate the overlap between the private remedies under [RICO] and under the federal securities law." Id. at 15 (emphasis added). "Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both unnecessary and unfair to expose defendants in securities cases" to RICO liability. Id.

Central Bank precludes a plaintiff from maintaining aiding-and-abetting claims, that plaintiff

may proceed on a RICO theory.  In Renner v. Chase Manhattan Bank, 1999 WL 47239

(S.D.N.Y. Feb. 3, 1999), the court observed that a plaintiff may not bring RICO claims based on

conduct that would have been "actionable" as securities fraud, "even if the pleader eschews

reference to the securities laws in describing the predicate acts and dresses his claim in other

clothing."  Id. at *5.  With that understanding of the RICO amendment in mind, the court held

that, "[b]ecause plaintiff's claim [of aiding and abetting securities fraud] would not have been

'actionable' against [the Defendant] under the securities law, the mere fact that plaintiff . . .

asserted it in his complaint would not bar a RICO claim."  Id. at *7.  OS Recovery, Inc. v. One

Groupe Int'l, Inc. is to the same effect.  See 354 F. Supp. 2d 357, 370 (S.D.N.Y. 2005) ("[T]his

conduct . . . was no more than aiding and abetting.  Hence, it is not actionable under the

securities laws and therefore actionable under RICO.").

        None of the cases cited by Mayer Brown supports its argument.  Only Payton v.

Flynn, 2006 WL 3087075, at *6-8 (N.D. Ill. Oct. 26, 2006), is even arguably on point.  Br. at 29.

But that case is factually distinguishable, as plaintiffs did not even assert federal securities fraud

claims against the defendants and instead brought solely RICO claims.  See id. at *5.  The

court's passing suggestion that the RICO claims could not proceed because they were predicated

on conduct that was potentially "actionable" by the SEC – with no citation to anything in the text

or legislative history of the PSLRA supporting the conclusion that the ability of the SEC to

pursue securities fraud claims renders a RICO remedy unavailable to a private plaintiff – thus

provides no persuasive basis for a dismissal of Plaintiffs' RICO claims.

        The other cases on which Mayer Brown relies are irrelevant.  Br. at 30.  In

Fezzani v. Bear, Stearns & Co., 2005 WL 500377 (S.D.N.Y. Mar. 2, 2005), the court denied

plaintiffs' request to add RICO claims to their complaint, concluding that the conduct alleged in the complaint was generally actionable as securities fraud. Id. at *6.[25] Howard v. AOL Inc., 208 F.3d 741 (9th Cir. 2000), and Hemispherx Biopharma, Inc. v. Asensio, 1999 WL 144109 (E.D. Pa. Mar. 15, 1999), hold only that a private plaintiff who lacks standing to pursue a securities fraud claim may not pursue RICO claims if another private plaintiff could maintain securities law claims.[26] Hollinger Int'l, Inc. v. Hollinger Inc., 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004), and In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511 (S.D Tex. 2003), hold that, on the specific facts alleged, the plaintiff had stated facts that would support federal securities law claims, such that its RICO claims were precluded.[27] Here, of course, no other private plaintiff may sue Mayer Brown under a securities fraud theory for its misrepresentations to Plaintiffs.

------

[25] Mayer Brown's lengthy excerpt from Fezzani (see Br. at 31) serves only to distinguish that case. The Fezzani court suggested that plaintiffs might have an "incentive" to circumvent the RICO amendment by "present[ing] only those facts that . . . would not form the basis of a securities fraud claim." 2005 WL 500377, at *4. Exactly the opposite is true here. The THL Funds have not tried to "deliberately plead facts that establish[] no more than that [Mayer Brown] aided and abetted another's securities fraud," id. at *5; to the contrary, they have alleged facts showing that Mayer Brown is a primary violator of the securities laws.

[26] See Howard, 208 F.3d at 749-50 ("Plaintiffs do not dispute that their securities fraud claims could be brought by a plaintiff with proper standing. The claims implicate 'conduct that would have been actionable as [securities] fraud.'") (citation omitted); Hemispherx Biopharma, 1999 WL 144109, at *4 (barring RICO claims where plaintiffs lacked standing to bring section 10(b) claims because they were not investors, but where the alleged conduct would have been actionable by private investors). Mayer Brown does not contend that any other private plaintiff could seek redress for the misrepresentations and deception visited upon the THL Funds by Mayer Brown, Bennett, and the other Refco conspirators.

[27] Hollinger Int'l, 2004 WL 2278545, at *8 (concluding that the RICO predicate acts alleged in the complaint were actionable under the securities laws, and rejecting the argument that the alleged misrepresentations were not made "in connection with the purchase or sale" of securities); In re Enron Corp. Securities, Derivatives, & ERISA Litig., 284 F. Supp. 2d at 652 ("Thus, the Court finds that the RICO claims are based on conduct actionable as securities fraud, indeed the same or similar conduct that has been or could have been alleged in Newby under the federal securities laws, and are therefore barred by the RICO Amendment.").

