UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                       :

| | |
|---|---|
| THOMAS H. LEE EQUITY FUND V, L.P., | 07 Civ. 6767 (GEL) |
| THOMAS H. LEE PARALLEL FUND V, L.P., | |
| and THOMAS H. LEE EQUITY (CAYMAN) | |
| FUND V, L.P., | |

                    Plaintiffs,

        v.

MAYER, BROWN, ROWE & MAW LLP,

                    Defendant.

----------------------------------------------------------------x

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF MAYER BROWN LLP, AN ILLINOIS LIMITED LIABILITY PARTNERSHIP

**WILLIAMS & CONNOLLY LLP**
725 Twelfth St., N.W.
Washington, DC  20005
Tel:    (202) 434-5000
Fax:    (202) 434-5029
*Attorneys for Mayer Brown LLP,*
*An Illinois Limited Liability*
*Partnership*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER RULE 10b-5(b)............................. 1

       A.     Plaintiffs Allege That Mayer Brown Was Only a Mere Conduit. ......................... 1

       B.     Plaintiffs' Misrepresentation Claims Are Barred by the Purchase
              Agreement's Non-Reliance and Integration Clauses. ............................................. 6

II.    NO CLAIM OF "SCHEME LIABILITY" HAS BEEN STATED. .................................. 9

III.   PLAINTIFFS HAVE FAILED TO ALLEGE SPECIFIC FACTS THAT
       GIVE RISE TO A STRONG INFERENCE OF SCIENTER. .......................................... 13

IV.    THE PSLRA BARS PLAINTIFFS' RICO CLAIM. ....................................................... 18

       A.     The RICO Allegations Plainly Involve Securities. ................................................ 18

       B.     The PSLRA Bars RICO Claims Based on Aiding and Abetting a
              Violation of the Securities Laws. .......................................................................... 20

V.     PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM. ....................................... 22

       A.     The Complaint Does Not Allege Agreement. ......................................................... 22

       B.     Plaintiffs Have Not Pleaded an Underlying RICO Violation Because
              They Fail to Plead Continuity. ............................................................................... 24

VI.    THE MARTIN ACT BARS PLAINTIFFS' NEGLIGENT
       MISREPRESENTATION CLAIM. ................................................................................. 27

VII.   PLAINTIFFS HAVE NOT PLEADED NEAR-PRIVITY. ............................................. 29

CONCLUSION ................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Abell v. Potomac Insurance Co.*, 858 F.2d 1104 (5th Cir. 1988), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989)......................................12

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)..........................12

*AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63 (2d Cir. 2003) .....................7

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 357 F. Supp. 2d 712 (S.D.N.Y. 2005) ..............7

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .....................7, 8, 13

*Bald Eagle Area School District v. Keystone Finance, Inc.*, 189 F.3d 321 (3d Cir. 1999) ..........19

*Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955 (2007)............................................23

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) .....................................19

*Bonavire v. Wampler*, 779 F.2d 1011 (4th Cir. 1985) ..............................................4, 5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)..........................................................................2, 13

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999)..................26, 27

*Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)........................................28

*Crossland Savings FSB v. Rockwood Insurance Co.*, 700 F. Supp. 1274 (S.D.N.Y. 1988) ...........................................................................29, 30

*Divine Tower International Corp. v. Kegler, Brown, Hill & Ritter Co.*, Nos. 2:04-cv-494, 2:04-cv-584, 2007 WL 2572258 (S.D. Ohio Sept. 4, 2007).................................4

*Doehla v. Wathne, Ltd. Inc.*, No. 98 Civ. 6087 CSH, 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999) ..........................................................................30

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ........................................23

*Emergent Capital Investment Management, L.L.C. v. Stonepath Group, Inc.*, 343 F.3d 189 (2d  Cir. 2003)..........................................................................7

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 235 F. Supp. 2d 549 (S.D. Tex. 2002)..........................................................................3

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 284 F. Supp. 2d 511
(S.D. Tex. 2003)....................................................................................................22

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 310 F. Supp. 2d 819
(S.D. Tex. 2004)....................................................................................................11

*In re Enron Corp. Sec., Deriv. & "ERISA" Litigation*, No. H-01-3624, 2005 WL 2230167
(S.D. Tex. Sept. 12, 2005) ...................................................................................11

*Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793, 2005 WL. 500377
(S.D.N.Y. Mar. 2, 2005) .......................................................................................22

*First Capital Asset Management v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).................24, 26

*Friedman v. Arizona World Nurseries L.P.*, 730 F. Supp. 521 (S.D.N.Y. 1990) ...........................5

*Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104 (S.D.N.Y. Mar. 23, 1994) .............29

*GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463 (2d Cir. 1995).................27

*In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) ........9, 10

*In re Global Crossing, Ltd. Securities Litigation*, 471 F. Supp. 2d 338 (S.D.N.Y. 2006) .............9

*Goren v. New Vision International, Inc.*, 156 F.3d 721 (7th Cir. 1998)........................................24

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)...................................................................7, 9

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) ..................................22, 23

*Hemispherx Biopharma, Inc. v. Asensio*, No. Civ. A. 98-5204, 1999 WL 144109
(E.D. Pa. Mar. 15, 1999).......................................................................................21

*Hollinger International, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545
(N.D. Ill. Oct. 8, 2004)..........................................................................................22

*Howard v. AOL, Inc.*, 208 F.3d 741 (9th Cir. 2000)...................................................................21

*HSA Residential Mortgage Services of Texas v. Casuccio*, 350 F. Supp. 2d 352
(E.D.N.Y. 2003)....................................................................................................28

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ............................................................................23

*In re Kidder Peabody Securities Litigation*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998) ........................6

*Johnson & Johnson v. Guidant Corp.*, No. 06 Civ. 7685, 2007 WL 2456625
(S.D.N.Y. Aug. 29, 2007) ....................................................................................23

*Kline v. First Western Government Securities Inc.*, 24 F.3d 480 (3d Cir. 1994)...........................3

*La Sala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246 (S.D.N.Y. 2007) ............................27

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ............................................2, 6

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).........................................................9

*In re Lernout & Hauspie Securities Litigation*, 236 F. Supp. 2d 161 (D. Mass. 2003)................11

*Ling v. Deutsche Bank, AG*, No. 04 CV 4566, 2005 WL 1244689
(S.D.N.Y. May 26, 2005).....................................................................................18, 19, 20

*Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998)................................................................24

*In re Livent, Inc. Noteholders Securities Litigation*, 151 F. Supp. 2d 371
(S.D.N.Y. 2001) ..........................................................................................................19

*In re MarketXT Holdings Corp.*, No. 04-12078, 2006 WL 2864963
(Bankr. S.D.N.Y. Sept. 29, 2006) ..............................................................................9

*Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156 (1998).........................................................21

*M'Baye v. N.J. Sports Production, Inc.*, No. 06 Civ. 3439 DC, 2007 WL 431881
(S.D.N.Y. Feb. 7, 2007) ..........................................................................................25, 26

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)..............................................................24

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 2007) ........................................................25

*Morin v. Trupin*, 711 F. Supp. 97, 105 (S.D.N.Y. 1989)............................................................25

*OSRecovery, Inc. v. One Groupe International, Inc.*, 354 F. Supp. 2d 357
(S.D.N.Y. 2005) ..........................................................................................................22

*Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007)...............................................................1

*In re Parmalat Securities Litigation*, 383 F. Supp. 2d 616 (S.D.N.Y. 2005) ..............................12

*Pension Commission of the University of Montreal Pension Plan v. Banc of America
Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006).......................................28

*Payton v. Flynn*, No. 06 C. 465, 2006 WL 3087075 (N.D. Ill. Oct. 26, 2006)............................22

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101
(W.D. Mich. 1996).................................................................................................5

*Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330 (D. Mass. 2005)........................................11

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL),
2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)...........................................10, 11

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..............14

*Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482
F.3d 372 (5th Cir. 2007), petition for cert. filed, Apr. 5, 2007 (No. 06-1341) ........3, 11, 12

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 1999 WL. 47239
(S.D.N.Y. Feb. 3, 1999) .....................................................................................22

*Republic of Colombia v. Diageo North America Inc.*, No. 04-CV-4372 (NGG),
2007 WL 1813744 (E.D.N.Y. June 19, 2007) ...........................................22, 23

*Reves v. Ernst & Young*, 494 U.S. 56 (1990).................................................................19

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)...............................................................20

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978).................................14

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)...........................................................14

*Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998)...........................3, 4

*In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) .........10

*Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991) ...................................................4, 5

*SEC v. Edwards*, 540 U.S. 389 (2004)..........................................................................19

*SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir. 1998)....................................10

*SEC v. Zandford*, 535 U.S. 813 (2002) .........................................................................19

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ...........................................20, 21-22

*Sound Video Unlimited v. Video Shack Inc.*, 700 F. Supp. 127 (S.D.N.Y. 1988) .........28

*Spira v. Nick*, 876 F. Supp. 553 (S.D.N.Y. 1995).........................................................25

