Material Lease. The Leased Real Property complies with all applicable Laws and is benefited by those Permits required to be maintained for the development, or use or occupancy of any portion of the Leased Real Property, except to the extent such failure to comply has not had and would not reasonably be expected to have a Material Adverse Effect. The Company has delivered or made available to Buyer complete and accurate copies of each of the Material Leases as currently in effect.

(c)    Personal Property.  Except as set forth on Schedule 3.20(c), as of the date hereof, the Company and the Subsidiaries have good and marketable title to or hold under valid leases all material tangible personal property necessary for the conduct of its business as currently conducted, and such items of property are not subject to any Lien except for Permitted Exceptions.

Section 3.21   **Insurance**.  The Company and the Subsidiaries have insurance policies in full force and effect for such amounts as are sufficient for all requirements of Law and all agreements to which the Company or any of the Subsidiaries is a party or by which it is bound. Neither the Company nor any of the Subsidiaries is in default with respect to its obligations under any material insurance policy maintained by them. Neither the Company nor any of the Subsidiaries has received written notice of termination, cancellation or non-renewal of any such insurance policies from any of its insurance brokers or carriers. All appropriate insurers under such insurance policies have been notified of all potentially insurable losses and pending litigation and legal matters, to the extent known by the Company, and no such insurer has informed the Company or any of its Subsidiaries in writing of any denial of coverage or reservation of rights thereto.

Section 3.22   **Working Capital**.  After giving effect to the $500,000,000 cash distribution by the Company to RGHI as provided in Section 5.1(c)(i), the Company and the Subsidiaries will have sufficient working capital for the normal operation of the Company's or any Subsidiary's business as currently conducted.

Section 3.23   **Assets of Asset Manager Entities**.  The Asset Manager Entities do not own any assets or otherwise possess any rights that are necessary for the continuation and normal operation of the Company's or any Subsidiary's business (other than the business conducted by the Asset Manager Entities) as currently conducted.

Section 3.24   **Liabilities Relating to Asset Manager Entities**.   To the Company's knowledge, from and following the Closing, the Company and the Subsidiaries will not have any liabilities, nor will they suffer any other Losses following the Closing, relating to any of the Asset Manager Entities or arising from or in connection with the sale or other disposition of the Asset Manager Entities.

Section 3.25   **Brokers**.  Except as set forth on Schedule 3.25, no broker, finder or investment banker is entitled to any brokerage, finder's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

upon arrangements made by and on behalf of the Company, any member of the Company or any of their respective Affiliates.

Section 3.26  **Brokerage Accounts.** Since January 1, 2000, none of RGHI or any of its Affiliates has or has had a brokerage or similar account with the Company or any of its Subsidiaries.

Section 3.27  **Exclusivity of Representations and Warranties**. THE REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES. RGHI HEREBY DISCLAIMS ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIONS OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA). EXCEPT AS SET FORTH IN SECTION 3.23 AND SECTION 3.24, NEITHER THE COMPANY NOR RGHI IS MAKING ANY REPRESENTATIONS AND WARRANTIES WHATSOEVER WITH RESPECT TO THE ASSET MANAGER ENTITIES AND ALL OF THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND RGHI SET FORTH IN THIS AGREEMENT RELATING TO RGHI, THE COMPANY AND/OR THE SUBSIDIARIES SHALL BE DEEMED TO EXCLUDE THE ASSET MANAGER ENTITIES.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES
## OF THE BUYER AND MERGER COMPANY

Buyer and Merger Company represent and warrant to the Company and RGHI as follows:

Section 4.1  **Organization**.

(a)  Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.

(b)  Merger Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder. Merger Company has no substantial assets or operations other than its ownership of 100% of the equity interest in Finance Company. Finance Company has no

MB02055034

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

substantial assets or operations other than with respect to the financing transactions contemplated by Section 6.2(f).

**Section 4.2    Authority.**

(a)    Buyer has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Buyer and no other proceeding on the part of Buyer is necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Buyer and constitutes a valid, legal and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by the Enforceability Limitations.

(b)    Merger Company has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated h ereby h ave b een d uly a uthorized b y a ll n ecessary a ction o n t he p art o f Merger Company and no other proceeding on the part of Merger Company is necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Merger Company and c onstitutes a v alid, legal a nd b inding agreement o f M erger C ompany, e nforceable against it in accordance with its terms, except as such enforceability may be limited by the Enforceability Limitations.

**Section 4.3    No Conflict or Violation.**

(a)    Neither the execution, delivery and performance of this Agreement by the Buyer nor the consummation by Buyer of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of the Organizational Documents of the Buyer or (b) violate any Law applicable to the Buyer or any of its properties or assets, or any Governmental Order to which the Buyer or any of its assets or properties is bound, except, in the case of clause (b) above, for violations which would not, individually or in the aggregate, be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.

(b)    Neither the execution, delivery and performance of this Agreement by Merger Company nor the consummation by Merger Company of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of the Organizational Documents of Merger Company or (b) violate any Law applicable to Merger Company or any of its properties or assets, or any Governmental Order to which Merger Company or any of its assets or properties is bound, except, in the case of clause (b) above, for violations which would not, individually or in the aggregate, be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 4.4     Governmental and Third Party Consents.**

(a)     Except for (1) compliance with Antitrust Laws, (2) the filing of amended registration forms with the applicable futures and securities authorities, (3) approval by each Self-Regulatory Organization of which a Subsidiary is a member, and (4) the other actions set forth on Schedule 4.4(a), the execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the transactions contemplated hereby do not and will not require, to the knowledge of the Buyer, the Buyer to obtain the approval, consent or authorization of, to make any declaration, filing or registration with, or to give notice to, any Governmental Authority, any Self-Regulatory Organization or any other Person, except to the extent the failure to obtain, make or give any of the foregoing would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereunder. Schedule 4.4(a) sets forth each of the approvals or consents of any Self-Regulatory Organization of which a Subsidiary is a member that, to the knowledge of the Buyer, is required to be obtained by the Buyer as a result of the execution and delivery of this Agreement by the Buyer and the consummation by the Buyer of the transactions contemplated hereby,

(b)     Except for (1) compliance with Antitrust Laws, (2) the filing of amended registration forms with the applicable futures and securities authorities, (3) approval by each Self-Regulatory Organization of which a Subsidiary is a member, and (4) the other actions set forth on Schedule 4.4(b), the execution, delivery and performance by Merger Company of this Agreement and the consummation by Merger Company of the transactions contemplated hereby do not and will not require, to the knowledge of Merger Company, Merger Company to obtain the approval, consent or authorization of, to make any declaration, filing or registration with, or to give notice to, any Governmental Authority, any Self-Regulatory Organization or any other Person, except to the extent the failure to obtain, make or give any of the foregoing would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereunder. Schedule 4.4(b) sets forth each of the approvals or consents of any Self-Regulatory Organization of which a Subsidiary is a member that, to the knowledge of the Buyer, is required to be obtained by Merger Company as a result of the execution and delivery of this Agreement by Merger Company and the consummation by the Merger Company of the transactions contemplated hereby.

**Section 4.5     Brokers**. Except as set forth on Schedule 4.5, no broker, finder or investment banker is entitled to any brokerage, finder's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by and on behalf of the Buyer.

**Section 4.6     Financing**. Finance Company has executed with lenders the commitment letters and/or "highly-confident" letters listed on Schedule 4.6 in connection with the financing arrangements for the senior indebtedness and subordinated indebtedness that is contemplated in connection with the Closing.

MB02055036

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# ARTICLE 5
## COVENANTS

**Section 5.1    Conduct of Business of the Company**. Except as contemplated by this Agreement, during the period from the date hereof to the Closing Date, the Company will conduct, and will cause each of the Subsidiaries to conduct, its operations in the ordinary course of business consistent with past practice, and the Company shall use, and shall cause each of the Subsidiaries to use, reasonable efforts to preserve substantially intact its business organization, to keep available the services of its present officers and key employees and to preserve the present commercial relationships with key persons with whom it does business. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, during the period from the date hereof to the Closing Date, the Company will not (and will not, to the extent applicable, permit any o f the Subsidiaries to), without the prior written c onsent of the Buyer:

(a)    amend its Organizational Documents;

(b)    issue, sell or agree or commit to issue (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) any membership interests of any class or any other equity securities or equity equivalents;

(c)    split, combine or reclassify any of its membership interests or declare, set aside or pay any dividends or other distributions (whether in cash or otherwise) in respect of its membership interests or other equity interests or repurchase or commit to repurchase any membership interests or other equity interests; provided, however, that, (i) subject to the provisions of Section 5.9, the Company shall distribute at the Closing (at the time described in Section 1.6(b)) to RGHI the $500,000,000 cash amount contemplated by Section 5.9, (ii) the Company shall distribute to RGHI at the Closing (at the time described in Section 1.6(b)) the equity interests of Forstmann-Leff International A ssociates LLC, w hich d irectly o r indirectly h olds all o f t he o utstanding equity interests of the entities listed on Schedule 5.1(c) (collectively, Forstmann-Leff International Associates LLC and the entities listed on Schedule 5.1(c) are referred to as the "Asset Manager Entities"), and (iii) the Company may make distributions to RGHI of up to $120,000,000 that was accrued a s of February 29, 2004 (provided that not more than $12,000,000 of such $120,000,000 amount is distributed in cash and the remaining distribution does not result in any net distribution of cash but, instead, merely results in a reduction in amounts owed to the Company from one or more members of the Company);

(d)    except as contemplated by this Agreement and other than Customer Financing Indebtedness, (i) incur or assume any indebtedness for borrowed money exceeding $5,000,000 in the aggregate, or (ii) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other person, except for obligations not exceeding $5,000,000 in the aggregate;

**MB02055037**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(e)     except as may be required by law, (i) enter into, adopt or amend or terminate any material bonus, profit sharing, compensation, severance, termination, option, appreciation right, restricted unit, performance unit, pension, retirement, deferred compensation, employment, severance or other employee benefit agreement, trust, plan, fund or other arrangement for the benefit or welfare of any director, officer or employee of the Company in any material manner, (ii) except for normal salary increases and bonus payments in the ordinary course of business consistent with past practice, increase in any material manner the compensation of any director, officer or employee of the Company or (iii) pay any material benefit not required by any plan and arrangement as in effect as of the date hereof;

(f)     other than sales and acquisitions of securities made in the ordinary course of business by the Company (provided that the Company is not taking any proprietary risk with respect to such sale or acquisition) sell, lease or dispose of or acquire any assets which have a value in the aggregate in excess of $5,000,000 in the aggregate; provided, however, that the Company (i) may make the distributions expressly permitted by Section 5.1(c) and (ii) may effect the acquisition by the Asset Manager Entities referred to in Section 5.1(k);

(g)     except as expressly contemplated by this Agreement or as set forth in Schedule 5.1(g), alter through merger, liquidation, reorganization, restructuring or in any other fashion the capital structure of the Company or such Subsidiary;

(h)     cause or allow the net capital levels of the Company and the Subsidiaries that are subject to such minimum net capital requirements to fall below the minimum level(s) of capital required by the SEC, CFTC, CME or other applicable Governmental Authority or Self-Regulatory Organization.

(i)     effect any change in any of its methods of accounting, except as may be required by GAAP;

(j)     fail to maintain the status of the Company as a partnership for federal income tax purposes;

(k)     use any funds, other than funds generated by the Asset Manager Entities, to fund the Asset Manager Entities or their operations, except that the Company may contribute up to $5,100,000 to the Asset Manager Entities to permit the Asset Manager Entities to complete the transactions contemplated by the Asset Purchase Agreement, dated April 23, 2004, between Forstmann-Leff Associates, LLC and Schroder Investment Management North America Inc., as amended, as previously disclosed to the Buyer;

(l)     settle or compromise any Legal Proceeding or governmental investigation (i) for an amount payable by the Company or any of the Subsidiaries in excess of $1,000,000, (ii) in a manner that requires the Company or any Subsidiary to

MB02055038

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

change its method of operation or of conducting business or (iii) that otherwise is material in amount or nature;

(m)    effect any acquisition of another Person or business for an amount in excess of $5,000,000 (or for an aggregate amount for all such acquisitions in excess of $10,000,000), or, with the exception of the acquisition referred to in Section 5.1(k), permit any Asset Manager Entity to effect any acquisition of another Person or business;

(n)    make or revoke any election relating to Taxes (other than the making of a Section 754 election as contemplated in the last sentence of Section 5.2(a)), settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, except as required by applicable Law, or make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recently filed federal income Tax Return, or prepare or file any Tax Return (or any amendment thereof) without having provided the Buyer with a copy thereof (together with supporting work papers) at least ten days prior to the due date thereof for Buyer's review and approval; or

(o)    agree to do any of the foregoing.

**Section 5.2    Tax Matters.**

(a)    Any Tax Returns with respect to income or similar Taxes of the Company with respect to a period ending on or prior to the Closing Date not filed as of the Closing Date ("Pre-Closing Tax Returns") shall be timely filed by the Surviving Company in accordance with the prior practice of the Company with the appropriate taxing authorities; provided, however, that such Pre-Closing Tax Returns shall be prepared by treating items on the Pre-Closing Tax Returns in a manner consistent with the past practices of the Company with respect to such items. RGHI agrees that the Surviving Company will file a Section 754 election on its last Pre-Closing Tax Return.

(b)    All transfer, sales and use, value added, registration, documentary, stamp and similar Taxes imposed directly in connection with the sale of the Membership Interests or any other transaction that occurs pursuant to this Agreement shall be borne 50% by the Buyer and 50% by RGHI.

**Section 5.3    Access to Information.**

(a)    Between the date hereof and the Closing Date, upon reasonable notice, the Company will provide to the Buyer and its financing sources and their respective authorized representatives during normal business hours reasonable access to all officers and to all books and records of the Company, and will cause the officers of the Company to furnish the Buyer with such financial and operating data and other information with respect to the business and properties of the Company as the Buyer may from time to time reasonably request. All of such information shall be treated as

MB02055039

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Confidential Information, as defined in and pursuant to the terms of the Confidentiality Agreement, dated November 4, 2003, between the Company and Thomas H. Lee Partners, L.P., the provisions of which are by this reference incorporated herein and which shall survive until the Closing. The Company shall provide reasonable cooperation in connection with the contemplated debt financing in connection with the transactions contemplated by this Agreement, including making senior management reasonably available for road shows or similar matters.

(b)     In order to facilitate the resolution of any claims made by or against or incurred by RGHI or the Surviving Company or for any other reasonable purpose, for the seven year period commencing on the Closing Date, the Surviving Company (or its successor) will provide RGHI and their authorized representatives during normal business hours reasonable access at RGHI's expense (including the right to make photocopies) to all books and records of the Surviving Company (or such successor) and other written information with respect to the Surviving Company (or such successor) that relate to periods prior to the Closing as RGHI may from time to time reasonably request.

