UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————— x
                    :

THOMAS H. LEE EQUITY FUND V, L.P.,     :    07 Civ. 6767 (GEL)
THOMAS H. LEE PARALLEL FUND V, L.P.,  :
and THOMAS H. LEE EQUITY (CAYMAN)  :    <u>FIRST AMENDED COMPLAINT</u>
FUND V, L.P.,                      :

               Plaintiffs,      :    JURY TRIAL DEMANDED

              v.             :

MAYER BROWN, ROWE & MAW LLP,      :

              Defendant.     :
————————————————————————————— x

       Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V,

L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds"), by and

through their undersigned counsel, for their first amended complaint against Mayer Brown,

Rowe & Maw LLP ("Mayer Brown"), allege on information and belief, except as to those

allegations describing their own actions, as follows:

       1.      This is an action brought for violations, alternatively, of the Securities

Exchange Act of 1934 or the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

and for violations of state law, to recover damages that the THL Funds suffered as a result of

repeated material misrepresentations and omissions that Mayer Brown made to them as part of a

scheme to defraud engaged in by Mayer Brown and several other co-conspirators.  Mayer

Brown, one of the largest law firms in the world, represented Refco Group Ltd., LLC, Refco's

former CEO Phillip Bennett ("Bennett"), and Bennett's personal holding company Refco Group

Holdings, Inc. ("RGHI") in connection with the THL Funds' purchase of a majority interest in Refco in 2004 (the "2004 Purchase").[1]

2.    As set forth below, Mayer Brown senior partner Joseph P. Collins ("Collins") and other Mayer Brown attorneys, in furtherance of a long-running scheme masterminded by Bennett and his co-conspirators and designed (among other things) to conceal Refco's true financial condition and thereby facilitate the ultimate sale of all or part of Refco, repeatedly misled the THL Funds in connection with the 2004 Purchase. In response to the THL Funds' due diligence requests, Mayer Brown misled the THL Funds by both denying the existence of and hiding a series of virtually identical sham related-party transactions – transactions that Mayer Brown negotiated, documented, and facilitated over a five-year period on 17 separate occasions.  These sham transactions, which were in themselves related-party transactions, were designed to defraud potential purchasers (such as the THL Funds), lenders, and potential lenders by concealing the existence of a receivable owed to Refco primarily by RGHI, a company controlled by Bennett that was used to "park" substantial uncollectible debts owed to Refco and Refco's own trading losses and other expenses (the "RGHI Receivable").  In response to the THL Funds' due diligence requests, Mayer Brown also misled the THL Funds by both denying the existence of and hiding numerous corporate guarantees and indemnifications that Refco provided in connection with the sham transactions, each of which also constituted a related-party transaction that should have been disclosed to the THL Funds.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[1]    Refco Group Ltd., LLC, Refco Inc., and their affiliates, subsidiaries, predecessors, and successors are collectively referred to as "Refco" or the "Company," unless reference to a specific Refco entity is made.  RGHI is excluded from this definition of Refco.



     3.     As the prepared remarks by the United States Attorney in connection with the recent indictment[2] filed against Collins make clear, Collins "was not merely a lawyer whose client was committing fraud and who should have caught on – Collins instead played an active and crucial part in perpetrating the Refco fraud."[3]  Moreover, Collins's role in the fraud was "vital because the people he lied to" – particularly the THL Funds – "believed him as a result of his long-standing relationship with [Refco] and his stature within the legal community."[4]

     4.     In this action, the THL Funds seek to recover the losses they have suffered as a result of the scheme and conspiracy in which Mayer Brown, Bennett, and others participated, alternatively under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, or under 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations

---

[2]    See United States v. Collins, 07 Cr. 1170 (LBS), filed on or about December 18, 2007 (the "Collins Indictment").

[3]    Prepared Remarks Concerning United States v. Joseph Collins by United States Attorney Michael J. Garcia, December 18, 2007.

[4]    Id.

Act (for a conspiracy to violate 18 U.S.C. § 1962(c)), and under a number of state law claims pleaded below.[5]

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over the First and Second Claims for Relief under 15 U.S.C. § 78aa.  The Court has jurisdiction over the Third Claim for Relief under 18 U.S.C. § 1964.  The Court has supplemental jurisdiction over the remaining Claims for Relief under 28 U.S.C. § 1367.

