legitimate business transactions, were undisclosed related-party transactions, and that failure to disclose them misled lenders, prospective purchasers, and the investing public. Mayer Brown's knowledge is established because, among other things, Mayer Brown:

>   (a)    negotiated and drafted virtually all the documentation for the 17 round-trip loan transactions and understood that each entailed the short-term lending of hundreds of millions of dollars to customers which had absolutely no risk of loss because they were backstopped by a Refco corporate guarantee and indemnification (yet the customer nevertheless received interest on those loans) and entailed borrowings by an entity (RGHI) that had no real operations or assets other than its investment in Refco;

>   (b)    knew that these round-trip loans, with one exception, were undertaken only at times that straddled Refco's financial reporting periods, and knew that these loans changed from being made annually to being made quarterly in anticipation of the 2004 Purchase and related transactions which required Refco to supply certain quarterly information.  Indeed, according to the Examiner, Mayer Brown was aware of Refco's financial reporting periods and Refco's need for audited financial statements for use in its business operations, including as required by its lenders pursuant to loan and financing documents that Mayer Brown itself had drafted;

>   (c)    understood that these transactions caused the RGHI related-party receivable to be removed from Refco's books and records at the time when financial statements were being prepared and then to reappear immediately thereafter, only to disappear yet again at the time of the next annual audit or quarterly statement;

(d)     knew that these were not arm's-length transactions, given Bennett's involvement on both sides, signing (in all but one instance) the guarantee and indemnification on behalf of Refco and the loan documents on behalf of RGHI;

(e)     knew that RGHI owed significant amounts to Refco.  According to the Examiner, in October 1999, Bennett asked Collins for assistance in developing arguments that could be used to demonstrate to the Federal Reserve Bank of New York that RGHI had substantial net worth, equal to "the value of its investment" in Refco.  The Examiner found a copy of this letter produced by Mayer Brown with this statement bracketed and – in handwriting consistent with that which Collins has acknowledged to be his own – the comment:  "minus loans to RGH[I]," thus demonstrating Collins's awareness of RGHI's corresponding obligations to Refco;

(f)     knew that these transactions lacked any proper business purpose. Mayer Brown witnesses interviewed by the Examiner stated that they were not aware of any business purpose for these transactions at the time they prepared the documentation, nor could they articulate one when interviewed long after Refco's bankruptcy.  The Examiner found that not a single Mayer Brown lawyer ever asked anyone at Refco about the business purpose of these transactions; and

(g)     knew that these transactions caused Refco to violate the Company's loan covenants (contained in documents Mayer Brown itself had drafted) by including corporate guarantees of all of RGHI's obligations in connection with the sham round-trip loans.

36.     Given this knowledge possessed by Mayer Brown, the Bankruptcy Examiner concluded that "evidence" existed "showing that Mayer Brown knew that the Round-

Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to bolster Refco's financial appearance to lenders and investors."

37.    Finally, Mayer Brown understood that the loans by which RGHI temporarily paid down its debt, the Refco corporate guarantees of the customer loans to RGHI, the indemnification of the customer for any losses arising from the transactions, and the subsequent reassumption of the debt by RGHI each separately constituted a related-party transaction that needed to be disclosed to the THL Funds, but was not. Mayer Brown further understood that Refco's guarantee and indemnification in favor of the customer also each separately constituted a material contract of Refco, which needed to be disclosed to the THL Funds, but was not. Thus, even had Mayer Brown not known (as it did) how Bennett and the other co-conspirators were using the RGHI loan proceeds, it knew that each of these related-party transactions and guarantee and indemnification obligations had to be disclosed to the THL Funds, but was not.

**The THL Funds' Due Diligence**

38.    In or about the fall of 2003, the THL Funds began to explore the possibility of purchasing an interest in Refco. In connection with this potential purchase, the THL Funds conducted exhaustive due diligence, with the assistance of their affiliates and numerous professional advisors, for more than eight months. Thomas H. Lee Partners L.P. ("THL Partners") personnel performed intensive due diligence for this investment, including dozens of meetings and conference calls with Refco management and outside advisors. Senior partners of THL Partners led this effort.

