75.    At no time after the execution of the Purchase Agreement did Mayer

Brown reveal the related-party transaction it was continuing to document for Refco.  Collins was

unquestionably aware of this work that Koury was performing.  According to the Examiner, on

June 21, 2004, he sent the firm's summary billing statement for services rendered in May 2004 to

Refco, which included a reference to "revision to liberty loan documents."

**The False and Misleading Offering Circular**

76.    Attorneys from Mayer Brown played a substantial role in drafting the

Offering Circular for the bond offering that raised $600 million in connection with the THL

Funds' financing of the 2004 Purchase.  Mayer Brown participated in the drafting of the various

closing sections of the Offering Circular and participated in drafting sessions at which the

disclosures contained in the Offering Circular were discussed and prepared.  Mayer Brown is

also listed in the Offering Circular as counsel to Refco.  Mayer Brown was aware that the

Offering Circular included customary related party transaction and management sections which

were intended to include disclosure regarding transactions between Refco, its named executive

officers and their respective affiliates.  In addition, Mayer Brown was involved in the diligence

conducted by the initial purchasers and other participants in the offering process and was aware

that the diligence materials provided to the THL Funds and their representatives were shared

with the initial purchasers and their counsel.

77.    The sham round-trip loan transactions described above rendered portions

of the Offering Circular false and misleading, both because they were not disclosed in the

Offering Circular and because they were employed to manipulate the financial statements

contained in the Offering Circular.  But during the preparation of the Offering Circular Mayer

Brown never disclosed to the THL Funds, the initial purchasers or their counsel the sham round-

trip transactions in which it had materially assisted, or otherwise that Mayer Brown possessed

knowledge and information to the effect that the Offering Circular was false and misleading. By remaining silent throughout the drafting of the Offering Circular, Mayer Brown misled the THL Funds, and other investors.

**The 2004 Purchase Closes**

78.     Following completion of the THL Funds' due diligence efforts, on August 5, 2004, the 2004 Purchase closed and the THL Funds acquired from RGHI approximately a majority of the equity interests in Refco, for approximately $452 million in cash.

79.     During the course of the transaction, and at the time of the closing, the THL Funds were not aware of, and could not with reasonable diligence have learned of, the fraudulent actions of Bennett, Mayer Brown, and others. The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them by Mayer Brown and Collins during the due diligence process in electing whether to proceed with the 2004 Purchase and invest $452 million in Refco. Had truthful and complete information been provided by Mayer Brown, the THL Funds would not have proceeded with the 2004 Purchase.[15]

80.     Mayer Brown's deception continued after the 2004 Purchase closed. Mayer Brown was involved in both the spring 2005 registered Exchange Offer relating to the

---

[15]     At the same time that the 2004 Purchase closed, Refco also entered into a Credit Agreement with the Secured Lenders, for which Bank of America, N.A. acted as the Administrative Agent. Bennett and his co-conspirators provided or caused to be provided to the Secured Lenders or their representatives the same or substantially similar false Refco financial information as was provided to the THL Funds (including at a "lenders presentation" in July 2004). They also gave false assurances to the Secured Lenders and their representatives, similar to those given to the THL Funds, that Refco's current and historical financial statements fairly presented Refco's financial condition (including in the Credit Agreement itself). Had these Secured Lenders known of Refco's true financial condition, they would not have loaned hundreds of millions of dollars to Refco. Because the Secured Lenders did not know the truth, however, they extended credit to Refco.

bonds issued in connection with the 2004 Purchase and Refco's August 2005 IPO. Mayer

Brown was aware that the offering materials for these securities included related party

transaction and management sections which were intended to include disclosure regarding

transactions between Refco, its named executive officers and their respective affiliates, and that

these sections did not fully or accurately disclose such transactions.

81.    Although Mayer Brown continued to work on sham round-trip loan

transactions after the 2004 Purchase, at no time did Mayer Brown: (a) disclose the existence of

the RGHI Receivable or the sham round-trip loan transactions, or (b) advise the THL Funds,

Refco's new Board of Directors, or the purchasers of Refco bonds or stock that the above-

referenced offering materials were false and misleading because they did not disclose, or take

into account, the existence of the very sham round-trip loan transactions Mayer Brown was

documenting for Refco.

