UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                       :

THOMAS H. LEE EQUITY FUND V, L.P.,     :     07 Civ. 6767 (GEL)
THOMAS H. LEE PARALLEL FUND V, L.P.,  :
and THOMAS H. LEE EQUITY (CAYMAN)  :
FUND V, L.P.,                         :
                                         :

                     Plaintiffs,    :
           v.                    :

MAYER, BROWN, ROWE & MAW LLP,     :
                                         :
                    Defendant.    :
                                         :
-------------------------------------------------------------------x

## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS OF MAYER BROWN LLP

**WILLIAMS & CONNOLLY LLP**
725 Twelfth St., N.W.
Washington, D.C.  20005
Tel:   (202) 434-5000
Fax:  (202) 434-5029
*Attorneys for Defendant*
*Mayer Brown LLP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

THE ALLEGATIONS IN THE AMENDED COMPLAINT.......................................................... 3

ARGUMENT ....................................................................................................................... 9

I.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES
FRAUD. ................................................................................................................... 9

    A.    Count II Should Be Dismissed Because Plaintiffs Have Not Alleged
Any Misrepresentations Made by Mayer Brown Lawyers on which
Plaintiffs Relied. .......................................................................................... 9

    B.    The Non-Reliance and Integration Clauses in the Purchase Agreement
Bar Count II. ............................................................................................... 19

    C.    Even if Statements Were Attributed to Mayer Brown Lawyers and the
Non-Reliance and Integration Clauses Did Not Bar Count II, Plaintiffs
Fail To Plead Reliance Adequately............................................................. 22

    D.    Count I Should Be Dismissed Under *Stoneridge* and *Lentell*. .............................. 25

        1.    *Stoneridge* Bars Plaintiffs' Scheme Claim. ............................................. 26

        2.    Plaintiffs' Claims of Material Omissions and
Misrepresentations Cannot Be Pleaded as a Violation of Rule
10b-5(a) & (c). .......................................................................................... 30

    E.    Plaintiffs Have Not Alleged Specific Facts to Give Rise to a Strong
Inference of Scienter With Respect to Any Mayer Brown Lawyer..................... 32

        1.    Motive and Opportunity.............................................................................. 33

        2.    Conscious Misbehavior or Recklessness .................................................. 34

            a.    The most compelling inference from the facts in the
Amended Complaint is that Mayer Brown lawyers did
not suspect the back-to-back loans were used by Refco
to commit fraud............................................................................ 36

            b.    Mayer Brown lawyers' actions during the negotiation
of Plaintiffs' leveraged buyout of Refco do not raise an
inference of scienter..................................................................... 41

            c.    The work of Mayer Brown lawyers regarding the
Proceeds Participation Agreement with DF Capital is
not indicative of scienter.............................................................. 44

II.    THE RICO CLAIM IS BARRED BY THE PSLRA....................................................... 45

III.    THE RICO CLAIM IN ANY EVENT FAILS AS A MATTER OF LAW...................... 51

    A.    Plaintiffs Have Not Pleaded Agreement. ............................................................. 51

i

      B.      Plaintiffs' RICO Conspiracy Claim Fails Because They Have Not Adequately Pleaded an Underlying RICO Violation............................................. 54

IV.    THE NEGLIGENT MISREPRESENTATION CLAIM IS BARRED BY THE MARTIN ACT AND IN ANY EVENT FAILS TO STATE A CLAIM. ........................ 57

V.    PLAINTIFFS' COMMON LAW FRAUD CLAIM UNDER NEW YORK LAW SHOULD BE DISMISSED. ................................................................................... 60

CONCLUSION................................................................................................................................. 60

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Alstom SA Securities Litigation*, 454 F. Supp. 2d 187 (S.D.N.Y. 2006) ..............................12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..................... passim

*Avis Budget Group, Inc. v. California State Teachers' Retirement System*, 128 S. Ct. 1120 (2008) ...............................................................................................................................30

*Bald Eagle Area School District v. Keystone Financial, Inc.*, 189 F.3d 321 (3d Cir. 1999).........50

*Ballard v. Savage*, No. 92-840, 1997 U.S. Dist. LEXIS 24013 (S.D. Cal. Nov. 10, 1997) .... 53-54

*In re Bayou Hedge Fund Litigation*, __ F. Supp. 2d. __, Nos. 06-MDL-1755, 06-CV-2943, 2007 WL 2319127 (S.D.N.Y. July 31, 2007) ..............................................................34

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................................................... passim

*Berk v. Moore, Clayton & Co.*, No. 06 Civ. 2716, 2006 WL 3616961 (S.D.N.Y. Dec. 11, 2006) ...................................................................................................58-59

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ............................................18, 50

*Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007) ........................................34

*Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312 (2d Cir. 2002) ........................................................50

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001)............................................58

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1995)............................................................................................................................... passim

*Chanayil v. Gulati*, 169 F.3d 168 (2d Cir. 1999)........................................................................60

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999).............54, 56, 57

*Condict v. Condict*, 826 F.2d 923 (10th Cir. 1987) ....................................................................54

*Congregacion de la Mision Provincia de Venez. v. Curi*, 978 F. Supp. 435 (E.D.N.Y. 1997) ..............................................................................................................................54

*Cosmas v. Hassett*, 896 F.3d 8 (2d Cir. 1989) ...........................................................................55

*Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)........................................58

*Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001)............................................................................................................58

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998)..........3

*Doehla v. Wathne Ltd.*, No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999) ...............59

*Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303 (S.D.N.Y. 2006) ................................59, 60

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ...................................................2, 52

*In re Dynegy, Inc., Securities Litigation*, 339 F. Supp. 2d 804 (S.D. Tex. 2004).........................31

*Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999) ..............................33

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189
    (2d Cir. 2003) ................................................................................................................ passim

*In re Enron Corp. Securities, Derivative, & ERISA Litigation*, 284 F. Supp. 2d 511 (S.D.
    Tex. 2003) ...........................................................................................................................49

*FD Property Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362 (E.D.N.Y. 2002)............52

*Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793, 2005 WL 500377
    (S.D.N.Y. Mar. 2, 2005) ................................................................................................48, 49

*First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).........55, 57

*Friedman v. Arizona World Nurseries L.P.*, 730 F. Supp. 521 (S.D.N.Y. 1990) .........................17

*GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463 (2d Cir. 1995)................57

*In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319
    (S.D.N.Y. 2004) .......................................................................................11, 12, 27, 30

*Goren v. New Vision International, Inc.*, 156 F.3d 721 (7th Cir. 1998).......................................53

*Granite Partners, LP v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998) ...................58

*H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)...........................................54

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, __ F.3d __, 2008 WL
    442416 (7th Cir. Feb. 20, 2008)...........................................................................................35

*Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609 (7th Cir. 1996)..........................................19

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)............................................................ passim

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) .......................................52

*Hemispherx Biopharma, Inc. v. Asensio*, No. Civ. A. 98 5204, 1999 WL 144109
    (E.D. Pa. Mar. 15, 1999).......................................................................................................49

*Hexagon Packaging Corp. v. Manny Gutterman & Assocs.*, Nos. 96 C 4356, 99 C 5493, 2000 WL 226396 (N.D. Ill. Feb. 17, 2000) ............................................................54

*Hollinger International, Inc. v. Hollinger Inc.*, No. 04 C 698, 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004)............................................................................................49

*Howard v. AOL, Inc.*, 208 F.3d 741 (9th Cir. 2000)..........................................46, 47, 54

*HSA Residential Mortgage Services of Texas v. Casuccio*, 350 F. Supp. 2d 352 (E.D.N.Y. 2003)......................................................................................................57

*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933 (2d Cir. 1998)........................................................................................................60

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ...............................................................52

*Jackvony v. RIHT Financial Corp.*, 873 F.2d 411 (1st Cir. 1989)..................................20

*Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336 (S.D.N.Y. 2007)...............52

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ......................................................33, 34

*In re Kidder Peabody Securities Litigation*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998) ................17, 18

*Kinsey v. Cendant Corp.*, No. 04 Civ 0582, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004).........33

*LaSala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246 (S.D.N.Y. 2007) .............57

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ...................... passim

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)..................................23, 30

*In re Lernout & Hauspie Securities Litigation*, 230 F. Supp. 2d 152 (D. Mass. 2002)................11

*Leung v. Law*, 387 F. Supp. 2d 105 (E.D.N.Y. 2005)..................................................55

*Ling v. Deutsche Bank, AG*, No. 04 CV 4566, 2005 WL 1244689 (S.D.N.Y. May 26, 2005)................................................................................50

*Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998)................................................53

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006)................................................3

*Marcus v. Frome*, 329 F. Supp. 2d 464 (S.D.N.Y. 2004)........................................59, 60

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)................................................55

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) ..............47, 48

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ....................................................55, 56

*Morin v. Trupin*, 711 F. Supp. 97 (S.D.N.Y. 1989)......................................................................28

*In re MTC Electronic Technologies Shareholders Litigation*, 898 F. Supp. 974
(E.D.N.Y. 1995)...........................................................................................................................10

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, No. 02 Civ.
0767, 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003)..................................................................58

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .......................................................................34, 36

*Novak v. Kasaks*, 997 F. Supp. 425 (S.D.N.Y. 1998) ...................................................................34

*One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988) .......................20, 21, 22

*OSRecovery, Inc. v. One Groupe International, Inc.*, 354 F. Supp. 2d 357
(S.D.N.Y. 2005) ...........................................................................................................................48

*Payton v. Flynn*, No. 06 C 465, 2006 WL 3087075 (N.D. Ill. Oct. 26, 2006)........................47, 49

*Pennsylvania Association of Edwards Heirs v. Rightenour*, 235 F.3d 839 (3d Cir. 2000) ...........53

*Pension Commission of the University of Montreal Pension Plan v. Banc of America
Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006)........................................................ 57-58

*In re Philip Services Corp. Securities Litigation*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004) .............34

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101
(W.D. Mich. 1996).......................................................................................................................17

*Pinter v. Dahl*, 486 U.S. 622 (1988) ..............................................................................................18

*Pro Bono Investments, Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787
(S.D.N.Y. Sept. 30, 2005)............................................................................................................58

*In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ.
643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)....................................................................27

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......................34, 35

*Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482
F.3d 372 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1120 (2008).........................................26, 29

*Regents of the University of California v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 128
S. Ct. 1120.....................................................................................................................................30

*Renner v. Chase Manhattan Bank*, No. 98 Civ 926, 1999 WL 47239
(S.D.N.Y. Feb. 3, 1999) ...............................................................................................................48

*Republic of Colombia v. Diageo North America Inc.*, 531 F. Supp. 2d 365
    (E.D.N.Y. 2007)........................................................................................52

*Reves v. Ernst & Young*, 507 U.S. 170 (1993).................................................51

*Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000) ................................20, 21, 22

*Roby v. Corp. of Lloyd's*, 796 F. Supp. 103 (S.D.N.Y. 1992) .........................1

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978)..................34

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)...........................................34

*In re Royal Dutch/Shell Transport Securities Litigation*, No. 04-374, 2006 WL 2355402
    (D.N.J. Aug. 14, 2006).............................................................................31

*Salinas v. United States*, 522 U.S. 52 (1997).........................................52, 54

*In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) .........................26

*In re Salomon Analyst Winstar Litigation*, No. 02 Civ. 6171, 2006 WL 510526
    (S.D.N.Y. Feb. 28, 2006)..........................................................................33

*Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991) ......................................17

*In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001)................11, 12

*SEC v. Edwards*, 540 U.S. 389 (2004)..........................................................50

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ..............................................50

*SEC v. Zandford*, 535 U.S. 813 (2002) ...................................................50, 51

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997)......................................10, 11

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) ...............29

*Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353
    (5th Cir. 2004).........................................................................................32

*Spira v. Nick*, 876 F. Supp. 553 (S.D.N.Y. 1995).........................................55

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ...... passim

*In re Sumitomo Copper Litigation*, 104 F. Supp. 2d 314 (S.D.N.Y. 2000) ...................55

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ....................32, 38

*United Mine Workers of America v. Coronado Coal Co.*, 259 U.S. 344 (1922) ...........................1

*United States v. Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007) ...................................................3

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ....................................................56

*Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355 (E.D.N.Y.), *aff'd sub nom., Winkler v. Wigley,* 242 F.3d 369 (2d Cir. 2000) ...................................................17

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998).................................................. passim

*Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004)..................................................51, 52

## STATE CASES

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 842 N.E.2d 471 (N.Y. 2005) ...................................................59

*CPC International Inc. v. McKesson Corp.*, 514 N.E.2d 116 (N.Y. 1987) ...................................58

*Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218 (App. Div. 1992).......................................58

*Gouldsbury v. Dan's Supreme Supermarket., Inc.*, 546 N.Y.S.2d 379 (App. Div. 1989)............60

*Horn v. 440 E. 57th Co.*, 547 N.Y.S.2d 1 (App. Div. 1989).........................................................58

*Rego Park Gardens Owners, Inc. v. Rego Park Gardens Associates*, 595 N.Y.S.2d 492 (App. Div. 1993) ...................................................58

*Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (App. Div. 2001)....................................58

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 78c(a)(10)..................................................................................................................50

15 U.S.C. § 78j(b) .................................................................................................................. passim

15 U.S.C. § 78t(a) .......................................................................................................................12

15 U.S.C. § 78u-4(b) ...................................................................................................................10

15 U.S.C. § 78u-4(b)(1) ..............................................................................................................31

15 U.S.C. § 78u-4(b)(2) ..............................................................................................................32

18 U.S.C. § 2....................................................................................................................................3

18 U.S.C. § 1962(a) ....................................................................................................................54

18 U.S.C. § 1962(b) ....................................................................................................................54

18 U.S.C. § 1962(c) ..................................................................................................51, 54, 57

18 U.S.C. § 1962(d) ................................................................................................. passim

18 U.S.C. § 1964(c) ..............................................................................................................46

Martin Act,  N.Y. Gen. Bus. Law § 352 *et seq.* ................................................... passim

Private Securities Litigation Reform Act of 1995 ................................................ passim

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ................. passim

Securities Litigation Uniform Standards Act of 1998 ........................................47, 48

17 C.F.R. § 240.10b-5 ............................................................................................. passim

Federal Rule of Civil Procedure 8(a) ............................................................................52

Federal Rule of Civil Procedure 9(b) ................................................................52, 55, 60

## LEGISLATIVE HISTORY

H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730,
   746................................................................................................................................46

141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995)...........................................................46

## DOCKETED CASES

Supplemental Brief in Support, *Regents of the University of California v. Merrill Lynch
   Pierce Fenner & Smith, Inc.*, No. 06-1341, 2008 WL 189168 (U.S. Jan. 17, 2008)...............29

Brief of Council of Institutional Investors as Amicus Curiae in Support of Petitioner,
   *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, No. 06-43, 2007 WL
   1701610 (U.S. June 11, 2007) ................................................................................................13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., et al.*,
   No. 06-2902-CV ......................................................................................................33

Complaint, *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608.....6, 36

Complaint, *Thomas H. Lee Equity Fund V, L.P., et al. v. Grant Thornton LLP*,
   No. 07 Civ. 8663.....................................................................................................23

## INTRODUCTION

Plaintiffs filed an Amended Complaint after Mayer Brown LLP[1] had fully briefed a motion to dismiss exposing the fundamental flaws in Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and under New York state law. The Supreme Court's recent decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008), confirms that Plaintiffs' claims under Section 10(b) fail as a matter of law. *See also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1995). The Amended Complaint is a transparent attempt to plead around *Stoneridge*. But the fatal deficiencies in Plaintiffs' claims against Mayer Brown cannot be cured, and the Amended Complaint accordingly should be dismissed with prejudice.

Plaintiffs seek to hold Mayer Brown liable for a fraud allegedly committed by the firm's client, Refco. The law does not permit that result. In the course of providing legal services to Refco, Mayer Brown lawyers documented some corporate transactions and served as a conduit

---

[1]    Mayer Brown LLP is an Illinois limited partnership that was formerly known as Mayer, Brown, Rowe & Maw LLP. In their Amended Complaint, Plaintiffs describe "Defendant Mayer, Brown, Rowe & Maw LLP" as a "combination" of two legal entities – an Illinois limited liability partnership and a limited liability partnership formed under English law. Compl. ¶ 11. There is no such single entity. The instant Motion is brought by the Illinois limited liability partnership, Mayer Brown LLP ("Mayer Brown"). Mayer Brown International LLP, the limited liability partnership incorporated in England and Wales, is filing a separate motion to dismiss.

