# EXHIBIT B



*First Leg: RCM loans money to a Refco Customer.* ¶ 25.

*Second Leg: A Refco Customer loans the same amount to RGHI.* ¶ 25.

*Third Leg: RGHI uses loan proceeds to pay down debit balances in various RGHI accounts held in Refco subsidiaries.* ¶¶ 21, 25.

Plaintiffs make conclusory allegations that Mayer Brown knew about "round trip loans," which allegedly consisted of three reversible legs. Plaintiffs have not pleaded any facts, however, to support an inference that Mayer Brown was aware of the critical third legs of the transactions, by which the RGHI Receivable was allegedly concealed and the fraud occurred. The diagram above illustrates the structure of the transactions and the limits of Mayer Brown's awareness. Plaintiffs' only factual allegations address the two-step, back-to-back loans contained in the large bold rectangle. No factual allegations support an inference that Mayer Brown knew of the fraudulent use of the loan proceeds, which occurred outside the rectangle.

# EXHIBIT C

No. 06-43

# In the Supreme Court of the United States

STONERIDGE INVESTMENT PARTNERS, LLC,
PETITIONER

*v.*

SCIENTIFIC-ATLANTA, INC., ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT*

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING AFFIRMANCE**

PAUL D. CLEMENT
 *Solicitor General
  Counsel of Record*

THOMAS G. HUNGAR
 *Deputy Solicitor General*

KANNON K. SHANMUGAM
 *Assistant to the Solicitor
  General
 Department of Justice
 Washington, D.C. 20530-0001
 (202) 514-2217*

## QUESTION PRESENTED

Whether a person may be liable in a private action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) and (c), for engaging in a transaction with the issuer of a security on the ground that the transaction constituted "deceptive" conduct, when the plaintiff did not rely on that conduct but at most relied only on a subsequent misstatement by the issuer concerning the transaction.

## TABLE OF CONTENTS

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Argument:
    The court of appeals correctly held that respondents
    cannot be held liable in a private action under Section
    10(b) and Rule 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    A.   The phrase "deceptive device or contrivance," as
        used in Section 10(b), encompasses deceptive
        conduct as well as misstatements (and omissions
        by parties with a duty to disclose) . . . . . . . . . . . . . . . 11
    B.   Because petitioner failed sufficiently to allege
        reliance, the court of appeals correctly upheld
        the dismissal of petitioner's complaint . . . . . . . . . . . 17
    C.   Allowing the complaint in this case to proceed
        would dramatically broaden the inferred right of
        action in Section 10(b) and Rule 10b-5 . . . . . . . . . . . 26
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

Cases:

    *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128
        (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 24
    *Alexander* v. *Sandoval*, 532 U.S. 275 (2001) . . . . . . . . . 27, 30
    *Anixter* v. *Home-Stake Prod. Co.*, 77 F.3d 1215
        (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) . . . . . . 18, 24, 25
    *Central Bank of Denver, N.A.* v. *First Interstate*
        *Bank of Denver, N.A.*, 511 U.S. 164 (1994) . . . . . *passim*

(III)

IV

Cases—Continued:                                                        Page

 *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61
  (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

 *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336
  (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18, 23, 25

 *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976) . . . . 12, 17

 *Fidel* v. *Farley*, 392 F.3d 220 (6th Cir. 2004) . . . . . . . . . . 21

 *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657
  (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

 *J.I. Case Co.* v. *Borak*, 377 U.S. 426 (1964) . . . . . . . . . . . . 27

 *Klein* v. *Boyd*, No. 97-1143 (3d Cir.) . . . . . . . . . . . . . . . . . . 21

 *Lampf, Pleva, Lipkind, Prupis & Petigrow* v.
  *Gilbertson*, 501 U.S. 350 (1991) . . . . . . . . . . . . . . . . . . . . 28

 *Pinter* v. *Dahl*, 486 U.S. 622 (1988) . . . . . . . . . . . . . . . . . . . 29

 *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148
  (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

 *Regents of the Univ. of Cal.* v. *Credit Suisse First*
  *Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007),
  petition for cert. pending, No. 06-1341 (filed Mar. 5,
  2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

 *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462
  (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

 *Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374
  (2d Cir. 1974), cert. denied, 421 U.S. 976 (1975) . . . 18, 19

 *Schweiker* v. *Chilicky*, 487 U.S. 412 (1988) . . . . . . . . . . . . 27

 *SEC* v. *Edwards*, 540 U.S. 389 (2004) . . . . . . . . . . . . . . . . 15

 *SEC* v. *Zandford*, 535 U.S. 813 (2002) . . . . . . . . . . . . . . . . 10

 *Shapiro* v. *Cantor*, 123 F.3d 717 (2d Cir. 1997) . . . . . . . . . 21

V

Cases—Continued:                                                    Page

   *Simpson* v. *AOL Time Warner Inc.*, 452 F.3d 1040
      (9th Cir. 2006), petition for cert. pending, No.
      06-560 (filed Oct. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 23

   *Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . 27

   *Superintendent of Ins.* v. *Bankers Life & Cas. Co.*,
      404 U.S. 6 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 27

   *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
      127 S. Ct. 2499 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   *United States* v. *Nobles*, 422 U.S. 225 (1975) . . . . . . . . . . 25

   *United States* v. *O'Hagan*, 521 U.S. 642 (1997) . . . . . . 15, 16

   *United States* v. *Russo*, 74 F.3d 1383 (2d Cir.), cert.
      denied, 519 U.S. 927 (1996) . . . . . . . . . . . . . . . . . . . . . . 16

   *Wilkie* v. *Robbins*, 127 S. Ct. 2588 (2007) . . . . . . . . . . . . . 27

   *Wright* v. *Ernst & Young LLP*, 152 F.3d 169 (2d Cir.
      1998), cert. denied, 525 U.S. 1104 (1999) . . . . . . . . . . . 21

   *Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir.
      2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Statutes, regulation and rule:

   Private Securities Litigation Reform Act of 1995, Pub.
      L. No. 104-67, § 201, 109 Stat. 758 . . . . . . . . . . . . . . . . 13

   Securities Act of 1933, 15 U.S.C. 77a *et seq.*:
      15 U.S.C. 77b(a)(11) (§ 2(a)(11)) . . . . . . . . . . . . . . . . . . . 29
      15 U.S.C. 77*l*(1) (§ 12(1)) . . . . . . . . . . . . . . . . . . . . . . . . . 29

   Securities Exchange Act of 1934, 15 U.S.C. 78a
      *et seq.*:
      15 U.S.C. 78j(a) (§ 10(a)) . . . . . . . . . . . . . . . . . . . . . . . . . 13
      15 U.S.C. 78j(b) (§ 10(b)) . . . . . . . . . . . . . . . . . . . . *passim*
      15 U.S.C. 78r(a) (§ 18(a)) . . . . . . . . . . . . . . . . . . . . . . . . . 29

VI

Statutes, regulation and rule—Continued:                    Page

    15 U.S.C. 78t(a) (§ 20(a))  . . . . . . . . . . . . . . . . . . . . . . . . . 29
    15 U.S.C. 78t(e) (§ 20(e))  . . . . . . . . . . . . . . . . . . . . 26, 29
    15 U.S.C. 78u-4(b)(4) (§ 21D(b)(4))  . . . . . . . . . . . . . . . 25
    15 U.S.C. 78u-4(f)(2)(A) (§ 21D(f)(2)(A))  . . . . . . . . . . . 28
    15 U.S.C. 78u-4(f)(3)(C) (§ 21D(f)(3)(C))  . . . . . . . . . . . 28
    15 U.S.C. 78u-4(f)(10)(A) (§ 21D(f)(10)(A))  . . . . . . . . . 13
17 C.F.R.:
    Section 240.10b-5 (Rule 10b-5)  . . . . . . . . . . . . . . . *passim*
    Section 240.10b-5(a) (Rule 10b-5(a))  . . . . . . . . . . 5, 11, 13
    Section 240.10b-5(b) (Rule 10b-5(b))  . . . . . . . . . . . 5, 13
    Section 240.10b-5(c) (Rule 10b-5(c))  . . . . . . . . . . 5, 11, 13
Fed. R. Civ. P. 23(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Miscellaneous:

    *Black's Law Dictionary* (3d ed. 1933) . . . . . . . . . . . . . . . . 14
    *Bouvier's Law Dictionary* (1928)  . . . . . . . . . . . . . . . . . . . 14
    *Charter Commc'ns, Inc., In re*, Exchange Act Release
        No. 50,098 (July 27, 2004) <http://sec.gov/
        litigation/admin/34-50098.htm>  . . . . . . . . . . . . . . . . . . . 4
    Restatement (Second) of Torts (1977)  . . . . . . . . . . . . 18, 19
    S. Rep. No. 792, 73d Cong., 2d Sess. (1934)  . . . . . . . . . . 13
    S. Rep. No. 98, 104th Cong., 1st Sess. (1995)  . . . . . . . . . . 26
    *Webster's New International Dictionary* (2d ed.
        1934)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

# In the Supreme Court of the United States

No. 06-43

STONERIDGE INVESTMENT PARTNERS, LLC,
PETITIONER

*v.*

SCIENTIFIC-ATLANTA, INC., ET AL.

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE EIGHTH CIRCUIT*

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING AFFIRMANCE**

### INTEREST OF THE UNITED STATES

The United States administers and enforces the federal securities laws. The question in this case concerns the scope of liability in private actions under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b). Meritorious private actions are an essential supplement to criminal prosecutions and civil enforcement actions brought by the government. At the same time, private securities actions can be abused in ways that impose substantial costs on companies that have fully complied with the applicable laws. The United States also has responsibility, through, *inter alia*, the federal banking agencies, for ensuring that entities providing services to publicly traded companies are not subject to inappropriate secondary liability. The United States thus has a strong interest in seeing that the principles applied in private actions

(1)

2

promote the purposes of the securities laws and other important federal laws, and has previously participated as an amicus curiae in cases involving those principles.

## STATEMENT

1.  This case involves a claim of securities fraud against respondents Scientific-Atlanta, Inc., and Motorola, Inc., which manufacture digital set-top boxes used by cable-television subscribers.  As alleged in the amended complaint, the facts are as follows.  Respondents supplied set-top boxes to Charter Communications, Inc. (Charter), one of the Nation's largest cable-television operators.  In August 2000, Charter realized that it was unlikely to meet its annual target for operating cash flow.  Charter decided to ask respondents to enter into "wash" transactions, whereby Charter would pay respondents additional amounts for the set-top boxes they supplied and respondents would use those amounts to "purchase" advertising on Charter's cable channels.  In effect, those transactions would entitle respondents to receive the advertising for free.  Scientific-Atlanta Br. in Opp. App. 31-32.

In order for Charter to improve its operating cash flow as a result of those transactions, it needed to capitalize the payments to respondents (on the theory that they were for the purchase of equipment) while treating the return payments from respondents as revenue (on the theory that they were for the purchase of advertising).  Before entering into the transactions, Charter discussed them with Arthur Andersen, its outside accountant.  Arthur Andersen advised Charter that it could not recognize the advertising payments as revenue if they were integrally related to the payments to respondents, but that it could do so if the two sets of payments were unrelated to each other, negotiated at least one month apart, and made at fair market value.  Charter informed Arthur Andersen that it would undertake to satisfy those conditions.  In

3

late September 2000, Charter and each respondent entered into separate agreements for the price increase in the set-top boxes and for the advertising; the agreements concerning the set-top boxes, however, were backdated to August 2000. Scientific-Atlanta Br. in Opp. App. 32-34.

The proposed second amended complaint, based on information obtained in discovery, contains more detailed allegations concerning the transactions.[1]  It alleges that Charter instructed Scientific-Atlanta to notify Charter that it was raising the price of set-top boxes that Charter had already agreed to purchase, and further instructed Scientific-Atlanta to cite higher manufacturing costs as the reason for the increase.  Scientific-Atlanta followed Charter's instructions, even though it knew that the stated reason for the increase was false.  The parties later entered into an agreement under which Charter would pay an extra $20 for each set-top box it had already agreed to purchase (totaling $6.73 million in excess payments).  The parties simultaneously entered into a separate agreement in which Scientific-Atlanta agreed to purchase $6.73 million in advertising from Charter (at rates four to five times higher than those paid by other advertisers).  J.A. 53a-59a.

The proposed second amended complaint also alleges that Charter entered into an agreement with Motorola to purchase 540,000 set-top boxes by December 31, 2000, even though Charter had no present need for the Motorola boxes (and thus no intention of buying them).  The agreement contained a provision requiring Charter to pay Motorola $20 per box in liquidated damages (totaling $10.8 million) if it did not pur-

---

[1]  After the district court had dismissed the claim against respondents, petitioner filed a motion for leave to file the proposed second amended complaint.  The district court denied the motion in relevant part, concluding that, in light of its reasoning in dismissing the claim, "amending the complaint would be futile."  Pet. App. 28a.

4

chase the boxes by the specified date. The parties entered into a separate agreement in which Motorola agreed to purchase $10.8 million in advertising from Charter (again at rates four to five times higher than those paid by other advertisers). J.A. 53a, 56a-59a.

The proposed second amended complaint alleges that respondents knew that Charter intended to use the transactions artificially to inflate its operating cash flow. It also alleges that the backdating of the contracts for the set-top boxes was indicative of "[respondents'] scienter and complicity in efforts to mislead Charter's auditors." J.A. 53a, 55a, 58a-60a.

Charter subsequently informed Arthur Andersen that the agreements had been negotiated a month apart from each other, and Arthur Andersen duly advised Charter that it could recognize the advertising payments as revenue. Charter did so in its financial statements for the fourth quarter of 2000, thereby increasing its operating cash flow by at least $17 million to a total of $433.2 million (and $1.56 billion for the entire year). But for its accounting of the transactions with respondents, Charter would not have met analysts' projections for its operating cash flow. Charter continued to report increases in cash flow throughout 2001 and the first quarter of 2002. On April 1, 2003, however, Charter issued a comprehensive restatement of its financial reports in which, *inter alia*, it reduced its operating cash flow for 2000 by $195 million and its operating cash flow for 2001 by $292 million. Scientific-Atlanta Br. in Opp. App. 33-34, 47, 49-60, 66.[2]

---

[2] The Securities and Exchange Commission (SEC) subsequently brought administrative proceedings against Charter; in its order instituting the proceedings, the SEC alleged that, as a result of the transactions at issue in this case, Charter had committed numerous reporting, books and records, and accounting control violations. See *In re Charter Commc'ns, Inc.*, Exchange Act Release No. 50,098 (July 27, 2004) <http://sec.gov/litigation/admin/34-50098. htm>. Charter settled the proceedings without admitting or denying any securities violations.

5

2.  As is relevant here, petitioner, an investment firm, filed a class action against respondents in the United States District Court for the Eastern District of Missouri on behalf of all purchasers of Charter securities between November 8, 1999, and July 17, 2002, alleging that respondents had engaged in fraudulent conduct in violation of Section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) and (c).[3]  Petitioner also brought claims against Charter and its executives, contending that Charter had engaged in numerous fraudulent acts to misrepresent its revenues and costs and to inflate its customer growth rate, and against Arthur Andersen, contending that Arthur Andersen had acted fraudulently in auditing Charter's financial statements.  Scientific-Atlanta Br. in Opp. App. 1-88.[4]

Respondents filed motions to dismiss, contending, *inter alia*, that the complaint failed to allege actionable misstatements or omissions by respondents, and also failed to allege that petitioner had relied on respondents' alleged deceptions. The district court granted the motions.  Pet. App. 30a-71a. The court held that "[petitioner's] claims against [respondents] amount to claims for aiding and abetting liability under § 10(b) and Rule 10b-5," and were therefore barred by *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that a private party may not pursue a Section 10(b) action on a theory of aiding and

---

[3]  Petitioner originally also alleged that respondents had made misstatements in violation of Rule 10b-5(b), 17 C.F.R. 240.10b-5(b), see Scientific-Atlanta Br. in Opp. App. 80, but dropped that claim in its second amended complaint, see J.A. 110a.

[4]  Charter and its executives entered into a settlement.  Arthur Andersen moved to dismiss the claim against it, contending that the complaint did not sufficiently allege scienter, but the district court denied the motion.  Pet. App. 47a-64a.  Arthur Andersen subsequently also entered into a settlement.

6

abetting liability. Pet. App. 39a. The district court reasoned that "[petitioner] do[es] not assert that [respondents] made any statement, omission or action at issue or that [petitioner] relied on any statement, omission or action made by either of them." *Id.* at 41a. Instead, the court noted, "[petitioner] contend[s] that [respondents] are liable to Charter's investors on the basis that they engaged in a business transaction that Charter purportedly improperly accounted for." *Ibid.* The court stated that it could "find no precedent" for the proposition that a company could violate Section 10(b) and Rule 10b-5 simply "by virtue of engaging in a business enterprise with a company such as Charter, the entity purported to have made the statements at issue." *Id.* at 41a-42a.

3. The court of appeals affirmed. Pet. App. 1a-11a. At the outset, the court of appeals stated that, in *Central Bank*, this Court "confirmed that § 10(b) prohibits only 'manipulative or deceptive' devices or contrivances," and that, in earlier cases, the Court "held that 'deceptive' conduct involves either a misstatement or a failure to disclose by one who has a duty to disclose." *Id.* at 4a-5a (citation omitted). The court of appeals further noted that, in *Central Bank*, this Court held that "Rule 10b-5 does not reach those who only aid or abet a violation of § 10(b)." *Id.* at 5a.

The court of appeals rejected petitioner's contention that it had "properly alleged a *primary* violation of the securities laws within the meaning of *Central Bank* because [respondents] violated Rule 10b-5(a) and (c)," Pet. App. 8a, which prohibit "employ[ing] [a] device, scheme, or artifice to defraud" or "engag[ing] in [an] act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." The court reasoned that "*Central Bank* and the earlier cases on which it relied stand for three governing principles." *Ibid.* First, the court explained, "a private plaintiff may not bring a 10b-5 suit against a defendant for

7

acts not prohibited by the text of § 10(b)." *Ibid.* (internal quotation marks and citation omitted). Second, the court contended, "[a] device or contrivance is not 'deceptive,' within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose." *Ibid.* (citation omitted). Third, the court noted, "[t]he term 'manipulative' in § 10(b) has [a] limited contextual meaning." *Ibid.* (citation omitted). Based on those principles, the court held that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Id.* at 9a.

