omissions on the same matters … about which [the lawyers] had prior
contacts with [the purchaser]," lawyers faced primary liability under Rule
10b-5; the lawyers could not escape liability by claiming that the purchase
agreement did not "belong" to them, but to their client) (relying on Rubin,
143 F.3d at 267-68, and Ackerman, 947 F.2d at 848); [9]

The facts here are even more compelling than in Kline. First, there was no direct

evidence in Kline that the law firm actually knew that its representations were false, see Kline,

24 F.3d at 484, whereas here Mayer Brown worked directly on the very transactions whose

existence it denied. See, e.g., Am. Compl. ¶¶ 2, 31, 32, 35, 52-56. Second, Mayer Brown had

greater knowledge of its clients' business than did the law firm in Kline. Mayer Brown partner

Collins was "Refco's 'go-to-guy'" and "all important transactions and deals involving the

brokerage [Refco] were first cleared through" Mayer Brown. Id. ¶ 14. Third, unlike the Kline

law firm, Mayer Brown made its false statements directly to the THL Funds and their counsel –

with full knowledge that the THL Funds were relying on those statements. Id. ¶¶ 41-43.

In support of its "mere conduit" defense, Mayer Brown primarily relies on Schatz

v. Rosenberg, 943 F.2d 485 (4th Cir. 1991), which is readily distinguishable. There, the parties

negotiated the transaction without counsel, while the lawyers acted as mere scriveners and did

not make any misrepresentations. Id. at 494 n.3 & 497. Here, Mayer Brown was involved in

negotiating the transaction, played a far greater role than a mere scrivener, and made

misrepresentations to the THL Funds. Furthermore, Schatz recognized the continued vitality of

Bonavire v. Wampler, 779 F.2d 1011 (4th Cir. 1985), which is much closer to the facts here and

which imposed liability on the law firm. As the Schatz court explained, the lawyer in Bonavire

---

[9] See also, e.g., Gilmore v. Berg, 761 F. Supp. 358, 370 (D.N.J. 1991) ("a jury could find [the attorney's]
statement [in a tax opinion letter] that 'the purchase price of $5.3 million reflects the fair market value of
the property as determined by the general partner' is so grossly misleading as to constitute actionable
fraud [under Rule 10b-5] in failing to disclose important facts underlying the determination of fair market
value," when plaintiffs had "presented evidence that ... [the attorney] knew that the fair market value of
$5.3 million was insupportable").

"made personal affirmative representations," "was actually involved in the deal," "participate[d]

in negotiation or solicitation," and made representations upon which "the plaintiffs ... clearly

relied ... in closing the deal." Schatz, 943 F.2d at 494 n.3.[10]

        Mayer Brown cites four other cases it mistakenly believes absolve it from liability

(Br. at 17).  Mayer Brown cites In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398 (S.D.N.Y.

1998), for the proposition that a parent corporation (GE) "could not be held liable" for false

information it reported that came from its subsidiary, Kidder, because it acted as "a mere

'conduit.'"  Br. at 17.  But there is no such holding in Kidder:  the court there held that the

Kidder defendants could be liable for information reported through GE because "[w]hen GE

opened its mouth regarding Kidder, Kidder's words came out."  10 F. Supp. 2d at 407.  And the

court did not say that GE was free from liability for uttering those words.  In fact, GE's potential

liability was not even at issue in Kidder; instead, its potential liability was the subject of a

separate lawsuit.  That lawsuit was dismissed not because GE was a "mere conduit" (and so did

not make any statements about Kidder), but because there were insufficient allegations that GE

---

[10] Mayer Brown engages in obvious hyperbole when it suggests that this clear legal standard – that an issuer's counsel who communicates with investors has a duty not to communicate false material facts – will make issuers' counsel guarantors of their client's deals (Br. at 17).  Counsel would not face liability if (a) it did not speak on certain subjects (since it would not be obligated to speak, even to correct a dishonest client), (b) it refused to communicate known lies, (c) it did not act with scienter, (d) investors did not rely on its communications, or (e) the other elements of a Rule 10b-5(b) claim cannot be proved. As the United States Attorney stated in connection with Collins's indictment, "[T]oday's charges should be no cause for concern for the vast majority of outside counsel who conduct themselves lawfully.  It is not a crime to have a client who commits a crime.  No lawyer will be prosecuted unless that lawyer knows about the client's fraud and agrees to join in it understanding its unlawful nature, or understanding its unlawful nature, takes steps intending to help the fraud succeed.  That is what Joseph Collins is alleged to have done:  that is why he is being charged today."  Prepared Remarks Concerning United States v. Joseph Collins by United States Attorney Michael J. Garcia, December 18, 2007 at 5-6 (Declaration of Seth Goodchild ("Goodchild Decl.") Ex. A).

acted with scienter when it made the statements about Kidder.[11]

In <u>Picard Chem. Inc. Proceeds Sharing Plan</u> v. <u>Perrigo Co.</u>, 940 F. Supp. 1101, 1112-13 (W.D. Mich. 1996), the plaintiffs alleged that the underwriter defendants "issu[ed] favorable press releases and research reports . . . to tout Perrigo stock" and "put a positive spin on Perrigo's results, and made overly optimistic projections of Perrigo's future performance while not disclosing fundamental problems which might enable the reasonable investor to understand that these profits and projections were not indicators of long term or continuous growth." The court rejected the underwriters' argument that they should not be liable because their false statements were based upon information they received from their client because that information was "invariably edited or incorporated" into their own statements. <u>Id.</u> at 1120. In any event, even if <u>Picard</u> could be read to support Mayer Brown's "mere conduit" defense, that reading is precluded by the Sixth Circuit's more recent decision in <u>Rubin</u>, 143 F.3d at 268.[12]

_____

[11] <u>See</u> <u>In re Gen. Elec. Sec. Litig.</u>, 1995 WL 590639, at *3 (S.D.N.Y. Oct. 4, 1995), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>Chill</u> <u>v. Gen. Elec. Co.</u>, 101 F.3d 263 (2d Cir. 1996). <u>See also</u> <u>Kidder</u>, 10 F. Supp. 2d at 407 ("GE believed that the information provided by Kidder accurately reflected Kidder's financial performance").

