are not securities, part of Mayer Brown's conduct resulted in fraud on other investors who purchased securities, and the PSLRA amendment is triggered where "any . . . predicate acts . . . were in connection with the purchase or sale of securities." Br. at 50 (internal quotation marks and emphasis omitted). But that analysis is wrong: by its terms, the amendment bars "conduct that would have been actionable as fraud in the purchase or sale of securities" from constituting a RICO violation. 18 U.S.C. § 1964(c). If the interests the THL Funds acquired in Refco were not securities, then the THL Funds would not have a claim for fraud "in the purchase or sale of securities." There is no language in the PSLRA amendment extending its reach to frauds "in connection with" the purchase or sale of securities.[35] In any event, Mayer Brown misplaces reliance on SEC v. Zanford, 535 U.S. 813, 815 (2002) to support its "in connection with" argument, because that case unquestionably involved securities, i.e., a stockbroker who sold "his customer's securities and us[ed] the proceeds for his own benefit"; here, the open question is whether Mayer Brown's fraud directed against the THL Funds involved securities at all. Not surprisingly, none of Mayer Brown's cases support the proposition that the THL Funds could maintain a securities fraud claim against Mayer Brown if this Court concluded that the THL Funds did not purchase "securities"; and if the THL Funds do not have actionable securities claims, then it makes no sense to conclude that the PSLRA amendment bars their RICO claim. The consequence of that view would be to immunize Mayer Brown under federal law from its

---

[35] For this reason, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006), has nothing to do with the proper interpretation of the PSLRA amendment to RICO, contrary to Mayer Brown's suggestion (Br. at 47-48). The Supreme Court there interpreted the statutory phrase "in connection with" the purchase or sale of securities under federal securities laws. See Merrill Lynch, 574 U.S. at 74-78. Dabit does not speak to the proper construction of the PSLRA amendment, which does not include the "in connection with" language. The THL Funds respectfully submit that the court in Ling v. Deutsche Bank, AG, 2005 WL 1244689 (S.D.N.Y. May 26, 2005), erroneously broadened the PSLRA amendment to encompass conduct "in connection with the purchase or sale of securities," id. at *3, leading to the incorrect statement (not applicable here in any event) that "[i]f one predicate act alleges breach of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar." Id. at 4.

fraud against the THL Funds.[36]

        2.      Mayer Brown's interpretation of the PSLRA amendment to RICO is flawed. Congress intended the amendment to address the specific concern that private plaintiffs with actionable claims under the securities laws would circumvent the PSLRA by bringing RICO claims instead. See Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999) (noting that "[p]rior to 1995, a private plaintiff could assert a civil RICO claim for securities law violations sounding in . . . fraud" and that "plaintiffs regularly elevated fraud to RICO violations because RICO offered . . . treble damages"). To avoid this result, the PSLRA amendment provides that a person cannot "rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation" of RICO. See 18 U.S.C. § 1964(c); Mezzonen, S.A. v. Wright, 1999 WL 1037866, at *4 (S.D.N.Y. Nov. 16, 1999) ("[t]he Conference Committee Report clarified that the amendment was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim").

        Mayer Brown's theory (Br. at 45-48) improperly extends this proscription to bar any RICO claim, by any private plaintiff, if the SEC could bring an enforcement action based on the same conduct. As an initial matter, the PSLRA amendment's plain language forecloses

---

[36] Mayer Brown refuses to read the PSLRA amendment to § 1964(c) in context. The section's initial condition – that a private party "injured in his business or property by reason of a violation of section 1962 . . . may sue therefor," 18 U.S.C. § 1964(c) – has long been interpreted to limit the party to suing for conduct that directly caused its injury. See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258 (1992). The section's latter condition – that the party may not rely upon "conduct actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" – refines that initial condition: the conduct causing the party injury cannot be actionable as fraud in the purchase or sale of securities. If the THL Funds' equity interests in Refco were not securities, this later condition is irrelevant. See Gintowt v. TL Ventures, 226 F. Supp. 2d 672, 679 (E.D. Pa. 2002) (denying motion to dismiss based upon PSLRA amendment because "Plaintiff does not allege that he purchased or sold any securities, and Defendants fail to identify any tangible relationship between the alleged predicate acts and any sale or purchase of securities by Plaintiff" (emphasis added)).

