to possible conflicts, defaults or violations of applicable laws, except for notices relating to possible conflicts, defaults or violations, which conflicts, defaults or violations would not have a Material Adverse Effect.

j. Environmental Matters.

(i) Except as set forth in Schedule 3(t), there are, to the Company's knowledge, with respect to the Company or any of its Subsidiaries or any predecessor of the Company, no past or present violations of Environmental Laws (as defined below), releases of any material into the environment, actions, activities, circumstances, conditions, events, incidents, or contractual obligations which may give rise to any common law environmental liability or any liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or similar federal, state, local or foreign laws and neither the Company nor any of its Subsidiaries has received any notice with respect to any of the foregoing, nor is any action pending or, to the Company's knowledge, threatened in connection with any of the foregoing. The term "Environmental Laws" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(i) Other than those that are or were stored, used or disposed of in compliance with applicable law, no Hazardous Materials are contained on or about any real property currently owned, leased or used by the Company or any of its Subsidiaries, and no Hazardous Materials were released on or about any real property previously owned, leased or used by the Company or any of its Subsidiaries during the period the property was owned, leased or used by the Company or any of its Subsidiaries, except in the normal course of the Company's or any of its Subsidiaries' business.

(i) Except as set forth in Schedule 3(t), there are no underground storage tanks on or under any real property owned, leased or used by the Company or any of its Subsidiaries that are not in compliance with applicable law.

a. Title to Property. The Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(u) or such as would not have a Material Adverse Effect. Any real property and facilities held under lease by the Company and its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as would not have a Material Adverse Effect.

b.      Insurance.  The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged.  Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

c.      Internal Accounting Controls.  The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company's board of directors, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

d.      Foreign Corrupt Practices.  Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

e.      Solvency.  The Company (both before and after giving effect to the transactions contemplated by this Agreement) is solvent (i.e., its assets have a fair market value in excess of the amount required to pay its probable liabilities on its existing debts as they become absolute and matured) and currently the Company has no information that would lead it to reasonably conclude that the Company would not have the ability to, nor does it intend to take any action that would impair its ability to, pay its debts from time to time incurred in connection therewith as such debts mature.  The Company did not receive a qualified opinion from its auditors with respect to its most recent fiscal year end and does not anticipate or know of any basis upon which its auditors might issue a qualified opinion in respect of its current fiscal year.

f.      No Investment Company.  The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement and the Certificate of Designation will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "Investment Company").  The Company is not controlled by an Investment Company.

1.  COVENANTS.

    a.  Best Efforts. The parties shall use their best efforts to satisfy timely each of the conditions described in Section 6 and 7 of this Agreement.

    b.  Form D; Blue Sky Laws. The Company agrees to file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof to each Buyer promptly after such filing. The Company shall, on or before the Closing Date with respect to the First Closing, take such action as the Company shall reasonably determine is necessary to qualify the Securities for sale to the Buyers at the Closing pursuant to this Agreement under applicable securities or "blue sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to each Buyer on or prior to the Closing Date with respect to the First Closing.

    a.  Reporting Status; Eligibility to Use Form S-3; Press Release. The Company's Common Stock is registered under Section 12(g) of the 1934 Act. So long as any Buyer beneficially owns any of the Securities, the Company shall timely file all reports required to be filed with the SEC pursuant to the 1934 Act, and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would permit such termination. The Company currently meets, and will take all necessary action to continue to meet, the "registrant eligibility" requirements set forth in the general instructions to Form S-3. The Company shall issue a press release describing the material terms of the transactions contemplated hereby as soon as practicable following the Closing Date with respect to the First Closing but in no event more than one (1) Trading Day (as defined in the Certificate of Designation) of the Closing Date with respect to the First Closing, and shall file with the SEC a Current Report on Form 8-K describing the material terms of the transactions contemplated hereby (and attaching as exhibits thereto this Agreement, the Registration Rights Agreement, the Certificate of Designation and the Warrants) within two (2) Trading Days of the Closing Date with respect to the First Closing, which press release and Form 8-K shall be subject to prior review by the Buyers.

    b.  Use of Proceeds. The Company shall use the proceeds from the sale of the Preferred Shares and the Warrants in the manner set forth in Schedule 4(d) attached hereto and made a part hereof and shall not, directly or indirectly, use such proceeds for any loan to or investment in any other corporation, partnership, enterprise or other person (except in connection with its currently existing direct or indirect Subsidiaries).

