copies of any notices or other information the Company makes available or gives to such stockholders.

d.      Reservation of Shares.  The Company shall at all times have authorized,
        ---------------------
and reserved for the purpose of issuance, a sufficient number of shares of Common Stock to provide for the full conversion of the outstanding Preferred Shares and issuance of the Conversion Shares in connection with the Preferred Shares (including sufficient shares to provide for the full exercise of the Investment Options) (based on the lesser of  the Market Price in effect from time to time and the Fixed Conversion Price in effect from time to time (each as defined in the Certificate of Designation)) and as otherwise required by the Certificate of Designation and the full exercise of the Warrants and issuance of the Warrant Shares in connection therewith (based on the Exercise Price (as defined in the Warrants) of the Warrants in effect from time to time).  The Company shall not reduce the number of shares of Common Stock reserved for issuance upon conversion of or otherwise pursuant to the Preferred Shares (including upon exercise of the Investment Options) and upon exercise of or otherwise pursuant to the Warrants without the consent of each Buyer.  The Company shall, at all times from the Closing Date to the Authorization Date (as defined herein), reserve a minimum of 15,437,962 shares of its authorized but unissued Common Stock for issuance upon conversion of the Preferred Shares and exercise of the Warrants.  After the Authorization Date, the Company shall use its best efforts at all times to maintain the number of shares of Common Stock so reserved for issuance at no less than two (2) times the number that is then actually issuable upon full conversion of the Preferred Shares and full exercise of the Investment Options (based on the lesser of  the Market Price in effect from time to time and the Fixed Conversion Price in effect from time to time (each as defined in the Certificate of Designation) and full exercise of the Warrants (based on the Exercise Price (as defined in the Warrants) of the Warrants in effect from time to time).  If at any time the number of shares of Common Stock authorized and reserved for issuance is below the number of Conversion Shares issued and issuable upon conversion of or otherwise pursuant to the Preferred Shares (based on the  lesser of  the Market Price in effect from time to time and the Fixed Conversion Price in effect from time to time (each as defined in the Certificate of Designation) and assuming full conversion of the Investment Options thereunder) and the aggregate number of Warrant Shares issued and issuable upon exercise of or otherwise pursuant to the Warrants (based on the Exercise Price (as defined in the Warrants) of the Warrants in effect from time to time), the Company will promptly take all corporate action necessary to authorize and reserve a sufficient number of shares, including, without limitation, calling a special meeting of stockholders to authorize additional shares to meet the Company's obligations under this Section 4(j), in the case of an insufficient number of authorized shares, and using its best efforts to obtain stockholder approval of an increase in such authorized number of shares.

e.      Listing.  The Company shall promptly secure the listing of the
        -------
Conversion Shares and Warrant Shares upon each national securities exchange or automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and, so long as any Buyer owns any of the Securities, shall maintain, so long as any other shares of Common Stock shall be so listed, such listing of all Conversion Shares and Warrant Shares from time to time issuable upon conversion of or otherwise pursuant to the Preferred Shares (including upon exercise of the Investment Options) or exercise of or otherwise pursuant to the Warrants.  The Company will obtain and, so long as any Buyer owns any of the Securities,  maintain the listing and trading of its Common Stock on AMEX, the Nasdaq National Market

("Nasdaq"), the Nasdaq SmallCap Market ("Nasdaq SmallCap") or the New York Stock Exchange ("NYSE") and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the National Association of Securities Dealers ("NASD") and such exchanges, as applicable. The Company shall promptly provide to each Buyer copies of any notices it receives from AMEX and any other exchanges or quotation systems on which the Common Stock is then listed regarding the continued eligibility of the Common Stock for listing on such exchanges and quotation systems.

f.      Corporate Existence. So long as a Buyer beneficially owns any Preferred
        --------------------
Shares or Warrants, the Company shall maintain its corporate existence and shall not merge, consolidate or sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where (i) the successor or acquiring entity and, if an entity different from the successor or acquiring entity, the entity whose securities into which the Preferred Shares shall become convertible pursuant to Article VI.C(ii) of the Certificate of Designation), in such transaction assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith (including the Certificate of Designation and the Warrants) and (ii) the entity whose securities into which the Preferred Shares shall become convertible pursuant to Article VI.C(ii) of the Certificate of Designation is a publicly traded corporation whose Common Stock is listed for trading on Nasdaq, Nasdaq SmallCap, NYSE or AMEX.

g.      No Integration.  The Company shall not make any offers or sales of any
        --------------
security (other than the Securities) under circumstances that would require registration of the Securities being offered or sold hereunder under the 1933 Act or cause the offering of Securities to be integrated with any other offering of securities by the Company for the purpose of any stockholder approval provision applicable to the Company or its securities.

