# EXHIBIT C

Slip Copy  
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)  
**(Cite as: 2008 WL 1970900 (N.Y.Sup.))**

Page 1

BT Triple Crown Merger Co., Inc. v. Citigroup Global Markets Inc.  
N.Y.Sup.,2008.  
NOTE: THIS OPINION WILL NOT BE PUBLISHED IN A PRINTED VOLUME. THE DISPOSITION WILL APPEAR IN A REPORTER TABLE.  
Supreme Court, New York County, New York.  
BT TRIPLE CROWN MERGER CO., INC., B Triple Crown Finco, LLC, and Triple Crown Finco, LLC., Plaintiffs and Counterclaim, Defendants,  
v.  
CITIGROUP GLOBAL MARKETS INC., Citibank, N.A., Citicorp Usa, Inc., Citicorp North America, Inc., Morgan Stanley Senior Funding, Inc., Credit Suisse, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, The Royal Bank of Scotland PLC, RBS Securities Corporation, Wachovia Bank, National Association, Wachovia Investment Holdings, LLC, Wachovia Capital Markets, LLC, Deutsche Bank AG New York Branch, Deutsche Bank AG Cayman Islands Branch, and Deutsche Bank Securities Inc., Defendants and Counterclaim Plaintiffs.  
No. 600899/08.

May 7, 2008.

Bruce S. Kaplan, Esq., Robert D. Kaplan, Esq., Robert J. Lack, Esq., Emily A. Stubbs, Esq., Chad M. Leicht, Esq., Amy Luria, Esq. and John N. Orsini, Esq., Friedman Kaplan Seiler & Adelman LLP, New York, NY, Mark C. Hansen, Esq., K. Chris Todd, Esq., Sean A. Lev, Esq., Colin S. Stretch, Esq., Rebecca A. Beynon, Esq. and Kevin J. Miller, Esq. Kellogg Huber Hansen Todd Evans & Figel, PLLC, Washington, D.C., for Plaintiffs BT Triple Crown Merger Co., Inc., B Triple Crown Finco, LLC and T Triple Crown Finco, LLC.  
Guy Miller Struve, Esq., Michael P. Carroll, Esq., Lawrence Portnoy, Esq., James I. McClammy, Esq. and Brian S. Weinstein, Esq., Davis Polk & Wardwell, New York, NY, for Defendants Citigroup Global Markets Inc., Citibank,, N.A., Citicorp USA, Inc., Citicorp North America, Inc., Morgan Stanley Senior Funding, Inc., Credit Suisse, Cayman Islands Branch, Credit Suisse Securities, (USA) LLC, the Royal Bank of Scotland PLC, RBS Securities Corporation, Wachovia Bank, National Association, Wachovia, Investment Holdings, LLC and Wachovia, Capital Markets, LLC, Deutsche Bank AG New York Branch, Deutsche Bank AG, Cayman Islands Branch, and Deutsche Bank Securities Inc.  
HELEN E. FREEDMAN, J.  
*1 Motion by the defendants for an order granting them summary judgment under CPLR 3212 is granted in part and denied in part for the reasons set forth below.

*Introduction*-The following summarizes the background and history of this action to date.[FN1] This lawsuit arises from a contemplated leveraged buyout by the plaintiffs and their affiliates (the " "Purchasers")[FN2] of most of the public stock of the media company Clear Channel Communications, Inc. (" "Clear Channel"). The defendants[FN3] are financial institutions which agreed to lend the Purchasers approximately $ 22 billion to finance the Clear Channel acquisition (the "Acquisition") pursuant to the terms of a Second Amended and Restated Commitment Letter, which was addressed to the plaintiffs and dated May 17, 2007 (the "Commitment Letter"). The Acquisition is governed by an Agreement and Plan of Merger dated May 17, 2007 (the "Merger Agreement") among Clear Channel, the plaintiffs, and a holding company that the plaintiffs control named CC Media Holdings, Inc. ("CC Media"), under which CC Media would merge into Clear Channel on or before June 12, 2008.