Mayer Brown's restrictive interpretation of the RICO statute is, moreover, foreclosed by the Supreme Court's teaching that RICO is to be interpreted "broadly," which is a consequence "not only of Congress' self-consciously expansive language . . . but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purpose.'" Sedima, S.P.L.R. v. Imrex Co., 473 U.S. 479, 497-98 (1985) (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970)); see also id. at 493-500 (rejecting court of appeals' imposition of non-textual limits on civil RICO claims under § 1964(c)). Importantly, "[t]he statute's remedial purposes are nowhere more evident than in the provision of a private action for those injured by racketeering activity." Id. at 498 (internal quotation marks omitted).  In view of the important remedial purposes furthered by private RICO claims, see, e.g., Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560, 568 (E.D.N.Y. 1999), this Court may not, in the absence of an express statutory directive, limit the availability of a private RICO remedy.  See, e.g., Ne. Women's Ctr, Inc. v. McMonagle, 868 F.2d 1342, 1348 (3d Cir. 1989) (in light of Sedima's teaching that RICO is to be interpreted broadly, courts are "not free to read additional limits into RICO once a plaintiff has made out all of the elements required for a finding of liability under the statute's explicit provisions"); see also Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 341 (2005) (the Court does "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply").

Finally, contrary to Mayer Brown's assertions, there is nothing "absurd" about Plaintiffs' proceeding against the Refco Operators on a securities fraud theory, while pursuing RICO claims against Mayer Brown.  See Br. at 30.  In the first place, Plaintiffs may well be able to pursue RICO claims against RGHI, Bennett, and other Refco insiders under RICO pursuant to

the statute's criminal conviction exception. See 18 U.S.C. § 1964(c). In any case, it is not "absurd" for Congress to create different statutory remedies for different conduct.[28] Here, Congress decided to limit use of RICO by those plaintiffs with actionable securities claims. Allowing parties without such claims to retain their rights to proceed under RICO provides them with no special benefit: RICO is a complex statute, and a plaintiff must overcome many hurdles to succeed on a RICO theory. Pleading RICO is not a quick ticket to trebled damages.

Ultimately, the statute's meaning and purpose must be measured by its text and the plain import of its legislative history, not by Mayer Brown's opinions on the merits of Congress's legislative choices. See Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) ("We assume that the legislative purpose is expressed by the ordinary meaning of the words used.") (citation omitted); see also Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461-62 (2002) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). Any anomalies (and there are none) arising from the availability of private RICO remedies in the circumstances of this case must be addressed by Congress. See Sedima, 473 U.S. at 499 (court of appeals' concern with "extraordinary" and "outrageous" results under RICO did not warrant engrafting judicial limits on the statute; any "defect – if defect it is – is inherent in the statute as written, and its correction must lie with Congress") (internal quotation marks omitted).

---

[28] Accord Campos v. INS, 961 F.2d 309, 316 (1st Cir. 1992) (holding that it is not "absurd that . . . Congress chooses to treat different crimes differently" and thus that the court would not "redraft[]" a statute to avoid the result that aliens convicted for mere possession of firearms are not eligible for a waiver of deportation, while aliens convicted of using firearms in committing armed robbery are eligible).

**B.**     **The Complaint Adequately Pleads Agreement**

Section 1962(d), the RICO conspiracy statute, is "simple in formulation . . . : 'It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.'" <u>Salinas</u> v. <u>United States</u>, 522 U.S. 52, 63 (1997) (quoting 18 U.S.C. § 1962(d)).  The RICO statute is "even more comprehensive" than the "general conspiracy provision applicable to federal crimes." <u>Id.</u>  It is enough to establish liability if "[a] conspirator . . . intend[s] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." <u>Id.</u> at 65.  A plaintiff thus need only "allege that defendants 'knew about and agreed to facilitate the scheme' that is part of the civil conspiracy." <u>Knoll</u> v. <u>Schectman</u>, 2006 WL 839428, at *6 (W.D.N.Y. Mar. 28, 2006) (quoting <u>Salinas</u>, 522 U.S. at 66).

The Complaint adequately pleads those elements.  Plaintiffs have alleged that "Mayer, Brown conspired with the Refco Operators to violate 18 U.S.C. § 1962(c)" (Compl. ¶ 90) as follows:

- "Mayer Brown negotiated, participated in, and/or coordinated 17 Refco round-trip loan transactions, knowing that they did not have a legitimate business purpose, lacked economic substance, and were used to move the RGHI Receivable off of Refco's financial statements at the end of financial reporting periods," <u>id.</u> ¶ 90(a);

- Mayer Brown made "material false representations, facilitated material false representations to be made, and failed to disclose material truthful information to the THL Funds," <u>id.</u> ¶ 90(b); and

- Mayer Brown "drafted and negotiated documents that contained false representations" and "knew [those] representations were false," <u>id.</u> ¶ 90(c).