*In re Sumitomo Copper Litigation*, 104 F. Supp. 2d 314 (S.D.N.Y. 2000) ...................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ...........................................13

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) ...................................................................10

*Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355 (E.D.N.Y.), *aff'd sub nom Winkler v. Wigley*, 242 F.3d 369 (2d Cir. 2000) ...................................................................................5

*In re WorldCom, Inc.*, 374 B.R. 94 (Bankr. S.D.N.Y. 2007)..........................................................8

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998).......................................................1, 6

*Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2004 WL. 2211650 (S.D.N.Y. Sept. 30, 2004) ...................................................................................................23

## STATE CASES

*Aglira v. Julien & Schlesinger, P.C.*, 631 N.Y.S.2d 816 (App. Div. 1995) ........................... 29-30

*Babcock v. Jackson*, 12 N.Y.2d 473 (1963)..................................................................................27

*Norton v. Drepanos*, No. CA903423, 1994 WL 902881 (Mass. Super. Ct. Sept. 13, 1994) ...................................................................................8, 9

*Schultz v. Boy Scouts of America*, 65 N.Y.2d 189 (1985) ............................................................27

*Vesey Assocs., Inc. v. Regime Realty Corp.*, 232 N.Y.S.2d 754 (Sup. Ct. 1961), *aff'd* 16 A.D.2d 920 (N.Y. App. Div. 1962) ...................................................................................8

*Wittenberg v. Robinov*, 9 N.Y.2d 261 (1961) ................................................................................8

## DOCKETED CASES

*Stoneridge Investment Partners v. Scientific Atlanta, Inc.*, No. 06-43 (Sup. Ct. June 11, 2007)...................................................................................................5

*Thomas H. Lee Equity Fund V, L.P. v. Bennett*, No. 05-CV-9608 (S.D.N.Y.)........................18, 19

## FEDERAL STATUTES AND RULES

15 U.S.C. § 77k(a)(4) (2000)............................................................................................................2

15 U.S.C. § 78t(e) ..................................................................................................21

18 U.S.C. § 1344..................................................................................................26

18 U.S.C. § 1962(d) ............................................................................................23

## LEGISLATIVE HISTORY

141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995).........................................................21

## TREATISES

1 Geoffrey C. Hazard & William Hodes, *The Law of Lawyering* (1987)....................................30

Despite a 57-page Opposition ("Opp."), Plaintiffs fail to demonstrate that Mayer Brown LLP ("Mayer Brown") can be held liable for Refco's fraud. The Complaint should be dismissed in its entirety.

## I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER RULE 10b-5(b).

### A.    Plaintiffs Allege That Mayer Brown Was Only a Mere Conduit.

Plaintiffs' theory that Mayer Brown can be held liable as a "speaker" under Rule 10b-5(b) is an unprecedented attempt to broaden the reach of Section 10(b) to impose liability on a law firm based on the alleged falsity of its *client's* statements of fact, simply because those statements were relayed to counterparties by the firm's lawyers. Plaintiffs apparently concede that Mayer Brown cannot be held liable for statements made by Refco insiders and insist that they are basing their misrepresentation claim on Mayer Brown lawyers' own "material lies." Opp. at 13. In fact, however, their allegations make clear that Mayer Brown lawyers acted as mere conduits of information from their client, as is common in sophisticated corporate transactions. Under the Second Circuit's bright-line rule, liability cannot be imposed on Mayer Brown for any misstatements the lawyers passed onto Plaintiffs because those statements were not "attributed to [Mayer Brown lawyers] at the time" and no Mayer Brown lawyer "endorse[d] [their] accuracy." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175, 178 (2d Cir. 1998).[1]

Mayer Brown was not a Refco insider. It provided legal services, not financial services. Mayer Brown was not an auditor, an investment adviser, or an underwriter. It provided no oral

---

[1] Plaintiffs refer to *Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007), but that case is inapposite. It involved the very different issue of whether an accountant who issues a certified opinion that is false or misleading can be held primarily liable if it later learns of that fact (or is reckless in not so learning). *Id*. at 486-87. The court noted that by issuing a certified opinion, an accountant "holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable, which creates a special relationship of trust." *Id*. at 485 (quotation marks and citations omitted). Mayer Brown is not – and could not be – alleged to do have done anything even remotely similar.

or written opinions to Plaintiffs. It was not an "expert" who "expertised" any portion of any document relied on by Plaintiffs.[2] It had no professional relationship with Plaintiffs. It served a commonplace role by, among other things, transmitting information from its client to Plaintiffs, who were well-represented by their own team of lawyers and experts.

Plaintiffs contend that they have alleged that Mayer Brown was more than a mere conduit, but the allegations they point to are mere conclusions that deserve no deference. *See, e.g.*, Opp. at 15 (quoting Compl. ¶ 36, which alleges in conclusory fashion that "[i]t was understood" that Plaintiffs would rely on Mayer Brown lawyers). Nowhere in the Complaint are specific facts alleged showing that any Mayer Brown lawyer purported to act as an independent source of information about Refco. In these circumstances, Plaintiffs' claimed "understanding" of Mayer Brown's role cannot give rise to primary liability, as the Second Circuit expressly held in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007) ("Unless the public's understanding is based on the [defendant's] articulated statement, the source for that understanding . . . does not matter.").

Even Plaintiffs' most specific allegations are insufficient to support primary liability, as is evidenced by Plaintiffs' improper attempt to embellish them. For example, Plaintiffs describe paragraph 46 of the Complaint as alleging that Mayer Brown "inform[ed] Plaintiffs that 'other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements

---

[2] Under Section 11(a)(4) of the Securities Act of 1933, a professional is subject to suit only if "with his consent [he has] been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement." 15 U.S.C. § 77k(a)(4) (2000). The Supreme Court has emphasized that it will not "expand the defendant class for 10b-5 actions beyond the bounds delineated for comparable express causes of action." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994). Although Section 11 does not technically apply here, it would defy the Supreme Court's teaching to interpret the implied remedy available under Section 10(b) to go beyond Section 11 in analogous circumstances.

existed between Refco, RGHI or other affiliates.'"  Opp. at 12.  But what paragraph 46 actually alleges is that Mayer Brown's Joseph Collins told a lawyer for Plaintiffs that Collins had "*confirmed with Bennett*" (emphasis added) that there were no other undisclosed contracts or arrangements.  Stating that a fact has been confirmed by a client clearly communicates that it is the *client* to whom the statement is attributable.  Nothing in such a statement suggests that the lawyer himself is endorsing or otherwise vouching for the accuracy of his client's statements.

Plaintiffs rely on several cases dealing with attorney opinion letters, *e.g.*, *Kline v. First W. Gov't Sec. Inc.*, 24 F.3d 480 (3d Cir. 1994), but none of those cases squares with the Second Circuit's bright-line rule.[3]  In any event, cases involving opinion letters are fundamentally different from this case.  An attorney providing an opinion letter necessarily makes a statement he knows and intends will be attributed to him.  The *Kline* court was explicit:  "We are dealing here with a situation in which Arvey, *by authoring its opinion letters*, has elected to speak regarding the transactions at issue."  24 F.3d at 490 (emphasis added).  *Kline* held that once a law firm gives its own opinion, it cannot knowingly or recklessly misrepresent or omit material facts that undermine the substance of the opinion, even if it states that the facts are being provided by its client.  Here, Mayer Brown is not alleged to have given any opinion or made any statement it knew or intended would be attributable to it.  It was no more the "author" of the information it relayed to Plaintiffs than a messenger is the author of the messages he delivers.[4]

---

[3] Plaintiffs note that the Second Circuit has approvingly cited *Kline*, Opp. at 16 n.5, but only for a proposition that is not relevant here.  Plaintiffs cite *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 235 F. Supp. 2d 549 (S.D. Tex. 2002), but that case expressly declined to follow the Second Circuit's bright-line rule and, in any event, is of doubtful validity after *Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *petition for cert. filed*, Apr. 5, 2007 (No. 06-1341).

[4] Plaintiffs also cite *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998). Although that case did not involve a formal written opinion, it is readily distinguishable.  There, promoters referred investors to their attorney to discuss the issuer's financial condition; the

The (il)logical extreme of Plaintiffs' position is revealed by their assertion that a draft of a disclosure schedule circulated by Mayer Brown lawyers simultaneously to Refco and to Plaintiffs constituted "more than an endorsement[;] it is the firm's statement." Opp. at 17 n.6. The Complaint refers to these documents as "Refco Disclosure Schedules" (¶ 54) and alleges that they were drafted "at the direction of Bennett" (¶ 55). That they were circulated simultaneously to Refco and to Plaintiffs did not make them Mayer Brown's own statements. In the transmittal email quoted in the Complaint (¶ 55(a)), Mayer Brown lawyers stated that the schedules were subject to change based on client review – thus, that the statements were merely drafts of the client's ultimate representations and could not be relied on as representations of Mayer Brown. It would work a radical change in securities law – and effectively end the useful practice of simultaneous circulation – if Mayer Brown could be held liable based on alleged misstatements in a draft of disclosures that its *client* would ultimately make to a counterparty.