**Section 5.4    <u>Efforts to Consummate</u>.**

(a)     Subject to the terms and conditions herein provided, each of RGHI, the Buyer and the Company agrees to use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including (i) cooperation in the preparation and filing of any filings that may be required under the HSR Act and any amendments thereto; <u>provided, however</u>, that the Buyer will not be required to agree to the sale or other disposal or divestiture by the Buyer or any of its Affiliates of any particular or specified assets, category of assets or businesses, nor will the Buyer be required to agree not to compete in any geographic area or line of business, (ii) making all filings, applications, statements and reports to all Governmental Authorities, Self-Regulatory Organizations and other Persons which are required to be made prior to the Closing Date by or on behalf of RGHI, the Company, any of the Subsidiaries, the Buyer or Merger Company pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby, (iii) the compliance with all requirements under the HSR Act applicable to the transactions contemplated hereby, (iv) contesting any Legal Proceeding relating to the transactions contemplated hereunder, (v) consummating all of the financing transactions contemplated by the commitment letters, term sheets and/or "highly-confident" letters listed on <u>Schedule 4.6</u>, and (vi) the execution of any additional instruments necessary to consummate the transactions contemplated hereby. RGHI and the Buyer each agrees to use reasonable best efforts to make, or cause to be made, all filings applicable to them or their ultimate parent entities of notification and report forms pursuant to the HSR Act with respect to the transactions contemplated hereunder within fifteen Business Days after the date of this Agreement (or, if applicable as a result of any change in requirements under the HSR Act, as promptly as practicable after such requirement becomes applicable) and to supply

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

promptly any additional information and documentary material that may be requested pursuant to the HSR Act.

(b)    Subject to the provisions of Section 7.3, all fees, costs and expenses required in connection with the application for or prosecution of any consent, approval, authorization, registration, filing or submission or in respect of any action relating to any Permits issued by any Governmental Authorities shall be borne by the party making such application.

Section 5.5    **Public Announcements**.  Prior to the Closing, without the prior written consent of the other Parties (which will not be unreasonably withheld), or except as otherwise required by Law, no Party nor any Affiliate or representative of such Party may directly or indirectly issue any press release, or otherwise make any public statements or other public disclosure, regarding this Agreement or in any way relating to the transactions contemplated hereby.

Section 5.6    **Exclusive Dealing**.  During the period from the date of this Agreement through the Closing Date or the termination of this Agreement pursuant to Section 7.1, neither RGHI or the Company shall take, nor will RGHI or the Company permit any of their respective Affiliates, representatives, consultants, financial advisors, attorneys, accountants or other agents to take, any action to solicit, encourage, initiate or engage in discussions or negotiations with, or provide any information to or enter into any agreement with any Person (other than the Buyer or its Affiliates) concerning any purchase of any of the Company's equity securities or any merger, sale of substantial assets or similar transaction involving the Company (other than assets sold in the ordinary course of business).

Section 5.7    **Employee Benefits**.

(a)    After the Closing, employees of the Surviving Company ("Company Employees") shall receive credit for purposes of eligibility to participate and vesting (and, for vacation and severance plans only, determination of the levels of benefits), but not for purposes of any benefit accruals under any plan, under each employee benefit plan, program or arrangement established or maintained for Company Employees by the Surviving Company, the Buyer or any Affiliate of the Buyer for service accrued or deemed accrued with the Company and its Affiliates prior to and on the Closing Date, to the extent such service was recognized as of the Closing Date for such employees for similar purposes under comparable plans to which the Company was a party; provided, however, that such crediting of service shall not operate to duplicate any benefit or the funding of any such benefit.  Any employee welfare benefit plan (as defined in Section 3(1) of ERISA) maintained for Company Employees by the Surviving Company, the Buyer or any Affiliate of the Buyer shall recognize expenses and claims incurred by any Company Employee (and any eligible dependents or beneficiaries thereof) in the year in which the Closing Date occurs and on or prior to the Closing Date for the purposes of computing deductible amounts, co-payments or other limitations on coverage, and shall recognize service for any Company Employee (and any eligible

MB02055041

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

dependents thereof) for purposes of satisfying any pre-existing health condition of any Company Employee (and any eligible dependents or beneficiaries thereof) to the extent such service was taken into consideration for similar purposes as of the Closing Date under a comparable plan to which the Company was a party.

(b)    Prior to the Effective Time, in connection with the sale or distribution of the Asset Manager Entities, the Company shall cause all current and former employees of the Asset Manager Entities ("Excluded Employees") to be covered under benefit plans (including, but not limited to a "group health plan" within the meaning of Section 5000(b)(1) of the Code such that the Surviving Company will have no obligation to provide notice or continuation coverage under COBRA) to be established by a purchaser or the distributee of the Asset Manager Entities and the Surviving Company will have no further liability (contingent or otherwise) or obligations with respect to the Excluded Employees.

**Section 5.8    No Disposition or Encumbrance of Membership Interests**. Prior to the Closing, except as expressly provided in Section 5.13, the members of the Company will not sell or transfer, or permit the imposition or existence of any Lien with respect to, any Membership Interests.

**Section 5.9    Segregation of Funds**.    The Company shall establish promptly upon the signing of this Agreement a separate account in its name to be designated account number 00151-111-955 at BAWAG Bank in Vienna, Austria (the "Separate Account"). The Separate Account shall be maintained by the Company until the earlier of the Closing Date or the termination of this Agreement and shall have at all times during such time period a cash balance of not less than $500,000,000. None of the cash in the Separate Account shall (i) except in connection with the distribution described in the final sentence of this Section 5.9, be withdrawn from the Separate Account, (ii) be utilized or taken into account for purposes of any regulatory capital calculation or financial calculation or for any similar purpose, (iii) be referred to or included as capital or other resources of the Company or any of its Subsidiaries for purposes of representations to or dealings with any customer, lender, or other third party with whom the Company or any Subsidiary transacts business, or (iv) otherwise be utilized in any way for the conduct of business.    $500,000,000 of the amount on deposit in the Separate Account may be distributed to RGHI in accordance with Section 5.1(c)(i) only if the Company has fully complied with Section 5.9 and the segregation of funds in the Separate Account and the Company's compliance with Section 5.9 has not had an adverse impact on the business or operations of the Company and its Subsidiaries as currently conducted.

**Section 5.10    2002 Financials**.    The Company will use reasonable best efforts to attempt to obtain and deliver to the Buyer prior to the Closing (but in any event, no later than sixty (60) days following the Closing) audited financial statements meeting the requirements of Regulation S-X promulgated by the SEC for financial statements included in filings of registration statements under the Securities Act of 1933, as amended, with respect to the Company's fiscal year ended February 28, 2002, which audited financial statements will be consistent with the financial statements covering such

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

periods that previously have been delivered to the Buyer, except as such financial statements may be restated to reflect depreciation of intangible assets as required pursuant to Financial Accounting Standard 141.

Section 5.11  **Financial Information**.  Within thirty (30) days after the end of each month between the date of this Agreement and the Closing, the Company shall deliver to Buyer the Company's monthly reporting package, including the unaudited balance sheet of the Company as of the end of such month and unaudited statements of income for such month and for the current fiscal year to date.  Within forty-five (45) days after the end of each of the fiscal quarters ended May 31, 2004 and August 31, 2004, the Company shall deliver to Buyer unaudited balance sheets of the Company as of the end of such fiscal quarter, unaudited statements of income, and unaudited statements of cash flows for such fiscal quarter and for the current fiscal year to date.  All of the foregoing financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied (other than omission of accompanying notes) and, with respect to quarterly statements, compared with both the actual results from the corresponding quarter of the previous fiscal year and the budget for the current fiscal year, all in reasonable detail, which detail shall be generally consistent with the Company's past practices.

Section 5.12  **Management Bonus Pool Plan**.  As promptly as practicable following the Closing, RGHI and the Buyer will cause the Company to adopt a Management Bonus Pool Plan in substantially the form attached hereto as Exhibit E.

Section 5.13  **BAWAG Interest Transfer Transactions**.  Each of RGHI and BAWAG jointly and severally covenants to the Buyer that, (i) at the Closing (and immediately following the purchase of the Purchased Interests in accordance with Section 1.1), RGHI and BAWAG will fully complete the merger of BOI with and into a newly formed wholly owned Subsidiary of RGHI in accordance with the terms of the Plan and Agreement of Merger, dated as of the date hereof, among RGHI, RGHI Merger Corp., a Delaware corporation, BOI and BAWAG as such agreement is in effect as of the execution and delivery of this Agreement (the "BAWAG Merger"), and (ii) the BAWAG Merger will result in such wholly owned Subsidiary of RGHI owning, of record and beneficially, all of the Membership Interests that are owned by BOI as of the date hereof. BAWAG hereby represents and warrants that neither the execution, delivery and performance by BAWAG of this Agreement nor any agreement relating to the BAWAG Merger does or shall (1) conflict with or violate any Organizational Document of BAWAG, any Law or any agreement to which BAWAG is a party or (2) require any consent or approval of any Governmental Authority.  RGHI covenants to the Buyer that at the Closing, immediately following the completion of the BAWAG Merger and immediately prior to the completion of the distributions described in Section 5.14, RGHI will cause all of the Membership Interests that, as a result of the BAWAG Merger, are held by such wholly owned Subsidiary of RGHI to be distributed as a dividend (or otherwise distributed in a manner reasonably satisfactory to the Buyer) to RGHI.  The transactions described in this Section 5.13 are collectively referred to herein as the "BAWAG Interest Transfer Transactions."

MB02055043

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Section 5.14  **Certain Distributions.**  At the Closing, immediately following the completion of the BAWAG Interest Transfer Transactions and immediately prior to the Merger, (i) the Limited Liability Company Agreement shall be amended in a manner reasonably satisfactory to RGHI and the Buyer to provide that the Buyer waives any right that it would otherwise have to receive any portion of the distributions referred to in this Section 5.14, (ii) subject to the provisions of Section 5.9, the Company will effect the $500,000,000 distribution described in the final sentence of Section 5.9, (iii) the Company will effect the distribution of the Asset Manager Entities as described in Section 5.1(c)(ii) and (iv) the Company will effect the distribution to RGHI of up to $120,000,000 as described in Section 5.1(c)(iii).

**ARTICLE 6**
**CONDITIONS TO CLOSING**

Section 6.1  **Conditions to the Obligations of the Parties**.  The obligations of the Parties to consummate the transactions contemplated hereunder are subject to the satisfaction ( or, i f p ermitted b y applicable l aw, waiver b y t he P arty for whose b enefit such condition exists) of the following conditions:

(a)    Any applicable waiting period under the HSR Act relating to the transactions contemplated hereunder shall have expired or been terminated; and

(b)    No statute, rule, regulation, executive order, decree, temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereunder shall be in effect and there shall be no proceeding that is pending that seeks to impose any of the foregoing or to impose any modification to any of the transactions contemplated hereby that would be materially adverse to the Company or any of the Subsidiaries.

Section 6.2  **Other Conditions to the Obligations of the Buyer**.  The obligations of the Buyer to consummate the transactions contemplated hereunder are subject to the satisfaction or, if permitted by applicable law, waiver by the Buyer of the following further conditions:

(a)    The representations and warranties of RGHI set forth in Article 3 hereof that are not qualified by materiality or "Material Adverse Effect" shall be true and correct in all material respects, and the representations and warranties of RGHI set forth in Article 3 hereof that are qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, in each case as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except to the extent such representations and warranties are made on and as of a specified date, in which case the same shall continue on the Closing Date to be true and correct (in all material respects or in all respects, as applicable) as of the specified date, and the Buyer shall have received a certificate of RGHI to such effect;

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(b)    The Company and RGHI shall have performed and complied in all material respects with all covenants required to be performed or complied with by the Company and RGHI under this Agreement on or prior to the Closing Date, and Phillip R. Bennett and Tone Grant shall have complied in all respects with their covenant set forth in Section 9.12 and the Buyer shall have received a certificate signed by Phillip R. Bennett and Tone Grant to such effect;

(c)    No Material Adverse Effect shall have occurred since the date of this Agreement and no event or change shall have occurred since the date of this Agreement that has had or would reasonably be expected to have a Material Adverse Effect;

(d)    The Company shall have delivered to the Buyer audited financial statements meeting the requirements of Regulation S-X promulgated by the SEC for financial statements included in filings of registration statements under the Securities Act of 1933, as amended, with respect to the Company's fiscal years ended February 28, 2003 and February 28, 2004, which audited financial statements will be consistent with the financial statements covering such periods that previously have been delivered to the Buyer except as such financial statements may be restated to reflect depreciation of intangible assets as required pursuant to Financial Accounting Standard 141;

(e)    Buyer shall have received all consents and approvals set forth on Schedule 4.4(a) or Schedule 4.4(b) and marked with an asterisk (and any other such consents and approvals that in the reasonable good faith judgment of the Buyer are required in order to avoid a material adverse impact on the Company or the operation of its business) and shall have received written evidence reasonably satisfactory to Buyer that all consents and approvals set forth on Schedule 3.4 or Schedule 3.5 and marked with an asterisk (and any other such consents and approvals that in the reasonable good faith judgment of the Buyer are required in order to avoid a material adverse impact on the Company or the operation of its business) have been obtained;

(f)    Finance Company shall have received proceeds from funded debt in the aggregate of at least $1,250,000,000 from (i) the senior indebtedness contemplated by the commitment letters described on Schedule 4.6, on the terms and conditions set forth therein, and (ii) the subordinated indebtedness, on terms and conditions not substantially less favorable than those set forth in the term sheets attached as Schedule 6.2(f);

(g)    The Employment Agreement entered into as of the execution of this Agreement (but to be effective as of the Closing) with Phillip Bennett shall be effective as of the Closing;

(h)    The Amended and Restated Limited Liability Company Agreement shall have been duly executed and delivered by RGHI;

MB02055045

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(i)     The Securityholders Agreement in the form attached hereto as Exhibit F (the "Securityholders Agreement") shall have been duly executed and delivered by RGHI and Phillip Bennett; and

(j)     The Escrow Agreement shall have been duly executed and delivered by the Escrow Agent, the Company and RGHI.

(k)     Any approval, authorization or registration referred to in Section 6.2(e) that has been obtained shall have been obtained without any term, limitation, restriction or condition that would negatively impact the ability of the Company or any Subsidiary to conduct its business as previously conducted or require the Buyer to undertake any commitments to or on behalf of the Company or any Subsidiary;

(l)     All Company Indebtedness shall have been repaid prior to the Closing and the Buyer shall have received evidence, reasonably satisfactory to it, (i) of the repayment or satisfaction of such Company Indebtedness and (ii) that all obligations to the lenders with respect thereto have been extinguished;

(m)     The Management Agreement (the "Management Agreement") between the Company and Thomas H. Lee Equity Fund V, L.P. and/or its Affiliates ("THL") in substantially the form attached hereto as Exhibit G shall have been duly executed and delivered by the Company; and

(n)     The tax reimbursement letter agreement (the "Letter Agreement") between RGHI and Buyer in substantially the form attached hereto as Exhibit H shall have been duly executed and delivered by RGHI.