6.      Venue is proper in this Court under 18 U.S.C. § 1965 (a) and 15 U.S.C. § 78aa.

## PARTIES

7.      Plaintiff Thomas H. Lee Equity Fund V, L.P. is a Delaware limited partnership.  Its principal place of business and headquarters is located in Boston, Massachusetts.

8.      Plaintiff Thomas H. Lee Parallel Fund V, L.P. is a Delaware limited partnership.  Its principal place of business and headquarters is located in Boston, Massachusetts.

9.      Plaintiff Thomas H. Lee Equity (Cayman) Fund V, L.P. is a Cayman Islands limited partnership.  Its principal place of business and headquarters is located in Boston, Massachusetts.

10.      Many of the affirmative misrepresentations and omissions by Collins and other lawyers at Mayer Brown, as well as by Bennett and other co-conspirators, were received

---

[5]      Whether the interests in Refco that the THL Funds acquired in the 2004 Purchase were securities involves a mixed question of law and fact.  The economic reality of the THL Funds' investment in Refco was that control of Refco's business affairs and policies, as well as its day-to-day management, was reasonably expected to remain, and in fact remained, with Bennett and Refco's existing management even after the 2004 Purchase.  Should the Court conclude that (a) the interests acquired by the THL Funds in the 2004 Purchase are securities and (b) Mayer Brown can be held liable under Section 10(b) and Rule 10b-5, then the RICO claim should be dismissed without prejudice under 18 U.S.C. § 1964(c) to the extent it overlaps with the THL Funds' securities claims, pending the outcome of the indictment against Collins.

and relied upon by the THL Funds at their headquarters and principal place of business in Boston, Massachusetts. The loss suffered by the THL Funds as a result of Mayer Brown's misrepresentations and omissions was suffered in Boston, Massachusetts as well.

11. Defendant Mayer Brown, Rowe and Maw LLP is among the largest law firms in the world, with more than 1,500 lawyers operating in 14 major cities worldwide, including Chicago, New York, and London. According to a footer on its website as of January 16, 2008, Mayer Brown is the combination of two limited liability partnerships, each named Mayer Brown, Rowe and Maw LLP, one established in the State of Illinois and one in the UK.[6] The combined Mayer Brown partnership is liable for the wrongful acts and omissions of the lawyers who performed the work described herein.

12. The combined Mayer Brown partnership should be treated as a single entity for purposes of this action because, among other things:

(a) Mayer Brown's United States and European partners have agreed to share, and in fact do share, profits and losses. As reported by TheLawyer.com, since 2005, the European and United States operations of the law firm have had one profit pool.

(b) Mayer Brown's partners in the United States and Europe exercise joint control and management over the combined law firm. Mayer Brown reported, in a press release on its website, that Mayer Brown is "governed by an international management committee, comprised of representatives from across the firm."

---

[6]     Since this litigation began, Mayer Brown has changed the footer, which now reads: "Mayer Brown is a global legal services organization comprising legal practices that are separate entities." See www.mayerbrown.com (last visited Feb. 14, 2008). But at least up until middle-to-late January 2008, the website stated that Mayer Brown is the combination of two limited liability partnerships, as stated above (See attached Exhibits 2-5).

(c)    Mayer Brown's partners in the United States and Europe contribute property, financial resources, effort, skill, and knowledge to the business of serving the combined firm's clients.

(d)    When the Chicago-based law firm Mayer, Brown & Platt and the London-based law firm Rowe & Maw merged in 2002 to form the firm then known as Mayer, Brown, Rowe & Maw, they declared their intention and agreement to become a single entity. The combined Mayer Brown firm told the public that the two firms would be "combining operations" and "'integrating our practices,'" in order to offer "'seamless, full-service legal capabilities in the most important commercial centers of Europe and North America.'" Furthermore, when the firm changed its name to Mayer Brown in 2007, James D. Holzhauer, the firm's chairman, announced: "'Unifying our brand name to Mayer Brown is a powerful sign of the global firm we have built.'"