39.    In addition to dedicating personnel from THL Partners, a number of professional advisors were retained. KPMG LLP was engaged to conduct accounting due

diligence, including an assessment of Refco's financial statements and a review of certain work papers of Grant Thornton, Refco's independent public accountants, and to perform information technology-related diligence. WGM was engaged to perform legal diligence and to analyze Refco's litigation and regulatory enforcement history, and McKinsey & Company was hired to conduct customer surveys across Refco's business lines and to analyze and forecast industry growth. Sandler O'Neill, an investment firm specializing in financial services companies, analyzed Refco's position within the market, Marsh & McLennan assessed risk management and the adequacy of insurance, and Mercer Human Resource Consulting reviewed human resource issues. And an investigative agency was engaged to explore the backgrounds of Bennett and certain other members of Refco's senior management so that they could be assured of their integrity and honesty. The diligence took some eight months. In performing that diligence, the THL Funds and their advisors relied substantially on the several years of Refco audited financial statements that Bennett and Trosten caused to be provided to them. These financial statements were materially false and misleading as a result of the fraudulent schemes perpetrated by Bennett and his co-conspirators as described above.

40.     The economic reality of the THL Funds' investment in Refco was that control of Refco's business affairs and policies, as well as its day-to-day management, was reasonably expected to remain, and in fact remained, with Bennett and Refco's existing management even after the 2004 Purchase, in part because Bennett and existing management purportedly had the specialized knowledge and expertise to operate Refco profitably in the highly specialized fixed income, foreign currency, and exchange-traded derivatives markets.

41.     Mayer Brown represented Refco Group, RGHI, and Bennett in connection with the 2004 Purchase. Among other things, Mayer Brown handled the drafting and negotiating

of the transactional documents and played a central role in the extensive diligence process

undertaken by the THL Funds, providing information directly to the THL Funds and their

advisors and coordinating access to documents and information being provided by Refco and its

affiliates as well as Bennett.  At the direction of, and in coordination with Bennett and Trosten,

Mayer Brown attorneys communicated frequently with the THL Funds' counsel regarding the

diligence process for the 2004 Purchase over interstate wires.

42.    During the due diligence process, Mayer Brown and Collins understood

that they would be providing information to the THL Funds upon which the THL Funds would

rely in deciding whether to proceed with the 2004 Purchase.  In this capacity, Mayer Brown

would not be serving merely as a conduit for information from Refco management and Bennett,

but would be drawing on its own extensive knowledge and information built up over the many

years that Collins and his Mayer Brown colleagues had been working with Refco.

43.    Consistent with these understandings, Mayer Brown attorneys had

extensive direct contact with the THL Funds and their representatives.  For example, Collins

attended two face-to-face meetings with representatives of the THL Funds and WGM lawyers in

April 2004 in connection with preparation of the Letter of Intent.  And Collins and other Mayer

Brown attorneys participated regularly in conference calls and engaged in email communications

employing the interstate wires on an almost daily basis as the 2004 Purchase neared closing.

**The THL Funds' Focus on Related-Party Transactions**

44.    Of critical importance to the THL Funds during the diligence process was

to identify and eliminate any related-party transactions and arrangements, in particular dealings

between Refco and its senior management (and their affiliates), which necessarily included

RGHI.  Despite the THL Funds' repeated requests for information concerning all dealings

between Refco and any related-party, including RGHI and Bennett, and despite the THL Funds'

insistence that any related-party obligations be eliminated by the closing of the 2004 Purchase (which Mayer Brown knew Bennett had agreed to do), Mayer Brown – throughout the diligence period and even after the 2004 Purchase – participated in and furthered the scheme of Bennett and the other co-conspirators. Mayer Brown did so by continuing to negotiate, coordinate, and provide material assistance on additional sham round-trip loan transactions (each of which was a related-party transaction and included indemnifications), all the while concealing those transactions from the THL Funds and assuring the THL Funds and their representatives that no undisclosed related-party transactions, indemnifications, or material contracts existed.

45.     Early in the diligence process, Refco disclosed to the THL Funds that RGHI owed Refco approximately $108 million as a result of a loan made to RGHI by Refco. The THL Funds insisted that this loan be paid off before closing. At no time did Refco or Mayer Brown disclose the RGHI Receivable or any of the round-trip loan transactions described above.[11] Refco and Bennett, with Mayer Brown's knowledge, agreed that the $108 million loan would be repaid, and it was.

46.     Bennett and the THL Funds addressed this matter during a face-to-face meeting held in New York City in April 2004. Collins attended this meeting, and represented Refco, RGHI, and Bennett in the subsequent drafting of the Letter of Intent, including the provision requiring the $108 million to be paid off before closing and the provision that no related-party transactions would remain at closing. This meeting followed another negotiating session attended by Collins, Bennett, WGM partners and representatives of the THL Funds.