82.    Rather, Mayer Brown continued to conceal the sham round-trip loan

transactions following the 2004 Purchase, remaining silent throughout this time period and

allowing Refco to file with the Securities and Exchange Commission ("SEC") and otherwise

publicly disseminate what Mayer Brown knew to be false and misleading offering materials. By

remaining silent throughout the drafting and dissemination of these offering materials, Mayer

Brown misled the THL Funds, the investors in Refco, and others.

**The Fraud is Revealed**

83.    In early October 2005, members of the new Refco Board of Directors

(including the THL Funds' designees) learned for the first time of the existence of an

approximately $430 million obligation that RGHI owed to Refco. The Audit Committee of the

Board of Directors immediately began an internal investigation into Bennett's actions, retaining

independent counsel and a forensic accounting firm. The Company also contacted the SEC,

CFTC, and other regulatory bodies to report the wrongdoing.  Although Mayer Brown was

counsel to the Company, Mayer Brown concealed from its client what it knew about the sham

loan transactions and the related-party transactions.

84.     On October 10, 2005, Refco issued a press release announcing Bennett's

manipulation of the Company's financial statements.  After the Audit Committee consulted

Refco's independent accountants, Refco further announced that the Company's financial

statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28,

2004, February 28, 2005 and May 31, 2005, taken as a whole, should no longer be relied upon.

Shortly thereafter, Bennett was arrested and has since been indicted, along with Trosten and

former Refco executive Tone Grant, in connection with the scheme.  Bennett pleaded guilty on

February 15, 2008.

85.     After these developments, Refco's stock price declined precipitously and

the NYSE ultimately halted trading.  On October 17, 2005, Refco and certain of its subsidiaries

or affiliates filed for Chapter 11 bankruptcy protection.  Refco's common stock has been delisted

and the equity interests acquired by the THL Funds in the 2004 Purchase are now worthless.  As

a result of Mayer Brown's actions, the THL Funds have suffered actual damages in an amount to

be determined at trial, including, but not limited to, the $245 million dollars they have already

lost on the 2004 Purchase.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

86.     The THL Funds repeat and reallege each of the allegations contained in

paragraphs 1 through 85 inclusive, as if fully set forth herein.

87.     Mayer Brown carried out, by use of instrumentalities of interstate

commerce and/or of the mails, a plan, scheme and course of conduct, pursuant to which it

intended (among other things) to deceive the THL Funds in connection with the THL Funds' purchase of Refco securities. In furtherance of this plan, scheme and course of conduct, Mayer Brown took the actions described at length above.

88.    By its involvement in creating and concealing the RGHI Receivable, including through its work on the sham round-trip loan transactions, Mayer Brown employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit in order (among other things) to defraud and mislead the THL Funds as to Refco's true financial condition and thereby induce the THL Funds to purchase Refco securities in the 2004 Purchase at an artificially inflated price. As a component thereof, Mayer Brown also made repeated false statements of material facts and omissions of material facts to the THL Funds, including about the existence of related-party transactions, indemnification obligations and material contracts as well as about the authenticity of the counterfeit Fourth LLC Agreement, knowing these statements and omissions were material to the THL Funds' decision to purchase Refco securities.

89.    Mayer Brown engaged in the conduct described above knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the THL Funds.

90.    The THL Funds reasonably and justifiably relied on the integrity of the financial and business information provided by Mayer Brown and – to their detriment – entered into the 2004 Purchase, investing $452 million in Refco. If the THL Funds had known of the falsity of the material facts represented to them or of the information intentionally withheld from them, or had the fraudulent conduct engaged in by Mayer Brown not occurred, they would not have proceeded with the 2004 Purchase.

91.     Upon the disclosure of the true facts which had been misrepresented or concealed as alleged herein, Refco's stock price declined precipitously, losing over $1 billion in market capitalization.

92.     By virtue of the foregoing, Mayer Brown knowingly or recklessly violated, and is liable as a primary violator under Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder in that it employed devices, schemes and artifices to defraud and engaged in practices and a course of business that operated as a fraud or deceit upon the THL Funds.  Indeed, the inevitable consequence of the sham round-trip loan transactions on which Mayer Brown worked – transactions that did not involve the sale of goods or services or even, in most cases, the transfer of funds other than the net interest payoffs to the third parties in the transactions – was to manipulate Refco's financial statements and the appearance of its financial health to outsiders such as the THL Funds, which relied directly and expressly on the accuracy of the financial information they were provided in making the 2004 Purchase.