A "combination" between two limited liability partnerships has no legal status. "It is well settled that it must appear that an association, if it is not a corporation, has received by appropriate legislation a legal status before it, or its members, may be sued in the name of the group." *Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 110-11 (S.D.N.Y. 1992) (quoting Brief for Petitioner, *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 351 (1922)). Accordingly, to the extent the Amended Complaint seeks to assert claims against a single entity comprising both the Illinois and United Kingdom entities, which are now named Mayer Brown LLP and Mayer Brown International LLP, respectively, it should be dismissed.

for a few bits of factual information provided by – and attributed to – Refco. But Mayer Brown never vouched for the accuracy of any of Refco's statements or otherwise stepped out of its role as counsel for Refco. Under these circumstances, Plaintiffs cannot claim to have relied upon or been misled by Mayer Brown's statements or conduct, as opposed to Refco's. In any event, Plaintiffs are sophisticated private equity firms that are improperly attempting to turn Section 10(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, into "downside insurance" for their own investment decision, contrary to the long-standing principle that these provisions do not establish a scheme of investors' insurance.[2] It is thus particularly untenable for Plaintiffs to allege reasonable or justifiable reliance when the detailed contract they negotiated made clear, in all-capital-letter text, that informal pre-closing statements were not material to the parties. In addition, Plaintiffs fail to plead facts giving rise to a strong inference that any Mayer Brown lawyer understood – any more than Plaintiffs did – that the Refco insiders had misstated the company's financial statements or were actively concealing related-party transactions.

    Unable to find a way around the *Stoneridge* decision, Plaintiffs try to use the indictment returned against Mayer Brown partner Joseph Collins as proof of the viability of their civil complaint. In so doing, Plaintiffs simply ignore the fact that the elements of a criminal case (and of the SEC's civil suit against Mr. Collins, which alleges only aiding and abetting) are significantly different than the elements of a private cause of action under Section 10(b). Most notably, the Government and the SEC can proceed on conspiracy and aiding and abetting theories that are not available to private plaintiffs under the Supreme Court's decisions in *Stoneridge* and *Central Bank*; moreover, the Government and SEC may not be required to prove

---

[2]    The Supreme Court reaffirmed this principle in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (Section 10(b) does "not . . . provide investors with broad insurance against market losses").

that investors relied on alleged misstatements.[3]  In light of the different standards that apply, the indictment and the SEC suit are relevant here only to demonstrate that private litigation is not necessary to address any wrongful conduct that may have occurred.  *See Stoneridge*, 128 S. Ct. at 773 (noting the availability of criminal and SEC enforcement proceedings is a strong deterrent and a factor counseling against expansion of the private right of action under Section 10(b)).

### THE ALLEGATIONS IN THE AMENDED COMPLAINT

Refco was a commodities and futures brokerage company.  In the fall of 2003, Plaintiffs began to explore the possibility of purchasing an interest in Refco.  Thomas H. Lee Partners, L.P. ("THL Partners") "performed intensive due diligence," as did professional advisors hired by Plaintiffs for that purpose, including the law firm of Weil, Gotshal & Manges LLP ("Weil Gotshal"), which is also representing Plaintiffs in the current action.  Compl. ¶¶ 38-39.

Following the completion of due diligence more than eight months later, Plaintiffs entered into an agreement on June 8, 2004 to purchase a majority equity interest in Refco for $452 million (the "Purchase Agreement") in a leveraged buyout ("LBO").[4]  *Id.* ¶ 78.  The Purchase Agreement was carefully negotiated by sophisticated parties and contained specific representations and warranties, an integration clause (Section 9.1), and a provision (Section 3.27)

---

[3]    The indictment charges conspiracy to commit, among other things, securities fraud, which under *Central Bank* is not actionable by a private plaintiff.  *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998).  Each of the other ten counts incorporates 18 U.S.C. § 2, which makes anyone who "*aids* [or] *abets*" the commission of a crime punishable as a principal offender, the exact form of liability foreclosed in private litigation by *Central Bank*.  On the other hand, the indictment does not expressly allege reliance or loss causation, neither of which appears to be required in prosecutions for securities fraud.  *See United States v. Ferguson*, 478 F. Supp. 2d 220, 233 (D. Conn. 2007) (listing elements).

[4]    A copy of the Purchase Agreement is attached to the Declaration of Thomas G. Ward in Support of Motion to Dismiss of Mayer Brown LLP ("Ward Decl.") as Exhibit A.  The Court may consider the Agreement on this Motion because it was referred to and relied on in the Amended Complaint.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).

explicitly designed to eliminate the possibility that any subsequent claims would be asserted based on alleged misstatements made during the course of the lengthy due diligence process. Section 3.27, entitled "Exclusivity of Representations and Warranties," was written (unlike the rest of the contract) in all capital letters for emphasis.  In that section, the parties agreed that the only representations and warranties that had been made in connection with the sale were those expressly contained in the agreement:

> THE REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES.  RGHI HEREBY DISCLAIMS ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIONS [sic] OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).

Ward Decl., Ex. A.  Section 9.1 further states that the Purchase Agreement "constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof . . . ."  *Id.*  The LBO closed on August 5, 2004.  On August 10, 2005, after Plaintiffs had owned Refco for just over a year, the company launched its initial public offering ("IPO"), enabling Plaintiffs to recoup $207 million of their initial $452 million investment.

A few months after the IPO was completed, it is alleged, Refco's Board of Directors learned that Refco Chief Executive Officer Phillip Bennett's "personal holding company," Refco Group Holdings, Inc. ("RGHI"), owed $430 million to Refco that had never been disclosed in Refco's financial statements.  Compl. ¶ 83.  Plaintiffs allege that this "RGHI Receivable"[5] can be traced back to undisclosed losses Refco had suffered in the 1990s as a result of (among other

---

[5]    In fact, there was no single "RGHI Receivable."  According to the Complaint, money owed by RGHI was reflected in debit balances held at three separate Refco accounts.  *Id.* ¶ 21.

things) millions of dollars of unpaid customer loans and Refco's own proprietary trading losses. *Id*. ¶¶ 19-20. Rather than writing off the uncollectible accounts, Bennett allegedly caused Refco to transfer them to RGHI in return for receivables from RGHI. *Id*. Starting in 1998, Bennett allegedly directed a series of short-term loan transactions that allowed RGHI temporarily to pay down its receivable around the end of Refco's fiscal year. *Id.* ¶¶ 21-23.[6] In 2000, Bennett "orchestrated" transactions in which a Refco company loaned money to a Refco customer, which then loaned the same amount to RGHI. *Id.* ¶¶ 31-32. Then, in the "third leg" of the transaction, RGHI would temporarily pay down its debt to Refco.[7] *Id.* ¶¶ 25-27. After this paydown, Refco's books would reflect a loan to the customer rather than a receivable from RGHI. *Id*. Plaintiffs allege that Refco arranged for these loans to be made just before the end of an accounting period so that the RGHI Receivable would not appear on its financial statements; shortly after the end of the fiscal year or quarter, the loans would be repaid and the RGHI Receivable would reappear on Refco's books. *Id*. ¶ 27. Plaintiffs describe these transactions as the "round trip loan transactions."[8]

---

[6]      Plaintiffs allege Bennett began manipulating Refco's financial results even earlier, through "wire-transfer 'loan[]'" transactions in which Mayer Brown is not alleged to have been involved. Compl. ¶ 21 n.9.

[7]      A diagram showing the structure of these loan transactions based on Plaintiffs' allegations is attached as Exhibit B to the Ward Declaration. While the Complaint alleges that Mayer Brown attorneys worked on the loan documentation for the first two legs of the transaction, *see* Compl. ¶ 30-32, the Complaint does not allege any facts from which the Court could infer that any Mayer Brown attorney had knowledge of or involvement in the "third leg" – the RGHI Receivable paydown – which is the crux of Plaintiffs' theory of the Refco fraud.

[8]      Plaintiffs presumably use the term "round-trip loan transactions" because they include the "third leg" of the transaction. *See* Compl. ¶ 21. For reasons previously stated, this term rests on a mischaracterization of Mayer Brown's knowledge and involvement. Mayer Brown therefore uses the term "back-to-back" loans to describe the first two legs of the transactions, for which it provided legal services.

After the $430 million receivable was revealed, Refco's stock price dropped and it quickly petitioned for bankruptcy. *Id.* ¶¶ 83-85. Plaintiffs allege that, as a result of Refco's collapse, the remaining Refco securities they acquired in the 2004 purchase are now worthless, resulting in claimed losses of $245 million. *Id.*

On November 14, 2005, Plaintiffs filed a complaint in this Court against RGHI, Bennett and two other former Refco insiders (Santo Maggio and Tone Grant), accusing them of securities fraud, common law fraud, negligent misrepresentation, and breach of contract. Compl., *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608. Plaintiffs filed their initial complaint against Mayer Brown on July 26, 2007, and their First Amended Complaint on February 20, 2008, claiming that Mayer Brown, which had served as Refco's principal outside counsel during the period in question, had assisted Refco insiders in perpetrating a fraud.

The Amended Complaint seeks to hold Mayer Brown liable for its client's fraud under Section 10(b) based on two distinct theories. First, notwithstanding *Stoneridge*, Plaintiffs continue to press a "scheme liability" claim, alleging that Mayer Brown's documentation of certain of the back-to-back loans described above enabled Refco to misstate its financial statements. The Amended Complaint makes clear, however, that Plaintiffs were not even aware of the transactions Mayer Brown lawyers documented and that they relied – not on anything Mayer Brown lawyers said or did with respect to these transactions – but rather on Refco's issuance of allegedly false and misleading financial statements. Under those circumstances, Plaintiffs' "scheme liability" claim is clearly barred under *Stoneridge.*

Second, Plaintiffs also continue to allege that Mayer Brown was responsible for a host of misrepresentations made by Refco, both during due diligence and in the Purchase Agreement. *See* Compl. ¶¶ 50-77. These representations included Refco's financial statements, which

"Bennett and [Refco Chief Financial Officer Robert] Trosten caused . . . to be provided" to them, *id.* ¶ 51; contractual representations and warranties; and officers' questionnaires obtained from Refco's top executives that certified facts about Refco's finances that Plaintiffs claim were false, *id*. Although the Amended Complaint suggests that Plaintiffs seek to hold Mayer Brown liable for all of these statements, Plaintiffs wisely abandoned such claims in their opposition to Mayer Brown's motion to dismiss the original complaint. Plaintiffs have instead focused on four instances prior to the closing of the transaction in which Mr. Collins, the Mayer Brown partner responsible for the Refco relationship and who represented the Refco sellers in the LBO, passed along representations made by Bennett and Refco management during due diligence. In each case, the Amended Complaint makes clear that Mr. Collins was merely repeating what his client had said, without any endorsement or representation that Mayer Brown had verified the information provided. *See, e.g.*, *id*. ¶ 53 (Mr. Collins tells Plaintiffs' counsel that "he had confirmed with Bennett that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI or other affiliates"); *see also id.* ¶¶ 54-56 (other Refco statements communicated by Mr. Collins).

Under well-settled Second Circuit law, the fact that these statements were never attributed to Mayer Brown is fatal to Plaintiffs' claims under Rule 10b-5(b). So too is Plaintiffs' evident lack of any basis for claiming transaction causation. It is simply not plausible that in entering into the half-billion-dollar Purchase Agreement, Plaintiffs relied on Mayer Brown's statements repeating information they had already heard from Refco – rather than on the many months of due diligence carried out by their sophisticated advisers, their examination of Refco's financial statements, and all of the formal representations, warranties and certifications explicitly made by Refco and its insiders. In any event, any misrepresentation claim is barred by the plain

terms of the Purchase Agreement, which expressly disclaims any reliance on informal representations not contained in the Agreement.

Plaintiffs' Section 10(b) claims also fail because Plaintiffs have not pleaded facts giving rise to a strong inference that Mr. Collins, or any other Mayer Brown lawyer, acted with scienter. The essence of Plaintiffs' scienter theory is that because Mayer Brown "handled" the back-to-back loans, it necessarily "knew" that Refco's financial statements were fraudulent and that Refco was lying to Plaintiffs when it failed to disclose the back-to-back loans in the course of due diligence. The Amended Complaint, however, does not allege a number of pivotal facts that one would expect to find given Plaintiffs' theory of the case:

- Plaintiffs allege no facts to suggest that any Mayer Brown attorney was aware of how Bennett and other Refco insiders were using the proceeds of the back-to-back loans, that is, that RGHI was using the funds to temporarily pay down receivables owed to Refco. This deficiency is vital because it was this "third leg" of the transaction that was the linchpin of Refco's misstatement of its financial statements. Nor do Plaintiffs plead any facts to suggest that any Mayer Brown attorney knew that there was a hidden set of RGHI receivables that needed to be manipulated at year- or quarter-end.

- Nor are there any facts alleged to suggest that Mr. Collins or any Mayer Brown lawyer knew which documents Refco had placed, *or not placed*, in the data room for THL Partners' review during the due diligence process or was aware of everything that Refco had or had not provided to Plaintiffs' advisers during the course of due diligence. Thus, even assuming that Mr. Collins was aware that the firm was continuing to document back-to-back loans for Refco at this time,[9] there are no facts alleged to support an inference that he knew the Refco insiders (i) had deliberately concealed those documents and (ii) were lying when they told Mr. Collins that all of the relevant documents had been disclosed.

- Plaintiffs allege no facts suggesting any motive for any Mayer Brown lawyer to engage in fraud, including no facts showing any personal interest in the transactions at issue and no facts showing that Mayer Brown was paid anything other than normal and customary hourly rates for its work. In fact, the transaction involved the sale of a client to a buyer who could be expected to (and did) transfer the bulk of the company's legal work to its usual outside counsel – Weil Gotshal.

---

[9]    Plaintiffs allege that Mr. Collins was copied on letters describing how the February 2000 and 2001 transactions were structured. Compl. ¶ 30. Notably, however, Plaintiffs do not, because they cannot, allege that these letters describe the third leg of the transactions.

Thus, even after amendment, Plaintiffs' allegations still fail to raise a strong inference that any individual lawyer at Mayer Brown acted with the requisite scienter.

Plaintiffs' alternative RICO conspiracy claim is barred under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which precludes claims based on alleged securities violations. *See* Section II, *infra*. In any event, even if Plaintiffs could pursue a claim under RICO, they have still failed to adequately plead that Mayer Brown agreed to any conspiracy or even that an underlying RICO violation occurred. Plaintiffs also try to repackage their securities fraud claim as state-law claims for fraud and negligent misrepresentation. The negligent misrepresentation claim cannot survive under New York's Martin Act and, in any event, fails to state a claim because Plaintiffs fail to plead reasonable reliance or privity between Plaintiffs and Mayer Brown. Finally, Plaintiffs' claims of fraud, whether based on securities law, RICO, or state law, are barred by the justifiable or reasonable reliance requirement as laid down by the Second Circuit in three recent cases that are indistinguishable from the present case. The Second Circuit has held time and again on motions to dismiss that sophisticated parties that have negotiated their own contracts with waiver and integration clauses may not claim to have been defrauded based on informal communications that occur during many months of due diligence.

## ARGUMENT

## I.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES FRAUD.

### A.    Count II Should Be Dismissed Because Plaintiffs Have Not Alleged Any Misrepresentations Made by Mayer Brown Lawyers on which Plaintiffs Relied.

In Count II of their Amended Complaint, Plaintiffs allege that Mayer Brown violated Section 10(b) and Rule 10b-5(b) by making material misstatements in connection with their purchase of Refco securities. In order to properly plead a material misstatement under the

PSLRA, Plaintiffs must "specify each statement alleged to have been misleading," explain "the reason or reasons why" the statement was misleading at the time it was made, and offer a theory of "loss causation" resulting from the actions of the particular defendant. 15 U.S.C. § 78u-4(b). Plaintiffs have alleged a variety of misstatements made to them directly by Refco insiders, as well as statements passed on by Mayer Brown lawyers. The Amended Complaint still does not explain which statements are the subject of Count II, even though that was an issue Mayer Brown raised in the last round of briefing. No matter which statements Plaintiffs claim to have relied upon, however, under controlling Second Circuit authority following *Central Bank*, 511 U.S. 164, Mayer Brown cannot be held liable for *any* of the misstatements alleged in the Complaint. That conclusion is fully supported by the decision in *Stoneridge*, 128 S. Ct. 761.