Applying that holding, the court of appeals determined that petitioner's complaint failed to state a claim against respondents. Pet. App. 9a-10a. The court reasoned that "the focus of [petitioner's] § 10(b) and Rule 10b-5 claims was deception" by Charter, and that "neither Motorola nor Scientific-Atlanta was alleged to have engaged in any * * * deceptive act." *Ibid.* In addition, the court held that respondents "did not issue any misstatement relied upon by the investing public, nor were they under a duty to Charter investors and analysts to disclose information useful in evaluating Charter's true financial condition." *Id.* at 10a. The court thus concluded that "the district court properly dismissed the claims against [respondents] as nothing more than claims, barred by *Central Bank*, that [respondents] knowingly aided and abetted the Charter defendants in deceiving the investor [class]." *Ibid.*

The court of appeals stated that it was "aware of no case imposing § 10(b) or Rule 10b-5 liability on a business that entered into an arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts." Pet. App. 10a. Imposing liability in those circumstances, the court

8

concluded, "would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings," and "[d]ecisions of this magnitude should be made by Congress." *Ibid.*

**SUMMARY OF ARGUMENT**

A.  The court of appeals in this case erred to the extent it held that Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), reaches only misstatements, omissions made while under a duty to disclose, or manipulative trading practices.  The plain language of Section 10(b) demonstrates that it potentially reaches *all* conduct that is "manipulative" or "deceptive." That interpretation is consistent both with the legislative history of the 1934 Act and with the contemporaneous understanding of the term "deceptive."  This Court's cases provide no support for the conclusion that non-verbal deceptive conduct is somehow beyond the reach of Section 10(b).

Properly understood, a person engages in "deceptive" conduct for purposes of Section 10(b) when the conduct by its nature is objectively likely to mislead another person, *e.g.*, when it has the effect of conveying a false appearance of material fact to an observer (assuming, of course, that the defendant possessed the requisite mental state in engaging in the conduct).  Respondents' alleged conduct constituted a "deceptive device or contrivance" because it not only was likely to, but allegedly did, mislead Charter's outside accountant, Arthur Andersen, about the nature of the transactions into which respondents had entered.  Such a reading of Section 10(b) does not nullify this Court's holding in *Central Bank* that aiding and abetting liability is not available in a private Section 10(b) action, because a person cannot be liable as a primary violator unless it *itself* engages in deceptive conduct—and, critically, unless the other elements of primary liability under Section 10(b) are also established.

9

B.  Although the court of appeals erred by concluding that petitioner had failed to satisfy Section 10(b)'s deception requirement, it nevertheless correctly upheld the district court's dismissal of petitioner's complaint, because petitioner did not sufficiently plead reliance on respondents' deceptive conduct.  Petitioner does not allege that it was even aware of the transactions that respondents executed with Charter; at most, petitioner relied on *Charter's* misstatements in purchasing Charter stock.  Petitioner does not dispute that Charter independently decided to make the misrepresentations in its financial statements, and does not contend that respondents drafted or otherwise created those misstatements.  Accordingly, the causal connection between respondents' conduct and petitioner's stock transactions is simply too attenuated to satisfy the reliance requirement.  That is particularly true because respondents' alleged conduct relates to only one aspect of Charter's fraudulent scheme, and has no connection with the publicly disseminated misstatements relating to numerous other, contemporaneous fraudulent acts in which Charter allegedly engaged.  For similar reasons, petitioner has also failed sufficiently to allege the related element of loss causation.

C.  Allowing liability for a primary violation under the circumstances presented here would constitute a sweeping expansion of the judicially inferred private right of action in Section 10(b) and Rule 10b-5, potentially exposing customers, vendors, and other actors far removed from the market to billions of dollars in liability when issuers of securities make misstatements to the market.  It would be particularly inappropriate to allow private liability under these circumstances in light of Congress's rejection of a private right of action for aiding and abetting liability under Section 10(b) in the wake of *Central Bank* (and Congress's creation of much narrower private rights of action in other provisions of the securities

10

laws). Congress consciously struck a balance between expo-
sure to aiding-and-abetting liability and complete immunity
by empowering the Securities and Exchange Commission
alone to pursue cases of aiding and abetting. Petitioner's
proposed rule would upset that congressional choice and
vastly expand liability in unpredictable ways. Such a radical
expansion of liability is a task for Congress, not the courts.

ARGUMENT

**THE COURT OF APPEALS CORRECTLY HELD THAT RE-
SPONDENTS CANNOT BE HELD LIABLE IN A PRIVATE
ACTION UNDER SECTION 10(b) AND RULE 10b-5**

Section 10(b) of the Securities Exchange Act of 1934 (1934
Act) makes it unlawful for "any person" "directly or indi-
rectly" to "use or employ, in connection with the purchase or
sale of any security * * * , any manipulative or deceptive
device or contrivance in contravention of such rules and regu-
lations as the [Securities and Exchange Commission (SEC)]
may prescribe as necessary or appropriate in the public inter-
est or for the protection of investors." 15 U.S.C. 78j(b). The
SEC's Rule 10b-5 implements Section 10(b) by declaring it
unlawful, "in connection with the purchase or sale of any secu-
rity," to (a) "employ any device, scheme, or artifice to de-
fraud"; (b) "make any untrue statement of a material fact or
to omit to state a material fact necessary in order to make the
statements made * * * not misleading"; or (c) "engage in
any act, practice, or course of business which operates or
would operate as a fraud or deceit upon any person." 17
C.F.R. 240.10b-5. This Court has noted that the scope of Rule
10b-5 is "coextensive" with that of Section 10(b). *SEC* v.
*Zandford*, 535 U.S. 813, 816 n.1 (2002). And for violations of
Section 10(b) and Rule 10b-5, courts have inferred a private
right of action that "resembles, but is not identical to,
common-law tort actions for deceit and misrepresentation."

11

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 341 (2005).

The question presented in this case is whether a person may be liable in a private action under Section 10(b) and Rule 10b-5(a) and (c) for engaging in a transaction with the issuer of a security on the ground that the transaction constituted "deceptive" conduct, when the plaintiff did not rely on that conduct but at most relied only on subsequent misstatements by the issuer concerning the transaction. Contrary to the view seemingly expressed by the court of appeals, Section 10(b)'s prohibition against deception is not limited to actual misstatements or omissions, but encompasses non-verbal deceptive conduct as well. For the reasons set forth below, however, the district court correctly dismissed the complaint for failure to allege that petitioner relied on respondents' deceptive conduct, and the judgment of the court of appeals should therefore be affirmed.

### A. The Phrase "Deceptive Device Or Contrivance," As Used In Section 10(b), Encompasses Deceptive Conduct As Well As Misstatements (And Omissions By Parties With A Duty To Disclose)

The court of appeals categorically stated that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." Pet. App. 9a. The court of appeals thereby appeared to foreclose the possibility that non-verbal deceptive conduct—*i.e.*, deceptive conduct other than misstatements or omissions—could give rise to a violation of Section 10(b). The court erred in its analysis in that regard, because a defendant may employ a "deceptive

12

device or contrivance" within the meaning of Section 10(b) by engaging in non-verbal deceptive conduct.[5]

1. The text of Section 10(b) unambiguously reaches non-verbal deceptive conduct, in addition to misstatements and omissions. Section 10(b) renders it unlawful for "any person" "directly or indirectly" to "use or employ" "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. 78j(b). This Court has previously addressed the meaning of the critical terms "device" and "contrivance." In *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976), the Court, quoting from a contemporaneous dictionary, defined "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," and defined "contrivance" as "[a] thing contrived or used in contriving; a scheme, plan, or artifice." *Id.* at 199 n.20 (second brackets in original) (quoting *Webster's New International Dictionary* 580, 713 (2d ed. 1934)). The breadth of those terms demonstrates that Section 10(b) reaches *all* conduct that is "deceptive" or "manipulative" (assuming that the other statutory requirements are satisfied), not merely *verbal* conduct (*i.e.*, misstatements or omissions). Consistent with that interpretation, the SEC, in promulgating Rule 10b-5, pro-

---

[5] The court seemingly recognized that Section 10(b) reaches at least some non-verbal conduct: *viz.*, when the "scheme or contrivance" at issue is "manipulative," rather than "deceptive." See Pet. App. 9a (holding that Section 10(b) makes it unlawful for a defendant, *inter alia*, to "engage in manipulative securities trading *practices*") (emphasis added). The court was correct to recognize that "manipulative" conduct can be non-verbal, because the prototypical examples of "manipulative" conduct are such non-verbal actions as "wash sales, matched orders, or rigged prices." *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 476 (1977). As the court of appeals noted (Pet. App. 9a & n.2), however, "manipulative" has been viewed as a term of art denoting manipulation that operates on *markets*, see, *e.g.*, *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 199 & n.21 (1976), and it is therefore not at issue in this case.

13

scribed not only misstatements and omissions that render statements misleading (in Rule 10b-5(b)), but also "any device, scheme, or artifice to defraud" (in Rule 10b-5(a)) and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" (in Rule 10b-5(c)).  The latter subparts of the rule would be rendered largely superfluous if Section 10(b) were construed to cover only misstatements and omissions.[6]

The legislative history of the 1934 Act confirms that Section 10(b) was intended to reach all forms of "deceptive" or "manipulative" conduct.  The Senate Report indicated that Section 10, together with other sections of the 1934 Act, was "aimed at those manipulative and deceptive *practices* which have been demonstrated to fulfill no useful function," without distinguishing between verbal and non-verbal conduct.  S. Rep. No. 792, 73d Cong., 2d Sess. 6 (1934) (emphasis added). And the Senate Report noted that, while Section 10(a) regulates short sales and stop-loss orders, Section 10(b) "authorizes the [SEC] by rules and regulations to prohibit or regulate the use of any other manipulative or deceptive *practices* which it finds detrimental to the interests of the investor," again without distinguishing between verbal and non-verbal conduct.  *Id.* at 18 (emphasis added).

2.  Nothing in the ordinary meaning of the word "deceptive" suggests that it limits the range of actionable "device[s] or contrivance[s]" to misstatements or omissions.  To the contrary, contemporary dictionaries confirm that "deception" and

---

[6]  Similarly, Section 21D(f)(10)(A) of the 1934 Act (which was added by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 201, 109 Stat. 758), in defining the circumstances under which a person "knowingly commits a violation of the securities laws" (and thus can be subject to joint and several liability), distinguishes between "an action that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading" and "an action that is based on any [other] conduct." 15 U.S.C. 78u-4(f)(10)(A).

14

"deceit" can arise from verbal and non-verbal conduct alike. See, *e.g.*, *Black's Law Dictionary* 529 (3d ed. 1933) (defining "deception" as, *inter alia*, "intentional misleading by falsehood spoken or acted"); *Bouvier's Law Dictionary* 276 (1928) (noting, in defining "deceit," that "[a] fraudulent misrepresentation or contrivance * * * need not be made in words").

This Court's cases likewise provide no support for the apparently contrary view of the court of appeals, which asserted that "[a] device or contrivance is not 'deceptive,' within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose." Pet. App. 8a; see *id.* at 5a, 9a. The court of appeals relied primarily on a single sentence from *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver,* 511 U.S. 164 (1994). See Pet. App. 5a. In that sentence, the Court stated that "the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank*, 511 U.S. at 177; see *id.* at 191 (same).

When that statement is read in context, it is clear that the Court did not intend to exclude non-verbal deceptive conduct from the reach of Section 10(b). In the very next sentence (and throughout the rest of the opinion), the Court used generic language indicating that the statute covers deceptive conduct, without distinguishing between verbal or non-verbal conduct. See *Central Bank*, 511 U.S. at 177 (stating that "[t]he proscription [in Section 10(b)] does not include giving aid to a person who commits a manipulative or deceptive *act*") (emphasis added); see also, *e.g.*, *id.* at 166 ("deceptive act"); *id.* at 167 ("deceptive practice"); *id.* at 170 ("deceptive act"); *id.* at 173 ("deceptive acts"); *id.* at 178 ("acts that are * * * deceptive"); *id.* at 183 ("deceptive conduct"); *id.* at 191 ("deceptive act"). To the extent that the relevant sentence can be read to have excluded non-verbal deceptive conduct, therefore, any such exclusion appears to have been inadvertent and

15

without significance.  Cf. *SEC* v. *Edwards*, 540 U.S. 389, 396 (2004) (stating that "we will not bind ourselves unnecessarily to passing dictum that would frustrate Congress' intent" under the securities laws).

The court of appeals also cited *United States* v. *O'Hagan*, 521 U.S. 642 (1997), and *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972) (see Pet. App. 5a), but those cases do not speak to the definition of "deceptive device or contrivance."  Instead, they involved collateral issues concerning the circumstances under which a defendant can be liable for engaging in deceptive conduct by means of an omission alone. See, *e.g.*, *O'Hagan*, 521 U.S. at 654 (stating that "[d]eception through nondisclosure is central to the theory of liability for which the Government seeks recognition"); *Affiliated Ute Citizens*, 406 U.S. at 153 (noting that the defendants had failed to "disclos[e] to [the plaintiffs] material facts that reasonably could have been expected to influence their decisions to sell").

In sum, "§ 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception," and "[n]ovel or atypical methods should not provide immunity from the securities laws." *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) (citation omitted); cf. *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 477 (1977) (concluding that "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices").  The court of appeals thus erred to the extent it excluded non-verbal deceptive conduct from the scope of Section 10(b).

3.  Because the court of appeals apparently concluded that only a misstatement or omission can constitute a "deceptive device or contrivance" for purposes of Section 10(b), it did

16

not attempt to elaborate on the circumstances under which other conduct could be "deceptive." The plain language of Section 10(b) provides substantial guidance on that issue. The same dictionary on which this Court relied in *Ernst & Ernst* in defining the statutory terms "manipulative," "device," and "contrivance" defines "deceptive" as "[t]ending to deceive" or "having power to mislead." *Webster's New International Dictionary* 679 (2d ed. 1934); see *ibid.* (defining "deceive" as "[t]o cause to believe the false, or disbelieve the truth"). It naturally follows that the phrase "deceptive device or contrivance" comprises any conduct that is committed with the requisite mental state and is objectively likely to mislead an observer: *e.g.*, conduct that has the effect of conveying a false appearance of material fact concerning a transaction into which the person has entered. Cf. *United States* v. *Russo*, 74 F.3d 1383, 1391 (2d Cir.) (concluding that trading scheme that "create[d] a false impression" of demand for stock constituted a "manipulative * * * device or contrivance" for purposes of Section 10(b)), cert. denied, 519 U.S. 927 (1996).[7]

When measured against the correct standard, respondents' alleged conduct in this case constituted a "deceptive device or contrivance." The parties are alleged to have deliberately backdated the agreements for the price increases in the set-top boxes, so as to make it appear that the parties had

---

[7]  In order to satisfy the "deceptive device or contrivance" requirement, a plaintiff need only allege that the defendant engaged in conduct that was objectively likely to mislead *another person*. Insofar as unlawful conduct under Section 10(b) requires some nexus with an *investor*, that requirement is rooted not in the "deceptive device or contrivance" requirement, but rather in Section 10(b)'s separate "in connection with" requirement, and (with respect to private actions) in the reliance and loss-causation requirements. See, *e.g.*, *O'Hagan*, 521 U.S. at 656-657; see also pp. 17-26, *infra*. Respondents did not seek dismissal in the district court on the ground that the "in connection with" requirement was not satisfied, and neither of the courts below addressed that question.

17

entered into those agreements before the reciprocal advertising agreements. See Scientific-Atlanta Br. in Opp. App. 33-34. By entering into the backdated agreements, respondents conveyed a false appearance of material fact concerning the transactions into which they had entered: *i.e.*, because their conduct not only was likely to, but in fact did, mislead Charter's outside accountant, Arthur Andersen, into believing that the two sets of transactions were discrete. On those alleged facts, respondents' conduct could be found to constitute a "deceptive device or contrivance" under Section 10(b).[8]

**B. Because Petitioner Failed Sufficiently To Allege Reliance, The Court Of Appeals Correctly Upheld The Dismissal Of Petitioner's Complaint**

In order to state a claim against a defendant as a primary violator of Section 10(b), a plaintiff not only must allege that the defendant engaged in "deceptive" or "manipulative" conduct, but also must satisfy "*all* of the [other] requirements for primary liability"—regardless of whether the defendant is itself the issuer of the relevant security or is a "secondary actor" (such as respondents). *Central Bank*, 511 U.S. at 191. Specifically, the plaintiff must allege that the defendant acted with the requisite scienter, see *Ernst & Ernst*, 425 U.S. at 194 n.12, and engaged in the requisite conduct "in connection with" the purchase or sale of a security, see *Dura Pharmaceuticals*, 544 U.S. at 341. Those requirements are elements not only of private actions such as this one, but also of criminal prosecutions and civil enforcement actions for viola-

---

[8]  Indeed, it is unclear why the backdating does not constitute a misstatement that would satisfy even the court of appeals' erroneously restrictive view of Section 10(b). To the extent that the court of appeals' test excludes even some material misstatements, it deviates even further from the proper scope of Section 10(b)'s prohibition on all deceptive conduct.

18

tions of Section 10(b) brought, respectively, by the Department of Justice and the SEC.