[12] The two other cases cited by Mayer Brown are also inapposite. <u>Winkler</u> v. <u>NRD Mining, Ltd.</u>, 198 F.R.D. 355, 357, 359 (E.D.N.Y. 2000), was a decision on a motion for a directed verdict and addressed whether a public relations firm could be liable for alleged misstatements contained in a press release it issued for its client. The plaintiff testified that the press release was significant to him because he viewed it as coming <u>directly</u> from the company, not because the public relations firm had any involvement in it. <u>Id.</u> at 365. The court held that imposing liability on the public relations firm for disseminating its client's press release "would effectively eliminate the requirement that plaintiff prove his reliance on an omission or misrepresentation attributable at the time of its dissemination to the defendant being sued." <u>Id.</u> at 366. Similarly, in <u>Friedman</u> v. <u>Ariz. World Nurseries Ltd.</u>, 730 F. Supp. 521, 533 (S.D.N.Y. 1990), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>Clark</u> v. <u>Ariz. World Nurseries Ltd.</u>, 927 F.2d 594 (2d Cir. 1991), plaintiffs merely alleged that the defendant law firm helped draft an offering memorandum that allegedly contained misstatements or omissions, but plaintiffs did "not attribute any specific misrepresentations to counsel." The court held that plaintiffs' allegations against the law firm could not satisfy the "time, place and content" pleading requirements of Fed. R. Civ. P. 9(b). <u>Id.</u> Neither of these cases is relevant here because the Amended Complaint pleads statements by Mayer Brown upon which the THL Funds relied, in part for the specific reason that they were made by Mayer Brown.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ These allegations state a Rule 10b-5(b) claim

against Mayer Brown under <u>Suez Equity Investors, L.P.</u> v. <u>Toronto Dominion Bank</u>, 250 F.3d 87

(2d Cir. 2001). There, rather than providing investors with a background report done by a third-

party investigator that included negative information about the securities issuer's principal,

certain defendants, which acted as the issuer's agents in selling the securities to the investors,

gave the investors a "modified" version of the report that "omitted negative events in [the

executive's] business and financial history." <u>Id</u>. at 93-94. The court held that, notwithstanding

<u>Central Bank</u> and <u>Wright</u>, the defendants that distributed the modified report were liable in their

own right as primary violators for providing a forged report in response to investor inquiries.

<u>See</u> <u>id</u>. at 101.[13]

     Nor can Mayer Brown escape liability for creating and then transmitting the

counterfeit Fourth LLC Agreement to the THL Funds by claiming that (a) the counterfeit was a

statement attributable to Refco or RGHI (Br. at 16), (b) ███████████████████████████

█████████████████████████████ (Br. at 44 n.33), or (c) Collins also sent to

the THL Funds "contemporaneous Refco board resolutions . . . which 'approved and adopted'

the so-called 'counterfeit' Refco LLC Agreement, making it effective and operative." Br. at 15-

16. It was Mayer Brown that created and then misrepresented the counterfeit Fourth LLC

---

[13] The defendants found liable included both corporations and an individual, DeRoziere, who was alleged to have acted on their behalf. The corporations sought to shift the blame to their agent, DeRoziere, who physically provided the modified report to the investors. The court easily dispatched this argument: "The fact that DeRoziere, or any other agent of the corporate defendants, may have supplied the report does not preclude them from primary liability. A corporation can only act through its employees and agents, and an allegation that a particular agent may have doctored or conveyed the report will not immunize the principals from liability for a knowing deception." <u>Id</u>. (citations omitted).

Agreement as the real one to the THL Funds, not Refco or Bennett, and thus Mayer Brown

cannot hide behind its conduit theory, even if the theory had any validity, and it does not.

Moreover, the Amended Complaint explicitly pleads ███████████████████████████

████████████████████████████████████████████████████, so Mayer

Brown's factual assertion to the contrary is improper.  Further, Mayer Brown misplaces reliance

on the Refco board resolutions to legitimize the counterfeit Fourth LLC Agreement.  These

resolutions, signed by Mayer Brown's co-conspirator Bennett, are nothing more than another

part of the fraud practiced on the THL Funds.[14]  The board resolutions address only one subject

— the transfer of 100 shares of Refco owned by Refco Group Holdings LLC to RGHI — and the

resolutions do not mention any purported reason to delete all references to DF Capital and the

Proceeds Participation Agreement from the prior agreement.  The unquestionable effect of the

resolutions is to cause an unsuspecting recipient to believe that the only change to the prior

agreement was to reflect the 100 share transfer to RGHI, one of the two previously disclosed

owners of Refco.[15]

---

[14] Furthermore, accepting Mayer Brown's argument would lead to the absurd result that a law firm can knowingly create a false document in furtherance of a fraud and escape liability simply because the law firm's client is also involved in creating the false document.

[15] Mayer Brown makes the last-ditch argument that the THL Funds supposedly knew about the Proceeds Participation Agreement but failed to ask for it, so nothing would have changed if the THL Funds had been give the real Fourth Amended LLC and pursued its reference to the Proceeds Participation Agreement.  (Br. 24-25) This is pure sophistry.  As ¶¶ 61 and 65 of the Amended Complaint allege, the THL Funds only saw a reference to the Proceeds Participation Agreement, not the Proceeds Participation Agreement itself; and the Proceeds Participation Agreement should have been produced in response to not one, but several, diligence requests.  On top of this, Collins made several misrepresentations to representatives of the THL Funds to further conceal the Proceeds Participation Agreement (Am Compl. ¶ 66).  So Mayer Brown's argument boils down to the suggestion that because the THL Funds were repeatedly defrauded by (a) having the Proceeds Participation Agreement withheld from them and (b) being lied to about the Proceeds Participation Agreement, Collins was free to defraud them yet again by creating a counterfeit Fourth LLC Agreement and misrepresenting it to be the real agreement.

C.    **Mayer Brown's "No Reliance" Argument Is Fatally Flawed**

    1.    **The Non-Reliance and Integration Clauses Do Not Bar the THL Funds' Misrepresentation Claim**

In arguing that the Amended Complaint fails to plead facts showing that the THL Funds relied on Mayer Brown (Br. at 19-25), Mayer Brown ignores the Amended Complaint's explicitly contrary allegations. For example, the Amended Complaint alleges that: "[d]uring the due diligence process, Mayer Brown and Collins understood that they would be providing information to the THL Funds upon which the THL Funds would rely in deciding whether to proceed with the 2004 Purchase." Am. Compl. ¶ 42; see also, e.g., id. ¶ 79 ("The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them by Mayer Brown and Collins during the due diligence process in electing whether to proceed with the 2004 Purchase and invest $452 million in Refco. Had truthful and complete information been provided by Mayer Brown, the THL Funds would not have proceeded with the 2004 Purchase").

Mayer Brown argues that, although it is not a party to the Purchase Agreement between the THL Funds and RGHI, it is protected by that Agreement's "non-reliance" and integration clauses. Br. at 19-22. But an examination of the non-reliance clause invoked by Mayer Brown confirms that the clause benefits only RGHI. The clause (Section 3.27 of the Purchase Agreement) states:

> The representations and warranties made in this agreement are in lieu of and are exclusive of all other representations and warranties, including any implied warranties. RGHI hereby disclaims any such other or implied representations or warranties, notwithstanding the delivery or disclosure to buyer or its officers, directors, employees, agents or representations of any documentation or other information (including any financial projections or other supplemental data).