Mayer Brown's argument that Congress intended to strip private plaintiffs of remedies under both the federal securities and RICO statutes in this manner. By its terms and consistently with cases interpreting it, the amendment applies only to conduct that "would have been actionable as fraud" but for a plaintiff's decision to plead a RICO violation instead of a securities fraud claim. See Powers v. Wells Fargo Bank NA, 439 F.3d 1043, 1045 n.2 (9th Cir.), cert. denied, 127 S. Ct. 437 (2006) (Congress's aim in enacting the RICO amendment was to "prevent[] class action suits asserting RICO claims that should have been presented as securities claims"); Bald Eagle Area Sch. Dist., 189 F.3d at 330 ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses . . . if the conduct giving rise to those predicate offenses amounts to securities fraud. Allowing such surgical presentation. . . would undermine the congressional intent behind the RICO Amendment.").[37]

The legislative history of the PSLRA reinforces the conclusion that the potential of an SEC aiding-and-abetting claim against Mayer Brown does not preclude the THL Funds from pursuing a RICO claim. Congress was concerned only with the potential for duplicative private securities law and RICO actions. The law was intended to address the issue that "[a]lmost every claim that a plaintiff alleges as a violation of securities laws may also be pled as a RICO violation. Plaintiffs' attorneys can easily allege both the enterprise and the pattern elements necessary to turn a securities action into a RICO claim." 141 Cong. Rec. H2760, 2775 (daily ed. Mar. 7, 1995) (statement of Rep. Fields) (emphases added); see also id. at H2772

---

[37] The United States Code uses the term "actionable" to refer to when conduct can lead to civil litigation in numerous sections, most notably the Copyright Act. See, e.g., 17 U.S.C. §§ 111(b), 115(b), 119(a), 122(d)-(f), 501(c)-(f), 512(e) & 602(a). In each instance, "actionable" refers to conduct that is remedied through private litigation. See also, e.g., 7 U.S.C. § 25(a) (private right of action for violating commodity exchange laws); 15 U.S.C. § 1125(c)(3) (private right of action for dilution); 39 U.S.C. § 3017(e)(2) (private right of action for sweepstakes mailed in violation of law). Congress presumptively used the term "actionable" in the PSLRA amendment to RICO in this sense as well. See Nat'l Treasury Employees Union v. Chertoff, 452 F.3d 839, 857 (D.C. Cir. 2006) ("There is a presumption that Congress uses the same term consistently in different statutes").

(statement of Rep. Cox) (citing SEC testimony that it is necessary to "eliminate the <u>overlap</u> between the <u>private</u> remedies under RICO and under the Federal securities laws") (emphases added).[38] Mayer Brown can point to nothing in the law or its legislative history that supports its view that the possibility of an SEC enforcement action would foreclose plaintiffs from pursuing their RICO claims; rather, the text and the legislative history establish that Congress's aim was to prevent plaintiffs from electing to pursue RICO claims instead of viable securities actions, but do not bar alternative pleading.

In keeping with the statute's text and legislative history, two courts in this District have squarely rejected Mayer Brown's theory by holding that, if <u>Central Bank</u> precludes a plaintiff from maintaining aiding-and-abetting claims, that plaintiff may proceed on a RICO theory. In <u>Renner v. Chase Manhattan Bank</u>, 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999), the court held that, "[b]ecause plaintiff's claim [of aiding and abetting securities fraud] would not have been 'actionable' against [the Defendant] under the securities law, the mere fact that plaintiff . . . asserted it in his complaint would not bar a RICO claim." <u>Id.</u> at *7. <u>OS Recovery, Inc. v. One Groupe Int'l, Inc.</u>, 354 F. Supp. 2d 357, 370 (S.D.N.Y. 2005), is to the same effect: "[T]his conduct . . . was no more than aiding and abetting. Hence, it is not actionable under the securities laws and therefore [is] actionable under RICO."