    c.  Additional Equity Capital; Right of First Offer. Subject to the exceptions described below, the Company will not, without the prior written consent of a majority-in-interest of the Buyers, negotiate or contract with any party to obtain additional equity financing (including debt financing with an equity component, during the period (the "Lock-up Period") beginning on the Closing Date with respect to the First Closing and ending one hundred eighty-five (185) days from the date the Registration Statement (as defined in the Registration Rights Agreement) is declared effective (subject to extension for any days in which sales of all of the Registrable Securities (as defined in the Registration Rights Agreement) cannot be made pursuant to the Registration Statement (as defined in the Registration Rights Agreement) occurring after the date on which such Registration Statement is first declared effective by the SEC). In addition, subject to the exceptions described below, the Company will not conduct any

equity financing (including debt with an equity component) ("Future Offerings") during the period beginning on the Closing Date and ending one hundred eighty (180) days after the end of the Lock-Up Period (subject to extension for any days in which sales of all of the Registrable Securities cannot be made pursuant to the Registration Statement occurring after the date on which such Registration Statement is first declared effective by the SEC) unless it shall have first delivered to each Buyer written notice describing the proposed Future Offering, including the terms and conditions thereof and proposed definitive documentation to be entered into in connection therewith, and providing each Buyer an option during the ten (10) Trading Day (as defined in the Certificate of Designation) period following delivery of such notice to submit a term sheet to the Company specifying the terms (the "Proposed Terms") on which it would purchase its pro rata share (based on the ratio that the number of Preferred Shares purchased by it hereunder bears to the aggregate number of Preferred Shares purchased hereunder) of the dollar amount of securities being offered in the Future Offering (the limitations referred to in this sentence and the preceding sentence are collectively referred to as the "Capital Raising Limitations"). In the event the Proposed Terms are equivalent or better than the terms described in the Future Offering, the Company will be required to commence the offering with the Buyers on the Proposed Terms. In the event no Buyer responds within the ten (10) Trading Day period or the Proposed Terms are not as favorable to the Company as those described in the Future Offering, the Company may, within sixty (60) days of the end of such ten (10) Trading Day period, complete the Future Offering with a thirty party. In the event the terms and conditions of a proposed Future Offering are amended in any respect after delivery of the notice to the Buyers concerning the proposed Future Offering, the Company shall deliver a new notice to each Buyer describing the amended terms and conditions of the proposed Future Offering (the "Amended Future Offering") and each Buyer thereafter shall have an option during the ten (10) Trading Day period following delivery of such new notice to submit a new term sheet to the Company specifying the new Proposed Terms (the "New Proposed Terms") on which it would purchase its pro rata share of the securities being offered on the same terms as contemplated by such proposed Future Offering, as amended. In the event the New Proposed Terms are equivalent or better than the terms described in the Amended Future Offering, the Company will be required to commence the offering with the Buyers on the New Proposed Terms. The foregoing two sentences shall apply to successive amendments to the terms and conditions of any proposed Future Offering. The Capital Raising Limitations shall not apply to any transaction involving (i) issuances of securities in a firm commitment underwritten public offering (excluding a continuous offering pursuant to Rule 415 under the 1933 Act) or (ii) issuances of securities as consideration for a merger, consolidation or purchase of assets, or in connection with any strategic partnership or joint venture (the primary purpose of which is not to raise equity capital), or in connection with the disposition or acquisition of a business, product or license by the Company. The Capital Raising Limitations also shall not apply to the issuance of securities upon exercise of conversion of the Company's options, warrants or other convertible securities outstanding as of the date hereof or to the grant of additional options or warrants, or the issuance of additional securities, under any Company stock option or restricted stock plan approved by the stockholders of the Company.

    d.    New Issue Option.

(i)    If at any time during the period beginning on the Closing Date with respect to the First Closing and ending on the three (3) year anniversary of the Closing Date (the "New Issue