h.      Stockholder Approval.  The Company shall hold an annual or special
        --------------------
meeting of its stockholders (the "Stockholders' Meeting") no later than January 31, 2001 and obtain at such meeting such approvals of the Company's stockholders as may be required to (i) issue all of the shares of Common Stock issuable upon conversion and exercise of, or otherwise with respect to, the Preferred Shares, the Investment Options and Warrants in accordance with applicable law and the rules and regulations of AMEX (including Section 713 of the AMEX Listing Standards, Policies and Requirements) (the "20% Rule Approval") and (ii) increase the authorized shares of Common Stock of the Company to at least 200,000,000 shares (the "Authorization Approval").  The date of the Authorization Approval shall be referred to as the "Authorization Date."  The Company shall comply with the filing and disclosure requirements of Section 14 under the Exchange Act, and the rules and regulations thereunder, in connection with the solicitation, acquisition and the disclosure of the 20% Rule Approval and the Authorization Approval.  The Company represents and warrants that its Board of Directors has approved, and will recommend that the Company's stockholders approve, the proposal contemplated by this Section 4(n) and shall so indicate such recommendation in the proxy statement used to solicit the 20% Rule Approval and the Authorization Approval.  The Company shall use its best efforts to cause its officers and directors to vote in favor of the proposals contemplated by this Section 4(n).

i.      Certificates of Elimination.  The Company shall promptly file
        ---------------------------
Certificates of Elimination with the Secretary of State of the State of Delaware with respect to each series of its outstanding preferred stock which (i) is fully converted by the holders thereof or redeemed by the

Company upon such conversion or redemption or (ii) has previously been fully converted by the holders thereof or redeemed by the Company.

1.    TRANSFER AGENT INSTRUCTIONS.  The Company shall issue irrevocable
instructions to its transfer agent to issue certificates, registered in the name of each Buyer or its nominee, for the Conversion Shares and Warrant Shares in such amounts as specified from time to time by each Buyer to the Company upon conversion of the Preferred Shares (including upon exercise of the Investment Options) or exercise of the Warrants in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions").  Prior to registration of the Conversion Shares and Warrant Shares under the 1933 Act or the date on which the Conversion Shares or Warrant Shares may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement.  The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(f) hereof (in the case of the Conversion Shares and Warrant Shares, prior to registration of the Conversion Shares and Warrant Shares under the 1933 Act or the date on which the Conversion Shares or Warrant Shares may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold), will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Registration Rights Agreement.  Nothing in this Section shall affect in any way the Buyer's obligations and agreement set forth in Section 2(g) hereof to comply with all applicable prospectus ·delivery requirements, if any, upon re-sale of the Securities.  If a Buyer provides the Company with (i) an opinion of counsel, in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of  such  Securities may be made without registration under the 1933 Act and such sale or transfer is effected or (ii) the Buyer provides reasonable assurances that the Securities can be sold pursuant to Rule 144, the Company shall permit the transfer, and, in the case of the Conversion Shares and Warrant Shares, promptly instruct its transfer agent to issue one or more certificates, free from any restrictive legend, in such name and in such denominations as specified by such Buyer.

1.    CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.  The obligation of
the Company hereunder to issue and sell the Preferred Shares and Warrants to a Buyer at each of the First Closing and the Second Closing is subject to the satisfaction, at or before the Closing Date in respect of such applicable Closing, of each of the following conditions thereto, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

a.      The applicable Buyer shall have executed this Agreement, the Registration Rights Agreement and the Escrow Agreement, and delivered the same to the Company.

b.      The applicable Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

c.      The Certificate of Designation shall have been accepted for filing with the Secretary of State of the State of Delaware.

d.      The representations and warranties of the applicable Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which representations and warranties shall be true and correct as of such date), and the applicable Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the applicable Buyer at or prior to the Closing Date.

e.      No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

1.      CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE.  The obligation
------------------------------------------------------
of each Buyer hereunder to purchase the Preferred Shares and Warrants at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for such Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion:

a.      With respect to the First Closing and the Second Closing:

(i)      The Company shall have executed this Agreement, the Registration Rights Agreement and the Escrow Agreement, and delivered the same to the Buyer.

(i)      The Company shall have delivered to such Buyer duly executed certificates (in such denominations as the Buyer shall request) representing the Preferred Shares and Warrants purchased at such Closing in accordance with Section 1(b) above.

(i)      The Certificate of Designation shall have been accepted for filing with the Secretary of State of the State of Delaware, and a copy thereof certified by such Secretary of State shall have been delivered to such Buyer.