> FN1. A prior decision in this case provides further detail. See *BT Triple Crown Merger Co. v. Citigroup Global Mkts. Inc.*, 2008 WL 1849845 (Sup.Ct. N.Y. Co. Apr. 25, 2008) (the "Prior Decision") at *1-*3.

> FN2. The plaintiffs are controlled by two private equity firms named Bain Capital Partners LLC and Thomas H. Lee Partners (the "Sponsors"). The Sponsors organized the plaintiffs as acquisition vehicles to effectuate "Project Triple Crown," the nickname that the participants used for the Clear Channel buyout.

> FN3. Defendants in this action include

Case 1:07-cv-06767-GEL   Document 61-6   Filed 05/23/2008   Page 3 of 10

Slip Copy                                                                    Page 2
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)
**(Cite as: 2008 WL 1970900 (N.Y.Sup.))**

Citigroup Global Markets Inc., Citibank, N.A., Citicorp North America, Inc., Morgan Stanley Senior Funding, Inc., Credit Suisse, Cayman Islands Branch, Credit Suisse Securities(USA) LLC, The Royal Bank of Scotland PLC, RBS Securities Corporation, Wachovia Bank, National Association, Wachovia Investment Holdings, LLC, Wachovia Capital Markets, LLC, Deutsche Bank AG Cayman Islands Branch, and Deutsche Bank Securities Inc.

The plaintiffs commenced this action on March 26, 2008. The Verified Complaint asserts claims against defendants for breach of contract, fraud, violation of Massachusetts statutes against unfair and deceptive trade practices, and civil conspiracy under Massachusetts common law. The gravamen of their claims is that defendants are reneging on their promise to lend the Purchasers funds for the Acquisition, in breach of their obligations under the Commitment Letter. In the Verified Complaint (the "Complaint"), the plaintiffs allege the following. The defendants' interest in the Acquisition dates from 2006, when they and other banks "competed energetically ... for the opportunity to [finance the Acquisition]." Motivated by the opportunity to "secure a high-profile engagement and more than $400 million in fees," the Complaint continues, the defendants "offered aggressive terms" and issued an initial commitment letter in November 2006, which was amended and restated by the final Commitment Letter in May 2007.

The plaintiffs allege that as the credit markets worsened during the summer of 2007, the defendants developed a case of "lenders' remorse." At that time the defendants allegedly determined that the Acquisition financing exposed them to potential losses that exceeded their expected fees. As a result, plaintiffs claim the defendants "plotted to shift [about $2.65 billion of] losses to the Purchasers or to escape their commitment."

The plaintiffs allege that the defendants attempted to wrest concessions from the Purchasers or prevent them from completing the Acquisition by (1) threatening to back out of another unrelated loan to the Purchasers, (2) meeting with the Purchasers in December 2007 to ask them, with "hat in hand," to change the terms of the financing, (3) "stalling to buy time to delay the transaction," and (4) failing to negotiate the final transaction agreements in good faith and instead asking for unreasonable terms.

*2 On the same day (March 26, 2008) that the plaintiffs filed this action, Clear Channel and CC Media (hereinafter, the "Texas Plaintiffs") commenced a lawsuit in Texas state court (the "Texas Court") against certain defendants in this action or their affiliates (collectively, the "Texas Defendants").[FN4] *Clear Channel v. Citigroup Global Markets, Inc.,* No.2008-CI-4864 (D. Ct. Bexar Co. Tex., Mar. 26, 2008) (the "Texas Action"). The Texas Plaintiffs' central claim is that the Texas Defendants tortiously interfered with the Merger Agreement among Clear Channel, CC Media and the Purchasers by using "any means possible ... to destroy the [Acquisition] and thus avoid their obligation to fund [it] as they are required to do."

> FN4. The Texas Defendants include Citigroup Global Markets, Inc., Citigroup USA, Inc., Citicorp North America, Inc., Morgan Stanley Senior Funding, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Corporation, Wachovia Investment Holdings, LLC, Wachovia Capital Markets, LLC, and Deutsche Bank Securities, Inc.