Through that participation in racketeering activities, the Complaint squarely alleges that "Mayer, Brown intended to further, <u>agreed to further</u>, and in fact did further the fraudulent schemes of the Refco Operators." <u>Id.</u> ¶ 91 (emphasis added).

Mayer Brown nonetheless selectively quotes from <u>Republic of Colombia</u> v. <u>Diageo North America Inc.</u>, 2007 WL 1813744, at *55 (E.D.N.Y. June 19, 2007), in support of its argument that § 1962(d) requires a plaintiff to allege "with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." Br. at 32. Mayer Brown misstates the applicable law. "It is well settled in this Circuit that the heightened pleading requirements of [Rule 9(b)] do not apply to the averment of conspiracy under Section 1962(d)." <u>American Buying Ins. Servs., Inc.</u> v. <u>S. Kornreich & Sons, Inc.</u>, 944 F. Supp. 240, 247 (S.D.N.Y. 1996).[29] Indeed, "[t]he Second Circuit has held that for a RICO conspiracy claim, the Court must limit its focus to 'whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise.'" <u>State Farm</u>, 375 F. Supp. 2d at 153 (quoting <u>United States</u> v. <u>Zichettello</u>, 208 F.3d 72, 99 (2d Cir. 2000)); <u>see also</u> <u>Baisch</u> v. <u>Gallina</u>, 346 F.3d 366, 377 (2d Cir. 2003) (to establish a RICO conspiracy, a plaintiff must allege only "that the defendant knew about and agreed to facilitate the scheme" (internal quotation marks omitted)).

The Complaint comfortably satisfies these requirements because it sets forth a "factual basis for a finding of a conscious agreement" by Mayer Brown to enter a conspiracy. <u>Hecht</u> v. <u>Commerce Clearing House, Inc.</u>, 897 F.2d 21, 26 n.4 (2d Cir. 1990). Specifically, Plaintiffs have alleged that "Mayer, Brown . . . agreed to further . . . the fraudulent schemes of the Refco Operators and was aware of the existence, if not the very identity, of the other participants in the fraudulent schemes and conspiracy." Compl. ¶ 91. The Complaint alleges

---

[29] <u>See also</u> <u>Rose</u> v. <u>Bartle</u>, 871 F.2d 331, 366 (3d Cir. 1989) (heightened pleading standards do not apply to RICO conspiracy); <u>State Farm Mut. Auto. Ins. Co.</u> v. <u>CPT Med. Servs., P.C.</u>, 375 F. Supp. 2d 141, 153 (E.D.N.Y. 2005) (the "more liberal standard of Fed. R. Civ. P. 8(a) applies" to allegations of a RICO agreement).

that Mayer Brown entered into an agreement by at least 2000 to participate with the Refco

Operators in defrauding regulators, lenders, investors, and potential purchasers of Refco in

exchange for substantial economic benefit to Mayer Brown from Refco's employment of the

firm, and that Mayer Brown was aware of the existence of other participants in the criminal

enterprise, including round-trip loan participants. See id. ¶¶ 30, 90, 91.

Those allegations are supported by numerous factual allegations: that Mayer

Brown was involved in multiple, coordinated sham loans over a substantial period of time;[30]

that Mayer Brown was involved in "all important transactions and deals involving [Refco]";[31]

that Mayer Brown had an economic motive to participate in and further the ends of the

conspiracy;[32] that Mayer Brown furthered the conspiracy's ends by making knowingly false

representations;[33] and that Mayer Brown regularly negotiated and drafted documents in

furtherance of obviously deceptive loans and made false statements to Plaintiffs and others.[34]

These allegations easily sustain Plaintiffs' claim that Mayer Brown agreed to, and did, further a

---

[30] See, e.g., Compl. ¶ 5 (alleging Mayer Brown was "involved in every facet of 17 separate sham round-trip loan transactions"); id. ¶ 30 (alleging Mayer Brown was intimately involved in all aspects of the round-trip loans); id. ¶ 90(a) (alleging "Mayer, Brown negotiated, participated in, and/or coordinated 17 Refco round trip-loan transactions, knowing that they did not have a legitimate business purpose"); id. ¶ 32 (alleging "Mayer, Brown understood that the round-trip loan transactions . . . affected Refco's financial statements, lacked any proper business purpose and were undisclosed related-party transactions").

[31] Id. ¶ 17.