The only sensible rule is that "a lawyer or law firm cannot be liable for the representations of a client, even if the lawyer incorporates the client's misrepresentations into legal documents or agreements necessary for closing the transaction." *Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th Cir. 1991).[5] "[L]awyers do not vouch for the probity of their clients when

---

attorney volunteered fraudulent assertions of fact and opinion and discouraged the plaintiffs from conducting due diligence. The Sixth Circuit characterized this conduct as "gratuitously tout[ing]" the investment. *Id.* at 266. No comparable allegations are present here. Plaintiffs also cite *Divine Tower International Corp. v. Kegler, Brown, Hill & Ritter Co.*, Nos. 2:04-cv-494, 2:04-cv-584, 2007 WL 2572258 (S.D. Ohio Sept. 4, 2007), which misunderstood *Rubin* as holding that representations in an agreement can be attributed to the lawyers who drafted it.

[5] Plaintiffs' attempt to distinguish *Schatz* misses the mark. The conduct of the law firm in *Schatz* was no different than that of Mayer Brown here – drafting documents that contained representations from the firm's client and relaying representations from the client to the counterparties. Contrary to Plaintiffs' contention, this case is not more like *Bonavire v. Wampler*, 779 F.2d 1011 (4th Cir. 1985). There, the attorney made personal representations that the promoter of the fraudulent investment was an "honest, straight-forward businessman" and he

they draft documents reflecting their clients' promises, statements, or warranties." *Id*.
Transmitting a client's misrepresentations – by, for example, delivering a letter containing false
statements from the client to the plaintiff, *id*. at 489 – "does not transform those
misrepresentations into the representations of" the law firm. *Id*. at 495. Only if a transactional
lawyer makes "*independent* affirmative misstatements" – *i.e.*, "*personal* affirmative
representations" – can he be primarily liable under Section 10(b). *Id*. at 494 & n.3 (emphasis
added). Plaintiffs' allegations do not reach that level here. Rather, the conduct of Mayer Brown
lawyers detailed in the Complaint is akin to the handing over of the letter in *Schatz* – an act of
transmission, not an "independent" or "personal" representation by the firm.[6]

Many other cases are consistent with *Schatz*, including:

- *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 364-66 (E.D.N.Y.) (defendant public relations firm could not be held liable under Section 10(b) for misstatements in a press release that it had disseminated under its own name and address because they had been expressly attributed to the president of defendant's corporate client), *aff'd sub nom Winkler v. Wigley*, 242 F.3d 369 (2d Cir. 2000);

- *Friedman v. Arizona World Nurseries L.P.*, 730 F. Supp. 521, 533 (S.D.N.Y. 1990) ("counsel who merely draft the memorandum cannot be held liable for the general statements in the offering memorandum not specifically attributed to them");

- *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1120-21 (W.D. Mich. 1996) (to be liable under Section 10(b), party must be "the original and knowing source of the misrepresentation" rather than "a mere conduit"; underwriters were potentially liable for statements based on information from issuer where underwriters edited the information so as to make themselves the "original source" of the final statements).

---

"verifi[ed] [the fraudster's] credibility." *Id*. at 1014, 1016 (quotation marks omitted). Unlike the attorney in *Bonavire*, Mayer Brown is not alleged to have verified Refco's credibility.

[6] It is worth noting that Plaintiffs' counsel filed an amicus brief in *Stoneridge Investment Partners v. Scientific Atlanta, Inc.*, No. 06-43 (Sup. Ct. June 11, 2007), advocating rejection of the Second Circuit's bright-line rule, which they acknowledged would bar the imposition of primary liability on a law firm that, like Mayer Brown, makes a statement "under the client's name." Brief of Council of Institutional Investors as Amicus Curiae. at 11-14. The facts alleged as to Mayer Brown fit within counsel's description of the reach of the bright-line rule.

- *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998) (GE acted as mere "conduit" when issuing false public disclosures regarding subsidiary Kidder's profits based on information provided by Kidder; Kidder "controlled the content of the information" and GE "did nothing more than collect the information and transcribe it onto the page" such that, "[w]hen GE opened its mouth regarding Kidder, Kidder's words came out").[7]

The *Kidder* court's description fits perfectly here: When Mayer Brown lawyers opened their mouths about Refco, Refco's words came out. No claim for primary liability can be maintained against Mayer Brown under Rule 10b-5(b).

**B.    Plaintiffs' Misrepresentation Claims Are Barred by the Purchase Agreement's Non-Reliance and Integration Clauses.**

The Purchase Agreement's non-reliance and integration clauses bar Plaintiffs' Rule 10b-5(b) and common-law fraud claims.[8] While Plaintiffs emphasize that some of the language of those provisions refers to the parties to the Agreement, they gloss over the broad and unqualified opening sentence of Section 3.27: "The representations and warranties made in this agreement are in lieu of and are exclusive of *all other representations* and warranties, including any implied warranties." (Emphasis added).[9] This sentence makes clear that the parties to the Agreement intended and acknowledged that the representations in the Agreement itself were the only ones on which the parties could rely or in fact had relied. Those representations were to the exclusion of *all other representations*, no matter the source.

---

[7] To the extent that *Kidder* suggested that someone other than an attributed author may be held primarily liable, this part of its holding is no longer viable after *Wright*, 152 F.3d 169, and *Lattanzio*, 476 F.3d 147.

[8] The common-law fraud claim also fails for this reason, as well as those stated regarding the 10b-5 claims.

[9] A copy of the Purchase Agreement is attached as Exhibit A to the Declaration of Thomas G. Ward filed in support of Mayer Brown's motion to dismiss ("Ward Decl."). All exhibits referred to herein are exhibits to that Declaration.

Plaintiffs point out that neither *Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996), nor

*Emergent Capital Investment Management, L.L.C. v. Stonepath Group, Inc.*, 343 F.3d 189 (2d

Cir. 2003), involved a third party, but neither of these cases negates the applicability of such a

clause here.  Moreover, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir.

2007), did involve the application of merger clauses to entities not party to the agreements that

contained the clauses.  In that case, ATSI sued entities that had bought securities from it pursuant

to written purchase agreements and also sued two entities (CCM and Crown Capital) that were

not parties to the purchase agreements.  Plaintiff alleged (among other things) that the defendants

made precontractual misrepresentations.  The Second Circuit held that the precontractual

misrepresentation claims against *all* defendants, including CCM and Crown Capital, were barred

by the merger clauses, without making any distinction as to whether they were parties to the

agreements.  *Id.* at 107-08.

Plaintiffs point out that the district court did not rely on the merger clauses in dismissing

the claims against the non-parties.[10]  But that is irrelevant, as the Second Circuit was entitled to

affirm the judgment on any basis supported by the record.  *See, e.g.*, *AmBase Corp. v. City

Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003).  Plaintiffs also argue that when

the Second Circuit stated that the claims against non-party CCM failed for "[l]argely . . . the

same reasons as above," *ATSI*, 493 F.3d at 108, it was referring to a failure to plead falsity and

loss causation.  Opp. at 34.  In fact, the Second Circuit's holding as to the claims of

*precontractual misrepresentations* were based *solely on the merger clauses*; the court discussed

other grounds for dismissal only with respect to the separate claims of misrepresentations within

---

[10] In fact, the district court, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 357 F. Supp. 2d 712
(S.D.N.Y. 2005), did not rely on the merger clauses as to any of the defendants.

the purchase agreements themselves, claims that did not apply to either CCM or Crown Capital. *ATSI*, 493 F.3d at 107-08.[11]

Plaintiffs also rely on state law for the proposition that integration and merger clauses do not extend to non-contracting parties. *See* Opp. at 33. But Mayer Brown was not a mere third party with respect to the Purchase Agreement – it was the attorney (an agent) of one the parties. This distinction renders inapposite the main state law case on which Plaintiffs rely, *In re WorldCom, Inc.*, 374 B.R. 94 (Bankr. S.D.N.Y. 2007). In *WorldCom*, the third party in question (MCI) maintained that it had "had nothing to do with the transaction" except to lend two attorneys to the seller. *Id.* at 108. The court carefully limited its holding: "the Integration Clause does not bar [the plaintiff] from asserting a cause of action based upon any representations that MCI employees may have made *if found to be acting on behalf of MCI*." *Id.* (emphasis added). The court explained that the integration clause was inapplicable only "to the extent the allegations relate[d] not to each attorney acting on behalf of [the seller] as their principal but on behalf of MCI as their principal." *Id.* at 109. In short, if the attorneys had acted as agents for a party to the transaction, MCI could have properly invoked the integration clause.[12]

---

[11] The Second Circuit's treatment of the claims against Crown Capital (which it referred to with other defendants as "Rose Glen," 493 F.3d at 95) makes this even clearer. The Second Circuit held that "ATSI cannot claim reliance on Rose Glen's pre-contractual, verbal representations because of the merger clause in the Registration Rights Agreement." *Id.* at 107. The court drew no distinction between Crown Capital, which was not a party to the Registration Rights Agreement, and those entities that were party to that agreement.