**Section 6.3     Other Conditions to the Obligations of RGHI**.  The obligations of RGHI to consummate the transactions contemplated hereunder are subject to the satisfaction or, if permitted by applicable law, waiver by RGHI of the following further conditions:

(a)     The representations and warranties of the Buyer set forth in Article 4 hereof that are not qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, and the representations and warranties of the Buyer set forth in Article 4 hereof that are qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, in each case as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except to the extent such representations and warranties are made on and as of a specified date, in which case the same shall continue on the Closing Date to be true and correct (in all material respects or in all respects, as applicable) as of the specified date, and RGHI shall have received a certificate of an officer of the Buyer to such effect;

(b)     The Buyer shall have performed and complied in all material respects with all covenants required to be performed or complied with by the Buyer under

MB02055046

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

this Agreement on or prior to the Closing Date, and RGHI shall have received a certificate of an officer of the Buyer signed on behalf of the Buyer to such effect;

       (c)     The Company and RGHI shall have received all consents and approvals set forth on Schedule 3.4 or Schedule 3.5 and marked with an asterisk (and any other such consents and approvals that are in the reasonable good faith judgment of RGHI required in order to avoid a material adverse impact on the Company or the operation of its business) and shall have received written evidence reasonably satisfactory to RGHI that all consents and approvals set forth on Schedule 4.4(a) or Schedule 4.4(b) and marked with an asterisk (and any other such consents and approvals that in the reasonable good faith judgment of RGHI are required in order to avoid a material adverse impact on the Company or the operation of its business) have been obtained;

       (d)     Finance Company shall have received the proceeds from funded debt in the aggregate of at least $1,250,000,000 from (i) the senior indebtedness contemplated by the commitment letters described on Schedule 4.6, on the terms and conditions set forth therein, and (ii) the subordinated indebtedness, on terms not substantially less favorable than those set forth in the term sheets or "highly-confident" letters described on Schedule 4.6;

       (e)     The Company shall not have been prohibited from paying to RGHI the distributions accrued as of February 29, 2004 as provided in Section 5.1(c)(iii) and the $500,000,000 distribution by the Company to RGHI at the Closing as provided in Section 5.14;

       (f)     The Management Agreement shall have been duly executed and delivered by THL;

       (g)     The Amended and Restated Limited Liability Company Agreement shall have been duly executed and delivered by the Buyer;

       (h)     The Securityholders Agreement shall have been duly executed and delivered by the Buyer;

       (i)     The Escrow Agreement shall have been duly executed and delivered by the Escrow Agent and the Buyer; and

       (j)     The Letter Agreement shall have been duly executed and delivered by the Buyer.

## ARTICLE 7
## TERMINATION; AMENDMENT; WAIVER

       Section 7.1   **Termination**.   This Agreement may be terminated and the transactions contemplated hereunder may be abandoned at any time prior to the Closing:

       (a)     by mutual written consent of the Buyer and RGHI;

MB02055047

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(b)     by the Buyer or RGHI if the transactions contemplated hereunder shall not have been consummated on or before October 5, 2004 (the "Termination Date"); provided, however, that the Termination Date shall be automatically extended as necessary in the event that any filing under the HSR Act becomes necessary as a result of any change in requirements under the HSR Act.

(c)     by either the Buyer or by RGHI if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated hereunder and such order, decree or ruling or other action shall have become final and nonappealable; provided, that the Party seeking to terminate this Agreement pursuant to this paragraph (c) shall have used commercially reasonable efforts to remove such order, decree, ruling, judgment or injunction;

(d)     by the Buyer in the event of a breach by the Company or RGHI of any representation, warranty, covenant or other agreement contained in this Agreement which (i) would give rise to the failure of a condition set forth in Sections 6.2(a) or 6.2(b) hereof and (ii) cannot be or has not been cured within 20 Business Days after the giving of written notice thereof to RGHI by the Buyer; or

(e)     by RGHI in the event of a breach by the Buyer of any representation, warranty, covenant or other agreement contained in this Agreement which (i) would give rise to the failure of a condition set forth in Sections 6.3(a) or 6.3(b) hereof and (ii) cannot be or has not been cured within 20 Business Days after the giving of written notice thereof to the Buyer by RGHI.

**Section 7.2     Effect of Termination.**  In the event of the termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become void, and there shall be no liability or obligation on the part of the Buyer, RGHI, Merger Company or the Company or, to the extent applicable, their respective officers, directors or equityholders, other than (a) the provisions of this Section 7.2, the second to last sentence of Section 5.3(a), Section 5.5, Section 7.3 and Article 9 (except Section 9.12), and (b) any liability of any Party or other signatory for any breach of this Agreement prior to such termination. Notwithstanding anything to the contrary set forth in this Agreement, in the event of a termination of this Agreement by the Buyer as a result of a breach of a representation or warranty of the Company or RGHI in accordance with Section 7.1(d), or by RGHI as a result of a breach of a representation or warranty of the Buyer in accordance with Section 7.1(e), the liabilities and obligations of the breaching Party (and their respective officers, directors or equityholders) shall in no event be greater than the actual, out-of-pocket expenses incurred by the non-breaching Party in connection with the transactions contemplated hereby, which expenses shall be reasonably substantiated in writing by the non-breaching Party (and which, with respect to a breach by RGHI, shall in no event include any fees or expenses payable to THL in connection with the transactions contemplated by this Agreement).

MB02055048

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 7.3** <u>Fees and Expenses</u>.  All fees and expenses incurred in connection with the transactions contemplated hereunder, this Agreement and the transactions contemplated by this Agreement, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses.  Notwithstanding the foregoing, at the Closing, the Surviving Company shall pay (i) the Company Transaction Expenses (to the extent not in excess of $20,000,000 in the aggregate), (ii) any fees or expenses payable to THL in connection with the transactions contemplated by this Agreement and (iii) the expenses of the Buyer in connection with the transactions contemplated hereby, which expenses shall be reasonably substantiated in writing by Buyer.

**Section 7.4** <u>Amendment</u>.  This Agreement may be amended or modified only by a written agreement executed and delivered by all of the Parties and, solely with respect to an amendment to <u>Section 9.12</u> (or to the other sections of this Agreement referred to in <u>Section 9.12</u>), by Phillip R. Bennett and Tone Grant.

**Section 7.5** <u>Extension; Waiver</u>.  At any time prior to the Closing, RGHI may (a) extend the time for the performance of any of the obligations or other acts of the Buyer contained herein, (b) waive any inaccuracies in the representations and warranties of the Buyer contained herein or in any document, certificate or writing delivered by the Buyer pursuant hereto or (c) waive compliance by the Buyer or Merger Company with any of the covenants, agreements or conditions contained herein.  At any time prior to the Closing, the Buyer may (i) extend the time for the performance of any of the obligations or other acts of RGHI or the Company contained herein, (ii) waive any inaccuracies in the representations and warranties of RGHI contained herein or in any document, certificate or writing delivered by RGHI pursuant hereto, or (iii) waive compliance by the Company or RGHI with any of the covenants, agreements or conditions contained herein.  Any agreement on the part of any Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of such rights.

## ARTICLE 8
## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

**Section 8.1** <u>Survival of Representations</u>.  The representations and warranties of RGHI and of the Buyer contained in this Agreement (whether or not contained in <u>Articles 3</u> and <u>4</u>) or in any certificate delivered pursuant to <u>Sections 6.2</u> or <u>6.3</u> shall survive the Closing and remain in effect until the later to occur of (x) 30 days after receipt by the Surviving Company of the completed audit of its financial statements for its fiscal year ending February 28, 2005 and (y) June 30, 2005; provided, that (i) the representations and warranties in <u>Section 3.14</u> (Taxes) and <u>Section 3.25</u> (Brokers) shall survive until thirty (30) days after the termination of the applicable statute of limitations (including any extensions thereof) and (ii) the representations and warranties in <u>Section 3.1</u> (Organization of the Company), <u>Section 3.2</u> (Authorization) and <u>Section 3.3</u> (Capitalization of the Company) (other than the last sentence of <u>Section 3.3</u>) shall survive indefinitely.

MB02055049

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 8.2**    **General Indemnification.**

(a)    If, after the Closing Date, the Buyer (and following the Closing the Surviving Company and any of the Subsidiaries) and/or their officers, directors, employees, affiliates and/or agents (each a "Buyer Indemnitee" and together the "Buyer Indemnitees") suffer any damages, losses, liabilities, obligations, claims of any kind, interest or expenses (including reasonable attorneys' fees and expenses) ("Loss") as a result of, in connection with, or arising out of (i) the failure of any representation or warranty made by RGHI in this Agreement (whether or not contained in Article 3) or in any certificate delivered to the Buyer pursuant to Sections 6.2(a) and/or 6.2(b) to be true and correct in all respects as of the date of this Agreement or as of the Closing Date, provided that, solely for the purposes of this Section 8.2(a)(i), the failure of such representations and warranties to be true and correct as of the date of this Agreement or as of the Closing Date shall be determined without regard to any materiality or Material Adverse Effect qualifiers contained therein, (ii) any breach by RGHI of any of its covenants or agreements contained herein which are to be performed by RGHI on or before the Closing Date, (iii) any breach by RGHI of any of its covenants or agreements contained herein which are to be performed by RGHI after the Closing Date, (iv) any breach by the Company of any of its covenants or agreements contained herein which are to be performed by the Company on or before the Closing Date, (v) any liabilities of or relating to any of the Asset Manager Entities or any Losses arising from or in connection with the sale or other disposition of the Asset Manager Entities or (vi) any Taxes owed by the Company or any Subsidiary with respect to any taxable periods ending on or prior to the Closing Date and the pre-Closing portion of all taxable periods beginning before and ending after the Closing Date, then, in any such case and subject to the other provisions of this Article 8, RGHI agrees to indemnify, defend and hold each Buyer Indemnitee harmless from any such Loss.

(b)    After the Closing, the Buyer agrees to, subject to the other provisions of this Article 8, indemnify, defend and hold RGHI and/or its respective agents (each a "Seller Indemnitee" and together the "Seller Indemnitees") harmless from any Loss suffered or paid, directly or indirectly, as a result of, in connection with, or arising out of (i) the failure of any representation or warranty made by the Buyer in this Agreement (whether or not contained in Article 4) or in any certificate delivered to RGHI pursuant to Sections 6.3(a) and/or 6.3(b) to be true and correct in all respects as of the date of this Agreement or as of the Closing Date, (ii) any breach by the Buyer or Merger Company of any of its covenants or agreements contained herein, and (iii) any breach by the Surviving Company of any of its covenants or agreements contained herein which are to be performed by the Surviving Company after the Closing Date.

(c)    The obligations to indemnify and hold harmless (x) pursuant to clause (i) of Section 8.2(a) and pursuant to clause (i) of Section 8.2(b) shall survive the consummation of the transactions contemplated hereby for the period set forth in Section 8.1, except for claims for indemnification pursuant to such clauses asserted prior to the end of such period, which claims shall survive until final resolution thereof and (y)

MB02055050

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

pursuant to any other clauses of Section 8.2(a) and Section 8.2(b) shall survive the consummation of the transactions contemplated hereby indefinitely.

**Section 8.3    Third Party Claims.**

(a)    If a claim, action, suit or proceeding by a third party (a "Third Party Claim") is made against any person or entity entitled to indemnification pursuant to Section 8.2 hereof (an "Indemnified Party"), and if such Indemnified Party intends to seek indemnity with respect thereto under this Article 8, such Indemnified Party shall promptly notify the Party obligated to indemnify such Indemnified Party (or, in the case of a Buyer Indemnitee seeking indemnification, such Buyer Indemnitee shall promptly notify R GHI) ( such n otified p arty, t he " Responsible P arty") o f s uch claims; p rovided, that the failure to so notify shall not relieve the Responsible Party of its obligations hereunder, except to the extent that the Responsible Party is actually and materially prejudiced thereby. Except as provided in the last sentence of this Section 8.3(a), the Responsible Party shall have 30 days after receipt of such notice to assume the conduct and control, through counsel reasonably acceptable to the Indemnified Party at the expense of the Responsible Party, of the settlement or defense thereof, and the Indemnified Party shall cooperate with it in connection therewith; provided that the Responsible Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by such Indemnified Party, provided that the fees and expenses of such counsel shall be borne by such Indemnified Party. So long as the Responsible Party is reasonably contesting any such claim in good faith, the Indemnified Party shall not pay or settle any such claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to pay or settle any such claim, provided that in such event it shall waive any right to indemnity therefor by the Responsible Party for such claim unless the Responsible Party shall have consented to such payment or settlement. If the Responsible Party does not notify the Indemnified Party within 30 days after the receipt of the Indemnified Party's notice of a claim of indemnity hereunder that it elects to undertake the defense thereof, the Indemnified Party shall have the right to contest, settle or compromise the claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement. The Responsible Party shall not, except with the consent of the Indemnified Party, enter into any settlement that does not include as an unconditional term thereof the giving by the person or persons asserting such claim to all Indemnified Parties of an unconditional release from all liability with respect to such claim or consent to entry of any judgment. Notwithstanding the foregoing, the Company shall have the right to control any Third Party C laim with respect to Taxes; provided, however, that the Company shall not settle or compromise any such claim without the consent of RGHI which consent shall not be unreasonably withheld or delayed.

(b)    All of the Parties shall cooperate in the defense or prosecution of any Third Party Claim in respect of which indemnity may be sought hereunder and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith.

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 8.4    Limitations on Indemnification Obligations**.

(a)    Subject to the provisions of Section 8.4(b) below, the rights of the Buyer Indemnitees to indemnification pursuant to Section 8.2(a) are subject to the following limitations:

(i)    the Buyer Indemnitees shall not be entitled to recover for any particular Loss pursuant to clause (i), (ii) or (iv) of Section 8.2(a) unless such Loss (or group of related Losses) equals or exceeds $250,000;

(ii)    the Buyer Indemnitees will not be entitled to recover Losses pursuant to clause (i), (ii) or (iv) of Section 8.2(a) until the total amount which the Buyer Indemnitees would recover under clauses (i), (ii) and (iv) of Section 8.2(a) (as limited by the provisions of Sections 8.4(a)(i) and 8.4(c)), but for this Section 8.4(a)(ii), exceeds $10,000,000 (the "Threshold"), at which time all amounts from the first dollar of Loss may be recovered; and

(iii)    the Buyer Indemnitees will be entitled to recover Losses pursuant to clauses (i), (ii) and (iv) of Section 8.2(a) in an aggregate amount of no more than 30% of the Aggregate Consideration Amount.