(e)    Mayer Brown announces the promotion of partners on a worldwide basis. In a press release issued in October 2007, Mayer Brown announced the "promotion of 27 new partners in the U.S. as part of 43 promotions worldwide." Mayer Brown also announces the demotion of partners on a worldwide basis, informing employees, in a 2007 memorandum, "[a]s one element of a strategic review, Mayer, Brown, Rowe & Maw has decided to restructure our partnership. Forty-five equity partners (approximately 10% of the worldwide total) have been asked either to leave the firm or to accept other positions within the firm."

(f)    Mayer Brown describes itself to the public as a single entity. It describes itself, on the firm's one website and elsewhere, as a "leading global law firm with 1,500 lawyers operating in major cities worldwide." Mayer Brown also describes all its offices

as belonging to the same entity, stating on its website that "Mayer Brown LLP is among

the largest law firms in the world with more than 1,500 lawyers in seven U.S. cities

(Charlotte, Chicago, Houston, Los Angeles, New York, Palo Alto and Washington), six

European cities (Berlin, Brussels, Cologne, Frankfurt, London and Paris) and Hong

Kong."[7]

13.    Before Refco's collapse, Mayer Brown had long been Refco's primary

outside counsel, handling most of its significant legal matters, including regulatory and

compliance issues and important corporate work.  Mayer Brown senior partner Collins, at the

time of the 2004 Purchase, had worked with Refco for many years, developing a close

relationship with Bennett, who had assumed control of Refco in September 1998.  Refco was

Collins's most significant client, and Mayer Brown invoiced in excess of $40 million from Refco

between 1997 and 2005, which amounted to about half the billings for which Collins was

responsible.

14.    Indeed, a former Refco employee was quoted in the press as describing

Collins as Refco's "go-to-guy," reporting that all important transactions and deals involving the

brokerage were first cleared through Collins or one of his colleagues at Mayer Brown.  The firm

represented Refco in connection with note and loan agreements to obtain hundreds of millions of

dollars of financing.

15.    Collins served as billing partner and, according to the Bankruptcy

Examiner, was responsible for and did review the detailed billing statements that Mayer Brown

issued to Refco on a monthly basis, and thus was aware of the work that each attorney at Mayer

Brown performed for Refco.  The Examiner concluded that, even for those sham round-trip loan

---

[7] See attached Exhibits 1-6 in support of the allegations in ¶ 12(a)-(f).

transactions that Collins did not handle himself, he was aware of Mayer Brown's work because (among other things) those transactions were described on the monthly billing statements that Collins prepared or reviewed and then sent to Refco.

16.     Mayer Brown was intimately familiar with Refco's business, finances, operations, and corporate structure. Mayer Brown presented itself as an expert on all things Refco, and it was understood that Mayer Brown had a particularly close and special relationship with both Bennett and Refco that far exceeded a typical attorney-client relationship. Both Bennett and Collins fostered this perception, not only in their dealings with the THL Funds, but throughout the markets in which Refco operated. Furthermore, Collins used Mayer Brown's reputation as one of the world's largest and most prestigious law firms to further his and Bennett's fraudulent goals. Given its long history of representing Refco, Mayer Brown had superior information about Refco at all relevant times and repeatedly vouched for the information it (along with its Refco-affiliated clients) provided concerning Refco and Refco's transactions, including the related-party transactions, knowing that this information was critical to the THL Funds' willingness to consummate the 2004 Purchase.

## FACTUAL BACKGROUND

17.     Until the fraud perpetrated by Bennett and his co-conspirators was revealed, Refco had been a leading provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets.

**The Fraudulent Scheme of Bennett, Mayer Brown and the Other Conspirators**

18.     According to the latest indictment filed against Bennett, Trosten, and

Grant (the "Bennett Indictment")[8] – to which Bennett pleaded guilty on February 15, 2008 –

beginning as early as 1997, Bennett and his co-conspirators concocted and implemented a

scheme that continued for many years to manipulate Refco's books and records so that Refco

appeared to be more profitable and financially stable than it was. In October 1997, Refco

customer Victor Niederhoffer and several funds under his control lost in excess of $90 million

using Refco margin loans. Instead of Refco writing off the uncollectible portion of this debt as a

loss, Bennett and his co-conspirators hid the debt in an RGHI subsidiary – Wells Limited –

through a series of settlements and assignments. By these transactions, Refco released

Niederhoffer from the remaining debt, and the RGHI subsidiary in effect assumed the remaining

Niederhoffer debt to Refco, which later became part of the RGHI Receivable discussed below.