47.     Mayer Brown and Collins at all times knew the importance that the THL Funds placed on identifying and eliminating related-party transactions. The Letter of Intent,

---

[11]     References in this Complaint to the RGHI Receivable and to related-party transactions between RGHI and Refco do not include this $108 million shareholder loan.

which Mayer Brown negotiated on behalf of the sellers, specifically provided that the acquisition

proposal contained therein was "based … on the following assumptions and understandings . . .

any existing shareholder loans will be terminated prior to Closing and funded with cash

otherwise payable to the Sellers, and all existing agreements, contracts or arrangements between

the Company and the Sellers or their affiliates will be terminated (other than employment

obligations to [Bennett] and indemnification obligations owed to the Sellers in their capacities as

directors or officers of the Company) . . . ."  Collins reviewed and provided comments on drafts

of the Letter of Intent and negotiated its terms.

48.     In addition to requesting information and documentation concerning all

related-party transactions or arrangements, particularly those involving RGHI and Bennett, the

THL Funds also requested, from the very outset of the diligence process, copies of all material

contracts to which Refco was a party and any agreements under which Refco had incurred

indemnification obligations to others.  The request for all material contracts, furthermore, was

not limited to "still-open" or "still-operative" contracts.  But although the round-trip loan

transactions both constituted material contracts and contained Refco indemnification obligations,

not a single document relating to those transactions was ever provided.

49.     Indeed, at precisely the same time the THL Funds were finalizing the

negotiations of the purchase agreement for the 2004 Purchase, Mayer Brown materially assisted

in the second largest sham round-trip loan transaction – for $700 million.  And in March 2004,

almost at the same time as the largest sham round-trip loan transaction – for $720 million – was

being unwound, with the RGHI Receivable to be rebooked to RGHI, Collins falsely informed a

representative of the THL Funds that Bennett had confirmed that no undisclosed related-party

transactions existed.  Moreover, the very Mayer Brown associate who worked on most of the

sham round-trip loan transactions – including the $700 million transaction – transmitted

disclosure schedules to the THL Funds stating that no undisclosed related-party transactions

existed at the same time that one of these sham round-trip loan transactions was being

completed.  The disclosure schedules were also false and misleading because they did not

disclose the existence of the related-party indemnifications and guarantees that accompanied the

sham round-trip loan transactions.  Those indemnifications and guarantees were material

contracts that remained in effect long after the 2004 Purchase closed.

**Bennett and His Co-Conspirators Repeatedly Deceive the THL Funds**

50.     Bennett and his co-conspirators, including Trosten and Maggio,

intentionally and deliberately concealed the existence of the sham round-trip loan transactions

from the THL Funds and provided materially false and misleading information regarding Refco's

financial condition and the accuracy of Refco's financial statements.  Bennett and his co-

conspirators did so to induce the THL Funds to purchase a majority interest in Refco.

51.     In connection with the 2004 Purchase, Bennett, Trosten and Maggio, with

the knowledge of Mayer Brown, made repeated false and misleading statements to the THL

Funds and omitted to state material facts, including the following:

a.     During the diligence process, Bennett and Trosten caused Refco's

audited financial statements to be provided to the THL Funds.  Those audited financial

statements were false and misleading because, among other things, they failed to disclose

or take into account the true nature of the RGHI Receivable, the sham round-trip loan

transactions which Bennett and the other co-conspirators were orchestrating and on

which Mayer Brown was providing material assistance, and the guarantees and

indemnification obligations incurred by Refco in connection therewith.

   b. On or about July 9, 2004, Bennett executed and transmitted to the THL Funds an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect material interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates or another entity which had been the subject of a guarantee by Refco. These representations were false because they did not disclose or account for the existence of the sham round-trip loan transactions or the RGHI Receivable. In addition, Bennett falsely certified that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Bennett knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed or taken into account in the Circular. He further agreed that he would notify the THL Funds of any misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Bennett never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

   c. On or about July 2, 2004, Trosten executed and transmitted to the THL Funds an officer's questionnaire in which he falsely certified, among other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Trosten knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed or taken into account in the Circular. He further agreed that he would notify the THL Funds of any

misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Trosten never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

        d.      On or about July 6, 2004, Maggio provided the THL Funds with an officer's questionnaire in which he falsely certified, among other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Maggio knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed in the Circular. He further agreed that he would notify the THL Funds of any misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Maggio never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

        e.      On or about March 30, 2004, Bennett told WGM partner Jay Tabor, during a conference call in which Trosten also participated, that no contracts or arrangements existed between Refco and Bennett, RGHI or his affiliates other than regarding his compensation arrangements, which was false – and which both Bennett and Trosten knew was false – because it intentionally ignored the RGHI Receivable and the round-trip loan transactions.