93.     As a direct and proximate result of the wrongful conduct of Mayer Brown, the THL Funds have suffered actual economic loss, incurring monetary damages in connection with the 2004 Purchase in an amount to be determined at trial, but that is in excess of $245 million, plus interest.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

94.     The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 through 85 inclusive, as if fully set forth herein.

95.     Mayer Brown made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by use of instrumentalities of interstate commerce and/or of the mails, in order to allow Refco securities to be sold to the THL Funds in the 2004 Purchase at an artificially inflated price.

96.     Mayer Brown knowingly or recklessly made false and misleading statements of material fact or omitted to state material facts which it knew, or was reckless in failing to know, were false and misleading or were rendered misleading and inaccurate by the failure to disclose material information or provided, prepared or directed the provision of information during the due diligence process that was materially false or misleading and failed to disclose material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in order to defraud and mislead the THL Funds as to Refco's true financial condition and thereby induce the THL Funds to purchase Refco securities at an inflated price.

97.     Mayer Brown knew and intended that the THL Funds would rely, and had a right to rely, on the repeated statements of material facts and omission of material facts, and false statements provided in the course of the diligence process, and knew that they were material and essential to the THL Funds' decision to make the investment.  Mayer Brown knew based on the material assistance it provided in connection with the sham round-trip loan transactions, its involvement in drafting the counterfeit Fourth LLC Agreement, and its access to Refco information that the information Mayer Brown provided to the THL Funds for their guidance and benefit in connection with the 2004 Purchase was materially false and misleading.

98.    Mayer Brown engaged in the conduct described above knowingly or intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the THL Funds.

99.    When the foregoing representations were made, and the misleading financial statements and information provided, the THL Funds believed them to be true and complete in all material respects, and acted reasonably and justifiably in reliance thereon and – to their detriment – entered into the 2004 Purchase, investing $452 million in Refco.  If the THL Funds had known of the falsity of the material facts represented to them or of the information intentionally withheld from them, or had the fraudulent conduct engaged in by Mayer Brown not occurred, they would not have so acted.

100.    Upon the disclosure of the true facts which had been misrepresented or concealed as alleged herein, Refco's stock price declined precipitously, losing over $1 billion in market capitalization.

101.    By virtue of the foregoing, Mayer Brown knowingly or recklessly violated, and is liable as a primary violator under, Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that it made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

102.    As a direct and proximate result of the wrongful conduct of Mayer Brown, the THL Funds have suffered actual economic loss, incurring monetary damages in connection with the 2004 Purchase in an amount to be determined at trial, but that is in excess of $245 million, plus interest.

## THIRD CLAIM FOR RELIEF
### (RICO – Conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d))

103.    The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 though 85 inclusive, as if fully set forth herein.

104.    At all times relevant to this Complaint, Refco was an "enterprise" within the meaning of 18 U.S.C. §1961(4), as it was a Delaware corporation or Delaware limited liability company with its headquarters in New York City, New York.  Refco provided execution and clearing services for exchange-traded derivatives to customers throughout and outside the United States, provided brokerage services in the fixed income and foreign exchange markets for customers throughout and outside the United States, and engaged in trading on its own behalf in the securities and instruments of or offered by entities throughout and outside the United States. As a result of these and other business activities of Refco, at all times relevant to this Complaint, Refco engaged in interstate and foreign commerce and its activities affected interstate and foreign commerce.

105.    At all times relevant to this Complaint, Bennett, Trosten and Maggio (the "Refco Operators") were "persons" within the meaning of 18 U.S.C. §1961(3) as they were individuals capable of holding a legal or beneficial interest in property.  As alleged in greater detail in the preceding paragraphs, each Refco Operator was (a) employed by and associated with Refco and (b) conducted and participated in the conduct of Refco's affairs.  For example, and without limiting the other allegations in this Complaint of their employment by, association with, and participation in the conduct of Refco:

(a)    At all times relevant to this Complaint, Bennett was the President and Chief Executive Officer of Refco and had a substantial indirect ownership interest in Refco.  Through his formal positions with Refco and otherwise, Bennett was involved in

managing Refco's affairs, including being directly involved in the sham round-trip loan

transactions used to conceal the RGHI Receivable and in making false representations to

the THL Funds about the related-party transactions between RGHI and Refco as well as

the financial commitments and condition of Refco.