In *Central Bank*, the Supreme Court held that a plaintiff in a suit brought under Section 10(b) and Rule 10b-5 may sue only a primary violator and cannot seek damages from a secondary actor for allegedly aiding and abetting the fraud. As the Court explained:

> As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act.

511 U.S. at 177. Following *Central Bank,* the Second Circuit, in *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997), adopted a "bright line" test for defining the scope of primary liability, under which a secondary actor cannot be held liable under Section 10(b) for alleged misstatements unless he "actually ma[de]" a false or misleading statement. *Id.* at 720 (quoting *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 987 (E.D.N.Y. 1995)). As the court explained,

> If *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is

> merely aiding and abetting, and no matter how substantial that aid
> may be, it is not enough to trigger liability under Section 10(b).

*Id.* (quotations omitted).

In subsequent decisions, the Second Circuit has adhered to the bright-line test. In *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998), it held that "a secondary actor cannot incur primary liability under the Act for a statement not *attributed to that actor at the time of its dissemination*," *id.* at 175 (emphasis added). In *Central Bank*, the Supreme Court emphasized the reliance element in rejecting aiding-and-abetting liability under Section 10(b), and in its post-*Central Bank* case law the Second Circuit has made clear that any deviation from the bright-line rule "would circumvent the reliance requirements of the Act." *Id.* "[R]eliance only on representations made by others cannot itself form the basis of liability." *Id*. (quotation omitted).

In *In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004), this Court noted that *Wright* "seemed to leave little doubt that the rule limiting liability to a defendant's own publicly attributed statements was absolute," *id.* at 331. The Court concluded, however, that the Second Circuit had "relaxed" the absolutist view taken in *Wright* to a certain extent in its subsequent decision in *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001), when it held that an officer of an issuer could be held liable for statements made by the issuer even if the statements were not attributed to the officer, *id.* at 75-76. Relying on the reasoning in *In re Lernout & Hauspie Securities Litigation*, 230 F. Supp. 2d 152 (D. Mass. 2002), this Court concluded that an auditor could be held liable even for unaudited quarterly financial statements that were not attributed to it if the complaint alleged facts showing (i) that the auditor was deeply involved in preparing those financial statements and (ii) that the auditor's responsibility for the company's reporting practices was so well known that sophisticated investors "could easily have relied on the [auditor's] involvement in making any public financial

11

reports, even where a . . . statement was not publicly attributed to it." *In re Global Crossing*, 322 F. Supp. 2d at 334. The Court concluded that the allegations against Arthur Andersen with respect to Global Crossing's quarterly unaudited financial statements met this standard.

The Second Circuit's recent decision in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007), however, demonstrates that the Court has not in fact retreated from the bright-line position it took in *Wright* as to secondary actors.[10] As in *Wright* and *Global Crossing*, the issue in *Lattanzio* was whether an outside auditor could be held liable under Section 10(b) for helping to compile and review its client's allegedly misleading interim financial statements. Although Deloitte had not issued an audit report opining on those financial statements, the plaintiffs argued that new SEC regulations requiring an outside auditor to review such statements "associated Deloitte with those statements to such a degree that they became Deloitte's statements." *Id.* at 155. The Second Circuit rejected this argument. The court held that it is not enough that investors *believe* the secondary actor has endorsed the statement in question; in addition, the secondary actor must have actually "articulated" its endorsement:

> Public understanding that an accountant is at work behind the scenes does not create an exception to the requirement that an actionable misstatement be made by the accountant. Unless the public's understanding is based on the accountant's articulated statement, the source for that understanding – whether it be a

---

[10]    *Scholastic* and similar cases focus on the obligations of corporate insiders. Courts in this district have observed that "the attribution requirement is of particular concern when plaintiffs seek to hold outside secondary actors . . . liable for a corporation's misleading statements, as opposed to inside corporate officers (as in *In re Scholastic*)." *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 204 n.12 (S.D.N.Y. 2006). In *Scholastic*, the defendant in question was the vice president for investor relations of the issuer and thus was in a position to control the issuer's disclosures. 252 F.3d at 75-76. Plaintiffs there alleged that he was "primarily responsible for the company's communications with investors and industry analysts," *id.*, and the Second Circuit found that he was potentially liable as a control person of the issuer, *id.* at 77-78. *See* 15 U.S.C. § 78t(a) (imposing liability on control persons). No such allegations have been made against Mayer Brown. *See Cent. Bank*, 511 U.S. at 184 (refusing to expand implied cause of action in a manner that would override limits on control person provision).

> regulation, an accounting practice, or something else – does not
> matter.

*Id.* (citation omitted).

*Stoneridge* buttresses this conclusion.  The Supreme Court again emphasized the importance of the reliance element in rejecting liability on the part of defendants where the plaintiffs were not aware of the transactions in which the defendants engaged and thus "did not in fact rely upon [the defendant's] *own* deceptive conduct."  128 S. Ct. at 770 (emphasis added).  As the Second Circuit made clear in *Wright* and *Lattanzio*, "a secondary actor cannot incur primary liability under the Act for a statement not attributed to the actor at the time of its dissemination" precisely because "[s]uch a holding would circumvent the reliance requirements of the Act."  *Wright*, 152 F.3d at 175; *Lattanzio*, 476 F.3d at 154-55.  Stoneridge thus reaffirmed the basis for the Second Circuit's bright-line rule.[11]

These principles are fatal to Count II here.  Mayer Brown cannot be held liable for the many misrepresentations alleged in the Amended Complaint that were made directly to Plaintiffs by Refco and Refco insiders.  Mayer Brown never purported to endorse or verify any of these statements.  As noted above, in the last round of briefing, Plaintiffs tacitly acknowledged that Mayer Brown had no liability for any of these statements. But the same analysis applies to misrepresentations that Mayer Brown lawyers allegedly relayed from Refco to Plaintiffs.  A lawyer who serves as a conduit for information from his client does not induce reliance on his

---

[11]    Counsel for Plaintiffs argued in *Stoneridge* (in an *amicus* brief submitted on behalf of another client) that the Second Circuit's bright-line rule (which they called the "strict test for primary liability") should be rejected.  They asserted that "[t]he requirement that plaintiffs rely on a fraudulent misrepresentation – as opposed to relying on attribution of the misrepresentation to a particular defendant – does not mandate" the bright-line rule.  Brief of Council of Institutional Investors as Amicus Curiae in Support of Petitioner, *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, No. 06-43, 2007 WL 1701610 (U.S. June 11, 2007) (Ward Decl., Ex. C).  The Supreme Court did not agree.  It left the bright-line rule undisturbed, and that rule is dispositive here.

own words or conduct.  Because the alleged statements merely recited Refco's representations
and were attributed to Refco, it was Refco, not Mayer Brown, on whom Plaintiffs relied.

Examination of the few statements allegedly made by Mr. Collins confirms this
conclusion.  In each one of those statements, Mr. Collins simply passed along representations
that were being made by Refco insiders.  *See* Compl. ¶ 53 (during a phone conversation in March
2004, Mr. Collins told Weil Gotshal partner Jay Tabor that "*he had confirmed with Bennett* that,
other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements
existed between Refco and Bennett, RGHI or other affiliates" (emphasis added)); *id.* ¶ 54 (during
"a telephone conference on due diligence issues in March 2004, Collins '*confirmed*' to WGM
partner Jay Tabor that all of Refco's receivables listed on Refco's balance sheet were 'from
customers in ordinary course.  *Company has gone through with accountants.*'" (emphasis
added)); *id.* ¶ 55 (on May 6, 2004, in response to a request from Plaintiffs, "Collins sent by e-
mail a memorandum, addressed to WGM, stating that: '[*w*]e were advised by Refco Management*
that all material contracts were either in the Data Room or are being produced'" (emphasis
added)); *id.* ¶ 56 ("Collins represented that '[*w*]e have been advised by Refco* that there are no
significant indemnification obligations which have not been disclosed already'" (emphasis
added)).  There is no allegation that Mr. Collins – an outside lawyer, not an accountant or
financial analyst – ever expressly endorsed or offered any opinion on the accuracy of these
statements.  Because there is no claim that the statements were ever attributed to Mayer Brown,
*Wright* and *Lattanzio* make clear that Mayer Brown cannot be held liable for them.

In an attempt to overcome these and other deficiencies, Plaintiffs have added to their
Amended Complaint allegations regarding a Proceeds Participation Agreement ("PPA") with DF
Capital, a topic Plaintiffs knew about, but chose not to address, in their original complaint.  *See*

Examiner's Report, at 288-89 (discussing Plaintiffs' awareness of PPA).  Plaintiffs allege that

Refco hid the PPA from them because it contained references to $350 million in hidden inter-

company debt.  Compl. ¶ 58.  Plaintiffs knew the PPA existed because they saw an unsigned

limited liability company agreement ("LLC Agreement") in Refco's data room that contained

references to it and to DF Capital.  *Id.* ¶ 61.  They do not claim to have ever specifically asked

Refco or Mayer Brown to provide them with a copy of the PPA.  Instead, Plaintiffs now contend

that the PPA was one of many different kinds of documents that was responsive to their general

requests for information.  *Id.* ¶ 65.  Plaintiffs contend that Mayer Brown should be held liable for

Refco's failure to provide this document to them.  But, like the other documents Plaintiffs claim

were withheld, they offer no basis for imposing any duty to disclose on Mayer Brown.

　　　　Plaintiffs also claim that Mr. Collins helped Refco conceal the PPA.  The convoluted tale

they tell begins with the fact that Plaintiffs asked Refco for a signed copy of the LLC Agreement

they found in the data room.  Refco responded that the agreement "needed to be updated" and

that Mr. Collins would do so.  *Id.* ¶ 62.  Mr. Collins is alleged to have drafted and sent to

Plaintiffs a "Fourth Amended and Restated Limited Liability Company Agreement for Refco

Group, Ltd. LLC" that did not contain references to the PPA.  *See id.* ¶¶ 61-64.  Plaintiffs

contend that this version was a fake and that a signed Fourth Amended Agreement already

existed that included a reference to the PPA.[12]  What Plaintiffs have conveniently left out of their

Amended Complaint is the fact that in the same email they refer to, *id.* ¶ 64, Mr. Collins sent

along with the LLC Agreement contemporaneous Refco board resolutions, signed by Bennett,

which "approved and adopted" the so-called "counterfeit" Refco LLC Agreement, making it

---

[12]　　　Although Plaintiffs do not quote any statement from Mr. Collins regarding the
supposedly "counterfeit" LLC agreement, they contend that he misrepresented the version he
was sending to them as the genuine, operative agreement.  Compl. ¶ 64.

effective and operative.  A few days later, Mr. Collins also sent to Weil Gotshal a signature page for the LLC Agreement, also signed by Bennett.

These allegations may be new to the Amended Complaint, but they do not give Plaintiffs a viable claim.  Just as with any alleged misrepresentations in the Purchase Agreement itself, any misrepresentations in the signed "Fourth Amended and Restated Limited Liability Company Agreement of Refco Group, Ltd., LLC" were statements made by, and attributed to, Refco or the signatory to the document, RGHI – not outside counsel who merely drafted updates to the document.  *See Lattanzio*, 476 F.3d at 155.  Moreover, as with the due diligence communications, this allegation places Mayer Brown in the role of a mere conduit.  At Refco's instruction, Mr. Collins provided Plaintiffs with an updated LLC Agreement, *id.* ¶ 64, that Refco endorsed and made effective by signing board resolutions adopting and approving the revised agreement.  Once again, Mr. Collins merely passed on documents Plaintiffs had asked Refco to provide, without providing any endorsement or independent verification that it was in fact the operative agreement.

It is legally irrelevant that Plaintiffs allege that they believed during the due diligence process that Mayer Brown would not be serving "merely as a conduit for information from Refco management and Bennett, but would be drawing on its own extensive knowledge and information built up over the many years that Mr. Collins and his Mayer Brown colleagues had been working with Refco."  *Id.* ¶ 42.  Plaintiffs do not claim that this understanding was ever communicated to Mayer Brown – let alone that Mayer Brown ever *agreed* that it was vetting or endorsing the information it was passing on from Refco.  As in *Lattanzio*, in the absence of an "articulated" endorsement by Mayer Brown of the statements made by Bennett and other Refco

insiders, Mayer Brown cannot be held liable under Section 10(b) merely for passing along statements made by others.

Transmitting a client's misrepresentations "does not transform those misrepresentations into the representations of" the law firm. *Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th Cir. 1991). In *Schatz*, the Fourth Circuit held that a law firm could not be held liable under Section 10(b) for merely delivering a letter to the plaintiff containing false statements made by its client. The *Schatz* court made clear that only if a transactional lawyer makes "*independent* affirmative misstatements" – i.e., "*personal* affirmative representations" – can he be primarily liable under Section 10(b). *Id*. at 494 & n.3 (emphases added). Plaintiffs' allegations do not reach that level here. Rather, the conduct of Mayer Brown lawyers detailed in the Amended Complaint is akin to the handing over of the letter in *Schatz* – an act of transmission, not an "independent" or "personal" representation by the lawyer.

Many other cases are consistent with *Schatz*, including:

- *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 364-66 (E.D.N.Y.) (defendant public relations firm could not be held liable under Section 10(b) for misstatements in a press release the firm had disseminated under its own name and address because the misstatements had been expressly attributed to the president of defendant's corporate client), *aff'd sub nom., Winkler v. Wigley*, 242 F.3d 369 (2d Cir. 2000);

- *Friedman v. Ariz. World Nurseries L.P.*, 730 F. Supp. 521, 533 (S.D.N.Y. 1990) ("counsel who merely draft the memorandum cannot be held liable for the general statements in the offering memorandum not specifically attributed to them");

- *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1120-21 (W.D. Mich. 1996) (to be liable under Section 10(b), party must be "the original and knowing source of the misrepresentation" rather than "a mere conduit");

- *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998) (GE could not be held liable because it acted as mere "conduit" when issuing false public disclosures regarding subsidiary Kidder's profits based on information provided by Kidder; Kidder "controlled the content of the information" and GE "did nothing more than collect the information and transcribe it onto the page" such that, "[w]hen GE opened its mouth regarding Kidder, Kidder's words came out").

17

The *Kidder* court's description fits perfectly here: When Mayer Brown lawyers opened their mouths about Refco, Refco's words came out. Accordingly, no claim for primary liability can be maintained against Mayer Brown under Rule 10b-5(b).

Indeed, permitting Count II to survive would contravene the strong policy reasons given by the Supreme Court in *Stoneridge* for not extending the implied private cause of action under Section 10(b). In particular, the *Stoneridge* Court noted its concern that expansion of Section 10(b) liability would "rais[e] the cost of doing business" and "raise the cost of being a publicly traded company under our law." 128 S. Ct. at 772. *Stoneridge* reaffirmed and echoed *Central Bank*, in which the Supreme Court similarly had pointed out that extending secondary liability for professionals could drive up the cost of such professionals' services and otherwise make it more difficult for issuer corporations to obtain those services. *Cent. Bank*, 511 U.S. at 189. A holding that Section 10(b) reaches the conduct of a lawyer who serves as a conduit for information supplied by a client would at the very least cause the cost of legal services to rise: no lawyer in his or her right mind would ever again pass information along from a client without first doing extensive due diligence to ensure it was entirely accurate.

Another significant policy consideration is the Supreme Court's oft-reiterated warning that securities regulation is "'an area that demands certainty and predictability.'" *Id.* at 188 (quoting *Pinter v. Dahl*, 486 U.S. 622, 652 (1988)). A "shifting and highly fact-oriented disposition of the issue of who may [be liable for] a damages claim for violation of Rule 10b-5" is unacceptable. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755 (1975). Plaintiffs' sweeping theory here would expose outside counsel to massive liability in completely unpredictable ways, based on indeterminate levels of involvement in issuers' statements. Such a standard ultimately would disserve the interests of investors.