Critically for purposes of this case, however, in order to state a claim in a *private* action under Section 10(b) and Rule 10b-5, the plaintiff also must satisfy the requirements of reliance and loss causation. See *Dura Pharmaceuticals*, 544 U.S. at 341-342. Although petitioner sufficiently alleged that respondents had engaged in deceptive conduct for purposes of Section 10(b), petitioner did not sufficiently plead that it had relied on that conduct. The court of appeals' decision upholding the dismissal of petitioner's complaint should be affirmed on that basis.[9]

1. In *Basic Inc.* v. *Levinson*, 485 U.S. 224, 243 (1988), this Court expressly held that reliance is an element of a private action under Section 10(b) and Rule 10b-5. In so holding, the Court recognized that "reliance is and long has been an element of common-law fraud," *ibid.* (citing Restatement (Second) of Torts § 525 (1977)), and explained that "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Ibid.*; see *Schlick* v. *Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974) (reasoning that the element of reliance requires that the defendant's fraudulent conduct have "caused the

---

[9]  The district court accepted respondents' contention that the complaint failed to allege reliance, noting that petitioner "do[es] not assert that * * * [it] relied on any statement, omission or action made by either of [respondents]." Pet. App. 41a. Respondents renewed that contention on appeal. See Scientific-Atlanta C.A. Br. 25-28; Motorola C.A. Br. 15-16. While the court of appeals did not address the reliance issue in detail, it appears to have endorsed the district court's resolution of that issue. See, *e.g.*, Pet. App. 7a (quoting the district court's ruling on reliance); *id.* at 10a (noting that respondents "did not issue any misstatement *relied upon* by the investing public") (emphasis added). In its brief before this Court, petitioner does not contend that the Court should not address the reliance issue, but instead contends only that reliance was sufficiently pleaded. See Br. 37-40.

19

[plaintiff] to engage in the transaction in question"), cert. denied, 421 U.S. 976 (1975). In *Central Bank*, the Court confirmed that reliance was "[an] element critical for recovery under Rule 10b-5," and that, in order to recover in a private action under Section 10(b) and Rule 10b-5, "[a] plaintiff must show reliance on the *defendant's* misstatement or omission" (or other deceptive conduct). 511 U.S. at 180 (emphasis added). Indeed, the importance of strict adherence to the reliance requirement in private actions against secondary actors was a key basis for this Court's rejection of aiding and abetting liability. "Were we to allow the aiding and abetting action proposed in this case," the Court reasoned, "the defendant could be liable without any showing that the plaintiff *relied upon the aider and abettor's statements or actions*." *Ibid.* (emphasis added).[10]

In this case, petitioner does not contend that it relied upon respondents' allegedly deceptive conduct (*i.e.*, the backdating of the contracts increasing the price of the set-top boxes) in engaging in the relevant transactions (*i.e.*, the purchase of Charter shares). In fact, petitioner does not contend that it (or the investing public) was even aware of the transactions that respondents executed with Charter. Instead, petitioner freely concedes that "[r]espondents did not themselves disseminate the false information to the securities market," Br. 38, and alleges only that the backdating of the contracts assisted *Charter* in mischaracterizing the payments from respondents as revenue (and thus in inflating its operating cash flow in its financial statements). See, *e.g.*, Scientific-Atlanta Br. in Opp. App. 33-34. Those allegations might rise to the

---

[10] See Restatement (Second) of Torts § 537 (1977) (providing that "[t]he recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, * * * he relies on the misrepresentation in acting or refraining from action, and * * * his reliance is justifiable").

20

level of aiding and abetting Charter's misstatements, but they fail to establish petitioner's reliance on respondents' misconduct.[11] Because petitioner (and other investors) at most relied only on Charter's misstatements, and not on respondents' apparently undisclosed deceptive conduct, petitioner has failed sufficiently to allege reliance for purposes of its claim against respondents. See *Central Bank*, 511 U.S. at 180.

Petitioner contends (Br. 38, 39) that reliance is nevertheless sufficiently alleged because, but for respondents' deceptive conduct, Charter could not have made the misstatements on which it (and other investors) allegedly relied in purchasing Charter stock. But alleging "but-for" causation is no substitute for alleging reliance on respondents' own conduct. "But-for" causation does not distinguish primary from secondary liability; alleged misconduct by secondary actors is frequently necessary to fraudulent schemes (as the facts of *Central Bank* illustrate), but that alone does not make those actors primarily liable. Petitioner does not dispute that Charter independently decided to make the misrepresentations in its financial statements; indeed, in its complaint, petitioner seemingly recognizes that Charter could have accounted for its transactions with respondents in a way that would have rendered its financial statements accurate. See Scientific-Atlanta Br. in Opp. App. 4; cf. Pet. Br. 38 (alleging only that Charter's misstatements "built upon" respondents' deceptive conduct). Conversely, Charter could have misrepresented its operating cash flow in other respects without engaging in these transactions. The critical point is that it was Charter's

---

[11] As discussed above, reliance is not an element in an enforcement action brought by the government under Section 10(b). Accordingly, a defendant as to whom reliance cannot be shown may nonetheless be liable in such an action, either as a principal violator or as an aider and abettor, even though it would be at most an aider and abettor (and therefore not liable) in the context of a private action.

21

misrepresentation of its cash flow, not respondents' conduct, on which petitioner allegedly relied.

Petitioner, moreover, does not contend that respondents affirmatively induced Charter to make the misstatements or that respondents actually drafted, created, or otherwise made those misstatements themselves.  As numerous courts of appeals have correctly held, a secondary actor cannot be held liable in a private securities action by virtue of a plaintiff's reliance on misstatements that were not "made" by the secondary actor.  See, *e.g. Fidel* v. *Farley*, 392 F.3d 220, 235 (6th Cir. 2004) (holding that accounting firm could not be liable for failing to correct issuer's misleading financial statements because it "did not make a material misstatement or omission"); *Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194, 1205-1207 (11th Cir. 2001) (holding that, notwithstanding "allegations of substantial assistance in the alleged fraud," "no statements attributable to [defendant] were ever made to [p]laintiffs; therefore, [p]laintiffs could not have relied on [defendant] in making their investment decisions"); *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (noting that "[r]eliance only on representations made by others cannot itself form the basis of liability") (citation omitted; brackets in original), cert. denied, 525 U.S. 1104 (1999); *Shapiro* v. *Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) (stating that accountants "must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors" in order to be liable) (citation omitted); *Anixter* v. *Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) (same); see also SEC Br. at 17-18, *Klein* v. *Boyd*, No. 97-1143, 1998 WL 55245 (3d Cir. Feb. 12, 1998)  <www.sec.gov/pdf/klein.pdf> (arguing that a person who "*creates* a misrepresentation  *  *  *  can be liable as a primary violator," but that

22

person who merely "knew of misrepresentations" but had not "created" them "would not be liable as a primary violator").[12]

This Court's decision in *Central Bank* is to the same effect. As the Court emphasized in that case, secondary actors may be held liable in a private action under Section 10(b), but only when, *inter alia*, reliance on *their* conduct has been demonstrated: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or *makes* a material misstatement (or omission) *on which a purchaser or seller relies* may be liable as a primary violator." 511 U.S. at 191 (emphases added). Words or actions by a secondary actor that facilitate an issuer's misstatement, but are not themselves communicated to investors, simply cannot give rise to reliance (and thus primary liability in a private action). That principle is at the heart of the distinction between primary liability and secondary liability of the kind rejected in *Central Bank*.

In this case, there is an additional reason to conclude that the complaint fails to satisfy the reliance requirement. While respondents' conduct allegedly related to Charter's statements inflating its operating cash flow by at least $17 million in the fourth quarter of 2000, petitioners allege that Charter also engaged in other, contemporaneous fraudulent acts to misrepresent its revenues and costs—thus raising the question whether the decision of petitioner (or any other investor) to purchase Charter stock, in reliance on Charter's rosy financial reports, could be connected even in an attenuated sense to respondents' conduct (which appears to have given rise

---

[12]  The courts in *Ziemba*, 256 F.3d at 1205, and *Wright*, 152 F.3d at 175, also held that misstatements made by a secondary actor must be *publicly attributed* to the secondary actor before liability can attach in a private action. There is no need to consider the correctness of that requirement in this case, because no misstatements made by respondents were disseminated to investors, either with or without attribution.

23

only to a fraction of the total overstatement in operating cash flow).

For example, the complaint alleges that Charter engaged in a variety of practices that materially overstated its operating cash flow in 2000 (the year in which respondents' transactions occurred) by $195 million, and its operating cash flow for 2001 by $292 million. See Scientific-Atlanta Br. in Opp. App. 5, 66. But respondents' conduct could account for no more than $17.53 million of the overstatement, or less than 10% of the total for 2000. The complaint also alleges that Charter materially inflated its subscriber growth rate and misstated its expenses. *Id.* at 3, 38-40. Thus, even if this Court were to adopt petitioner's erroneous effort to equate reliance with mere "but-for" causation, but see *Dura Pharmaceuticals*, 544 U.S. at 344 (endorsing "the need to prove proximate causation"), it is difficult to see how petitioner could satisfy such a requirement, because, taking the facts as alleged in the complaint as true, there is no basis for concluding that, but for respondents' conduct, petitioner would not have purchased Charter stock. Under any standard for reliance, therefore, petitioner's complaint is deficient. Where a cause of action for aiding and abetting exists, an aider and abettor may be held accountable for losses resulting from the scheme it aided, but a theory of primary liability must focus on the actions of the defendant on which the plaintiff allegedly relied.[13]

---

[13] In *Simpson* v. *AOL Time Warner Inc.*, 452 F.3d 1040 (2006), petition for cert. pending, No. 06-560 (filed Oct. 19, 2006), the Ninth Circuit held that the reliance requirement would be satisfied as long as "the introduction of misleading statements into the securities market was the intended end result of a scheme to misrepresent revenue." *Id.* at 1051. In amicus briefs in that case, the SEC took the position that "[t]he reliance requirement is satisfied where a plaintiff relies on a material deception flowing from a defendant's deceptive act, even though the conduct of other participants in the fraudulent scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction." SEC Reply Br. at 12, *Simpson*, *supra* (No. 04-55665)

24

2.  Just as petitioner has failed sufficiently to allege that it actually relied on defendants' conduct in purchasing Charter stock, so too has petitioner failed to show that it is entitled to a presumption of reliance.[14]  This Court has recognized presumptions of reliance in only two contexts: first, when a defendant with a duty to disclose has made a material omission (and it would thus be impossible to show how the plaintiff would have acted if the omitted information had been disclosed), see *Affiliated Ute*, 406 U.S. at 153-154, and second, when a defendant commits "fraud on the market" by publicly making material misstatements concerning an efficiently traded security, see *Basic*, 485 U.S. at 241-247.

Petitioner suggests (Br. 38 & n.14; Scientific-Atlanta Br. in Opp. App. 72) that it can avail itself of the fraud-on-the-market presumption.  Even assuming, however, that the fraud-on-the-market presumption would be available in an action *against Charter* for its misstatements concerning the transactions with respondents, such a presumption could not assist petitioner in establishing reliance with respect to its claim against respondents.  By its very terms, the presump-

---

(Feb. 7, 2005) <http://www.sec.gov/litigation/briefs/homestore_020405.pdf>. The SEC's briefs, however, were filed without the involvement of the Solicitor General, and the position on reliance that was expressed in those briefs does not reflect the views of the United States.  For the reasons stated in text, that position, and the Ninth Circuit's holding on reliance in *Simpson*, are inconsistent with *Central Bank* (and with this Court's other cases concerning the reliance requirement).

[14] As a practical matter, without a presumption of reliance, petitioner would probably be unable to proceed with a class action, because the individualized issue of reliance would "overwhelm[]" any common issues (and thereby preclude class certification under Federal Rule of Civil Procedure 23(b)(3)). *Basic*, 485 U.S. at 242; see, *e.g.*, *Regents of the Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 394 (5th Cir. 2007) (holding that, because no presumption of reliance was available in a case involving similar allegations against secondary actors, the district court erred by granting class certification), petition for cert. pending, No. 06-1341 (filed Mar. 5, 2007).

25

tion applies only to publicly disseminated misrepresentations: "Because most *publicly available* information is reflected in market price, an investor's reliance on any *public* material misrepresentations * * * may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247 (emphases added). Petitioner's complaint does not identify any public statements or actions by respondents. Accordingly, petitioner cannot rely on the fraud-on-the-market theory to satisfy the reliance requirement here.

3. For many of the same reasons that the complaint does not satisfy the reliance (or transaction-causation) requirement, it also does not satisfy the related loss-causation requirement.[15] In order to show loss causation, a plaintiff must prove that the defendant's fraudulent conduct "proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals*, 544 U.S. at 346; see 15 U.S.C. 78u-4(b)(4) (codifying loss-causation requirement). In its complaint, petitioner alleges only that it purchased stock during a specified class period. See Scientific-Atlanta Br. in Opp. App. 2, 7. Petitioner does not allege that *respondents'* conduct caused its loss; indeed, petitioner does not even specifically allege how (and when) it was revealed that Charter had misrepresented its operating cash flow as it related to the transactions with respondents, much less that petitioner (or other class members) still held its

---

[15] Although respondents appear to have raised the loss-causation issue in the district court (see Scientific-Atlanta Mot. to Dismiss 20), they did not separately raise the issue in the court of appeals, and that court did not address it. Because of the purely legal nature of that issue, however, which is conceptually linked to the reliance issue (in that both address aspects of causation), and in view of the need for clarity and certainty regarding the scope of the implied private right of action under Section 10(b), the Court may wish to exercise its discretion to address that alternative ground for affirmance. See, *e.g.*, *United States* v. *Nobles*, 422 U.S. 225, 240 n.15 (1975).

26

Charter stock at the time that the revelation occurred.[16]  Petitioner, moreover, does not allege that any injury it suffered from a decline in Charter's share price was attributable to the revelation that Charter had misrepresented its cash flow as it related to the transactions with respondents, as opposed to revelations concerning the numerous other fraudulent acts in which Charter allegedly engaged.  See *id.* at 6 (generically alleging that Charter's share price fell during and after the class period as a result of "[i]ncreasing skepticism regarding the accuracy of [Charter's] prior disclosures" and "the disclosure of [a] [g]rand [j]ury [i]nvestigation" into Charter's accounting practices); cf. *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (requiring plaintiff to show that "there is a reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information").  Petitioner's complaint thus fails sufficiently to allege loss causation, as well as reliance.

### C. Allowing The Complaint In This Case To Proceed Would Dramatically Broaden The Inferred Right Of Action In Section 10(b) And Rule 10b-5

In the wake of this Court's decision in *Central Bank*, Congress considered, and rejected, a proposal to create an express private right of action for aiding and abetting under Section 10(b), and chose instead to authorize only the SEC to seek civil redress against aiders and abettors.  See, *e.g.*, 15 U.S.C. 78t(e); S. Rep. No. 98, 104th Cong., 1st Sess. 19 (1995).  Congress thus struck a careful and deliberate balance between open-ended secondary liability, on the one hand, and

---

[16]  The amended complaint alleges only that, on June 18, 2002, an analyst expressed the view that Charter "ha[d] a more aggressive capitalization policy" than other cable operators (and that Charter "ha[d] done some marketing deals with equipment vendors").  Scientific-Atlanta Br. in Opp. App. 63-64.

27

impunity for aiders and abettors, on the other.  Allowing liability for a primary violation under the circumstances presented here would effectively circumvent that congressional judgment and would constitute a sweeping expansion of the judicially inferred private right of action in Section 10(b) and Rule 10b-5.

1.  This Court first recognized the existence of an inferred private right of action under Section 10(b) and Rule 10b-5 in *Bankers Life*, 404 U.S. at 13 n.9, at a time when the Court took the view that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute.  *J.I. Case Co.* v. *Borak*, 377 U.S. 426, 433 (1964).  Since that time, however, the Court has consistently warned against judicial inference of private rights of action not specifically authorized by Congress.  See, *e.g.*, *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 727 (2004); *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61, 67 & n.3 (2001); *Alexander* v. *Sandoval*, 532 U.S. 275, 287-288 (2001).  The Court has also repeatedly warned against extending preexisting inferred rights of action to new contexts.  See, *e.g.*, *Wilkie* v. *Robbins*, 127 S. Ct. 2588, 2604-2605 (2007); *Malesko*, 534 U.S. at 74; *Schweiker* v. *Chilicky*, 487 U.S. 412, 421 (1988).

It would greatly expand the inferred private right of action under Section 10(b) and Rule 10b-5 if "secondary actors" could be held primarily liable whenever they engage in allegedly deceptive conduct, even if investors do not rely on (and are not even aware of) that conduct.  Such a rule would expose not only accountants and lawyers who advise issuers of securities, but also vendors (such as respondents) and other firms that simply do business with issuers, to potentially billions of dollars in liability when those issuers make misrepresentations to the market.  Such a rule would thereby considerably widen the pool of deep-pocketed defendants that could be

28

sued for the misrepresentations of issuers, increasing the likelihood that the private right of action will be "employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). Moreover, extending liability to vendors could have the effect of substantially expanding liability for foreign companies that trade with publicly listed companies. Likewise, creating new and unpredictable liability for closely regulated entities like banks could create particular problems and greatly complicate the task of regulators. And the expansion of liability would raise difficult questions concerning the apportionment of liability where, as here, the conduct of the secondary actor relates only to a small part of a broader fraudulent scheme. See, *e.g.*, 15 U.S.C. 78u-4(f)(3)(C) (providing that, in apportioning liability, the trier of fact should consider "the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs" and "the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs").[17]

Permitting secondary actors to be held liable under these circumstances would also be inconsistent with the much narrower private rights of action that Congress expressly created in other provisions of the securities laws. This Court has repeatedly looked to those express rights of action in defining the contours of the inferred right of action in Section 10(b) and Rule 10b-5. See, *e.g.*, *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U.S. 350, 359-360 (1991). In construing those express rights of action, moreover, the Court has strictly defined the class of persons who can be held lia-

---

[17] Indeed, a rule that permitted secondary actors to be held liable would raise the specter of joint and several liability where such an actor was found to have "knowingly" violated the securities laws. See 15 U.S.C. 78u-4(f)(2)(A).

29

ble. For example, in *Pinter* v. *Dahl*, 486 U.S. 622 (1988), the Court rejected the proposition that Section 12(1) of the Securities Act of 1933, 15 U.S.C. 77*l*(1), which imposes liability on any person who "offers or sells" an unregistered security, reaches any person whose participation in the transaction was a "substantial factor" in the transaction's occurrence. *Pinter*, 486 U.S. at 649. Petitioner's proposed rule not only would be inconsistent with the Court's practice in construing *express* rights of action, but would threaten to swamp those rights of action by creating an all-encompassing inferred right of action under Section 10(b) and Rule 10b-5. See, *e.g.*, 15 U.S.C. 77b(a)(11), 78t(a) (imposing liability on secondary actors only to the extent that they "control" persons who violate the securities laws); 15 U.S.C. 78r(a) (imposing liability on parties that "cause to be made" a false statement in an SEC filing, where the plaintiff acted "in reliance upon such statement"); cf. *Central Bank*, 511 U.S. at 180 (noting that "it would be * * * anomalous to impute to Congress an intention in effect to expand the defendant class for 10b-5 actions beyond the bounds delineated for comparable express causes of action").