See Ward Decl., Ex. A., at § 3.27 (emphasis added). The Purchase Agreement defines RGHI as "Refco Group Holdings, Inc.," which does not include any agents of RGHI, and Section 3.27

appears in Article III of the Purchase Agreement, entitled "Representations and Warranties of RGHI." Similarly, Section 9.1, the Agreement's integration clause, by its express terms, only applies "among the parties" to the contract, i.e., the THL Funds and RGHI. See Ward Decl., Ex. A., at § 9.1 ("This Agreement (a) constitutes the entire agreement among the Parties . . . and supersedes all other prior agreements and understandings, both written and oral, among the Parties . . ."). This, of course, only makes sense: the THL Funds could release RGHI from prior representations because RGHI was now bound by the representations in the Agreement (including that there were no undisclosed related-party transactions, material contracts or indemnity obligations). But the THL Funds would not have any reason to release other persons from their representations if those persons were not also bound by the Agreement.

The words of the Agreement are fatal to Mayer Brown's argument. New York and Massachusetts courts have held that, absent express language to the contrary, integration and merger clauses do not extend to non-contracting parties. For example, in In re WorldCom, Inc., 374 B.R. 94 (Bankr. S.D.N.Y. 2007), the court rejected MCI's argument that claims arising out of its allegedly fraudulent oral representations were barred by the integration clause in an agreement to which it was not a party. See id. at 109 ("MCI cannot benefit from a clause that binds only those parties to the agreement. The Integration Clause by its express terms only applies to the 'parties' and it does not state that it can be relied upon by non-contracting parties.").[16]

---

[16] See also Wittenberg v. Robinov, 9 N.Y.2d 261, 263-64 (1961) (holding that a clause disclaiming reliance on all representations outside a contract did not bar an action for fraudulent inducement against the seller's real estate broker because "the disclaimer provision by its express language did not inure to [the agent's] benefit."); Trioano v. Tuccio, 227 A.D.2d 467, 467 (N.Y. App. Div. 1996) ("The language of the disclaimer provision contained in the contract of sale between the plaintiff and the seller demonstrates that the disclaimer provision did not inure to the benefit of the defendant, who was a real estate broker on the transaction and also is alleged to have fraudulently induced the plaintiff to purchase the subject property"); Diodato v. Eastchester Dev. Corp., 111 A.D.2d 303, 305 (N.Y. App. Div. 1995)

Furthermore, not one of the cases cited by Mayer Brown supports its position.[17]

Not one of these cases analyzed whether the fraudulent representations and omissions of a third-party agent not a party to the contract – like Mayer Brown – can be immunized by non-reliance or merger clauses.[18] Indeed, Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609 (7th Cir. 1996), Br. at 19, both fails to analyze the liability of a third-party agent and does not involve a non-reliance or merger clause at all.

Similarly, while Mayer Brown suggests that the Second Circuit in ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007), allowed an agent (CCM) to avoid liability by invoking a non-reliance clause (Br. at 22), this was not the Second Circuit's holding. Rather, the Court there merely stated, without analysis, that "[l]argely for the same reasons as above [in the opinion], the district court properly dismissed th[e] claims" against CCM. Id. at 108. The "reasons ... above" included not only that a party to the agreement could

---

("In any event, the purported disclaimer would not inure to the benefit of defendant L'Hommedieu as he was not a party to the contract"); Norton v. Drepanos, 1994 WL 902881, at *1 (Mass. Super. Sept. 13, 1994) (finding that an integration clause "does not reach outside the contract to insulate non-parties"); Restatement (Third) of Agency § 6.01 cmt. d(1) (2006) ("If an agent does not become a party to a contract and is not subject to liability on the contract as an individual, the agent should not be able to assert rights as an individual derived from the contract in the absence of indicia that the parties to the contract so intended").

[17] See Br. at 19-20 (citing Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189 (2d Cir. 2003); Rissman v. Rissman, 213 F.3d 381 (7th Cir. 2000); and One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988)).

[18] Mayer Brown's reliance on Jackvony v. RIHT Fin. Corp., 873 F.2d 411 (1st Cir. 1989) (Br. at 20), is equally misplaced. The Jackvony court relied on a merger clause in an agreement to reject only a contract theory pressed by the plaintiff: "Insofar as Jackvony argues that Hospital Trust's pre-Agreement statements constitute a contractually binding promise, his argument fails in light of the later written contract, with its explicit statement that it contains the parties' entire bargain." 873 F.2d at 416. As to whether the plaintiff could establish reasonable reliance to support his Section 10(b) and common law fraud claims, on the other hand, the court applied an eight-factor balancing test, which weighed against the plaintiff because (among other things) the allegedly misleading statements "seem to have been vague," the statements were inconsistent with the representations in written documents (unlike here, where the Purchase Agreement perpetuated Mayer Brown's lies), and Jackvony had received a proxy statement telling him that "[n]o person has been authorized to give any information or make any representation not contained in the accompanying Prospectus/Proxy statement and, if given or made, any such information or representation should not be relied upon." Id. None of these facts are present here.

invoke its non-reliance clause (while still accountable for the express representations in the
agreement), but also that the plaintiff had not demonstrated falsity or loss causation. Id. at 107-
08. The latter two reasons, not the non-reliance clause, were the bases for the District Court's
dismissal: "[T]he securities claims against CCM . . . fail for the reasons that the claims against
[the investor defendants] fail – the Complaint fails adequately to allege falsity and loss
causation." ATSI Comm'ns, Inc. v. The Shaar Fund, Ltd., 357 F. Supp. 2d 712, 720 (S.D.N.Y.
2005), aff'd 493 F.3d 87 (2d Cir. 2007).[19] In fact, CCM never even invoked the non-reliance
clause in the District Court or moved to dismiss the complaint, but the District Court
nevertheless disposed of the claims against CCM because the complaint pleaded neither falsity
nor loss causation.[20] Id.