The cases cited by Mayer Brown (Br. at 47-49) do not support its position. <u>Payton v. Flynn</u>, 2006 WL 3087075, at *6-8 (N.D. Ill. Oct. 26, 2006), is distinguishable, as

---

[38] As Arthur Levitt (then-Chairman of the SEC) likewise emphasized to Congress, "the [SEC] has consistently stressed the importance of <u>private remedies</u> against securities fraud." Prepared Testimony of Arthur Levitt, Chairman, SEC, Before the H. Subcomm. on Telecommc'ns & Fin. Comm. on Commerce, 104th Cong. at 1 (Feb. 10, 1995) (emphasis added). With respect to the PSLRA amendment to RICO, Chairman Levitt emphasized that "the [SEC] has supported legislation to eliminate the <u>overlap between the private remedies</u> under [RICO] and under the federal securities laws." <u>Id.</u> at 16 (emphasis added). "Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both unnecessary and unfair to expose defendants in securities cases" to RICO liability. <u>Id.</u>

plaintiffs in that case brought only RICO claims. See id. at *5. The court's passing and unsupported suggestion that the RICO claims could not proceed because they were predicated on conduct that was potentially "actionable" by the SEC provides no persuasive basis for a dismissal of the THL Funds' alternative RICO claims in this case (or for its assigning a meaning to the term "actionable" contrary to its common usage in the United States Code, see note 36, supra). The other cases on which Mayer Brown relies (Br. at 49) are irrelevant, with the critical distinction being that here, unlike in those cases, no other private plaintiff could sue Mayer Brown under a securities fraud theory for the misrepresentations and deception visited upon the THL Funds by Mayer Brown, Bennett, and the other Refco conspirators. In Fezzani v. Bear, Stearns & Co., 2005 WL 500377, at *6 (S.D.N.Y. Mar. 2, 2005), the court denied plaintiffs' request to add RICO claims to their complaint, concluding that the conduct alleged in the complaint was generally actionable as securities fraud.[39] Likewise, the court in Hollinger Int'l, Inc. v. Hollinger Inc., 2004 WL 2278545, at *10 (N.D. Ill. Oct. 8, 2004), rejected a corporation's attempt to sue defendants for the same harm its shareholders could sue those defendants under the securities laws. Howard v. AOL, Inc., 208 F.3d 741 (9th Cir. 2000), In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511 (S.D. Tex. 2003), and Hemispherx Biopharma, Inc. v. Asensio, 1999 WL 144109 (E.D. Pa. Mar. 15, 1999), hold only that a private plaintiff who lacks standing to pursue a securities fraud claim may not pursue RICO claims if another private plaintiff could maintain securities law claims for the same conduct.[40]

---

[39] Mayer Brown's lengthy excerpt from Fezzani (see Br. at 49) only distinguishes that case. The Fezzani court suggested that plaintiffs might have an "incentive" to circumvent the RICO amendment by "present[ing] only those facts that . . . would not form the basis of a securities fraud claim." 2005 WL 500377, at *4. Exactly the opposite is true here. The THL Funds have not tried "deliberately [to] plead facts that establish[] no more than that [Mayer Brown] aided and abetted another's securities fraud," id. at *5; to the contrary, they have alleged that Mayer Brown is a primary violator of the securities laws.

[40] See Howard, 208 F.3d at 749-50 ("Plaintiffs do not dispute that their securities fraud claims could be brought by a plaintiff with proper standing. The claims implicate 'conduct that would have been

Mayer Brown's restrictive interpretation of RICO is, moreover, foreclosed by the Supreme Court's teaching that RICO is to be interpreted "broadly," as a consequence "not only of Congress' self-consciously expansive language . . . but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purpose.'" Sedima, S.P.L.R. v. Imrex Co., 473 U.S. 479, 497-98 (1985) (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970)); see also id. at 493-500 (rejecting court of appeals' imposition of non-textual limits on civil RICO claims under § 1964(c)). In view of the important remedial purposes furthered by private RICO claims,[41] this Court should not limit the availability of those claims absent an express statutory directive.[42]

Finally, there is nothing "absurd" about the THL Funds proceeding against the Refco Operators on a securities fraud theory while pursuing RICO claims against Mayer Brown. Br. at 48. In the first place, the THL Funds may well be able to pursue RICO claims against RGHI, Bennett, and other Refco insiders under RICO pursuant to the statute's criminal conviction exception in light of recent guilty pleas. See 18 U.S.C. § 1964(c) (the RICO amendment "does not apply to an action against any person that is criminally convicted in connection with the fraud"). In any case, it is not "absurd" for Congress to create different

---

actionable as [securities] fraud.'") (citation omitted); In re Enron Corp., 284 F. Supp. 2d at 652 ("Thus, the Court finds that the RICO claims are based on conduct actionable as securities fraud, indeed the same or similar conduct that has been or could have been alleged in Newby under the federal securities laws, and are therefore barred by the RICO Amendment."); Hemispherx Biopharma, 1999 WL 144109, at *4 (barring RICO claims where plaintiffs lacked standing to bring section 10(b) claims because they were not investors, but where the alleged conduct would have been actionable by private investors).