Expiration Date"), the Company intends in good faith to issue equity securities of the Company pursuant to that certain Private Equity Credit Agreement, dated as of April 10, 2000, by and between the Company and Binkley, LLC (the "Equity Line" and each issuance thereunder being referred to as an "Equity Line Issuance"), the Company must first deliver to each Buyer, at least twenty (20) Trading Days, but no more than thirty (30) Trading Days, prior to the effective date of such Equity Line Issuance, written notice (the "Equity Line Notice") describing the amount of equity securities issuable pursuant thereto and the aggregate purchase price payable therefor (the "Equity Line Purchase Price"). The Buyers shall have an option (a "New Issue Option") during the fifteen (15) Trading Day period following delivery of the Equity Line Notice (a "New Issue Option Period") to purchase shares of a new series of Preferred Stock of the Company ("New Issue Preferred Stock"), with the New Issue Preferred Stock having an aggregate stated value equal to the aggregate Equity Line Purchase Price, and (ii) a warrant exercisable into Common Stock (collectively, the "New Issue Warrants"), each on the terms described in Section 4(f)(ii) below. The Company acknowledges and agrees that each Buyer shall have a New Issue Option each time that the Company issues Equity Securities pursuant to the Equity Line prior to the New Issue Expiration Date. In the event that a Buyer either does not give notice within such fifteen (15) Trading Day period that it intends to exercise the New Issue Option or informs the Company in writing that it does not intend to participate in all or any part of such issuance, the Company shall offer to the other Buyers the option during the five (5) Trading Day period following the aforementioned fifteen (15) Trading Day period to purchase up to, in the aggregate, the amount of New Issue Preferred Stock and New Issue Warrants declined by such Buyer, on the same terms as were offered to such Buyer. Should more than one other Buyer exercise this additional option, the Company shall offer to each an amount of New Issue Preferred Stock and New Issue Warrants pro rata in proportion to the Series E Preferred Stock held by such Buyer.

(i)     In the event that the Company receives due notice from a Buyer (an "Electing Buyer") that such Electing Buyer intends to exercise its New Issue Option (a "New Issue Purchase Notice"), the Company will, within three (3) Trading Days (as defined in the Certificate of Designation) after the last day of the New Issue Option Period, prepare and file with the Secretary of State of the State of Delaware a certificate of designation (a "New Issue Certificate of Designation") setting forth the terms of the New Issued Preferred Stock and covering the aggregate number of shares of new Issue Preferred Stock to be purchased by all of the Electing Buyers (but in no event covering an amount greater than such aggregate number). Each New Issue Certificate of Designation will have terms identical to the terms of the Certificate of Designation, except that the fixed conversion price stated therein (the "New Issue Fixed Conversion Price") will be equal to one hundred and twenty percent (120%) of the Closing Bid Price (as defined in the Certificate of Designation) for the Common Stock on the Trading Day immediately preceding the date on which the New Issue Preferred Stock is issued (the "New Issue Closing Price") (such date of issuance being referred to herein as the "New Issue Closing Date"). The New Issue Warrant purchased by an Electing Buyer will be exercisable into a number of shares of Common Stock equal to fifty percent (50%) of the number of shares issuable obtained by dividing the dollar amount of New Issue Preferred Stock purchased by the New Issue Closing Price. Each New Issue Warrant shall have terms identical to the Warrants, except that the exercise price therefor shall be equal to one hundred twenty-five

percent (125%) of the New Issue Closing Price (and shall be subject to adjustment, including a reset of adjustment on the first anniversary of the issue date thereof, on the same basis as the Exercise Price for the Warrants) and such New Issue Warrant will expire on the four (4) year anniversary of the issue date thereof.

(i)   On each New Issue Closing Date, which shall occur on the fifth (5th) Trading Day following the last day of the related New Issued Option period, the Company shall deliver to each Electing Buyer, against payment of the purchase price therefor (the "New Issue Purchase Price"), certificates representing the New Issue Preferred Stock and New Issue Warrant being purchased by such Buyer. The New Issue Purchase Price shall be equal to the stated value of the New Issue Preferred Stock being purchased.

(i)   Except as may be set forth in the Equity Line Notice, upon the issuance of New Issue Preferred Stock and New Issue Warrants, (i) each of the representations, warranties and covenants made by the Company herein with respect to the Preferred Shares, the Warrants, the Conversion Shares and the Warrant Shares (including without limitation the Company's covenants herein set forth in Section 4(j)) shall be deemed to apply, mutatis mutandis, to such New Issue Preferred Stock and New Issue Warrants, and to the shares of common Stock issuable thereunder, respectively, (ii) each representation and warranty made by the Company herein shall be deemed to be re-made as of the applicable New Issue Date, (iii) each reference to the Closing Date in any representation, warranty or covenant made herein shall be deemed to include the related New Issue Closing Date, (iv) all of the obligations of the Company pursuant to the Registration Rights Agreement shall be deemed to apply mutatis mutandi, to the Common Stock issuable upon conversion or exercise of the New Issue Preferred Stock and New Issue Warrants except that the time periods for filing of the Registration Statement and the declaration of effectiveness thereof shall run from the New Issue Closing Date; (v) the definition of "Securities" contained in this Agreement shall be deemed to include such New Issue Preferred Stock and New Issue Warrants, and the shares of Common Stock issuable upon conversion or exercise thereof; and (vi) the Company shall be required to meet all of the conditions to closing described in Section 7 hereof and deliver such certificates, opinions and other documents described in such section in conformance with such section and dated as of the New Issue Closing Date. Each Electing purchaser shall have the right to decline to purchase any New Issued Preferred Stock or New Issue Warrants by delivering written notice thereof to the Company on or before the Trading Day immediately preceding the New Issue Closing Date if (i) any representation made by the Company is untrue at such time or (ii) the Company has breached any covenant made by it herein, in the Certificate of Designation, in the Registration Rights Agreement or in the Warrants, in any such case as of the date of such notice.