(i)      The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to a majority-in-interest of the Buyers, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent.

(i)      The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of the applicable Closing Date as though made at such time (except for representations and warranties that speak as of a specific date, which representations and warranties shall be true and correct as of such date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the applicable Closing Date. The Buyer shall have received a certificate or certificates, executed by the chief executive officer of the Company, dated as of the applicable Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by such Buyer including, but not limited to certificates with respect to the Company's Certificate

of Incorporation, By-laws and Board of Directors' resolutions relating to the transactions contemplated hereby.

(i)     No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

(i)     An additional listing application to authorize the Conversion Shares and the Warrant Shares for quotation on AMEX shall have been filed with AMEX no later than one (1) Trading Day after the First Closing and trading in the Common Stock on the AMEX shall not have been suspended by the SEC or AMEX.

(i)     The Buyer shall have received an opinions of the Company's counsel, dated as of the applicable Closing Date, in form, scope and substance reasonably satisfactory to the Buyer and in substantially the same form as Exhibit "E-1" and Exhibit "E-2" attached hereto.

(i)     The Buyer shall have received an officer's certificate described in Section 3(c) above, dated as of the applicable Closing Date.

(i)     The Company shall have received "Lock-Up" letters from the individuals set forth on Schedule 7(j) in the form attached hereto as Exhibit "F".

(i)     The Company shall have received waivers, in form, scope and substance reasonably satisfactory to the Buyer, of each purchaser who are parties to that certain Securities Purchase Agreement dated as of July 13, 2000.

(i)     The Company shall have received from The Shaar Fund, Ltd. (the "Fund") waivers of the payments owed pursuant to Section 2(b) of the Registration Rights Agreements dated as of September 24, 1999 and February 22, 2000 between the Company and the Fund.

(i)     The Company shall have received waivers of anti-dilution adjustments and rights of first refusal from The Shaar Fund Ltd.

(i)     The concession granted by the Secretaria de Communicaciones y Transportes of the Republic of Mexico to the Company to install, operate or work a public communications network in Mexico (the "Concession") shall be in full force and effect.

a.      With respect to the Second Closing:

b.
(i)     The Registration Statement (as defined in the Registration Rights Agreement) shall have been declared effective by the SEC and no stop order shall have been issued in respect thereof.

(i)    The Company shall have obtained the 20% Rule Approval and Authorization Approval.

(i)    The transactions contemplated in the Merger Agreement, dated June 14, 2000, between Genesis Communications International, Inc. and the Company shall have been consummated.

(i)    Prior to December 31, 2000, the buyer approved by the Buyer as of the date hereof shall have purchased Five Thousand (5,000) Option Preferred Shares and Option Warrants to purchase One Million Eight Hundred Eighteen Thousand One Hundred Eighty-Two (1,818,182) in accordance with Section 1(d) hereof.

(i)    No Mandatory Redemption Event (as defined in the Certificate of Designation) or "deemed" Liquidating Event (as described in Article IV.B of the Certificate of Designation) shall have occurred and been continuing.

1.    GOVERNING LAW; MISCELLANEOUS.
      ----------------------------

a.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed in the State of Delaware (without regard to principles of conflict of laws). Both parties irrevocably consent to the exclusive jurisdiction of the United States federal courts and the state courts located in Delaware with respect to any suit or proceeding based on or arising under this Agreement, the agreements entered into in connection herewith or the transactions contemplated hereby or thereby and irrevocably agree that all claims in respect of such suit or proceeding may be determined in such courts. Both parties irrevocably waive the defense of an inconvenient forum to the maintenance of such suit or proceeding. Both parties further agree that service of process upon a party mailed by first class mail shall be deemed in every respect effective service of process upon the party in any such suit or proceeding. Nothing herein shall affect either party's right to serve process in any other manner permitted by law. Both parties agree that a final non-appealable judgment in any such suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on such judgment or in any other lawful manner.

a.    Counterparts; Signatures by Facsimile. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

b.    Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

c.    Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement or the validity or enforceability of this Agreement in any other jurisdiction.

d.       Entire Agreement; Amendments.  This Agreement and the instruments
         ---------------------------
referenced herein contain the entire understanding of the parties with respect
to the matters covered herein and therein and, except as specifically set forth
herein or therein, neither the Company nor the Buyer makes any representation,
warranty, covenant or undertaking with respect to such matters.  No provision of
this Agreement may be waived or amended other than by an instrument in writing
signed by the party to be charged with enforcement.