Upon the Texas Plaintiffs' application, the Texas Court issued an *ex parte* temporary restraining order enjoining the Texas Defendants from, among other things, "taking any action that would interfere with or thwart consummation of the Merger Agreement," including "refusing to fund the [Acquisition] as agreed in the Commitment Letter." The Texas Court also scheduled a hearing on the application for a temporary injunction and an expedited trial and directed that the Texas Defendants receive notice.

On April 4, 2008, the defendants filed their answer to the Verified Complaint in this action, joined Clear Channel and CC Media in this action, and brought four counterclaims against plaintiffs, Clear Channel and CC Media (the "Counterclaim Defendants"), in which they sought declaratory judgments that the defendants have not breached the Commitment Letter (first counterclaim); that certain terms that the defendants had proposed for the final transaction agreements, and to which the plaintiffs had objected,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-06767-GEL   Document 61-6   Filed 05/23/2008   Page 4 of 10

Slip Copy                                                                                              Page 3
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)
**(Cite as: 2008 WL 1970900 (N.Y.Sup.))**

are consistent with the terms of the Commitment Letter (second); that, as a matter of law, specific performance of the Commitment Letter is unavailable as a remedy for the plaintiffs in this action (third); and that the Commitment Letter and Merger Agreement limit the defendants' potential liability to the Counterclaim Defendants to at most $600 million (fourth). Soon thereafter, the Counterclaim Defendants moved for an order dismissing the counterclaims.

By order and decision dated April 25, 2008, this Court dismissed the counterclaims against Clear Channel and CC Media. As a result, the latter are no longer parties to this action. The plaintiffs' motion to dismiss the counterclaims against them was denied.

*Motion* The defendants have moved here for summary judgment on all of the plaintiffs' claims and for a declaratory judgment on their counterclaims against the plaintiffs. They seek a declaration that (1) the Banks have not breached the Commitment Letter, (2) as a matter of law, specific performance is unavailable as a remedy for plaintiffs in connection with the Commitment Letter, and (3) "the liability, if any, of the Banks to [Clear Channel] would, as a matter of contract, be capped at or limited to $ 500 million."Each branch of the defendants' motion will be addressed in turn.

**\*3***Breach of contract* The defendants argue that they cannot as of now be in breach of the Commitment Letter because that contract does not obligate them to lend the plaintiffs the funds for the Acquisition until June 12, 2008. They allege that the plaintiffs' objection to certain terms that the defendants have proposed for the transaction could not give rise to any claim at present, because the parties are still negotiating the final terms and the defendants' deadline for performance has not yet passed.

In opposition, the plaintiffs first contend that its breach of contract claim is ripe because the defendants' time to perform the Commitment Letter has already passed. The plaintiffs allege that the Commitment Letter afforded them the right to schedule the closing for March 27, 2008, and the defendants breached the contract by refusing to close on that date. The plaintiffs add that, even if the defendants' closing deadline is June 12, then the plaintiffs' claim for breach is still ripe, because the defendants repudiated the Commitment Letter by negotiating in bad faith and through other actions and words. The plaintiffs contend that the defendants' repudiation immediately gave rise to a claim of anticipatory breach of contract.

The plaintiffs' claim that the defendants breached the Commitment Letter by failing to fund the Acquisition on March 27, 2008 lacks any merit. As one of a number of conditions precedent to closing, the Commitment Letter requires that the parties agree on final credit documentation, and no agreement had been reached by March 27. In fact, the plaintiffs commenced this action on March 26 while the defendants were reviewing the plaintiffs' latest proposed documentation, which they had delivered just hours before. The Commitment Letter affords plaintiffs the right to schedule a closing date, but the defendants have no legal obligation to fund on that date unless the conditions precedent have been satisfied.