[32] See id. ¶ 17 (alleging Refco was Collins' "most significant client" and that Mayer Brown's "total Refco billings between 2000 and 2005 exceeded $23 million").

[33] See id. ¶ 90(b) (alleging "Mayer, Brown made material false representations").

[34] See, e.g., id. ¶ 90(a) (alleging "Mayer, Brown negotiated, participated in, and/or coordinated 17 Refco round trip-loan transactions, knowing that they did not have a legitimate business purpose"); id. ¶ 90(b) (alleging "Mayer, Brown made material false representations" about related-party transactions)

conspiracy to violate § 1962(c).  See Rose, 871 F.2d at 366 (allegations of conspiracy under

§ 1962(d) "must be sufficient to describe the general composition of the conspiracy, some or all

of its broad objectives, and the defendant's general role in that conspiracy" (internal quotation

marks omitted)).  Republic of Colombia is not to the contrary; the court in that case held, on

allegations far weaker than those here, that the complaint adequately alleged a RICO violation.[35]

    Mayer Brown goes on to insist (Br. at 33) that agreement may not be inferred

from providing "legal services to an enterprise allegedly engaged in fraudulent activity."  But

Plaintiffs have not relied on Mayer Brown's mere provision of routine legal services to support

an inference of agreement.  The two cases on which Mayer Brown relies, Goren v. New Vision

Int'l, Inc., 156 F.3d 721, 732-33 (7th Cir. 1998) and Lippe v. Bairnco Corp., 218 B.R. 294, 300,

304 (S.D.N.Y. 1998), are inapposite.  In contrast to the plaintiffs in those cases, Plaintiffs have

alleged that Mayer Brown knowingly agreed to participate in a criminal conspiracy to commit

fraud on numerous victims and intended to further the ends of that conspiracy, by (among many

other things) lying directly to Plaintiffs on numerous occasions and participating actively in 17

sham round-trip loans.  Compl. ¶¶ 90-91; Cf. Lippe, 218 B.R. at 304 (the complaint did not

allege "that any of the professional defendants agreed to participate in predicate racketeering

acts, that they agreed to pursue the same criminal objective, or that they knew that the general

nature of the conspiracy extended beyond their individual roles").  Such allegations place Mayer

Brown's conduct well outside the bounds of "routine" legal services, and state a claim for a

violation of § 1962(d).

---

[35] See Republic of Colombia, 2007 WL 1813744, at *57 (holding that plaintiffs stated a violation
of section 1962(d) by identifying "numerous instances of communications and other activities
taken in furtherance of the conspiracy," even though there were "fewer factual assertions
concerning the horizontal conspiracy amongst Defendants" and "the allegations concerning
specific transaction through which money was laundered are old and may fall outside of the
statute of limitations").

C.    **The Complaint Adequately Pleads A Violation Of § 1962(c)**

"To state a valid claim under Section 1962(c), a plaintiff must allege the following: (1) defendants through the commission of two or more predicate acts; (2) constituting a 'pattern' (3) of 'racketeering activity' (4) directly or indirectly invested in, or maintained an interest in, or participated in (5) an 'enterprise'; (6) the activities of which affect interstate or foreign commerce." Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 269-70 (S.D.N.Y. 2006).  Contrary to Mayer Brown's arguments, the Complaint satisfactorily alleges a pattern of racketeering activities by pleading predicate acts that amount to a threat of continued criminal activity under either "close-ended" or "open-ended" continuity theories.

Plaintiffs have alleged that the Refco Operators participated in "multiple acts of racketeering activity within the past ten years."  Compl. ¶ 87(a).  The Complaint alleges that the acts began in February 1998 and continued through October 2005, id. ¶ 87(b); these racketeering acts "were the regular way of operating Refco" as the Refco Operators, with Mayer Brown's knowledge, repeatedly engaged in sham round-trip loans for the purpose of concealing the RGHI Receivable and defrauding "the THL Funds, regulators, financial institutions, and the investing public," id. ¶ 87(c); the acts "implied a threat of continued criminal activity" because making false statements about Refco's financial condition was an ordinary activity of the Refco Operators and "would have continued had it not been for [] discovery" of the fraud "by someone outside the Refco Operators' conspiracy"; id. ¶ 87 (d); there were "a number of participants in the Refco Operators' fraudulent schemes," including Refco employees, BAWAG, and third parties; id. ¶ 87 (e); and there were "a substantial number of victims" of these schemes, including Plaintiffs, financial institutions that lent money to Refco, investors who purchased Refco's debt securities, and the investing public who purchased Refco's equity securities, id. ¶ 87 (f).