[12] Plaintiffs also cite *Wittenberg v. Robinov*, 9 N.Y.2d 261 (1961), but that decision was distinguished in *Vesey Associates, Inc. v. Regime Realty Corp.*, 232 N.Y.S.2d 754, 756 (Sup. Ct. 1961), *aff'd* 16 A.D.2d 920 (N.Y. App. Div. 1962), on the basis that it involved a real estate broker who received a commission. Unlike the broker in *Wittenberg*, Mayer Brown had no financial interest of its own in closing the Purchase Agreement. In fact, by doing so, it stood to (and did) lose its client. Plaintiffs also cite *Norton v. Drepanos*, No. CA903423, 1994 WL 902881, at *1 (Mass. Super. Ct. Sept. 13, 1994), but that opinion does not quote the integration clause in question, engages in no significant legal reasoning, and contains too little information about the roles of the parties to be accorded any significance here. Plaintiffs also cite comment

Here, the Complaint alleges that Mayer Brown represented Refco in the relevant transaction, Compl. ¶¶ 1, 35, and communicated with the Plaintiffs "[a]t the direction of" Refco officers, *id*. ¶ 35.  Nothing in the Complaint suggests that Mayer Brown acted outside the scope of its agency relationship.  Accordingly, even under *In re WorldCom*, Mayer Brown is entitled to invoke the non-reliance provision of the Purchase Agreement.[13]

## II.    NO CLAIM OF "SCHEME LIABILITY" HAS BEEN STATED.

Plaintiffs' theory of scheme liability as to Mayer Brown cannot be squared with *Central Bank* or the Second Circuit's case law, nor is it supported by this Court's prior opinions.[14]

---

d(1) to section 6.01 of the Restatement (Third) of Agency, but more on point is comment e to section 7.01 of the Restatement, which states that "[m]ost privileges held by a principal may be delegated to an agent. . . .  To be protected by a privilege held by the principal, an agent must act for the purpose for which the privilege is given to the principal."  Here, under the allegations of the Complaint, Mayer Brown acted for the purpose for which the relevant privilege (the non-reliance clause) was given to Mayer Brown's principal.

[13] Plaintiffs also argue in a footnote (Opp. at 35 n.20) that "many courts have refused to enforce [non-reliance] clauses where, as here, a party was fraudulently induced to enter into the contract."  There is no Second Circuit support for such an exception.  In *Harsco*, the Second Circuit clearly stated that if a party disclaims reliance on a contractual representation, it "cannot, in a subsequent action . . . claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."  91 F.3d at 345.  The cases from within this district cited by Plaintiffs address a separate issue – whether there is an exception from the rule where the allegedly misrepresented facts in question are "peculiarly within [the defendant's] knowledge."  *In re MarketXT Holdings Corp.*, No. 04-12078, 2006 WL 2864963 at *12 (Bankr. S.D.N.Y. Sept. 29, 2006) (alteration in original, quotation marks omitted).  Plaintiffs do not argue that this exception applies, nor could they.  *See* n.29, *infra*.

[14] Plaintiffs do not successfully distinguish *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), which held that no claim under Rule 10b-5(a) and (c) may be maintained when the claim is based solely on misrepresentations or omissions.  *Id.* at 177-78.  Plaintiffs' own allegations make plain that the claim is based on alleged misrepresentations and omissions concerning Refco's finances.  Complaint ¶¶ 1, 23, 68, 70.  Plaintiffs invoke this Court's decision upholding claims against Arthur Andersen in *In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004), but that case was decided before *Lentell*.  In a subsequent *Global Crossing* opinion, the Court indicated (with respect to a different defendant) that the argument Mayer Brown has made here "might have merit."  *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 351 n.13 (S.D.N.Y. 2006).

As this Court has recognized, the Second Circuit and courts in this district have "typically dismissed" scheme claims against "outside professionals who provided necessary services to the fraudsters." *In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455, 473 (S.D.N.Y. 2004).[15] Only in "highly unusual circumstances" – where the professional "conceived and engineered, rather than merely abetted or turned a blind eye to, a fraudulent scheme" – may it be held primarily liable under a scheme theory. *Id*. at 474 (citing *In re Global Crossing Sec. Litig.*, 322 F. Supp. 2d 319, 330 (S.D.N.Y. 2004)). There are no such unusual circumstances alleged here.

Plaintiffs point to their allegations that Mayer Brown was "involved in" numerous back-to-back loan transactions, through which it "materially assisted" the fraud and "participated in and furthered" the scheme. Opp. at 22 (citing Compl. ¶¶ 5-7, 25). But these allegations of "provid[ing] necessary services to the fraudsters" are of the type that are "typically dismiss[ed]" as disguised aiding-and-abetting claims. *In re Salomon*, 350 F. Supp. 2d at 473-74. Plaintiffs identify no factual allegation that portrays Mayer Brown as having "conceived and engineered" the alleged Refco scheme. To the contrary, Plaintiffs have alleged that it was Bennett who masterminded the alleged scheme. *See, e.g.*, Compl. ¶¶ 2, 6, 24, 25, 30.

Moreover, as this Court recently held, "[i]n order to coherently allege deceptive conduct, plaintiffs must identify (1) the source of the understanding falsely created by defendants (that is, a fiduciary duty, prior representation, or some other reason why they believed defendants would act otherwise than they did), and (2) conduct that violated that understanding." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469,

---

[15] Plaintiffs suggest that the Second Circuit endorsed scheme liability in *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir. 1998), but that case merely held that someone who "effect[ed] the very buy and sell orders that artificially manipulated [the issuer's] stock price upward" was primarily liable. *United States v. Regan*, 937 F.2d 823 (2d Cir. 1991), similarly involved manipulative trading in the issuer's stock. No such conduct is alleged here.

at *8 (S.D.N.Y. Sept. 13, 2007). "[I]t is necessary to identify the sense in which the conduct was deceptive, as opposed to merely untoward." *Id*. "Defendants are entitled to know what deceptive or manipulative acts were performed and in what sense they were deceptive." *Id*. at *10 (quotation marks omitted). Here, Plaintiffs fail to describe how the transactional work of Mayer Brown lawyers – as opposed to the conduct of Refco and its insiders – deceived them.

Plaintiffs rely on a number of cases from outside the Second Circuit that are either no longer good law, even in their own Circuits, or are not congruent with Second Circuit law – and are unlikely to survive the Supreme Court's ruling in *Stoneridge*. Plaintiffs cite *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 310 F. Supp. 2d 819 (S.D. Tex. 2004), for its holding that Merrill Lynch's "substantial, active role in major fraudulent transactions with no legitimate business purpose" was enough to give rise to liability. Opp. at 23 n.12. But that opinion was effectively reversed by *Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), which found "[t]he district court's conception of 'deceptive act' liability is inconsistent with the Supreme Court's decision that § 10 does not give rise to aiding and abetting liability." *Id*. at 386.[16] According to the Fifth Circuit, "the banks [including Merrill Lynch] only aided and abetted [Enron's] fraud by engaging in transactions to make it more plausible." *Id*. Two other cases relied on by Plaintiffs here – *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330 (D. Mass. 2005), and *In re Lernout & Hauspie Securities Litigation*, 236 F. Supp. 2d 161 (D. Mass. 2003) – also were described by the Fifth Circuit as having "gone awry"

---

[16] Significantly, while the *Enron* district court held that counterparties who engaged in transactions that Enron used to misstate its financial statements could be primarily liable for scheme liability, the court dismissed "scheme" claims against an Enron law firm that allegedly "structured and prepared documents" for similar transactions. *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, No. H-01-3624, 2005 WL 2230167 (S.D. Tex. Sept. 12, 2005).

by losing sight of the limits of liability under Section 10(b). *Regents of the Univ. of Cal.*, 482

F.3d at 387.[17]  The Second Circuit has carefully and consistently enforced those limits.

Finally, Plaintiffs' scheme claim fails because they cannot show reliance on Mayer

Brown's conduct.  Plaintiffs incorrectly argue that reliance should be presumed under *Affiliated*

*Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  That presumption arises only when a

defendant with a duty to disclose has made a material omission.  *Id*. at 153-54.  "Merely pleading

that defendants failed to fulfill [a duty to disclose] by means of a scheme or an act, rather than by

a misleading statement, does not entitle plaintiffs to employ the *Affiliated Ute* presumption."

*Regents of the Univ. of Cal.*, 482 F.3d at 384.

Plaintiffs plead no basis for inferring any duty on Mayer Brown's part to disclose

information about Refco's transactions.  Plaintiffs' theory of duty appears to be that Mayer

Brown lawyers spoke and therefore had a duty to speak truthfully, but that theory applies (if at

all) only to their claim under Rule 10b-5(b) and does not trigger the *Affiliated Ute* presumption.

*See Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988) (holding that the *Affiliated*

*Ute* presumption applies only where "the defendant has failed to disclose any information

whatsoever relating to material facts about which the defendant has a duty to the plaintiff to

disclose"), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989).