(b)    Notwithstanding anything to the contrary contained herein, the provisions of Section 8.4(a) shall not apply to any Losses resulting from a breach of a representation or warranty contained in any of Section 3.1 (Organization of the Company), Section 3.2 (Authorization), Section 3.3 (Capitalization of the Company) (other than the last sentence of Section 3.3), Section 3.14 (Taxes) and Section 3.26 (Brokers).

(c)    The amount of any and all Losses indemnified pursuant to this Article 8 will be determined net of (i) amounts actually received by the Indemnified Party under any insurance policy with respect to such Losses (except to the extent that recovery under such insurance policy results in a premium increase or other damage to the Indemnified Party), (ii) any Tax benefit actually realized by the Indemnified Party arising from the facts or circumstances giving rise to such Losses and (iii) any recoveries obtained by the Indemnified Person from any other third party. Each Indemnified Party shall exercise commercially reasonable efforts to obtain such amounts, benefits and recoveries. If any such amounts, proceeds or recoveries are received by an Indemnified Party with respect to any Losses after an Indemnifying Party has made a payment to the Indemnified Party with respect thereto, the Indemnified Party shall pay to the Indemnifying Party the amount of such amounts, benefits or recoveries (up to the amount of the Indemnifying Party's payment).

**Section 8.5    Knowledge**.    Notwithstanding anything contained herein to the contrary, no Party to this Agreement shall have any liability for any breach of or inaccuracy in any representation or warranty by such Party, if the other Party or any of its officers, employees, counsel or other representatives had actual knowledge at or before

MB02055052

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

the execution of this Agreement of the facts as a result of which such representation or warranty was breached or inaccurate. The Parties to this Agreement acknowledge and agree that the burden of proving that another Party had actual knowledge of the facts or events described in the preceding sentence shall rest with the Party asserting the existence of such knowledge.

**Section 8.6    Exclusive Remedy.**  N otwithstanding a nything e lse c ontained i n this Agreement to the contrary, after the Closing, (i) indemnification pursuant to the provisions of this Article 8 shall be the exclusive remedy for damages for the Parties for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement (other than the covenants contained in Section 5.2) or in any certificate delivered pursuant hereto and (ii) making a claim hereunder shall be the sole and exclusive remedy available to the Parties for any Loss, Losses or other amounts arising under the indemnification obligations set forth herein, or otherwise in respect of the transactions contemplated hereby, except that the foregoing shall not apply to the actual fraud or willful or intentional misconduct of RGHI.

**Section 8.7    Proration.**  In the case of Taxes that are payable with respect to any taxable period which begins before, and ends after, the Closing Date, the pre-Closing portion of any such tax shall be:

> (i)    in the case of Taxes that are either (A) based upon or related to income or receipts, or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), deemed equal to the amount that would be payable if the taxable year ended with (and included) the Closing Date; and

> (ii)    in the case of Taxes that are imposed on a periodic basis with respect to the assets of the Company or any Subsidiary, deemed to be the amount of such Taxes for the entire period, multiplied by a fraction the numerator of which is the number of calendar days in the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period.

## ARTICLE 9
## MISCELLANEOUS

**Section 9.1    Entire Agreement; Assignment.**  This Agreement (a) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and (b) shall not be assigned by any Party (whether by operation of law or otherwise) prior to the Closing without the prior written consent of the other Parties; provided, however, that each of the Buyer or Merger Company may assign all or a portion of their rights under this Agreement (i) to any of their Affiliates, (ii) for collateral purposes in connection with financing transactions, or (iii) to a Person to whom equity interests in the Surviving Company may be transferred

MB02055053

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

by the Buyer following the Closing pursuant to the Securityholders Agreement (provided that such assignment relates only to the right to purchase a number of Purchased Membership Interests that is no greater than the number that could be so transferred in accordance with the Securityholders Agreement).

     **Section 9.2**    **Notices**.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, facsimile or telex, or by registered or certified mail (postage prepaid, return receipt requested) to any Party as follows:

     (a)     To the Company, RGHI or Phillip R. Bennett:

          Refco Group Ltd., LLC
          One World Financial Center
          200 Liberty Street
          New York, NY 10281
          Attention:  Phillip R. Bennett
          Facsimile:  (212) 693-7686

          with a copy (which shall not constitute notice to the Company or RGHI) to:

          Mayer, Brown, Rowe & Maw LLP
          1675 Broadway
          New York, NY 10019
          Attention:  Joseph P. Collins
          (212) 262-1910

     (b)     To Merger Company or the Buyer:

MB02055054

**CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP**

Refco Merger LLC
THL Refco Acquisition Partners
c/o Thomas H. Lee Partners, L.P.
100 Federal Street
Boston, MA 02110
Attention: Scott Schoen
           Scott Jaeckel
           George Taylor
Facsimile: (617) 227-3514

with a copy (which shall not constitute notice to the Buyer) to:

Weil, Gotshal & Manges LLP
100 Federal Street
Boston, MA 02110
Attention: James Westra
Facsimile: (617) 772-8333

and

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Attention: R. Jay Tabor
Facsimile: (214) 746-7777

(c)    To BAWAG or BOI:

Alinea Holdings GmbH
c/o McDermott, Will & Emery
50 Rockefeller Plaza – 11th Floor
New York, NY 10020-1605
Attention: John Sullivan
Facsimile: (212) 547-5444

(d)    To Tone Grant:

Mr. Tone Grant
875 N. Michigan Avenue
Suite 2720
Chicago, IL 60611
Facsimile: (312) 787-7503

or to such other address as the Party to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

MB02055055

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 9.3    Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

**Section 9.4    Construction; Interpretation**.  The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.  Article, section, exhibit, schedule, annex, party, preamble and recital references are to this Agreement unless otherwise stated.  No Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any Party.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

**Section 9.5    Parties in Interest**.  T his A greement s hall b e b inding u pon and inure s olely t o t he b enefit o f e ach P arty a nd i ts s uccessors a nd p ermitted a ssigns a nd, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.  Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of any Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of any Buyer, nor any director, officer, employee, representative, agent or other controlling Person of any Buyer shall have any liability or obligation arising under this Agreement or the transactions contemplated hereby.

**Section 9.6    Severability**.  If any term or other provision of this Agreement is invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

**Section 9.7    Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

**Section 9.8    Knowledge of the Company**.  For all purposes of this Agreement, the phrase "to the Company's knowledge", "to the knowledge of the Company" and "known by the Company" shall mean as of the applicable date, the actual knowledge of Phillip R. Bennett, Robert C. Trosten, Santo C. Maggio, Joseph R. Murphy, William M. Sexton and Dennis Klejna, after reasonable inquiry by such individuals of the Person or Persons who report directly to each such individual.

**Section 9.9    Waiver of Jury Trial**.  The Parties each hereby waive, to the fullest extent permitted by law, any right to trial by jury of any claim, demand, action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or

MB02055056

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

related or incidental to the dealings of the Parties in respect of this Agreement or any of the transactions related hereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise. The Parties each hereby agree and consent that any such claim, demand, action, or cause of action shall be decided by court trial without a jury and that the Parties may file an original counterpart of a copy of this Agreement with any court as written evidence of the consent of the Parties to the waiver of their right to trial by jury.

Section 9.10    Schedules.

(a)    Any information disclosed pursuant to any schedule hereto shall be deemed to be disclosed to Buyer for all purposes of any other schedule or section of this Agreement to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other schedule or section of this Agreement. Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item or matter in any schedule hereto is intended to imply that such amount, or higher or lower amounts, or the item or matter so included or other items or matters, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any schedule is or is not material for purposes of this Agreement. Unless this Agreement specifically provides otherwise, neither the specification of any item or matter in any representation or warranty contained in this Agreement nor the inclusion of any specific item or matter in any schedule hereto is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of the setting forth or the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any schedule is or is not in the ordinary course of business for purposes of this Agreement. RGHI may, from time to time prior to or at the Closing, by notice in accordance with the terms of this Agreement, supplement or amend any schedule, including one or more supplements or amendments to correct any matter which would constitute a breach of any representation, warranty, covenant or obligation contained herein (the "Updated Schedules"). Except as expressly set forth in Section 9.10(b), any new or revised information in the Updated Schedules (i) shall be deemed to be for informational purposes only and (ii) shall not modify or qualify any rights or remedies of the Buyer under this Agreement.

(b)    New or revised information in an Updated Schedule shall be deemed to modify the representations and warranties to which such Updated Schedule relates and will not be deemed to be or to cause a breach of any such representations or warranties ( as if such new or revised information had been set forth in the applicable schedule as of the date of this Agreement) only if (i) such new or revised information sets forth facts or events that occurred after the date of this Agreement and did not arise from any matter or condition that existed and was required to have been disclosed in the schedules as of the date of this Agreement in order to avoid a breach or untruth of a

MB02055057

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

representation or warranty but that was not so disclosed, (ii) except in the case of an update to <u>Schedules 3.13</u>, the penultimate sentence and the last sentence of <u>3.6</u>, <u>3.14(iv)</u> or <u>(vi)</u>, <u>3.16(e)</u> or the last sentence of <u>3.17(a)</u> (where no such acknowledgment shall be necessary), RGHI acknowledges in writing that such new or revised information would permit the Buyer to exercise its right not to effect the Closing pursuant to <u>Section 6.2</u> and (iii) the Buyer nevertheless elects to effect the Closing.

### Section 9.11   <u>Definitions</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person through the ownership of more than 50% of such Person's voting securities, by contract or otherwise.

"<u>Antitrust Laws</u>" means any applicable antitrust or trade regulatory laws of any Governmental Authority, including the HSR Act.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>CFTC</u>" means the Commodity Futures Trading Commission.

"<u>CME</u>" means the Chicago Mercantile Exchange.

"<u>Company Indebtedness</u>" means any indebtedness of the Company or any of the Subsidiaries for borrowed money other than Customer Financing Indebtedness.

"<u>Company Transaction Expenses</u>" means the out-of-pocket fees and expenses of Phillip Bennett, the Company and RGHI in connection with the transactions contemplated by this Agreement, including fees and expenses of attorneys, accountants, advisors and investment bankers (but not including (i) any fees or expenses payable to THL in connection with the transactions contemplated by this Agreement, which fees and expenses shall be paid solely by the Surviving Company as provided in <u>Section 7.3</u> or (ii) any fees or expenses payable to any broker, finder or investment banker in connection with the transactions contemplated by this Agreement based upon arrangements made by and on behalf of any Buyer).

"<u>Customer Financing Indebtedness</u>" means (i) indebtedness which is short term in nature, incurred in the ordinary course of business consistent with past practice and which is either (a) indebtedness of Refco Capital, LLC in conjunction with its customer

MB02055058

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

financing business, (b) indebtedness incurred for the purpose of financing customer margined inventory, acquired or cleared or financed in conjunction with customer brokerage activities which indebtedness is secured by the asset(s) being financed, (c) obligations in respect of letters of credit posted in connection with clearinghouse guarantees or (d) secured customer financing entered into by regulated Subsidiaries of the Company from time to time, (ii) guarantees by the Company of indebtedness of any Subsidiary in the ordinary course of its brokerage business and by any Subsidiary of indebtedness of any other Subsidiary and (iii) indebtedness of the Company to any Subsidiary and of any Subsidiary to the Company or any other Subsidiary.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Finance Company" means Refco Finance Holdings LLC, a Delaware limited liability company that is wholly owned by Merger Company.

"Governmental Authority" means any court, government (federal, state, local, foreign or multinational), department, commission, board, bureau, agency, official or other regulatory, administrative or governmental authority.

"Governmental Order" means any order, writ, injunction, decree, award, judgment or ruling entered by or with any Governmental Authority.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Intellectual Property" means all worldwide rights in any or all of the following: (a) patents, applications therefor and all reissues, divisions, renewals, reexaminations, extensions, provisionals, continuations, and continuations-in-part (the "Patents"), inventions (whether patentable or not), invention disclosures and trade secrets; (b) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor together with all goodwill associated therewith, (the "Trademarks"); (c) Internet Web addresses, sites and domain names; (d) industrial designs and any registrations and applications therefor; (e) copyrights, copyright registrations and applications therefor and all other rights corresponding thereto, including mask works and registrations and applications therefor (the "Copyrights"); and (f) and all other proprietary or intellectual property rights.

"IRS" means the Internal Revenue Service.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement.

"Legal Proceeding" means any judicial, administrative or arbitration actions, suits, proceedings (public or private) or claims or proceedings by or before a Governmental Authority.

MB02055059

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, encumbrance or any other restriction or limitation whatsoever.

"Material Adverse Effect" means any change or effect that, individually or in combination with other factors, is material and adverse to the financial condition, assets or results of operations of the Company and the Subsidiaries, taken as a whole, provided that any change or effect relating to or arising out of any of the following shall be deemed not to constitute a Material Adverse Effect: (1) any change or trend in the economy in general or in the national, international, local or regional markets or industries in which the Company operates, (2) acts of terrorism or war (whether or not declared) occurring prior to, on or after the date of this Agreement, (3) any change or trend in the securities or financial markets in the United States or in any other country or region in which the Company operates, (4) any changes or effects resulting from the execution of this Agreement or the announcement, implementation and closing of this Agreement and the transactions contemplated hereby and (5) the unreasonable failure of Buyer to consent to any of the actions proscribed by Section 5.1 that are necessary for the preservation of the business of the Company and the Subsidiaries as currently conducted. The Parties acknowledge and agree that the mere fact that a change or effect is foreseeable as of the date of this Agreement will not, in and of itself, prevent such change or effect from being determined to be a Material Adverse Effect.

"Organizational Documents" means the charter, articles, memorandum or certificate of incorporation or association, partnership agreement, certificate of limited partnership, operating agreement, limited liability company agreement, certificate of formation, bylaws, stockholder or shareholder agreements and/or similar formation or governance documents and agreements of any Person, whether or not filed with any Governmental Authority, including any amendments thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority.

"Permitted Exceptions" means (i) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, provided an appropriate reserve is established therefor on the financial statements in accordance with GAAP; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business that are not material to the business, operations and financial condition of the property so encumbered and that are not resulting from a breach, default or violation by the Company or any of the Subsidiaries of any contract or Law; (iii) zoning, entitlement and other land use and environmental regulations by any Governmental Authority, provided that such regulations have not been violated; and (iv) such other imperfections in title, charges, easements, restrictions and encumbrances which do not materially detract from the value of or materially interfere with the present use of any property subject thereto or affected thereby.

MB02055060

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

"Person" means and includes an individual, a partnership, a corporation, a limited liability company, a trust, a joint venture, an unincorporated organization, an association, a joint stock company and any Governmental Authority or Self-Regulatory Organization.

"Post Closing Earn-Out Amounts" means any amounts that are required to be paid following the Closing by the Company or any of the Subsidiaries that represent any deferred (whether or not contingent) obligation to pay purchase price or other consideration in connection with any acquisition of a business or any business combination transaction (provided that such payment obligation arises from a contractual obligation incurred by the Company or any of the Subsidiaries prior to the Closing).