At least some of the documents for these transactions – including the settlement documents –

were negotiated and prepared by Mayer Brown lawyers, including Collins. Accordingly, Mayer

Brown knew that Refco had sustained significant losses as a result of Niederhoffer's trading

activity, and that Refco was disguising these losses by shifting them to RGHI.

19.     Refco customers to which Refco had extended credit incurred hundreds of

millions of dollars of losses in their Refco accounts in the 1990s. Also during that time period,

Refco directly and indirectly incurred a series of substantial trading losses. When the customers

could not repay the loans that Refco had extended or when Refco lost money through its

proprietary trading, Refco did not disclose the losses and write them off as required. Instead,

Bennett and his co-conspirators embarked on a fraudulent scheme to hide the losses and thereby

mask Refco's true financial condition.

---

[8]     See U.S. v. Bennett, et al., S3 05 Cr. 1192 (NRB), filed on or about January 16, 2007.

20.     As described below, Mayer Brown participated directly with, and provided material assistance to, Bennett and his co-conspirators in helping them execute the fraudulent scheme to hide Refco's losses.  Starting no later than 1997, according to the Examiner, Collins and other Mayer Brown attorneys participated directly with and provided material assistance to Bennett and the other co-conspirators on transactions to conceal the uncollectible debts incurred by Refco from lenders, potential investors, and others.  Thus, Mayer Brown knew that Refco had sustained significant losses, that Refco was using RGHI to hide these losses, and that Refco was engaging in transactions that had no legitimate business purpose, but were instead intended to manipulate the Company's financial statements.  These losses later became part of the RGHI Receivable.

**The Sham Round-Trip Loan Transactions**

21.     Beginning in 2000, Bennett and his co-conspirators engineered a series of sham round-trip loan transactions intended to hide the losses suffered by Refco and its customers. The first step in this fraudulent scheme involved transferring these uncollectible receivables to RGHI, thereby increasing the RGHI Receivable. The RGHI Receivable consisted of debit balances in three sets of Refco accounts:  (i) RGHI's accounts at Refco Capital Markets, Ltd. ("RCM"), (ii) RGHI's accounts at Refco Capital Corporation (later, Refco Capital LLC) ("RCC"), and (iii) Refco Global Finance's ("RGF") accounts at RCM.  According to the Refco Bankruptcy Examiner, from 2000 to 2005, Mayer Brown attorneys (including Collins) were involved in, and provided material assistance for, 17 of these sham round-trip loan transactions, all but one of which straddled Refco's fiscal year-end or quarter-end, and all of which were designed to conceal the RGHI Receivable from others reviewing Refco's financial statements.[9]

---

[9]     Even before the co-conspirators started using the sham round-trip loan transactions, they were manipulating Refco's financial statements.  Specifically, in February 1998, Refco and RGHI engaged in a

22.     As a key means of hiding the RGHI Receivable from financial institutions, investors, and potential purchasers of Refco, Bennett and his co-conspirators directed that the RGHI Receivable be temporarily transferred – immediately before the end of each Refco financial reporting period – to one or more unaffiliated third parties in a series of sham loan transactions. These transactions gave Refco the appearance of having a legitimate receivable from a third party on its books, rather than an uncollectible debt parked in a related entity, RGHI. Then, immediately after the end of each reporting period, the Receivable was rebooked to RGHI, and the unaffiliated entities were compensated for their role in the scheme. Bennett and his co-conspirators, with Mayer Brown's active involvement, caused Refco to engage in these sham loan transactions at every fiscal year-end from at least February 2000 and, when financial reporting periods changed, at every fiscal quarter-end from May 2004 through August 2005.

23.     These sham transactions rendered Refco's financial statements and books and records materially false and misleading. These transactions constituted related-party arrangements of Refco which Mayer Brown knew were required to be disclosed to the THL Funds in connection with the 2004 Purchase, but were not. As explained further below, each transaction also involved a guarantee and indemnification by Refco, which Mayer Brown knew provided an additional required basis for the transactions to be disclosed to the THL Funds, but again, they were not disclosed.