**Mayer Brown's Repeated Lies to the THL Funds**

        52.      At all times relevant to the 2004 Purchase, Mayer Brown knew that Refco had engaged in, and was engaging in, numerous sham round-trip loan transactions with RGHI and that these arrangements represented material corporate contracts that imposed significant

obligations upon Refco, including corporate guarantees of RGHI's obligations and indemnification obligations to the counterparties. Mayer Brown knew that the sham round-trip loan transactions: (a) were themselves related-party transactions, (b) covered up other related-party transactions, (c) did not reflect arm's-length bargaining, and (d) needed to be disclosed. Nevertheless, Mayer Brown did not disclose these material transactions to the THL Funds and made or joined in representations to the contrary.

53.    During a telephone conference on due diligence issues in March 2004, Collins represented to WGM partner Jay Tabor that he had confirmed with Bennett that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI or other affiliates. As Collins knew at the time, this statement was false. Nothing Bennett said to Collins could erase the fact that Mayer Brown knew about and directly participated in contracts and arrangements between Refco and RGHI and that Mayer Brown knew those transactions had not been disclosed.

54.    During a telephone conference on due diligence issues in March 2004, Collins "confirmed" to WGM partner Tabor that all of Refco's receivables listed on Refco's balance sheet were "from customers in ordinary course. Company has gone through with accountants." Collins knew this statement was false because neither the RGHI Receivable nor the receivables arising from the sham loan transactions arose from customers in the ordinary course of Refco's business and they rendered Refco's balance sheet false and misleading.

55.    On May 6, 2004, in response to the THL Funds' repeated requests for all material contracts, Collins sent by email a memorandum, addressed to WGM, stating that: "[w]e were advised by Refco Management that all material contracts were either in the Data Room or

are being produced in response to the requests in Exhibit C to the Letter of Intent."[12] As Collins

knew, this statement was false because not one of the documents relating to the sham round-trip

loan transactions was included in the data room, produced in response to the Letter of Intent, or

otherwise disclosed to the THL Funds.

        56.     In a second memorandum emailed to WGM, also dated May 6, 2004,

Collins represented that "[w]e have been advised by Refco that there are no significant

indemnification obligations which have not been disclosed already." Collins knew that this

statement was false because each sham round-trip loan transaction contained indemnification

obligations on the part of Refco, but none of these transactions had been disclosed to the THL

Funds or their representatives.

**The Proceeds Participation Agreement and the Counterfeit LLC Agreement**

        57.     Mayer Brown and Collins made additional material misrepresentations

and omissions to further conceal the true financial condition of Refco and to facilitate the

Company's sale to the THL Funds. Specifically, Mayer Brown and Collins, acting in concert

with Bennett and others, refused to reveal to the THL Funds, or their representatives, the

existence of the PPA, a related letter agreement (the "Letter Agreement"), and those agreements'

underlying terms. The PPA and the Letter Agreement fell squarely within the THL Funds'

diligence requests and should have been disclosed to the THL Funds and their representatives

during the diligence process. Moreover, not only did Mayer Brown conceal the existence of

these documents, but it also went much further: ███████████████████████████

---

[12]     Exhibit C to the April 2004 Letter of Intent requested the following documents: "Please also
supply any documents relating to arrangements among the owners and affiliates of Refco Group, Ltd.,
LLC – please include items such as, but not limited to, shareholders/interestholders agreements, voting
arrangements and any other arrangements that may be applicable or otherwise relevant in connection with
a sale of any part of Refco Group Ltd., LLC or its owners or affiliates."