(b)  Trosten held positions at Refco from the 1990s through August 2004,

including serving as Chief Financial Officer of Refco from in or about May 2001 until in

or about August 2004.  Through his formal positions with Refco and otherwise, Trosten

was involved in managing Refco's affairs, including being directly involved in the sham

round-trip loan transactions used to conceal the RGHI Receivable and in making false

representations to the THL Funds about the related-party transactions between RGHI and

Refco as well as the financial commitments and condition of Refco.

(c)  At all times relevant to this Complaint, Maggio was a Senior Vice

President of Refco and the President and Chief Executive Officer of Refco's

broker/dealer subsidiary, Refco Securities, LLC.  Maggio also was President of another

Refco subsidiary, RCM, from 2001 until in or about October 2005.  Through his formal

positions with Refco and otherwise, Maggio was involved in managing Refco's affairs,

including being directly involved in the sham round-trip loan transactions used to conceal

the RGHI Receivable and in making false representations to the THL Funds about the

related-party transactions between RGHI and Refco.

106.    As alleged in greater detail in the preceding paragraphs and as set forth in

the Bennett Indictment, each Refco Operator conducted and participated in the conduct of

Refco's affairs through racketeering activities – namely, wire fraud in violation of 18 U.S.C.

§1343, mail fraud in violation of 18 U.S.C. §1341, financial institutions fraud in violation of 18

U.S.C. §1344, and money laundering in violation of 18 U.S.C. § 1957.  For example, and without limiting the other allegations in this Complaint of the Refco Operators' racketeering activities:

> (a) The Refco Operators were involved in conceiving, negotiating, and effectuating and directing others to effectuate the sham round-trip loan transactions for the purposes of concealing the RGHI Receivable from regulators[16] and financial institutions and so that Refco's financial statements, which the Refco Operators and their co-conspirators used to induce third parties such as the THL Funds to invest in Refco, would disguise the RGHI Receivable and Refco's true financial condition.  These transactions were furthered by the use of the interstate and/or foreign wires, if not also the interstate and/or foreign mail, as documents relating to the transactions were communicated to the various participants through at least the interstate and/or foreign wires, if not also the interstate and/or foreign mail.

> (b) The Refco Operators transmitted or caused others to transmit the materially false financial statements that did not accurately reflect the RGHI Receivable and Refco's true financial condition (because of, among other things, the sham round-trip loan transactions) to third parties, including one or more financial institutions that loaned money to Refco and potential investors such as the THL Funds, through at least the interstate wires, if not also the interstate mail.

---

[16]     Even before it became a publicly traded company, Refco (including its subsidiaries) was subject to extensive regulation by federal and state agencies and by self-regulatory organizations.  Among the applicable regulations were ones imposing capital requirements and financial reporting requirements. The Refco Operators did not disclose Refco's true financial condition to these regulating agencies and organizations, just as they did not disclose the same to the THL Funds.

(c) The Refco Operators transmitted or caused others to transmit through the interstate wires materially false information about the financial condition of Refco, Refco's related-party transactions, and the RGHI Receivable to the THL Funds or their representatives to induce the THL Funds to invest in Refco. They caused Refco's materially false financial statements to be transmitted to the THL Funds knowing that those statements did not accurately reflect (among other things) Refco's financial condition or the RGHI Receivable.

(d) Each Refco Operator transmitted or caused to be transmitted to the THL Funds through the interstate wires an officer's questionnaire in which he falsely represented that he was not aware of any material fact concerning Refco's business and operations that was not accurately disclosed in specified offering materials while knowing that those materials did not accurately disclose (among other things) the RGHI Receivable or the related-party transactions in which Refco was involved.

(e) As set forth in the Bennett Indictment, Bennett and Trosten engaged or caused others to engage in the wire fraud, financial institution fraud and money laundering activities alleged therein.

107.    As alleged in greater detail in the preceding paragraphs, the foregoing racketeering activities by the Refco Operators constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). For example, and without limiting the other allegations in this Complaint of the Refco Operators' pattern of racketeering activities:

(a) The wire, mail, and financial institution fraud of the Refco Operators alleged in the preceding paragraphs involved multiple acts of racketeering activity within the past ten years.