18

### B.     The Non-Reliance and Integration Clauses in the Purchase Agreement Bar Count II.

A second, independent reason that Count II fails is that, in light of the Purchase Agreement's express terms, Plaintiffs cannot establish, as a matter of law, that they reasonably or justifiably relied on any statements made by Mayer Brown lawyers.[13]  *See Emergent Capital Inv. Mgmt., LLC  v. Stonepath Group, Inc.*, 343 F.3d 189, 195-96 (2d Cir. 2003) (dismissing claim on pleadings "for lack of reasonable reliance"); *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 618 (7th Cir. 1996) ("The fact of reliance . . . is not enough by itself; that reliance must be justifiable, or reasonable."), *quoted in Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996).

As described above, the Purchase Agreement contains not only an integration clause, Section 9.1, but also an explicit "non-reliance" clause, Section 3.27, which is the only contractual provision that is written in all-capital letters.  Section 9.1 states that the Purchase Agreement "constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties . . . ."  Ward Decl., Ex. A.  Section 3.27 follows fourteen pages of representations and then states in unmistakably clear terms: "THE REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES."  *Id.*  This type of provision is used in sophisticated corporate transactions to ensure that the *only* representations the purchaser can claim to have relied upon are the representations made in the agreement and to exclude any subsequent claims that the purchaser was deceived by prior representations (not repeated in the final agreement) that were made during the course of due diligence.

---

[13]     The Agreement's terms also bar Plaintiffs' common-law fraud claim for the same reasons.  *Emergent Capital Inv. Mgmt., LLC  v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

Complex private securities transactions, like the one at issue here, "would be impossibly uncertain if federal law precluded parties from agreeing to rely on the written word alone." *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000). Courts in this circuit and elsewhere have enforced these clauses against sophisticated parties like Plaintiffs who seek to disregard the plain terms of the agreement and claim deception based on extra-contractual representations; in those cases, courts repeatedly have concluded that any reliance on such representations would be unreasonable as a matter of law. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105-08 (2d Cir. 2007); *Emergent Capital*, 343 F.3d at 195-96; *Harsco*, 91 F.3d at 345-47; *see also Rissman*, 213 F.3d at 383-86; *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416-17 (1st Cir. 1989) (Breyer, J.); *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1286-87 (D.C. Cir. 1988) (R.B. Ginsburg, J.).

Plaintiffs cannot plead reasonable reliance for the same reasons identified in those cases. In *Harsco*, for example, the purchase agreement contained an integration clause, fourteen pages of representations and warranties, and a specific provision, like Section 3.27 here, providing that the contractual representations were the *only* representations that had been made by the sellers. 91 F.3d at 340-43. When the disappointed purchaser sued for securities fraud based on alleged misstatements made during due diligence that were not embodied in the final contract, the Second Circuit upheld the dismissal of the complaint on the ground that the plaintiffs could not have relied on those representations. *Id.* at 345-47. Like the plaintiffs in the cases cited, Plaintiffs here are "clearly . . . sophisticated investor[s]."[14] *ATSI*, 493 F.3d at 105; *accord*

---

[14]    THL Partners states on its public website that it has "one of the largest complements of senior partners in the buyout business and emphasize a hands-on approach to investing. [Its] 13 senior investment partners have an average of approximately 20 years of professional experience and 13 years of experience at THL. THL benefits significantly from the cumulative experience, knowledge, and relationships resident in this team and believes it has unmatched continuity and

*Emergent Capital*, 343 F.3d at 196; *Harsco*, 91 F.3d at 344.  With the assistance of counsel, Plaintiffs negotiated the agreement at "arm's length."  *Harsco*, 91 F.3d at 344; *see also Emergent Capital*, 343 F.3d at 196.  During the negotiations leading up to the LBO closing, oral representations were undoubtedly made by Refco, Plaintiffs and THL Partners.  But rather than rely on statements made in the give-and-take of negotiations, the parties settled on merger and non-reliance clauses that "ensure[d] that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication."  *Rissman*, 213 F.3d at 384; *see also One-O-One*, 848 F.2d at 1286.

Plaintiffs entered into a contract that explicitly disclaimed all prior representations, whether oral or written, not contained in the final contract.  Therefore, they cannot complain that they were misled by, for example, draft representations that were exchanged during the course of negotiations but did not make it into the final Purchase Agreement, or documents they did or did not receive during due diligence such as the PPA or allegedly "counterfeit" LLC Agreement.[15] Nor can Plaintiffs complain of oral or written assurances provided to them during the course of due diligence, such as the assurances Refco communicated through Mr. Collins.  *Emergent Capital*, 343 F.3d at 196.  Plaintiffs should not be allowed to now "disavow" the contractual provisions they negotiated because the clauses no longer suit them.  *Rissman*, 213 F.3d at 383.

---

depth of experience among these senior professionals."  http://www.thlee.com/aboutThl/index.html (last visited March 26, 2008).  THL Partners specifically identifies "financial services" as one of its main areas of investment expertise.  *Id.*

[15]    Plaintiffs specifically bargained for a representation from RGHI regarding the "organization" of Refco, Section 3.1 of the Purchase Agreement, which contained presumably all the elements of Refco's corporate organization that Plaintiffs deemed relevant to its decision whether to enter into the transaction.  *See* Ward Decl., Ex. A.  At the end of the day, it was immaterial to Plaintiffs whether or not they had the current version of the LLC Agreement.

Entertaining such claims would "defeat the clear words and purpose of" the Purchase

Agreement. *One-O-One Enters.*, 848 F.2d at 1287.

This is true even though Mayer Brown was an agent of the party to the agreement and not

a party itself. In *Harsco*, the Second Circuit recognized that when "there is a detailed writing

developed via negotiations among sophisticated business entities and their advisors," it is "that

writing [that] defines the boundaries of the transaction." 91 F.3d at 343. Plaintiffs helped shape

those boundaries in the Purchase Agreement. Plaintiffs specifically bargained for RGHI, not its

outside counsel, to represent and warrant that, for example, the audited financial statements

"present fairly in all material respects" the financial condition of Refco and that Refco did not

have "undisclosed liabilities." Ward Decl., Ex. A. Plaintiffs cannot now reach outside the

Purchase Agreement to claim reliance on pre-contractual representations made by a

counterparty's agent. Last year, the Second Circuit rejected such an effort by dismissing fraud

claims against two non-parties to agreements because the merger clauses in those agreements

precluded any reasonable reliance on any precontractual representations. *ATSI*, 493 F.3d at 107-

08 (dismissing claims based on alleged pre-contractual, verbal misrepresentations made by

individuals not party to the agreements for lack of reasonable reliance). The same reasoning

applies here: the Purchase Agreement's express provisions preclude Plaintiffs from claiming

they justifiably or reasonably relied on any alleged "representation" by Mayer Brown.

### C.    Even if Statements Were Attributed to Mayer Brown Lawyers and the Non-Reliance and Integration Clauses Did Not Bar Count II, Plaintiffs Fail To Plead Reliance Adequately.

Even if the statements upon which Plaintiffs try to premise liability were attributed to

Mayer Brown lawyers (which they were not), and even if any reliance on those statements was

not foreclosed by the explicit non-reliance and integration clauses in the Purchase Agreement

(which it was), Plaintiffs still fail to adequately plead reliance. To plead reliance, one must plead

"transaction causation." *ATSI*, 493 F.3d at 106. This means that a complaint must contain "allegations that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). As with any other element, to plead reliance, plaintiffs must plead sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *see also ATSI*, 493 F.3d at 98-99 (applying *Twombly* to securities fraud claim). Plaintiffs fail to do so regarding the core allegations in their Amended Complaint.

Although Plaintiffs claim to have relied on the four Refco statements that Mr. Collins forwarded to Plaintiffs, Plaintiffs also emphasize that they engaged in "more than eight months" of due diligence, and that this diligence was both "exhaustive" and "intensive." Compl. ¶ 38. The foundation of the due diligence was Refco's audited financial statements, on which Plaintiffs, THL Partners, and their other advisors "*relied substantially*," and which were provided by Refco and its auditors, not Mayer Brown lawyers. *Id.* ¶ 39 (emphasis added).[16]

To conduct due diligence, Plaintiffs turned to professionals at THL Partners, who staffed the transaction with "[s]enior partners." *Id.* ¶ 38; *see* n.14, *supra*.[17] Both Plaintiffs and THL Partners enlisted a cadre of top-flight financial consultants. *See* Compl. ¶ 39. Accountants studied Refco's financial statements and its auditors' work papers; management consultants studied Refco's industry and customer satisfaction with Refco; investment bankers studied

---

[16]    *See also* Compl., *Thomas H. Lee Equity Fund V, L.P., et al. v. Grant Thornton LLP*, No. 07 Civ. 8663, at ¶ 36 ("Refco's financial statements and risk profile were integral to THL Funds' investment decision").

[17]    THL Partners states on its public website that it considers itself "the preeminent growth buyout firm," has "rais[ed] approximately $22 billion of equity capital," and has "invest[ed] in more than 100 businesses with an aggregate purchase price of more than $125 billion." *See* http://www.thlee.com (last visited March 26, 2008).

Refco's position in its industry; and human resources consultants scrutinized Refco's internal workings. *Id.* In addition to the audited financial statements, which included independently-verified representations regarding inter-company debt, Plaintiffs received direct representations from Refco insiders in the form of officer questionnaires, *see id.* ¶ 51(b)-(d), and certificates incorporated into the Purchase Agreement, *see* Ward Decl., Ex. D. Perhaps most importantly, Plaintiffs negotiated a series of express representations and warranties from Refco in the Purchase Agreement. It is literally incredible that, after such an exhaustive review of all things Refco, Plaintiffs would not have made a *half-billion dollar* investment in Refco but for outside counsel's two short oral statements made in separate conference calls, Compl. ¶¶ 53-54, and two single-sentence statements made in emails, *id.* ¶¶ 55-56. *See Twombly*, 127 S. Ct. at 1974 (requiring "enough facts to state a claim to relief that is plausible on its face").

Plaintiffs' new allegations regarding the PPA suffer from the same defect. Plaintiffs' basic contention is that if not for Mr. Collins forwarding Refco's supposedly "counterfeit" LLC Agreement that did not refer to the PPA, Plaintiffs would have asked for and reviewed the PPA, which would have alerted them to the fact that RGHI owed Refco $350 million and thus would have given them a better understanding of "Refco's true financial condition." *See* Compl. ¶¶ 57-67. But Plaintiffs admit that they already knew about the PPA. Plaintiffs affirmatively allege that they saw an unsigned Refco LLC Agreement that "contained a reference to DF Capital and the PPA" in the Refco data room. *Id.* ¶ 61. Indeed, notes made by Weil Gotshal attorneys, incorporated into the Examiner's Report, leave no doubt that Plaintiffs *knew* the PPA existed. Plaintiffs' counsel had known full well since February 2004 that there was a "Proceeds Participation Agreement dated as of July 12, 2002 between company & DF Capital Inc.," thought the PPA was a "minor point to keep track of," and had considered whether to "*get [a]*

*copy of*" the transaction documents.  Examiner's Report at 288-89 (citing WGM-L 0011187,

WGM-L 0010412 (Ward Decl., Exs. E-F) (emphasis in original)).  Apparently, Plaintiffs

ultimately chose not to request a copy of the PPA.  It is simply implausible that Plaintiffs –

having already known of the PPA, concluding it was a "minor point," and deciding not to request

a copy of the transaction documents – would have changed their minds and requested the

agreement merely because they saw references to it a second time in an LLC Agreement.  Even

drawing the most generous inferences, Plaintiffs utterly fail to "nudge[ ] their claims across the

line from conceivable to plausible." *Twombly*, 127 S. Ct. at 1974.

For all these reasons, Plaintiffs fail to state a claim against Mayer Brown based on any

statements during the negotiation of Plaintiffs' purchase of Refco.

### D.    Count I Should Be Dismissed Under *Stoneridge* and *Lentell*.

Unable to point to any actionable statements by Mayer Brown, Plaintiffs try to

circumvent *Central Bank* in Count I of their Amended Complaint by claiming that Mayer Brown

can be held liable for supposedly participating in a "scheme" to defraud them.  Plaintiffs contend

that Mayer Brown violated SEC Rule 10b-5(a) & (c), which make it unlawful, "in connection

with the purchase or sale of any security," to (a) "employ any device, scheme, or artifice to

defraud"; and (c) "engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(a) & (c).  In Count I, as in

Count II, Plaintiffs do not bother to articulate precisely what conduct they are claiming exposes

Mayer Brown to liability under their "scheme" theory.  However, their claim appears to be that

Mayer Brown should be held liable for the alleged misstatements in Refco's financial statements

because the back-to-back loans the firm documented enabled those misstatements to be made.

Any such claim, however, is simply *Stoneridge* redux and is barred for the same reasons as the

claims asserted in that case.  To the extent that Plaintiffs' scheme claim is based on alleged

misrepresentations, it is properly considered under Rule 10b-5(b), rather than Rule 10b-5(a) & (c), and it fails for the reasons described in Sections II.A-C above.

### 1.      *Stoneridge* **Bars Plaintiffs' Scheme Claim.**

Even before the Supreme Court's decision in *Stoneridge*, it was clear that Plaintiffs' claim of scheme liability against Mayer Brown under Rule 10b-5(a) & (c) was legally insufficient.  As this Court has previously recognized, the Second Circuit and courts in this district have "typically dismiss[ed]" scheme claims against "outside professionals who provided necessary services to the fraudsters."  *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 473 (S.D.N.Y. 2004); *see also Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.* ("*Enron*"), 482 F.3d 372 (5th Cir. 2007) (rejecting scheme liability claim as to entities that entered into allegedly fraudulent transactions with Enron), *cert. denied*, 128 S. Ct. 1120 (2008).  *Stoneridge* erases any possible doubt on this question.

As noted above, in *Stoneridge*, the Supreme Court reaffirmed the critical element of reliance in a private cause of action under Section 10(b).  In particular, the Supreme Court emphasized that no liability arises if the plaintiff "did not in fact rely upon [the defendants'] own deceptive conduct."  *Stoneridge*, 128 S. Ct. at 770.  The *Stoneridge* Court applied this principle to affirm the dismissal of a Section 10(b) scheme claim, despite allegations that the defendants had knowingly agreed with the issuer to conduct sham transactions, produce phony documentation, and backdate contracts so that the issuer could overstate its revenue and cash flow.  *See id.* at 766-67.

*Stoneridge* is directly on point with respect to the scheme liability theory pleaded in Count I and requires that it be dismissed.  That count cites Rule 10b-5(a) & (c) in asserting that Mayer Brown participated in a scheme to defraud the Plaintiffs.  It alleges that Mayer Brown was "involv[ed] in creating and concealing the RGHI Receivable, including through its work on

the sham round-trip loan transactions." Compl. ¶ 88. But Plaintiffs affirmatively allege that they

had no knowledge of Mayer Brown's conduct. *See id.* ¶¶ 37, 44, 45 ("At no time did Refco or

Mayer Brown disclose the RGHI Receivable or any of the round-trip loan transactions"); 79

("During the course of the transaction, and at the time of the closing, [Plaintiffs] were not aware

of" the back-to-back loan transactions which Mayer Brown documented). Therefore, Plaintiffs

could not have relied on any conduct of Mayer Brown, just as the plaintiffs in *Stoneridge* did not

know of, and thus could not have relied on, the conduct of the defendants in entering into the

round trip transactions in that case. *See* 128 S. Ct. at 769.[18]

　　In *Stoneridge*, the Supreme Court held that the fact that the issuer used round-trip

transactions with Motorola and Scientific-Atlanta to misstate its financial statements was not

enough to give rise to a claim against those companies under Section 10(b). *See id.* at 766-67.

That was true even though the Court assumed, for purposes of argument, that the counterparties

knew that the transactions were designed to achieve precisely that result. *See id.* at 767. The

same analysis necessarily applies here. That Mayer Brown documented transactions that Refco

subsequently used to misstate its financial statements cannot give rise to a claim against it under

Section 10(b). Like the defendants in *Stoneridge*, Mayer Brown is alleged to be (at most) an

aider and abettor of Refco's conduct.[19]

---

[18]　　The same conclusion applies under this Court's recently articulated standard for alleging
deceptive conduct, *see In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06
Civ. 643, 2007 WL 2694469, at *8 (S.D.N.Y. Sept. 13, 2007), read in light of *Stoneridge*. Mayer
Brown cannot be primarily liable because Plaintiffs have not described how its conduct, as
opposed to Refco's, deceived them.