2. Moreover, at the same time that it refused to create an express *private* right of action for aiding and abetting under Section 10(b), Congress expressly authorized the SEC to pursue civil enforcement actions on a theory of aiding and abetting liability for violations of the 1934 Act. See 15 U.S.C. 78t(e). In such actions, a person may be liable as an aider and abettor if the person "knowingly provides substantial assistance" to a primary actor's violation of the securities laws. *Ibid.*; cf. *Central Bank*, 511 U.S. at 168 (listing elements of preexisting private action for aiding and abetting). The SEC therefore can take action not only against any party that itself engages in deceptive or manipulative conduct in violation of Section 10(b), but also against any party that knowingly facilitates *another* party's deceptive or manipulative conduct: *e.g.*,

30

when, as is alleged to have occurred here, a party enters into a deceptive transaction in the knowledge that the other party intends to make misrepresentations concerning that transaction to its investors.

More fundamentally, Congress's unwillingness to recognize a private right of action for aiding and abetting suggests that this Court should be loath to create the functional equivalent of such a right of action itself.  Cf. *Alexander*, 532 U.S. at 290 (noting that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others").  Such an action would upset the deliberate balance struck by Congress.  Insofar as petitioner and its amici advance various policy arguments in favor of broad liability for secondary actors, there are ample policy arguments to the contrary (some of which apparently struck a chord when Congress last expressly addressed the issue).  In any event, all of those policy arguments "are more appropriately addressed to Congress than to this Court." *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 156 n.12 (1976).

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

PAUL D. CLEMENT
*Solicitor General*

THOMAS G. HUNGAR
*Deputy Solicitor General*

KANNON K. SHANMUGAM
*Assistant to the Solicitor General*

AUGUST 2007

# EXHIBIT D

# REFCO GROUP HOLDINGS, INC.

## OFFICERS' CERTIFICATE

### August 5, 2004

The undersigned, Phillip Bennett, does hereby certify that he is the duly elected, qualified and acting President of Refco Group Holdings, Inc., a Delaware corporation ("RGHI"), and that, as such, he is authorized to execute and deliver this Certificate as an officer of RGHI, and not individually, pursuant to Section 6.2(a) and (b) of the Equity Purchase and Merger Agreement by and among Refco Group Ltd., LLC, RGHI, THL Refco Acquisition Partners and New Refco Group Ltd., LLC, dated as of June 8, 2004 (as amended by that certain First Amendment to Equity Purchase and Merger Agreement dated as of July 9, 2004, the "Purchase Agreement"), and further certifies in his capacity as an officer of RGHI, and not individually, as set forth below. All capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Purchase Agreement.

1. The representations and warranties of RGHI set forth in Article 3 of the Purchase Agreement that are not qualified by materiality or "Material Adverse Effect" are true and correct in all material respects, and the representations and warranties of RGHI set forth in Article 3 of the Purchase Agreement that are qualified by materiality or "Material Adverse Effect" are true and correct in all respects, as of the date hereof as though made on and as of the date hereof, except to the extent such representations and warranties are made on and as of a specified date, in which case the same continues on the date hereof to be true and correct (in all material respects or in all respects, as applicable) as of the specified date;

2. RGHI has performed and complied in all material respects with all covenants required to be performed or complied with by RGHI under the Purchase Agreement on or prior to the date hereof.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1232327.3  03210817

MB02056151

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate as of the date written above.

REFCO GROUP HOLDINGS, INC.

By: _____

Name: Phillip R. Bennett
Title:   President

1232327.3  03210817

**MB02056152**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# REFCO GROUP LTD., LLC

## OFFICERS' CERTIFICATE

### August ⊆, 2004

The undersigned, Phillip Bennett, does hereby certify that he is the duly elected, qualified and acting President of Refco Group Ltd., LLC, a Delaware limited liability company (the "Company"), and that, as such, he is authorized to execute and deliver this Certificate in his capacity as an officer of the Company, and not individually, pursuant to Section 6.2(b) of the Equity Purchase and Merger Agreement by and among the Company, Refco Group Holdings, Inc., THL Refco Acquisition Partners and New Refco Group Ltd., LLC, dated as of June 8, 2004 (as amended by that certain First Amendment to Equity Purchase and Merger Agreement dated as of July 9, 2004, the "Purchase Agreement"), and further certifies in his capacity as an officer of the Company, and not individually, that the Company has performed and complied in all material respects with all covenants required to be performed or complied with by the Company under the Purchase Agreement on or prior to the date hereof. All capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Purchase Agreement.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1232330.3 03210817

**MB02056154**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate as of the date written above.

REFCO GROUP LTD., LLC

By: _____

Name: Phillip R. Bennett

Title:   President

1232330.3  03210817

MB02056155

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT E

*corp. structure — can't confirm it*
*45-45-16*

WGM Draft
~~2/20/04~~
2/26

**PROJECT ROYCE**
**Open Diligence Issues**

I.    **Additional Diligence Items Needed**

1) Employment Agreements or arrangements with key employees, if any, such as Philip Bennett, Richard Goldman, Thomas Hack, Joseph Murphy, Santo Maggio, Robert Tan, Robert Trosten, Perry Rotkowitz, Dennis Klejna, and William Sexton.

2) Agreements or arrangements with Executive Committee Members of Refco Group Ltd, Newco LLC – William L. Graham, Edwin L. Cox Jr., Thomas H. Dittmer (Chairman of the Board).

3) Acquisitions listed in the Information Memorandum and Management Presentation which are not in the data room:
   1) Trafalgar Commodities
   2) Friedberg Mercantile Group
   3) Carlton Brokerage (UK)
   4) Mac Futures (UK)
   5) Global Institutional Services Division

4) General information about the following which are in the data room but not in the Information Memorandum or Management Presentation:
   1) QV Trading Systems, Inc.
   2) CFG Financial Group, Inc.
   3) Professional Market Brokerage
   4) Spear Leads & Kellogg, LP – is this the same entity as SLK Locals Group?

5) Organizational files of the following subsidiaries are missing from the data room:
   1) Tilney Holdings
   2) Edinburgh Fund Managers
   3) Refco Managed Futures, LLC
   4) MCC Futures Mgmt. L.P.
   5) Refco Hong Kong Limited
   6) Refco Global Finance Ltd.
   7) Peconic Partners LLC a/k/a Stamford Advisors
   8) Refco Europe Ltd.
   9) MacFutures
   10) Refco Overseas Ltd.
   11) Westminster Derivatives Ltd.
   12) Westminster Clearing Ltd.
   13) Refco India Pte. Ltd.
   14) Refco Sify Securities (India) Ltd. (60%)

NY2:\1372488\01\TF0_01!.DOC\77356.0001

CONFIDENTIAL                                                                 WGM-L 0011186

15) Refco Futures, Canada
16) Refco (Singapore) Pte. Ltd.
17) Refco Investment Services Pte. Ltd. (Singapore)
18) Refco Taiwan, Ltd.
19) Refco Securities SSA
20) Refco Japan, Ltd.
21) Refco Capital Markets, Ltd.
22) Refco Capital Markets Int'l, Ltd.
23) Refco Capital Markets Int'l Services, Ltd.

6) Organizational documents for Refco Group Holdings, Inc., Refco Group Holdings, LLC and BAWAG Overseas, Inc. (owners of Refco Group Ltd., LLC)

7) The data room contains formation documents with respect to the following entities that are not listed in the corporate structure of Refco Group Ltd., LLC:
    1) Refco Global Capital Management LLC
    2) Refco Mortgage Securities LLC
    3) Market Educational Institute LLC
    4) Lind-Waldock (Newco) LLC
    5) Forstmann-Leff International Associates, Inc.
    6) Summit Management (Newco) LLC
    7) Bersec International LLC

8) Litigation – data room only has a chart of litigation from 2003 and 2002. We would like to see information for prior years and have access to the litigation documents.

9) Organizational Documents for Foreign Subsidiaries

10) Copy of 9.18% Senior Notes documentation

11) Copy of Unsecured Revolving Credit Facility documentation

12) Minor Points to Keep Track of
    a) Executed copy of LLC Agreement of Refco Global Capital Management, LLC
    b) Subscription Agreement for Refco Securities, LLC
    c) Merger documents for Lind-Waldock Securities LLP
    d) Ownership structure of Forstmann-Leff Associates, LLC (certificate for other 49 shares)
    e) Copy of Proceeds Participation Agreement between Refco Group, Ltd. LLC and DF Capital Inc.

CONFIDENTIAL                                                           WGM-L 0011187

## II.    Open Questions – As to items we've seen

1)  Market Educational Institute, Inc. (formerly Refco Educational Services, Inc.) – LLC has Voting and Non-Voting Members.  Agreement is not signed.  It is unclear where this entity is in the structure chart, what it does, and whether there are Members other than wholly owned by affiliates of Refco Group, Ltd. LLC.  Appears to be related to the Main Street Acquisition.

2)  Status and information on an entity called Futures Now.

3)  **Vendor agreements between vendors of a technology platform (system) – third party.  They are very dependent on third party providers of technology. Some statements made about vendors and there are no agreements for those vendors.  Refco EasyScreen JV, which is not in the documents.  There is LeoWeb.  Something provided by Trading Technologies (by X Trader), product called CrossFire, provided by Future Dynamics; Futures Point (platform owned by Matrix, supported by Refco.)  No agreements in data room that support the relationships with these vendors.  Limited consulting agreements for IP.  Don't know if it's the universe of stuff.

4)  There was a shareholders agreement related to the Main Street and Newhall Purchase.

5)  Information on capital structure of Refco Group Ltd., LLC (need Schedule I to Refco Group Ltd. LLC Agreement)

6)  Ownership Structure of Refco Securities, LLC (need executed LLC Agreement)

7)  Information on current status of Refco Securities, LLC w/r/t Refco Securities, Inc. failed merger

8)  Details as to disciplinary actions against Forstmann-Leff Associates, LLC as per their Form ADV

## III.    Open Questions - Generally

1)  Contracts with exchanges, fee agreements with CFTC or NFA

2)  Customer contracts

3)  Information about foreign operations

4)  Hard to tell what each entity does on a day to day basis

CONFIDENTIAL                                                                         WGM-L 0011188

5) Foreign regulatory issues

6) We don't know a whole lot about the acquired businesses

7) No apparent history of the company prior to 1999

8) Relationship of P. Bennett and T. Grant to entities owning Refco Group Ltd., LLC

CONFIDENTIAL                WGM-L 0011189

# EXHIBIT F

**Refco Group Ltd., LLC** *Formation* *formed*

Certificate of ~~Incorporation~~: ~~incorporated~~ Jan. 7, 1999

Limited Liability Company Agreement
- Membership Shares
  - o 3 Authorized Classes
    - Voting Membership Shares – 947 issued & outstanding (can vote on any issue)
    - Non-Voting Membership Shares – 53 issued & outstanding (can only vote on creation of class of Membership Interests having liquidation preference over them or dissolution of the company)
    - Profits Membership Shares (no voting rights) – *None are currently issued.*
  - o Company & holders of Voting Membership Shares not allowed to vote to permit company to issue any new shares of any class except as contemplated by Proceeds Participation Agreement dated as of July 12, 2002 between company & DF Capital Inc. *(get copy of?)*
  - o Issuance of additional Shares requires making capital contribution and unanimous approval of BoM and Voting Members
  - o *Missing Schedule I listing initial owners of Membership Shares*
  - o Legend on Certificate of Membership Interest states that shares "can only be assigned as permitted by the Limited Liability Company Agreement".
- Distributions – net cash flow shall be distributed among the Members pro rata in accordance with their respective Membership Shares from time to time as determined by the BoM *(which includes holders of Voting Membership Shares, Non-Voting Membership shares and Profits Membership Shares.)*
  - o If interest of a Member is converted to a Designated Interest (only occurs upon withdrawal of a Profits Member), no distribution of net cash flow to such Designated Interest; BoM has discretion to distribute Designated Amount for Designated Interest upon consultation with Active Members
  - o Guideline is for BoM to distribute 75% of net cash flow of the company in respect of each fiscal year; distribution of another amount must be unanimously approved by Voting Members
- Allocations of profits and losses to Members shall be made in accordance with their respective Membership Shares *(pro rata)*
- *Governance* • Board of Managers – not less than 1 and not more than 15; originally fixed at 1; elected by Voting Members (Sole manager as of 1/7/00 was Phillip Bennett)
- New Members
  - o Admittance as a Member only upon approval of BoM & Voting Membership Shareholders and execution of LLC Agreement by new Member; new Profits Member can be admitted with approval of BoM & execution of LLC Agreement
  - o No assignment of Membership Shares without unanimous consent of all Voting Members except to an affiliate or family member of transferring Member

*BawAG has an observer*

*Assignment –*

*BoM forms an Executive Committee*

A:\NOTES ON REFCO GROUP LTD LLC.DOC

CONFIDENTIAL    WGM-L 0010412

Unanimous Consent of Board of Managers dated May 14, 1999
- Merged Refco Group Ltd. (Newco) LLC with Refco Group Ltd. (a DE corp.), with LLC as surviving company
- Elected Executive Committee:
  - Phillip R. Bennett
  - William L. Graham
  - Edwin L. Cox, Jr.
- Elected Officers:
  - Chairman of the Board –        Thomas H. Dittmer
  - President & CFO –              Phillip R. Bennett
  - Exec. VP & COO –              Kathryn Meyer
  - Exec. VP & Gen. Counsel –     Dennis A. Klejna
  - Exec. VP, Global Sales –       Joseph A. Murphy
  - Treasurer –                    Perry Rotkowitz
  - Secretary –                    Philip Silverman
- Issued Certificates of Membership Interests:
  - 100 Voting Shares & 700 Voting Shares to Refco Group Holdings, Inc.
  - 100 Voting Shares to Refco Group Holdings, LLC
- Authorized Purchase Agreement under which Certificate for 47 Voting Shares and Certificate for 53 Non-Voting Shares (10% of outstanding Membership Shares of the company) are to be issued to BAWAG Overseas, Inc. (a DE corp.) for $95 million
- Signed by all members of Board of Managers (Bennett, Graham, Dittmer, Cox)

Unanimous Written Consent of Board of Managers dated July 1, 2000
- Elected Robert C. Trosten as Executive Vice President & CFO
- Signed by all then-current Managers of Company (Bennett, Joseph J. Murphy)

Unanimous Written Consent of Board of Managers dated June 1, 2002
- Elected Thomas Hackl as Executive Vice President
- Signed by all then-current Managers of Company (Bennett, Joseph J. Murphy)

Company owns 15% of QV Trading Systems

CONFIDENTIAL                                                                      WGM-L 0010413

# EXHIBIT G

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 2/17
OCT 19 '99 19:07 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.02/17

**Refco Group Ltd., LLC**

One World Financial Center
200 Liberty Street • Tower A
New York, NY 10281-1094

Telephone
212-693-7000

*Q's:*
*① if combine loan to Hrldgs +*
*  L+d ⟹*
*  what % of K, sub*
*  debt +*
*  total debt?*

October 15, 1999

**REFCO**®

*② if loan to parent*
*  % of parent's*
*  K, sub debt,*
*  total debt.*

Joseph P. Collins, Esq.
Mayer, Brown & Platt
1675 Broadway – 19 floor
New York, NY 10019

Dear Joe:

RE: **BAWAG/Refco**

Following our discussions on the structure of the Refco/BAWAG deal I had tried to analyze the Wells Fargo footnote as a means of responding in a comparable way to questions concerning the BAWAG loan to Refco Group Holdings. I found this difficult particularly as the definition of "Borrower" in the footnote is not all together clear and I was not sure whether the interpretation applied to Wells Fargo's investment in its subsidiary or the financing activities of that subsidiary with third-party clients. It may prove, therefore, that the comparison is not entirely valid.

In light of this, I think it may be better to focus on an overall analysis of the financial resources of Refco Group and repeat, once again, the arms-length nature of the loan transaction between BAWAG and Refco Group Holdings. Specifically:-

1. Refco Group Holdings is a non-operating holding company. The principal and overwhelming asset is its 90% ownership of Refco Group Ltd. and subsidiaries.

2. Refco Group Holdings is closely held and with the exception of the BAWAG loan has no third-party lending arrangements or equity investors. This, together with a historical policy of strict confidentiality, is the principal reason that the company does not (and is not obligated to) produce financial statements. Refco Group Ltd. and subsidiaries on the other hand produces regular audited financial statements.

3. Given the fact that it is not an operating company, Refco Group Holdings capital (i.e. net worth) is represented by the value of its investment in Refco Group Limited. At May 31, 1999, the net worth of Refco Group Ltd. totaled $446 million. In addition, Refco Group Holdings holds a $16 million subordinated note from a subsidiary of Refco Group Ltd., Refco, Inc. The combined value of Refco

*asset minus loans to RGH*

MB02071243

*2*

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 3/17
OCT 19 '99 19:07 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.03/17

**Refco Group Ltd., LLC**

October 15, 1999
BAWAG/Refco
Page 2

Group Holdings 90% interest in the equity of Refco Group Ltd. plus the principal of the subordinated note is, therefore, approximately $418 million.

4. The loan extended by BAWAG to Refco Group Holdings has a principal value of $85 million. This loan, subject to a Separate Loan Agreement, has been negotiated at arms length and is not convertible into either equity of Refco Group Holdings or equity of Refco Group Ltd. The principal balance of the loan represents approximately 20.3% of the value of Refco Group Holding's investment in Refco Group Ltd.

5. In terms of the commercial viability of the loan, interest and principal can readily be covered by the remittance of dividend payments or distributions from Refco Group Ltd. and its subsidiaries to Refco Group Holdings, its parent entity. There would be not additional call upon the assets of Refco Group Ltd. for debt service.