---

[19] Mayer Brown makes reference in its brief to the "Second Circuit … dismissing fraud claims against
two non-parties to agreements because [of] merger clauses in th[e] agreements." Br. at 22 (emphasis
added). The second non-party to which Mayer Brown is apparently referring is Crown Capital
Corporation, an agent of Rose Glen Capital Management and others. ATSI, 493 F.3d at 95. Unlike with
CCM, however, Crown Capital's liability is never addressed separately in the Second Circuit's opinion
because ATSI did not appeal the judgment as to Crown Capital, which is why Crown Capital is not listed
as one of the defendants-appellees in the case caption. Id. at 87. In any event, had the Second Circuit
considered the Rose Glen agreement, it would have seen that the agreement – unlike the Purchase
Agreement here – expressly disavowed any reliance by ATSI on statements by Rose Glen (as the buyer)
and its representatives and agents. See Goodchild Decl. Ex. B (ATSI Comm. Form 8-K, Ex. 10.1
(Securities Purchase Agreement)), at "f. Acknowledgement Regarding Buyers' Purchase of Securities"
("any statement made by any Buyer or any of their respective representatives or agents in connection with
this Agreement and the transactions contemplated hereby … has not been relied upon by the Company, its
officers or directors in any way. … the Company's decision to enter into this Agreement has been based
solely on the independent evaluation of the Company and its representatives").

[20] Beyond this, even assuming that Mayer Brown could invoke these provisions, many courts have
refused to enforce them where, as here, a party was fraudulently induced to enter into the contract. See,
e.g., E*Trade Fin. Corp. v. MarketXT Holdings Corp. (In re MarketXT Holdings Corp.), 2006 WL
2864963, at *12-13 (Bankr. S.D.N.Y. Sept. 29, 2006) (parties cannot evade liability based on merger and
integration provisions when they concealed facts "peculiarly within [their] knowledge" that could not
have been discovered without "extraordinary effort or great difficulty" (citing Dimon Inc. v. Folium, Inc.,
48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999))); Abry Partners V, L.P. v. F&W Acquisition LLC, 891 A.2d
1032, 1035, 1064 (Del. Ch. 2006) (non-reliance and other exculpation provisions are "unenforceable as a
matter of public policy" "[t]o the extent [they] purport[] to limit the Seller's exposure for its own
conscious participation in the communication of lies to the Buyer"). Bates v. Southgate, 31 N.E.2d 551,
558 (Mass. 1941) ("contracts or clauses attempting to protect a party against the consequences of his own
fraud are against public policy and void where fraud inducing the contract is shown").

Finally, Mayer Brown's position is breathtakingly inconsistent. The Purchase Agreement is riddled with false representations, false warranties, and false disclosure schedules. Am. Compl. ¶ 70. So, on the one hand, Mayer Brown backpedals furiously in an attempt to avoid liability stemming from all these material lies in the Purchase Agreement, stating that it cannot be held liable for the "host of misrepresentations made by Refco … in the Purchase Agreement" (Br. at 6 ), while on the other hand, Mayer Brown embraces the Purchase Agreement and seeks its protection. Mayer Brown cannot have it both ways.

### 2.     The THL Funds Have Adequately Pleaded Transaction Causation

Mayer Brown next argues that the THL Funds have not pleaded reliance because the THL Funds have not pleaded "transaction causation" – that is "but for the claimed misrepresentations or omissions, [the THL Funds] would not have entered into the detrimental securities transaction." Br. at 22-23 (quoting ATSI, 493 F.3d at 106). But that is precisely what the THL Funds did allege. See, e.g., Am. Compl. ¶ 79 ("The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them by Mayer Brown and Collins during the due diligence process in electing whether to proceed with the 2004 Purchase and invest $452 million in Refco. Had truthful and complete information been provided by Mayer Brown, the THL Funds would not have proceeded with the 2004 Purchase."); id. ¶¶ 69, 99. Thus, the THL Funds have sufficiently alleged transaction causation. See, e.g., Harrison v. Rubenstein, 2007 WL 582955, at *14 (S.D.N.Y. Feb. 26, 2007) ("[p]laintiffs have adequately alleged transaction causation by their claim that they 'would not have purchased or otherwise acquired their Cornerstone securities' . . . but for the alleged misrepresentations and omissions of the [defendants]").

Moreover, transaction causation is presumed where, as here, a plaintiff alleges

material omissions.[21]  In particular, the Amended Complaint pleads that Mayer Brown failed to disclose to the THL Funds the existence of the sham round-trip loans and the attendant indemnifications and guarantees (Am. Compl. ¶ 52), despite the THL Funds' repeated requests for information on related-party transactions and for copies of all material contracts to which Refco was a party (id. ¶¶ 44, 48).  The Amended Complaint further pleads that Mayer Brown never disclosed to the THL Funds the RGHI Receivable.  Id. ¶ 45.  To the same effect, Collins failed to disclose the existence of the Proceeds Participation Agreement, failed to provide the genuine Fourth LLC Agreement to the THL Funds, ████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Id. ¶¶ 57, 61-64.  Again, this more than adequately pleads transaction causation.

Finally, it is not "literally incredible," as Mayer Brown contends, that "Plaintiffs would not have made a *half-billion dollar* investment in Refco but for outside counsel's two short oral statements made in separate conference calls . . . and two single-sentence statements made in e-mails."  Br. at 24.  Putting aside that this contention seriously understates the breadth of Mayer Brown's deceptions, Mayer Brown's equating immateriality with brevity rings entirely hollow:  the damage caused by a lie is not measured by whether the lie was concise.  Had Mayer Brown told the truth, the THL Funds would have learned that many of the material representations they received were false, including that there was no related-party transactions, which was "[o]f critical importance to the THL Funds," (Am. Compl. ¶ 44), and which they

---

[21] See, e.g., Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001) ("In the securities fraud context, transaction causation is presumed when a claim rests on a material omission.") (citations omitted); In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 233 (S.D.N.Y. 2006) ("[T]ransaction causation is presumed where a plaintiff's claims are based on a defendant's failure to disclose material information.") (citation omitted).

insisted on before closing (id. ¶ 47). Had Mayer Brown told the truth, the 2004 Purchase would not have occurred. This more than adequately pleads transaction causation.

### D. The THL Funds Have Alleged Particularized Facts Giving Rise to a Strong Inference of Scienter

In the Second Circuit, a plaintiff may establish the required strong inference of scienter in two ways: (1) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness; or (2) by alleging facts to show that defendant had both motive and opportunity to commit fraud. See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 644 (S.D.N.Y. 2007) (citing Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)). The Amended Complaint overflows with facts showing that Mayer Brown consciously lied to the THL Funds.[22]

The Amended Complaint details how Mayer Brown lawyers falsely advised the THL Funds that all related-party transactions, material contracts, and indemnification obligations had been disclosed although those very same lawyers knew – because they personally negotiated, coordinated, and drafted the sham round-trip loans – that no aspect of those loans in which they were involved had been disclosed to the THL Funds. See, e.g., Am. Compl. ¶¶ 31-32, 52-56. Indeed, Mayer Brown communicated to the THL Funds that all related-party transactions had