[41] See, e.g., Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560, 568 (E.D.N.Y. 1999).

[42] See, e.g., Nebraska Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1348 (3d Cir. 1989) (in light of Sedima's teaching that RICO is to be interpreted broadly, courts are "not free to read additional limits into RICO once a plaintiff has made out all of the elements required for a finding of liability under the statute's explicit provisions").

statutory remedies for different conduct.[43] Here, Congress decided to limit the use of RICO by plaintiffs that also hold actionable securities claims. Allowing parties <u>without</u> "actionable" securities claims to proceed under RICO provides them with no special benefit, especially given RICO's additional substantive proof elements (e.g., proof of an enterprise and a pattern).

Ultimately, RICO's meaning must be measured by its text and the import of its legislative history, not by Mayer Brown's opinions on the wisdom of Congress's legislative choices. Any anomalies, and there are none, arising from the availability of private RICO remedies here can be addressed only by Congress. See Sedima, 473 U.S. at 499 (court of appeals' concern with "extraordinary" and "outrageous" results under RICO did not warrant engrafting judicial limits on the statute; any "defect – if defect it is – is inherent in the statute as written, and its correction must lie with Congress") (internal quotation marks omitted).[44]

**B.      The Amended Complaint Clearly Pleads a Conspiratorial Agreement**

Section 1962(d), the RICO conspiracy statute, is "simple in formulation . . . : 'It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.'" Salinas v. United States, 522 U.S. 52, 63 (1997) (quoting 18 U.S.C. § 1962(d)). The RICO statute is "even more comprehensive" than the "general conspiracy provision applicable to federal crimes." Id. It is enough to establish liability if "[a] conspirator . . . intend[s] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 65. A plaintiff thus need only "allege that defendants 'knew about

---

[43] Accord Campos v. INS, 961 F.2d 309, 316-17 (1st Cir. 1992) (holding that it is not "absurd that . . . Congress chooses to treat different crimes differently" and thus the court would not "redraft[]" a statute to avoid differential treatment).

[44] Cf. Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) ("We assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'") (citation omitted).

and agreed to facilitate the scheme' that is part of the civil conspiracy." Knoll v. Schectman, 2006 WL 839428, at *6 (W.D.N.Y. Mar. 28, 2006), aff'd 2008 WL 1868440 (2d Cir. Apr. 25, 2008) (quoting Salinas, 522 U.S. at 66).

The Amended Complaint more than adequately pleads these elements. It alleges that "Mayer Brown conspired with the Refco Operators to violate 18 U.S.C. § 1962(c)" by (a) participating in 17 sham round-trip loans, knowing they were used to move the RGHI Receivable temporarily off Refco's books, (b) making false statements about Refco's related-party transactions, material contracts and indemnification obligations, (c) knowingly drafting documents containing false representations, (d) conducting a round-trip loan transaction during the due diligence period to conceal the RGHI Receivable from the THL Funds, and (e) manufacturing the counterfeit Fourth LLC Agreement and telling the THL Funds that it was the genuine Fourth LLC Agreement. Am. Compl. ¶ 110. Through this participation in racketeering activities, the Amended Complaint squarely alleges that "Mayer Brown intended to further, agreed to further, and in fact did further the fraudulent schemes of the Refco Operators." Id. ¶ 111. Indeed, no other conclusion is remotely plausible in view of the above allegations: there is no sensible explanation for why Mayer Brown would lie, participate in sham transactions, and fabricate a significant corporate agreement for the direct benefit of the RICO Operators absent an agreement to participate in the Refco Operators' conspiracy.