(i)   If, with respect to a proposed Equity Line Issuance, the stated value of the New Issue Preferred Stock purchased pursuant to the related New Issue Option (the "New Issue Stated Value") is equal to or greater than the proposed purchase price for the equity securities that the Company proposed to issue pursuant such Equity Line Issuance (the "Proposed Equity Line Purchase Price"), the Company may not issue any securities under the Equity Line (pursuant to such Equity Line Issuance or otherwise) prior to the date on which the Registration Statement (as defined in the Registration Rights Agreement) covering the shares of Common

Stock issuable pursuant to such New Issue Preferred Stock and the related New Issue Warrants is declared effective by the SEC and may issue securities pursuant to the Equity Line thereafter only if it first offers to each Buyer a New Issue Option with respect to such further issuance. If, with respect to a proposed Equity Line Issuance, (A) no Buyer elects to exercise the New Issue Option, the Company may issue Equity Securities under such Equity Line Issuance for a purchase price equal to the Proposed Equity Line Purchase Price or (B) one or more Buyers elect(s) to exercise the New Issue Option, but the New Issue Stated Value is less than the Proposed Equity Line Purchase Price, the Company may issue Equity Securities under such Equity Line Issuance for a purchase price equal to the difference between such New Issue Stated Value and such proposed Equity Line Purchase Price, provided, that, following an issuance pursuant to this clause (B), the Company may not issue any other securities pursuant to the Equity Line prior to the date on which the Registration Statement (as defined in the Registration Rights Agreement) covering the shares of Common Stock issuable pursuant to the New Issue Preferred Stock and related New Issue Warrants issued under this clause (B) is declared effective by the SEC and may issue securities pursuant to the Equity Line thereafter only if it first offers to each Buyer a New Issue Option with respect to such further issuance.

a.  Exchange Option. In the event that the Company issues Equity Securities while any Preferred Shares are outstanding (a "New Issuance Securities"), each Buyer shall have the right to exchange all or any part of the Preferred Shares then held by it for such New Issuance Securities together with any other securities, rights and assets issued or delivered to the purchasers thereof in connection with the issuance of such New Issuance Securities (the "Exchange Option") and, upon exercise of its Exchange Option, shall receive, on the closing date for such issuance, an amount of such New Issuance Securities and any such other securities, rights and assets that such purchaser would receive upon payment of an amount of cash (or other applicable consideration) equal to the Stated Value (as defined in the Certificate of Designation) of and accrued dividends (and any other amounts payable) on the Preferred Shares being exchanged. The Company agrees that it will not issue New Issuance Securities while any Preferred Shares are outstanding unless it first gives each Buyer at least twenty (20) Trading Days' prior written notice thereof (a "Notice of Issuance"). In order for a Buyer to exercise its Exchange Option, such Buyer must deliver written notice thereof to the Company on or before the fifth (5th) Business Day following its receipt of a Notice of Issuance.

b.  Expenses. The Company shall reimburse Rose Glen Capital Management, L.P. ("Rose Glen") for all expenses incurred by it in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the other agreements to be executed in connection herewith, including, without limitation, attorneys' and consultants' fees and expenses and travel expenses. The Company's obligation to reimburse Rose Glen's expenses under this Section 4(h) shall be limited to Thirty Thousand Dollars ($30,000) of which Ten Thousand Dollars ($10,000) was advanced previously.

c.  Financial Information. The Company agrees to send the following reports to each Buyer until such Buyer transfers, assigns, or sells all of the Securities: (i) within ten (10) days after the filing with the SEC, a copy of its Annual Report on Form 10-K, its Quarterly Reports on Form 10-Q and any Current Reports on Form 8-K; (ii) within one (1) day after release, copies of all press releases issued by the Company or any of its Subsidiaries; and (iii) contemporaneously with the making available or giving to the stockholders of the Company,