e.       Notices.  Any notices required or permitted to be given under the terms
         -------
of this Agreement shall be sent by certified or registered mail (return receipt
requested) or delivered personally or by courier (including a recognized
overnight delivery service) or by facsimile and shall be effective five days
after being placed in the mail, if mailed by regular United States mail, or upon
receipt, if delivered personally or by courier (including a recognized overnight
delivery service) or by facsimile, in each case addressed to a party.  The
addresses for such communications shall be:

                    If to the Company:

                         American Telesource International, Inc.
                         6000 NW Parkway, Suite 110
                         San Antonio, Texas 78249
                         Attention:  Chief Financial Officer
                         Facsimile:  (210) 558-6090

               With copy to:

                         Patrick Tobin
                         Jackson Walker, LLP
                         112 E. Pecan Street, Suite 2100
                         San Antonio, Texas 78205
                         Facsimile:  (210) 978-7790

     If to a Buyer:  To the address set forth immediately below such Buyer's
name on the signature pages hereto.

                    With copy to:

                         Bradley D. Houser
                         Akerman, Senterfitt & Eidson, P.A.
                         SunTrust International Center
                         One Southeast Third Avenue, 28th Floor
                         Miami, Florida  33131-1714
                         Facsimile:  (305) 374-5095

     Each party shall provide notice to the other party of any change in
address.

a.       Successors and Assigns.  This Agreement shall be binding upon and inure
         ----------------------
to the benefit of the parties and their successors and assigns.  Neither the
Company nor any Buyer shall assign this Agreement or any rights or obligations
hereunder without the prior written consent of

the other. Notwithstanding the foregoing, subject to Section 2(f), any Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from a Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

b.      Third Party Beneficiaries.  This Agreement is intended for the benefit
        ---------------------------
of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

c.      Survival.  The representations and warranties of the Company and the
        --------
agreements and covenants set forth in Sections 3, 4, 5 and 8 shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyers.  The Company agrees to indemnify and hold harmless each of the Buyers and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in Sections 3 and 4 hereof or any of its covenants and obligations under this Agreement or the Registration Rights Agreement, including advancement of expenses as they are incurred.

d.      Publicity.  The Company and each of the Buyers shall have the right to
        ---------
review a reasonable period of time before issuance of any press releases, filings with the SEC, NASD or any stock exchange or interdealer quotation system, or any other public statements with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled,
                                 --------  -------
without the prior approval of each of the Buyers, to make any press release or public filings with respect to such transactions as is required by applicable law and regulations (although each of the Buyers shall be consulted by the Company in connection with any such press release prior to its release and shall be provided with a copy thereof and be given an opportunity to comment thereon).

e.      Further Assurances.  Each party shall do and perform, or cause to be
        ------------------
done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

f.      No Strict Construction.  The language used in this Agreement will be
        ----------------------
deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

g.      Remedies.  The Company acknowledges that a breach by it of its
        --------
obligations hereunder will cause irreparable harm to each Buyer by vitiating the intent and purpose of the transactions contemplated hereby.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that each Buyer shall be entitled, in addition to all other available remedies in law or in equity, to an injunction or injunctions to prevent or cure any breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, without the necessity of showing economic loss and without any bond or other security being required.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned Buyers and the Company have caused this Agreement to be duly executed as of the date first above written.

AMERICAN TELESOURCE INTERNATIONAL, INC.


By:/c/ H. Douglas Saathoff
    -------------------
       H. Douglas Saathoff,
       Senior Vice President and
       Chief Financial Officer


RGC INTERNATIONAL INVESTORS, LDC
By:    Rose Glen Capital Management, L.P., Investment Manager
       By:  RGC General Partner Corp., as General Partner

By:/c/ Steven B. Katznelson
    ------------------------
       Steven B. Katznelson
       Managing Director

RESIDENCE:   Cayman Islands

ADDRESS:

       c/o Rose Glen Capital Management, L.P.
       3 Bala Plaza East, Suite 501
       251 St. Asaphs Road
       Bala Cynwyd, PA  19004
       Facsimile:  (610) 617-0570
       Telephone:  (610) 617-5900

AGGREGATE SUBSCRIPTION AMOUNT:

       First Closing:
       -------------
       Number of Closing Preferred Shares:          2,500
                                                 ----------
       Number of Closing Warrants:                909,091
                                                 ----------
       Aggregate Purchase Price:                          $2,500,000
                                                          ----------


       Second Closing:
       --------------
       Number of Closing Preferred Shares:          7,500
                                                 ----------
       Number of Closing Warrants:              2,727,273
                                                 ----------
       Aggregate Purchase Price:                          $7,500,000
                                                          ----------