The more cogent issue is whether the plaintiffs have a claim against the defendants for anticipatory breach of the Commitment Letter. A party to a contract becomes liable for anticipatory breach when repudiating the agreement by disavowing the contractual obligations before performance is due. LILCO v. *Northville Indus. Corp.,* 41 N.Y.2d 455, 463 (1977).A party can signal an anticipatory breach by stating an intention not to perform the contract, or by taking some action which renders the party unable to perform. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458, 463 (1998). The repudiation must be clear and unqualified. *De Lorenzo v. Bac Ag. Inc.,* 256 A.D.2d 906, 908 (3d Dept.1998); see also *Rachmani Corp. v. 9 E. 96th St. Apt. Corp.,* 211 A.D.2d 262, 266-67(1st Dept.1995) (an anticipatory breach claim must arise from a defendant's "definite and final communication of the intention to forego performance"). In general, the question as to whether a defendant's statements or actions constitute unequivocal repudiation is an issue of fact. See *O'Connor v. Sleasman,* 14 AD3d 986, 987-88 (3d Dept.2005). A defendant also repudiates a contract by adopting a "take-it-or-leave-it" position by refusing to perform the contract unless the plaintiff accepts the defendant's untenable construction of an essential term. See *IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.,* 92 N.Y.2d 989, 993 (1998). However, "[a] proposal of

or a demand for performance on terms that go beyond the contract is not a repudiation ... unless it is coupled with a threat of nonperformance if those terms are not accepted."*O'Connor v. Sleasman, 37 AD3d 954, 956-57 (3d Dept.2007)*.

*4 The plaintiffs do not claim that the defendants repudiated the Commitment Letter by expressly refusing to perform it, but instead contend that they repudiated it by insisting that the plaintiffs accept certain terms for the closing documents that were antithetical to those in the Commitment Letter. The plaintiffs take particular exception to three terms that would restrain certain financial transactions by Clear Channel after the closing. The first would prohibit Clear Channel from drawing on the defendants' revolving credit facility to pay off subordinated notes which mature after 2009. The second restricts Clear Channel's ability to extend the maturity of a $ 2.5 billion note that will come due in 2010. Finally, the third sets monetary "baskets" maximum amounts of debt, investments, and asset sales deemed consistent with the defendants' financing terms that plaintiffs allege are inappropriately small. Henceforth, these proposals will be referred to as the "Disputed Terms."

The defendants contend that the Disputed Terms are entirely consistent with the Commitment Letter, and that in any event they never adopted a "take-it-or-leave-it" position with respect to them. The defendants state that, until the plaintiffs filed this lawsuit on March 26, 2008, the defendants stood ready, willing, and able to continue negotiating the terms of the final loan documents, but plaintiffs unilaterally broke off negotiations and resorted to legal action. As evidence, the defendants submit a memo from the Sponsors' attorneys dated March 25, 2008 in which they represented that they "remain [ ] fully committed to this deal," and would shortly be sending a counterproposal reflecting "further meaningful compromises." The defendants' evidence indicates that the Sponsors did not deliver counter-proposals until about noon on March 26, and that while the defendants were still reviewing the plaintiffs' new proposals that afternoon, they learned that both this lawsuit and the Texas Action had been commenced.

In opposition, the plaintiffs claim that the defendants informed them that they would not perform pursuant to the Commitment Letter unless the plaintiffs accepted the Disputed Terms. As evidence, they submit the joint affidavit of Steven Barnes and Charles Brizius, who are principals of the Sponsors. They state that "[e]ach of us believes that the Banks' position as to [the Disputed Terms] has been unequivocal and take-it-or-leave-it, and that position has prevented the deal from being completed."

The plaintiffs also submit internal email messages of bankers employed by the defendants, which the plaintiffs obtained during discovery. It is not disputed that the subject of these messages is the Acquisition financing. The most noteworthy email dates from just after the December 2007 meeting at which the defendants had asked the plaintiffs to restructure the financing to reduce the defendants' risk of loss. When informing a colleague on December 21, 2007 that the plaintiffs had not yet responded, one employee wrote "[l]et's draft the nuclear version," and his colleague agreed that "[s]ending that may elicit the response." On January 31, 2008, another employee told a colleague that he was delivering document drafts to the Purchasers which "are meant to be draconian docs [sic]". Finally, on February 3, 2008, a bank employee wrote that it was "[t]ime to take the gloves off."