Mayer Brown argues that, for those predicate acts of mail and wire fraud that

occurred outside the period during which the 2004 Purchase was negotiated, the Complaint does

not plead "closed-ended" continuity because it does not "describe the content of the allegedly

false financial statements, or when they were disseminated" or "most glaringly . . . who was

defrauded." Br. at 35-36.  Mayer Brown misstates the relevant analysis:  to establish mail or

wire fraud as a predicate act under RICO, Plaintiffs need allege only that the acts were in

furtherance of a scheme to defraud and directly related to that fraudulent scheme – not the acts

each had the effect of defrauding a discrete victim or constituted a misrepresentation.[36]

Plaintiffs' allegations are plainly sufficient.  Before 2000, the Refco Operators devised a

multifaceted scheme to defraud multiple parties, including potential purchasers of Refco, and

in furtherance of that overall fraudulent scheme committed numerous predicate acts of mail and

wire fraud up and until October 2005.  Compl. ¶¶ 86-87.  See H.J. Inc. v. Nw. Bell Tel. Co., 492

U.S. 229, 242 (1989) (Congress intended RICO to address "long-term criminal conduct" and

---

[36] See Spira v. Nick, 876, F. Supp. 553, 559 (S.D.N.Y. 1995) (Rule 9(b) does not "require[] that that mailings . . . relied upon as jurisdictional elements of the predicate acts, but which are not themselves said to have been fraudulent, be alleged with particularity"; "[o]nce the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls"); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir. 1991) ("The actual violation is the mailing, although the mailing must relate to the underlying fraudulent scheme.  Moreover, each mailing that is 'incident to an essential part of the scheme' constitutes a new violation."); id. at 1414 ("The mailing need not contain any misrepresentations.") (internal quotation marks omitted); see also In re Adelphia Communications Corp., 2007 WL 2403553, at *13 (Bankr. S.D.N.Y. Aug. 17 2007) ("in cases where the plaintiff claims that mail and wire fraud took place in furtherance of a larger scheme to defraud, the communications themselves need not have contained false or misleading information"; "Rule 9(b) is satisfied so long as the alleged mailings and wire transfers further an underlying scheme that itself has a fraudulent, deceptive purpose") (internal quotation marks omitted); M'Baye v. New Jersey Sports Prod., Inc., 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007) (when "the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants").

therefore, to establish closed-ended continuity, a plaintiff must show "a series of related

predicates extending over a substantial period of time").

Moreover, "closed-ended continuity" is not, as Mayer Brown would have it,

solely a temporal concept: "other factors such as the number and variety of predicate acts, the

number of both participants and victims, and the presence of separate schemes are also relevant."

First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004) (internal

quotation marks omitted); see also Zito v. Leasecomm Corp., 2003 WL 22251352, at *16

(S.D.N.Y. Sept. 30, 2003) (holding that, although the Second Circuit has not yet found closed-

ended continuity in a pattern lasting less than two years, "statistics do not make binding law" and

rejecting a "pleading requirement involving a minimum duration of two years" because "duration

is but one of several factors to be considered in determining whether a pattern of racketeering

activity has the requisite continuity"). Those other factors are present here:  the Complaint

alleges numerous predicate acts involving multiple conspirators spanning a more than seven-year

period with a substantial and diverse range of victims. See Compl. ¶ 87. Those allegations drive

home the point that this case involves the very type of continuous and "long-term criminal

conduct" that RICO is intended to reach. Nw. Bell Tel., 492 U.S. at 242.

Finally, contrary to Mayer Brown's assertions, the Complaint sets forth sufficient

detail with respect to predicate acts outside the period in which the 2004 Purchase was

negotiated. Tellingly, Mayer Brown does not argue that the Complaint fails to plead a fraud with

particularity, identify the participants in that fraud, or furnish concrete details on when the fraud

took place, where it occurred, or how it was effectuated. All of this the Complaint provides in

abundance. Instead, Mayer Brown's Rule 9(b) argument boils down to the contention that

Plaintiffs' RICO claim should be dismissed and repleaded because it does not identify by name

the recipients, other than Plaintiffs, of Refco's materially false statements. But the case law does not require Plaintiffs, at this stage, to identify other victims by name. See Zito v. Leasecomm Corp., 2004 WL 2211650, at *12 (S.D.N.Y. Sept. 30, 2004) (a complaint "need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed") (internal quotations marks and citation omitted). Moreover, given Mayer Brown's long relationship with Refco, it certainly has the greater knowledge of what other parties received Refco's financial statements.[37] In short, if this is an issue at all, it is an issue for discovery, not for pleading.