Plaintiffs also assert that it is sufficient that "the fraudulent scheme in which Mayer

Brown participated enabled Refco to manipulate its financial statements," and Plaintiffs relied on

---

[17] Plaintiffs' reliance on *In re Parmalat Securities Litigation*, 383 F. Supp. 2d 616 (S.D.N.Y.
2005), is misplaced.  Although Plaintiffs claim to have alleged that Mayer Brown went beyond
furnishing legal advice (Opp. at 24), their allegations that Mayer Brown lawyers negotiated and
drafted documentation for Refco's back-to-back loan transactions (Compl. ¶¶ 30, 32) are nothing
like the allegations in *Parmalat*, where the law firm itself formed and controlled shell entities
that directly engaged in transactions with the issuer.  383 F. Supp. 2d at 624-25 n.39 (rejecting
liability for allegations of "prepar[ing] contracts" and "provid[ing] legal opinions and advice").

those financial statements.  Opp. at 35-36.  This argument serves only to highlight the conflict

between Plaintiffs' theory and *Central Bank*.  In *Central Bank*, the Court held that "[a] plaintiff

must show reliance on *the defendant's* misstatement or omission" or other deceptive conduct.

511 U.S. at 180 (emphasis added).  That standard cannot be met here, where Plaintiffs were not

even aware of the conduct on Mayer Brown's part that they claim was deceptive.

## III.    PLAINTIFFS HAVE FAILED TO ALLEGE SPECIFIC FACTS THAT GIVE RISE TO A STRONG INFERENCE OF SCIENTER.

In their Opposition, Plaintiffs abandon any contention that Mayer Brown had the "motive

and opportunity" to commit fraud, and limit their effort to establish scienter to the claim that

there is strong circumstantial evidence of conscious misbehavior or recklessness on Mayer

Brown's part.  *See ATSI*, 493 F.3d. at 99.  In so doing, Plaintiffs draw the most unreasonable

inferences from their allegations, contrary to the compelling inference requirement of *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2509-10 (2007).

At its core, Plaintiffs' case for scienter is based on the foundation that Mayer Brown must

have been aware of, or recklessly closed its eyes to, the third leg of the "round trip loan

transactions" – the paydown of the RGHI Receivable with the proceeds from the back-to-back

loans.  *See* Ex. B, Ward Decl. (diagram of Plaintiffs' allegations regarding loan transactions).

Without that foundation, Plaintiffs' allegations of scienter collapse – and that foundation is

lacking from the Complaint.

First, although Plaintiffs contend that they have "specifically allege[d] that Mayer Brown

had knowledge" of the third leg in paragraph 32 of the Complaint (Opp. at 28), they have not.

That paragraph merely alleges in conclusory terms that Mayer Brown "understood that these

transactions caused the RGHI related-party receivable to be removed from Refco's books and

records."  Compl. ¶ 32.  It does not allege specific facts sufficient to give rise to a strong

inference of scienter, as the PSLRA requires.  Plaintiffs do not allege that any Refco insider asked Mayer Brown to document the paydown or told Mayer Brown that the back-to-back loan proceeds were being used to periodically pay down the RGHI Receivable.[18]  Nor do Plaintiffs allege that anyone else – such as Refco's auditors – informed Mayer Brown of the RGHI Receivable or its periodic paydown.  In fact, the most plausible inference from the facts alleged is that Mayer Brown was not aware of the paydown.

Plaintiffs' second argument is that even if Mayer Brown did not have actual knowledge of the third leg, given knowledge of the first two legs, any "reasonable person"[19] would have known that "the inevitable consequence" was that RGHI was using the loan proceeds to pay down a related party receivable   Opp. at 28.  The facts alleged in the Complaint, however, do not support the inference that any Mayer Brown attorney who worked on the back-to-back loans should have known, was reckless in not knowing, or did know that the paydown of a carefully hidden related-party receivable was the inevitable consequence of the back-to-back loans. Again, the opposite inference is more compelling.  To the Mayer Brown attorneys working on

---

[18] Plaintiffs assert that this Court's decision in *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), supports their scienter argument because the Court concluded that the securities plaintiffs had sufficiently pleaded scienter as to Dennis Klejna, Refco's General Counsel, based on his review of billing records referencing the back-to-back loans and his role within Refco, *id*. at 652.  That finding has no application here.  Mayer Brown's position was entirely different from Klejna's.  Unlike Refco's corporate insiders, accountants, and auditors, Mayer Brown is not alleged to have had day-to-day access to Refco's financial books and records.  Without such access, and without the expertise to understand the accounting and financial information, there is no basis to conclude that Mayer Brown attorneys knew, or were reckless in not knowing, that Refco was engaging in fraud.

[19] To survive a motion to dismiss, Plaintiffs must allege facts sufficient to show that Mayer Brown's conduct "represent[ed] 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (alteration in original) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  Claims based on what a "reasonable person" would have known can only constitute negligence, not actual knowledge or recklessness.

the back-to-back loans, the purpose of the loan documents was presumably obvious from the face of the documents – to provide RGHI with short-term liquidity. There are many legitimate reasons why Refco might have wanted to lend or borrow money on a short-term basis,[20] none of which would have raised suspicion or had any bearing on the straightforward legal services that Mayer Brown was asked to provide. Also, the fact that the loans were repeated is of no significance. RGHI could have wanted the money for a cyclical investment or trading opportunity. Refco and its affiliates were players in sophisticated commodities futures and foreign exchange transactions, where it is not difficult to imagine that arbitrage or other trading opportunities could present themselves at short, regular intervals. In any event, Plaintiffs fail to cite any law for the proposition that any time a law firm drafts loan documents it must conduct an investigation into the ultimate use of the loan proceeds or else face claims for securities fraud if its client uses the proceeds to effect a carefully hidden fraud. That is not, and never has been, a corporate lawyer's responsibility. Having failed to plead facts sufficient to support even a negligence standard, it follows that Plaintiffs have not pleaded facts sufficient to support an inference of recklessness or actual knowledge of fraud.

In a third effort to make out scienter, Plaintiffs assert that Mayer Brown attorneys acted with recklessness or intent to defraud by failing to disclose what they knew about the back-to-back loans in various provisions of, or schedules to, the Purchase Agreement. Opp. at 29. As an initial matter, it is unreasonable to believe that all of Mayer Brown's attorneys, including associate Paul Koury, were aware of the parties' negotiated understandings of each provision of

---

[20] Mayer Brown disputes the notion that the back-to-back loans in this case are inherently fraudulent or obviously lacking in business purpose as a matter of law. Plaintiffs have failed to cite any caselaw, scholarly articles, or other authority supporting such a conclusion. Back-to-back and short-term loans are used in numerous contexts, including for tax purposes, regulatory

the 48-page Purchase Agreement. Even assuming, however, that the Mayer Brown attorneys who worked on the back-to-back loans analyzed which agreements had to be disclosed pursuant to the Purchase Agreement, it is far from clear that any of the specific provisions cited by Plaintiffs require disclosure of the back-to-back loans. Compl. ¶ 51. For example, Sections 3.10 and 3.15 , regarding undisclosed liabilities and material contracts, seek information on liabilities and agreements that were outstanding on the effective date of the Purchase Agreement, not historical obligations or obligations no longer in effect. As Plaintiffs acknowledge, no back-to-back loan was outstanding as of June 8, 2004, the effective date of the Purchase Agreement, *see* Compl. ¶ 31(*l*), and neither Section 3.10 nor Section 3.15 called for disclosure of any historical loan transactions that terminated before that date.[21]

Section 3.12, which Plaintiffs interpret as calling for disclosure of related-party transactions, likewise required only the listing of agreements "to which the Company or any Subsidiary *is* a party or by which any of their properties or assets *may be* bound or affected." (Emphasis added). This wording suggests that any historical agreements to which the Company *had been* a party, or by which its property or assets *had been* bound or affected, were not called for. As noted above, because no back-to-back loan was outstanding as of June 8, 2004, Section 3.12 would not require any such loans to be disclosed. Although the first clause of Section 3.12 contains a date modifier ("since March 1, 2003"), that modifier pertains only to the onset of the interests held by the related party. In other words, the representation calls for the disclosure of any agreements to which the Company currently "is" a party or by which its property or assets

purposes, foreign exchange transactions, whole business securitization, municipal financing, and sovereign debt restructuring, not to mention for investment purposes.

[21] The other disclosures referenced by Plaintiffs exhibit the same pattern, and Plaintiffs do not and cannot point to any disclosure cited in the Complaint that, by its terms, should have disclosed any of the back-to-back loans. *See* Compl. ¶ 51.

currently "may be" affected, if a related party had an interest in that agreement "since March 1, 2003," regardless of whether the related party still had the interest.

The treatment by the parties in Section 5.1(c) of a $108 million related-party debt supports this reading of Section 3.12. By their own admission, Plaintiffs were well aware of $108 million in related-party debt accrued as of February 29, 2004. *See* Compl. ¶ 38. This related party debt clearly qualified as a transaction in which a related party had had an interest "since March 1, 2003." But it was not listed in Schedule 3.12 because it had been paid off as of February 29, 2004. Assuming any Mayer Brown attorney even considered this issue, the exclusion of the historical $108 million related-party debt from Schedule 3.12 would have confirmed that Refco was not required to disclose any historical back-to-back loans that were not outstanding as of June 8, 2004.