"RGHI Equity Portion" means the number of the Voting Membership Interests other than BAWAG Transferred Interests held by RGHI that must be converted into Class A Common Units in order that the total number of Class A Common Units that are issued to RGHI pursuant to the Merger (including Class A Common Units that are issued to RGHI on account of the conversion of BAWAG Transferred Interests) will represent 43% of the total Class A Common Units that will be issued and outstanding immediately following the Merger.

"SEC" means the Securities and Exchange Commission.

"Self-Regulatory Organization" means the National Association of Securities Dealers, Inc., the American Stock Exchange, the National Futures Association, the Chicago Mercantile Exchange, the Chicago Board of Trade, the New York Stock Exchange, Inc., any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), any other securities exchange, futures exchange, contract market, commodities market, any other such exchange, clearinghouse or corporation or other similar federal, state or foreign self-regulatory body or organization.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by the Company.

"Taxes" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i) and (iii) any liability in respect of any items described in clause (i) or (ii) as a successor, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any other Law) or as an indemnitor, guarantor, surety or in a similar capacity under any contract, arrangement, agreement, understanding or commitment (whether oral or written).

MB02055061

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means collectively, all designs, formulae, algorithms, procedures, methods, techniques, know-how, research and development, technical data, computer programs, whether in source code or object code, databases, compilations, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all associated documentation, apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

**Section 9.12  Obligations for Indemnification.**  From and following the Closing, each of Phillip R. Bennett and Tone Grant hereby (i) guarantees the obligations of RGHI under Section 2.4, Section 5.13 and Article 8 (provided, that each such party guarantees only 50% of such obligations of RGHI) and (ii) warrants and covenants that, at the time the Closing is to occur, the statements and covenants in Section 10.10 of the Securityholders Agreement will be accurate and will not have been violated.  The guarantees set forth in this Section 9.12 are unconditional and shall survive any amendment or modification of the terms of this Agreement or the Securityholders Agreement.

MB02055062

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

IN WITNESS WHEREOF, each of the Parties has caused this Equity Purchase and Merger Agreement to be duly executed on its behalf as of the day and year first above written.

REFCO GROUP LTD., LLC

By: _____
Name: _____PHILIP BENNETT_____
Title: _____PRES.n CEO._____

REFCO GROUP HOLDINGS, INC.

By: _____
Name: _____PHILIP BENNETT_____
Title: _____PRES.n CEO_____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055063

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

THL REFCO ACQUISITION PARTNERS

By:  THL Refco GP LLC, a general partner

By: _____
Name: Scott Schoen
Title:   President

MB02055064

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

REFCO MERGER LLC

By: _____
Name: Scott Schoen
Title:  President

MB02055065

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of <u>Section 5.13</u>:

ALINEA HOLDING GMBH

By: _____

Name: _JOHANN MANTLER_    _FRANZ JUSTG_

Title: _____

MB02055066

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of Section 9.12:

PHILIP R. BENNETT

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055067

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of <u>Section 9.12</u>:

TONE GRANT

_____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055068

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT B



Third Leg: RGHI uses loan proceeds to pay down debit balances in various RGHI accounts held in Refco subsidiaries. ¶¶ 21, 26.

Second Leg: A Refco Customer loans the same amount to RGHI. ¶ 26.

First Leg: RCM loans money to a Refco Customer. ¶ 26.

**Plaintiffs** make conclusory allegations that Mayer Brown knew about "round trip loans," which allegedly consisted of three reversible legs. Plaintiffs have not pleaded any facts, however, to support an inference that Mayer Brown was aware of the critical third leg of the transactions, by which the RGHI Receivable was allegedly concealed and the fraud occurred. The diagram above illustrates the structure of the transactions and the limits of Mayer Brown's awareness. Plaintiffs' only factual allegations address the two-step, back-to-back loans contained in the large bold rectangle. No factual allegations support an inference that Mayer Brown knew of the fraudulent use of the loan proceeds, which occurred outside the rectangle.

# EXHIBIT C

No. 06-43

# In the Supreme Court of the United States

STONERIDGE INVESTMENT PARTNERS, LLC,
PETITIONER

*v.*

SCIENTIFIC-ATLANTA, INC., ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT*

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING AFFIRMANCE**

PAUL D. CLEMENT
*Solicitor General
Counsel of Record*

THOMAS G. HUNGAR
*Deputy Solicitor General*

KANNON K. SHANMUGAM
*Assistant to the Solicitor
General
Department of Justice
Washington, D.C. 20530-0001
(202) 514-2217*

## QUESTION PRESENTED

Whether a person may be liable in a private action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) and (c), for engaging in a transaction with the issuer of a security on the ground that the transaction constituted "deceptive" conduct, when the plaintiff did not rely on that conduct but at most relied only on a subsequent misstatement by the issuer concerning the transaction.

## TABLE OF CONTENTS

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Argument:
    The court of appeals correctly held that respondents
    cannot be held liable in a private action under Section
    10(b) and Rule 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    A.   The phrase "deceptive device or contrivance," as
        used in Section 10(b), encompasses deceptive
        conduct as well as misstatements (and omissions
        by parties with a duty to disclose) . . . . . . . . . . . . . . . 11
    B.   Because petitioner failed sufficiently to allege
        reliance, the court of appeals correctly upheld
        the dismissal of petitioner's complaint . . . . . . . . . . . 17
    C.   Allowing the complaint in this case to proceed
        would dramatically broaden the inferred right of
        action in Section 10(b) and Rule 10b-5 . . . . . . . . . . . 26
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

Cases:

    *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128
        (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 24
    *Alexander* v. *Sandoval*, 532 U.S. 275 (2001) . . . . . . . . 27, 30
    *Anixter* v. *Home-Stake Prod. Co.*, 77 F.3d 1215
        (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) . . . . . . 18, 24, 25
    *Central Bank of Denver, N.A.* v. *First Interstate*
        *Bank of Denver, N.A.*, 511 U.S. 164 (1994) . . . . . *passim*

(III)

IV

Cases—Continued:                                                    Page

   *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61
      (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336
      (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18, 23, 25

   *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976) . . . . 12, 17

   *Fidel* v. *Farley*, 392 F.3d 220 (6th Cir. 2004) . . . . . . . . . . 21

   *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657
      (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   *J.I. Case Co.* v. *Borak*, 377 U.S. 426 (1964) . . . . . . . . . . . . 27

   *Klein* v. *Boyd*, No. 97-1143 (3d Cir.) . . . . . . . . . . . . . . . . . . 21

   *Lampf, Pleva, Lipkind, Prupis & Petigrow* v.
      *Gilbertson*, 501 U.S. 350 (1991) . . . . . . . . . . . . . . . . . . . 28

   *Pinter* v. *Dahl*, 486 U.S. 622 (1988) . . . . . . . . . . . . . . . . . . 29

   *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148
      (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   *Regents of the Univ. of Cal.* v. *Credit Suisse First
      Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007),
      petition for cert. pending, No. 06-1341 (filed Mar. 5,
      2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462
      (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

   *Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374
      (2d Cir. 1974), cert. denied, 421 U.S. 976 (1975) . . . 18, 19

   *Schweiker* v. *Chilicky*, 487 U.S. 412 (1988) . . . . . . . . . . . . 27

   *SEC* v. *Edwards*, 540 U.S. 389 (2004) . . . . . . . . . . . . . . . . 15

   *SEC* v. *Zandford*, 535 U.S. 813 (2002) . . . . . . . . . . . . . . . . 10

   *Shapiro* v. *Cantor*, 123 F.3d 717 (2d Cir. 1997) . . . . . . . . . 21

V

Cases—Continued:                                                    Page

*Simpson* v. *AOL Time Warner Inc.*, 452 F.3d 1040
   (9th Cir. 2006), petition for cert. pending, No.
   06-560 (filed Oct. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . 27

*Superintendent of Ins.* v. *Bankers Life & Cas. Co.*,
   404 U.S. 6 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 27

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Nobles*, 422 U.S. 225 (1975) . . . . . . . . . . 25

*United States* v. *O'Hagan*, 521 U.S. 642 (1997) . . . . . . 15, 16

*United States* v. *Russo*, 74 F.3d 1383 (2d Cir.), cert.
   denied, 519 U.S. 927 (1996) . . . . . . . . . . . . . . . . . . . . . . 16

*Wilkie* v. *Robbins*, 127 S. Ct. 2588 (2007) . . . . . . . . . . . . . 27

*Wright* v. *Ernst & Young LLP*, 152 F.3d 169 (2d Cir.
   1998), cert. denied, 525 U.S. 1104 (1999) . . . . . . . . . . . 21

*Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir.
   2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Statutes, regulation and rule:

Private Securities Litigation Reform Act of 1995, Pub.
   L. No. 104-67, § 201, 109 Stat. 758 . . . . . . . . . . . . . . . . 13

Securities Act of 1933, 15 U.S.C. 77a *et seq.*:
   15 U.S.C. 77b(a)(11) (§ 2(a)(11)) . . . . . . . . . . . . . . . . . . . 29
   15 U.S.C. 77*l*(1) (§ 12(1)) . . . . . . . . . . . . . . . . . . . . . . . . 29

Securities Exchange Act of 1934, 15 U.S.C. 78a
   *et seq.*:
   15 U.S.C. 78j(a) (§ 10(a)) . . . . . . . . . . . . . . . . . . . . . . . . . 13
   15 U.S.C. 78j(b) (§ 10(b)) . . . . . . . . . . . . . . . . . . . . . *passim*
   15 U.S.C. 78r(a) (§ 18(a)) . . . . . . . . . . . . . . . . . . . . . . . . . 29

VI

Statutes, regulation and rule—Continued:                     Page

    15 U.S.C. 78t(a) (§ 20(a))  . . . . . . . . . . . . . . . . . . . . . . . . 29

    15 U.S.C. 78t(e) (§ 20(e))  . . . . . . . . . . . . . . . . . . . . . 26, 29

    15 U.S.C. 78u-4(b)(4) (§ 21D(b)(4))  . . . . . . . . . . . . . . . 25

    15 U.S.C. 78u-4(f)(2)(A) (§ 21D(f)(2)(A))  . . . . . . . . . . . 28

    15 U.S.C. 78u-4(f)(3)(C) (§ 21D(f)(3)(C))  . . . . . . . . . . . 28

    15 U.S.C. 78u-4(f)(10)(A) (§ 21D(f)(10)(A))  . . . . . . . . . 13

17 C.F.R.:

    Section 240.10b-5 (Rule 10b-5)  . . . . . . . . . . . . . . . *passim*

    Section 240.10b-5(a) (Rule 10b-5(a))  . . . . . . . . . . 5, 11, 13

    Section 240.10b-5(b) (Rule 10b-5(b))  . . . . . . . . . . . 5, 13

    Section 240.10b-5(c) (Rule 10b-5(c))  . . . . . . . . . . 5, 11, 13

Fed. R. Civ. P. 23(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Miscellaneous:

    *Black's Law Dictionary* (3d ed. 1933) . . . . . . . . . . . . . . . . 14

    *Bouvier's Law Dictionary* (1928)  . . . . . . . . . . . . . . . . . . . 14

    *Charter Commc'ns, Inc., In re,* Exchange Act Release
        No. 50,098 (July 27, 2004) <http://sec.gov/
        litigation/admin/34-50098.htm>  . . . . . . . . . . . . . . . . . . . 4

    Restatement (Second) of Torts (1977)  . . . . . . . . . . . . 18, 19

    S. Rep. No. 792, 73d Cong., 2d Sess. (1934)  . . . . . . . . . . . 13

    S. Rep. No. 98, 104th Cong., 1st Sess. (1995)  . . . . . . . . . . 26

    *Webster's New International Dictionary* (2d ed.
        1934)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

# In the Supreme Court of the United States

No. 06-43

STONERIDGE INVESTMENT PARTNERS, LLC,
PETITIONER

*v.*

SCIENTIFIC-ATLANTA, INC., ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT*

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING AFFIRMANCE**

### INTEREST OF THE UNITED STATES

The United States administers and enforces the federal securities laws. The question in this case concerns the scope of liability in private actions under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b). Meritorious private actions are an essential supplement to criminal prosecutions and civil enforcement actions brought by the government. At the same time, private securities actions can be abused in ways that impose substantial costs on companies that have fully complied with the applicable laws. The United States also has responsibility, through, *inter alia*, the federal banking agencies, for ensuring that entities providing services to publicly traded companies are not subject to inappropriate secondary liability. The United States thus has a strong interest in seeing that the principles applied in private actions

(1)

2

promote the purposes of the securities laws and other important federal laws, and has previously participated as an amicus curiae in cases involving those principles.

## STATEMENT

1.  This case involves a claim of securities fraud against respondents Scientific-Atlanta, Inc., and Motorola, Inc., which manufacture digital set-top boxes used by cable-television subscribers.  As alleged in the amended complaint, the facts are as follows.  Respondents supplied set-top boxes to Charter Communications, Inc. (Charter), one of the Nation's largest cable-television operators.  In August 2000, Charter realized that it was unlikely to meet its annual target for operating cash flow.  Charter decided to ask respondents to enter into "wash" transactions, whereby Charter would pay respondents additional amounts for the set-top boxes they supplied and respondents would use those amounts to "purchase" advertising on Charter's cable channels.  In effect, those transactions would entitle respondents to receive the advertising for free. Scientific-Atlanta Br. in Opp. App. 31-32.

In order for Charter to improve its operating cash flow as a result of those transactions, it needed to capitalize the payments to respondents (on the theory that they were for the purchase of equipment) while treating the return payments from respondents as revenue (on the theory that they were for the purchase of advertising).  Before entering into the transactions, Charter discussed them with Arthur Andersen, its outside accountant.  Arthur Andersen advised Charter that it could not recognize the advertising payments as revenue if they were integrally related to the payments to respondents, but that it could do so if the two sets of payments were unrelated to each other, negotiated at least one month apart, and made at fair market value.  Charter informed Arthur Andersen that it would undertake to satisfy those conditions.  In

3

late September 2000, Charter and each respondent entered into separate agreements for the price increase in the set-top boxes and for the advertising; the agreements concerning the set-top boxes, however, were backdated to August 2000. Scientific-Atlanta Br. in Opp. App. 32-34.

The proposed second amended complaint, based on information obtained in discovery, contains more detailed allegations concerning the transactions.[1]  It alleges that Charter instructed Scientific-Atlanta to notify Charter that it was raising the price of set-top boxes that Charter had already agreed to purchase, and further instructed Scientific-Atlanta to cite higher manufacturing costs as the reason for the increase.  Scientific-Atlanta followed Charter's instructions, even though it knew that the stated reason for the increase was false.  The parties later entered into an agreement under which Charter would pay an extra $20 for each set-top box it had already agreed to purchase (totaling $6.73 million in excess payments).  The parties simultaneously entered into a separate agreement in which Scientific-Atlanta agreed to purchase $6.73 million in advertising from Charter (at rates four to five times higher than those paid by other advertisers).  J.A. 53a-59a.