---

series of wire-transfer "loans" with the following unrelated third parties: Tradewinds Debt Strategies Fund, Tradewinds Emerging Debt Fund, and MLC Emerging Markets HSE-Cox ("MLC"). Refco and RGHI again engaged in these wire-transfer "loans" in February 1999 with the following unrelated third parties: the Bulgarian-Russian Investment Bank ("BriBank"), GlobeInvest Corp. (an entity related to BriBank), EMF Ltd., and MLC. These transactions, however, were not booked as loans; rather, they were booked as "repo" transactions with "repo termination dates" in early March of the relevant year. The wire-transfer "loans" were an early method of hiding the RGHI Receivable so that it temporarily disappeared from Refco's books, replaced by an apparently valid receivable from a third party unrelated to Refco or RGHI. Each of these repo transactions was accomplished, and furthered by, the use of interstate or foreign wires.

24.     These transactions lacked economic substance and were undertaken by
Bennett and his co-conspirators solely in furtherance of an illegal scheme to defraud investors,
financial institutions, regulators and the public so that the conspirators could eventually reap
millions of dollars from the sale of all or part of Refco.  Mayer Brown knew as early as 2001 that
Refco insiders wanted to cash out some or all of their interests in the Company and thus had a
powerful incentive to manipulate Refco's financial records to make the Company more attractive
to potential purchasers.

25.     Each of the 17 sham round-trip loan transactions followed a similar
pattern.  A Refco entity, generally RCM, would make a loan to an unaffiliated customer.
Simultaneously, the customer would make a loan in the same amount to RGHI, and RGHI would
use the funds to pay down its obligation to Refco.  Refco unconditionally and absolutely
guaranteed the prompt and complete performance of all of RGHI's obligations and liabilities
under the loan agreement, including repayment.  Each of these transactions was accomplished,
and furthered by, the use of interstate or foreign wires.  As a result of these "loans," Refco's
period-end financial statements did not reflect related-party transactions from RGHI, but instead
reflected receivables in those amounts from third parties unaffiliated with Refco, Bennett, or
RGHI.  In addition, Refco's financial statements never revealed the existence of the related-party
guarantee by Refco of RGHI's obligations created pursuant to the documents drafted by Mayer
Brown.

26.     To enable the customers to profit from this arrangement, the interest rate
that RGHI paid the customers for their "loans" was between 15 and 100 basis points higher than
the interest rate that the customers paid Refco on the Refco "loans."  According to the Examiner,
the net profit made by the customers on each transaction ranged from $1,500 to almost $200,000,

depending on the amount loaned, the interest spread, and the duration of the transaction. Although characterized as loans, in most of these transactions no funds were actually transferred, other than the customer's profit from the interest spread.

27.    A few days after the end of each Refco financial reporting period, the transactions were unwound. Refco would lend the money back to RGHI (thus increasing the amount owed by RGHI to Refco), and RGHI would then use the money to pay back the unrelated customer the full amount of the loan. Bennett stood on both sides of each transaction: on behalf of RGHI, he signed the documentation for each loan to RGHI and, with one exception, he also signed the guarantees and indemnities on behalf of Refco. The corresponding RCM loans to the customer were generally executed by Santo Maggio, but Bennett executed one, and several were executed by another Refco executive. (Maggio, like Bennett, pleaded guilty to criminal charges in connection with his role in the Refco scheme).

28.    Not only were these loans unwound within days of the end of Refco's financial reporting period, but in each instance the third-party customer was insulated from all economic risk: Refco unconditionally and absolutely guaranteed all of RGHI's obligations and liabilities to the customer under the loan documents, including the obligation to pay principal and interest. This guarantee itself constituted a related-party transaction of Refco and was required to be disclosed to the THL Funds.

▐▐ In addition, Refco agreed to defend, indemnify, and hold harmless the third-party customer from and against, among other things, any claims, losses, or liabilities imposed upon or suffered by the customer as a result of any claim of a third party arising out of or based on the loan transactions. �â–ˆâ–ˆâ–ˆâ–ˆâ–ˆ



Each indemnification itself constituted a related-party transaction and a material contract of

Refco and was required to be disclosed to the THL Funds.

30.      Mayer Brown fully understood the true nature of these fraudulent "loans"

and the means by which they were accomplished at least as far back as February 2000.