████████████████████████████████████████

████████████████████████████

58.     Under the PPA, entered into on July 12, 2002 between Refco and

BAWAG[13] affiliate DF Capital, DF Capital agreed to provide Refco with payments totaling

approximately $467 million.  In the related Letter Agreement, entered into that same day with

the stated objective "to affect a 'Sale of the Company [Refco]'" prior to February 28, 2005,[14]

Refco agreed to use $350 million of that payment "for the retirement of inter-company debt of

[RGHI]" – i.e., to pay down the RGHI Receivable.  For its part, DF Capital received the right to

participate in the proceeds of any "company sale" as if it actually owned voting membership

shares of Refco.  In addition, DF Capital had the ability to exchange its participation right on

each payment date for the equivalent number of Refco membership shares.  According to the

Examiner's Report and the Collins Indictment, Collins and other attorneys at Mayer Brown

negotiated and drafted the PPA and the related Letter Agreement.  Thus, Mayer Brown was not

only aware of their existence, but it was also intimately familiar with the terms of both the PPA

and the Letter Agreement.

59.     The PPA further provided that Refco would indemnify DF Capital, its

affiliates, and their respective officers, directors, employees, controlling persons, agents and

representatives against any claim by a third party arising from any material inaccuracy in any

representation, or the material breach of, or failure duly to perform or observe, any material

---

[13]     "BAWAG" is Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse
Aktiengesellschaft, which held an ownership interest in Refco through an entity called BAWAG Overseas
Inc.  The bank and its subsidiary BAWAG Overseas are collectively referred to as "BAWAG."

[14]

████████████████████████████████████████

████████████████████████████████████

warranty, covenant, or other agreement made by Refco in the PPA. RGHI also guaranteed

Refco's obligations under the agreement and, according to the Examiner, was to secure DF

Capital's participation right pursuant to a corresponding Security and Pledge Agreement.

        60.      The PPA, the Letter Agreement, and the Security and Pledge Agreement

were material contracts and related-party transactions between and among Refco, RGHI, and

BAWAG (which owned DF Capital), and were thus required to be disclosed to the THL Funds

during the diligence process for the 2004 Purchase because these agreements:

      (a)      required Refco to indemnify DF Capital against any loss incurred arising out of any third-party claim in which DF Capital was named as a party;

      (b)      provided that approximately $350 million of the purchase price would retire inter-company obligations of RGHI;

      (c)      contained provisions under which RGHI secured DF Capital's participation right and guaranteed Refco's performance;

      (d)      set forth the intent of various parties (Refco, RGHI, BAWAG, and DF Capital) to "affect a sale of" Refco and established certain guidelines and parameters of any such transaction;

      (e)      called for Bennett to remain as CEO pursuant to a Management Agreement (the existence of which itself was never disclosed);

      (f)      gave BAWAG (through DF Capital) the ability to obtain a larger ownership stake in Refco;

      (g)      contained covenants about how the business was to be managed and operated; and

      (h)      gave DF Capital a veto right with respect to a Company sale.

      61.      Mayer Brown not only never disclosed the existence of the PPA but it also

took affirmative steps to conceal the PPA from the THL Funds and their representatives. Indeed,

in an especially egregious example of Mayer Brown's efforts to hide the PPA, Collins and Mayer

Brown created and provided to the THL Funds a counterfeit corporate agreement during the

diligence process. More specifically, early in the diligence process, WGM saw an unexecuted

copy of a Refco Group LLC Agreement in the data room. This unexecuted LLC Agreement listed three entities – RGHI, BAWAG Overseas, and Refco Group Holdings LLC – as owning membership shares in Refco, and contained a reference to DF Capital and the PPA.

62.    WGM immediately asked Refco for further information about Refco's capital structure and for a copy of the executed, operative LLC Agreement. In response, the THL Funds were told that the LLC Agreement needed to be updated and that Collins would prepare the new agreement.



64.    On or about June 2, 2004, Collins's assistant sent via email (over the interstate wires) to Tabor and other WGM lawyers a memo from Collins in which Collins stated that he was attaching the "Fourth Amended and Restated Limited Liability Company Agreement of Refco Group, Ltd., LLC." The attached document bore an execution date as of January 1, 2003 ███████████████████████████████. Collins represented this document to be the genuine, operative Fourth LLC Agreement, but it was, instead, the counterfeit Fourth LLC Agreement that Mayer Brown had manufactured. ████████████

65.     The PPA should have been disclosed because it was called for by several due diligence requests from the THL Funds.  For example, the THL Funds asked whether Refco had any obligation to make payments to any party in connection with the 2004 Purchase.  The PPA fell squarely within this request because it required Refco to make payments to DF Capital upon the sale of Refco, yet neither Collins, nor anyone else at Mayer Brown, disclosed the PPA to the THL Funds as required.  In addition, as detailed more fully above, the THL Funds asked numerous questions during diligence that were aimed at identifying all related-party transactions and any indemnification obligations and material contracts.  Nevertheless, Mayer Brown never disclosed to the THL Funds that the PPA existed, even though they knew full well that the PPA was itself a related-party transaction and included Refco indemnification obligations and was a material contract.