(b)  The wire, mail, and financial institution fraud of the Refco Operators alleged in the preceding paragraphs began as early as February 1998 and continued through at least October 2005.

(c)  These acts of racketeering were the regular way of operating Refco by the Refco Operators.  On an annual basis from February 2000 through February 2005, and on a quarterly basis from May 2004 through August 2005, the Refco Operators engaged in the sham round-trip loan transactions for the purpose of concealing the RGHI Receivable and the true financial condition of Refco from others, including at various times the THL Funds, regulators, financial institutions, and the investing public.  The Refco Operators also regularly and repeatedly made and caused to be made false statements to the THL Funds or their representatives about Refco's financial condition and the existence and size of the RGHI Receivable.

(d)  The very nature of these acts of racketeering implied a threat of continued criminal activity.  The Refco Operators were regularly engaged in making or causing others to make false statements about Refco's financial condition and the size of the RGHI Receivable starting as early as 1998 and continuing through the discovery of their fraud in October 2005, and these false statements would have continued had it not been for their discovery by someone outside the Refco Operators' conspiracy in October 2005.

(e)  There were a number of participants in the Refco Operators' fraudulent schemes, including not only the Refco Operators, but also (without limitation) other Refco employees, Mayer Brown, BAWAG, and the third parties who engaged in sham round-trip and "repo" transactions with Refco and RGHI.

(f)  There were a substantial number of victims of the Refco Operators' fraudulent schemes.  In addition to the THL Funds, other victims include the Secured Lenders, other financial institutions that lent money to Refco, the investors who purchased Refco's debt securities, and the investing public who purchased Refco's equity securities.[17]

108.    In summary, the Refco Operators conducted and participated in the conduct of Refco's affairs through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c).

109.    At all times relevant to this Complaint, Mayer Brown was a "person" within the meaning of 18 U.S.C. § 1961(3) as it was an entity capable of holding a legal or beneficial interest in property.

110.    As alleged in greater detail in the preceding paragraphs, Mayer Brown conspired with the Refco Operators to violate 18 U.S.C. §1962(c), all in violation of 18 U.S.C. § 1962(d).  For example, and without limiting the other allegations in this Complaint of Mayer Brown's conspiracy with the Refco Operators, in violation of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c):

(a)  Mayer Brown negotiated, participated in, and/or coordinated 17 sham round-trip loan transactions, knowing that they did not have a legitimate business purpose, lacked economic substance, and were used to move the RGHI Receivable off of Refco's financial statements at the end of financial reporting periods.

(b)  In connection with the 2004 Purchase, Mayer Brown made material false representations, facilitated material false representations to be made, and failed to

---

[17]    In its bankruptcy petition, Refco identified its 50 largest unsecured creditors and the debt owed to them.  The smallest debt to qualify for this list was still over $10 million (attached hereto as Exhibit 7).

disclose material truthful information to the THL Funds and their representatives about Refco's related-party transactions (including the existence of the sham round-trip loan transactions), Refco's material contracts and Refco's indemnification obligations. Mayer Brown knew these misrepresentations were false and the THL Funds relied on the representations to be true in deciding to effect the 2004 Purchase.

(c)  In connection with the 2004 Purchase, Mayer Brown drafted and negotiated documents that contained false representations about Refco's related-party transactions (including the existence of the sham round-trip loan transactions), Refco's material contracts and Refco's indemnification obligations. Mayer Brown knew the representations were false and the THL Funds relied on those representations to be true in deciding to invest in Refco.

(d)  In fact, during the period of due diligence for the 2004 Purchase, Mayer Brown was handling a $700 million round-trip loan transaction to take place at the end of Refco's next financial reporting period (May 2004). This transaction was conducted to conceal the RGHI Receivable and Refco's true financial position from the THL Funds and others. Mayer Brown never disclosed this transaction or the other round-trip loan transactions to the THL Funds or their representatives during the due diligence process.

(e)  Mayer Brown event went so far as to manufacture a counterfeit Fourth LLC Agreement, transmitted that counterfeit to the THL Funds over the interstate wires, and falsely represented to the THL Funds that the counterfeit was the genuine Fourth LLC Agreement. Mayer Brown undertook those actions and misrepresentations to

mislead the THL Funds as to Refco's financial condition, its ownership structure, and its related-party transactions.