[19]　　Although this Court has suggested in the past that being the "mastermind" of a fraudulent
scheme would be deceptive conduct under Rule 10b-5(a) & (c), *see In re Global Crossing, Ltd.
Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004), that opinion deliberately left open
whether reliance had been pleaded adequately, *see id.* ("[p]ostponing" issue of reliance). We
respectfully suggest that *Stoneridge* has resolved that reliance cannot be pleaded for conduct of
which plaintiffs remain unaware. In any event, Plaintiffs here have not come close to alleging

Plaintiffs have added passages in the amended version of Count I that attempt to plead around *Stoneridge*, but these efforts fail. For example, Count I alleges that "the inevitable consequence of the sham round-trip loan transactions on which Mayer Brown worked . . . was to manipulate Refco's financial statements." Compl. ¶ 92. Tthe current allegations are no different than those presented in *Stoneridge* – there, too, the plaintiffs alleged that the transactions in question "had no business purpose whatsoever. Their only purpose was to artificially inflate Charter's reported revenues and cash flow . . . ." No. 06-43, Brief for Petitioner, *Stoneridge*, 2007 WL 1701941, at *3 (U.S. June 11, 2007). Yet it was still the issuer's decision how to account for the transactions, 128 S. Ct. at 770, just as it was Refco's decision how to account for the transactions at issue here. Mayer Brown cannot be held liable based on how Refco used the transactions. Moreover, as explained in Section II.E, Mayer Brown worked on only two of the three legs of the loan transactions; there is no legal or factual reason why it would be inevitable that Refco would use the proceeds of the back-to-back loans to pay down the RGHI Receivable. Nor would an outside law firm to one party have any duty to disclose information about its client to an opposing party, to whom it owed no fiduciary or comparable duty. *See, e.g.*, *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (rejecting liability for "not blow[ing] the whistle" on a client).[20]

---

facts showing that Mayer Brown was the mastermind of the Refco fraud. To the contrary, the Complaint paints Bennett and other Refco insiders as the masterminds. *See, e.g.*, Compl. ¶ 2 (the scheme at Refco was "masterminded by Bennett and his co-conspirators"); ¶¶ 18, 20 (alleging that "Bennett and his co-conspirators concocted and implemented a scheme" and that Mayer Brown "provided material assistance").

[20]    Although Plaintiffs may argue that Mayer Brown assumed a duty by speaking, as shown in Section II.A above, the statements allegedly made by Mayer Brown were not attributed to it and therefore did not constitute statements by Mayer Brown.

In another transparent attempt to avoid *Stoneridge*, Count I also alleges that the transactions Mayer Brown worked on "did not involve the sale of goods or services or even in most cases, the transfer of funds other than the net interest payoffs to the third parties in the transactions." Compl. ¶ 92. Plaintiffs evidently intend to argue that *Stoneridge* is limited to the "marketplace for goods and services." But *Stoneridge*'s holding cannot be so limited. The key point in *Stoneridge* is not whether the conduct took place in the "marketplace for goods and services"; the key point is whether the plaintiff relied on the defendant's own conduct. As the Supreme Court held, applying the label "scheme liability" does not save a claim where the plaintiff "did not in fact rely upon [the defendants'] own deceptive conduct." 128 S. Ct. at 770. Here, Plaintiffs were not aware of and thus could not have relied on Mayer Brown's own conduct. Accordingly, under *Stoneridge*, their scheme liability claim fails as a matter of law.

The Supreme Court's treatment of the petition for certiorari in the *Enron* case confirms that *Stoneridge* is not limited to the "marketplace for goods and services." In the *Enron* case, the Fifth Circuit had rejected plaintiff's scheme liability allegations. *Regents of the Univ. of Cal.*, 482 F.3d 372. Plaintiffs petitioned for certiorari and the Court held the petition until after *Stoneridge* was decided, along with the petition arising from *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006). After *Stoneridge*, the *Enron* plaintiffs filed a supplemental brief urging the Court to vacate and remand that decision on the same type of theory Plaintiffs have advanced here – that the alleged scheme involved "fraud by financial professionals that [was] directed at securities transactions" rather than "ordinary business transactions." Supplemental Brief in Support, *Regents of the Univ. of Cal. v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 06-1341, 2008 WL 189168, at *2 (U.S. Jan. 17, 2008). The Court, however, saw no reason to give the *Enron* plaintiffs an opportunity to litigate the scope of the *Stoneridge* decision in the

Fifth Circuit: rather than vacating and remanding, as the plaintiffs had requested, the Court denied certiorari in *Enron*. 128 S. Ct. 1120 (2008). At the same time, the Supreme Court vacated and remanded the *Simpson* decision because it had suggested that a species of scheme liability might survive dismissal. *Avis Budget Group, Inc. v. Cal. State Teachers' Ret. Sys.*, 128 S. Ct. 1120 (2008). These actions, taken together, demonstrate that the Court meant what it said in *Stoneridge* and that the concept of scheme liability fails wherever reliance on the defendant's conduct is lacking, no matter in what "sphere" the conduct occurs.[21]

## 2. Plaintiffs' Claims of Material Omissions and Misrepresentations Cannot Be Pleaded as a Violation of Rule 10b-5(a) & (c).

Plaintiffs try to buttress their 10b-5(a) & (c) claim by relying on their allegations that Mayer Brown lawyers made misrepresentations. Those allegations are properly considered under Rule 10b-5(b), not (a) & (c). In any event, no matter which section of the rule applies, such allegations fail for the reasons discussed in Sections II.A-C.

The Second Circuit has held that, where the sole bases for a claim under Section 10(b) are misrepresentations or omissions, a plaintiff cannot make out a claim under Rule 10b-5(a) or (c), because those subsections address conduct that does not involve speaking. In *Lentell*, investors sued a brokerage house and its former analyst alleging (among other things) that they engaged in a scheme to defraud investors by issuing research reports that deceived the market, causing stock prices to be artificially inflated. 396 F.3d at 177-78. The Second Circuit upheld dismissal of plaintiffs' scheme liability claim on the ground that a "scheme[ ] to defraud" that consisted "largely of an aggregation of material misrepresentations" did not state a claim under Rule 10b-5(a) & (c). *Id.*; *see also In re Global Crossing*, 322 F. Supp. 2d at 337 n.17 (defendant

---

[21]     If involvement in the "investment sphere" were determinative, the indenture trustee found not subject to suit in *Central Bank* (Central Bank itself) would have been primarily liable. The trustee played a key role in the issuance of the bonds in that case. 511 U.S. at 167-68.

can be held liable only for "specific false statements to the extent that it can be said to have made those statements under Rule 10b-5(b)").  As the court observed in *In re Royal Dutch/Shell Transport Securities Litigation*, No. 04-374, 2006 WL 2355402 (D.N.J. Aug. 14, 2006), to allow a claim for misrepresentations to go forward under a scheme liability theory would not only "permit a plaintiff to evade the pleading requirements of 15 U.S.C. § 78u-4(b)(1) that are imposed in misrepresentation cases, but it would also permit a plaintiff to 'circumvent *Central Bank's* limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements.'"  *Id.* at *8 (quoting *In re Dynegy, Inc., Sec. Litig.*, 339 F. Supp. 2d 804, 916 (S.D. Tex. 2004)).

Here, Plaintiffs' claims are based entirely on alleged misrepresentations and omissions in the disclosures that were made to them.  In the very first paragraph of their Amended Complaint, Plaintiffs state that they seek "to recover damages that [Plaintiffs] suffered as a result of repeated material *misrepresentations and omissions*."  (Emphasis added).  And in Count I itself, alleging liability under Rule 10b-5(a) & (c), Plaintiffs claim that Mayer Brown participated in a fraudulent scheme by making material misrepresentations and concealing adverse material information.  Compl. ¶ 88.  The only conduct alleged in the Amended Complaint is the firm's work on the back-to-back loan transactions.  But those transactions are not alleged to have affected Plaintiffs directly.  Instead, it was the failure to disclose those transactions and Refco's use of them to "render[] Refco's financial statements and books and records materially false and misleading" that constituted the alleged "deceptive or manipulative" act in connection with the sale of Refco securities.  Compl. ¶ 23.  Under those circumstances, Plaintiffs have no separate claim for "scheme" liability, but only a deficient claim for alleged misrepresentations.

**E.**    **Plaintiffs Have Not Alleged Specific Facts to Give Rise to a Strong Inference of Scienter With Respect to Any Mayer Brown Lawyer.**

Plaintiffs have failed to meet the heavy burden for pleading scienter imposed by the PSLRA.  In any private securities action in which a defendant's liability turns on its state of mind, Congress has mandated that a plaintiff's complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Supreme Court emphasized the PSLRA's "particularity" requirement and decided that "omissions and ambiguities [in a complaint] count against inferring scienter,"  *id.* at 2511.

In addition, *Tellabs* clarified what is required for a showing of scienter under the PSLRA's heightened pleading standard.  The Court held that, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Id.* at 2509.  Accordingly, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 2510.  Further, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – *it must be cogent and compelling, thus strong in light of other explanations.*  A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* (emphasis added).

Many courts have held that scienter may be established as to an organization only if the individual official responsible for the alleged violation acted with scienter.  The Fifth Circuit so held in *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("For purposes of . . . [Section] 10(b) scienter we believe it appropriate to look to the

state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge" of the corporation).  A number of courts in this district have agreed.  *See, e.g.*, *Kinsey v. Cendant Corp.*, No. 04 Civ 0582, 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) ("A defendant corporation is deemed to have the requisite scienter . . . only if the individual . . . making the statement has the requisite level of scienter . . . .").[22]  Under this principle, Mayer Brown can be held to have acted with scienter only if an individual lawyer in the firm acted with scienter.

Plaintiffs have failed to meet their burden of pleading particular facts giving rise to a strong inference that any Mayer Brown lawyer acted with "an intent to deceive, manipulate, or defraud."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation omitted).  In this Circuit, a plaintiff may satisfy this requirement by alleging facts (1) showing that the defendant had both motive and opportunity to commit fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *ATSI*, 493 F.3d at 99.

### 1.    Motive and Opportunity

Plaintiffs do not seriously attempt to plead motive and opportunity, nor could they. Although the Amended Complaint alleges that Refco was Mr. Collins's most significant client and that Mayer Brown billed Refco more than $40 million from 1997 to 2005, Compl. ¶ 13, such allegations repeatedly have been held insufficient to establish a motive to commit fraud.  *See Kalnit*, 264 F.3d at 140; *In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526, at *10 (S.D.N.Y. Feb. 28, 2006); *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 639-40 (S.D.N.Y. 1999).  For an individual professional, such as Mr. Collins, assisting a client's

---

[22]    We note that several courts in this district have reached a seemingly contrary conclusion, and that the Second Circuit is now considering the issue in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., et al.*, No. 06-2902-CV (argued Jan. 30, 2008).  We respectfully suggest that the rule adopted by the cases cited in the text is correct.

fraud is "perhaps even more economically irrational" than it is for an entire firm, because the individual receives "relatively little of the financial gain from the fraud, but he subjects himself to substantial professional and financial risk." *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 470-71 (S.D.N.Y. 2004). The Amended Complaint pleads no facts showing that any Mayer Brown lawyer had any personal interest in any of the transactions, or that the firm received anything other than routine compensation for its services. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007) (motive must be "concrete and personal"). Indeed, any notion that Mayer Brown lawyers had a motive to commit fraud to further the sale of Refco is belied by the fact that the sale could have been expected to (and did) result in the loss of most of Refco's legal work to THL Partners' outside counsel, Weil Gotshal.

### 2.    Conscious Misbehavior or Recklessness

Plaintiffs' scienter allegations are centered on a "conscious misbehavior or recklessness" theory. Recklessness is "a state of mind 'approximating actual intent, and not merely a heightened form of negligence.'" *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (quoting *Novak v. Kasaks*, 997 F. Supp. 425, 430 (S.D.N.Y. 1998)). Recklessness is instead conduct "representing 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Moreover, because Plaintiffs have not pleaded that Mayer Brown lawyers had any motive to participate in fraud, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." *Kalnit*, 264 F.3d at 142, *quoted in Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 412 (S.D.N.Y. 2007); *In re Bayou Hedge Fund Litig.*, __ F. Supp. 2d. __, Nos. 06-MDL-1755, 06-CV-2943, 2007 WL 2319127, at *8 (S.D.N.Y. July 31, 2007).

The Amended Complaint does not give rise to a cogent and compelling inference that any Mayer Brown lawyer engaged in conscious misbehavior or recklessness. Rather, the opposing, non-culpable inferences are far more compelling. Unlike the corporate insiders, Mayer Brown did not have access to a broad range of information about Refco. Instead, as Refco's outside counsel, Mayer Brown lawyers knew only the bits and pieces of information that Refco chose to share with them. Plaintiffs do not allege, for example, that any Mayer Brown lawyer had access to the day-to-day cash flows and financial records of RGHI, Refco, or RCM, unlike the Refco executives for whom this Court has already found sufficient allegations of scienter. *See In re Refco, Inc.*, 503 F. Supp. 2d at 650, 652. Indeed, THL Partners, itself a leading private equity firm that specializes in analyzing companies, hired professionals including accountants, business consultants, and investment bankers to do just that and conduct "exhaustive due diligence" in advance of Plaintiffs' half-billion dollar investment in Refco. Compl. ¶¶ 38-39, 78. In contrast, Mayer Brown's role was to provide *legal* services to Refco. Lawyers are not business consultants, financial advisors, accountants, or auditors. Mayer Brown attorneys were not asked to analyze, advise on, or even understand the business purpose for the transactions in which Refco engaged, and there is no allegation to the contrary. Nor could there be. Outside counsel have no responsibility for a client's finances or business decisions; companies look to other trained, sophisticated outside professionals – i.e., "number verifiers" and "number crunchers" – for such advice. *HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, __ F.3d __, 2008 WL 442416, at *2 (7th Cir. Feb. 20, 2008) (noting "division of labor" that "allows specialists to do what they are best at" provides "large benefits for an economy").

Under these circumstances, there is no cogent and compelling reason to assume that Mayer Brown knew that Refco was manipulating its financial statements or was misleading

Plaintiffs during the course of due diligence.  Instead, the more plausible conclusion is that

Mayer Brown lawyers saw in Refco what the rest of the world saw: a growing and vibrant

company that was a "leading" player in its fields and which had been thoroughly vetted by

armies of Plaintiffs' "professional advisors." *Id.* ¶¶ 17, 38-39; *see also* Compl. ¶ 6, *Thomas H.*

*Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (Refco appeared to have "a

strong market position operating in an expanding market").

> **a.      The most compelling inference from the facts in the Amended**
> **Complaint is that Mayer Brown lawyers did not suspect the**
> **back-to-back loans were used by Refco to commit fraud.**

Plaintiffs' attempt to base scienter on Mayer Brown attorneys' work on the first two legs

of the so-called "round-trip loan transactions" is insufficient. *See* Compl. ¶¶ 35-37.  The first leg

was a loan from Refco Capital Markets ("RCM") to a third party, for which Refco Group

Limited indemnified the third party. *E.g.*, *id.* ¶ 25.  The second leg was a loan from a third party

to RGHI, for which Refco Group guaranteed payment by RGHI. *Id.*  The third leg was RGHI's

use of the loan proceeds from the third party to periodically pay down the RGHI Receivable. *Id.*;

*see also* Ward Decl., Ex. B (chart describing transactions).  As noted earlier, Mayer Brown refers

to the first two legs as back-to-back loans. *See* n.7, *supra*.  Although Mayer Brown lawyers

worked on the back-to-back loans, they did not work on or have any knowledge of the critical

third leg of the transactions, which was how Refco effectuated the fraud.