Given the absence of third-party liabilities or investors at the Refco Group Holdings level and the concentration of Refco Group Holdings assets and net worth in Refco Group Ltd., an audited entity, we can clearly state that the BAWAG loan to Refco Group Holdings, quite apart from being arms-length in nature does not represent a disproportionate share of the capital value of Refco Group Holdings and is in fact less than 25% of that number. Furthermore, the loan has no direct or indirect rights in respect of ownership or financial claims against Refco Group Ltd., which should further support the view that there is no implication of control derived from the existence of the loan.

A copy of the internal management accounts for May 31, 1999, and the audited financial statements for February 28, 1999, are enclosed for information in support of the above financial analysis. Please let me know if you have additional questions.

Yours sincerely,

*[signature]*

Phillip Bennett
President and CEO

kf
Enclosure

*[handwritten annotation]* by 11/30
70MM L-T-Debt to Insur
Cos

MB02071244          3

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 4/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.04/17

Refco Group Ltd., LLC and Subsidiaries
Consolidated Balance Sheet
May 31, 1999
(USD, in thousands)

|  | May 31, 1999 |
|---|---|
| **ASSETS** | |
| Cash and short-term investments, at market value | $    332,822 |
| Margin deposits with commodity exchanges, clearing associations and brokers | 778,256 |
| Receivables: | |
| Brokers and dealers | 95,463 |
| Loans | 436,723 |
| Customers | 1,582,161 |
| Other | 151,623 |
| Financial instruments owned, at market value | 1,302,007 |
| Securities purchased under agreements to resell | 5,996,623 |
| Other assets | 244,551 |
|  | $ 10,900,229 |
| | |
| **LIABILITIES AND SHARE CAPITAL** | |
| Payable to brokers, dealers and other financial institutions | $      82,275 |
| Payable to customers | 2,409,657 |
| Bank loans | 330,885 |
| Notes payable | 28,335 |
| Loans payable | 10,627 |
| Financial instruments sold not yet purchased, at market value | 442,821 |
| Securities sold under agreements to repurchase | 6,740,759 |
| Accounts payable and other liabilities | 112,007 |
|  | 10,155,346 |
| Long-term debt | 130,000 |
|  | 10,285,346 |
| Subordinated debt | 16,000 |
| Minority interest | 27,522 |
| Preferred securities issued by a subsidiary | 125,000 |
| Share capital | |
| Membership shares, $1 par value; 1,000 shares authorized, issued and outstanding | 1 |
| Additional paid-in capital | 223,505 |
| Retained earnings | 228,091 |
| Currency translation adjustment | (5,236) |
|  | 446,361 |
|  | $ 10,900,229 |

The above financial statement is unaudited and is to be used for internal management purposes only.

MB02071245

4

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 5/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.05/17

Refco Group Ltd., LLC and Subsidiaries
Consolidated Statement of Income and Retained Earnings
For the Three Months Ended May 31, 1999
(USD, in thousands)

|  | May 31, 1999 |
|---|---|
| **REVENUES** |  |
| Commissions | $     59,957 |
| Brokerage | 15,473 |
| Interest | 351,026 |
| Principal transactions, net | 13,472 |
| Asset management and advisory fees | 9,461 |
| Other income | 2,088 |
|  | 451,477 |
|  |  |
| **EXPENSES** |  |
| Commissions and order execution costs | 46,456 |
| Interest | 332,731 |
| Employee compensation and benefits | 33,034 |
| General, administrative and other | 23,518 |
|  | 435,739 |
|  |  |
| Income before provision for income taxes, minority interest and dividends on preferred securities issued by a subsidiary | 15,738 |
| Provision for income taxes | 1,968 |
| Income before minority interest and dividends on preferred securities issued by a subsidiary | 13,770 |
| Minority interest | 524 |
| Income before dividends on preferred securities issued by a subsidiary | 13,246 |
| Dividends on preferred securities issued by a subsidiary | 2,976 |
| Net income | 10,270 |
| RETAINED EARNINGS AS OF MARCH 1 | 217,821 |
| RETAINED EARNINGS AS OF MAY 31 | $    228,091 |

The above financial statement is unaudited and is to be used for internal management purposes only.

MB02071246

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 6/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540     P.06/17



**Refco Group, Ltd. and Subsidiaries**
Consolidated Financial Statements
February 28, 1999

MB02071247

ι

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 7/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540        P.07/17

## ARTHUR ANDERSEN LLP

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Refco Group, Ltd.:

We have audited the accompanying consolidated balance sheet of Refco Group, Ltd. (a Delaware corporation) and subsidiaries as of February 28, 1999, and the related consolidated statements of income, changes in stockholder's equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Refco Group, Ltd. and subsidiaries as of February 28, 1999, and the results of their operations and their cash flows for the year then ended in conformity with generally accepted accounting principles.

*Arthur Andersen LLP*

New York, New York
May 19, 1999

MB02071248

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 8/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.08/17

# REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEET

### FEBRUARY 28, 1999

(000's omitted)

### ASSETS

| | |
|---|---:|
| CASH AND SHORT-TERM INVESTMENTS, at market value | $ 226,910 |
| MARGIN DEPOSITS WITH COMMODITY EXCHANGES, CLEARING ASSOCIATIONS AND BROKERS | 844,949 |
| RECEIVABLES: | |
| Brokers and dealers | 159,769 |
| Loans | 257,477 |
| Customers | 1,317,291 |
| Other | 190,986 |
| FINANCIAL INSTRUMENTS OWNED, at market or fair value | 730,715 |
| SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL | 5,092,298 |
| OTHER ASSETS | 236,791 |
| Total assets | $ 9,059,156 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

| | |
|---|---:|
| LIABILITIES: | |
| Payable to brokers, dealers and financial institutions | $ 211,762 |
| Payable to customers | 1,866,920 |
| Bank loans | 244,000 |
| Notes payable | 221,335 |
| Loans payable | 1,351 |
| Financial instruments sold but not yet purchased, at market or fair value | 498,485 |
| Securities sold under agreements to repurchase | 5,196,704 |
| Accounts payable and other liabilities | 171,234 |
| | 8,411,791 |
| LONG-TERM DEBT | 146,000 |
| | 8,557,791 |
| SUBORDINATED DEBT | 16,000 |
| MINORITY INTEREST | 26,998 |
| PREFERRED SECURITIES ISSUED BY SUBSIDIARIES | 125,000 |
| STOCKHOLDERS' EQUITY: | |
| Common stock, $1 par value; 1,000 shares authorized, issued and outstanding | 1 |
| Additional paid-in capital | 120,605 |
| Retained earnings | 217,821 |
| Currency translation adjustment | (5,060) |
| Total stockholder's equity | 333,367 |
| Total liabilities and stockholder's equity | $ 9,059,156 |

The accompanying notes are an integral part of this consolidated balance sheet.

MB02071249

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

REFCO GROUP, LTD. AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF INCOME

FOR THE YEAR ENDED FEBRUARY 28, 1999

(000's omitted)

| | |
|---|---:|
| **REVENUES:** | $    235,687 |
| Commissions | 70,438 |
| Brokerage income | 1,290,553 |
| Interest | 90,425 |
| Principal transactions, net | 34,768 |
| Asset management and advisory fees | 6,660 |
| Other income | 1,728,531 |
| | |
| **EXPENSES:** | 213,510 |
| Commissions and order execution costs | 1,222,903 |
| Interest | 140,845 |
| Employee compensation and benefits | 109,920 |
| General, administrative and other | 1,687,178 |
| Income before restructuring charge, provision for income taxes, minority interest, and dividends on preferred securities issued by subsidiaries | 41,353 |
| RESTRUCTURING CHARGE | 5,000 |
| Income before provision for income taxes, minority interest, and dividends on preferred securities issued by subsidiaries | 36,353 |
| PROVISION FOR INCOME TAXES | 4,497 |
| Income before minority interest and dividends on preferred securities issued by subsidiaries | 31,856 |
| MINORITY INTEREST | 877 |
| Income before dividends on preferred securities issued by subsidiaries | 30,979 |
| DIVIDENDS ON PREFERRED SECURITIES ISSUED BY SUBSIDIARIES | 10,859 |
| Net income | $    20,120 |

The accompanying notes are an integral part of this consolidated statement.

MB02071250

9

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 10/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.10/17

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY

## FOR THE YEAR ENDED FEBRUARY 28, 1999

### (000's omitted)

| | Common Stock | Additional Paid-in Capital | Retained Earnings | Currency Translation Adjustment | Total |
|---|---|---|---|---|---|
| BALANCE, February 28, 1998 | $ 1 | $ 35,605 | $ 197,701 | $ (2,283) | $ 231,024 |
| Contributed capital | - | 85,000 | - | - | 85,000 |
| Net income | - | - | 20,120 | - | 20,120 |
| Currency translation adjustment | - | - | - | (2,777) | (2,777) |
| BALANCE, February 28, 1999 | $ 1 | $ 120,605 | $ 217,821 | $ (5,060) | $ 333,367 |

The accompanying notes are an integral part of this consolidated statement.

-4-

MB02071251

10

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 11/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.11/17

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CASH FLOWS

## FOR THE YEAR ENDED FEBRUARY 28, 1999

### (000's omitted)

| | |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Net income | $   20,120 |
| | |
| Noncash items included in net income- | |
| Depreciation and amortization | 13,223 |
| Minority interest in earnings of subsidiaries | 877 |
| | |
| (Increase) decrease in operating assets- | |
| Margin deposits with commodity exchanges, clearing associations and brokers | (14,050) |
| Receivable from brokers and dealers | (74,648) |
| Loans receivable | (19,926) |
| Receivable from customers | 248,746 |
| Other receivables | (49,029) |
| Financial instruments owned | 396,352 |
| Securities purchased under agreements to resell | (4,169,786) |
| Other assets | (34,345) |
| | (3,702,586) |
| | |
| Increase (decrease) in operating liabilities- | |
| Payable to brokers, dealers and financial institutions | (45,509) |
| Payable to customers | (54,311) |
| Bank loans | 87,251 |
| Notes payable | 71,260 |
| Loans payable | (64,948) |
| Financial instruments sold but not yet purchased | (450,264) |
| Securities sold under agreements to repurchase | 3,922,192 |
| Accounts payable and other liabilities | 19,650 |
| | 3,485,321 |
| Cash used in operating activities | (197,145) |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Repayment of long-term debt | (34,400) |
| Repayment of subordinated debt | (12,295) |
| Issuance of preferred securities by a subsidiary | 50,000 |
| Proceeds from contributed capital | 85,000 |
| Net cash provided by financing activities | 88,305 |
| Net decrease in cash and short-term investments | (108,840) |
| | |
| CASH AND SHORT-TERM INVESTMENTS, February 28, 1998 | 337,750 |
| CASH AND SHORT-TERM INVESTMENTS, February 28, 1999 | $   228,910 |

The accompanying notes are an integral part of this consolidated statement.

-5-

MB02071252

11

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

REFCO GROUP, LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

FEBRUARY 28, 1999

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements include the accounts of Refco Group, Ltd. (the "Company") and its subsidiaries (the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Company's worldwide headquarters in Chicago is complemented by a network of United States and international offices.

The consolidated financial statements include the accounts of each of the Company's subsidiaries, all of which are either wholly or majority owned. All material intercompany transactions and balances have been eliminated in consolidation.

The preparation of consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. In the opinion of management, these estimates are not material to the financial position of the Group.

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year-end spot rate. Gains and losses resulting from foreign currency transactions are included in the consolidated statement of income. Gains and losses resulting from translating foreign currency financial statements into U.S. dollars are included in currency translation adjustment, as a separate component of stockholder's equity.

Cash and short-term investments are defined as segregated and nonsegregated cash and short-term, liquid investments with maturities of 90 days or less when acquired.

Financial instruments owned and financial instruments sold but not yet purchased are recorded on a trade date basis and consist primarily of U.S. and foreign equity and fixed income securities as well as derivative financial instruments which are stated at market value or fair value, with unrealized gains and losses included in income.

Loans receivable are stated at principal value, are generally due on demand and bear interest at variable market rates. Loans receivable are renewed at the option of the Group.

-6-

MB02071253

17

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 13/17
OCT 19 '99 19:10 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.13/17

Securities purchased under agreements to resell and securities sold under agreements to repurchase are accounted for as collateralized financing transactions and are recorded at the amount at which the securities will be resold or repurchased, including accrued interest. The Group generally controls access to the collateral pledged by the counterparties, which consists largely of securities issued by the U.S. Government and foreign sovereign governments. The value and adequacy of the collateral are continually monitored. Consequently, the risk of credit loss from counterparties' failure to perform in connection with collateralized lending activities is minimal.

The Company continues to report assets as owned when they are pledged as collateral in secured financing arrangements and the secured party cannot sell or repledge the assets or the Company can substitute collateral or otherwise redeem it on short notice. The Company continues not to report securities received as collateral in secured financing arrangements because the debtor typically has the right to substitute or redeem the collateral on short notice.

The Company recognizes commissions earned on customers' open futures positions on a half-turn basis.

2. **RECEIVABLES FROM AND PAYABLE TO BROKERS AND DEALERS, FINANCIAL INSTITUTIONS AND CUSTOMERS**

These balances primarily pertain to margin and open contractual commitments related to futures, foreign currencies and securities transactions. These receivables are generally secured or collateralized. For certain receivables that are not fully secured and where the Company deems appropriate, the Company pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate. The Group nets receivables and payables related to its foreign currency and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

3. **BANK LOANS, NOTES PAYABLE, SUBORDINATED DEBT, AND LONG-TERM DEBT**

The Company maintains a committed unsecured revolving credit facility of $135 million under an agreement with a syndicate of banks. The agreement contains covenants which require, among other things, that the Company maintain specified levels of liquidity and tangible net worth, as defined in the agreement. Borrowings under this line at February 28, 1999 totaled $85 million and are included under bank loans in the accompanying financial statements.

Remaining Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers. At February 28, 1999, the Group had approximately $128 million of secured bank loans for which the Group had collateral pledged of approximately $223 million.

Notes payable include amounts due to former shareholders of acquired companies, a term loan from a financial institution, and obligations issued by a subsidiary. These notes bear interest at negotiated rates and have maturity dates through December 31, 2000.

-7-

MB02071254                    13

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 14/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.14/17

Subordinated debt due to the stockholder bears interest at the prime rate and is subordinated to the claims of present and future general creditors. During 1999, the weighted average interest rate on subordinated debt was 8.23%. The maturity date is May 31, 2000.

Subordinated debt can be repaid only if after giving effect to such repayment, certain regulated subsidiaries meet the capital requirements governing repayment of subordinated debt.

Long-term debt of $146 million represents unsecured senior notes with maturities ranging from May 16, 1999 to December 18, 2006. These loans bear interest at rates ranging from 7.18% to 8.21%, which are fixed rates based upon market rates at their respective dates of issuance.

## 4. REGULATORY CAPITAL REQUIREMENTS

The Company operates globally through a network of subsidiaries, with several being subject to regulatory requirements in the United States. Certain subsidiaries of the Company are subject to either minimum financial requirements as set forth by the Commodities Futures Trading Commission or the net capital requirement of the Securities Exchange Commission (the "SEC"). In accordance with these regulations, at February 28, 1999, these subsidiaries are required to maintain minimum net capital, as defined, of approximately $55.3 million and have excess net capital of approximately $94.7 million.

## 5. CONTINGENCIES

Two subsidiaries of the Company, together with several other financial institutions, including primary government securities dealers, have been named as defendants in civil actions. Another subsidiary of the Group has been named as a defendant in several lawsuits and arbitrations which involve claims that aggregate to substantial amounts.

With regard to these civil actions and arbitrations, the Company, its subsidiaries and legal counsel believe that the resolution for these matters will not have a material adverse effect on the financial condition and results of operations of the Company.

## 6. INCOME TAXES

Effective January 1, 1997, the Group's parent filed an election with the United States Internal Revenue Service to be treated as an S corporation for U.S. federal income tax purposes, as defined in the regulations. Under these regulations, the stockholder of the Group is responsible for the federal income tax liability related to the Group's operating results, except for Refco, Inc., a subsidiary, which files its own federal corporate tax return. Accordingly, the Group did not record any U.S. federal income tax liability related to its operating results. This election does not affect foreign, state or city taxes. A provision for foreign, state and city taxes is included in the consolidated financial statements.

Income taxes are allocated to members of the consolidated group by computing such taxes as if the member were a separate taxpayer. Income taxes are payable to its parent.

MB02071255                14

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 15/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR H9 312 782 2770 TO 12128495540          P.15/17

## 7. RELATED PARTY TRANSACTIONS

During the year ended February 28, 1999, the Group loaned money to and borrowed money from its stockholder, affiliated companies and other related parties. At year-end, these balances included net loans receivable of approximately $252 million due from these related parties. Those transactions occurred in the normal course of the Group's business. Interest was generally charged at prevailing market rates.

## 8. OFF-BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer-driven operations, the Group enters into various contractual commitments involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and options contracts. Most contracts entered into are fully hedged with offsetting contracts or the underlying cash instrument.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off-balance sheet.

Derivatives are generally based on notional values. Notional values are not recorded on the consolidated balance sheet, but rather are utilized solely as a basis for determining future cash flows to be exchanged. Although notional or contractual amounts may be indicative of the level of transactions, they do not measure the Group's exposure to market or credit risk. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits. Management believes the Group's exposure to market risk, however, is expected to be immaterial relative to the underlying notional amounts.

A summary of the approximate notional amounts of derivative financial instruments at February 28, 1999 appears below (in millions):

| | |
|---|---:|
| Forward currency contracts: | |
| Commitments to sell | $ 8,007 |
| Commitments to purchase | 7,787 |
| Forward financing transactions: | |
| Commitments to purchase securities under agreements to resell | 382 |
| Commitments to sell securities under agreements to repurchase | 2,185 |
| Swap contracts: | |
| Commitments to sell | 11 |
| Commitments to purchase | 16 |
| Option contracts sold or written | 10,959 |
| Option contracts purchased | 10,965 |

MB02071256                    15

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 16/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540        P.16/17

A summary of the market or fair value of derivative financial instruments at February 28, 1999 appears below (in millions); averages are based on quarter-end balances.

| | Assets | | Liabilities | |
| --- | --- | --- | --- | --- |
| | February 28, 1999 | Average | February 28, 1999 | Average |
| Forward currency contracts | $ 29 | $ 144 | $ 41 | $ 142 |
| Option contracts | 180 | 569 | 189 | 571 |
| Swap contracts | 1 | 12 | 3 | 12 |

The Group regularly transacts business with corporations and other financial institutions and owns securities issued by a broad range of governments and U.S. and foreign corporations. The Group also enters into collateralized financing agreements in which it extends short-term credit to financial institutions and customers. The Group generally controls access to the collateral pledged by the counterparties, which consists largely of securities issued by the U.S. Government and foreign sovereign governments. The value and adequacy of the collateral are continually monitored. Consequently, the risk of credit loss from counterparties' failure to perform in connection with collateralized lending activities is minimal.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouses its customers' performance under these contracts. To reduce its risk, the Group requires its customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer which reduces the risk to the Group of failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements. Management believes that the margin deposits held at February 28, 1999 were adequate to minimize the risk of material loss which could be created by the positions held at that time.