---

[22] Citing primarily Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004), Mayer Brown argues that it "can be held to have acted with scienter only if an individual lawyer in the firm acted with scienter." Br. at 32-33. But the Amended Complaint overflows with allegations that Collins and Koury acted with scienter. See, e.g., Am. Compl. ¶¶ 32-33, 52-56, 63-67 (pages 3-4 & 6-7, above, 25 & 28 below). Furthermore and as Mayer Brown admits, several courts in this District have rejected the Southland rule and held that collective allegations of an organization's scienter are sufficient. Br. at 33 n.22; see In re Worldcom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (to show that a corporate defendant acted with scienter, "plaintiffs in securities fraud cases need not prove that any one individual employee . . . also acted with scienter"); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) ("[N]othing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter."). As Mayer Brown notes, the Second Circuit will likely address the permissibility of pleading collective scienter in Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., No. 06-2902-CV (argued Jan. 30, 2008). Regardless of how the Court of Appeals rules, the THL Funds' allegations plead that Mayer Brown had scienter under both the "collective scienter" standard and Southland.

been disclosed while Mayer Brown was still involved in the sham round-trip loans. Id. ¶¶ 32(l),

49. The Amended Complaint further details how, after being asked by the THL Funds to provide

a copy of the operative Fourth LLC Agreement, Collins manufactured a counterfeit Fourth LLC

Agreement that ████████████████. Collins then gave this counterfeit to the THL

Funds to ████████████████. Id. ¶¶ 61, 63-64.

    In light of these particularized allegations, Mayer Brown's contention, that "[t]he

Amended Complaint does not give rise to a cogent and compelling inference that any Mayer

Brown lawyer engaged in conscious misbehavior or recklessness," (Br. at 35), is meritless. Nor

can Mayer Brown shield itself from liability for these knowing falsehoods by seeking refuge in

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007). Tellabs requires only that a

court "consider plausible nonculpable explanations" in determining whether "the inference of

scienter [is] cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." Id. at 2510. But Mayer Brown has not offered any "plausible nonculpable

explanation" that could possibly be drawn from the factual allegations of the Amended

Complaint. Instead, Mayer Brown offers up several excuses for its conduct that are wholly

implausible, collide with the allegations of the Amended Complaint, or contradict this Court's

opinion in In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611 (S.D.N.Y. 2007).

    For example, Mayer Brown contends that it had no knowledge of the "third leg"

of the round-trip loans – i.e., that RGHI actually used the loans to pay down the receivable to

Refco – and without this knowledge, Mayer Brown did not know that the round-trip loans were

being used for a fraudulent purpose. This argument fails because Mayer Brown is again

attempting to rewrite the Amended Complaint and is again ignoring the facts alleged. The THL

Funds specifically allege at length that Mayer Brown had knowledge of this "third leg." Am.

Compl. ¶¶ 35(a)-(g); 36-37.

       Furthermore, the Amended Complaint alleges that, given the very nature of the first two "legs" of the sham round-trip loans, Mayer Brown's knowledge of those legs alone was enough for a reasonable person – let alone attorneys of Mayer Brown's sophistication –  to know that the "third leg" was the inevitable consequence of the first two "legs" and thus part of a massive fraud: Mayer Brown knew of the RGHI Receivable, knew the loans had no business purpose, and knew Refco bore all the risk in the transactions so that it could regularly funnel money indirectly to RGHI for short periods of time straddling Refco's reporting periods.  See Am. Compl. ¶¶ 18, 20, 21 & 35.  As this Court has already held:  "The [round-trip loan] transactions were certainly large, and their timing, recurrent nature, and obvious lack of business purpose would certainly have been suspicious to anyone who became aware of them. . . .  In this case, there was certainly a monster under the bed . . . ."  In re Refco, 503 F. Supp. 2d at 648-49.

       In addition, even if – contrary to simple logic and the allegations in the Amended Complaint – Mayer Brown did not know or recklessly disregarded the possibility that RGHI was using the sham loans to pay down its debt to Refco, this does not save Mayer Brown.  The sham loans and corresponding legal documents Mayer Brown negotiated were — as Mayer Brown knew — themselves material contracts, created material indemnity obligations for Refco, and constituted related-party transactions (because, for example, Refco was providing indemnities for RGHI loans).  Am. Compl. ¶¶ 28-29, 37, 48.  Mayer Brown also "at all times knew the importance the THL Funds placed on identifying and eliminating related-party transactions."  Id. ¶ 47.  Thus, Mayer Brown could not omit these transactions from its disclosures and communications to the THL Funds regardless of whether Mayer Brown knew (as it did) that the transactions also involved RGHI using the loans from Refco customers to hide its debt to Refco.

In attempting to negate its scienter, Mayer Brown also argues that "the more plausible conclusion is that Mayer Brown lawyers saw in Refco what the rest of the world saw: a growing and vibrant company that was a 'leading' player in its fields." Br. at 36. But Mayer Brown's perspective is not that of "the rest of the world." Mayer Brown "had long been Refco's primary outside counsel, handling most of its significant legal matters," (Am. Compl. ¶ 13), Collins was Refco's "go-to-guy" (id. ¶ 14), and "Mayer Brown was intimately familiar with the Refco's business, finances, operations, and corporate structure." Id. ¶ 16. In addition, Mayer Brown knew that for years Refco engaged in startlingly large period-ending related-party transactions with no discernible business purpose, ████████████████████████████████████ ██████████████████████████████████████████████████████, that Refco had engaged in no less than 17 sham round-trip loans in five years, and that serving Refco's purposes meant lying to the THL Funds and creating a counterfeit document to mislead them. Equally outlandish is Mayer Brown's explanation that the work it performed "was typical of legal work on routine corporate transactions." Br. at 37. Sham round-trip loan transactions are not "routine corporate transactions" and creating counterfeit documents is not "typical … legal work." As the detailed factual allegations in the Amended Complaint show, Mayer Brown senior partner Collins was not indicted for rendering typical, routine legal services – he was indicted based on allegations that, if true, make him a criminal who used his legal skills to effectuate a massive fraud.