Mayer Brown nonetheless selectively quotes from Republic of Colombia v. Diageo N. Am. Inc., 531 F. Supp. 2d 365, 428 (E.D.N.Y. 2007), in support of its argument that § 1962(d) requires a plaintiff to allege "with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." Br. at 52. Mayer Brown misstates the law. "'It is well settled,'" as Mayer Brown

acknowledges (see id.), "in this Circuit that the heightened pleading requirements of [Rule 9(b)] do not apply to the averment of conspiracy under Section 1962(d)." Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc., 944 F. Supp. 240, 247 (S.D.N.Y. 1996).[45] Indeed, "[t]he Second Circuit has held that for a RICO conspiracy claim, the Court must limit its focus to 'whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise.'" State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., 375 F. Supp. 2d 141, 153 (E.D.N.Y. 2005) (quoting United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000)).[46]

The Amended Complaint satisfies these requirements, because it sets forth a "factual basis for a finding of a conscious agreement" by Mayer Brown to enter a conspiracy. Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990). The Amended Complaint alleges that "Mayer Brown . . . agreed to further . . . the fraudulent schemes of the Refco Operators and was aware of the existence, if not the very identity, of the other participants in the fraudulent schemes and conspiracy" (Am. Compl. ¶ 111) and that Mayer Brown entered into an agreement by at least 2000 to participate with the Refco Operators in defrauding regulators, lenders, investors, and potential purchasers of Refco in exchange for substantial economic benefit to Mayer Brown from Refco's employment of the firm, and that Mayer Brown was aware of the existence of other participants in the criminal enterprise. See id. ¶¶ 13, 21, 110.

For those reasons, Mayer Brown's reliance (see Br. at 52) on Bell Atlantic Corp.

---

[45] See also Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (heightened pleading standards do not apply to RICO conspiracy).

[46] See also Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003) (to establish a RICO conspiracy, a plaintiff must allege only "that the defendant knew about and agreed to facilitate the scheme") (citation and internal quotation marks omitted). Republic of Colombia is not to the contrary; the court there held, on allegations far weaker than those here, that the complaint adequately alleged a RICO violation. See 531 F. Supp. 2d at 430.

v. Twombly, 127 S. Ct. 1955 (2007), is misplaced. The Amended Complaint does not make a naked and implausible allegation of "conspiracy" as in Twombly; rather, the THL Funds' conspiracy claim is supported by numerous, specific allegations, all of which demonstrate the plausibility – if not the certainty – of Mayer Brown's agreement to have participated in a conspiracy: that Mayer Brown was involved in multiple, coordinated sham round-trip loans for Refco;[47] that Mayer Brown had an economic motive to participate in the conspiracy;[48] that Mayer Brown knew of Refco's losses and that Refco was disguising those losses;[49] that Mayer Brown knowingly made false representations to the THL Funds and others;[50] that Mayer Brown negotiated and drafted documents in furtherance of obviously deceptive loan transactions;[51] and that Mayer Brown created and provided the THL Funds with a "counterfeit corporate agreement."[52] See Rose, 871 F.2d at 366 (allegations of conspiracy "must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy" (citation and internal quotation marks omitted)).

Moreover, contrary to Mayer Brown's assertion (see Br. at 53), the THL Funds have not relied on the provision of routine legal services to support an inference of agreement.

---

[47] See, e.g., Am. Compl. ¶ 31; id. ¶ 35 (a) (alleging that Mayer Brown "negotiated and drafted virtually all documentation for the 17 round-trip loan transactions"); id. ¶ 35(b)-(c) (alleging that Mayer Brown "knew that these round-trip loans, with one exception, were undertaken only at times that straddled Refco's financial reporting periods" and "understood that these transactions caused the RGHI related-party receivable to be removed from Refco's books and records at the time when financial statements were being prepared"); id. ¶ 35(f) (alleging that Mayer Brown "knew that the transactions lacked any proper business purpose"); id. ¶ 35(g) (alleging that Mayer Brown "knew that these transactions caused Refco to violate the Company's loan covenants"); see also id. ¶¶ 30, 34, 110(a).

[48] See id. ¶ 13 (alleging Refco was Collins' "most significant client" and that "Mayer Brown invoiced in excess of $40 million from Refco between 1997 and 2005, which amounted to about half the billings for which Collins was responsible").

[49] See id. ¶¶ 18, 20.

[50] See id. ¶¶ 54, 55, 56, 66, 110(b).

[51] See, e.g., id. ¶¶ 35, 110(a).

[52] Id. ¶¶ 57, 61, 110(e).