*5 The plaintiffs' evidence that the defendants threatened not to finance the Acquisition unless the plaintiffs agreed to the Disputed Terms is not compelling. However, Barns' and Brizius' perception that the defendants were threatening them with non-performance, when coupled with the rather ominous tone of the defendants' internal emails, suffices to raise a triable issue of fact as to whether the defendants presented the plaintiffs with an ultimatum. The question as to whether the Disputed Terms conflict with the Commitment Letter shall also be determined at trial.

*Fraud* The defendants argue that the plaintiffs' fraud claim fails for two reasons. First, defendants contend that, under New York law, a fraud claim that entirely duplicates a breach of contract claim cannot be maintained. *See, e.g., J.E. Morgan Knitting Mills, Inc. v. Reeves Bros., Inc., 243 A.D.2d 422, 423 (1st Dept.1997)*. The defendants assert that both claims are based on the same allegations that the defendants intended to avoid financing the Acquisition by insisting on Disputed Terms which they knew that

the plaintiffs would reject, while misrepresenting to the plaintiffs that they were committed to closing the transaction. Second, the defendants assert that the plaintiffs fail to establish their reliance on defendants' alleged misrepresentation was justified.

In opposition, the plaintiffs first claim that the law of Massachusetts, not the law of New York, applies to their fraud claim, and that under Massachusetts law the same allegations can give rise to both fraud and breach of contract claims. The plaintiffs further argue that they justifiably relied on the defendants' statements that they were "committed" to funding the Acquisition, and as a result "did not seek alternative financing when it might still have been possible to do so."

Plaintiffs correctly point out that "under New York conflict of law principles, fraud claims are governed by the law of the place of injury," which is usually deemed to be the place "where [the] plaintiffs are located." *J.A.O. Acq. Corp. v. Stavitsky*, 192 Misc.2d 7, 12 (Sup.Ct. N.Y. Co.2001), *aff'd*, 293 A.D.2d 323 (1st Dept.2002). Since the plaintiffs' businesses operate from Boston, their alleged injury occurred there and the substantive law of Massachusetts applies to their fraud claim.[FN5] However, neither party has briefed the Court on whether Massachusetts law allows a fraud claim that arises from the same circumstances as a breach of contract claim. On the other hand, the defendants demonstrate that the substantive law of New York and Massachusetts which govern the elements of a fraud claim do not materially differ. *See PI, Inc. v. Ogle*, 932 F.Supp. 80, 83 (S.D.NY 1996); *see also Collins v. Hulack*, 57 Mass.App. 387, 391-92, 783 N.E.2d 834, 839 (2003).

> FN5. It should be noted that the law of New York governs the plaintiffs' burden of proof in connection with the fraud claim, since burdens of proof and other matters which are procedural in nature are governed by the law of the forum. *See, e.g., Clark v. Harnischfeger Sales Corp.*, 238 A.D. 493, 495 (2d Dept.1933); *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*, 173 Misc.2d 901 (Sup.Ct.1997). Under the laws of this State, a plaintiff must prove a fraud claim by "clear and convincing evidence." *Simcuski v. Saeli*, 44 N.Y.2d 442, 452 (1978).

The evidence that the plaintiffs submitted in connection with this motion fails to establish the elements of a cause of action for fraud. To prevail on the claim, the plaintiffs must establish that the defendants "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage." *Danca v. Taunton Sav. Bank*, 385 Mass.1, 8, 429 N.E.2d 1129 (1982) (citations omitted). Moreover, "the plaintiff's reliance on the defendant's false statement must be reasonable and justifiable under the circumstances." *Collins*, 57 Mass.App. at 392, 783 N.E.2d at 839.

*6 The plaintiffs summarize the bases for their cause of action as follows:

> The [defendants] made repeated, false assertions that they were committed to abiding by the terms of the Commitment Letter when they knew that they would be actively trying to scuttle the transaction. The Commitment Letter was executed on May 17, 2007. In December and January, 2008, while seeking significant concessions from Plaintiffs, the Banks reiterated that they were committed to the transaction.... Thus, for instance, in November 2007, the Banks stated to the rating agencies, that "[o]ur current expectation is to close in late 2007 or early 2008...." And even after the Banks delivered draft final documents on February 8, 2008, they went through the pretense of negotiation, all the while refusing to move off positions that they knew could never be accepted. The plaintiffs reasonably relied on the [defendants'] statements that they were committed to funding the transaction.... [The plaintiffs] therefore did not seek alternative financing when it might still have been possible to do so. As a result of the Banks' fraudulent misrepresentations, the plaintiffs were unable to find financing partners who were actually committed to the transaction.