The Complaint more than meets the applicable pleading requirements by alleging that the Refco Operators engaged in schemes to hide the RGHI Receivable "at every fiscal year-end from at least February 28, 1998 and at every fiscal quarter-end from May 2004 through August 2005." Compl. ¶ 22; see id. ¶ 87(c). The result of the sham round-trip loans was to "render[] Refco's financial statements and books and records materially false and misleading," id. ¶ 23, with the effect of defrauding "a substantial number of victims," including, in addition to Plaintiffs, "the financial institutions that lent money to Refco, the investors who purchased Refco's debt securities, and the investing public who purchased Refco's equity securities," id. ¶ 87(f). The Complaint also sets forth, in detail (including dates and names of relevant participants), the manner in which the Refco Operators carried out the sham round-trip loans,

---

[37] See Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc., 2001 WL 282687, at *3 (S.D.N.Y. Mar. 22, 2001) (finding RICO claims satisfied Rule 9(b) because "the Complaint in this case alleges over two-hundred fraudulent transactions spread over a two year period, establishes a pattern of the fraud by way of nine specific examples in an attached exhibit (Compl. Ex. 1), and alleges the participation of each member in the scheme. The use of mail, wire other instrumentalities of interstate commerce is also alleged and is otherwise self-evident from the face of the Complaint. Rule 9(b) requires no more of Sterling at this stage of the litigation").

which were, of course, essential acts in furthering the criminal enterprise. <u>See</u> <u>id.</u> ¶ 31.[38]

Finally, the Complaint alleges acts of money laundering outside the time period leading up to the

2004 Purchase, <u>see</u> <u>id.</u> ¶ 86, which, as Mayer Brown concedes, "are not subject to Rule 9(b)."

<u>See</u> Br. at 35 n.16.

        Mayer Brown also argues that the fraud against Plaintiffs was "inherently

terminable" and that Plaintiffs thus have not pleaded "open-ended continuity." Br. at 36.

That is not so. Open-ended continuity is established by showing "that the predicate acts were the

regular way of operating [a legitimate] business," <u>DeFalco</u> v. <u>Bernas</u>, 244 F.3d 286, 323 (2d Cir.

2001) (internal quotation marks omitted); the Complaint alleges precisely that. <u>See</u> Compl.

¶¶ 87, 90. Moreover, the fraud against Plaintiffs was but one (albeit a substantial) part of a

complicated, multifaceted effort to defraud numerous parties – including regulators, lenders, and

investors. <u>See</u> Compl. ¶ 87(e). The criminal enterprise thus did not end with the 2004 Purchase;

indeed, the fraud continued after August 2004, <u>see</u> Compl. ¶ 87(d); <u>id.</u> ¶ 31, making clear that the

Refco Operators' scheme was not "inherently terminable" and supporting the inference that fraud

against regulators, financial institutions, and others would have continued into the future. <u>See</u>

<u>DeFalco</u>, 244 F.3d at 324 (evidence that defendants "had no intention of stopping once they met

some immediate goal" supported a conclusion "defendants would have continued extorting the

plaintiffs into the future" and therefore that "the scheme was not 'inherently terminable'");

<u>Sterling Interiors Groups, Inc.</u> v. <u>Haworth, Inc.</u>, 1996 WL 426379, at *13 (S.D.N.Y. July 30,

1996) ("[a] threat of continuity 'may be inferred from all of the surrounding circumstances,'"

---

[38] Indeed, the THL Funds have pleaded these facts in more detail than is required, as Mayer Brown's and the Refco Operators' deceit of other parties is information peculiarly within their knowledge that need not be pled with specificity. <u>See</u> <u>In re Crude Oil Commodity Litig.</u>, 2007 WL 1946553, at *7 (S.D.N.Y. June 28, 2007) ("An exception to the strict dictates of Rule 9(b) exists where allegations are based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal quotation marks omitted).

and allegations that predicates were part of a "'regular way of doing business'" establish open-ended continuity) (citations omitted).  Indeed, the repeated nature of the fraudulent conduct alleged, standing alone, supports an inference of continuity.  See United States v. Aulicino, 44 F.3d 1102, 1114 (2d Cir. 1995).

## III.   PLAINTIFFS HAVE STATED CLAIMS FOR COMMON-LAW FRAUD AND NEGLIGENT MISREPRESENTATION

### A.    Plaintiffs Have Stated A Claim For Common-Law Fraud

Mayer Brown contends (Br. at 39-40) that Plaintiffs' common-law fraud claim should be dismissed for the same reasons that require dismissal of their federal securities law claims.  Aside from the fact that the PSLRA's heightened pleading requirements do not apply to Plaintiffs' state law claims, the particularized allegations set forth in the Complaint state a claim against Mayer Brown for primary liability under Section 10(b) and Rule 10b-5, as thoroughly explained in Points I(A) & (B), above.  Accordingly, for the same reasons that Mayer Brown's motion to dismiss the federal securities claims fails, so too must Mayer Brown's motion to dismiss the common-law fraud claim.[39]

### B.    Plaintiffs' Negligent Misrepresentation Claim Should Not Be Dismissed Under The Martin Act

Mayer Brown argues that Plaintiffs' common-law negligent misrepresentation claim should be dismissed because it is preempted by New York's Martin Act.  Br. at 37.  In so arguing, Mayer Brown assumes – without any analysis – that New York law applies.