Plaintiffs also make a conclusory and unsupported claim that Collins *knew* that Bennett was lying when he told Collins to tell Plaintiffs that all related party transactions had been disclosed. Plaintiffs contend that Collins could not have reasonably believed that the back-to-back loans had been disclosed in the data room or in other communications between the negotiating parties. Opp. at 29. Although Plaintiffs cite to paragraphs 44 through 48 of their Complaint in support of these allegations, those paragraphs are devoid of facts supporting this claim. Instead, paragraphs 44 through 48 discuss the few Refco statements that Collins passed on to Plaintiffs as a conduit. What Plaintiffs have not alleged, and cannot allege, is that Mayer Brown was the sole spigot through which all information flowed to and from Refco, was responsible for cataloging or ensuring the completeness of the contents of the data room, or that Mayer Brown was otherwise privy to the totality of information communicated among Refco, the Plaintiffs, and the many professionals hired by each.

In fact, Plaintiffs acknowledge in their various other complaints against Philip Bennett, Tone Grant, Santo Maggio, and Grant Thornton LLP that the principals had direct access to one another during the course of this transaction, and many critical communications constituting the alleged fraud occurred outside Mayer Brown's presence. *See, e.g.*, Compl. ¶ 22(b), (c), (f), (h), (j), *Thomas H. Lee Equity Fund V, L.P. v. Bennett*, No. 05-CV-9608 (S.D.N.Y.). Thus, Collins's conduct in passing on Refco's assurances in no way bespoke recklessness or knowing intent to mislead. The opposite inference is far more cogent and compelling – it would have been reasonable for him to believe that others had disclosed numerous facts to Plaintiffs outside his presence and that, of the thousands of documents placed in the data room responsive to Plaintiffs' requests, there were many documents that he did not personally select or know about. Any other conclusion would make the practice of law impossible for senior partners in corporate law firms across the country and would turn law firms into insurers for counterparties.

## IV.    THE PSLRA BARS PLAINTIFFS' RICO CLAIM.

### A.    The RICO Allegations Plainly Involve Securities.

Plaintiffs now suggest, for the first time, that their 2004 purchase of equity interests in Refco was really not a purchase of securities after all. As one court in this district responded to a similar argument, "Creative but no cigar." *Ling v. Deutsche Bank, AG*, No. 04 CV 4566, 2005 WL 1244689, at *5 (S.D.N.Y. May 26, 2005). Plaintiffs identify no basis for concluding that the 2004 Purchase did not involve securities. Mayer Brown has never argued otherwise. Moreover, Plaintiffs themselves unambiguously allege that they did purchase securities.

Contrary to Plaintiffs' argument, they have not pleaded in the alternative on this issue. The Complaint does not allege that the equity interests they bought are not securities. [22] On the

---

[22] Plaintiffs point only to a footnote from a prefatory paragraph in their Complaint. The footnote asked for the Court to dismiss the RICO claim "[s]hould the Court conclude that (a) the interests

contrary, in their "Factual Summary," Plaintiffs allege that "the *securities* purchased by the THL

Funds in the 2004 Purchase are now worthless," *id.* ¶ 64 (emphasis added). This paragraph is

realleged at the beginning of Plaintiffs' RICO claim. *Id.* ¶ 83 (repeating "paragraphs 1 through

64 inclusive"); *see In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 407 (S.D.N.Y.

2001) (Fed. R. Civ. P. 8(e)(2) permits alternative pleading but "presumes that each unitary claim

must be sufficient standing on its own"). Even aside from the securities claims, the Complaint

refers to Plaintiffs' "investment" in Refco. *See* Compl. ¶ 95 ("the THL Funds [made] an *equity*

*investment* in Refco in August 2004") (emphasis added); *id.* ¶¶ 33, 105. "'Congress' purpose in

enacting the securities laws was to regulate *investments*, in whatever form they are made and by

whatever name they are called.' To that end, it enacted a broad definition of 'security,' sufficient

'to encompass *virtually any instrument* that might be sold as an investment.'" *SEC v. Edwards*,

540 U.S. 389, 393 (2004) (second emphasis added) (quoting *Reves v. Ernst & Young*, 494 U.S.

56, 61 (1990)).[23]

In any event, the relevant analysis is whether any of the alleged predicate acts were "in

connection with the purchase or sale of securities," not just whether the 2004 purchase was.

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) (quoting

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 (1975)); *Ling*, 2005 WL 1244689, at

*3. The "in connection with" requirement is met when a securities transaction "coincide[s]"

with the challenged conduct. *SEC v. Zandford*, 535 U.S. 813, 825 (2002). "If one predicate act

---

acquired by the THL Funds in the 2004 Purchase *are securities*." Compl. ¶ 10 n.3 (emphasis
added). Even with Plaintiffs' post hoc insertion of the word "not," *see* Opp. 36, the Complaint
does not affirmatively plead that the interests were not securities.

[23] Furthermore, Plaintiffs' complaint against Bennett, Grant, and Maggio brings claims for
securities fraud under Section 10(b) and Rule 10b-5; it does not plead any claim in the alternative
under RICO on the theory that the 2004 Purchase was not a purchase of securities. *See* Compl.,
*Thomas H. Lee Equity Fund V, L.P. v. Bennett*, No. 05 Civ. 9608 (S.D.N.Y.).

alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar." *Ling*, 2005 WL 1244689, at *4. $600 million in bonds were issued "in connection with . . . the 2004 Purchase." Compl. ¶ 56. Moreover, Plaintiffs allege that Refco executives perpetrated a long-running fraud that lasted through 2005, when the bonds were registered and Refco had an "Initial Public Offering of common stock" ("IPO"). *Id.* ¶ 31(q); *see* ¶¶ 22, 30. In fact, when identifying the victims of the Refco schemes, Plaintiffs cite the "*investors who purchased Refco's debt securities*, and the *investing public who purchased Refco's equity securities*." *Id.* ¶ 87(f) (emphases added). Thus, Plaintiffs plainly contemplate predicate acts of mail and wire fraud that did "coincide" with both the bond offering and the IPO – events unquestionably involved the purchase or sale of securities. *Zandford*, 535 U.S. at 825.

### B.    The PSLRA Bars RICO Claims Based on Aiding and Abetting a Violation of the Securities Laws.

Mayer Brown agrees with Plaintiffs that the meaning of a statute is to be governed by the plain meaning of its text. *See* Opp. at 38. But Plaintiffs do not explain how the plain text they trumpet supports their reading of the PSLRA RICO amendment, which would limit the term "actionable" to "actionable by private plaintiffs." Plaintiffs argue that "[b]y its plain terms, the provision applies solely to conduct that 'would have been actionable as fraud' *but for a plaintiff's decision to plead a RICO violation instead of a securities fraud claim*." Opp. at 38 (emphasis added). The operative language in the quoted sentence is all inserted by Plaintiffs. Plaintiffs' "plain text" argument is nothing of the sort.[24]

---

[24] Plaintiffs invoke *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), to ask that the Court interpret RICO broadly. But RICO's "liberal construction" clause "is not an invitation to apply RICO to new purposes that Congress never intended." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

To the extent that the legislative history is relevant, it also supports Mayer Brown's interpretation. The amendment in question is one part of the PSLRA. When considering that legislation, one of the key decisions Congress had to make was whether to revive aiding-and-abetting liability after *Central Bank*, and it chose a middle course in which the SEC could bring enforcement actions for aiding and abetting. *See* 15 U.S.C. § 78t(e). Thus, the same legislators who decided to exclude from RICO "conduct that would have been actionable as fraud," also expressly made aiding and abetting securities fraud "actionable" by the SEC. There is no reason to think Congress drafted one section of the PSLRA without any consideration for the other.

Plaintiffs cite snippets of legislative history that indicate that Congress wished to eliminate duplicative securities-law and RICO actions, but they do not establish that Congress was concerned "*only*" with that problem. Opp. at 39 (emphasis added).[25] Plaintiffs' invocation of SEC Chairman Arthur Levitt's reasons for supporting the PSLRA's RICO amendment (Opp. at 39 n.24) also cannot establish that Congress's sole purpose was the one he advanced.

Plaintiffs' cramped interpretation of the PSLRA RICO amendment cannot be reconciled with *Howard v. AOL, Inc.*, 208 F.3d 741, 749-50 (9th Cir. 2000), or *Hemispherx Biopharma, Inc. v. Asensio*, No. Civ. A. 98-5204, 1999 WL 144109, at *4-*5 (E.D. Pa. Mar. 15, 1999), both of which barred RICO claims for plaintiffs who could not bring any securities claims. For the plaintiffs in those cases, the RICO remedy was neither "redundant" nor "overlapping." Nor can Plaintiffs' interpretation be reconciled with other opinions recognizing that the PSLRA bar

---

[25] Plaintiffs' quotation from Rep. Fields' statement concerning the dangers of such duplicative litigation (Opp. at 39) confirms that Congress could not have intended to "completely eliminate[e] the so-called 'treble damage blunderbuss of RICO' in securities fraud cases" for primary violators (the Refco insiders in this case), but to leave it in place for secondary actors like Mayer Brown. *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 164 (1998) (quoting 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995)); *see also Sedima*, 473 U.S. at 504 (Marshall, J.,

applies irrespective of whether the plaintiff in the suit can bring securities claims. *See Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545, at *7 (N.D. Ill. Oct. 8, 2004); *In re Enron Corp. Sec., Deriv. & "ERISA" Litigation*, 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003).