The proposed second amended complaint also alleges that Charter entered into an agreement with Motorola to purchase 540,000 set-top boxes by December 31, 2000, even though Charter had no present need for the Motorola boxes (and thus no intention of buying them).  The agreement contained a provision requiring Charter to pay Motorola $20 per box in liquidated damages (totaling $10.8 million) if it did not pur-

---

[1]  After the district court had dismissed the claim against respondents, petitioner filed a motion for leave to file the proposed second amended complaint.  The district court denied the motion in relevant part, concluding that, in light of its reasoning in dismissing the claim, "amending the complaint would be futile."  Pet. App. 28a.

4

chase the boxes by the specified date.  The parties entered into a separate agreement in which Motorola agreed to purchase $10.8 million in advertising from Charter (again at rates four to five times higher than those paid by other advertisers).  J.A. 53a, 56a-59a.

The proposed second amended complaint alleges that respondents knew that Charter intended to use the transactions artificially to inflate its operating cash flow.  It also alleges that the backdating of the contracts for the set-top boxes was indicative of "[respondents'] scienter and complicity in efforts to mislead Charter's auditors."  J.A. 53a, 55a, 58a-60a.

Charter subsequently informed Arthur Andersen that the agreements had been negotiated a month apart from each other, and Arthur Andersen duly advised Charter that it could recognize the advertising payments as revenue.  Charter did so in its financial statements for the fourth quarter of 2000, thereby increasing its operating cash flow by at least $17 million to a total of $433.2 million (and $1.56 billion for the entire year).  But for its accounting of the transactions with respondents, Charter would not have met analysts' projections for its operating cash flow.  Charter continued to report increases in cash flow throughout 2001 and the first quarter of 2002.  On April 1, 2003, however, Charter issued a comprehensive restatement of its financial reports in which, *inter alia*, it reduced its operating cash flow for 2000 by $195 million and its operating cash flow for 2001 by $292 million.  Scientific-Atlanta Br. in Opp. App. 33-34, 47, 49-60, 66.[2]

---

[2]  The Securities and Exchange Commission (SEC) subsequently brought administrative proceedings against Charter; in its order instituting the proceedings, the SEC alleged that, as a result of the transactions at issue in this case, Charter had committed numerous reporting, books and records, and accounting control violations. See *In re Charter Commc'ns, Inc.*, Exchange Act Release No. 50,098 (July 27, 2004) <http://sec.gov/litigation/admin/34-50098.htm>.  Charter settled the proceedings without admitting or denying any securities violations.

5

2.   As is relevant here, petitioner, an investment firm, filed a class action against respondents in the United States District Court for the Eastern District of Missouri on behalf of all purchasers of Charter securities between November 8, 1999, and July 17, 2002, alleging that respondents had engaged in fraudulent conduct in violation of Section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) and (c).[3]  Petitioner also brought claims against Charter and its executives, contending that Charter had engaged in numerous fraudulent acts to misrepresent its revenues and costs and to inflate its customer growth rate, and against Arthur Andersen, contending that Arthur Andersen had acted fraudulently in auditing Charter's financial statements.  Scientific-Atlanta Br. in Opp. App. 1-88.[4]

Respondents filed motions to dismiss, contending, *inter alia*, that the complaint failed to allege actionable misstatements or omissions by respondents, and also failed to allege that petitioner had relied on respondents' alleged deceptions. The district court granted the motions.  Pet. App. 30a-71a. The court held that "[petitioner's] claims against [respondents] amount to claims for aiding and abetting liability under § 10(b) and Rule 10b-5," and were therefore barred by *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that a private party may not pursue a Section 10(b) action on a theory of aiding and

---

[3]  Petitioner originally also alleged that respondents had made misstatements in violation of Rule 10b-5(b), 17 C.F.R. 240.10b-5(b), see Scientific-Atlanta Br. in Opp. App. 80, but dropped that claim in its second amended complaint, see J.A. 110a.

[4]  Charter and its executives entered into a settlement.  Arthur Andersen moved to dismiss the claim against it, contending that the complaint did not sufficiently allege scienter, but the district court denied the motion.  Pet. App. 47a-64a.  Arthur Andersen subsequently also entered into a settlement.

abetting liability. Pet. App. 39a. The district court reasoned that "[petitioner] do[es] not assert that [respondents] made any statement, omission or action at issue or that [petitioner] relied on any statement, omission or action made by either of them." *Id.* at 41a. Instead, the court noted, "[petitioner] contend[s] that [respondents] are liable to Charter's investors on the basis that they engaged in a business transaction that Charter purportedly improperly accounted for." *Ibid.* The court stated that it could "find no precedent" for the proposition that a company could violate Section 10(b) and Rule 10b-5 simply "by virtue of engaging in a business enterprise with a company such as Charter, the entity purported to have made the statements at issue." *Id.* at 41a-42a.

3. The court of appeals affirmed. Pet. App. 1a-11a. At the outset, the court of appeals stated that, in *Central Bank*, this Court "confirmed that § 10(b) prohibits only 'manipulative or deceptive' devices or contrivances," and that, in earlier cases, the Court "held that 'deceptive' conduct involves either a misstatement or a failure to disclose by one who has a duty to disclose." *Id.* at 4a-5a (citation omitted). The court of appeals further noted that, in *Central Bank*, this Court held that "Rule 10b-5 does not reach those who only aid or abet a violation of § 10(b)." *Id.* at 5a.

The court of appeals rejected petitioner's contention that it had "properly alleged a *primary* violation of the securities laws within the meaning of *Central Bank* because [respondents] violated Rule 10b-5(a) and (c)," Pet. App. 8a, which prohibit "employ[ing] [a] device, scheme, or artifice to defraud" or "engag[ing] in [an] act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." The court reasoned that "*Central Bank* and the earlier cases on which it relied stand for three governing principles." *Ibid.* First, the court explained, "a private plaintiff may not bring a 10b-5 suit against a defendant for

7

acts not prohibited by the text of § 10(b)." *Ibid.* (internal quotation marks and citation omitted). Second, the court contended, "[a] device or contrivance is not 'deceptive,' within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose." *Ibid.* (citation omitted). Third, the court noted, "[t]he term 'manipulative' in § 10(b) has [a] limited contextual meaning." *Ibid.* (citation omitted). Based on those principles, the court held that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Id.* at 9a.

Applying that holding, the court of appeals determined that petitioner's complaint failed to state a claim against respondents. Pet. App. 9a-10a. The court reasoned that "the focus of [petitioner's] § 10(b) and Rule 10b-5 claims was deception" by Charter, and that "neither Motorola nor Scientific-Atlanta was alleged to have engaged in any * * * deceptive act." *Ibid.* In addition, the court held that respondents "did not issue any misstatement relied upon by the investing public, nor were they under a duty to Charter investors and analysts to disclose information useful in evaluating Charter's true financial condition." *Id.* at 10a. The court thus concluded that "the district court properly dismissed the claims against [respondents] as nothing more than claims, barred by *Central Bank*, that [respondents] knowingly aided and abetted the Charter defendants in deceiving the investor [class]." *Ibid.*

The court of appeals stated that it was "aware of no case imposing § 10(b) or Rule 10b-5 liability on a business that entered into an arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts." Pet. App. 10a. Imposing liability in those circumstances, the court

8

concluded, "would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings," and "[d]ecisions of this magnitude should be made by Congress." *Ibid.*

## SUMMARY OF ARGUMENT

A. The court of appeals in this case erred to the extent it held that Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), reaches only misstatements, omissions made while under a duty to disclose, or manipulative trading practices. The plain language of Section 10(b) demonstrates that it potentially reaches *all* conduct that is "manipulative" or "deceptive." That interpretation is consistent both with the legislative history of the 1934 Act and with the contemporaneous understanding of the term "deceptive." This Court's cases provide no support for the conclusion that non-verbal deceptive conduct is somehow beyond the reach of Section 10(b).

Properly understood, a person engages in "deceptive" conduct for purposes of Section 10(b) when the conduct by its nature is objectively likely to mislead another person, *e.g.*, when it has the effect of conveying a false appearance of material fact to an observer (assuming, of course, that the defendant possessed the requisite mental state in engaging in the conduct). Respondents' alleged conduct constituted a "deceptive device or contrivance" because it not only was likely to, but allegedly did, mislead Charter's outside accountant, Arthur Andersen, about the nature of the transactions into which respondents had entered. Such a reading of Section 10(b) does not nullify this Court's holding in *Central Bank* that aiding and abetting liability is not available in a private Section 10(b) action, because a person cannot be liable as a primary violator unless it *itself* engages in deceptive conduct—and, critically, unless the other elements of primary liability under Section 10(b) are also established.

9

B.  Although the court of appeals erred by concluding that petitioner had failed to satisfy Section 10(b)'s deception requirement, it nevertheless correctly upheld the district court's dismissal of petitioner's complaint, because petitioner did not sufficiently plead reliance on respondents' deceptive conduct.  Petitioner does not allege that it was even aware of the transactions that respondents executed with Charter; at most, petitioner relied on *Charter's* misstatements in purchasing Charter stock.  Petitioner does not dispute that Charter independently decided to make the misrepresentations in its financial statements, and does not contend that respondents drafted or otherwise created those misstatements.  Accordingly, the causal connection between respondents' conduct and petitioner's stock transactions is simply too attenuated to satisfy the reliance requirement.  That is particularly true because respondents' alleged conduct relates to only one aspect of Charter's fraudulent scheme, and has no connection with the publicly disseminated misstatements relating to numerous other, contemporaneous fraudulent acts in which Charter allegedly engaged.  For similar reasons, petitioner has also failed sufficiently to allege the related element of loss causation.

C.  Allowing liability for a primary violation under the circumstances presented here would constitute a sweeping expansion of the judicially inferred private right of action in Section 10(b) and Rule 10b-5, potentially exposing customers, vendors, and other actors far removed from the market to billions of dollars in liability when issuers of securities make misstatements to the market.  It would be particularly inappropriate to allow private liability under these circumstances in light of Congress's rejection of a private right of action for aiding and abetting liability under Section 10(b) in the wake of *Central Bank* (and Congress's creation of much narrower private rights of action in other provisions of the securities

10

laws). Congress consciously struck a balance between expo-
sure to aiding-and-abetting liability and complete immunity
by empowering the Securities and Exchange Commission
alone to pursue cases of aiding and abetting. Petitioner's
proposed rule would upset that congressional choice and
vastly expand liability in unpredictable ways. Such a radical
expansion of liability is a task for Congress, not the courts.

## ARGUMENT

### THE COURT OF APPEALS CORRECTLY HELD THAT RE-SPONDENTS CANNOT BE HELD LIABLE IN A PRIVATE ACTION UNDER SECTION 10(b) AND RULE 10b-5

Section 10(b) of the Securities Exchange Act of 1934 (1934
Act) makes it unlawful for "any person" "directly or indi-
rectly" to "use or employ, in connection with the purchase or
sale of any security  *  *  * , any manipulative or deceptive
device or contrivance in contravention of such rules and regu-
lations as the [Securities and Exchange Commission (SEC)]
may prescribe as necessary or appropriate in the public inter-
est or for the protection of investors." 15 U.S.C. 78j(b). The
SEC's Rule 10b-5 implements Section 10(b) by declaring it
unlawful, "in connection with the purchase or sale of any secu-
rity," to (a) "employ any device, scheme, or artifice to de-
fraud"; (b) "make any untrue statement of a material fact or
to omit to state a material fact necessary in order to make the
statements made  *  *  * not misleading"; or (c) "engage in
any act, practice, or course of business which operates or
would operate as a fraud or deceit upon any person." 17
C.F.R. 240.10b-5. This Court has noted that the scope of Rule
10b-5 is "coextensive" with that of Section 10(b). *SEC* v.
*Zandford*, 535 U.S. 813, 816 n.1 (2002). And for violations of
Section 10(b) and Rule 10b-5, courts have inferred a private
right of action that "resembles, but is not identical to,
common-law tort actions for deceit and misrepresentation."

11

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 341 (2005).

The question presented in this case is whether a person may be liable in a private action under Section 10(b) and Rule 10b-5(a) and (c) for engaging in a transaction with the issuer of a security on the ground that the transaction constituted "deceptive" conduct, when the plaintiff did not rely on that conduct but at most relied only on subsequent misstatements by the issuer concerning the transaction. Contrary to the view seemingly expressed by the court of appeals, Section 10(b)'s prohibition against deception is not limited to actual misstatements or omissions, but encompasses non-verbal deceptive conduct as well. For the reasons set forth below, however, the district court correctly dismissed the complaint for failure to allege that petitioner relied on respondents' deceptive conduct, and the judgment of the court of appeals should therefore be affirmed.

### A. The Phrase "Deceptive Device Or Contrivance," As Used In Section 10(b), Encompasses Deceptive Conduct As Well As Misstatements (And Omissions By Parties With A Duty To Disclose)

The court of appeals categorically stated that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." Pet. App. 9a. The court of appeals thereby appeared to foreclose the possibility that non-verbal deceptive conduct—*i.e.*, deceptive conduct other than misstatements or omissions—could give rise to a violation of Section 10(b). The court erred in its analysis in that regard, because a defendant may employ a "deceptive

12

device or contrivance" within the meaning of Section 10(b) by engaging in non-verbal deceptive conduct.[5]

1. The text of Section 10(b) unambiguously reaches non-verbal deceptive conduct, in addition to misstatements and omissions. Section 10(b) renders it unlawful for "any person" "directly or indirectly" to "use or employ" "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. 78j(b). This Court has previously addressed the meaning of the critical terms "device" and "contrivance." In *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976), the Court, quoting from a contemporaneous dictionary, defined "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," and defined "contrivance" as "[a] thing contrived or used in contriving; a scheme, plan, or artifice." *Id.* at 199 n.20 (second brackets in original) (quoting *Webster's New International Dictionary* 580, 713 (2d ed. 1934)). The breadth of those terms demonstrates that Section 10(b) reaches *all* conduct that is "deceptive" or "manipulative" (assuming that the other statutory requirements are satisfied), not merely *verbal* conduct (*i.e.*, misstatements or omissions). Consistent with that interpretation, the SEC, in promulgating Rule 10b-5, pro-

---

[5]  The court seemingly recognized that Section 10(b) reaches at least some non-verbal conduct: *viz.*, when the "scheme or contrivance" at issue is "manipulative," rather than "deceptive." See Pet. App. 9a (holding that Section 10(b) makes it unlawful for a defendant, *inter alia*, to "engage in manipulative securities trading *practices*") (emphasis added). The court was correct to recognize that "manipulative" conduct can be non-verbal, because the prototypical examples of "manipulative" conduct are such non-verbal actions as "wash sales, matched orders, or rigged prices." *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 476 (1977). As the court of appeals noted (Pet. App. 9a & n.2), however, "manipulative" has been viewed as a term of art denoting manipulation that operates on *markets*, see, *e.g., Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 199 & n.21 (1976), and it is therefore not at issue in this case.