Specifically, before one of the first documented sham loan transactions – a February 25, 2000

sham round-trip loan with an entity called CIM Ventures, Inc. ("CIM Ventures") – CIM

Ventures sent a letter to Mayer Brown confirming exactly how the transaction was to proceed:

> It is planned that RCM will deposit the loan proceeds in CIM's
> account (No. 6800-10101) at RCM on February 25, 2000.  CIM
> will then fax a letter to RCM instructing them to move the funds to
> RGHI with a 15 basis point uplift in the interest rate.  RCM then
> will withdraw the funds from CIM's account and deposit them in
> RGHI's account, thereby completing the back-to-back loan
> transaction.  The steps will be reversed on March 9, 2000.  RCM
> will then transfer the CIM spread on the transaction to its Royal
> Bank of Canada account in the Cayman Islands.

As discussed in more detail below, Refco entered into another sham round-trip loan with CIM

Ventures on February 23, 2001.  Before that transaction, CIM Ventures sent a nearly identical

letter (apart from changes in dates and interest rate) to Collins confirming the details and

mechanics of the transaction.

31.     Between 2000 and 2005 – which included the period during which the THL Funds conducted due diligence and completed the 2004 Purchase – Mayer Brown was involved in multiple facets of the 17 sham round-trip loan transactions that Bennett orchestrated to hide the RGHI Receivable and misrepresent Refco's true financial condition. Mayer Brown partners and associates created and shaped the underlying documentation, negotiated the terms of the loan documents with the loan participants or their counsel, transmitted the documents to Refco and to the loan participants, and retained and distributed copies of the executed loan documents. On at least two separate occasions, Mayer Brown sent the loan participants confirmations that the loans had been unwound, endorsing the promissory notes as "paid in full." The work performed by these Mayer Brown attorneys was undertaken in the ordinary course of their employment at Mayer Brown and in furtherance of Mayer Brown's business.

32.     The following summarizes the 17 sham round-trip loan transactions that Refco engaged in with unrelated entities to hide the RGHI Receivable and thereby mask Refco's true financial condition from financial institution lenders, regulators, potential investors (such as the THL Funds) and the public, and illustrates the material assistance that Mayer Brown provided in connection therewith. Each of these transactions was structured as described in ¶¶ 21-29, above:

(a)     On or about February 25, 2000, Bennett, Refco Chief Financial Officer Rob Trosten ("Trosten") and/or Refco Executive Vice President Santo Maggio ("Maggio") caused Refco to engage in a $150 million sham loan transaction with CIM Ventures, an Ingram Micro, Inc. ("Ingram") subsidiary, which was unwound on March 9, 2000. Collins was involved from the inception of these transactions. The Examiner's Report refers to a conversation between a Refco executive and Collins concerning the

structure of the loan transaction, after which Mayer Brown lawyers (including Collins)

prepared, edited, and reviewed the transactional documents, including the guarantee and

indemnification provided by Refco.  Mayer Brown lawyers also communicated directly

with representatives of CIM Ventures as well as Refco executives about the loans.  For

example, Mayer Brown sent to Ingram's corporate treasurer on February 4, 2000 drafts of

the loan agreements and an indemnity letter from RGHI, prepared and forwarded to

Ingram on February 11, 2000 revised drafts reflecting Ingram's comments,

communicated with Ingram and Refco concerning the transaction and, in connection with

the unwinding of the loans, transmitted the original promissory note that the customer

had signed, which the Mayer Brown lawyer endorsed as "paid in full" as the authorized

agent of RCM.  Mayer Brown plainly understood the mechanics of the transaction – on

February 22, 2000, CIM Ventures sent the Mayer Brown lawyer a letter summarizing and

detailing how the transaction was to work, including that RCM would be paying the

interest spread on the transactions.  Mayer Brown lawyers sent and received execution

copies of the documents and thus understood that Bennett was signing on behalf of both

RGHI and the Refco entities.  At the time of his involvement in these transactions,

Collins had been aware for seven months that RGHI owed money to Refco, including

amounts arising from the uncollectible Niederhoffer debt.

> (b)    On February 25, 2000, Bennett, Trosten and/or Maggio caused

Refco to engage in a $110 million sham round-trip loan transaction with CS Land

Management, LLC ("CS Land") that was unwound on March 3, 2000.  The same Mayer

Brown lawyer again handled the transaction documents, sending drafts to the customer

and its counsel on February 24, 2000 and the final executed versions four days later.