66.     Moreover, to further conceal the PPA and Letter Agreement from the THL Funds, Collins made numerous direct misrepresentations to representatives of the THL Funds during the diligence process:

(a)     Collins knowingly misrepresented to the THL Funds that there were no material contracts or arrangements between Refco and Bennett or his affiliates (including RGHI), other than Bennett's compensation arrangements (see ¶¶ 52-56).  These representations were false and misleading, and Collins knew it, because the PPA was a material contract between Refco, Bennett, and RGHI;

(b)     On or about May 6, 2004, Collins represented to WGM that "[w]e have been advised by Refco that there are no significant indemnification obligations which have not been disclosed already."  This too was a knowing misrepresentation because, and as described above in ¶¶ 58-60 and ¶ 65, Collins was aware that the PPA contained significant

indemnification obligations that had not been disclosed to the THL Funds; and

(c)    Also on or about May 6, 2004, Collins knowingly misrepresented to WGM that "all material contracts were either in the Data Room or are being produced in response to the requests in Exhibit C to the Letter of Intent." The PPA, however, was not in the data room, nor was it ever produced in response to the THL Funds' diligence requests.

67.    

## The False and Misleading Equity Purchase Agreement

68.    In addition, Mayer Brown hid the sham round-trip loan transactions, the RGHI Receivable, and the PPA from the THL Funds in other ways, in particular by negotiating and preparing documents that contained representations that they knew to be false and misleading.

69.    Given the importance of related-party transactions to the THL Funds, they negotiated for, and obtained from the sellers, a series of contractual representations in the Equity Purchase Agreement, executed on June 8, 2004, that Refco's financial statements were accurate and that there were no related-party transactions. These representations were critical to the THL Funds' decision to proceed with the transaction. Mayer Brown handled the negotiating and drafting of the Agreement for Refco, RGHI, and Bennett.

70.    Although fully aware of the sham round-trip loan transactions they had drafted, their materiality and impact on Refco's financial statements, as well as the fact that the sham round-trip loans constituted related-party transactions, Mayer Brown and Collins negotiated, drafted, and reviewed the Agreement, which contained the following representations and warranties, among others:

(a)    That Refco's books and records had been maintained in accordance with applicable accounting requirements, reflected only bona fide transactions, and were complete and correct;

(b)    That Refco's financial statements "present fairly in all material respects the consolidated financial position, results of operations and cash flows" and "are in conformity with" GAAP;

(c)    That, except for certain operating guarantees of obligations of subsidiaries made in the ordinary course of business, Refco did not have any undisclosed debt, guaranty, liability, claim or obligation of any nature;

(d)    That, except as disclosed on Schedule 3.10, Refco did not have any liabilities or obligations that should have been shown on a balance sheet;

(e)    That, except as disclosed on Schedule 3.12, "since March 1, 2003, no officer, manager, director or member of the Company or any Subsidiary, or any Affiliate of any such officer, director, member or other equity holder has had, either directly or indirectly, a material interest in any contract or agreement to which the Company or any Subsidiary is a party or by which any of their properties or assets may be bound or affected except for employment contracts entered into on an arm's length basis"; and

(f)    That, except as set forth on Schedule 3.15, Refco was not a party to or bound by any agreement or indenture with any third party imposing a Lien on any of the Company's or any Subsidiary's assets or relating to the incurrence, assumption or guarantee of any indebtedness for borrowed money, except for indebtedness for borrowed money for an amount less than $1,000,000.

The disclosure schedules accompanying the Agreement – including Schedules 3.10, 3.12 and 3.15 – did not disclose any of the sham loan transactions or their impact on Refco's financial statements, even though such disclosure was plainly required by the Agreement.

71.     From the very outset of the negotiations, Mayer Brown misled the THL

Funds; in fact, Mayer Brown negotiated and prepared the first draft of the Agreement which

contained a representation that stated no officer (or any affiliate thereof) "has had, directly or

indirectly, a material interest in any contract or agreement to which the Company … is a party or

by which any of their properties or assets may be bound or affected, except for contracts entered

into on an arm's-length basis and on terms and conditions customary in the market."  Mayer

Brown knew that these representations were false because they had drafted and negotiated the

round trip transactions in which Refco was a party and RGHI, a Bennett affiliate, had a material

interest.