111.     As alleged in greater detail in the preceding paragraphs, through its participation in and facilitation of the racketeering activities of the Refco Operators, Mayer Brown intended to further, agreed to further, and in fact did further the fraudulent schemes of the Refco Operators and was aware of the existence, if not the very identity, of the other participants in the fraudulent schemes and conspiracy. Mayer Brown's false and misleading statements and omissions to the THL Funds were part of, and undertaken in furtherance of, a common scheme, plan and agreement with Bennett and his other co-conspirators to induce (a) the THL Funds to complete the 2004 Purchase (and at a grossly inflated price), (b) financial institutions to lend money to Refco, and (c) other third parties to invest in Refco, as well as to mislead governmental and exchange regulators as to Refco's financial health and compliance with regulatory and capital requirements. Among the tortious and wrongful conduct of Mayer Brown in furtherance of this conspiracy were Mayer Brown's active involvement in the sham round-trip loan transactions, Collins's false statements and deceptions relating to the sham round-trip loan transactions, and Collins's manufacturing of the counterfeit Fourth LLC Agreement, which he falsely represented to the THL Funds to be the genuine Fourth LLC Agreement.

112.     As alleged in greater detail in the preceding paragraphs, the THL Funds were directly injured in their business and property by reason of the violations of 18 U.S.C. § 1962 set forth above, and therefore are entitled under 18 U.S.C. § 1964(c) to damages in an amount to be determined, but that exceed $245 million, trebled, plus interest and attorneys' fees.

### FOURTH CLAIM FOR RELIEF
#### (Fraud)

113.    The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 through 85 inclusive, as if fully set forth herein.

114.    As alleged in greater detail in the preceding paragraphs, Mayer Brown knowingly made untrue statements of material fact and/or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading and provided material false information to the THL Funds.  For example, Mayer Brown knowingly failed to disclose to the THL Funds, despite repeated requests for such information, the existence of, and the documentation relating to, the sham round-trip loan transactions and the underlying RGHI Receivable (among other things).  Having elected to speak, Mayer Brown had a duty to tell the truth.  Also as alleged in greater detail in the preceding paragraphs, Mayer Brown made numerous false and material statements about Refco to the THL Funds and their representatives (which includes providing the THL Funds with a counterfeit Fourth LLC Agreement and representing it to be the genuine Fourth LLC Agreement).

115.    As alleged in greater detail in the preceding paragraphs, Mayer Brown acted intentionally with respect to these matters.  Mayer Brown intended that the THL Funds rely on its statements as being both truthful and complete.  Mayer Brown knew that its statements and omissions were material and essential to the THL Funds' decision to proceed to close the 2004 Purchase.  Mayer Brown made its false statements, or omitted to disclose requested information, for the purpose of inducing the THL Funds to effect the 2004 Purchase.

116.    At the time the foregoing statements were made and information was provided, the THL Funds believed them to be true and complete, and the THL Funds acted

reasonably and justifiably in reliance thereon to their detriment by entering into the

2004 Purchase.  If the THL Funds had known of the falsity of the material facts provided by

Mayer Brown, of the information Mayer Brown intentionally withheld despite requests for the

information from the THL Funds or their representatives, or of Refco's true financial condition,

the THL Funds would not have so acted.

117.    As alleged in greater detail in the preceding paragraphs, Mayer Brown's

false and misleading statements and omissions to the THL Funds were part of, and undertaken in

furtherance of, a common scheme, plan and agreement with Bennett and his other co-

conspirators to (among other things) induce the THL Funds to complete the 2004 Purchase, and

to do so at a grossly inflated price.  Among the tortious and wrongful conduct of Mayer Brown

in furtherance of this conspiracy were Mayer Brown's active involvement in the sham round-trip

loan transactions, Collins's false statements and deceptions relating to the sham round-trip loan

transactions, and Collins's manufacturing of the counterfeit Fourth LLC Agreement, which he

falsely represented to the THL Funds to be the genuine Fourth LLC Agreement.  Mayer Brown

is therefore responsible for all of the tortious and wrongful conduct of the conspirators in

furtherance of their common scheme, plan and agreement.

118.    Mayer Brown's conduct caused the THL Funds actual injury, was

wrongful, without justification or excuse, and contrary to generally accepted standards of

morality.  These acts and omissions were committed intentionally by Mayer Brown with actual

malice, and with reckless, wanton, and willful disregard of the THL Funds' rights, representing

inequitable and unjustifiable conduct against which the public needs protection from similar acts.