Any allegation that it should have been obvious to the lawyers who worked on the back-

to-back loans that they were being used to commit accounting fraud is nothing more than a claim

of "fraud by hindsight." *Novak*, 216 F.3d at 309 (quotation omitted).  The Amended Complaint

itself makes clear that the Mayer Brown lawyers' work on the back-to-back loans was ministerial

rather than substantive. *See* Compl. ¶¶ 25, 32(h) (loan transactions "followed a similar pattern,"

and 2002 loan documents were "used as a model" for all subsequent loans), Examiner's Report

at 35 (concluding that all back-to-back loans "basically used the same template" as first loan transaction).  Mayer Brown attorneys were given the exact terms and structure of the transactions by Refco executives, who had already negotiated the transactions with counter-parties who were represented by various law firms.  *See, e.g.*, Compl. ¶ 32(a) (describing first back-to-back loan); Examiner's Report at 44, 54 (noting back-to-back loan parties sent documents to their counsel for review).  The work done was typical of legal work on routine corporate transactions.  *See* Compl. ¶ 31.  The alleged fraud was not in the documents reviewed or work done by Mayer Brown lawyers, but in Refco's use of the loan proceeds to pay down the RGHI Receivable in the hidden third leg of the transaction.  *See* Ward Decl., Ex. B.

Nor can Plaintiffs successfully paint the back-to-back loans as inherently suspicious.  *See* Compl. ¶ 35.  Back-to-back loans are commonly used in financing transactions; there is nothing controversial about them.[23]  Indeed, the documents themselves make clear that the purpose of the back-to-back loans was to provide RGHI with short-term liquidity, which is a regular occurrence in financial institutions and brokerage houses.[24]  It is common for privately-held parent

---

[23]    Back-to-back and short-term loans are used – legitimately – in numerous contexts, including for tax purposes, regulatory purposes, foreign exchange transactions, whole business securitization, municipal financing, and sovereign debt restructuring, not to mention for investment purposes.  The Federal Reserve, for example, provides back-to-back loans for member financial institutions and commercial paper markets do the same for a multitude of business partners.  *See, e.g.*, *JP Morgan Shares Down After Financing Bear Stearns; Analysts Back Rankings*, *available at* http://money.cnn.com/news/newsfeeds/articles/newstex/AFX-0013-23783077.htm (last viewed March 26, 2008) (discussing Federal Reserve's financing of Bear Stearns through "back-to-back financing" through JP Morgan).

[24]    While Plaintiffs offer a naked conclusion that the Mayer Brown attorneys "knew that [the back-to-back loan transactions] lacked any proper business purpose," Compl. ¶ 35(f), their more specific allegations tell a different story.  The Amended Complaint states only that the lawyers did not know Refco's business purpose when they worked on the transactions.  *Id.*  In fact, in his Examiner Interview, Mr. Collins explained that "there could have been a number of legitimate business purposes for such transactions," including tax purposes and generating short-term funds for RGHI.  Examiner's Report at 245 n.759.

companies to obtain liquidity for themselves or their shareholders by borrowing money from their subsidiaries rather than taking dividends. In addition, the mere fact that the back-to-back loans usually occurred at regular intervals, *see id.* ¶ 35(b), is of no moment. RGHI could have wanted the money for a cyclical investment or trading opportunity; such opportunities abound in the sophisticated commodities futures and foreign exchange markets in which Refco operated. Nor would it have been of concern that RGHI sought liquidity close to the end of Refco financial reporting periods. Companies frequently engage in legitimate year- and quarter-end transactions; and attorneys need not assume such conduct is evidence of accounting fraud.

Although the Amended Complaint alleges in a conclusory fashion that Mayer Brown lawyers "understood that the [the back-to-back loans] caused the RGHI related-party receivable to be removed from Refco's books," Plaintiffs offer no support for that inference. *Id.* ¶ 35(c). Indeed, the far stronger inference is that Mayer Brown lawyers were unaware of Refco's well-hidden set of RGHI receivables and, thus, did not suspect that Refco was using the back-to-back loans to hide them.[25] As the Amended Complaint makes clear, inter-company debt was an acknowledged fact about Refco. *See id.* ¶ 45 ("Early in the diligence process, Refco disclosed to [Plaintiffs] that RGHI owed Refco approximately $108 million as a result of a loan made to RGHI by Refco."). Plaintiffs allege that other RGHI debts to Refco were tucked away as debit balances in three accounts buried in different subsidiaries within Refco. *Id.* ¶ 21; *see* Ward

---

[25]     While Plaintiffs refer to the Examiner's conclusion that "there is evidence" Mayer Brown knew that the back-to-back loans were used to hide the RGHI Receivable, *id.* ¶ 36, the Examiner also admitted he "ha[d] not located direct evidence" of such knowledge. Examiner's Report, at 233-34. The identification of *some* evidence is plainly insufficient under the PSLRA's requirement that facts be pleaded that raise a "cogent and compelling" inference of scienter. *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 127 S. Ct. 2499, 2510 (2007). In any event, the Examiner's conclusion should be discounted because the Examiner was charged with identifying potential claims for the Refco estate to bring against "Refco's prepetition professionals." Examiner's Report at 8-9. The Report did not contemplate claims governed by the PSLRA.

Decl., Ex. B.  The fraud perpetrated by certain Refco executives consisted in hiding this other, larger set of receivables.  The sporadic encounters Mayer Brown lawyers are alleged to have had with a far more limited amount of inter-company debt at Refco dispel any inference that they were, or should have been, aware of the larger, hidden RGHI receivables.

There is no better evidence of this than the notations to the October 1999 draft letter that Plaintiffs use as the basis for their contention that Mayer Brown lawyers "knew that RGHI owed significant amounts to Refco."  *Id.* ¶ 35(e).  A Mayer Brown attorney is alleged to have written in the margin of a letter that RGHI's net worth was diminished by Refco's "loans to RGH[I]."[26] *Id.*  The letter in question attaches Refco's audited financial results for fiscal year 1998, which openly disclose in the "Related Party Transactions" footnote that Refco was owed "net *loans*" amounting to $252 million from, among other entities, its "stockholder" – RGHI.  Ward Decl., Ex. G (emphasis added).  The handwritten note Plaintiffs find so significant confirms only that, on one occasion, a Mayer Brown lawyer was exposed to the fact that Refco had reported inter-company debt on its audited financial statements.  The note does not suggest any knowledge at all about inter-company debt at Refco that was *not* disclosed in the financial statements.

Plaintiffs also try to connect Mayer Brown to hidden RGHI receivables by referring to Mayer Brown lawyers' work in connection with Refco customer Victor Niederhoffer.  According to the Amended Complaint, Mayer Brown attorneys worked on a 1997 transaction in which Refco transferred an uncollectible debt owed by Mr. Niederhoffer to an RGHI subsidiary, thus allegedly adding to the amount RGHI owed Refco.  Compl. ¶ 18.[27]  Again, this transaction

---

[26]    The Amended Complaint attributes these notations to Mr. Collins on the ground that the Examiner's Report noted that the notations resembled his handwriting.  Examiner's Report at 248.  The Examiner never asked Mr. Collins about this note and, in fact, it was not made by him.

[27]    Plaintiffs allege that Refco suffered other customer losses in the 1990s.  Compl. ¶ 19.  But Plaintiffs conspicuously fail to allege that Mayer Brown was aware that these losses were

has nothing to do with hidden debt. In fact, the "series of settlements and assignments," *id.*, that Plaintiffs refer to called for a cash infusion of $71 million in "immediately available funds." Ward Decl., Ex. H ("As consideration for the assignment and sale contemplated in Section 1 hereto, the Assignee shall pay to the Assignor on the date hereof in *immediately available funds* an amount not to exceed $71,000,000." (emphasis added)). Thus, according to the transaction documents that Mayer Brown lawyers allegedly saw, there is no reason to think RGHI would have owed Refco money after the immediate cash infusion was completed. Even were one to assume, however, that the transfer created a receivable owed by RGHI, the receivable would have been for $71 million, far less than the $252 million in inter-company debt reported in Refco's audited financial statements just a year later.

The same is true with respect to Plaintiffs' allegations regarding $350 million in inter-company debt that was disclosed in the 2002 PPA transaction with DF Capital. *See* Compl. ¶ 58. Plaintiffs plead no facts to suggest that the Mayer Brown attorneys who worked on the transaction thought this $350 million inter-company receivable was in any way secret. The debt was disclosed to DF Capital, which was purchasing the right to receive a portion of the proceeds in a future sale of Refco. And, as the Amended Complaint alleges, the $350 million was to be paid off using part of DF Capital's payments. *Id.* Thus, any Mayer Brown attorney reading the DF Capital transaction documents with an eye towards inter-company debt would have believed that Refco had disclosed its inter-company debt and that the debt was scheduled to be paid off.

Finally, there is no reason that any Mayer Brown lawyer would have associated the back-to-back loan transactions with inter-company debt because the amounts of inter-company debt to

---

later transferred to RGHI. In fact, even the Examiner, who was tasked with finding causes of action for the Refco estate, "found no evidence" that Mayer Brown attorneys were aware that other customer losses were transferred to RGHI. Examiner's Report at 256.

which any single lawyer was fleetingly exposed bore no relation to the dollar amounts of the back-to-back loans.  The highest level of inter-company debt of which any Mayer Brown lawyer is alleged to have known was $350 million in 2002.  The back-to-back loans peaked at more than double that amount when Refco engaged in two such transactions totaling $720 million in February 2004.  *See id.* ¶ 32(k).  There was simply no apparent connection between the two.

> **b.**    **Mayer Brown lawyers' actions during the negotiation of Plaintiffs' leveraged buyout of Refco do not raise an inference of scienter.**

Plaintiffs also assert that Mayer Brown attorneys acted with recklessness or intent to defraud by failing to disclose what they knew about the back-to-back loans during due diligence or in various provisions of, or schedules to, the Purchase Agreement.  *See id.* ¶ 37.  This theory rests on the implausible assumption that Mayer Brown attorneys knew every element of the transaction, including not only what had been disclosed throughout due diligence, but also what Plaintiffs now say was the parties' understanding of the deal terms.

When read as a whole, the Amended Complaint makes clear that Mayer Brown lawyers did not – and could not – know the full extent of due diligence.  Plaintiffs allege that they engaged in extensive financial and accounting due diligence, which would not have involved attorneys, and there is no allegation to the contrary.  *See id.* ¶ 39 (listing five different business advisors in addition to THL Partners that led different areas of due diligence, and noting Weil Gotshal performed "*legal* diligence" (emphasis added)).  Much of the due diligence was based on the contents of a data room, *see id.* ¶¶ 55, 61, which Plaintiffs conspicuously do not allege any Mayer Brown lawyer created or maintained.  Plaintiffs sought materials and assurances directly from Refco, including its financial statements and officer questionnaires regarding such topics as inter-company transactions, *see id.* ¶ 51(a)-(d), and had numerous conversations and meetings with Refco executives outside the presence of Mayer Brown lawyers, *see id.* ¶¶ 38,

51(e).  It is therefore no surprise that Mr. Collins's communications with Weil Gotshal about due

diligence matters took the form of forwarding statements by Refco.  Given how much due

diligence plainly took place outside his presence, Mr. Collins could not have had personal

knowledge of what had or had not been disclosed during the course of eight months of

"intensive" and "exhaustive" due diligence.[28]  *Id.* ¶ 38.

       The same central flaw applies to Plaintiffs' claim that scienter is demonstrated by the fact

that the back-to-back loans were not disclosed in the schedules to the Purchase Agreement.

Plaintiffs offer no reason to believe that it must have been obvious to the one Mayer Brown

attorney who had worked on the back-to-back loans during the due-diligence period (associate

Paul Koury) that those loans and the associated guarantees should have been disclosed on the

schedules to the Purchase Agreements.  Plaintiffs allege no facts, for example, to suggest that

Koury in particular or Mayer Brown lawyers in general understood that Plaintiffs interpreted the

schedules as calling for the disclosure of agreements that were no longer in force.[29]  The

Amended Complaint simply asserts in a conclusory fashion that the back-to-back loans were

called for by the representations listed in paragraph 70.  Compl. ¶ 70.  Yet, on their face, the

---

[28]    Nor does the Complaint raise a strong inference that Mr. Collins was even aware that the back-to-back loans continued after February 2002.  *See* Compl. ¶ 32(h).  Plaintiffs can point only to a September 2004 summary billing statement that generically refers to preparing a loan agreement with Liberty Corner and a May 2005 email – sent long after the representations at issue in this case – in which Mr. Collins was copied on a set of back-to-back loan documents.  The billing statement does not even mention there being more than one loan, and neither document refers to the transactions as back-to-back loans.  *See id.*  It is simply implausible that Mr. Collins would remember a set of seemingly routine loan transactions based on nothing more than vague references in a billing statement and being "cc'd" on an email.

[29]    For example, Plaintiffs now allege that their due diligence request for material contracts "was not limited to 'still-open' or 'still-operative' contracts."  *Id.* ¶ 48.  Not only do Plaintiffs not allege that their understanding of the term "material contracts" was communicated to or shared by Mayer Brown lawyers, but Section 6.2 of the Purchase Agreement contradicts their asserted understanding by noting that the representations made in the Agreement shall be true "in each case as of the date hereof and as of the Closing Date."  Ward Decl., Ex. A.

provisions cited by Plaintiffs did not require disclosure of the back-to-back loans. *Id.*[30] Sections 3.10 and 3.15, for example, seek information on liabilities and agreements that were outstanding on the effective date of the Purchase Agreement, not historical obligations or obligations no longer in effect. Ward Decl., Ex. A. As Plaintiffs acknowledge, no back-to-back loan was outstanding as of June 8, 2004, the effective date of the Purchase Agreement, *see id.* ¶ 32(*l*), and thus Sections 3.10 and 3.15 are inapplicable.[31]

While Plaintiffs also point to Section 3.12 as requiring the disclosure of the back-to-back loans, *see id.* ¶ 70(e), the Amended Complaint itself negates their requested inference. Plaintiffs' position presumably is that Section 3.12 required disclosure of the back-to-back loan transactions because a Refco subsidiary (RCM) and RGHI were parties to the agreements. But it is not at all clear that transactions with RGHI, especially ones no longer in effect at the time of signing, were called for by Section 3.12. Indeed, both Plaintiffs and Refco were aware of a $108 million related-party debt that was in place shortly before the LBO. *See* Compl. ¶ 45-46. Yet this nine-figure loan from Refco to RGHI is *not listed* on the schedule to Section 3.12. If a direct loan between RGHI and Refco did not have to be disclosed on Schedule 3.12, there is no reason why the back-to-back loans would have to be disclosed. Assuming any Mayer Brown attorney even considered this issue, the exclusion of the historical $108 million RGHI-Refco debt from

---

[30]    Plaintiffs refer to three representations made by RGHI in Section 3.9 of the Purchase Agreement, entitled Financial Statements. *See* Compl. ¶ 70(a)-(c); Ward Decl., Ex. A. That series of representations concerned the audited financial statements, and depended on accounting judgments that Mayer Brown was in no position to make.

[31]    Plaintiffs allege that, unlike the rest of the back-to-back loan transactions, the indemnification agreements did not expire and thus were outstanding potential obligations of Refco at the time of the Purchase Agreement. *See id.* ¶ 29. Even assuming this is correct, there is little reason to believe that the indemnity agreements in their own right should have appeared in the schedules to Sections 3.10 or 3.15. *See id.* (claiming only that the indemnifications should have been disclosed as related-party transactions or material contracts).

Schedule 3.12 would have confirmed that Refco was not required to disclose the back-to-back loans.

> **c.**    **The work of Mayer Brown lawyers regarding the Proceeds Participation Agreement with DF Capital is not indicative of scienter.**

Plaintiffs assert that their new allegations regarding the PPA support a strong inference of scienter because, they claim, Mr. Collins sent a "counterfeit" Refco LLC Agreement that did not refer to the PPA, which Plaintiffs allege contained references to supposedly hidden debt.[32]  *See* Compl. ¶¶ 2, 57-67.  Plaintiffs contend that the "real" LLC Agreement was the same as the unsigned version they had seen in Refco's data room, which they claim was hidden to discourage Plaintiffs from making any requests for information about the PPA.  Conspicuously absent from the Amended Complaint, however, is any allegation that the changes Mr. Collins made to the revised LLC Agreement did not accurately reflect the state of affairs as of the date it was signed.