The Group engages in various trading activities which include the use of derivative instruments described in the aforementioned table. The net principal transactions revenues related to the trading of foreign exchange, fixed income and equity derivatives comprise principal transactions, net on the accompanying consolidated statement of income.

## 9.  PREFERRED SECURITIES ISSUED BY SUBSIDIARIES

During calendar year 1998, Refco Preferred Capital Trust I and II, consolidated subsidiaries of the Company, issued $125 million of Trust Originated Preferred Securities ("TOPRs") to third parties with a weighted average interest rate of 9.52%. The Company has guaranteed payment of all distributions on the TOPRs, with the guarantees being subordinated to all senior indebtedness. Distributions are payable semiannually if funds are legally available. These securities have maturities extending through 2008. The TOPRs are recorded as Preferred Securities Issued by Subsidiaries on the accompanying consolidated balance sheet.

MB02071257

16

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## 10. RESTRUCTURING

The Company recorded a $5 million restructuring charge related to certain actions taken to improve ongoing profitability. These actions are a result of specific business reviews and the reorganization of certain corporate functions. These reviews resulted in reductions of both business unit and corporate personnel. The charge primarily consists of severance payments made to terminated employees.

## 11. SUBSEQUENT EVENTS (UNAUDITED)

In May 1999, the Company reorganized into a Delaware limited liability company, Refco Group, Ltd. LLC, and sold 10% of LLC interests to a subsidiary of Bank fur Arbeit und Wirtschaft (BAWAG) for $95 million. The amounts sold represent 4.9% voting LLC interests and 5.1% non-voting LLC interests.

-11-

MB02071258

17

** TOTAL PAGE.17 **

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT H

## ASSIGNMENT AGREEMENT

AGREEMENT dated October 28, 1997 between REFCO, INC. (the "Assignor") and WELLS LIMITED (THE "Assignee").

### W I T N E S S E T H

WHEREAS, this Assignment Agreement (the "Agreement") relates to those certain trading accounts maintained at the Assignor by Niederhoffer Friends & Partners (Account No. 64476), Niederhoffer Intermarket (Account No. 68682), Niederhoffer Global Systems (Account No. 61877), and Niederhoffer Strategic Fund (Account No. 84625) (collectively, the "Accounts" and separately, an "Account");

WHEREAS, as provided under the governing customer agreement, each Account has agreed to make margin payments to the Assignor (each a "Payment");

WHEREAS, the Assignor proposes to assign to the Assignee certain rights of the Assignor to Payments from the Accounts in exchange for the transfer from the Assignee to the Assignor of an amount up to $71,000,000 (to be paid to the Assignor in immediately available funds on the date hereof) and the Assignee proposes to accept assignment of such rights on such terms;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1. Assignment. The Assignor hereby assigns and sells to the Assignee the rights of the Assignor against the Accounts to collect the Payments set forth in Exhibit A from each Account, and the Assignee hereby accepts such assignment from the Assignor. Upon the execution and delivery hereof by the Assignor and the payment specified in Section 2 hereof the Assignee shall, as of the date hereof, succeed to the rights of the Assignor against each Account to Payments in the amount set forth in Exhibit A. The assignment provided for herein shall be without recourse to the Assignor.

SECTION 2. Payment. As consideration for the assignment and sale contemplated in Section 1 hereto, the Assignee shall pay to the Assignor on the date hereof in immediately available funds an amount not to exceed $71,000,000. The Assignor hereby agrees that if it receives any assigned Payment from an account which is for the account of the Assignee, it shall receive the same for the account of the Assignee to the extent of the Assignee's interest therein and shall promptly pay the same to the Assignee.

-2-

SECTION 3.  Non-Reliance on Assignor.  The Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of an Account, or the validity and enforceability of the obligations of an account to make any Payment.  The Assignee acknowledges that it has, independently and without reliance on the Assignor, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the business, affairs and financial condition of each Account.

SECTION 4.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

SECTION 5.  Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers on the date first above written.

REFCO, INC.

By

WELLS LIMITED

By

EXHIBIT A

ASSIGNED PAYMENTS FOR
EACH ACCOUNT

| Account | Assignment Payments |
|---|---|
| Niederhoffer Friends & Partners | $ 18,100,000 |
| Niederhoffer Intermarket | $ 14,675,000 |
| Niederhoffer Global Systems | $ 37,500,000 |
| Niederhoffer Strategic Fund | $ 725,000 |

# EXHIBIT I

United States of America v. Phillip Bennett                                    2/15/2008

Page 1

SOUTHERN DISTRICT OF NEW YORK

-----------------------------x

UNITED STATES OF AMERICA,

     v.                           05 CR 001192 (NRB)

PHILLIP BENNETT,

       Defendant.

-----------------------------x

                New York, N.Y.
                February 15, 2008
                5:40 p.m.


Before:

           HON. NAOMI REICE BUCHWALD,

              District Judge


           APPEARANCES

MICHAEL J. GARCIA
   United States Attorney for the
   Southern District of New York
NEIL M. BAROFSKY
CHRISTOPHER L. GARCIA
   Assistant United States Attorneys

KRAMER LEVIN NAFTALIS & FRANKEL
   Attorneys for Defendant
GARY P. NAFTALIS
DAVID S. FRANKEL
ADAM C. FORD
DARREN A. LAVERNE

ALSO PRESENT:  WILLIAM JOHNSON, Postal Inspector
         KRIS MOON, Postal Inspector
         ANNE RAILTON, Law Student


      SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                                        2/15/2008

Page 2

1      (In open court)
2      (Case called)
3      THE DEPUTY CLERK:  The case is United States against
4   Phillip Bennett; docket number 05 CR 1192.  Is the government
5   ready to proceed?
6      MR. BAROFSKY:  Yes.  Neil Barofsky for the government.
7   With me at counsel table, with your Honor's permission, is
8   Christopher Garcia of our office, our postal inspectors on the
9   case, William Johnson and Kris Moon, as well as our legal
10  intern, Annie Railton, who's been assisting the trial of this
11  matter.  Good evening, your Honor.
12     MR. GARCIA:  Good evening, your Honor.
13     THE DEPUTY CLERK:  Is the defense ready to proceed?
14     MR. NAFTALIS:  Yes, we are.  Gary Naftalis for
15  Mr. Bennett, along with David Frankel.
16     THE COURT:  Mr. Naftalis?
17     MR. NAFTALIS:  Your Honor, we have an application on
18  behalf of Mr. Bennett to withdraw his plea of not guilty to the
19  charges in the indictment and to offer to plead guilty to the
20  charges in the indictment.
21     THE COURT:  All right.  Mr. Bennett, would you stand
22  please.  Would you raise your right hand.
23     (Defendant sworn)
24     THE COURT:  And would you state your full name for me
25  please.
                SOUTHERN DISTRICT REPORTERS, P.C.

Page 3

1      THE DEFENDANT:  Phillip Roger Bennett.
2      THE COURT:  And Mr. Bennett, how old are you?
3      THE DEFENDANT:  59, your Honor.
4      THE COURT:  Why don't you sit down.  Mr. Bennett, what
5   was the highest grade in school that you completed?
6      THE DEFENDANT:  University.  Grade, twelfth grade, I
7   think it is, your Honor.
8      THE COURT:  You have the equivalent of a college
9   degree.
10     THE DEFENDANT:  Yes, master of arts.
11     THE COURT:  And are you now or have you currently been
12  under the care of a doctor or psychiatrist?
13     THE DEFENDANT:  No, your Honor.
14     THE COURT:  And have you ever been hospitalized or
15  treated for alcoholism or narcotics addiction?
16     THE DEFENDANT:  No, your Honor.
17     THE COURT:  Are you under the influence of any drug or
18  alcohol today?
19     THE DEFENDANT:  I'm not, no, your Honor.
20     THE COURT:  And how are you feeling physically today?
21     THE DEFENDANT:  Fine, your Honor.  Thank you.
22     THE COURT:  Mr. Bennett, have you had the opportunity
23  to review the charges against you and your plea with
24  Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as
25  well?
                SOUTHERN DISTRICT REPORTERS, P.C.

Page 4

1      THE DEFENDANT:  I have, your Honor, yes.
2      THE COURT:  And have you been satisfied with the
3   advice and counsel that Messrs. Naftalis and Frankel have given
4   to you?
5      THE DEFENDANT:  I have, yes.
6      THE COURT:  Are you ready to change your plea at this
7   time?
8      THE DEFENDANT:  I am, your Honor.
9      THE COURT:  And what is your plea at this time, guilty
10  or not guilty?
11     THE DEFENDANT:  It's guilty, your Honor.
12     THE COURT:  Mr. Bennett, in order to determine whether
13  your plea is voluntary and made with a full understanding of
14  the charges against you and the consequences of your plea, I
15  will make certain statements to you and I will ask you certain
16  questions.  I want you to understand that I need not accept
17  your plea unless I am satisfied that you are, in fact, guilty,
18  and that you fully understand your rights.  I'm tempted to ask
19  the government to pick a few favorite charges instead of all of
20  these, but, okay.
21     Mr. Bennett, you've been charged in the 20-count
22  indictment.
23     The first count charges you with a conspiracy to
24  commit securities fraud, wire fraud, bank fraud, and money
25  laundering, and to make false filings to the SEC.  This crime
                SOUTHERN DISTRICT REPORTERS, P.C.

Page 5

1   carries a maximum sentence under the law of five years
2   imprisonment, a maximum fine of the greatest of $250,000 or
3   twice the gross pecuniary gain derived from the offense or
4   twice the gross pecuniary loss to persons other than yourself
5   as a result of the offense, and a $100 special assessment, and
6   a maximum term of supervised release of three years.
7      Do you understand that those are the charges in Count
8   One of the indictment and the maximum statutory penalties
9   applicable to those charges?
10     THE DEFENDANT:  I do, your Honor, yes.
11     THE COURT:  Counts Two and Three of the indictment
12  charge you with securities fraud.  Each of these counts carries
13  a maximum sentence of 20 years in prison, a maximum fine of
14  $5,000,000 or twice the gross pecuniary gain derived from the
15  offense or twice the gross pecuniary loss to a person other
16  than yourself as a result of the offense, a $100 special
17  assessment, and a maximum term of supervised release of three
18  years.
19     Do you understand that those are the charges in Counts
20  Two and Three and the maximum penalties under law for those
21  charges of securities fraud?
22     THE DEFENDANT:  I do, your Honor.
23     THE COURT:  Count Four charges you with making a false
24  filing with the Securities and Exchange Commission.  And this
25  crime carries a maximum statutory penalty of 20 years in
                SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                      2/15/2008

Page 6

1    prison, a maximum fine of the greatest of $5,000,000 or twice
2    the gross monetary gain derived from the offense or twice the
3    gross monetary loss to a person other than yourself as a result
4    of the offense, a $100 special assessment, and a maximum term
5    of supervised release of three years.
6          Do you understand that those are the charges in Count
7    Four and the maximum penalties applicable to those charges?
8          THE DEFENDANT: I do, your Honor.
9          THE COURT: Counts Five and Six of the indictment
10   charge you with making a false filing with the Securities and
11   Exchange Commission -- excuse me, with the Securities and
12   Exchange Commission. Each of these counts carries a maximum
13   sentence under the law of five years imprisonment, a maximum
14   fine of the greatest of $250,000 or twice the gross pecuniary
15   gain derived from the offense or twice the gross pecuniary loss
16   to a person other than yourself as a result of the offense, and
17   a $100 special assessment, and a maximum supervised release
18   term of three years. Do you understand that those are the
19   charges in Counts Five and Six of the indictment and the
20   maximum penalties provided for by law for those crimes?
21         THE DEFENDANT: Yes, I do, your Honor.
22         THE COURT: And Counts Seven through Thirteen of the
23   indictment charge you with wire fraud. Each of these counts
24   carries a maximum possible sentence of 20 years in prison, a
25   maximum fine of the greatest of $250,000 or twice the gross

SOUTHERN DISTRICT REPORTERS, P.C.

Page 7

1    pecuniary gain derived from the offense or twice the gross
2    pecuniary loss to a person other than yourself as a result of
3    the offense, a $100 special assessment, and a maximum term of
4    supervised release of three years.
5          Do you understand that those are the charges in Counts
6    Seven through Thirteen, and the maximum penalties under the
7    statute for those charges?
8          THE DEFENDANT: Yes, I do, your Honor.
9          THE COURT: All right. Count Fourteen charges you
10   with making material misstatements to auditors. And this crime
11   carries a maximum sentence of 20 years imprisonment, a maximum
12   fine of $5,000,000 or twice the gross pecuniary gain derived
13   from the offense or twice the gross pecuniary loss to a person
14   other than yourself as a result of the offense, a $100 special
15   assessment, and a maximum term of supervised release of three
16   years.
17         Do you understand that that is the crime charged in
18   Count Fourteen of the indictment, and the maximum penalty
19   provided for by statute for Count Fourteen?
20         THE DEFENDANT: Yes, I do, your Honor.
21         THE COURT: Count Fifteen of the indictment charges
22   you with bank fraud. And this crime carries a maximum sentence
23   of 30 years in prison, a maximum fine of the greatest of
24   $1,000,000 or twice the gross pecuniary gain derived from the
25   offense or twice the gross pecuniary loss to a person other

SOUTHERN DISTRICT REPORTERS, P.C.

Page 8

1    than yourself as a result of the offense, a $100 special
2    assessment, and a maximum term of supervised release of five
3    years.
4          Do you understand that that is the charge in Count
5    Fifteen, and that those are the maximum penalties provided for
6    by law?
7          THE DEFENDANT: Yes, your Honor. Forgive me, yes,
8    your Honor.
9          THE COURT: Counts Sixteen through Twenty charge you
10   with money laundering. Each of these counts carries a maximum
11   possible sentence of ten years imprisonment, a maximum fine of
12   the greatest of $250,000, twice the gross pecuniary gain
13   derived from the offense or twice the gross pecuniary loss to a
14   person other than yourself as a result of the offense, and a
15   $100 mandatory special assessment, and a maximum supervised
16   release term of five years.
17         Do you understand that those are the crimes charged in
18   Counts Sixteen through Twenty, and the maximum possible penalty
19   provided by law?
20         THE DEFENDANT: Yes, your Honor.
21         THE COURT: Do you also understand that the Court must
22   impose an order of restitution by law?
23         THE DEFENDANT: Yes, your Honor.
24         THE COURT: And do you understand that you are also
25   subject to mandatory asset forfeiture?

SOUTHERN DISTRICT REPORTERS, P.C.

Page 9

1          THE DEFENDANT: Yes, your Honor.
2          THE COURT: And do you understand that you have the
3    right to plead not guilty and the right to a trial on the
4    charges against you and, in fact, the right to a jury trial?
5          THE DEFENDANT: Yes, your Honor.
6          THE COURT: At this time, I'd ask the government to
7    recite the elements of the crimes charged.
8          MR. BAROFSKY: Yes, your Honor. For Count One,
9    conspiracy, the government would have to prove the following
10   elements:
11         First, that an agreement or understanding existed to
12   commit the objects charged in the indictment. Second, the
13   defendant knowingly became a member of that agreement or
14   understanding. And third, that one of the conspirators
15   knowingly committed at least one overt act in furtherance of
16   the conspiracy during the life of the conspiracy.
17         With respect to Counts Two and Three, securities
18   fraud, the government would have to prove, first, that Bennett,
19   in connection with the purchase or sale of securities, and for
20   Count Two, that would be the notes described in the indictment,
21   and in Count Three, the common stock of Refco described in the
22   indictment, he did one or more of the following: He either
23   employed a device, scheme, or artifice to defraud or made an
24   untrue statement of a material fact or omitted to state a
25   material fact which made what was said under the circumstances

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                              2/15/2008

Page 10

1  misleading or engage in an act, practice, or course of business
2  that operated or would operate as a fraud or deceit on a
3  purchaser or seller.  Second, that Bennett acted knowingly,
4  willfully, and with intent to defraud.  And, third, that he
5  used or caused to be used any means or instruments of
6  transportation or communication in interstate commerce, but he
7  used the mails in furtherance of the fraudulent conduct.
8       With respect to Count Four, which charges false filing
9  under the Exchange Act, the first element the government would
10  have to prove is that Refco was required by the Securities
11  Exchange Act of 1934 to file the 10-K that's described in Count
12  Four.  And, second, the defendant knowingly and willfully made
13  or caused to be made a materially false or misleading statement
14  in that document or omitted to state any material fact required
15  to be stated therein or necessary to make the statements
16  therein not misleading.
17      With respect to Counts Five and Six, false filings
18  under the Securities Act, the government would have to prove,
19  again, first, that Refco was required under the Securities Act
20  of 1933 to file the S4, which is described in Count Five, and
21  the S1 registration statement described in Count Six.  And,
22  second, that Bennett knowingly and willfully made or caused to
23  be made a materially false or misleading statement in those
24  documents or omitted to state any material fact required to be
25  state therein or necessary to make the statements therein not

SOUTHERN DISTRICT REPORTERS, P.C.