Mayer Brown also maintains that the THL Funds have not alleged that Collins knew his oral statements to the THL Funds were false because those oral statements only asserted that there were no undisclosed material contracts or indemnification obligations, and Collins could not have known whether someone else had disclosed the existence of the sham

round-trip loans to the THL Funds. Br. at 41-42. Not only is this argument wholly inappropriate in a motion to dismiss, but in any event, this argument ignores the allegations of the Amended Complaint that Collins knew that no one else had disclosed to the THL Funds the contracts and indemnity obligations created by the sham round-trip loans. Am. Compl. ¶¶ 53-56. Furthermore, it is simply impossible to believe that Collins thought someone else disclosed the sham round-trip loans to the THL Funds when Mayer Brown was solely responsible for drafting disclosure statements that should have, but did not, list these documents as material contracts, related-party transactions, corporate guarantees, or indemnity obligations.[23]

The Amended Complaint's allegations also refute Mayer Brown's implausible explanation that (a) "Mayer Brown lawyers were unaware of Refco's well-hidden set of RGHI receivables" (Br. at 38) and (b) the Niederhoffer settlement had "nothing to do with hidden debt" (Br. 39-40). The Niederhoffer settlement was an early material component of the RGHI Receivable. Am. Compl. ¶ 18. The Amended Complaint explicitly alleges that Refco hid the Neiderhoffer loss in an RGHI subsidiary in the late 1990s instead of writing this loss off as it should have.[24] Id. Mayer Brown negotiated and drafted these settlement documents. Id. In any event, the Amended Complaint clearly alleges that Mayer Brown knew of the RGHI Receivable, even if it did not know of every component of the Receivable, id. ¶¶ 18, 20, 21, 35(c), (e), 36, and that Mayer Brown negotiated and drafted the Proceeds Participation Agreement and related Letter Agreement, a key aspect of which was that Refco would use $350 million of the proceeds it received under the Proceeds Participation Agreement "'for the retirement of the inter-company

---

[23] This argument also ignores the Amended Complaint's allegations that Mayer Brown made numerous false and unqualified written statements directly to the THL Funds and their counsel.

[24] Am. Compl. ¶ 18 ("Instead of Refco writing off the uncollectible portion of this debt as a loss, Bennett and his co-conspirators hid the debt in an RGHI subsidiary – Wells Limited – through a series of settlements and assignments.").

debt of [RGHI].'" Id. ¶ 58.

       Mayer Brown's additional contention that, because the agreements relating to the

sham round-trip loans were supposedly not in force at the closing (Br. at 42-43), its lawyers did

not know that disclosure of the sham loans was called for by the schedules to the Purchase

Agreement, once again ignores the record: Section 3.12 of the Purchase Agreement and its

corresponding schedule both called for the disclosure of related-party transactions "since March

1, 2003" — not just as of the closing (Am. Compl. ¶ 70(e)).            

This is no mere technicality. Indemnifying a

party to a sham transaction can have real consequences. Equally meritless is Mayer Brown's

contention that because the $108 million loan between RGHI and Refco did not have to be

disclosed on the closing schedule, then neither did the back-to-back loans (Br. at 43). But as the

Amended Complaint specifically pleads, the parties expressly agreed that the $108 million loan

was to be eliminated before the closing – and it was (Am. Compl. ¶¶ 45-46). The THL Funds

did not know about the sham loans, and Mayer Brown cannot point to any agreement concerning

those loans.

       With respect to the counterfeit LLC Agreement, Mayer Brown maintains that

"[t]he far stronger inference is that Mr. Collins did not know that

This argument is completely baseless because, as

alleged in the Amended Complaint, Collins did

████████████████████████████ He created the counterfeit Fourth LLC

Agreement ███████████████████████████████████████████

███████████████████████████ 25

Mayer Brown also attempts to distinguish itself from the individual Refco

executives who this Court has already found acted with scienter. In re Refco, 503 F. Supp. 2d at

648-49. According to Mayer Brown, it is situated differently because, unlike these Refco

executives, the Amended Complaint does not allege that "any Mayer Brown lawyer had access

to the day-to-day cash flows and financial records of RGHI, Refco, or [its RCM subsidiary]."

Br. at 35. And according to Mayer Brown, "[a]ny allegation that it should have been obvious to

the lawyers who worked on the back-to-back loans that they were being used to commit

accounting fraud is nothing more than a claim of 'fraud by hindsight.'" Br. at 36.

But Mayer Brown did not need access to the books of Refco, RGHI, or RCM to

know about the sham round-trip loans: it worked directly on the loans. Furthermore, Mayer

Brown conspicuously ignores this Court's finding that scienter had been sufficiently alleged as to

Refco's general counsel Dennis Klejna based not on allegations about Klejna's knowledge of

"cash flows" or "financial records," but on allegations that Klejna knew about the sham round-

trip loans from reviewing the legal bills of Mayer Brown:

> [T]he fraudulent transactions were allegedly orchestrated by one or more
> attorneys at an unnamed law firm. (Compl. ¶¶ 403-05.) The plaintiffs allege that
> Sherer, as CFO, and Klejna, as General Counsel, were responsible for receiving
> and authorizing the payment of bills from this firm that "described the legal work
> performed ... in connection with documenting the transactions." (Compl. ¶ 595.) It
> is of course possible that Bennett orchestrated the legal work without the help or
> knowledge of the corporate officers responsible for supervising the law firm, but
> the allegation that Sherer and Klejna stood between Bennett and the law firm in

---

25 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████

the relevant chain of command supports a strong inference that they were aware of the work being done. The size of the transactions, their recurrent nature, and their obvious lack of business purpose may not themselves be sufficient to support an inference of scienter, but together with the allegations concerning the roles and responsibilities of Silverman, Sherer, and Klejna, they suffice.

In re Refco, 503 F. Supp. 2d at 652.

        In sum, the allegations in the Amended Complaint create a strong inference that Mayer Brown lawyers were not only reckless in not knowing, but in fact consciously knew, that their material misstatements and omissions to the THL Funds were false and misleading.  As this Court has previously stated, "there was certainly a monster under the bed; the question is whether anyone had a reason to look there."  Id. at 649.  Mayer Brown did not need a reason to look for the monster under the bed:  it already knew full well that the monster was there because it was instrumental in creating and concealing the monster.

**E.**      **Plaintiffs' Factual Allegations State a Claim for "Scheme Liability" Under Section 10(b) and Rule 10b-5(a) & (c)**

        In addition to Mayer Brown's actionable misstatements, the THL Funds have alleged that Mayer Brown engaged in a broader fraudulent scheme that included employing manipulative devices.  Specifically, the Amended Complaint alleges that Mayer Brown conspired with Bennett to operate, and participated in, a long-running scheme designed to conceal the RGHI Receivable and Refco's true financial condition.  Am. Compl. ¶¶ 21-37.