> Boiled down to their essence, the plaintiffs' allegations amount to a charge that the defendants tried to force the plaintiffs to release them from their obligations under the Commitment Letter by demanding the Disputed Terms, which they knew were in conflict with the Commitment Letter and which they knew the plaintiffs would never accept, all the while claiming that they still wanted to fund

Slip Copy
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)
(Cite as: 2008 WL 1970900 (N.Y.Sup.))

Page 6

the Acquisition. However, the plaintiffs do not submit any evidence showing (1) that the defendants proposed the Disputed Terms in bad faith because they believed that they conflicted with the Commitment Agreement, (2) that the defendants did not believe some compromise could be reached with the plaintiffs over the Disputed Terms, (3) and that the defendants did not still want to fund the Acquisition, although they were trying to win some concessions from the plaintiffs through "hard bargaining." In short, the plaintiffs fail to make a *prima facie* showing that the defendants lied when they represented that they wanted to complete the transaction or that they were negotiating in bad faith.

Accordingly, the fraud claim is dismissed.

*Massachusetts Consumer Protection Statute* The plaintiffs' claim under the Massachusetts consumer protection statute, Mass. Gen. Laws ch 93A, § 11 ("Chapter 93A") fails for two different reasons. First, under Massachusetts law a Chapter 93A claim cannot proceed when the gravamen of a plaintiff's claims is a contractual dispute, and the contract in question contains a choice-of-law provision requiring that the law of another state (i.e., not Massachusetts) is to be applied. Worldwide Commodities, Inc. v. J. Amicone Co., 36 Mass.App. 304, 308-09, 630 N.E.2d 615, 617-18 (1994). The Commitment Letter contains a New York choice of law provision, and the plaintiffs' Chapter 93A claim is based upon the same factual allegations as their breach of contract claim.

*7 Second, Chapter 93A requires that the alleged "deceptive conduct" occur "primarily and substantially" in Massachusetts. Mass. Gen. Laws Ch. 93A § 11, ¶ 8 (2008). A plaintiff's receipt of deceptive communications from parties located outside the state does not fulfill that requirement. See, e.g., Ezenia! Inc. v. Datacraft Mexico, S.A., 2004 WL 3091658 (Mass.Super.Nov.23, 2004). The Complaint alleges that "[v]irtually all of the unfair and deceptive communications" were telephone calls and email messages from the out-of-state defendants to the Sponsors' Boston offices, but those communications did not "occur" in Massachusetts for purposes of Chapter 93A. See id. The only conduct occurring in Massachusetts that the plaintiffs allege is the meeting of December 2007, for which the defendants traveled to Boston. However, the Complaint does not allege that this meeting, which the plaintiffs refer to as the defendants' "hat in hand" meeting, was in any way deceptive.

Accordingly, summary judgment is granted to defendants on this claim.

*Massachusetts Civil Conspiracy* Unlike New York, Massachusetts recognizes a claim for civil conspiracy to commit a tort. Compare Alexander & Alexander of N.Y. Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986) (holding that "a mere conspiracy to commit a [tort] is never of itself a cause of action") with Kurker v. Hill, 44 Mass.App. 184, 188-89, 689 N.E.2d 833, 836-37 (1998) (discussing the elements of a Massachusetts civil conspiracy claim). Moving for summary judgment, the defendants contend that the law of New York governs the plaintiffs' allegations of conspiracy, and accordingly the plaintiffs fail to state a cause of action. However, for the reasons stated above in the discussion of the fraud claim, Massachusetts law governs this claim. See supra at 9-10.

However, under Massachusetts law the conspiracy claim fails because it cannot be maintained in the absence of an underlying tort claim. See Kurker v. Hill, 689 N.E.2d 833, 837 (Mass.App.1998). Since the fraud claim is dismissed, this claim is dismissed as well.