This Court follows New York's choice-of-law rules to decide which law governs Plaintiffs' common-law claims.  See Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989).  In

---

[39] As discussed in Point III.B, there is an open question about which state's law provides the substantive rules of decision for Plaintiffs' common law claims.  As to Plaintiffs' fraud claim, the pleading requirements appear to be uniform across the potentially applicable jurisdictions.  The burden of proof requirement for fraud claims, however, does vary.  See Levin v. Dalva Bros., 459 F.3d 68, 74 (1st Cir. 2006).

tort actions, New York courts apply an "interest analysis" to determine which jurisdiction's law applies, an analysis that is necessarily highly fact-specific, requiring, among other things, consideration of the parties' domiciles and the locus of the tort. See e.g., Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006).

Plaintiffs respectfully submit that the current record is insufficient to assess the relevant contacts of each jurisdiction with interests in this dispute, such as where the Mayer Brown lawyers were when they made the misrepresentations to Plaintiffs and their representatives. Although Mayer Brown well knows that Plaintiffs are based in Boston – and thus ultimately received the representations and suffered the effects of Mayer Brown's fraudulent conduct in Massachusetts – discovery will be required to determine whether other relevant contacts nevertheless require application of a different state's law. Accordingly, the Court should deny Mayer Brown's motion to dismiss the negligent misrepresentation claim pending discovery because Mayer Brown's Martin Act defense will be eliminated if the Court decides the law of a state other than New York applies.[40] See Steed Fin. LDC v. Nomura Sec. Int'l, Inc., 2001 WL 1111508, at *11 (S.D.N.Y. Sept. 20, 2001) (denying without prejudice defendants' motion to dismiss negligent misrepresentation claim on grounds that it was preempted by the Martin Act when the plaintiff argued that New Jersey, not New York, law applied and the "record submitted is insufficient to decide the choice of law issue").[41]

---

[40] Massachusetts courts have allowed common law misrepresentation claims to proceed alongside claims arising under the state securities law. See, e.g., Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1031 (Mass. 2004); Harbourvest v. Axent Technologies, Inc., 2000 WL 1466096, at *1 (Mass. Super. Aug. 31, 2000).

[41] See also, e.g., Gaetano Assocs. Ltd. v. Artee Collections, Inc., 2006 WL 330322, at *4 (S.D.N.Y. Feb. 14, 2006) (Cote, J.) (denying motion to dismiss state law claims when "insufficient information [existed] to make a choice-of-law determination," noting "issues raised regarding state common law claims" could be addressed "when a more complete record can be presented to allow a reliable choice-of-law determination to be made"); Rudin v. Dow Jones &

Deferring the choice-of-law question and Mayer Brown's Martin Act defense is particularly warranted here for two additional reasons. First, if the Court concludes that the equity interests in Refco that Plaintiffs acquired are not securities, see Compl. ¶ 10 n.3, Mayer Brown's Martin Act defense would no longer exist regardless of which state's law governs Plaintiffs' common law claims.[42] Second, deferring the choice-of-law question does not work any prejudice on Mayer Brown because a negligent misrepresentation claim does not impose any additional discovery obligations beyond Plaintiffs' other claims.

C.    **Assuming New York Law Applies, Plaintiffs Have
Satisfied The Requirement Of Showing Near Privity**

Assuming, without conceding, that New York law applies here, Mayer Brown's argument that Plaintiffs' negligent misrepresentation claim fails to satisfy the "near privity" requirement is unavailing. Under New York law, Plaintiffs may assert a negligent misrepresentation claim against Mayer Brown even absent actual privity of contract where, as here, they can show "that there was … a relationship so close as to approach that of privity." Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 382 (1992).

---

Co., 510 F. Supp. 210, 217 (S.D.N.Y. 1981) (denying motion to dismiss libel action premised on defense under California law when significant New York contacts also existed, and finding that choice of law "issues cannot be sufficiently considered on a motion to dismiss addressed to the face of the complaint"); Gen. Accident Ins. Co. v. Fidelity & Deposit Co., 598 F. Supp. 1223, 1230 (E.D. Pa. 1984) ("Because when faced with a motion to dismiss, I must resolve all doubts in favor of the non-moving party, unless it is clear that [plaintiff's] allegations could not state a valid claim under the laws of any of the potentially interested states, I cannot grant a motion to dismiss with regard to that claim" when the Court had not been presented with sufficient information to assess which states have a significant relationship to the dispute).