As expected, Plaintiffs attempt to distinguish *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793, 2005 WL 500377 (S.D.N.Y. Mar. 2, 2005), and rely on *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999), and *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357 (S.D.N.Y. 2005). Their approach is unavailing. *Fezzani* is on point. There, the court had dismissed the plaintiffs' claims. *Id.* at *1. Plaintiffs sought leave to replead their 10b-5 claims and to add a RICO claim in the alternative if and only if "the Court [found] any defendant was merely an aider and abettor." *Id.* at *3. That is to say, the *Fezzani* plaintiffs intended to do exactly what Plaintiffs have done in this Complaint. The court determined that the amendments would have been futile because, even if the conduct was merely aiding and abetting, the PSLRA RICO amendment would bar it. *Id.* at *4-*6; *see also Payton v. Flynn*, No. 06 C. 465, 2006 WL 3087075, at *8-*9 (N.D. Ill. Oct. 26, 2006). Thus, under the better reasoned decisions, Plaintiffs' RICO claim should be dismissed under the PSLRA RICO amendment even if they cannot maintain claims under the Exchange Act.

## V.    PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM.

### A.    The Complaint Does Not Allege Agreement.

Although Rule 9(b) does not apply to allegations of agreement under 18 U.S.C. § 1962(d), agreements must be pleaded with "sufficient particularity." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *Rep. of Colom. v. Diageo N. Am. Inc.*, No. 04-CV-4372 (NGG), 2007 WL 1813744, at *55 (E.D.N.Y. June 19, 2007). Plaintiffs must plead

---

dissenting) (noting the "tremendous financial exposure" and reputational harms that force defendants to settle RICO claims that survive motions to dismiss).

"some factual basis for a finding of a *conscious agreement* among the defendants." *Hecht*, 897

F.2d at 26 n.4 (emphasis added). Thus, a complaint "should state with specificity what the

agreement was, who entered into the agreement, when the agreement commenced, and what

actions were taken in furtherance of it." *Rep. of Colom.*, 2007 WL 1813744, at *55.

This standard is analogous to that endorsed by the Supreme Court in analyzing

allegations of an agreement under § 1 of the Sherman Act in *Bell Atlantic Corp. v. Twombly*, __

U.S. __, 127 S. Ct. 1955 (2007).[26] Under *Twombly*, even Rule 8(a) pleading requires "enough

facts to state a claim to relief that is plausible on its face." *Johnson & Johnson v. Guidant Corp.*,

No. 06 Civ. 7685, 2007 WL 2456625, at *4 (S.D.N.Y. Aug. 29, 2007) (quoting *Twombly*, 127 S.

Ct. at 1974); *see also Iqbal v. Hasty*, 490 F.3d 143, 155-58 (2d Cir. 2007) (interpreting *Twombly*

as creating a flexible plausibility standard). In assessing the plausibility of the plaintiffs'

conspiracy claims in *Twombly*, the Supreme Court considered competing, innocent inferences

from the allegations in the complaint. *See, e.g.*, 127 S. Ct. at 1972 (commenting that "a natural

explanation" was that the defendants were not engaging in anti-competitive behavior).

Plaintiffs repeat their mantras – Mayer Brown documented "sham" loans; drafted

transactional documents containing false representations; and forwarded statements by its client

that it allegedly knew were false, *see* Compl. ¶ 90 – but these allegations do not support an

inference that Mayer Brown intended to enter into a criminal conspiracy. No facts are pleaded

that could establish that Mayer Brown knew that Refco was using the loans to misstate its

financial results. As to the alleged "lies" told by Collins, the "natural explanation" is that he was

---

[26] The practical concerns identified in *Twombly* are particularly acute in this securities-related
RICO claim where allowing a weak case to proceed represents an "'*in terrorem* increment of the
settlement value'" of Plaintiffs' claims. 127 S. Ct. at 1966 (quoting *Dura Pharms., Inc. v.
Broudo*, 544 U.S. 336, 347 (2005)); *see also Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL),

simply forwarding statements made by his client, the truth of which hinged on facts outside his knowledge.  Even assuming the disclosure schedules should have disclosed the back-to-back loans, circulation of incorrect schedules by a Mayer Brown associate does not evince intent to enter a criminal conspiracy.  As to the Mayer Brown attorneys' supposed motive to participate in a criminal fraud, *see* Opp. at 46, Plaintiffs never address the fact that the Mayer Brown lawyers had nothing to gain and, in fact, stood to lose their client to Weil Gotshal if the 2004 Purchase went forward.[27]

### B. Plaintiffs Have Not Pleaded an Underlying RICO Violation Because They Fail to Plead Continuity.

Plaintiffs do not contest that they cannot bring their § 1962(d) conspiracy claim if they have not adequately pleaded that Bennett, Trosten, and Maggio engaged in a scheme to defraud under § 1962(c).  Nor do they contest that, under the Second Circuit's decision in *First Capital Asset Management v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), the Court cannot consider predicate acts not pleaded with particularity when evaluating "continuity" for purposes of RICO, *id.* at 178-79.  Plaintiffs claim that they have met these pleading requirements, but they have not.

The predicate acts alleged in the Complaint – except money laundering – must be pleaded with particularity pursuant to Rule 9(b).  *E.g.*, *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (mail fraud).[28]  Plaintiffs point to cases that relax the pleading requirements for

---

[27] Plaintiffs' attempt to distinguish *Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998) and *Goren v. New Vision International, Inc.*, 156 F.3d 721 (7th Cir. 1998), is unpersuasive. Plaintiffs' response is to simply repeat their allegations that Mayer Brown knowingly agreed to participate in a criminal conspiracy.  Opp. at 47.  This is nothing more than *ipse dixit*.

[28] Even though not governed to Rule 9(b), allegations of a predicate act of money laundering still must plead all the elements of the crime.  Plaintiffs point to ¶ 86, but that paragraph does nothing more than list money laundering as a predicate act.

2004 WL 2211650, at *6 (S.D.N.Y. Sept. 30, 2004) (noting the stigmatizing effect of allowing a civil RICO claim to proceed against a defendant).

mailings or wires purely incidental to a scheme to defraud. *E.g.*, *M'Baye v. N.J. Sports Prod., Inc.*, No. 06 Civ. 3439 DC, 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007). This relaxation is irrelevant here because a scheme to defraud itself must still be adequately pleaded. *Id.* (relaxing particularity requirements for mails or wirings used only in furtherance of a scheme when the "RICO scheme is sufficiently pled to give notice to the defendants"); *Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995). Under Rule 9(b), allegations of a scheme must include "a detailed description" identifying the scheme's "specific circumstances." *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 320 (S.D.N.Y. 2000) (quotation marks omitted); *Spira*, 876 F. Supp. at 559. The fraudulent statements themselves must be pleaded with particularity. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 2007); *Spira*, 876 F. Supp. at 559. "[A] proper pleading of predicate acts based on mail and wire fraud requires an allegation of an underlying fraudulent scheme. Where the fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall." *M'Baye*, 2007 WL 431881, at *7 (quoting *Morin v. Trupin*, 711 F. Supp. 97, 105 (S.D.N.Y. 1989)).

With the arguable exception of acts taken in relation to the Purchase Agreement, the Complaint fails to "set forth the who, what, when, where, and how" regarding the other alleged frauds. *Id.* at *6. The Complaint alleges "financial institution fraud" in violation of 18 U.S.C. § 1344. Compl. ¶ 86. *Who* among "the financial institutions that lent money to Refco" were defrauded? *Id.* ¶ 87(f). *How*? *When* did it happen? *Where*? None of these questions are answered in the Complaint. Plaintiffs clearly intend to plead predicate acts stemming from the bond offering and IPO. *See id.* Yet the same questions can be asked about these predicate acts. If Refco transmitted false statements through wires or mail to its lenders, or in connection with the public bond and stock offerings, *what* were the contents of those statements?

Apart from the allegations leading up to the Purchase Agreement, Plaintiffs' allegations go half-way: they offer tools that Bennett and others used to manipulate Refco's financial statements.[29]  But Plaintiffs make no attempt to explain how and when someone was defrauded – except for them.  *See* Compl. ¶¶ 33-64.