13

scribed not only misstatements and omissions that render statements misleading (in Rule 10b-5(b)), but also "any device, scheme, or artifice to defraud" (in Rule 10b-5(a)) and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" (in Rule 10b-5(c)). The latter subparts of the rule would be rendered largely superfluous if Section 10(b) were construed to cover only misstatements and omissions.[6]

The legislative history of the 1934 Act confirms that Section 10(b) was intended to reach all forms of "deceptive" or "manipulative" conduct. The Senate Report indicated that Section 10, together with other sections of the 1934 Act, was "aimed at those manipulative and deceptive *practices* which have been demonstrated to fulfill no useful function," without distinguishing between verbal and non-verbal conduct. S. Rep. No. 792, 73d Cong., 2d Sess. 6 (1934) (emphasis added). And the Senate Report noted that, while Section 10(a) regulates short sales and stop-loss orders, Section 10(b) "authorizes the [SEC] by rules and regulations to prohibit or regulate the use of any other manipulative or deceptive *practices* which it finds detrimental to the interests of the investor," again without distinguishing between verbal and non-verbal conduct. *Id.* at 18 (emphasis added).

2.  Nothing in the ordinary meaning of the word "deceptive" suggests that it limits the range of actionable "device[s] or contrivance[s]" to misstatements or omissions. To the contrary, contemporary dictionaries confirm that "deception" and

---

[6]  Similarly, Section 21D(f)(10)(A) of the 1934 Act (which was added by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 201, 109 Stat. 758), in defining the circumstances under which a person "knowingly commits a violation of the securities laws" (and thus can be subject to joint and several liability), distinguishes between "an action that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading" and "an action that is based on any [other] conduct." 15 U.S.C. 78u-4(f)(10)(A).

14

"deceit" can arise from verbal and non-verbal conduct alike. See, *e.g.*, *Black's Law Dictionary* 529 (3d ed. 1933) (defining "deception" as, *inter alia*, "intentional misleading by falsehood spoken or acted"); *Bouvier's Law Dictionary* 276 (1928) (noting, in defining "deceit," that "[a] fraudulent misrepresentation or contrivance * * * need not be made in words").

This Court's cases likewise provide no support for the apparently contrary view of the court of appeals, which asserted that "[a] device or contrivance is not 'deceptive,' within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose."  Pet. App. 8a; see *id.* at 5a, 9a.  The court of appeals relied primarily on a single sentence from *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver,* 511 U.S. 164 (1994).  See Pet. App. 5a.  In that sentence, the Court stated that "the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act."  *Central Bank*, 511 U.S. at 177; see *id.* at 191 (same).

When that statement is read in context, it is clear that the Court did not intend to exclude non-verbal deceptive conduct from the reach of Section 10(b).  In the very next sentence (and throughout the rest of the opinion), the Court used generic language indicating that the statute covers deceptive conduct, without distinguishing between verbal or non-verbal conduct.  See *Central Bank*, 511 U.S. at 177 (stating that "[t]he proscription [in Section 10(b)] does not include giving aid to a person who commits a manipulative or deceptive *act*") (emphasis added); see also, *e.g.*, *id.* at 166 ("deceptive act"); *id.* at 167 ("deceptive practice"); *id.* at 170 ("deceptive act"); *id.* at 173 ("deceptive acts"); *id.* at 178 ("acts that are * * * deceptive"); *id.* at 183 ("deceptive conduct"); *id.* at 191 ("deceptive act").  To the extent that the relevant sentence can be read to have excluded non-verbal deceptive conduct, therefore, any such exclusion appears to have been inadvertent and

15

without significance.  Cf. *SEC* v. *Edwards*, 540 U.S. 389, 396 (2004) (stating that "we will not bind ourselves unnecessarily to passing dictum that would frustrate Congress' intent" under the securities laws).

The court of appeals also cited *United States* v. *O'Hagan*, 521 U.S. 642 (1997), and *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972) (see Pet. App. 5a), but those cases do not speak to the definition of "deceptive device or contrivance."  Instead, they involved collateral issues concerning the circumstances under which a defendant can be liable for engaging in deceptive conduct by means of an omission alone.  See, *e.g.*, *O'Hagan*, 521 U.S. at 654 (stating that "[d]eception through nondisclosure is central to the theory of liability for which the Government seeks recognition"); *Affiliated Ute Citizens*, 406 U.S. at 153 (noting that the defendants had failed to "disclos[e] to [the plaintiffs] material facts that reasonably could have been expected to influence their decisions to sell").

In sum, "§ 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception," and "[n]ovel or atypical methods should not provide immunity from the securities laws."  *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) (citation omitted); cf. *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 477 (1977) (concluding that "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices").  The court of appeals thus erred to the extent it excluded non-verbal deceptive conduct from the scope of Section 10(b).

3.  Because the court of appeals apparently concluded that only a misstatement or omission can constitute a "deceptive device or contrivance" for purposes of Section 10(b), it did

16

not attempt to elaborate on the circumstances under which other conduct could be "deceptive." The plain language of Section 10(b) provides substantial guidance on that issue. The same dictionary on which this Court relied in *Ernst & Ernst* in defining the statutory terms "manipulative," "device," and "contrivance" defines "deceptive" as "[t]ending to deceive" or "having power to mislead." *Webster's New International Dictionary* 679 (2d ed. 1934); see *ibid.* (defining "deceive" as "[t]o cause to believe the false, or disbelieve the truth"). It naturally follows that the phrase "deceptive device or contrivance" comprises any conduct that is committed with the requisite mental state and is objectively likely to mislead an observer: *e.g.*, conduct that has the effect of conveying a false appearance of material fact concerning a transaction into which the person has entered. Cf. *United States* v. *Russo*, 74 F.3d 1383, 1391 (2d Cir.) (concluding that trading scheme that "create[d] a false impression" of demand for stock constituted a "manipulative * * * device or contrivance" for purposes of Section 10(b)), cert. denied, 519 U.S. 927 (1996).[7]

When measured against the correct standard, respondents' alleged conduct in this case constituted a "deceptive device or contrivance." The parties are alleged to have deliberately backdated the agreements for the price increases in the set-top boxes, so as to make it appear that the parties had

---

[7] In order to satisfy the "deceptive device or contrivance" requirement, a plaintiff need only allege that the defendant engaged in conduct that was objectively likely to mislead *another person*. Insofar as unlawful conduct under Section 10(b) requires some nexus with an *investor*, that requirement is rooted not in the "deceptive device or contrivance" requirement, but rather in Section 10(b)'s separate "in connection with" requirement, and (with respect to private actions) in the reliance and loss-causation requirements. See, *e.g.*, *O'Hagan*, 521 U.S. at 656-657; see also pp. 17-26, *infra*. Respondents did not seek dismissal in the district court on the ground that the "in connection with" requirement was not satisfied, and neither of the courts below addressed that question.

17

entered into those agreements before the reciprocal advertising agreements.  See Scientific-Atlanta Br. in Opp. App. 33-34.  By entering into the backdated agreements, respondents conveyed a false appearance of material fact concerning the transactions into which they had entered:  *i.e.*, because their conduct not only was likely to, but in fact did, mislead Charter's outside accountant, Arthur Andersen, into believing that the two sets of transactions were discrete.  On those alleged facts, respondents' conduct could be found to constitute a "deceptive device or contrivance" under Section 10(b).[8]

### B.  Because Petitioner Failed Sufficiently To Allege Reliance, The Court Of Appeals Correctly Upheld The Dismissal Of Petitioner's Complaint

In order to state a claim against a defendant as a primary violator of Section 10(b), a plaintiff not only must allege that the defendant engaged in "deceptive" or "manipulative" conduct, but also must satisfy "*all* of the [other] requirements for primary liability"—regardless of whether the defendant is itself the issuer of the relevant security or is a "secondary actor" (such as respondents).  *Central Bank*, 511 U.S. at 191.  Specifically, the plaintiff must allege that the defendant acted with the requisite scienter, see *Ernst & Ernst*, 425 U.S. at 194 n.12, and engaged in the requisite conduct "in connection with" the purchase or sale of a security, see *Dura Pharmaceuticals*, 544 U.S. at 341.  Those requirements are elements not only of private actions such as this one, but also of criminal prosecutions and civil enforcement actions for viola-

---

[8]  Indeed, it is unclear why the backdating does not constitute a misstatement that would satisfy even the court of appeals' erroneously restrictive view of Section 10(b).  To the extent that the court of appeals' test excludes even some material misstatements, it deviates even further from the proper scope of Section 10(b)'s prohibition on all deceptive conduct.

18

tions of Section 10(b) brought, respectively, by the Department of Justice and the SEC.

Critically for purposes of this case, however, in order to state a claim in a *private* action under Section 10(b) and Rule 10b-5, the plaintiff also must satisfy the requirements of reliance and loss causation. See *Dura Pharmaceuticals*, 544 U.S. at 341-342. Although petitioner sufficiently alleged that respondents had engaged in deceptive conduct for purposes of Section 10(b), petitioner did not sufficiently plead that it had relied on that conduct. The court of appeals' decision upholding the dismissal of petitioner's complaint should be affirmed on that basis.[9]

1. In *Basic Inc.* v. *Levinson*, 485 U.S. 224, 243 (1988), this Court expressly held that reliance is an element of a private action under Section 10(b) and Rule 10b-5. In so holding, the Court recognized that "reliance is and long has been an element of common-law fraud," *ibid.* (citing Restatement (Second) of Torts § 525 (1977)), and explained that "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Ibid.*; see *Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974) (reasoning that the element of reliance requires that the defendant's fraudulent conduct have "caused the

---

[9] The district court accepted respondents' contention that the complaint failed to allege reliance, noting that petitioner "do[es] not assert that * * * [it] relied on any statement, omission or action made by either of [respondents]." Pet. App. 41a. Respondents renewed that contention on appeal. See Scientific-Atlanta C.A. Br. 25-28; Motorola C.A. Br. 15-16. While the court of appeals did not address the reliance issue in detail, it appears to have endorsed the district court's resolution of that issue. See, *e.g.*, Pet. App. 7a (quoting the district court's ruling on reliance); *id.* at 10a (noting that respondents "did not issue any misstatement *relied upon* by the investing public") (emphasis added). In its brief before this Court, petitioner does not contend that the Court should not address the reliance issue, but instead contends only that reliance was sufficiently pleaded. See Br. 37-40.

19

[plaintiff] to engage in the transaction in question"), cert. denied, 421 U.S. 976 (1975).  In *Central Bank*, the Court confirmed that reliance was "[an] element critical for recovery under Rule 10b-5," and that, in order to recover in a private action under Section 10(b) and Rule 10b-5, "[a] plaintiff must show reliance on the *defendant's* misstatement or omission" (or other deceptive conduct).  511 U.S. at 180 (emphasis added).  Indeed, the importance of strict adherence to the reliance requirement in private actions against secondary actors was a key basis for this Court's rejection of aiding and abetting liability.  "Were we to allow the aiding and abetting action proposed in this case," the Court reasoned, "the defendant could be liable without any showing that the plaintiff *relied upon the aider and abettor's statements or actions*." *Ibid.* (emphasis added).[10]

In this case, petitioner does not contend that it relied upon respondents' allegedly deceptive conduct (*i.e.*, the backdating of the contracts increasing the price of the set-top boxes) in engaging in the relevant transactions (*i.e.*, the purchase of Charter shares).  In fact, petitioner does not contend that it (or the investing public) was even aware of the transactions that respondents executed with Charter.  Instead, petitioner freely concedes that "[r]espondents did not themselves disseminate the false information to the securities market," Br. 38, and alleges only that the backdating of the contracts assisted *Charter* in mischaracterizing the payments from respondents as revenue (and thus in inflating its operating cash flow in its financial statements).  See, *e.g.*, Scientific-Atlanta Br. in Opp. App. 33-34.  Those allegations might rise to the

---

[10] See Restatement (Second) of Torts § 537 (1977) (providing that "[t]he recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, * * * he relies on the misrepresentation in acting or refraining from action, and * * * his reliance is justifiable").

20

level of aiding and abetting Charter's misstatements, but they fail to establish petitioner's reliance on respondents' misconduct.[11] Because petitioner (and other investors) at most relied only on Charter's misstatements, and not on respondents' apparently undisclosed deceptive conduct, petitioner has failed sufficiently to allege reliance for purposes of its claim against respondents. See *Central Bank*, 511 U.S. at 180.

Petitioner contends (Br. 38, 39) that reliance is nevertheless sufficiently alleged because, but for respondents' deceptive conduct, Charter could not have made the misstatements on which it (and other investors) allegedly relied in purchasing Charter stock. But alleging "but-for" causation is no substitute for alleging reliance on respondents' own conduct. "But-for" causation does not distinguish primary from secondary liability; alleged misconduct by secondary actors is frequently necessary to fraudulent schemes (as the facts of *Central Bank* illustrate), but that alone does not make those actors primarily liable. Petitioner does not dispute that Charter independently decided to make the misrepresentations in its financial statements; indeed, in its complaint, petitioner seemingly recognizes that Charter could have accounted for its transactions with respondents in a way that would have rendered its financial statements accurate. See Scientific-Atlanta Br. in Opp. App. 4; cf. Pet. Br. 38 (alleging only that Charter's misstatements "built upon" respondents' deceptive conduct). Conversely, Charter could have misrepresented its operating cash flow in other respects without engaging in these transactions. The critical point is that it was Charter's

---

[11] As discussed above, reliance is not an element in an enforcement action brought by the government under Section 10(b). Accordingly, a defendant as to whom reliance cannot be shown may nonetheless be liable in such an action, either as a principal violator or as an aider and abettor, even though it would be at most an aider and abettor (and therefore not liable) in the context of a private action.

21

misrepresentation of its cash flow, not respondents' conduct, on which petitioner allegedly relied.

Petitioner, moreover, does not contend that respondents affirmatively induced Charter to make the misstatements or that respondents actually drafted, created, or otherwise made those misstatements themselves.  As numerous courts of appeals have correctly held, a secondary actor cannot be held liable in a private securities action by virtue of a plaintiff's reliance on misstatements that were not "made" by the secondary actor.  See, *e.g. Fidel* v. *Farley*, 392 F.3d 220, 235 (6th Cir. 2004) (holding that accounting firm could not be liable for failing to correct issuer's misleading financial statements because it "did not make a material misstatement or omission"); *Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194, 1205-1207 (11th Cir. 2001) (holding that, notwithstanding "allegations of substantial assistance in the alleged fraud," "no statements attributable to [defendant] were ever made to [p]laintiffs; therefore, [p]laintiffs could not have relied on [defendant] in making their investment decisions"); *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (noting that "[r]eliance only on representations made by others cannot itself form the basis of liability") (citation omitted; brackets in original), cert. denied, 525 U.S. 1104 (1999); *Shapiro* v. *Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) (stating that accountants "must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors" in order to be liable) (citation omitted); *Anixter* v. *Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) (same); see also SEC Br. at 17-18, *Klein* v. *Boyd*, No. 97-1143, 1998 WL 55245 (3d Cir. Feb. 12, 1998)  <www.sec.gov/pdf/klein.pdf> (arguing that a person who "*creates* a misrepresentation * * * can be liable as a primary violator," but that

22

person who merely "knew of misrepresentations" but had not "created" them "would not be liable as a primary violator").[12]

This Court's decision in *Central Bank* is to the same effect. As the Court emphasized in that case, secondary actors may be held liable in a private action under Section 10(b), but only when, *inter alia*, reliance on *their* conduct has been demonstrated: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or *makes* a material misstatement (or omission) *on which a purchaser or seller relies* may be liable as a primary violator." 511 U.S. at 191 (emphases added). Words or actions by a secondary actor that facilitate an issuer's misstatement, but are not themselves communicated to investors, simply cannot give rise to reliance (and thus primary liability in a private action). That principle is at the heart of the distinction between primary liability and secondary liability of the kind rejected in *Central Bank*.