According to the Examiner's Report, on February 23, 2000, Collins discussed with Maggio and a Mayer Brown colleague how to respond to CS Land's request for an enforceability opinion. As with the CIM Ventures round-trip transaction, after the close of Refco's reporting period, the same Mayer Brown lawyer sent CS Land a copy of its note payable to RCM which he had endorsed as "Paid in Full – March 3, 2000."

 (c) On February 25, 2000, Bennett, Trosten and/or Maggio caused Refco to engage in a $50 million sham round-trip loan transaction with EMF Core Fund ("EMF") that was unwound on March 3, 2000. The transactional documents were handled by the same Mayer Brown lawyer.

 (d) On February 23, 2001, Bennett, Trosten and/or Maggio caused Refco to engage in a $250 million sham round-trip loan transaction with CIM Ventures that was unwound on March 6, 2001. Once again, the same Mayer Brown lawyer handled the transactional documents and negotiated terms with the customer's outside counsel. After the transaction was unwound, Collins was copied on the transmittal of the original promissory note to CIM Ventures marked "paid in full."

 (e) On February 26, 2001, Bennett, Trosten and/or Maggio caused Refco to engage in a $200 million round-trip loan transaction with Delta Flyer, Inc. ("Delta Flyer") that was unwound on March 2, 2001. Mayer Brown associate Paul Koury, who would subsequently be involved in Mayer Brown's representation of Refco in connection with the 2004 Purchase, negotiated and handled the transactional documents. Trosten executed the guaranty and indemnity on behalf of RGL.

 (f) On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $175 million round-trip loan transaction with Delta Flyer that was

unwound on March 4, 2002. Koury handled the documentation and sent the final executed documents to Delta Flyer on February 26, 2002.

(g)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $125 million round-trip loan transaction with Beckenham Trading Company, Inc. ("Beckenham") that was unwound on March 4, 2002. Mayer Brown's Koury drafted and handled the transactional documents and forwarded them to Beckenham for its review and execution using the interstate wires or mails. This transaction was originally to be with CIM Ventures, but CIM Ventures pulled out, explaining to Refco in an email that the "Enron debacle is putting pressure in the SEC to increase the level of financial disclosure by large companies." Collins was aware that CIM Ventures had been preparing to engage in another round-trip loan transaction, having received a mark-up of the 2001 documents (reflecting the new dates and interest rates).

(h)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $325 million round-trip loan transaction with Liberty Corner that was unwound on March 4, 2002. This was the first of ten such round-trip loan transactions that Refco undertook with Liberty Corner. Maggio and another Refco employee approached Liberty Corner in early February 2002 about a round-trip loan transaction and directed Liberty Corner to Koury. Koury handled the documentation, emailing drafts to Liberty Corner on February 14, 2002. The documentation finally agreed upon for this transaction was used as a model for the subsequent Liberty Corner round-trip loans, most of which Koury drafted. Although Koury was the principal Mayer Brown attorney on these transactions, Collins knew of Koury's work on the round-trip

loan transactions – for example: (i) on September 27, 2004, Collins sent Refco a bill for work performed during August 2004 which included "preparation of loan agreement, indemnification and guaranty for Liberty Corner," and (ii) Collins was copied on a May 20, 2005 Koury email to Maggio attaching "documents for use in connection with the loans for" Liberty Corner. The email's text included a brief list of the loan documents and the existence of the guaranty and indemnity letter as well.

(i)    On February 21, 2003, Bennett, Trosten and/or Maggio caused Refco to engage in a $150 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2003. Koury again drafted the loan documents.

(j)    On or about February 21, 2003, Bennett, Trosten and/or Maggio caused Refco to engage in a $500 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2003. Mayer Brown drafted the loan documents.

(k)    On February 20, 2004, Bennett, Trosten and/or Maggio caused Refco to engage in a $720 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2004. Mayer Brown handled the loan documents. This sham round-trip loan transaction was particularly significant because the loans were initially planned to be split between Delta Flyer ($200 million) and Liberty Corner ($500 million). But when Delta Flyer refused to engage in another such transaction, Mayer Brown and Refco were required to redraft the documents so that a single Liberty Corner round-trip loan transaction could be completed for $720 million. This last-minute change plainly illustrated Refco's need to complete a round-trip loan transaction at this particular time, which was the close of Refco's 2004 fiscal year. The round-trip loan necessarily

impacted Refco's financial statements at the exact time when the THL Funds were conducting due diligence.