72.     In connection with the Agreement, at the direction of Bennett, Mayer

Brown used the interstate wires, transmitting numerous drafts of the Agreements containing false

and misleading representations to the THL Funds and their representatives, including on the

following dates:

(a)     On May 7, 2004 at 9:02 p.m., a Mayer Brown partner circulated a

revised draft of the Agreement by email to multiple WGM attorneys as well as to 8 other

Mayer Brown attorneys, including Collins, reflecting Mayer Brown's comments on the

draft previously sent by WGM;

(b)     On May 25, 2004 at 11:19 a.m., a Mayer Brown partner circulated

another mark-up of the Agreement draft by email to multiple WGM attorneys with copies

to Bennett, Trosten, and 15 other Mayer Brown attorneys, including Collins and Koury;

(c)     On May 25, 2004 at 4:40 p.m., a Mayer Brown partner distributed

additional comments on the draft Agreement to multiple WGM attorneys with copies to

Bennett, Trosten and 15 other Mayer Brown attorneys, including Collins and Koury; and

(d)    On May 30, 2004 at 8:56 p.m., a Mayer Brown partner circulated an updated draft of the Agreement to multiple WGM attorneys, Bennett, Trosten and 17 other Mayer Brown attorneys, including Collins and Koury stemming from a telephone conference earlier that day.

73.    Similarly, the final Refco Disclosure Schedules, prepared by Refco and Mayer Brown, that accompanied the executed copy of the Agreement did not disclose the sham round-trip loan transactions, although the schedules were sent to the THL Funds by Koury, the very same Mayer Brown associate who was then handling the round-trip loan transactions. Indeed, the final version of Schedule 3.12, which was supposed to list all related-party transactions and arrangements, contained only the single word "none."

74.    While drafting the Disclosure Schedules at the direction of Bennett, Mayer Brown used the interstate wires, transmitting numerous drafts of the Schedules – none of which accurately disclosed the RGHI Receivable or the sham loan transactions – to the THL Funds by email, including Disclosure Schedules that were transmitted to the THL Funds on the following dates that did not include any mention of the round-trip loan transactions:

(a)    On May 25, 2004 at 9:42 p.m., Paul Koury sent an email attaching Mayer Brown's initial draft of the Disclosure Schedules to multiple WGM attorneys as well as to Bennett, Trosten and 16 other Mayer Brown attorneys, including Collins, stating: "Attached please find our initial draft of the Schedules to the Equity Purchase Agreement. Please note that these Schedules are being delivered simultaneously to our client and internally at MBR&M for reviewed [sic] and are therefore subject to further comment";

(b)    On May 28, 2004 at 8:45 a.m., Paul Koury sent an email attaching another draft of the Disclosure Schedules to multiple WGM attorneys as well as to Bennett, Trosten and 16 other Mayer Brown attorneys, including Collins;

(c)    On June 2, 2004 at 9:32 p.m., Paul Koury sent an email attaching another draft of the disclosure schedules to multiple WGM lawyers, as well as to Bennett, Trosten, 16 other Mayer Brown attorneys, including Collins, as well as counsel for the lenders negotiating the Credit Agreement ("Secured Lenders") and the initial purchasers of the Rule 144A bonds to be issued in connection with the 2004 Purchase ("Initial Purchasers");

(d)    On June 4, 2004 at 11:15 p.m., Paul Koury distributed an updated draft of the Disclosure Schedules by email to multiple WGM attorneys as well as to Bennett, Trosten and 17 other Mayer Brown attorneys, including Collins, as well as counsel for the Secured Lenders and Initial Purchasers;

(e)    On June 7, 2004 at 5:23 p.m., Paul Koury circulated an updated draft of the Disclosure Schedules by email to multiple WGM attorneys as well as to Bennett, Trosten and 17 other Mayer Brown attorneys, including Collins, as well as counsel for the Secured Lenders and Initial Purchasers;

(f)    On June 8, 2004 at 9:42 a.m., Paul Koury distributed revised "Final Schedules" by email to multiple WGM attorneys as well as other Mayer Brown attorneys; and

(g)    On June 8, 2004 at 12:16 p.m., Paul Koury sent a Dallas-based WGM associate another version of the Final Disclosure Schedules by email.