119.    As a direct and proximate result of the fraud and deceit engaged in by

Mayer Brown and its co-conspirators, and the THL Funds' justifiable reliance thereon, the THL

Funds have suffered monetary damages in an amount to be determined at trial, but that is in

excess of $245 million, plus interest.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

120.    The THL Funds repeat and reallege each of the allegations contained in

paragraphs 1 through 84 and 114 through 119 inclusive, as if fully set forth herein.

121.    At all relevant times, Mayer Brown possessed a duty to act with due care,

competence, fairly and in good faith toward the THL Funds in connection with its

communications with the THL Funds and to completely, truthfully and accurately convey to the

THL Funds and their representatives material information and facts relating to Refco as

requested, including the existence of related-party transactions, indemnification obligations,

material contracts, the PPA, the Letter Agreement, and the genuine Fourth LLC Agreement.

Having undertaken to provide the THL Funds with material information about such matters,

Mayer Brown had a duty to provide complete and truthful information and refrain from

providing information it knew, or should have known, was false or misleading.

122.    As alleged in greater detail in the preceding paragraphs, Mayer Brown,

acting in the course of its business in connection with its work on the 2004 Purchase (for which

Mayer Brown was compensated and thereby possessed a pecuniary interest), provided the THL

Funds with false and misleading information for the guidance and benefit of the THL Funds and

failed to disclose to the THL Funds material information requested by the THL Funds or their

representatives, all for the purpose of inducing the THL Funds to consummate the

2004 Purchase.  Mayer Brown failed to exercise reasonable care or competence in obtaining and

communicating information to the THL Funds and in connection with their dealings with the

THL Funds and their representatives.

123.    Mayer Brown's false and misleading statements were addressed directly to the THL Funds and their representatives, and were made without any disclaimers, assertions of privilege or other limitations.  Mayer Brown was aware that the information it provided directly to the THL Funds and their representatives in the course of the transaction would be used by the THL Funds for the particular purpose of deciding whether to proceed with the 2004 Purchase, and that the THL Funds did in fact rely upon the oral and written representations described above in deciding to consummate the 2004 Purchase.  The work performed by Collins, Koury, and others at Mayer Brown, including on the sham round-trip loan transactions, was within the scope and sphere of their authority as Mayer Brown lawyers and was in furtherance of Mayer Brown's business interests, and each had a duty to act upon and accurately report and disclose the information acquired during this work.

124.    Mayer Brown's materially false statements and omissions were made with full knowledge of the reliance the THL Funds placed on its expertise and intimate knowledge of Refco and Refco's business dealings.  Mayer Brown was at all times aware that the information it provided and the representations it made to the THL Funds and their representatives would be relied upon and employed by the THL Funds in deciding to proceed with the 2004 Purchase.  By communicating with representatives of the THL Funds and directly addressing correspondence and memoranda to them, Mayer Brown engaged in conduct which evinced its awareness and understanding that the THL Funds would rely on the information Mayer Brown provided to them.  Mayer Brown at all times was aware of the material nature of such information and the importance the THL Funds placed on, for example, identifying all Refco related-party transactions and arrangements involving Bennett-affiliated entities – such as RGHI eliminating all related-party debts – and understanding Refco's true financial condition.

125.   Refco and RGHI, through Bennett, Trosten, and others, knew and expected that Mayer Brown would communicate with the THL Funds throughout the diligence process, and specifically, that Mayer Brown would provide the THL Funds with false and misleading information regarding the existence of related-party transactions, material contracts, and Refco's indemnification obligations.  Refco, RGHI, and Bennett expected and anticipated that Mayer Brown would make representations and provide information to the THL Funds on Refco's behalf and doing so was very much within the intended scope of Mayer Brown's services to its clients.  Refco, RGHI, and Bennett were aware and fully intended that the THL Funds would rely upon the representations made, and information provided, by Mayer Brown as being accurate and complete in deciding whether to proceed with their investments in Refco.