Indeed, Plaintiffs' own allegations demonstrate that Mr. Collins had no intent to defraud them or that he was even aware that Refco had executed the earlier, unsigned version of the LLC Agreement in February 2003.[33]  Plaintiffs allege that they reviewed an unsigned LLC Agreement in the Refco data room, and then asked Refco for "further information about Refco's capital structure and for a copy of the executed, operative LLC Agreement."  *Id.* ¶¶ 61-62.  Refco then informed them that "the LLC Agreement needed to be *updated* and that Collins would prepare *the new agreement*."  *Id.* ¶ 62 (emphases added).  So Plaintiffs knew that the Refco document

---

[32]    As discussed earlier, the PPA refers to using the proceeds from the transaction to *pay down* inter-company debt.  *See* Compl. ¶ 60(b).  The 2002 PPA is therefore not inconsistent with there being $108 million in inter-company debt remaining in 2004.  Thus no Mayer Brown lawyer would have known of any reason to hide the PPA.

[33]    Mr. Collins did not know that Refco executives had signed the LLC Agreement described in paragraph 63 of the Amended Complaint.  He made changes to what he thought was the operative LLC Agreement to accurately reflect changes in Refco's ownership.

Mr. Collins sent to them in June 2004 was a new document, and could compare it to the unsigned version in the data room. Mr. Collins never sought to conceal the fact that he was sending a new LLC Agreement. On the contrary, footers on the LLC Agreement and the accompanying board resolution indicate both were created on *May 28, 2004* – only five days before the documents were sent to Plaintiffs. Under these circumstances, there is no cogent and compelling inference that Mr. Collins acted with scienter. The far stronger inference is that Mr. Collins did not know that the earlier LLC Agreement had been executed in February 2003, believed his changes to the LLC Agreement were appropriate, including the "as of" date, and would have explained each and every change to Plaintiffs or Weil Gotshal had they so inquired.

## II.      THE RICO CLAIM IS BARRED BY THE PSLRA.

Plaintiffs have brought a RICO conspiracy claim as an alternative to their two securities fraud claims.[34]  Plaintiffs recognize that they cannot bring both a RICO claim and a securities fraud claim. Plaintiffs contend, however, that they can pursue a RICO claim to the extent the Court decides that their securities fraud claim fails as a matter of law. Compl. ¶ 4 n.5. That argument should be rejected. Under the PSLRA, Plaintiffs' RICO claim is barred even if they cannot state a claim against Mayer Brown for securities fraud.

Prior to 1995, a private plaintiff could assert a RICO claim for securities violations that sounded in fraud. Because "fraud in the sales of securities" was a predicate offense, plaintiffs often added RICO claims to securities complaints, seeking treble damages awards. However, in the PSLRA, enacted in 1995, Congress amended RICO by limiting the conduct that qualifies as a predicate act. As amended, 18 U.S.C. § 1964(c) provides that

---

[34]      To our knowledge, this is the only RICO claim that has been brought in connection with Refco's collapse. Neither federal prosecutors nor any other private plaintiff has brought a RICO claim against any defendant in this series of lawsuits.

> Any person injured in his business or property by reason of a
> violation of section 1962 of this chapter may sue therefor in any
> appropriate United States district court and shall recover threefold
> the damages he sustains and the cost of the suit, including a
> reasonable attorney's fee, *except that no person may rely upon any*
> *conduct that would have been actionable as fraud in the purchase*
> *or sale of securities to establish a violation of section 1962*.

(Emphasis added). The Conference Committee Report that accompanied the amendment

stressed that it was enacted not only "to eliminate securities fraud as a predicate offense in a civil

RICO action," but to prevent a plaintiff from "plead[ing] other specified offenses, such as mail

fraud or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that

would have been actionable as securities fraud." H.R. Rep. No. 104-369, at 47 (1995) (Conf.

Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 746.

The legislative history of this provision makes it clear that Congress did not envision

RICO as being an alternative cause of action, which a plaintiff could assert if its securities fraud

claim failed to pass muster. To the contrary, the provision's sponsor, Representative Christopher

Cox, explained during the floor debate that the provision would ensure that private plaintiffs

could not "bypass the carefully crafted liability provisions of the securities laws and thereby

recover damages in cases in which Congress or the courts have determined that no recovery

should be available." 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995).

The RICO exception for securities fraud therefore precludes the assertion of a RICO

claim in any case where the conduct alleged could be actionable as securities fraud – regardless

of whether the particular plaintiff could have brought a securities fraud claim against the

defendant in question. Thus, in *Howard v. AOL, Inc.*, 208 F.3d 741 (9th Cir. 2000), the Ninth

Circuit held that the fact that plaintiffs lacked standing to bring a securities fraud complaint –

because they were customers of AOL, rather than purchasers or sellers of its stock – did not give

them the right to use alleged securities fraud as the predicate acts in a RICO claim against AOL, *id.* at 749-50. The court reasoned that Congress had precluded RICO claims based on any "conduct" that would have constituted securities fraud, regardless of whether the plaintiffs themselves could have brought a securities fraud claim based on that conduct.

The same analysis applies here. Even though *Central Bank* precludes Plaintiffs from asserting a securities claim against Mayer Brown (because the most they have alleged is aiding and abetting), they still cannot bring a claim against Mayer Brown under RICO. In the PSLRA, Congress accepted the Supreme Court's view that private plaintiffs should not be able to bring claims for alleged aiding and abetting securities violations, but at the same time it amended the law to expressly permit the SEC alone to bring aiding and abetting claims. Thus, a claim for aiding and abetting securities fraud is precisely the kind of conduct that cannot provide the predicate offense for a RICO claim. *See Payton v. Flynn*, No. 06 C 465, 2006 WL 3087075, at *8 (N.D. Ill. Oct. 26, 2006) ("Aiding and abetting a violation of the federal securities laws is actionable. The fact that it is actionable by the SEC alone, and not by plaintiffs, does not affect the analysis . . . *the PSLRA bar is based on whether the conduct is actionable as securities fraud, not whether it is actionable by a particular plaintiff.*" (citations omitted and emphasis added)). This conclusion is supported by the Supreme Court's decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81-89 (2006), where the Court held that the Securities Litigation Uniform Standards Act of 1998's prohibition on state law class actions alleging conduct that violates Section 10(b) applies to any alleged conduct that would be actionable as

47

securities fraud by someone – whether or not the particular plaintiff was able to bring a federal securities fraud action.[35]

Any other result would lead to absurd consequences. Under Plaintiffs' view of the law, they would be barred from asserting a RICO claim against the alleged primary wrongdoers in this case – RGHI, Bennett and other Refco insiders – but they would be able to pursue a RICO claim against a party like Mayer Brown, which is accused only of assisting in the fraud. Congress could not have intended to allow a RICO claim, with its treble damages and attorneys' fees provisions, to be asserted against a party who allegedly aided and abetted securities fraud, while the primary wrongdoer would face no RICO liability at all. That is particularly true since Congress made a conscious decision, when it enacted the PSLRA, not to overrule *Central Bank* to allow private plaintiffs to bring aiding and abetting actions under Section 10(b).

We recognize that two courts in the Southern District have taken a different view and have held that RICO claims survive when a securities fraud claim is not viable because the defendant was at most an aider and abettor. *See Renner v. Chase Manhattan Bank*, No. 98 Civ 926, 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999); *OSRecovery, Inc. v. One Groupe Int'l, Inc*., 354 F. Supp. 2d 357 (S.D.N.Y. 2005). Those decisions, we submit, were wrongly decided. Neither court had the benefit of the Supreme Court's *Dabit* decision, and neither considered the fact that the conduct at issue could be "actionable" by someone other than the plaintiffs before them (e.g., the SEC).

The better reasoned decision is that of the court in *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793, 2005 WL 500377, *4-5 (S.D.N.Y. Mar. 2, 2005). Holding that the RICO bar applies,

---

[35]    In *Dabit*, the state court plaintiffs were not purchasers or sellers and therefore lacked standing to bring a federal securities law claim. They argued that their state law class action claim for fraud involving covered securities was therefore not precluded by SLUSA, which preempts state law class actions alleging Section 10(b) violations.

notwithstanding the lack of a viable securities cause of action, the court in *Fezzani* observed as

follows:

> Were courts to permit RICO claims whenever a plaintiff failed to
> state a cause of action for securities fraud against a particular
> defendant, plaintiffs would then have the incentive to present only
> those facts that, if taken as true (as they must be on a motion to
> dismiss), would not form the basis of a securities fraud claim.  The
> plaintiff as master of the complaint, could reap the benefits of a
> RICO claim complete with the threat of treble damages by merely
> failing to state a cause of action for securities fraud . . . .  Armed
> with the knowledge that aiding and abetting a manipulative or
> deceptive practice is insufficient under *Central Bank*, for example,
> a plaintiff could deliberately plead facts that established no more
> than that a particular defendant aided and abetted another's
> securities fraud. . . .  Under Plaintiff's interpretation of the RICO
> amendment, such a plaintiff would be able to seek treble damages
> and thereby easily avoid Congress's purpose in the PSLRA.

*Id.* at *4-5.  The *Fezzani* court's holding should be followed here, and is, indeed, the reasoning of

all other federal courts of which we are aware that have considered the issue.  *See, e.g.*, *In re*

*Enron Corp. Sec., Derivative, & ERISA Litig.*, 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) ("The

RICO Amendment bars claims based on conduct that could be actionable under the securities

laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws.

The language of the statute does not require that the same plaintiff who sues under RICO must

be the one who can sue under the securities laws."); *see also Payton*, 2006 WL 3087075, at *6;

*Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 698, 2004 WL 2278545, at *7 (N.D. Ill. Oct. 8,

2004); *Hemispherx Biopharma, Inc. v. Asensio*, No. Civ. A. 98 5204, 1999 WL 144109, at *4-5

(E.D. Pa. Mar. 15, 1999).

Finally, the allegations in the Amended Complaint are sufficiently related to the purchase

or sale of securities for the RICO exception for securities fraud to apply.  By alleging that the

"economic reality" of their investment in Refco was that business and financial control of the

company "was reasonably expected to remain, and in fact remained, with Bennett and Refco's existing management," Compl. ¶¶ 4 n.5, 40, Plaintiffs affirmatively allege that their 2004 investment was an "investment contract" governed by the securities laws. *See* 15 U.S.C. § 78c(a)(10) (including "investment contract" in definition of security). The Supreme Court developed a standard for determining what constituted an "investment contract," and thus also a security for purposes of the securities laws, in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The *W.J. Howey* standard focuses on the "economic reality" of an investment. *Id.* at 298; *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 325 (2d Cir. 2002). In particular, investment contracts are denoted by "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *W.J. Howey*, 540 U.S. at 301). Plaintiffs deliberately track the *W.J. Howey* test. Accordingly, because Plaintiffs allege that their investment in Refco was a security, the PSLRA RICO Amendment applies.

In any event, the relevant analysis is whether any of the predicate acts alleged by Plaintiffs were "*in connection with* the purchase or sale of securities." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) (quoting *Blue Chip Stamps*, 421 U.S. at 733). The "in connection with" requirement is met when a securities transaction "coincide[s]" with the challenged conduct. *SEC v. Zandford*, 535 U.S. 813, 825 (2002). "If one predicate act alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar." *Ling v. Deutsche Bank, AG*, No. 04 CV 4566, 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005). That is clearly the case here, as Plaintiffs identify as victims of the Refco scheme "*investors who purchased Refco's debt securities*, and the *investing public who purchased Refco's equity securities*." Compl. ¶ 107(f) (emphases added). They allege that Refco issued $600 million in bonds "in connection with . . . the 2004 Purchase." *E.g.*,

*id.* ¶ 76.  Moreover, Plaintiffs allege (albeit with insufficient particularity) that Refco executives

perpetrated a fraud that lasted through 2005, when Refco had its IPO.  *See id.* ¶¶ 22, 31, 32(q),

107(b)-(c).  Thus, Plaintiffs plainly contemplate predicate acts of mail and wire fraud that

"coincide" with the bond offering and the IPO – events unquestionably involving the purchase or

sale of securities.  *Zandford*, 535 U.S. at 825.

## III.    THE RICO CLAIM IN ANY EVENT FAILS AS A MATTER OF LAW.

As the Court has stated, "Courts in this district, in agreement with the holdings of several

Courts of Appeals, have carefully scrutinized civil RICO claims at the dismissal stage, since the

statute was enacted expressly, as set forth in the preamble to the Act, to seek the eradication of

organized crime in the United States and therefore mere assertion of a RICO claim . . . has an

almost inevitable stigmatizing effect on those named as defendants."  *Zito v. Leasecomm Corp.*,

No. 02 Civ. 8074, 2004 WL 2211650, at *6 (S.D.N.Y. Sept. 30, 2004) (internal quotations

omitted).  In this case, even if Plaintiffs' RICO claim was not barred by the PSLRA RICO

Amendment, their attempt to use the RICO statute to reach the provision of routine corporate-

law services by a law firm fails as a matter of law.  Congress never intended RICO to have such

a broad reach.  As the Supreme Court recognized in *Reves v. Ernst & Young*, 507 U.S. 170

(1993), "Congress did not intend RICO to extend beyond the acquisition or operation of an

enterprise," *id.* at 182, and thus reach the conduct of outsiders, *id.* at 181-85.

### A.    Plaintiffs Have Not Pleaded Agreement.

Plaintiffs seek to plead a conspiracy claim under 18 U.S.C. § 1962(d), which makes

criminal any conspiracy to violate Section 1962(c).  Under Section 1962(c), in turn, it is a crime

for a person employed by or associated with an enterprise to conduct or participate in the conduct

of the enterprise's affairs through a pattern of racketeering.  To state a Section 1962(d) claim

under RICO, it must be alleged that the defendant knew about *and agreed* to facilitate a criminal

scheme. *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997). Plaintiffs' conspiracy claim should be dismissed because it fails to allege adequately that Mayer Brown ever so agreed.

Although Rule 9(b) does not apply to allegations of agreement under Section § 1962(d), conclusory allegations will not suffice and agreements must be pleaded with "sufficient particularity." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). Plaintiffs must plead "some factual basis for a finding of a *conscious agreement* among the defendants." *Id.* at 26 n.4 (emphasis added). Thus, a complaint "should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." *Repub. of Colom. v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 428 (E.D.N.Y. 2007) (quoting *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002)). The standard employed by the Supreme Court in analyzing allegations of an agreement under § 1 of the Sherman Act in *Twombly* is especially analogous.[36] Under *Twombly*, even Rule 8(a) pleading requires "enough facts to state a claim to relief that is plausible on its face." *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 345 (S.D.N.Y. 2007) (quoting *Twombly*, 127 S. Ct. at 1974); *see also Iqbal v. Hasty*, 490 F.3d 143, 155-58 (2d Cir. 2007) (interpreting *Twombly* as creating a flexible plausibility standard). In assessing the plausibility of the plaintiffs' conspiracy claims in *Twombly*, the Supreme Court considered competing, innocent inferences from the allegations in the complaint. *See, e.g.*, 127 S. Ct. at 1972 (commenting that "a natural explanation" was that the defendants were not engaging in anti-competitive behavior).

---

[36]    The practical concerns identified in *Twombly* are particularly acute in this securities-related RICO claim where allowing a weak case to proceed represents an "'*in terrorem* increment of the settlement value'" of Plaintiffs' claims. 127 S. Ct. at 1966 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *see also Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2004 WL 2211650, at *6 (S.D.N.Y. Sept. 30, 2004) (noting the stigmatizing effect of allowing a civil RICO claim to proceed against a defendant).

Plaintiffs cannot rest on allegations regarding Mayer Brown's provision of legal services to an enterprise allegedly engaged in fraudulent activity to establish an agreement.  *See* Compl. ¶¶ 110-11.[37]  It is well-established that even providing services essential to allegedly illegal activity does not give rise to the inference of agreement required for Section 1962(d) liability. *See, e.g.*, *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732-33 (7th Cir. 1998) ("Although these defendants are alleged to have performed certain services for New Vision and to have known that certain statements on the Wallach tape had 'no basis,' the complaint is utterly devoid of allegations indicating either a specific agreement by these defendants to participate in the affairs of the enterprise or an agreement to the commission of two specific predicate acts.").