Page 11

1  misleading.
2       With respect to Counts Seven through Thirteen of wire
3  fraud, the government would have to prove, first, that a scheme
4  to defraud must have existed; that Bennett must have
5  participated in the scheme with intent to defraud; that
6  misrepresentations or omissions must have related to material
7  facts were made in furtherance of the fraud; that the scheme
8  was executed to obtain money or property; and that in the
9  execution of the scheme, Bennett used or caused to be used the
10  interstate wires listed in the indictment.  And here for Count
11  Seven is the June 22nd of 2004 email from Robert Trosten; in
12  Count Eight, the August 3, '04 email from Robert Trosten; in
13  Count Nine, the April 6, '05 transmission of the S4 from New
14  York to Virginia; in Count Ten, the July 19th, 2005
15  transmission of 10-K from New York to Virginia; in Count
16  Eleven, the August 5th, 2004 transmission of $4,000,000 from
17  New York to Illinois; in Count Twelve, the August 5th, 2004
18  transmission of $40,000,000 from New York to Illinois; and in
19  Count Thirteen, the August 8th, 2005 transmission of the S1
20  registration statement from New York to Virginia.
21      For Count Fourteen, material misstatements to
22  auditors, the government would have to prove, first, that Refco
23  was a public company that was required to submit financial
24  statements to the SEC; second, that Bennett was a
25  director/officer of Refco; third, Bennett knowingly and

SOUTHERN DISTRICT REPORTERS, P.C.

Page 12

1  willfully made, caused to be made, a materially false or
2  misleading statement or omitted to state a material fact
3  necessary order to make the statements made in light of the
4  circumstances under which such statements were made not
5  misleading to an accountant, and that the statement was made in
6  connection with the audit or examination of the financial
7  statements of Refco required to be made pursuant to the Act.
8       Count Fifteen charges the defendant with bank fraud.
9  And specifically, that on August 5th, 2004, defrauded HSBC.
10  And the government would have to prove, first, there was a
11  scheme to defraud a bank by means of materially false or
12  fraudulent pretenses, representations, or promises; second,
13  that Bennett executed or attempted to execute the scheme with
14  intent to defraud the bank, here, again, HSBC; and third, at
15  the time of the execution of the scheme, HSBC had its deposits
16  insured by the FDIC.  And I'll represent to the Court that at
17  the relevant time periods, HSBC's deposits were insured by the
18  FDIC.
19      And finally, Counts Sixteen through Twenty charge the
20  defendant with money laundering.  And the government would have
21  to prove, first, that Bennett engaged or attempted to engage in
22  monetary transactions involving criminally derived property of
23  a value greater than $10,000; second, that the property
24  involved in the monetary transaction was, in fact, derived and
25  specified unlawful activity; third, that Bennett acted

SOUTHERN DISTRICT REPORTERS, P.C.

Page 13

1  knowingly.  And for these purposes, wire fraud, bank fraud, and
2  securities fraud are all specified unlawful activities and
3  would have to prove each of the transactions listed in the
4  indictment in Counts Sixteen through Twenty, basically the wire
5  transactions which are described therein.
6       THE COURT:  Mr. Bennett, do you understand that if you
7  pled not guilty and went to trial, that the burden would be on
8  the government to prove each and every element of every crime
9  charged beyond a reasonable doubt in order to convict you of
10  that crime?
11      THE DEFENDANT:  I do, your Honor.
12      THE COURT:  Do you understand that at a trial you
13  would have the right to be represented by an attorney at all
14  stages of the proceeding and, if necessary, an attorney would
15  be appointed for you?
16      THE DEFENDANT:  Yes, I do.
17      THE COURT:  And do you understand that at a trial you
18  would have the right to confront and cross-examine witnesses
19  and the right not to be compelled to incriminate yourself?
20      THE DEFENDANT:  I do, your Honor.
21      THE COURT:  And do you understand that at a trial you
22  would be presumed innocent until such time, if ever, the
23  government established your guilt by competent evidence to the
24  satisfaction of the trier of fact beyond a reasonable doubt?
25      THE DEFENDANT:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                    2/15/2008

Page 14

1    THE COURT:  And do you understand that at a trial you
2    would have the right to testify and would also be entitled to
3    compulsory process; in other words, the right to call other
4    witnesses on your behalf?
5    THE DEFENDANT:  Yes, your Honor.
6    THE COURT:  And do you understand that if your plea is
7    accepted, that there will be no further trial of any kind, so
8    that by pleading guilty, you are waiving your right to a trial?
9    THE DEFENDANT:  I do understand that, your Honor, yes.
10   THE COURT:  And do you understand that if you are
11   sentenced to a period of supervised release, and if you violate
12   the terms of your supervised release, that an additional period
13   of jail time may be imposed without credit for the time that
14   you've previously spent on supervised release?
15   THE DEFENDANT:  Yes, your Honor.
16   THE COURT:  Do you understand that in connection with
17   your plea of guilty, that the Court may ask you certain
18   questions about the offense to which you have pled; and if you
19   answer those questions under oath and on the record and in the
20   presence of your counsel, that your answers are false may later
21   be used against you in a prosecution against you for perjury or
22   false statement?
23   THE DEFENDANT:  Yes, your Honor.
24   THE COURT:  And I recall, Mr. Bennett, you're a
25   citizen of Great Britain.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 15

1    THE DEFENDANT:  I am, your Honor, yes.
2    THE COURT:  Do you understand that following any
3    sentence that you receive, that you will likely be deported?
4    THE DEFENDANT:  That is my understanding, your Honor,
5    yes.
6    THE COURT:  And do you understand that in determining
7    your sentence, that the Court is obligated to calculate the
8    applicable sentencing guidelines range, and to consider that
9    range and any possible departures under the guidelines and
10   other sentencing factors under the statute which entitles the
11   Court to consider the nature and circumstances of the offense
12   and the history and characteristics of the defendant?
13   THE DEFENDANT:  Yes, your Honor.
14   THE COURT:  And have you reviewed with your counsel
15   the government's letter to them of yesterday which explains the
16   government's position as to the sentence that you face if the
17   sentencing guidelines are applied to your case?
18   THE DEFENDANT:  I have reviewed it, your Honor,
19   correct.
20   THE COURT:  Actually, that was said very badly.  Let
21   me just try it again so that there's no confusion.
22   Have you reviewed that letter with your lawyers which
23   sets forth the government's calculation of the sentence that
24   you face under the sentencing guidelines?
25   THE DEFENDANT:  I have reviewed it.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 16

1    THE COURT:  And do you understand that the government
2    calculates that under the guidelines, that you face a sentence
3    of life imprisonment; and that it has calculated that the
4    maximum possible statutory sentence is 315 years; and that the
5    fine range is from 25,000 to $5,000,000?
6    THE DEFENDANT:  I understand that, your Honor,
7    correct.
8    THE COURT:  And do you understand that that
9    calculation by the guidelines -- that by the government is just
10   based on the information they currently have?
11   THE DEFENDANT:  Yes, your Honor.
12   THE COURT:  And do you further understand that the
13   government's letter doesn't bind either the Court or the
14   probation department, and that ultimately the sentence that you
15   receive will be determined by the Court?
16   THE DEFENDANT:  Yes, your Honor.
17   THE COURT:  Mr. Bennett, have any threats or promises
18   been made to you to make you plead guilty?
19   THE DEFENDANT:  No, your Honor.
20   THE COURT:  Have any understandings or promises been
21   made to you concerning the sentence that you will receive?
22   THE DEFENDANT:  None.
23   THE COURT:  Is your plea voluntary?
24   THE DEFENDANT:  It is, your Honor.
25   THE COURT:  Mr. Bennett, did you commit the crimes

SOUTHERN DISTRICT REPORTERS, P.C.

Page 17

1    that you've been charged with in the indictment?
2    THE DEFENDANT:  I did, your Honor.
3    THE COURT:  Would you tell me in your own words what
4    you did?
5    THE DEFENDANT:  Your Honor, during the period that I
6    served as CEO of Refco, I agreed with other Refco executives to
7    enter into a series of transactions at the end of Refco's
8    financial reporting periods to make it appear as if a
9    receivable due to Refco from Refco Upholdings, Inc., a related
10   party, was instead due from an independent third-party
11   customer.
12   The IGHI receivable was composed of, amongst other
13   things, historical customer losses, bad debts, and expenses
14   that IGHI had incurred on behalf of Refco.
15   I, along with other Refco executives, have caused
16   Refco to enter into these transactions in order to conceal the
17   size and nature of the IGHI receivable.  We concealed the
18   receivable from, amongst others, Refco's auditors, Thomas H.
19   Lee Partners, various lenders who, in 2004, participated in
20   Refco's senior secured credit facility, and the issuance of 9
21   percent senior subordinated notes, and also investors in
22   Refco's common stock.
23   Among the lenders to whom I knowingly caused the IGHI
24   receivable to be misrepresented was HSBC Bank, referenced in
25   Count Fifteen of the indictment.  I and other Refco executives

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                                         2/15/2008

Page 18

1  also used the interstate wires to accomplish these acts within
2  this district, as referenced in Counts Seven through Thirteen.
3  Furthermore, I caused funds obtained from the transaction with
4  Thomas H. Lee Partners, referenced in paragraph 34 of the
5  indictment, to be wired to various parties receiving proceeds
6  from the transaction, as referenced in Counts Sixteen through
7  Twenty, knowing that this money had been unlawfully obtained.
8       The IGHI receivable and related party transaction used
9  to conceal it were material information that Refco investors
10  and lenders would have wanted to have known prior to investing
11  in or lending money to Refco. While I believed that I would be
12  able to pay the IGHI receivable down over time, and did, in
13  fact, ultimately pay off the receivable balance in its
14  entirety, I knew that failing to disclose the receivable was
15  wrong; I knew that obtaining funds from Refco's investors and
16  lenders based on misleading financial statements was also
17  wrong.
18       I also caused Refco to file documents with the SEC,
19  namely S1, S4, and 10-K that did not disclose the full extent
20  of the IGHI receivable or the transactions used to conceal it;
21  and, thus, were false and misleading with respect to material
22  facts. I knew that failing to disclose these facts in public
23  filings and in connection with Refco's sale and registration of
24  Refco's notes and common stock was wrong, and I deeply regret
25  having done so.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 19

1       Your Honor, I take full responsibility for my actions.
2  I wish to publicly apologize to my family and to all of those
3  who have been harmed by my conduct. Thank you, your Honor.
4       THE COURT: Mr. Barofsky, is there anything else you
5  would want me to ask the defendant?
6       MR. BAROFSKY: Your Honor, can we just have a moment
7  to review? There's a lot of elements. Thank you, your Honor.
8       THE COURT: Certainly.
9       (Pause)
10       MR. BAROFSKY: Your Honor, just a couple of areas for
11  clarification. First, if you can please ask the defendant to
12  confirm that he was a director or officer of Refco during this
13  relevant time period. Should I go one-by-one?
14       THE COURT: Mr. Bennett, can you confirm that?
15       THE DEFENDANT: I was, your Honor.
16       MR. BAROFSKY: Second, your Honor, that the
17  misstatements made about Refco's auditor was in connection with
18  the auditor's preparation of a financial statement, and that
19  occurred after April of 2005.
20       THE COURT: Can you confirm that?
21       THE DEFENDANT: That's correct, your Honor.
22       MR. BAROFSKY: Your Honor, and if you can ask the
23  defendant to confirm he made reference to various wire
24  transfers and wire communications, as well as certain filings
25  in the indictment, if you could please confirm with the

SOUTHERN DISTRICT REPORTERS, P.C.

Page 20

1  defendant that those acts occurred on or about the dates set
2  forth in the indictment.
3       THE DEFENDANT: They did, your Honor.
4       MR. BAROFSKY: And finally, your Honor, as I noted
5  earlier, I will represent to the Court that HSBC was --
6  deposits were insured by the FDIC during the relevant time
7  period; and also that Refco was an entity that was required to
8  file the various reports and documents and registration
9  statements under the Exchange Acts of 1933 and 1934, as well as
10  to file financial statements with respect to the 10-K and the
11  misstatement to auditors account. Thank you, your Honor.
12       THE COURT: Mr. Bennett, do you still wish to plead
13  guilty?
14       THE DEFENDANT: I do, your Honor, yes.
15       THE COURT: Mr. Naftalis, do you know of any reason
16  that Mr. Bennett ought not plead guilty?
17       MR. NAFTALIS: No, your Honor.
18       THE COURT: Mr. Bennett, I'm satisfied that you
19  understand the nature of the charge against you and the
20  consequences of your plea; and that your plea is made
21  voluntarily and knowingly; and that there is a factual basis
22  for it. Accordingly, I will accept your plea of guilty and
23  direct that a presentence report be prepared.
24       THE DEFENDANT: Thank you, your Honor.
25       THE COURT: As for a sentencing date, can I just

SOUTHERN DISTRICT REPORTERS, P.C.

Page 21

1  basically count out the requisite number of days or does the
2  government have a view that it should be maybe a little bit
3  more off into the future in light of the trial that's still
4  upcoming?
5       MR. BAROFSKY: Your Honor, we think we can be prepared
6  in three months.
7       THE COURT: All right. Why don't we set sentencing
8  for May 20th at 4 o'clock. And since I would anticipate some
9  significant presentence submissions, I think we should set a
10  schedule for that. Why don't we say that the government's
11  submission is due -- the defense submission is due on May 6th,
12  and the government's on May 13th.
13       MR. BAROFSKY: That's fine, your Honor.
14       MR. NAFTALIS: Your Honor, if there are things in the
15  government submission that we want to respond to, that's sort
16  of --
17       THE COURT: Doesn't give you quite enough time.
18       MR. NAFTALIS: We don't have -- you're having us
19  first, so we don't really sort of provide -- they could go
20  first, we could go second; we wouldn't object to that.
21       MR. BAROFSKY: We could do simultaneous submissions,
22  as well, your Honor, on the 6th and then we could each respond.
23       THE COURT: Sounds like fun.
24       MR. BAROFSKY: Okay.
25       MR. NAFTALIS: It's a living.

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                2/15/2008

Page 22

1     THE COURT: Let's not go there. Okay? Are we done?
2     MR. BAROFSKY: No, your Honor. There is the issue of
3  bail. And at this time, your Honor, the government does
4  request that defendant be remanded. And if your Honor will let
5  me, I would like to speak briefly on the topic.
6     THE COURT: Okay.
7     MR. BAROFSKY: Obviously the standard has changed
8  under the Bail Act under 3143. Before when we appeared before
9  your Honor several years ago, the burden was ours to prove the
10  defendant was a risk of flight. Now, of course, it is the
11  defendant's burden to prove by clear and convincing evidence
12  that he is not likely to flee. And respectfully, we submit
13  that there have been some extremely significant changed
14  circumstances, that we respectfully submit the defendant cannot
15  meet the burden in this case.
16     First of all, under the current bond, which, as your
17  Honor may recall, is a $50,000,000 bond, secured by $5,000,000
18  in cash and two properties, that security is now essentially
19  worthless; it's essentially an unsecured bond, because all of
20  those properties and that money are subject to asset
21  forfeiture. The $5,000,000 we have traced as direct proceeds
22  from the IPO, which the defendant has just admitted was money
23  that was fraudulently obtained, and we already have lis pendens
24  on both of the properties, because basically under substitute
25  assets, we'd be able to take those, as well. Those are all

SOUTHERN DISTRICT REPORTERS, P.C.

Page 23

1  subject to asset forfeiture and, therefore, don't provide any
2  security for the existing bond.
3     Secondly, the defendant is facing a $2.4 billion asset
4  forfeiture. We don't think he has $2.4 billion, but we do
5  believe that will essentially -- through proceeds and
6  substitute assets, once this conviction is final -- will
7  basically deprive the defendant of all of his assets. We have
8  restrained a number of his assets pretrial, but we have not
9  been able to restrain assets that we haven't been able to prove
10  are directly traceable. And we don't know the exact amount of
11  those items, but we believe that they are in the $20,000,000
12  range, which would certainly facilitate the ability of the
13  defendant to flee.
14     Third, and I guess the most obvious point, is the
15  defendant now faces an advisory guideline range of 315 years of
16  imprisonment. And that obviously changes the calculus a lot
17  from when we last appeared before your Honor. We're not
18  suggesting that your Honor is going to --
19     THE COURT: He always faced that, right?
20     MR. BAROFSKY: Yes, your Honor; but before,
21  pretrial -- I'm sorry, pre-guilty plea, there was no certainty
22  that he was necessarily going to be convicted in this case.
23  Now, jail is an inevitability. And I don't mean to presume
24  what the ultimate sentence will be in this case, because
25  there's obviously no way to predict what the precise sentence

SOUTHERN DISTRICT REPORTERS, P.C.

Page 24

1  will be, but the best guess, I think, from anyone's
2  perspective, is that it will be a substantial prison sentence.
3  And for this defendant -- he is now with certainty facing such
4  a sentence that has -- under the guidelines is the equivalent
5  of a life sentence.
6     Defendant is 59 years old. A sentence of -- a
7  significant sentence in this case may very well prove to be the
8  equivalent of a life sentence. The defendant is facing certain
9  deportation after he serves that sentence.
10     THE COURT: Not to a bad place though.
11     MR. BAROFSKY: Not to a bad place, your Honor. But it
12  does give the defendant a tremendous incentive to self-deport.
13  In other words, to flee the jurisdiction really with -- unlike
14  most cases, with very little downside. The worse that happens
15  if he flees and gets caught is he's brought back to the United
16  States and does a jail sentence that probably will be the rest
17  of his life. If he stays, he's facing pretty much the prospect
18  of the same result, a sentence that may, in fact, result in him
19  being in jail for the rest of his life, given his age.
20     And, your Honor, we respectfully submit that given the
21  shifting of the burden in these really remarkable circumstances
22  of a defendant who's not a U.S. citizen, who's facing the
23  equivalent of a life sentence, and who's now basically would be
24  free on an unsecured bond, that the circumstances dictate the
25  defendant should start serving his sentence, in effect,

SOUTHERN DISTRICT REPORTERS, P.C.