        Mayer Brown's conduct is precisely the type of conduct that this Court found supported a "scheme liability" claim under Rules 10b-5(a) and (c) in In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319 (S.D.N.Y. 2004) (Lynch, J.).  In addition to their separate claims under 10b-5(b), the Global Crossing plaintiffs alleged that Arthur Andersen violated 10b-5(a) and (c) by playing a central role in devising and implementing a scheme involving the creation of "interrelated transactions . . . that had no economic substance but which were used to fool

investors into believing that the industry and these companies were growing much faster than the reality." Id. at 327. The Court rejected Arthur Andersen's principal argument that plaintiffs' scheme claim was "'a thinly disguised . . . aiding and abetting claim,'" id. at 335, emphasizing that plaintiffs' allegations that Arthur Andersen "actively participated," "was intimately involved in," and played a "central role in these schemes" easily established that Arthur Andersen had "'committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud.'" Id. at 327, 336 (citation omitted). In rejecting Arthur Andersen's argument, the Court emphasized that "subsections (a) and (c) . . . encompass the use of '<u>any</u> device, scheme or artifice,' or '<u>any</u> act, practice, or course of business' used to perpetrate a fraud on investors." Id. at 336 (emphasis in original).[26]

Nevertheless, Mayer Brown mistakenly contends that the THL Funds' claim under Rule 10b-5(a) and (c) fails on two grounds. First, Mayer Brown contends that the THL Funds' scheme liability claim is nothing more than a reiteration of their Rule 10b-5(b) claim. See Br. at 30-31. But the authority on which Mayer Brown principally relies, Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005), holds only that "where the <u>sole basis</u> for [a scheme liability claim] is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)". Here, of course, Mayer Brown's false statements are hardly the "sole basis" for the THL Funds' Rule 10b-5(a) and (c) claims. Those claims, instead, also encompass Mayer Brown's other deceptive conduct, including its key role in the sham round-trip loan transactions, and the fact that a participant in a scheme also made

---

[26] <u>See also</u> In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 620, 626 (S.D.N.Y. 2005) (holding that outside counsel could be held liable under Section 10(b) for "arrang[ing]" sham transactions through the creation of shell corporations that Parmalat used to record multi-million dollar third-party receivables" because the sham transactions were "inventions, projects, or schemes with the tendency to deceive [that] created the appearance of a conventional sale and loan when, in fact, the reality was quite different." (citation and internal quotation marks omitted)).

misrepresentations does not mean that there was not a scheme.

Second, Mayer Brown argues extensively that the THL Funds' scheme liability

claim is barred under Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc., 128 S. Ct. 761

(2008), and Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372 (5th

Cir. 2007), cert. denied, 128 S. Ct. 1120 (2008). From these cases, Mayer Brown concludes that

the THL Funds cannot satisfy the reliance element of a Section 10(b) private cause of action

based upon Mayer Brown's role in the sham round-trip loan transactions because (1) the THL

Funds did not know of Mayer Brown's role in the sham transactions at the time of the 2004

Purchase and (2) Refco, not Mayer Brown, decided "how to account for the transactions." This

conclusion, however, both overextends Stoneridge and Credit Suisse and purposely ignores the

full scope of the THL Funds' Rule 10b-5(a) and (c) claim.

To start, Stoneridge turns on the element of reliance, as Mayer Brown concedes

(Br. at 26), and the Amended Complaint explicitly alleges that the THL Funds relied upon being

told by Mayer Brown that there were no undisclosed related-party transactions, material

contracts, or indemnification obligations. See Am Compl. ¶¶ 42, 79, 90. Literally at the very

same time, however, Mayer Brown was perpetuating the scheme to conceal Refco's massive

RGHI Receivable by continuing to engage in secret related-party transactions involving material

contracts and indemnification obligations hidden from the THL Funds' view, including a $720

million round-trip loan transaction from February 20 to March 4, 2004, and another $700 million

round-trip loan transaction from May 27 to June 7, 2004. See id. ¶ 32(k)-(l). The THL Funds'

reliance on Mayer Brown included relying on Mayer Brown not to engage in conduct such as

this that put the lie to Mayer Brown's statements, and Mayer Brown took advantage of that

reliance by continuing the round-trip transactions to ensure the THL Funds would not discover

the RGHI Receivable and Refco's deal-breaking financial condition.[27]  Mayer Brown's false

statements to the THL Funds and their agents establish a direct link absent in both <u>Stoneridge</u>

and <u>Credit Suisse</u> between Mayer Brown's involvement in the sham transactions and the THL

Funds' decision to proceed with the 2004 Purchase.[28]

      Ignoring the Amended Complaint, Mayer Brown also asks this Court to assume

that its participation in the Refco fraud was as distant from the THL Funds as the suppliers in

<u>Stoneridge</u> were from the public shareholders of Charter Communications, Inc., and therefore to

equate the chain of causation here with the chain in <u>Stoneridge</u>.  But the shareholder plaintiffs in

<u>Stoneridge</u> had no connection at all with the suppliers.  There was no allegation in <u>Stoneridge</u>

that any shareholder inquired into — or even knew about — Charter's supply contracts; the sole

deception was that Charter improperly inflated the revenue in its financial statements based on

transactions with the suppliers that the suppliers on "their own financial statements" properly

recorded "as a wash, under generally accepted accounting principles."  <u>Stoneridge</u>, 128 S. Ct. at

767.  Here, of course, the deception went far beyond Refco's financial statements, rendering

meaningless Mayer Brown's argument that Refco, not Mayer Brown, decided "how to account

for the transactions":  the THL Funds specifically inquired into Refco's related-party

transactions, material contracts, and indemnification commitments – <u>i.e.</u>, the very areas of Mayer

---

[27] Presumably Mayer Brown is not arguing that there cannot be liability here unless the THL Funds specifically knew of the sham transactions and Mayer Brown's role in creating and then hiding them.  If the THL Funds knew of the conduct, there would be no fraud in the first instance.  Any requirement that a plaintiff can only prove reliance on deceptive conduct if the plaintiff knew of the deception would simply eliminate liability under Section 10(b) altogether, particularly where, as here, the defendant's role in the scheme included hiding the fraud, which is not a result either <u>Stoneridge</u> or <u>Credit Suisse</u> even remotely contemplate.

[28] As noted above, <u>Lentell</u> does not foreclose a plaintiff from relying on false statements as part of the chain of evidence establishing a Rule 10b-5(a) and (c) claim where, as here, the false statements are not the "sole basis" for the claim.  396 F.3d at 177.

Brown's manipulation – but were directly deceived by Mayer Brown.[29] This is, in other words, a one-link chain – "Mayer Brown and Collins at all times knew the importance that the THL Funds placed on identifying and eliminating related-party transactions," Am. Compl. ¶ 47, yet Mayer Brown and Collins repeatedly participated in and concealed those transactions to mask Refco's true precarious financial condition, id. ¶¶ 31-32.[30]

    Stoneridge and Credit Suisse are also inapposite because both focused not on whether a plaintiff can establish reliance under any circumstances, but on whether plaintiffs seeking to pursue claims on a classwide basis can rely on the presumption of reliance established by Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988).[31] But the THL Funds are not seeking to invoke any presumption of classwide reliance; they have alleged and intend to prove that they individually relied on Mayer Brown's conduct. The THL Funds relied not only on Mayer Brown telling them the truth, but also on Mayer Brown not engaging in conduct – such as negotiating

---

[29] Cf. Burnett v. Rowzee, 2008 WL 638503, at *6 (C.D. Cal. Feb. 11, 2008) (distinguishing Stoneridge, in part, because the Charter investors had no contact with the companies involved in the sham transactions, whereas in the case before the District Court, the Harvest Income investors "had direct contact with GamePlan and, relying on information gained from this relationship, invested in Harvest Income").