*Declaratory Judgment: Breach of Commitment Letter* That branch of the defendants' motion granting them summary judgment and declaring that they have not breached the Commitment Letter is denied. As explained above, plaintiffs have raised a triable issue as to whether the defendants are liable for anticipatory breach of the contract. See supra at 8-9.

*Availability of Specific Performance* In the Complaint, the plaintiffs seek "a decree of specific performance, ordering defendants to perform their obligations pursuant to the terms of the Commitment Letter," including their alleged obligation to finance the Acquisition. The defendants seek a declaration that specific performance is unavailable to the plaintiffs as a matter of law. In opposition, the plaintiffs contend that specific performance is warranted under the circumstances because Clear Channel is a "unique" asset and alternative financing is unavailable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*8 Specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action. *Cho v. 401-403 57th St. Realty Corp., 300 A.D.2d 174, 175 (1st Dept.2002)*. In general, a court will not order specific performance if "money damages would be adequate to protect the expectation interest of the injured plaintiff."*Sokoloff v. Harriman Ests. Dev. Corp., 96 N.Y.2d 409, 415 (2001)* (quoting Restatement [Second] of Contracts § 359[1] ). Specific performance is appropriate, however, when "the subject matter of the particular contract is unique and has no established market value."*Van Wagner Advert. Corp. v. S & M Enters., 67 N.Y.2d 186, 193 (1986)*. The Court in *Van Wagner Advert. Corp.* added that "[t]he point at which breach of contract will be redressable by specific performance ... [lies] not in any inherent physical uniqueness of [the subject matter of the contract] but instead in the uncertainty of valuing it."*Van Wagner Advert. Corp., 67 N.Y.2d at 193*.

The decision to award specific performance "rests in the sound discretion of the trial court."*Sokoloff, 96 N.Y.2d at 415*. The Court of Appeals has set forth some of the relevant criteria for ordering specific performance:

> In determining whether money damages would be an adequate remedy, a trial court must consider, among other factors, the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damages award.... Specific performance is an appropriate remedy for a breach of contract concerning goods that are unique in kind, quality or personal association where suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure.

*Id.* (omitting internal quotations and citation).

Ordinarily, the New York courts will not order specific performance of a contract to lend money to a plaintiff, on the ground that money is fungible, and an injured party can borrow funds elsewhere and recover damages based on the higher costs it was forced to pay to the replacement lender. *See Bradford, Eldred & Cuba R.R. Co. v. NY, Lake Erie & W. R.R. Co., 123 N.Y. 316, 325-27 (1890)*. A very few exceptions have been made to this general rule.

In *Bregman v. Meehan, 125 Misc.2d 332 (Sup.Ct. Nassau Co.1984)*, the defendant breached a contract obligating her to (1) sell plaintiffs a house and (2) extend them a purchase-money mortgage for part of the sale price. The Court ordered specific performance for both the sale and the loan, reasoning that, because seller-financing is usually given to encourage a sale, it was unlikely that the plaintiffs would be able to obtain a similar commitment from a different lender. *See also Leben v. Nassau Sav. & Loan Assoc., 40 A.D.2d 830 (2d Dept.1972), aff'd, 34 N.Y.2d 671 (1974)*(ordering defendant to lend plaintiffs money to purchase real estate at 6% interest pursuant to their contract, where defendant demanded a higher rate at the closing, and plaintiffs had already moved into their home, expended more than $ 8 thousand in connection with the purchase, and cancelled the lease on their apartment); *Spoolan Realty Corp. v. Haebler, 147 Misc. 9 (Sup.Ct. Bronx Co.1931)*(ordering specific performance of a construction loan by the defendant/seller to plaintiff because loan agreement was "part and parcel" of a contract to sell real estate).

*9 To demonstrate that the circumstances of this case warrant specific performance, the plaintiffs submit the joint affidavit of Steven Barnes and Charles Brizius, who are principals of the sponsors. In relevant part, the affidavit describes Clear Channel as a "unique company" because (1) it is the United States' largest radio and outdoor advertising company, (2) it owns radio properties with "strong brand names," and (3) it "owns or has exclusive rights to unique real estate assets" for advertising "in premier locations in very attractive urban markets."Barnes and Brizius further state that if specific performance is not ordered, they will lose the opportunity to acquire Clear Channel, because "leveraged financing of the magnitude necessary to complete this transaction is not available in the market today."