[42] Even if New York law applies, the Martin Act does not necessarily preempt the negligent misrepresentation claim. The New York Court of Appeals has not addressed the resolved the issue. See Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104 (2d Cir. 2001). Mayer Brown argues that a no-preemption position "cannot be reconciled" with Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001). While Castellano held that a fiduciary duty claim was preempted by the Martin Act, it did not reach the issue of whether a negligent misrepresentation claim was precluded by the Martin Act. Id. at 190 n.9.

A "near privity" relationship exists when (i) the defendant makes a statement with the awareness that the statement is to be used for a particular purpose; (ii) a "known party" relies on the statement in furtherance of that purpose; and (iii) there is some conduct by the defendant linking it to the known party and evincing its understanding of the known party's reliance. Id. at 384.[43]

Here, the Complaint specifically alleges that Mayer Brown had regular, direct, and continuous contact with Plaintiffs and their representatives – including face-to-face meetings, telephone conferences, email and other correspondence, and that Mayer Brown provided documents directly to Plaintiffs – all of which Mayer Brown understood was to induce Plaintiffs to make the 2004 Purchase. See, e.g., Compl. ¶¶ 39, 46-48, 53-55. The Complaint also alleges that Mayer Brown knew full well that Plaintiffs were relying on the information Mayer Brown was providing and that this information was material to Plaintiffs' decision to proceed with the 2004 Purchase. See, e.g., Compl. ¶ 102 ("Mayer Brown was aware that the information it provided directly to the THL Funds . . . in the course of the transaction would be used … for the particular purpose of deciding whether to proceed with the 2004 Purchase, and that the THL Funds did in fact rely upon the oral and written representations described above in

_____

[43] That Mayer Brown did not issue an opinion letter to Plaintiffs does not, under these circumstances, bar a negligent misrepresentation claim. In Doehla v. Wathne Ltd., Inc., 1999 WL 566311, at * 20 (S.D.N.Y. Aug. 3, 1996) (cited in Br. at 39), the court dismissed the negligent misrepresentation claim, in the absence of an opinion letter, because there were no allegations that the defendant had provided documents directly to the non-client upon which the non-client was urged to rely, that the purpose of its work was to induce such reliance, or that it held itself out as possessing any special expertise. Here, the Complaint contains those allegations. See, e.g., Compl. ¶¶ 47-48, 54-55 (provision of documents prepared specifically for Plaintiffs); id. ¶¶ 35-36, 59, 102-05 (Plaintiffs' reliance on the information provided and Mayer Brown's awareness thereof); id. ¶ 103 (Mayer Brown's "unique and specialized knowledge and expertise" as to Refco); id. ¶¶ 35, 101, 104-05, 107 (Mayer Brown's role, including to induce Plaintiffs' reliance for purposes of consummating the transaction). These allegations render the lack of an opinion letter immaterial. Similarly, and for the reasons discussed above in Points I(A) and (D), Mayer Brown's argument that Plaintiffs have not adequately alleged reliance and a duty to disclose (Br. at 39) are without merit.

deciding to consummate the 2004 Purchase"); id. ¶ 36 ("[i]t was understood that during the

diligence process Mayer Brown and Collins would be providing information to the THL Funds

upon which Plaintiffs would rely"). These allegations clearly satisfy Prudential's "near privity"

test.[44]

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny in

their entirety Mayer Brown's motions to dismiss the Complaint.


Dated: New York, New York
       November 9, 2007


| | |
|---|---|
| Mark C. Hansen | By: _Greg Danlow_ |
| Silvija A. Strikis | Greg A. Danilow (GD-1621) |
| James M. Webster III | Paul Dutka (PD-2568) |
| Rebecca A. Beynon | Christopher R.J. Pace (CP-0001) |
| KELLOGG, HUBER, HANSEN, TODD, | Seth Goodchild (SG-2296) |
|   EVANS & FIGEL P.L.L.C. | WEIL, GOTSHAL & MANGES LLP |
| Sumner Square | 767 Fifth Avenue |
| 1615 M Street, N.W., Suite 400 | New York, NY 10153 |
| Washington, D.C. 20036 | Tel.: (212) 310-8000 |
| Tel.: (202) 326-7900 | |

*Attorneys for Plaintiffs Thomas H. Lee
Equity Fund V, L.P., Thomas H. Lee
Parallel Fund V, L.P., and Thomas H. Lee
Equity (Cayman) Fund V, L.P.*

---

[44] These allegations would be more than sufficient to state a claim under Massachusetts law as well, particularly given that Refco "had no reasonable expectation of confidentiality" or claim of privilege (see Compl. ¶ 106) for Mayer Brown's communications with Plaintiffs regarding the related-party transactions. See Kirkland Constr. Co. v. James, 658 N.E.2d 699, 701 (Mass. App. Ct. 1995); see also DeLuca v. Jordan, 781 N.E.2d 849, 857-58 (Mass. App. Ct. 2003).