Even assuming that Plaintiffs allege a fraud relating to the Purchase Agreement, the predicate acts span less than a year, which is insufficient for pleading a pattern of "closed-ended continuity."  The Second Circuit has held that one year is an "insufficient length" for a pattern of racketeering activity.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999).  In any event, Plaintiffs do not contest that *First Capital Asset Management* prevents consideration of insufficiently pleaded predicate acts when determining continuity.  385 F.3d at 178-79.  Thus Plaintiffs do not adequately describe a variety of victims or participants, a variety of predicate acts, or the existence of other schemes.  *See id.* at 181.

Lastly, Plaintiffs have not pleaded a pattern of "open-ended continuity."  Plaintiffs did not invest a nine-figure sum in a company whose "regular way of operating" was racketeering.  *Cofacredit*, 187 F.3d at 243.  The fraudulent scheme occurred for short, if regular, durations.  Otherwise, Refco was "a leading provider of execution and clearing services . . . and a major provider of prime brokerage services."  Compl. ¶ 18.  Bennett, Trosten, and Maggio undertook the alleged predicate acts for the purpose of convincing others to invest in Refco.  Such a scheme contemplates its own end point, and thus is necessarily "inherently terminable."  *E.g.*,

---

[29] Plaintiffs seek to excuse their pleading deficiencies by claiming that information necessary for their claims is "peculiarly within" the knowledge of the Refco executives and Mayer Brown. Opposition at 52 n.38.  This claim is untenable given that following the 2004 Purchase, individuals associated with Plaintiffs were senior executives at Refco and sat on the company's Board of Directors.  Also, from 2004 to 2005, Refco was frequently represented by Weil Gotshal.  Plaintiffs have more than enough information upon which to base claims.

*Cofacredit*, 187 F.3d at 244. Plaintiffs thus cannot plead "open-ended continuity." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).

## VI.    THE MARTIN ACT BARS PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM.

Plaintiffs all but concede that New York's Martin Act precludes their common-law negligent misrepresentation claim under New York law. Their attempt to delay this inevitable result by suggesting that Massachusetts law *might* apply to the claims at issue is a red-herring. There are ample facts in Plaintiffs' Complaint to enable the Court to determine that New York law applies under New York's interests-analysis approach to choice of law.

In applying the interests analysis, New York courts have held that where conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.[30] New York courts have held that "the locus of the tort is where the last event necessary to make the actor liable occurred." *La Sala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246, 264 (S.D.N.Y. 2007) (quotation omitted). In misrepresentation cases, some courts have held that the place of the "last event" necessary for liability is the place the loss is suffered. *See, e.g.*, *Sound Video Unlimited v. Video Shack Inc.*, 700 F. Supp. 127, 134 (S.D.N.Y. 1988).

Nonetheless, as Plaintiffs recognize (Opp. at 54), courts have counseled against "blind adherence" to the last-event principle and have refused to apply it where the majority of actionable conduct occurred in one jurisdiction but the injury was felt in another. *La Sala*, 510 F. Supp. 2d at 265 (refusing to apply the last event test where the alleged misconduct occurred in

---

[30] *See Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 198 (1985) ("when the conflicting rules involve the appropriate standards of conduct . . . the law of the place of the tort 'will usually have a predominant, if not exclusive, concern'") (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 483 (1963)).

Cyprus but that misconduct was felt in the United States).  In particular, where, as here, a single

state is the overwhelming center of gravity of the events at issue and that state's interest in

regulating the conduct of work performed there is strong, the laws of that jurisdiction take

precedence.  *See id.*[31]

Massachusetts's lone contact to the underlying events is that Plaintiffs maintain their

principal place of business within that state.  By contrast, New York was the clear center of

gravity of the events at issue, as the following facts demonstrate:

- Refco, the center of the alleged fraud, had its headquarters and principal place of business in New York.  Compl. ¶ 84.

- Collins's key face-to-face meetings with Plaintiffs' representatives occurred in New York, as did the parties' negotiating sessions.  *See id.* ¶¶ 37, 39.

- Paul Koury, the author of many of the emails alleged to have conveyed misrepresentations, was based in New York and sent the referenced emails from Mayer Brown's New York offices.  *See id.*  ¶¶ 31, 55.

- Plaintiffs' counsel Weil Gotshal – the direct recipient of most of the alleged misrepresentations – was based in New York.  *See id.* ¶¶ 46, 47.

- Given Refco's location and the above facts, the bulk of due diligence presumably took place in New York.

- Plaintiffs' leveraged buyout of RGHI (as well as Refco Inc.'s IPO) closed in New York.  *See* Purchase Agreement §1.6(a).  The Purchase Agreement also contains a New York choice of law provision.  *Id.* at § 9.3.

---

[31] *See also Pension Comm'n of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 193-95 (S.D.N.Y. 2006) (applying New York law to claims against third-party participants in a fraudulent scheme where underlying fraud was committed by primary tortfeasors in New York); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492-93 (S.D.N.Y. 2001) (applying New York law where majority of fraudulent conduct occurred there even where injury was felt in Bermuda); *HSA Residential Mortgage Servs. of Tex. v. Casuccio*, 350 F. Supp. 2d 352, 365 (E.D.N.Y. 2003) (applying New York law where all parties other than plaintiff resided in New York and the audit work at issue was conducted there because New York has a strong interest in defining the scope of liability for accountants who work in its state).

On these facts (drawn from Plaintiffs' complaint and the incorporated documents), New York has greater contacts to the relevant events. New York's interest in regulating conduct taking place almost exclusively within its borders outweighs any tangential interests that Massachusetts may have. The fact that New York law applies should come as no surprise to Plaintiffs, who chose to avail themselves of its courts. Accordingly, Plaintiffs' negligent misrepresentation claim should be dismissed because it is preempted by the Martin Act.

## VII.   PLAINTIFFS HAVE NOT PLEADED NEAR-PRIVITY.

Plaintiffs concede that they cannot succeed on their negligent misrepresentation claim without satisfying the near-privity requirement. *See* Opp. at 55-56. They acknowledge that near-privity between an attorney and a non-client has been found only in cases where the attorney gave an opinion letter. Plaintiffs also concede that Mayer Brown did not deliver an opinion letter to Plaintiffs. *See id.* at 56 n.43. These concessions are dispositive.

In the absence of an opinion letter, "[u]nder New York law, attorneys are not liable to the third party for negligent representations, even where they prepare documents knowing that third parties will rely upon them" or where they "engage in face to face negotiations with an adversarial party . . . even if that party with the attorney's knowledge relies on the attorney's representation." *Crossland Sav. FSB v. Rockwood Ins. Co.*, 700 F. Supp. 1274, 1281 (S.D.N.Y. 1988) (collecting additional cases); *Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104, at *7 (S.D.N.Y. Mar. 23, 1994) (no privity where alleged misrepresentations were made in contract drafted by attorneys rather than opinion letter). Liability to a third party in these circumstances would be inconsistent with the attorney's duties to its own client. *Friedman*, 1994 WL 97104, at *6-*7 ("Imposing such liability would 'detract from the attorney's incentive to represent clients zealously'") (citations omitted); *Crossland*, 700 F. Supp. at 1282; *Aglira v.*

*Julien & Schlesinger, P.C.*, 631 N.Y.S.2d 816, 819 (App. Div. 1995) (attorney does not owe a duty of care to his adversary).

Courts have carved out a narrow exception for opinion letters because in preparing an opinion letter, an attorney "expressly states (with her client's consent) that she is rendering a legal service to the third party." *Crossland*, 700 F. Supp. at 1282 (citing 1 Geoffrey C. Hazard & William Hodes, *The Law of Lawyering* 320 (1987)); *see also Doehla v. Wathne, Ltd. Inc.*, No. 98 Civ. 6087 CSH, 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999) (in opinion letter cases, "reliance on the opinion by the third-party is the end and aim of the engagement of the lawyer") (internal quotations omitted). Plaintiffs have not alleged that Refco authorized Mayer Brown to render legal services to Plaintiffs or that Mayer Brown understood itself to be rendering any legal services to the Plaintiffs. Such an allegation would be implausible where Plaintiffs had their own army of due diligence professionals. *See* Compl. ¶¶ 8, 34. For these reasons, Plaintiffs' negligent misrepresentation claim should be dismissed.

## CONCLUSION

For the reasons stated above and in Mayer Brown's opening memorandum, the Complaint should be dismissed in its entirety.

Dated: Washington, D.C.
      December 17, 2007

Respectfully submitted,

John K. Villa (admitted *pro hac vice*)
George A. Borden (GB-7019)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., NW
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (fax)
*Attorneys for Defendant Mayer Brown LLP*

## CERTIFICATE OF SERVICE

I, Thomas G. Ward, hereby certify that on this 17th day of December, 2007, I

caused true and correct copies of the Reply Memorandum in Support of Motion to Dismiss of

Mayer Brown LLP, an Illinois Limited Liability Partnership, to be served via email and

overnight delivery upon:


Greg A. Danilow, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Mark C. Hansen
Kellogg, Huber, Hansen, Todd, Evans & Figel P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Plaintiffs*

Joel M. Cohen
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Attorneys for the*
*UK Limited Liability Partnership*
*Mayer Brown International LLP*


Thomas G. Ward (TW-6255)