In this case, there is an additional reason to conclude that the complaint fails to satisfy the reliance requirement. While respondents' conduct allegedly related to Charter's statements inflating its operating cash flow by at least $17 million in the fourth quarter of 2000, petitioners allege that Charter also engaged in other, contemporaneous fraudulent acts to misrepresent its revenues and costs—thus raising the question whether the decision of petitioner (or any other investor) to purchase Charter stock, in reliance on Charter's rosy financial reports, could be connected even in an attenuated sense to respondents' conduct (which appears to have given rise

---

[12] The courts in *Ziemba*, 256 F.3d at 1205, and *Wright*, 152 F.3d at 175, also held that misstatements made by a secondary actor must be *publicly attributed* to the secondary actor before liability can attach in a private action. There is no need to consider the correctness of that requirement in this case, because no misstatements made by respondents were disseminated to investors, either with or without attribution.

only to a fraction of the total overstatement in operating cash flow).

For example, the complaint alleges that Charter engaged in a variety of practices that materially overstated its operating cash flow in 2000 (the year in which respondents' transactions occurred) by $195 million, and its operating cash flow for 2001 by $292 million. See Scientific-Atlanta Br. in Opp. App. 5, 66. But respondents' conduct could account for no more than $17.53 million of the overstatement, or less than 10% of the total for 2000. The complaint also alleges that Charter materially inflated its subscriber growth rate and misstated its expenses. *Id.* at 3, 38-40. Thus, even if this Court were to adopt petitioner's erroneous effort to equate reliance with mere "but-for" causation, but see *Dura Pharmaceuticals*, 544 U.S. at 344 (endorsing "the need to prove proximate causation"), it is difficult to see how petitioner could satisfy such a requirement, because, taking the facts as alleged in the complaint as true, there is no basis for concluding that, but for respondents' conduct, petitioner would not have purchased Charter stock. Under any standard for reliance, therefore, petitioner's complaint is deficient. Where a cause of action for aiding and abetting exists, an aider and abettor may be held accountable for losses resulting from the scheme it aided, but a theory of primary liability must focus on the actions of the defendant on which the plaintiff allegedly relied.[13]

---

[13] In *Simpson* v. *AOL Time Warner Inc.*, 452 F.3d 1040 (2006), petition for cert. pending, No. 06-560 (filed Oct. 19, 2006), the Ninth Circuit held that the reliance requirement would be satisfied as long as "the introduction of misleading statements into the securities market was the intended end result of a scheme to misrepresent revenue." *Id.* at 1051. In amicus briefs in that case, the SEC took the position that "[t]he reliance requirement is satisfied where a plaintiff relies on a material deception flowing from a defendant's deceptive act, even though the conduct of other participants in the fraudulent scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction." SEC Reply Br. at 12, *Simpson, supra* (No. 04-55665)

24

2.  Just as petitioner has failed sufficiently to allege that it actually relied on defendants' conduct in purchasing Charter stock, so too has petitioner failed to show that it is entitled to a presumption of reliance.[14]  This Court has recognized presumptions of reliance in only two contexts:  first, when a defendant with a duty to disclose has made a material omission (and it would thus be impossible to show how the plaintiff would have acted if the omitted information had been disclosed), see *Affiliated Ute*, 406 U.S. at 153-154, and second, when a defendant commits "fraud on the market" by publicly making material misstatements concerning an efficiently traded security, see *Basic*, 485 U.S. at 241-247.

Petitioner suggests (Br. 38 & n.14; Scientific-Atlanta Br. in Opp. App. 72) that it can avail itself of the fraud-on-the-market presumption.  Even assuming, however, that the fraud-on-the-market presumption would be available in an action *against Charter* for its misstatements concerning the transactions with respondents, such a presumption could not assist petitioner in establishing reliance with respect to its claim against respondents.  By its very terms, the presump-

---

(Feb. 7, 2005) <http://www.sec.gov/litigation/briefs/homestore_020405.pdf>. The SEC's briefs, however, were filed without the involvement of the Solicitor General, and the position on reliance that was expressed in those briefs does not reflect the views of the United States.  For the reasons stated in text, that position, and the Ninth Circuit's holding on reliance in *Simpson*, are inconsistent with *Central Bank* (and with this Court's other cases concerning the reliance requirement).

[14] As a practical matter, without a presumption of reliance, petitioner would probably be unable to proceed with a class action, because the individualized issue of reliance would "overwhelm[]" any common issues (and thereby preclude class certification under Federal Rule of Civil Procedure 23(b)(3)). *Basic*, 485 U.S. at 242; see, *e.g.*, *Regents of the Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 394 (5th Cir. 2007) (holding that, because no presumption of reliance was available in a case involving similar allegations against secondary actors, the district court erred by granting class certification), petition for cert. pending, No. 06-1341 (filed Mar. 5, 2007).

25

tion applies only to publicly disseminated misrepresentations: "Because most *publicly available* information is reflected in market price, an investor's reliance on any *public* material misrepresentations * * * may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247 (emphases added). Petitioner's complaint does not identify any public statements or actions by respondents. Accordingly, petitioner cannot rely on the fraud-on-the-market theory to satisfy the reliance requirement here.

3. For many of the same reasons that the complaint does not satisfy the reliance (or transaction-causation) requirement, it also does not satisfy the related loss-causation requirement.[15] In order to show loss causation, a plaintiff must prove that the defendant's fraudulent conduct "proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals*, 544 U.S. at 346; see 15 U.S.C. 78u-4(b)(4) (codifying loss-causation requirement). In its complaint, petitioner alleges only that it purchased stock during a specified class period. See Scientific-Atlanta Br. in Opp. App. 2, 7. Petitioner does not allege that *respondents'* conduct caused its loss; indeed, petitioner does not even specifically allege how (and when) it was revealed that Charter had misrepresented its operating cash flow as it related to the transactions with respondents, much less that petitioner (or other class members) still held its

---

[15] Although respondents appear to have raised the loss-causation issue in the district court (see Scientific-Atlanta Mot. to Dismiss 20), they did not separately raise the issue in the court of appeals, and that court did not address it. Because of the purely legal nature of that issue, however, which is conceptually linked to the reliance issue (in that both address aspects of causation), and in view of the need for clarity and certainty regarding the scope of the implied private right of action under Section 10(b), the Court may wish to exercise its discretion to address that alternative ground for affirmance. See, *e.g.*, *United States* v. *Nobles*, 422 U.S. 225, 240 n.15 (1975).

26

Charter stock at the time that the revelation occurred.[16]  Petitioner, moreover, does not allege that any injury it suffered from a decline in Charter's share price was attributable to the revelation that Charter had misrepresented its cash flow as it related to the transactions with respondents, as opposed to revelations concerning the numerous other fraudulent acts in which Charter allegedly engaged.  See *id.* at 6 (generically alleging that Charter's share price fell during and after the class period as a result of "[i]ncreasing skepticism regarding the accuracy of [Charter's] prior disclosures" and "the disclosure of [a] [g]rand [j]ury [i]nvestigation" into Charter's accounting practices); cf. *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (requiring plaintiff to show that "there is a reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information").  Petitioner's complaint thus fails sufficiently to allege loss causation, as well as reliance.

### C. Allowing The Complaint In This Case To Proceed Would Dramatically Broaden The Inferred Right Of Action In Section 10(b) And Rule 10b-5

In the wake of this Court's decision in *Central Bank*, Congress considered, and rejected, a proposal to create an express private right of action for aiding and abetting under Section 10(b), and chose instead to authorize only the SEC to seek civil redress against aiders and abettors.  See, *e.g.*, 15 U.S.C. 78t(e); S. Rep. No. 98, 104th Cong., 1st Sess. 19 (1995). Congress thus struck a careful and deliberate balance between open-ended secondary liability, on the one hand, and

---

[16]  The amended complaint alleges only that, on June 18, 2002, an analyst expressed the view that Charter "ha[d] a more aggressive capitalization policy" than other cable operators (and that Charter "ha[d] done some marketing deals with equipment vendors").  Scientific-Atlanta Br. in Opp. App. 63-64.

impunity for aiders and abettors, on the other. Allowing liability for a primary violation under the circumstances presented here would effectively circumvent that congressional judgment and would constitute a sweeping expansion of the judicially inferred private right of action in Section 10(b) and Rule 10b-5.

1. This Court first recognized the existence of an inferred private right of action under Section 10(b) and Rule 10b-5 in *Bankers Life*, 404 U.S. at 13 n.9, at a time when the Court took the view that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute. *J.I. Case Co.* v. *Borak*, 377 U.S. 426, 433 (1964). Since that time, however, the Court has consistently warned against judicial inference of private rights of action not specifically authorized by Congress. See, *e.g.*, *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 727 (2004); *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61, 67 & n.3 (2001); *Alexander* v. *Sandoval*, 532 U.S. 275, 287-288 (2001). The Court has also repeatedly warned against extending preexisting inferred rights of action to new contexts. See, *e.g.*, *Wilkie* v. *Robbins*, 127 S. Ct. 2588, 2604-2605 (2007); *Malesko*, 534 U.S. at 74; *Schweiker* v. *Chilicky*, 487 U.S. 412, 421 (1988).

It would greatly expand the inferred private right of action under Section 10(b) and Rule 10b-5 if "secondary actors" could be held primarily liable whenever they engage in allegedly deceptive conduct, even if investors do not rely on (and are not even aware of) that conduct. Such a rule would expose not only accountants and lawyers who advise issuers of securities, but also vendors (such as respondents) and other firms that simply do business with issuers, to potentially billions of dollars in liability when those issuers make misrepresentations to the market. Such a rule would thereby considerably widen the pool of deep-pocketed defendants that could be

28

sued for the misrepresentations of issuers, increasing the likelihood that the private right of action will be "employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). Moreover, extending liability to vendors could have the effect of substantially expanding liability for foreign companies that trade with publicly listed companies. Likewise, creating new and unpredictable liability for closely regulated entities like banks could create particular problems and greatly complicate the task of regulators. And the expansion of liability would raise difficult questions concerning the apportionment of liability where, as here, the conduct of the secondary actor relates only to a small part of a broader fraudulent scheme. See, *e.g.*, 15 U.S.C. 78u-4(f)(3)(C) (providing that, in apportioning liability, the trier of fact should consider "the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs" and "the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs").[17]

Permitting secondary actors to be held liable under these circumstances would also be inconsistent with the much narrower private rights of action that Congress expressly created in other provisions of the securities laws. This Court has repeatedly looked to those express rights of action in defining the contours of the inferred right of action in Section 10(b) and Rule 10b-5. See, *e.g.*, *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U.S. 350, 359-360 (1991). In construing those express rights of action, moreover, the Court has strictly defined the class of persons who can be held lia-

---

[17] Indeed, a rule that permitted secondary actors to be held liable would raise the specter of joint and several liability where such an actor was found to have "knowingly" violated the securities laws. See 15 U.S.C. 78u-4(f)(2)(A).

29

ble.  For example, in *Pinter* v. *Dahl*, 486 U.S. 622 (1988), the
Court rejected the proposition that Section 12(1) of the Secu-
rities Act of 1933, 15 U.S.C. 77*l*(1), which imposes liability on
any person who "offers or sells" an unregistered security,
reaches any person whose participation in the transaction was
a "substantial factor" in the transaction's occurrence.  *Pinter*,
486 U.S. at 649.  Petitioner's proposed rule not only would be
inconsistent with the Court's practice in construing *express*
rights of action, but would threaten to swamp those rights of
action by creating an all-encompassing inferred right of ac-
tion under Section 10(b) and Rule 10b-5.  See, *e.g.*, 15 U.S.C.
77b(a)(11), 78t(a) (imposing liability on secondary actors only
to the extent that they "control" persons who violate the secu-
rities laws); 15 U.S.C. 78r(a) (imposing liability on parties that
"cause to be made" a false statement in an SEC filing, where
the plaintiff acted "in reliance upon such statement"); cf. *Cen-
tral Bank*, 511 U.S. at 180 (noting that "it would be  *  *  *
anomalous to impute to Congress an intention in effect to
expand the defendant class for 10b-5 actions beyond the
bounds delineated for comparable express causes of action").

2.  Moreover, at the same time that it refused to create an
express *private* right of action for aiding and abetting under
Section 10(b), Congress expressly authorized the SEC to pur-
sue civil enforcement actions on a theory of aiding and abet-
ting liability for violations of the 1934 Act.  See 15 U.S.C.
78t(e).  In such actions, a person may be liable as an aider and
abettor if the person "knowingly provides substantial assis-
tance" to a primary actor's violation of the securities laws.
*Ibid.*; cf. *Central Bank*, 511 U.S. at 168 (listing elements of
preexisting private action for aiding and abetting).  The SEC
therefore can take action not only against any party that itself
engages in deceptive or manipulative conduct in violation of
Section 10(b), but also against any party that knowingly facili-
tates *another* party's deceptive or manipulative conduct:  *e.g.*,

30

when, as is alleged to have occurred here, a party enters into a deceptive transaction in the knowledge that the other party intends to make misrepresentations concerning that transaction to its investors.

More fundamentally, Congress's unwillingness to recognize a private right of action for aiding and abetting suggests that this Court should be loath to create the functional equivalent of such a right of action itself. Cf. *Alexander*, 532 U.S. at 290 (noting that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"). Such an action would upset the deliberate balance struck by Congress. Insofar as petitioner and its amici advance various policy arguments in favor of broad liability for secondary actors, there are ample policy arguments to the contrary (some of which apparently struck a chord when Congress last expressly addressed the issue). In any event, all of those policy arguments "are more appropriately addressed to Congress than to this Court." *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 156 n.12 (1976).

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

PAUL D. CLEMENT
*Solicitor General*

THOMAS G. HUNGAR
*Deputy Solicitor General*

KANNON K. SHANMUGAM
*Assistant to the Solicitor
General*

AUGUST 2007