(l)    On May 27, 2004, Bennett, Trosten and/or Maggio caused Refco to engage in a $700 million round-trip loan transaction with Liberty Corner that was unwound on June 7, 2004. This transaction, which was handled by Koury, occurred simultaneously with the drafting and negotiating of the Equity Purchase and Merger Agreement (the "Agreement") for the 2004 Purchase by the THL Funds, which was executed on June 8, 2004. At the same time that Mayer Brown was handling this transaction, and during the ten-day period that this transaction was in place, Koury sent WGM draft disclosure schedules that failed to disclose this $700 million round-trip loan transaction. And other Mayer Brown attorneys sent to WGM drafts of the Agreement containing representations that no undisclosed related-party transactions or arrangements existed between Refco and RGHI. These representations were false and misleading. In fact, the very loan transactions that Koury was handling were themselves related-party transactions and rendered the draft schedules he was sending WGM false and misleading. From this point forward, the round-trip loan transactions increased in frequency to every quarter end as Refco prepared for the 2004 Purchase and its obligations thereafter. Yet, despite this obvious sign that these transactions were undertaken only to manipulate Refco's financial condition, Mayer Brown continued to work on these transactions.

(m)    On August 25, 2004, Bennett and/or Maggio caused Refco to engage in a $485 million round-trip loan transaction with Liberty Corner that was unwound on September 7, 2004. Mayer Brown handled the loan documents.

(n)    On November 26, 2004, Bennett and/or Maggio caused Refco to engage in a $545 million round-trip loan transaction with Liberty Corner that was unwound on December 3, 2004. Mayer Brown handled the loan documents.

(o)    On December 30, 2004, Bennett and/or Maggio caused Refco to engage in a $550 million round-trip loan transaction with Liberty Corner that was unwound on or about January 5, 2005. Mayer Brown handled the loan documents. This was the only round-trip loan that did not straddle the end of a Refco financial reporting period.

(p)    On February 23, 2005, Bennett and/or Maggio caused Refco to engage in a $345 million round-trip loan transaction with Liberty Corner that was unwound on March 8, 2005. Mayer Brown handled the loan documents.

(q)    On May 25, 2005, Bennett and/or Maggio caused Refco to engage in a $450 million round-trip loan transaction with Liberty Corner that was unwound on or about June 6, 2005. This transaction occurred as Refco was preparing for the Initial Public Offering of common stock (the "IPO"). Koury handled the loan documents, and Collins received copies of the documents on May 20, 2005.

33.    Each of the foregoing transactions involved, and was furthered by, the use of interstate or foreign wires, if not also the use of interstate or foreign mail, in order to transmit draft and final loan documentation, transmit comments on loan documentation, transfer funds, and communicate about the transactions.

34.    The round-trip loan transactions that Mayer Brown worked on rendered Refco's financial statements – including those presented to the THL Funds in connection with the diligence process in the course of the 2004 Purchase – materially false and misleading and

were designed to and did provide a distorted picture of Refco's financial health. Mayer Brown

knew that these financial statements not only would be provided to prospective purchasers of

Refco, such as the THL Funds, but also to financial institutions that lent money to Refco and that

required, as part of the underlying credit agreements, that Refco furnish them with accurate,

audited financial statements. Mayer Brown represented Refco in connection with its largest

financial institution financings and negotiated the credit agreements on behalf of Refco.

According to the Examiner, many of these credit agreements contained covenants that prohibited

Refco from incurring additional indebtedness beyond certain levels and, in some cases, from

becoming liable as a guarantor. ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ Mayer Brown, nevertheless, worked on the sham round-trip

loan transactions that violated the very loan covenants it had negotiated with these financial

institutions, and did not disclose the sham transactions to Refco's lenders. And thereafter, Mayer

Brown never disclosed to THL that, as a result of sham transactions Mayer Brown had

documented, Refco had repeatedly violated covenants in its credit agreements.

     35.     Based on its extensive work for Refco and its conduct and actions

described above, Mayer Brown understood that the round-trip loan transactions, for which it

provided material assistance, substantially affected Refco's financial statements, could not be

10 ███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████