126.   Mayer Brown's clients had no reasonable expectation of confidentiality regarding the existence of the sham round-trip loan transactions given that the documents were provided to and executed by unaffiliated third parties, and therefore could not be protected from disclosure as privileged communications.  Mayer Brown never advised the THL Funds that it was precluded from providing complete and accurate information concerning related-party transactions, material contracts, or indemnification obligations because of the attorney-client privilege or other confidentiality obligation to its clients.  Mayer Brown's clients also had no reasonable expectations of confidentiality regarding the existence of the Fourth LLC Agreement, which also involved third-party signatories.  Moreover, even if they had such an expectation, that would not excuse Mayer Brown's wrongful conduct in manufacturing and transmitting to the THL Funds a counterfeit Fourth LLC Agreement.

127.   Mayer Brown's false and misleading representations caused the THL Funds to suffer pecuniary loss.  These representations by Mayer Brown were intended to, and did

in fact, influence the THL Funds' decision to proceed with the 2004 Purchase and thereby substantially affected the rights of the THL Funds. The THL Funds justifiably and reasonably relied upon the information and representations given by Mayer Brown as being accurate and complete, and as a result of such reliance, suffered pecuniary injury. If the THL Funds had known of the falsity of the material facts that were represented, or were aware of the information withheld from them, they would not have so completed the 2004 Purchase.

128.    As alleged in greater detail in the preceding paragraphs, Mayer Brown's false and misleading statements and omissions to the THL Funds were part of, and undertaken in furtherance of, a common scheme, plan and agreement with Bennett and his other co-conspirators to (among other things) induce the THL Funds to complete the 2004 Purchase, and to do so at a grossly inflated price. Among the tortious and wrongful conduct of Mayer Brown in furtherance of this conspiracy were Mayer Brown's active involvement in the sham round-trip loan transactions, Collins's false statements and deceptions relating to the sham round-trip loan transactions, and Collins's manufacturing of the counterfeit Fourth LLC Agreement, which he falsely represented to the THL Funds to be the genuine Fourth LLC Agreement. Mayer Brown is therefore responsible for all of the tortious and wrongful conduct of the conspirators in furtherance of their common scheme, plan and agreement.

129.    As a direct and proximate result of the conduct of Mayer Brown and its co-conspirators, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

130.    WHEREFORE, the THL Funds demand judgment against Mayer Brown as follows:

(a)     On the First, Second, Fourth and Fifth Claims for Relief, awarding the THL Funds damages against Mayer Brown in an amount not less than $245 million, plus interest, to be determined at trial;

(b)     on the Third Claim for Relief, awarding the THL Funds damages against Mayer Brown in an amount not less than $245 million, trebled, plus interest and attorneys' fees, to be determined at trial;

(c)     on the Fourth Claim for Relief, awarding the THL Funds exemplary damages against Mayer Brown in an amount to be determined at trial;

(d)     awarding the THL Funds the costs and disbursements incurred in prosecuting this action, including a reasonable allowance for the fees and expenses of their attorneys and experts; and

(e)     granting such other and further legal and equitable relief as the Court may deem just and proper in these circumstances.

The THL Funds demand trial by jury of any and all issues so triable.

Dated:     New York, New York          WEIL, GOTSHAL & MANGES LLP
           February 20, 2008


           By:  _____
                Greg A. Danilow (GD-1621)

                Paul Dutka (PD-2568)
                Christopher R.J. Pace (CP-0001)
                Seth Goodchild (SG-2296)
                767 Fifth Avenue
                New York, New York 10153
                (212) 310-8000

                KELLOGG, HUBER, HANSEN, TODD,
                EVANS & FIGEL, P.L.L.C
                Mark C. Hansen
                Rebecca A. Benyon
                James M. Webster, III

                1615 M Street, N.W., Suite 400
                Washington, D.C. 20036
                (202) 326-7900

                *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February 2008, I sent the foregoing **FIRST AMENDED COMPLAINT** to the counsel listed below via certified and electronic mail.

| | |
|---|---|
| John K. Villa<br>George A. Borden<br>Thomas G. Ward<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth Street, NW<br>Washington, D.C. 20005<br>Tel.: (202) 434-5000<br>Fax: (202) 434-5029<br><br>*Attorneys for Defendant Mayer Brown LLP* | Joel M. Cohen<br>Anthony M. Candido<br>Timothy Casey<br>CLIFFORD CHANCE US LLP<br>31 West 52nd Street<br>New York, NY 10019<br>Tel.: (212) 878-8000<br>Fax: (212) 878-8375<br><br>*Attorneys for Defendant Mayer Brown UK LLP* |

Scott D. Woller