A good example of this principle in action is provided by Judge Chin's decision in *Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998).  Plaintiffs in that case alleged that two outside law firms had engaged in a RICO conspiracy by drafting fraudulent disclosures and by assisting in structuring allegedly fraudulent transactions.  *See id.* 300, 304.  The court held that "[t]he factual allegations and reasonable inferences of the allegations that do appear in the amended complaint . . . could not reasonably be interpreted as alleging that any of the professional defendants agreed to participate in predicate racketeering acts, that they agreed to pursue the same criminal objective, or that they knew that the general nature of the conspiracy extended beyond their individual roles."[38]  *Id.* at 304.  Similarly, here, the Amended Complaint fails

---

[37]    As pleaded, Plaintiffs' RICO conspiracy claim is nothing more than aiding and abetting, under a different name.  While we recognize the distinction between conspiracy claims and aiding and abetting claims, the Supreme Court's *Central Bank* decision precludes aiding and abetting claims not only in a securities context but in a RICO context as well.  As the Third Circuit held in *Pennsylvania Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839 (3d Cir. 2000), "the text of [RICO] § 1962 itself contains no indication that Congress intended to impose private civil aiding and abetting liability under RICO,"  *id*. at 843 (citations omitted).

[38]    *See also Ballard v. Savage*, No. 92-840, 1997 U.S. Dist. LEXIS 24013, at *34 (S.D. Cal. Nov. 10, 1997) ("Mere association with conspirators, even with the knowledge of their

because it does not allege any agreement by Mayer Brown to the commission of a substantive

RICO violation, or any facts from which any agreement could be inferred.

> ### B. Plaintiffs' RICO Conspiracy Claim Fails Because They Have Not Adequately Pleaded an Underlying RICO Violation.

While anyone who agrees to pursue the same unlawful objective can be held liable for a

RICO violation, *Salinas*, 522 U.S. at 63-64, a conspirator must intend to further an endeavor that,

if completed, would satisfy all the requirements of a RICO claim, *id*. at 65. If a plaintiff has no

viable claim under sections 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a

matter of law. *See Howard*, 208 F.3d at 751 (RICO conspiracy claim will not stand unless

plaintiff can sustain a viable claim under another subsection of § 1962); *Condict v. Condict*, 826

F.2d 923, 927 (10th Cir. 1987) ("[A]ny claim under § 1962(d) based on a conspiracy to violate

the provisions of 18 U.S.C. § 1962(a), (b), or (c) must necessarily fall if the substantive claims

are themselves deficient."); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d

229, 244-45 (2d Cir. 1999) (reversing liability under § 1962(d) because plaintiff had not proven a

pattern of racketeering conduct under § 1962(c)). Here, Plaintiffs have failed to plead a Section

1962(c) violation because their allegations of a pattern of racketeering activity are insufficient.

To establish a pattern of racketeering activity, Plaintiffs must plead predicate acts that

"amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Nw. Bell Tel. Co.*, 492

U.S. 229, 239 (1989). "Continuity" can take one of two forms – either "closed-ended" or "open-

ended." *E.g.*, *Cofacredit*, 187 F.3d at 242. To the extent that Plaintiffs seek to allege predicate

---

involvement in a crime, is insufficient to prove participation in a conspiracy. Similarly, evidence
of 'mere negative acquiescence' is insufficient to raise a triable issue of fact." (internal quotation
and citation omitted)); *Hexagon Packaging Corp. v. Manny Gutterman & Assocs.*, Nos. 96 C
4356, 99 C 5493, 2000 WL 226396, at *5-6 (N.D. Ill. Feb. 17, 2000) ("negative acquiescence"
does not demonstrate conspiracy) (quotation omitted); *Congregacion de la Mision Provincia de
Venez. v. Curi*, 978 F. Supp. 435, 451 (E.D.N.Y. 1997) ("[M]ere knowledge of the scheme, even
coupled with personal benefit, is not enough to impose liablity for a RICO conspiracy.").

acts sounding in fraud, however, those predicate acts must be pleaded with particularity under Rule 9(b). *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004). And any predicate acts not pleaded with particularity cannot be used to establish continuity. *Id.* at 178-79.

With the exception of money laundering, all of the predicate acts pleaded by Plaintiffs are subject to the heightened pleadings standards of Rule 9(b).[39] *See* Compl. ¶ 106 (pleading predicate acts of wire fraud, mail fraud, financial institutions fraud, and money laundering). This means "[i]n the RICO context, . . . the complaint [must] *specify the statements* it claims were false or misleading, *give particulars* as to the respect in which plaintiffs contend the statements were fraudulent, *state when and where the statements were made*, and *identify those responsible* for the statements." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) (emphases added) (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (quoting *Cosmas v. Hassett*, 896 F.3d 8, 11 (2d Cir. 1989))). Rule 9(b) also requires that allegations regarding a scheme to defraud must themselves include "a detailed description" identifying the scheme's "specific circumstances." *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 320 (S.D.N.Y. 2000) (quotation marks omitted); *see Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995).

Plaintiffs fail to meet Rule 9(b)'s pleading requirements for any predicate acts outside the time period of the LBO. For example, Plaintiffs allege that Refco executives used the interstate wires and mail to transmit false financial statements to Refco's lenders, and that similarly false financial statements and other data was sent to Plaintiffs, including officer questionnaires. *See* Compl. ¶ 106(b)-(d). Aside from the officer questionnaire's associated with the LBO and a

---

[39]     Although predicate acts of money laundering are not subject to Rule 9(b), a plaintiff still must plead all the necessary elements of the crime in its complaint. *Leung v. Law*, 387 F. Supp. 2d 105, 118 (E.D.N.Y. 2005). Plaintiffs have not done so in the Amended Complaint.

conference call between Bennett, Trosten, and a Weil Gotshal partner, *id.* ¶¶ 51(b)-(e), the Amended Complaint nowhere "specif[ies]" any representations in the financial statements that were allegedly false or when they were disseminated. *Moore*, 189 F.3d at 173.

Perhaps most glaringly, apart from Plaintiffs themselves, the Amended Complaint does not describe with any particularity to whom any false statements were disseminated – i.e., who was defrauded. In apparent reference to alleged predicate acts of financial institution fraud, Plaintiffs describe that "one or more financial institutions that loaned money to Refco" were defrauded, Compl. ¶ 106(b), and that some unspecified set of them were entitled to correct financial statements and had covenants preventing Refco from taking on additional debt, *see id.* ¶ 34 & n.10. But Plaintiffs do not name any particular bank with such an agreement, state any specific falsehoods in particular financial statements, or even allege how or when those falsehoods were transmitted to the banks. *Compare id.* ¶¶ 34, 106(b) (allegations regarding bank fraud), *with id.* ¶¶ 51(b)-(e) (allegations regarding 2004 misrepresentations by Refco executives) *and id.* ¶¶ 53-56 (specific allegations regarding Refco statements forwarded by Mr. Collins).[40]

Thus, even assuming that Plaintiffs' adequately plead predicate acts surrounding the LBO, any such predicate acts occurred over the span of less than a year. Accordingly, Plaintiffs have failed to plead a "closed-ended continuity" pattern. *Cofacredit*, 187 F.3d at 244. Moreover, because Bennett, Trosten, and Maggio undertook the alleged predicate acts for the

---

[40]     Plaintiffs refer to a single covenant from a credit agreement between Refco and Chase Manhattan Bank that allows Refco to engage in inter-company transactions in the ordinary course of business if "on 'terms no less favorable . . . than would obtain in a comparable arm's-length transaction." *Id.* ¶ 34. Nowhere does the Amended Complaint explain how the back-to-back loans created unfair business terms for Refco. And, in any event, pointing to an alleged violation of a single loan covenant does not amount to sufficient pleading of financial institutions fraud. This single allegation does not establish any "scheme to defraud," how the Refco executives made "material misrepresentations" to the bank or how they "intended to victimize the bank by exposing it to loss." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).

purpose of convincing Plaintiffs to invest in Refco, which they did in August 2004, the scheme

was "inherently terminable" and thus not grounds for establishing "open-ended continuity."  *Id.*;

*First Capital Asset Mgmt.*, 385 F.3d at 180-81; *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67

F.3d 463, 466 (2d Cir. 1995).[41]  Because Plaintiffs do not plead either closed or open-ended

continuity, they fail to allege an underlying violation of Section 1962(c) and, thus also, fail to

state a claim against Mayer Brown for a conspiracy to violate that section under Section 1962(d).

## IV.    THE NEGLIGENT MISREPRESENTATION CLAIM IS BARRED BY THE MARTIN ACT AND IN ANY EVENT FAILS TO STATE A CLAIM.

Count V is based in negligence and charges that Mayer Brown "failed to exercise

reasonable care or competence in obtaining and communicating information to [Plaintiffs] and in

connection with their dealings with [Plaintiffs] and their representatives."  Compl. ¶ 122.

However, a claim of negligent misrepresentation arising out of the sale of securities is barred

under New York's Martin Act,  N.Y. Gen. Bus. Law § 352 *et seq.*[42]

---

[41]    Any question as to whether Bennett's scheme was inherently terminable was put to rest during Bennett's plea colloquy, in which he affirmed that he had always planned to pay back the receivable.  *See* Bennett Plea Tr. at 18 (Ward Decl., Ex. I) (stating he "believed that [he] would be able to pay the [R]GHI receivable down over time, and did, in fact, ultimately pay off the receivable balance in its entirety.").

[42]    Plaintiffs allege in their Amended Complaint that an unidentified set of misrepresentations were received in Massachusetts, and that their eventual loss occurred in that state.  *See* Compl. ¶ 10.  Yet Plaintiffs cannot escape that the locus of the alleged events was New York.  That is where Refco was headquartered, *id.* ¶ 104, key face-to-face meetings occurred, *id.* ¶ 46, Mayer Brown has an office, *id.* ¶ 12(f), Weil Gotshal is headquartered, the bulk of due diligence occurred, the transaction was negotiated, Refco's IPO took place, and its stock was listed.  New York is also where the Purchase Agreement, which contains a New York choice-of-law provision, was signed.  *See* Ward Decl., Ex. A at §§ 1.6(a), 9.3.  Mr. Collins had an office in New York, and Mr. Koury worked only out of the New York office.  Especially given New York's strong interest in defining the scope of liability for professionals who work in the state, New York law applies.  *HSA Residential Mortgage Servs. of Tex. v. Casuccio*, 350 F. Supp. 2d 352, 365 (E.D.N.Y. 2003); *see also, e.g.*, *LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 264-65 (S.D.N.Y. 2007) (applying Cyprus law because that was locus of alleged wrongdoing); *Pension Comm'n of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 193-95 (S.D.N.Y. 2006) (applying New York law to claims against third-

The Martin Act applies to claims in connection with fraudulent and deceitful practices in the purchase and sale of securities that do not require proof of intent to defraud or scienter. *See Granite Partners, LP v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998). Unlike the blue sky laws of other states, there is no private right of action under the New York statute. *See CPC Int'l Inc. v. McKesson Corp.*, 514 N.E.2d 116, 118 (N.Y. 1987) ("Under the Martin Act . . . no private action has been expressly authorized. A majority of this Court now holds that there is no cause of action impliedly created.").[43] Only the Attorney General of the State of New York may bring an action under the statute for securities violations. *Id*. at 119.[44] Both federal and state courts have held that state law claims for negligence and negligent misrepresentations relating to the purchase and sale of securities are preempted by the statute. *See Berk v. Moore, Clayton & Co.*, No. 06 Civ. 2716, 2006 WL 3616961, at *6 (S.D.N.Y. Dec. 11, 2006) ("New

party participants in a fraudulent scheme where underlying fraud was committed by primary tortfeasors in New York); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492-93 (S.D.N.Y. 2001) (applying New York law where majority of fraudulent conduct occurred there even where injury was felt in Bermuda).

[43]     Most New York courts have held that the Martin Act precludes a private right of action for common law claims such as negligent misrepresentation. *See Horn v. 440 E. 57th Co*., 547 N.Y.S.2d 1, 5 (App. Div. 1989); *see also Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs*., 595 N.Y.S.2d 492, 494 (App. Div. 1993); *Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218, 219 (App. Div. 1992). The only two cases to the contrary, *Scalp & Blade, Inc. v. Advest, Inc*., 722 N.Y.S.2d 639, 640 (App. Div. 2001), and *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548, at *34 (S.D.N.Y. Sept. 19, 2001), "stand as solitary islands in a stream of contrary opinion," *Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787, *16 (S.D.N.Y. Sept. 30, 2005) (quotations omitted), and the holdings cannot be reconciled with the Second Circuit's decision in *Castellano v. Young & Rubicam, Inc*., 257 F.3d 171, 190-91 (2d Cir. 2001).

[44]     *See Castellano*, 257 F.3d at 190 (no implied right of action under the Martin Act because it would be "inconsistent with the Attorney General's exclusive enforcement powers); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22052894, at *2-4 (S.D.N.Y. Sept. 2, 2003) ("allowing private litigants to press common law claims 'covered' by the Martin Act would upset the Attorney General's exclusive enforcement power in exactly the same way that it would upset the exclusive enforcement power to allow private claims pleaded under the Martin Act itself").

York's Martin Act bars private claims of negligent misrepresentation arising out of the sale of securities."); *Marcus v. Frome*, 329 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004) (dismissing state law claim for negligent misrepresentation on preemption grounds).

Even if the claims were not barred, the Amended Complaint fails to state a claim for negligent misrepresentation. Under New York law, a negligent misrepresentation claim requires "[a] carelessness in imparting words, upon which others were expected to rely, upon which they did act or failed to act, to their damage, and the author must express the words directly, with knowledge they will be acted upon, to one whom the author is bound by some relation or duty of care." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 330 (S.D.N.Y. 2006) (citations omitted). As discussed above, these required elements, including reliance, have not been adequately alleged by Plaintiffs.

In cases involving attorneys in corporate transactions, New York courts have made clear that there can be no liability for negligent misrepresentation absent "actual privity or a relationship that otherwise closely resembles privity" between the attorney and the plaintiff. *See AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 842 N.E.2d 471, 478-79 (N.Y. 2005). Of course Plaintiffs and Mayer Brown are not alleged to have been in privity here, nor do Plaintiffs' allegations show any relationship approaching privity. *See Doehla v. Wathne Ltd.*, No. 98 Civ. 6087, 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999) ("the only cases of which this Court is aware holding that an attorney had, or was properly alleged to have had, a relationship approaching privity with a third-party are those in which the attorney issued an 'opinion letter' to his client in connection with a transaction for the purpose of reliance by the third-party on its contents"). Accordingly, Plaintiffs have failed to properly plead negligent misrepresentation against Mayer Brown.

## V.   PLAINTIFFS' COMMON LAW FRAUD CLAIM UNDER NEW YORK LAW SHOULD BE DISMISSED.

The elements of common law fraud in New York are "essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b-5." *Dover*, 423 F. Supp. 2d at 327 (quotation omitted).  To plead a claim for fraud in New York a plaintiff must establish, by clear and convincing proof, that (i) the defendant made a material misrepresentation; (ii) with knowledge of its falsity; (iii) with the intent to defraud plaintiff; (iv) on which the plaintiff reasonably relied; and (v) that caused damage to the plaintiff as a result. *Id.*; *see also Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933 (2d Cir. 1998); *Gouldsbury v. Dan's Supreme Supermarket., Inc*., 546 N.Y.S.2d 379, 381 (App. Div. 1989).  A claim for common law fraud in New York must also satisfy the heightened pleading requirements of Rule 9(b).  *E.g.*, *Marcus*, 329 F. Supp. 2d at 475.  For the reasons outlined in the discussion of the securities fraud claims, Plaintiffs' common law fraud claims should also be dismissed.  *See* Section II, *supra*; *see also Emergent Capital*, 343 F.3d at 195-96 (dismissing state law claims for lack of reasonable reliance); *Harsco*, 91 F.3d at 345-48 (same).

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety for failure to state a claim against Mayer Brown.

Dated: Washington, D.C.
       March 28, 2008

Respectfully submitted,

John K. Villa (admitted *pro hac vice*)
George A. Borden (GB-7019)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (fax)

*Attorneys for Defendant Mayer Brown LLP*