Page 25

1  immediately. And the defendant should be remanded on the
2  grounds that he cannot meet his burden of demonstrating by
3  clear and convincing evidence that he is not a risk of flight.
4     THE COURT: Mr. Naftalis.
5     MR. NAFTALIS: Most respectfully, I find this
6  application most surprising and a baseless one. And I say it
7  with -- most advisedly.
8     You have a situation here where our client, for almost
9  two and-a-half years, has met every single condition of the
10  bond that was set here. Your Honor got a report today from the
11  office of pretrial services, which we were given a copy of when
12  we entered the room, in which the office of pretrial services
13  has pointed out that he has complied with the terms of his bail
14  all the way through.
15     And I can sort of punctuate that a little bit because,
16  in fact, if you check with Officer Forelli, who he deals with
17  in pretrial services, you could hear anecdotal information such
18  as Mr. Bennett was the one who has set up the monitoring system
19  in the house in New Jersey because, whatever, I guess they're
20  technophobes, like I, the marshals service, he actually set up
21  the monitoring service which passed their muster in the
22  electronic stuff. Once, when his bracelet broke down, he
23  immediately reported it to Officer Forelli that it was
24  malfunctioning and he went in. He's been meticulous in
25  reporting to these people.

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                    2/15/2008

Page 26

1    And secondly, something that the government
2  consciously avoided bringing to your attention, his bond is
3  signed by the three immediate members of his family. The three
4  of them who are American citizens: His wife, his daughter, and
5  his son. They have signed a $50,000,000 bond on his behalf,
6  and these are people with roots in the community. The daughter
7  is a lawyer, works at a law firm; the son is an investment
8  banker with a leading firm. The notion that he would run away
9  and do that to his family, I mean, is incomprehensible. And
10  all we have is rhetoric from the government there.
11    You also have the strict monitoring conditions in
12  which he's under and which he's faithfully complied with for
13  the last two and-a-half years. Of course, he has no passport;
14  his wife has given up her passport; he has no effective way of
15  leaving the country.
16    And with respect to other situations, in other
17  situations in high-profile cases where people were facing
18  enormous sentences, no such applications were ever granted.
19  For example, the Computer Associates case, where the CEO of
20  Computer Associates, Mr. Kumar, who, under the guidelines which
21  were then in effect, where the Gall case,
22  the guidelines are just, you know, one ingredient in the soup
23  for your Honor to consider under 3533. He faced life
24  imprisonment under his guidelines. After pleading guilty, he
25  continued to be free on bond, even though there were admissions

SOUTHERN DISTRICT REPORTERS, P.C.

Page 27

1  of obstruction of justice in that case.
2    After Kumar was sentenced or he got a 12-year
3  sentence, he continued to be allowed to be -- remained free on
4  bond to work out various issues of restitution and the like.
5    In the case in front of Judge Sand, the Adelphia case,
6  which is one of the cases, the Rigases, who got 15 and 20-year
7  sentences, one of them was an eighty -- somewhere in his
8  eighties, they were allowed to remain free on bond pending
9  appeal, even though they had the same sort of issues. Even
10  Mr. Ebbers, who received the largest sentence in history I've
11  ever heard of, a real outlier sentence, 25 years, he was
12  allowed to remain free on bond pending appeal and the like.
13    And apart from the fact that there is not the
14  slightest bit of evidence for this most unfair application,
15  it's also prejudicial. As your Honor knows, we have to put in
16  sentencing submissions. And under 3533, your Honor has a lot
17  of things which you can properly consider in determining in
18  your best judgment what's a fair and just sentence under the
19  case here. And obviously it's very prejudicial to us in being
20  able to work with our client, who for the last two and-a-half
21  years has been coming to our office every day on a daily basis
22  to work on the case with us. So I don't see any good-faith
23  basis for any change in bond here whatsoever.
24    THE COURT: Mr. Barofsky.
25    MR. BAROFSKY: Your Honor, if there's any specific

SOUTHERN DISTRICT REPORTERS, P.C.

Page 28

1  points you'd like me to respond to. The ones that jump out to
2  me is, I mean the notion that a defendant can't chronically
3  prepare for sentencing when he's incarcerated, obviously your
4  Honor knows countless defendants who are able to prepare for
5  sentencing when they are incarcerated; and having spent so much
6  time with Mr. Naftalis, I think they are pretty much -- I'm
7  sure they have contemplated this before, this is not the first
8  time.
9    As opposed to those other cases, defendants who are
10  released pending appeal after they've been convicted at trial
11  is a different situation. There's obviously provisions within
12  3143 when there are issues on appeal that the judge finds are
13  significant issues that need to be considered and possibly
14  could result in the reversal of a conviction. That's a
15  different -- those are different facts, and that's a different
16  standard. Here, we have a guilty plea. I don't think that
17  Mr. Bennett is going to be challenging his conviction in this
18  case. He just gave a very detailed guilty plea.
19    With respect to his assurances to his family, I don't
20  mean to minimize the bond between Mr. Bennett and his family,
21  but on the flip side, we're looking at a man who just admitted
22  to telling a series of lies to a large number of victims that
23  resulted in the defrauding of $2.4 billion. 1.7 or 8 billion,
24  which we will show for restitution at the time of sentencing,
25  has not been collected. People are out all of this money.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 29

1    So this man maybe may have some allegiance to his
2  family, but I think you have to look at the flip side as to how
3  strong that may be by a man if he is willing to tell whatever
4  lie is necessary to -- you know, on proportions that are
5  mind-boggling, in the billions of dollars.
6    So we would respectfully submit that -- and we don't
7  contest the fact, by the way, to be clear, that Mr. Bennett has
8  complied with the conditions. And that is certainly a relevant
9  factor that Mr. Naftalis points out and we don't contest it.
10  We just don't think that that's enough to meet his burden,
11  given his changed circumstances. And that to allow a defendant
12  like this, who's also not a U.S. citizen, unlike those
13  individuals, out on what is essentially an unsecured bond, it
14  simply isn't the right course of action here.
15    MR. NAFTALIS: Just one small point, which they
16  reminded me to mention. Although Mr. Bennett never changed his
17  citizenship, like his wife, or became an American citizen like
18  his children, he's lived in the United States for more than 30
19  years; so it's not like he has any roots anyplace else. So
20  it's a little unfair for this eleventh-hour application which
21  we heard about today to suggest as if he had someplace to go
22  to.
23    And the government ignored the situation in the Kumar
24  case. He said that all these other cases where people were on
25  appeal. In the Kumar case it was a plea of guilty with someone

SOUTHERN DISTRICT REPORTERS, P.C.

8 (Pages 26 to 29)

United States of America v. Phillip Bennett                                    2/15/2008

| Page 30 |
| --- |

1  facing, if one took the government's view of the thing, a life
2  sentence. And he was allowed out, and he showed up. Even
3  after he got his sentence of 12 years he remained out on bond
4  to work out the restitution things.
5       And we don't necessarily agree at all with the amount
6  of the forfeiture issues here. I mean there's a forfeiture
7  issue in the case, but the numbers he tosses around are not
8  numbers that we have stipulated to or agreed to by any stretch
9  of the imagination, and he throws them around.
10      That's the only point I wanted to make.
11      THE COURT: All right. I'm not going to remand
12  Mr. Bennett, although I do think I can modify his bail
13  conditions to create greater security. And I'm not going to do
14  so for a number of reasons, the most important of which is that
15  this indictment was filed in 2005.
16      If Mr. Bennett had wanted to flee, he should have fled
17  before he paid his lawyers all the money, and kept it, and gone
18  to an appealing location. In fact, having pled guilty, to
19  leave now, extraditing him will be much easier. So there's a
20  balance there.
21      In addition, I note that just by statute, to release
22  someone on appeal requires the same finding as the finding now.
23  The judicial officer has to be persuaded by clear and
24  convincing evidence that the person is not likely to flee.
25  That's half of the standard. The appellate issue is the other
          SOUTHERN DISTRICT REPORTERS, P.C.

| Page 31 |
| --- |

1  half, so it's the same standard.
2       And I also think that -- and I want to make it
3  clear -- that I don't make any prejudgments about the substance
4  of the case, but this is a case in which there has been a lot
5  of information, publicly, at least, from the bankruptcy
6  proceeding, and so this is a situation in which Mr. Bennett has
7  had the opportunity to see an examiner put the evidence
8  together. This is not a situation where as the case approaches
9  trial, the government finally turns over information. I think
10  Mr. Bennett has had a pretty good idea of the nature of the
11  case and the evidence for at least some time, which makes the
12  fact that he stays more significant.
13      The pretrial officer tells me that it would be easier
14  and more effective to monitor Mr. Bennett if he stayed in one
15  home or the other. And, I guess -- and tells me that basically
16  the minute he leaves home they know about it. So given that it
17  would take some time to -- since make an escape without a
18  passport, I think that if we modified the bail conditions to
19  limit his location, pretrial tells me that that makes it a more
20  secure situation. In addition, if the government has any
21  particular practical economic conditions that you can think of,
22  I'm always willing to listen to those.
23      MR. BAROFSKY: Your Honor, the posting of additional
24  assets by the defendant, they are largely forfeitable assets,
25  but to the extent that there are assets that have not been --
          SOUTHERN DISTRICT REPORTERS, P.C.

| Page 32 |
| --- |

1  as I said, we estimate that it's in the range of approximately
2  $20,000,000. If we could at least secure those assets, these
3  are assets that we've not yet secured by having him posted for
4  the bond.
5       In addition, because, frankly, we're going to get
6  those assets anyhow at the conclusion of this case, perhaps the
7  posting the requiring of assets from the children. He
8  mentioned that the children are successful, one's an investment
9  banker. And if they have property, that may increase the
10  incentive for Mr. Bennett to stay.
11      THE COURT: I think it's enough that he's -- the bond
12  mortgages their future if he flees. We're not taking his kids'
13  money.
14      MR. BAROFSKY: We aren't. I wouldn't suggest that we
15  would take it other than if he fled. We would only be posting
16  whatever interest. Because really right now the problem, your
17  Honor, and I hear what your Honor is saying, is that he has an
18  unsecured bond, and that just causes us a great deal of
19  concern. I don't know what the circumstances are in Kumar or
20  Ebbers, but this is a situation if there is a third party
21  posting collateral --
22      THE COURT: For all those people, the bottom line is
23  that for any defendant who was older and who was facing
24  sentencing, in, lets call it, the post-Enron era, the situation
25  was the same as for Mr. Bennett. The possibility that their
          SOUTHERN DISTRICT REPORTERS, P.C.

| Page 33 |
| --- |

1  sentence would be -- that their residence in the Bureau of
2  Prisons was the last residence they are going to have.
3       So I don't think this is really dramatically
4  different. And I don't think the fact that he's a British
5  citizen changes the situation, that he has to -- I think he
6  gets the credit for having complied with all of his bail
7  conditions and having had two and-a-half years to reflect.
8       MR. BAROFSKY: Your Honor, to be clear, I wasn't
9  rearguing the bail application. I was merely trying to respond
10  to your Honor's question whether there were additional economic
11  circumstances.
12      THE COURT: I'm not asking his children, okay?
13      MR. BAROFSKY: Well, your Honor, then I would ask that
14  in the alternative, if the defendant could post additional
15  property or money that has not been seized or frozen by the
16  government to secure this bond to at least increase so that
17  there's some notional security of the bond. And I would ask
18  for a number of $10,000,000 in cash or property.
19      MR. NAFTALIS: Your Honor, I just think there is no
20  basis whatsoever for the application. His children, the most
21  important things in the world, are on the hook for $50,000,000
22  if he were to leave. As they've indicated, they don't have any
23  evidence of anything that he's ever done anything which would
24  indicate he would leave. As your Honor said, quite correctly,
25  we've known about the evidence in this case; your Honor
          SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                    2/15/2008

Page 34

1  remembers the litigation with respect to the bankruptcy trusts,
2  these report the motion practice there. There's no secret
3  about that. He's showed up all the time; he's complied with
4  all the conditions. And there's not a reason in the world and
5  there's not a basis in the world for any change here
6  whatsoever.
7      MR. BAROFSKY: Your Honor, respectfully, I don't see
8  any harm in having him post additional property that could only
9  be used at this time for the purposes to facilitate flight. He
10  can't transfer these properties without violating the money
11  laundering laws at this point, and I don't see -- I don't even
12  understand how upping the collateral so as to prevent him from
13  fleeing prejudices him in any way. And we're not asking even
14  for all of the money that we believe is out there, we're asking
15  for $10,000,000 to provide some additional security on what is
16  now an essentially an uncollateralized bond. It doesn't really
17  move the ball tremendously for us, but it helps. And at least
18  it would limit his ability to flee, should he make that
19  decision, that it makes more sense to self-deport, since he's
20  going to be going back to England anyhow before he has to face
21  the sentence. I don't think the government's request is
22  shocking or surprising or terribly dramatic, but we do think it
23  would help, given the situation.
24      MR. NAFTALIS: They have not shown anything for this
25  eleventh-hour request. It's totally and absolutely baseless.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 35

1  And I don't think -- I don't know what property may or may not
2  exist, but I don't think that there's any justification. And
3  they just can't come into court without any basis whatsoever
4  and allege things where all the evidence shows that this
5  application is frivolous.
6      MR. BAROFSKY: Your Honor, I've listened to this for a
7  fair amount of time now. And to characterize our application
8  as frivolous and baseless and eleventh-hour I think is unfair.
9      THE COURT: At least the eleventh hour.
10      MR. BAROFSKY: I don't know when we were supposed to
11  have made this application. I don't know if Mr. Naftalis would
12  have had us make it when he notified us about the intent to
13  change his plea yesterday afternoon, I don't think so. I think
14  the only time we can make a plea based on the changed
15  circumstance of the defendant entering a guilty plea is after
16  he enters the guilty plea.
17      As far as it being baseless, the notion that a
18  defendant who's facing 315 years of prison time --
19      THE COURT: He wishes.
20      MR. BAROFSKY: -- is -- that it's baseless to seek his
21  remand when he is an English citizen subject to deportation --
22      THE COURT: Excuse me. We're not -- we're sending him
23  to one of the most civilized countries in the world. It's not
24  punishment to live in England, all right?
25      MR. BAROFSKY: Exactly, your Honor, which is why we

SOUTHERN DISTRICT REPORTERS, P.C.

Page 36

1  would ask for additional collateral.
2      THE COURT: And there is an extradition treaty between
3  the United States and Great Britain, so...
4      MR. BAROFSKY: Your Honor, I just don't understand the
5  harm --
6      THE COURT: Because I'm not sure that the purpose of
7  bail is to help you collect, you know, whatever you claim is
8  your eventual restitution.
9      MR. BAROFSKY: Your Honor, if I wasn't clear on this
10  argument, I apologize. The reason why we're asking for this is
11  to assure the defendant's appearance. If that money is posted
12  as a bond, it's not so that we can eventually seize it. If
13  it's posted as a bond, it's not available for him to use to
14  facilitate flight. It's also to secure the bond. This
15  original bond was issued because it was secured by money and
16  property. Right now it's essentially not secured by money and
17  property.
18      THE COURT: But that argument applies to any
19  additional money that he would put up. You would say it was
20  just as forfeitable to you. So it then becomes unsecured, the
21  same way.
22      MR. BAROFSKY: But it's unrestrained property, Judge,
23  that's the difference. This property is actually restrained on
24  top of the fact that it's -- because it's their direct
25  proceeds.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 37

1      What I'm suggesting, these are other properties that
2  have not been restrained, because we're not able to restrain
3  certain properties that are not proceeds. So this is money
4  that is available to the defendant for use if he wants to
5  facilitate flight.
6      The purpose of a bond, obviously security of a bond,
7  and why your Honor endorsed the order of a secured bond, was
8  because more security means less likelihood of flight. And all
9  we're suggesting is taking this property that is now available
10  to the defendant and posting it as security for the bond. And
11  obviously if we are unable to prove, as Mr. Naftalis suggests,
12  that this is property that's subject to asset forfeiture or
13  restitution, he'll get it back when -- at the time of his
14  sentencing or the time that he reports.
15      So we're not taking anything; we're not putting our
16  hands on stuff that we're not entitled to; we're just asking
17  that this bond be really secured, because right now we're
18  basically -- it's the exact same situation we had in October of
19  2005, when he's going out on the same conditions, it's
20  essentially an unsecured bond. And I don't think that your
21  Honor would have ordered an unsecured bond back then, and we're
22  just asking for some additional security. Money that is
23  available for the defendant or property, and that we have that
24  to secure the bond in case the defendant flees, and to
25  encourage him not to flee.

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Phillip Bennett                                    2/15/2008

Page 38

1    MR. NAFTALIS:  Apart from the fact that the government
2  has proffered not a single fact that anything has changed, I
3  don't agree with the notion that this bond is unsecured.  One
4  of the homes which is securing the bond -- there's $5,000,000
5  cash, there's two residences, is in a trust.  So without going
6  through all the legalities, I don't think it's so quickly
7  forfeitable, as they say.
8    And the notion of ignoring -- and that will be worked
9  out; we're not here to litigate that issue, but I just -- and
10  the notion that they can continue to ignore the fact that his
11  wife and children have signed a $50,000,000 bond that they will
12  be on the hook for and their lives will be ruined, the notion
13  there's not the slightest reason to suppose that he would do
14  this to his children, he never has, and I have nothing else to
15  say.
16    THE COURT:  I think $50,000,000 is a lot of money.
17  And it does directly affect wife, children, inheritances.  So
18  what about the issue of where he's going to live?
19    MR. NAFTALIS:  If your Honor wants -- feels it would
20  be better, pretrial services --
21    THE COURT:  That's what pretrial tells me.
22    MR. NAFTALIS:  I think he would -- there's a residence
23  in New York and a residence in New Jersey.  I think he would
24  prefer to be in New Jersey where his wife is, and then subject
25  to the fact he could just come to our offices and work with us,

SOUTHERN DISTRICT REPORTERS, P.C.

Page 39

1  which I think he's allowed to do, I think that would be his
2  preference in terms of the quality of the life until the
3  sentence, if that's --
4    THE COURT:  I get the high sign from pretrial; so
5  he'll stay in New Jersey.
6    MR. NAFTALIS:  Okay.
7    THE COURT:  Other than when he goes to you and also
8  when you have to get him to pretrial for -- to probation for
9  his interview.
10    MR. NAFTALIS:  Yes.
11    THE COURT:  Which we do need to do within the two
12  weeks so that the sentencing schedule can proceed.  And the
13  same is true for the government's description of the crimes.
14    Okay?  I think we're done then.
15    MR. NAFTALIS:  Thank you, your Honor.
16    MR. BAROFSKY:  Thank you, your Honor.
17    MR. GARCIA:  Thank you, your Honor.
18    THE DEFENDANT:  Thank you, your Honor.
19            *   *   *
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.