[30] As Mayer Brown notes (Br. at 29-30), Stoneridge distinguishes between Section 10(b) claims brought in the context of "the securities markets – the realm of financing business," and Section 10(b) claims brought in the context of "purchase and supply contracts – the realm of ordinary business operations." Stoneridge, 128 S. Ct. at 770-71. This case, of course, deals with the "realm of financing business," further separating it from Stoneridge. Recognizing this, Mayer Brown argues that the Supreme Court promptly disavowed its Stoneridge distinction between financing transactions versus goods and services transactions when it denied the petition for certiorari in Credit Suisse, but it is well settled that "the denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times," Missouri v. Jenkins, 515 U.S. 70, 85 (1995) (citation and alteration omitted); see also Triestman v. United States, 124 F.3d 361, 365 (2d Cir. 1997) (accord).

[31] See Stoneridge, 128 S. Ct. at 770 ("The argument is that the financial statement Charter released to the public was a natural and expected consequence of respondents' deceptive acts. ... That causal link is sufficient, petitioner argues, to apply Basic's presumption of reliance to respondents' acts"); Credit Suisse, 482 F.3d at 383 ("Without a classwide presumption of reliance, plaintiffs would have to prove individual reliance on defendants' conduct. A fraud class action cannot be certified when individual reliance will be an issue." (citation, alteration, and internal quotation marks omitted)); id. at 394 ("Because no class may be certified in a § 10(b) case without a classwide presumption of reliance, our analysis of reliance disposes of this appeal").

and coordinating the sham round-trip loan transactions and creating false documents – that put the lie to what Mayer Brown and its co-conspirators were telling the THL Funds about Refco's related-party transactions, material contracts, and indemnification obligations.[32]

Finally, Mayer Brown simply ignores the most salient holding in <u>Stoneridge</u>. The Supreme Court did not eliminate scheme liability under Rule 10b-5(a) and (c). To the contrary, the Court made crystal clear that liability under Section 10(b) and Rule 10b-5 does not require "a specific oral or written statement …. Conduct itself can be deceptive." 128 S. Ct. at 769; <u>see also id.</u> at 773-74 (Section 10(b) "continues to cover secondary actors who commit primary violations"). Accordingly, Mayer Brown cannot escape liability here by claiming that its words and actions do not amount to official "statements" of Mayer Brown. "Conduct can be deceptive," <u>id.</u> at 769, and Mayer Brown's conduct here was unequivocally, and repeatedly, deceptive. That deception is actionable under Rule 10b-5(a) and (c), and Mayer Brown's effort to escape liability should be rejected.

## II.    THE AMENDED COMPLAINT STATES A RICO CLAIM

### A.    The PSLRA Does Not Bar the THL Funds' RICO Claim

Mayer Brown argues that, because the SEC could pursue Mayer Brown for aiding and abetting securities fraud, the THL Funds' RICO claim is barred by the PSLRA amendment to 18 U.S.C. § 1964(c) because the underlying conduct "would have been actionable as fraud in the purchase or sale of securities." Br. at 46-47. While Mayer Brown is wrong that it was only

---

[32] In a letter, dated May 5, 2008, to the Court, Mayer Brown cited <u>In re DVI Inc. Sec. Litig.</u>, 2008 WL 1900384 (E.D. Pa. Apr. 29, 2008), as establishing that an investor cannot prove reliance on a law firm's alleged involvement in a fraudulent scheme if that involvement was not disclosed to investors. But <u>DVI</u> is just like <u>Stoneridge</u> and <u>Credit Suisse</u> – it only held that no presumption of reliance could apply in the situation before it, so proving reliance would be an individualized issue; the court did not foreclose proving reliance on an individualized basis. <u>See id.</u> at *21 ("because Lead Plaintiffs are not entitled to either presumption in establishing reliance on a class wide basis, the Court find that individual issues of reliance will predominate over common issues of law and fact with respect to Clifford Chance").

an aider and abettor, rather than a primary violator, of the securities laws, see Parts I (A) & (B) (supra), even if it had only been an aider and abettor, Mayer Brown's argument that it is shielded from private liability under both RICO and the securities laws fails as a matter of law.

      1.      This Court need not reach Mayer Brown's argument regarding the scope of the PSLRA amendment to RICO.  The THL Funds have pleaded a RICO claim under 18 U.S.C. § 1962(d) in the alternative, should this Court conclude that the interests "that the THL Funds acquired in the 2004 Purchase were [not] securities." Am. Compl. ¶ 4 n.5.[33]  The question whether the THL Funds' equity interests in Refco were "securities" should not be resolved on the pleadings because it is a mixed question of fact and law.  See Jones v. Deutsche Bank AG, 2005 WL 1683614, at *3 (N.D. Cal. July 19, 2005) (declining to dismiss RICO claim based on PSLRA amendment reasoning that "the complex nature of the . . . transaction and the limited facts before the Court make the issue more appropriately addressed in a summary judgment motion").[34]  If the THL Funds' equity interests were not securities, the PSLRA amendment to RICO does not prevent the THL Funds suing Mayer Brown for the injury it caused the THL Funds.  See, e.g., Fleet Nat'l Bank v. Boyle, 2005 WL 2455673, at *4 (E.D. Pa. Sept. 12, 2005) (finding that there is no authority for the view that a RICO claim by "a plaintiff who had not bought or sold securities" is "barred as securities fraud preempted by the PSLRA").

      Mayer Brown's fallback position is that, even if the THL Funds' equity interests

---

[33]The Federal Rules of Civil Procedure expressly contemplate this type of alternative pleading.  See Fed. R. Civ. P. 8(e)(2) ("[a] party may set forth two or more statements of a claim or defense alternately or hypothetically"); see also Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994) (under Rule 8(e)(2) "a plaintiff may plead two or more statements of a claim . . . regardless of consistency").

[34]Mayer Brown argues that the Amended Complaint should be read to conclude that the equity interests the THL Funds acquired were "investment contracts," and therefore securities.  Br. at 50.  The question whether the THL Funds' interests in Refco were "investment contracts" should be determined based on the "economic reality" of the transaction, and resolution of that issue is factbound and should not be decided on a motion to dismiss.  See Crowley v. Montgomery Ward & Co., 570 F.2d 875, 877 (10th Cir. 1975); Jones, 2005 WL 1683614, at *3.