The plaintiffs also submit the affidavit of Christopher Culp, a consultant [FN6] and professor with impressive credentials. The plaintiffs engaged Professor Culp to give his opinion as to whether they could obtain alternate financing to complete the Acquisition. After setting forth his analysis, Professor Culp concludes that

FN6. Dr. Culp is a Senior Advisor with

Case 1:07-cv-06767-GEL    Document 61-6    Filed 05/23/2008    Page 9 of 10

Slip Copy                                                                                                Page 8
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)
(Cite as: 2008 WL 1970900 (N.Y.Sup.))

> Compass Lexecon, a consulting firm "that applies economic analysis to legal and regulatory matters."

> [g]iven the ongoing instability in leveraged loan markets, the uncertainty in the market about when the credit crisis will end and where the economy is headed, the size of the [defendants' facility under the Commitment Letter], and the absence of any large new leveraged loans being brought to market, ... it would be a practical impossibility under current market conditions for the Purchasers to replace [the defendants' facility] with a new group of lenders on terms remotely similar to those in the Commitment Letter.[FN7]

>> FN7. It should be noted that, in contrast to Barnes and Brizius, Professor Culp does not state that it would be impossible for the plaintiffs to obtain alternate financing; rather, Professor Culp states that any alternate financing would be on far less favorable terms for the plaintiffs.

The defendants supplement their papers by submitting the plaintiffs' Expert Disclosure statement of Daniel R. Fischel, who is the President of Compass Lexecon (see *infra* n. 7) and who also has an impressive career in academics. Among other things, the Expert Disclosure statement indicates that

> [i]n the event that specific performance is not granted, Professor Fischel is also expected to testify to certain damages caused to [the plaintiffs] as a result of [the defendants'] breach of contract." After describing Professor Fischel's methodology, the document states that he will update the plaintiffs' damages by "mak[ing] appropriate adjustments based on market considerations and other relevant considerations. For example, Professor Fischel will testify that [as of] March 31, 2008, damages would equal approximately $ 3.0 billion."

The defendants offer the plaintiffs' Disclosure Statement as evidence that the plaintiffs could be adequately compensated by money damages.

Based on the papers before this Court, it cannot be determined whether, if the defendants were found to have breached the Commitment Letter, specific performance would be available as a remedy. Plaintiffs have raised triable issues as to (1) whether Clear Channel is "unique", (2) whether alternate financing can be procured for the Acquisition, and (3) whether the plaintiffs' money damages can be proven with reasonable certainty. Accordingly, the defendants' summary judgment motion for a declaration about the availability of specific performance is denied, with leave to renew after trial if the defendants are found to have breached the Commitment Letter.

*10 *Liability to Clear Channel* Finally, that branch of the defendants' motion which seeks summary judgment declaring a cap on its liability to Clear Channel is denied. Clear Channel has been dismissed from this action, and accordingly this Court lacks any jurisdiction over it. In any event, a liability cap affecting Clear Channel would be contained in the Merger Agreement, which affects Clear Channel's rights and not those of the defendants.

Accordingly, it is

ORDERED that the defendants' motion for summary judgment is granted to the extent that the second, third, and fourth causes of action of the Verified Complaint are severed and dismissed, and it is further

ORDERED that the defendants' motion for summary judgment on their counterclaims is denied, and it is further

ORDERED that the action shall continue as to the first cause of action in the Verified Complaint and the counterclaims, and it is further

ORDERED the Clerk is directed to enter judgment accordingly, and it is further

ORDERED that the parties shall appear for trial as will be determined.

N.Y.Sup.,2008.
BT Triple Crown Merger Co., Inc. v. Citigroup Global Markets Inc.
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 1970900 (N.Y.Sup.), 2008 N.Y. Slip Op. 50941(U)
**(Cite as: 2008 WL 1970900 (N.Y.Sup.))**

Page 9

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.