UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                  :

| | |
|---|---|
| THOMAS H. LEE EQUITY FUND V, L.P., : | 07 Civ. 6767 (GEL) |
| THOMAS H. LEE PARALLEL FUND V, L.P., : | |
| and THOMAS H. LEE EQUITY (CAYMAN) : | |
| FUND V, L.P., : | |
| : | |
|               Plaintiffs, : | |
|       v. : | |
| : | |
| MAYER, BROWN, ROWE & MAW LLP, : | |
| : | |
|             Defendant. : | |
| : | |

--------------------------------------------------------------x


# REPLY MEMORANDUM IN SUPPORT OF
# MOTION TO DISMISS OF MAYER BROWN LLP


**WILLIAMS & CONNOLLY LLP**
725 Twelfth St., N.W.
Washington, D.C.  20005
Tel:    (202) 434-5000
Fax:   (202) 434-5029
*Attorneys for Defendant*
*Mayer Brown LLP*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER RULE 10b-5(b) .............................. 2

    A.    Plaintiffs Allege That Mayer Brown Was a Mere Conduit. .................................. 2

    B.    Plaintiffs' Misrepresentation Claims Are Barred by the Purchase
         Agreement's Non-Reliance and Integration Clauses. ............................................. 8

    C.    Even Aside from the Purchase Agreement, Plaintiffs Have Not
         Adequately Alleged Transaction Causation or Loss Causation............................ 12

II.   PLAINTIFFS' SCHEME CLAIM FAILS AS A MATTER OF LAW. .......................... 14

III.  PLAINTIFFS HAVE FAILED TO ALLEGE SPECIFIC FACTS THAT
     GIVE RISE TO A STRONG INFERENCE OF SCIENTER. ........................................ 19

IV.   THE PSLRA BARS PLAINTIFFS' RICO CLAIM. .................................................... 26

    A.    Plaintiffs' RICO Allegations Plainly Involve Securities. .................................... 26

    B.    The PSLRA Bars RICO Claims Based on Aiding and Abetting a
         Violation of the Securities Laws. ......................................................................... 29

V.    PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM. ...................................... 32

    A.    The Complaint Does Not Allege Agreement. ....................................................... 32

    B.    Plaintiffs Have Not Pleaded an Underlying RICO Violation Because
         They Fail to Plead Continuity. ............................................................................. 34

VI.   PLAINTIFFS' COMMON LAW CLAIMS SHOULD BE DISMISSED. ...................... 38

    A.    Plaintiffs' Common Law Claims Are Governed by New York Law.................... 38

    B.    PLAINTIFFS HAVE NOT STATED A CLAIM FOR COMMON
         LAW FRAUD. ..................................................................................................... 40

    C.    PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM
         FAILS UNDER NEW YORK OR MASSACHUSETTS LAW.......................... 41

VII.  STRONG POLICY REASONS CALL FOR DISMISSAL OF ALL OF
     PLAINTIFFS' CLAIMS.................................................................................................. 44

CONCLUSION................................................................................................................. 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005)...............16

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)..........................14

*American Financial International Group-Asia, LLC v. Bennett,* No. 05 Civ. 8988, 2007
WL 1732427 (S.D.N.Y. June 14, 2007) ................................................................40

*AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63 (2d Cir. 2003) ....................11

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..............9, 10, 11, 12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 357 F. Supp. 2d 712 (S.D.N.Y. 2005) .............11

*Bald Eagle Area School District v. Keystone Financial, Inc.*, 189 F.3d 321
(3rd Cir. 1999) .........................................................................................27, 28, 29

*Baron v. Chehab*, No. 05-3240, 2006 WL 156828 (C.D. Ill. Jan. 20, 2006)..........................27, 32

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .........................................33, 34

*Benedict v. Amaducci*, No. 92 Civ. 5239, 1995 WL 702444 (S.D.N.Y. Nov. 28, 1995) .............35

*Bonavire v. Wampler*, 779 F.2d 1011 (4th Cir. 1985) ....................................................8

*Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131, 2008 WL 2329761 (2008)...............30

*Burnett v. Rowzee*, __ F. Supp. 2d __, Nos. 07-0393, 07-0641, 2008 WL 638503
(C.D. Cal. Feb. 11, 2008)..............................................................................17, 18

*Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007)........................................19

*In re Carter-Wallace, Inc., Securities Litigation*, 220 F.3d 36 (2d Cir. 2000) ..............................20

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164
(1994).......................................................................................................1, 3, 45

*Cheswell, Inc. v. Premier Homes & Land Corp.*, 319 F. Supp. 2d 144 (D. Mass. 2004)..............44

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999)........................37

*Cook v. Campbell*, 482 F. Supp. 2d 1341 (M.D. Ala. 2007) ............................................29

*Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)................................. 39-40

*Crossland Savings FSB v. Rockwood Insurance Co.*, 700 F. Supp. 1274 (S.D.N.Y. 1988)....41, 42

*Crowley v. Montgomery Ward & Co.*, 570 F.2d 875 (10th Cir. 1975) ..........................................26

*Dirks v. SEC*, 463 U.S. 646 (1983) ..............................................................................................30

*Divine Tower International Corp. v. Kegler, Brown, Hill & Ritter Co.*, Nos. 2:04-cv-494, 2:04-cv-584, 2007 WL 2572258 (S.D. Ohio Sept. 4, 2007) ....................................................6

*Doehla v. Wathne Ltd.*, No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1996) .........41, 42

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ....................................................1, 45

*Dutton v. Glass*, No. 04 CV 3496, 2005 WL 146503 (S.D.N.Y. Jan. 20, 2005) ...........................38

*In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008) ...........................................15

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .................................................................................................................................9

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) ...........................................................................................................28, 29

*Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793, 2005 WL 500377 (S.D.N.Y. Mar. 2, 2005) ................................................................................................................................32

*First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).........34, 37

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)..................................14

*Fleet National Bank v. Boyle*, No. 04CV1277, 2005 WL 2455673 (E.D. Pa. Sept. 12, 2005) ................................................................................................................................27, 28

*Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104 (S.D.N.Y. Mar. 23, 1994) ........41, 42

*Gatz v. Ponsoldt*, 297 F. Supp. 2d 719 (D. Del. 2003) .................................................................28

*Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007) ........................................................................................................40

*In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) ......15, 16

*Goren v. New Vision International, Inc.*, 156 F.3d 721 (7th Cir. 1998).........................................34

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, 517 F.3d 454 (7th Cir. 2008) ................................................................................................................21, 33, 45

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)..................................................................9, 12

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) ........................................32

*Hemispherx Biopharma, Inc. v. Asensio*, No. Civ. A. 98-5204, 1999 WL 144109
(E.D. Pa. Mar. 15, 1999) ................................................................................28, 31

*Hidden Brook Air, Inc. v. Thabet Aviation Intenational Inc.*, 241 F. Supp. 2d 246
(S.D.N.Y. 2002) .................................................................................................38

*Hollinger International, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545
(N.D. Ill. Oct. 8, 2004) ..................................................................................28, 29

*Howard v. AOL, Inc.*, 208 F.3d 741 (9th Cir. 2000) ..............................................28, 31

*HSA Residential Mortgage Servs. v. Casuccio*, 350 F. Supp. 2d 352 (E.D.N.Y. 2003) ..........39, 40

*International Strategies Group, Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1
(1st Cir. 2007) ............................................................................................ passim

*Jones v. Deutsche Bank AG*, No. C 04-05357, 2005 WL 1683614
(N.D. Cal. July 19, 2005) ....................................................................................26

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ..........................................................19

*Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 889, 2004 WL 2903776 (S.D.N.Y. Dec.
14, 2004) ...........................................................................................................41

*Kline v. First Western Government Securities Inc.*, 24 F.3d 480 (3d Cir. 1994) .......................5, 6

*Krock v. Lipsay*, 97 F.3d 640 (2d Cir. 1996) ..............................................................38

*La Sala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246 (S.D.N.Y. 2007) .....................38, 39

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ..............................................4, 7

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).......................................................16

*Leung v. Law*, 387 F. Supp. 2d 105 (E.D.N.Y. 2005)................................................................35

*Ling v. Deutsche Bank AG*, No. 04 CV 4566, 2005 WL 1244689
(S.D.N.Y. May 26, 2005) ...............................................................................27, 29

*Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998)................................................................34

*In re Livent, Inc. Noteholders Securities Litigation*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001).........26

*Loftin v. KPMG LLP*, No. 02-81166, 2003 WL 22225621 (S.D. Fla. Sept. 10, 2003) ................29

*M'Baye v. New Jersey Sports Production, Inc.*, No. 06 Civ. 3439, 2007 WL 431881
(S.D.N.Y. Feb. 7, 2007) ................................................................................35, 36

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006).......................................................5, 14

*In re MarketXT Holdings Corp.*, No. 04-12078, 2006 WL 2864963
(Bankr. S.D.N.Y. Sept. 29, 2006) ......................................................12

*Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156 (3d Cir. 1998) ..............................31

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ..........................14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) .................29

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ..........................................36

*Morin v. Trupin*, 711 F. Supp. 97 (S.D.N.Y. 1989) .....................................................36

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, No. 02 Civ.
0767, 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003).................................................41

*Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514
(S.D.N.Y. 2001) ..........................................................................................................36

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)......................................................23, 40

*Novak v. Kasaks*, 997 F. Supp. 425 (S.D.N.Y. 1998) ..................................................23

*One National Bank v. Antonellis*, 80 F.3d 606 (1st Cir. 1996)................................43, 44

*OSRecovery, Inc. v. One Groupe International, Inc.*, 354 F. Supp. 2d 357
(S.D.N.Y. 2005) ..........................................................................................................32

*Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007)............................................ 2-3

*In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...............16

*Payton v. Flynn*, No. 06 C 465, 2006 WL 3087075 (N.D. Ill. Oct. 26, 2006)..............32

*Pension Commission of the University of Montreal Pension Plan v. Banc of America
Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006)...........................................39

*In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ.
643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ..................................................15

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........19, 21

*Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482
F.3d 372 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1120 (2008)..............................15

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 1999 WL 47239
(S.D.N.Y. Feb. 3, 1999)..............................................................................................32

*Republic of Columbia v. Diageo North America, Inc.*, 531 F. Supp. 2d 365
(E.D.N.Y. 2007) ........................................................................................................33

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ..........................................................30

*Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998) ..........................6

*In re Salomon Analyst Metromedia Litigation*, 236 F.R.D. 208 (S.D.N.Y. 2006) ......14

*Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991) ..............................................7, 8

*Schlecht v. Smith*, No. 92-30099, 1994 WL 621594 (D. Mass. Nov. 7, 1994) ............44

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) ........................................16

*SEC v. Lyon*, 529 F. Supp. 2d 444 (S.D.N.Y. 2008) ..................................................30

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ...........................................................26

*SEC v. Zandford*, 535 U.S. 813 (2002) ....................................................................29

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ............................................30, 31

*Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363 (S.D.N.Y. 2004) ..........27, 29

*Sell v. Zions First Nation Bank*, No. CV 05 0684, 2006 WL 322469 (D. Ariz. Feb. 9,
2006) .............................................................................................................. 26-27, 28

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .................................20

*Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46 (E.D.N.Y. 2000) ...............................38

*Smith v. Soros*, No. 02 Civ. 4229, 2003 WL 22097990 (S.D.N.Y. Sept. 5, 2003) ........38

*Spira v. Nick*, 876 F. Supp. 553 (S.D.N.Y. 1995) ...............................................35, 36

*Spool v. World Child International Adoption Agency*, 520 F.3d 178 (2d Cir. 2008) .......37

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103
(2d Cir. 2005) ...........................................................................................................14

*Stechler v. Sidley, Austin Brown & Wood LLP*, 382 F. Supp. 2d 580 (S.D.N.Y. 2005) ..........29

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ..1, 4, 9, 18

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ....7

*In re Sumitomo Copper Litigation*, 104 F. Supp. 2d 314 (S.D.N.Y. 2000) ..................35

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) ..................................................29

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, __ F.3d __,
  2008 WL 2521676 (2d Cir. June 26, 2008) ....................................................19, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ...........................20

*Twombly v. Bell Atlantic Corp.*, 313 F. Supp. 2d 174 (S.D.N.Y. 2003).........................33

*United States v. O'Hagan*, 521 U.S. 642 (1997) ........................................................29

*In re WorldCom, Inc.*, 374 B.R. 94 (Bankr. S.D.N.Y. 2007)......................................9, 10

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998)........................................2, 7

*Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2004 WL 2211650 (S.D.N.Y. Sept. 30,
  2004) ..................................................................................................................36

## STATE CASES

*Aglira v. Julien & Schlesinger, P.C.*, 631 N.Y.S.2d 816 (App. Div. 1995) ..................42

*BT Triple Crown Merger Co. v. Citigroup Global Markets Inc.*, No. 600899/08, 2008 WL
  1970900 (N.Y. Sup. Ct. May 7, 2008).........................................................................38

*Diodato v. Eastchester Development Corp.*, 489 N.Y.S.2d 293 (App. Div. 1985) ......................10

*Fistel v. Favaloro*, 828 N.E.2d 549 (Mass App. Ct. 2005)...........................................43

*Global Financial Corp. v. Triarc Corp.*, 715 N.E.2d 482 (N.Y. 1999)........................38

*Kirkland Construction v. James*, 658 N.E.2d 699 (Mass. App. Ct. 1995)....................44

*National Bank of Canada v. Hale & Dorr, LLP*, No. 2000000296, 2004 WL 1049072
  (Mass. Super. Ct. Apr. 28, 2004) ............................................................................44

*Norton v. Drepanos*, No. CA903423, 1994 WL 902881 (Mass. Super. Ct. Sept. 13, 1994).........10

*Stock v. Fife*, 430 N.E.2d 845 (Mass. App. Ct. 1982)..................................................41

*Troiano v. Tuccio*, 643 N.Y.S.2d 157 (App. Div. 1996) .............................................10

*Vesey Associates, Inc. v. Regime Realty Corp.*, 232 N.Y.S.2d 754 (Sup. Ct. 1961), *aff'd*,
  16 A.D.2d 920 (N.Y. App. Div. 1962) ....................................................................10

*Wittenberg v. Robinov*, 9 N.Y.2d 261 (1961) ............................................................10

## DOCKETED CASES

*In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) ........................................... 34-35

*Kirschner v. Grant Thornton, et al.*, No. 07 Civ. 11604 (GEL) (S.D.N.Y.) ................................ 35

*Kirschner v. Thomas H. Lee Partners, L.P., et al.*, No. 07 Civ. 7074 (GEL) (S.D.N.Y.) ............ 35

*Lentell v. Merrill Lynch & Co.*, No. 03-7948 (2d Cir.) ................................................................ 16

*Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL) (S.D.N.Y.) .................................................................................................................................. 27

*United States v. Grant*, No. 05 Cr. 1192 (S.D.N.Y. Apr. 4, 2008) ............................................... 13

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 77k(a)(4) ...................................................................................................................... 3

15 U.S.C. § 78j(b) ................................................................................................................... passim

15 U.S.C. § 78t(e) .................................................................................................................... 30, 31

18 U.S.C. § 1964(c) ................................................................................................... 2, 28, 30, 31

Private Securities Litigation Reform Act of 1995 ................................................................. passim

17 C.F.R. § 240.10b-5 ............................................................................................................. passim

Federal Rule of Civil Procedure 8(d)(2) ...................................................................................... 26

Federal Rule of Civil Procedure 8(e)(2) ....................................................................................... 26

Federal Rule of Civil Procedure 9(b) .............................................................................. 34, 35, 40

## LEGISLATIVE HISTORY

141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) .......................................................................... 31

## MISCELLANEOUS

*Black's Law Dictionary* (8th ed. 2004) ........................................................................................ 30

Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* (1991) ...................................................................................................................................... 45

Janet Cooper Alexander, *Rethinking Damages in Securities Class Actions*, 48 Stan. L. Rev. 1487 (1996) ..................................................................................................................... 45

Restatement (Third) of Agency § 6.01 cmt. d(1)............................................................................10

Restatement (Third) of Agency § 6.01 cmt. e...............................................................................10

Plaintiffs' opposition to dismissal rests almost entirely on conclusory assertions that Mayer Brown partner Joseph Collins "lied" in four short statements during the due diligence process. Plaintiffs, which are sophisticated investors, turn their back on the agreement they signed in which they contractually agreed to rely solely on the Refco sellers' formal representations. Instead, they now claim that they based their investment decision on an outside lawyer. But in the four statements Plaintiffs identify, that outside lawyer merely functioned as a conduit of information passed on from Refco and which Refco and its insiders then formally represented and certified to be true. Plaintiffs' attempt to establish reliance on Mayer Brown based on these routine diligence communications amounts to the pursuit of a free "downside insurance policy" from the law firm. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 348 (2005). Plaintiffs' claims thus cannot be reconciled with "the narrow dimensions [courts] must give" to Section 10(b)'s implied right of action, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 774 (2008), and should be dismissed.

Recognizing that acting as a mere conduit will not support a private cause of action in this Circuit, Plaintiffs attempt to state a claim for "scheme liability" based on Mayer Brown's work on loan agreements and other similar documents. But Plaintiffs affirmatively allege that they were unaware of this conduct and, thus, they could not have relied on it. *Stoneridge* flatly rules out claims based on unknown conduct. Expanding the implied cause of action to expose attorneys to hundreds of millions of dollars in investment losses is at odds with the policies underlying *Stoneridge* and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). *See id.* at 189 ("expanding liabilities for third parties will reduce the availability and increase the cost of professional services").

Plaintiffs alternatively press a novel RICO conspiracy claim in the hope that if this Court denies them free insurance on their securities claims, it will allow them to seek a triple-indemnity recovery. But Plaintiffs' RICO claim is squarely prohibited by the PSLRA's amendment to 18 U.S.C. § 1964(c) and, even if it were not, Plaintiffs fail to plead a RICO conspiracy claim.

Plaintiffs' last resort is common law claims for negligent misrepresentation and fraud. New York law applies to these claims, and thus the Martin Act forecloses Plaintiffs' negligent misrepresentation claim. The Court need not decide that question, however, because Plaintiffs' negligent misrepresentation and fraud claims fail under either New York or Massachusetts law.

# I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER RULE 10b-5(b).

## A.    Plaintiffs Allege That Mayer Brown Was a Mere Conduit.

Plaintiffs' theory that Mayer Brown can be held liable as a "speaker" under Rule 10b-5(b) is an unjustified attempt to broaden the reach of Section 10(b) to impose liability on a law firm based on the alleged falsity of its *client's* statements of fact, simply because those statements were relayed to counterparties by the firm's lawyers. Plaintiffs apparently concede that Mayer Brown cannot be held liable for statements made by Refco insiders and insist that they are basing their misrepresentation claim on Mayer Brown lawyers' own "material lies." Opp. at 8. In fact, however, their allegations make clear that Mayer Brown lawyers acted as mere conduits of information from their client, as is common in sophisticated corporate transactions. Under the Second Circuit's bright-line rule, liability cannot be imposed on Mayer Brown for any misstatements the lawyers passed on to Plaintiffs, because those statements were not "attributed to [Mayer Brown lawyers] at the time" and no Mayer Brown lawyer "endorse[d] [their] accuracy." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175, 178 (2d Cir. 1998).[1] The

---

[1] Plaintiffs refer to *Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007), but that case is inapposite. It involved the very different issue of whether an accountant who issues a certified

correctness of this conclusion is now reinforced by the Supreme Court's decision in *Stoneridge*, which Plaintiffs fail even to mention in their discussion of the Rule 10b-5(b) claim.

Mayer Brown was not a Refco insider. It provided legal services, not financial services. It provided no oral or written opinions to Plaintiffs. It was not an "expert" who "expertised" any portion of any document relied on by Plaintiffs.[2] It had no professional relationship with Plaintiffs. It served a commonplace role by, among other things, transmitting information from its client to Plaintiffs, who were well-represented by their own team of lawyers and experts.

Plaintiffs contend that they have alleged that Mayer Brown was more than a mere conduit, but the allegations they point to are sheer conclusions that deserve no deference. *See, e.g.*, Opp. at 10 (quoting Compl. ¶ 42, which conclusorily alleges that "Mayer Brown and Collins understood" that Plaintiffs would rely on Mayer Brown lawyers). Nowhere in the Complaint are specific facts alleged showing that any Mayer Brown lawyer purported to act as an independent source of information about Refco. To the contrary, Plaintiffs' own quotations of the statements at issue make clear that Mayer Brown was just a conduit. Specifically, Plaintiffs allege that:

- Mr. Collins stated to a Weil Gotshal partner that "he had *confirmed with Bennett* that, other than Bennett's compensation arrangements, no other undisclosed contracts or

---

opinion that is false or misleading can be held primarily liable if it later learns of that fact (or is reckless in not so learning). *Id*. at 486-87. The court noted that by issuing a certified opinion, an accountant "holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable, which creates a special relationship of trust." *Id*. at 485 (quotation marks omitted). Mayer Brown is not – and could not be – alleged to do have done anything even remotely similar.

[2] Under Section 11(a)(4) of the Securities Act of 1933, a professional is subject to suit only if "with his consent [he has] been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement." 15 U.S.C. § 77k(a)(4). The Supreme Court has emphasized that it will not "expand the defendant class for 10b-5 actions beyond the bounds delineated for comparable express causes of action." *Cent. Bank*, 511 U.S. at 180. It would defy the Supreme Court's teaching to interpret the implied remedy available under Section 10(b) to go beyond Section 11 in analogous circumstances.

arrangements existed between Refco and Bennett, RGHI or other affiliates," Compl. ¶ 53 (emphasis added);[3]

•      Mr. Collins "confirmed" to a Weil Gotshal partner that "*Company* has gone through with accountants" and all of Refco's receivables listed on Refco's balance sheet were from customers in the ordinary course of business, Compl. ¶ 54 (emphasis added);

•      Mr. Collins sent a one-sentence memorandum by email that stated "we were *advised by Refco Management* that all material contracts were either in the Data Room or are being produced in response to the requests in Exhibit C to the Letter of Intent," Compl. ¶ 55 (emphasis added);

•      Mr. Collins sent another one-sentence memorandum by email that stated "[w]e have been *advised by Refco* that there are no significant indemnification obligations which have not been disclosed already," Compl. ¶ 56 (emphasis added).

Stating that a fact has been confirmed by a client clearly communicates that it is the *client* to whom the statement is attributable.  Nothing in such a statement suggests that the lawyer himself is endorsing or otherwise vouching for the accuracy of his client's statements.  In these circumstances, any claimed "understanding" of Mayer Brown's role cannot give rise to primary liability, as the Second Circuit expressly held in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007) ("Unless the public's understanding is based on the [defendant's] articulated statement, the source for that understanding . . . does not matter.").

*Stoneridge* mandates the same conclusion.  By emphasizing that a plaintiff must rely on the defendant's "own deceptive conduct," 128 S. Ct. at 770, the Supreme Court foreclosed claims against a conduit based on relayed statements.  Plaintiffs offer no response to this point.

They instead disingenuously characterize as "clever" Mr. Collins's statements that the information he was relaying was coming from Refco, Opp. at 10, when in fact they knew full

---

[3] Plaintiffs improperly attempt to embellish the allegation in paragraph 53 of the Complaint by describing it as alleging that Mayer Brown "inform[ed] Plaintiffs that 'other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco, RGHI or other affiliates.'"  Opp. at 16.  But, as set forth in the text, what paragraph 53 actually alleges is that Mr. Collins said he had "*confirmed with Bennett*" (emphasis added) that there were no other undisclosed contracts or arrangements.

well that Refco was the source.  Plaintiffs wanted, asked for, and relied on information, and later

formal representations and certificates, from Refco and its officers – not Mr. Collins.  The

following chronology of due diligence events shows why Plaintiffs have not alleged, and cannot

allege, that Mr. Collins was anything more than a conduit:[4]

- On April 19, 2004, Plaintiffs and Refco entered into a Letter of Intent.  Exhibit C to the Letter of Intent contained 14 specific due diligence requests from Plaintiffs to Refco.  Borden Decl., Ex. A.  The requests included any "significant indemnification obligations" and also asked Refco to "[p]lease confirm that there are no other contracts *considered material by management* that have not been supplied."  *Id.* (emphasis added).

- On May 3, 2004, Bennett sent Mr. Collins a memo containing Refco's responses to each of the 14 requests in Exhibit C to the Letter of Intent.  Borden Decl., Ex. B.  Those responses included:  "There are no significant indemnification obligations that have not been noted already" and "*I can confirm* that there are no other material contracts to be disclosed."  *Id.* (emphasis added).

- On May 6, three days later, Mr. Collins relayed this information, in two one-sentence memos that accurately attributed the information to Refco management, to Plaintiffs' counsel.  Yet these are the very memos, cited in Paragraphs 55 and 56 of the Complaint, on which Plaintiffs base their claim of supposed reliance *on Mayer Brown*.

Plaintiffs attempt to overcome the clear law barring liability in such circumstances by

relying on several cases dealing with attorney opinion letters, *e.g.*, *Kline v. First W. Gov't Sec.

Inc.*, 24 F.3d 480 (3d Cir. 1994), but those cases cannot save Plaintiffs' claim.  To the extent

those cases hold that lawyers may be liable for recitations of facts expressly attributed to the

lawyers' clients, they do not square with the Second Circuit's bright-line rule.[5]  In any event,

cases involving opinion letters are fundamentally different from this case.  An attorney providing

an opinion letter necessarily makes a statement he knows and intends will be attributed to him.

---

[4] These documents are attached as exhibits to the Declaration of George A. Borden in Support of Motion to Dismiss of Mayer Brown LLP ("Borden Decl."). They are offered here for background, *see Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006), and to correct any misimpression that might be created by Plaintiffs' unsupported characterization.

[5] Plaintiffs note that the Second Circuit has approvingly cited *Kline*, Opp. at 10 n.5, but only for a proposition that is not relevant here.

The *Kline* court was explicit:  "We are dealing here with a situation in which Arvey, *by authoring its opinion letters*, has elected to speak regarding the transactions at issue."  24 F.3d at 490 (emphasis added).  *Kline* held that once a law firm gives its own opinion, it cannot knowingly or recklessly misrepresent or omit material facts that undermine the substance of the opinion, even if it states that the facts are being provided by its client.  Here, Mayer Brown is not alleged to have given any opinion or made any statement it knew or intended would be attributable to it.[6]

The illogical extreme of Plaintiffs' position is revealed by their assertion that a draft of a disclosure schedule circulated by Mayer Brown lawyers simultaneously to Refco and to Plaintiffs constituted "more than an endorsement[;] [it is] the firm's statement."  Opp. at 12.  The Amended Complaint refers to these documents as "Refco Disclosure Schedules," Compl. ¶ 73, and alleges that they were drafted "at the direction of Bennett."  *Id.* ¶ 74.  That they were circulated simultaneously to Refco and to Plaintiffs did not make them Mayer Brown's own statements.  In the transmittal email quoted in the Amended Complaint, *id.* ¶ 74(a), Mayer Brown lawyers stated that the schedules were subject to change based on client review – thus, that the statements were merely drafts of the client's ultimate representations and could not be relied on as representations of Mayer Brown, or, as unsigned drafts, representations of *anything at all*.  It would work a radical change in securities law – and effectively end the useful practice

---

[6] Plaintiffs also cite *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998) (en banc).  Although that case did not involve a formal written opinion, it is readily distinguishable.  There, promoters referred investors to their attorney to discuss the issuer's financial condition; the attorney volunteered fraudulent assertions of fact and opinion and discouraged the plaintiffs from conducting due diligence.  The Sixth Circuit characterized this conduct as "gratuitously tout[ing]" the investment.  *Id.* at 266.  No comparable allegations are present here.  Plaintiffs also cite *Divine Tower International Corp. v. Kegler, Brown, Hill & Ritter Co.*, Nos. 2:04-cv-494, 2:04-cv-584, 2007 WL 2572258 (S.D. Ohio Sept. 4, 2007), which misunderstood *Rubin* as holding that representations in an agreement can be attributed to the lawyers who drafted it.

of simultaneous circulation – if Mayer Brown could be held liable based on alleged misstatements in a draft of disclosures that its *client* would ultimately make to a counterparty.

Similarly untenable is Plaintiffs' argument that Mr. Collins violated Rule 10b-5(b) by transmitting to Plaintiffs a supposedly "counterfeit" Fourth LLC Agreement.  As the very document Plaintiffs cite makes clear, the Agreement was duly authorized by Refco's board and was signed by Bennett.  In no sense can it be considered a statement by Mr. Collins, who was not a party or signatory to it, and who merely transmitted it.  Plaintiffs assert that Mr. Collins "created" the document, Opp. at 16-17 & n.14, but "creation" is decidedly not the standard for private liability in this Circuit.  As the Second Circuit has emphasized repeatedly, attribution of authorship is required; absent that, the critical element of reliance is not satisfied.  *See Wright*, 152 F.3d at 175; *Lattanzio*, 476 F.3d at 154-55.[7]  The document could be attributed to no one other than Bennett and RGHI, who signed contemporaneous board resolutions that "approved and adopted" the agreement.[8]

The only sensible rule – and the only one consistent with Supreme Court and Second Circuit law – is that "a lawyer or law firm cannot be liable for the representations of a client, even if the lawyer incorporates the client's misrepresentations into legal documents or agreements necessary for closing the transaction."  *Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th

---

[7] Plaintiffs cite *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), but the issue in that case was whether corporate defendants could be liable for statements made to the plaintiffs by the corporations' officers and agents, *id.* at 101.  There is no allegation, nor could there be, that Refco was Mayer Brown's agent.

[8] Plaintiffs assert that the board resolutions "address only one subject – the transfer of 100 shares of Refco owned by Refco Group Holdings LLC to RGHI."  Opp. at 17.  This claim cannot be squared with the resolutions themselves, which unambiguously state that the "Fourth Amended and Restated [LLC] Agreement in the form attached hereto as Exhibit A be, and it hereby is, approved and adopted."  Borden Decl., Ex. C.

Cir. 1991).[9]  "[L]awyers do not vouch for the probity of their clients when they draft documents reflecting their clients' promises, statements, or warranties."  *Id*.  Transmitting a client's misrepresentations – by, for example, delivering a letter containing false statements from the client to the plaintiff, *id*. at 489 – "does not transform those misrepresentations into the representations of" the law firm.  *Id*. at 495.  Only if a transactional lawyer makes "*independent* affirmative misstatements*" – *i.e.*, "*personal* affirmative representations" – can he be primarily liable under Section 10(b).  *Id*. at 494 & n.3 (emphasis added).  Plaintiffs' allegations do not reach that level here.  Rather, the conduct of Mayer Brown lawyers detailed in the Complaint is akin to the handing over of the letter in *Schatz* – an act of transmission, not an "independent" or "personal" representation by the firm.

**B.    Plaintiffs' Misrepresentation Claims Are Barred by the Purchase Agreement's Non-Reliance and Integration Clauses.**

The Purchase Agreement's non-reliance and integration clauses provide an independent basis for dismissing Plaintiffs' Rule 10b-5(b) and common-law fraud claims.  While Plaintiffs emphasize that some of the language of those provisions refers to the parties to the Agreement, they gloss over the broad and unqualified opening sentence of Section 3.27:  "The representations and warranties made in this agreement are in lieu of and are exclusive of *all other*

---

[9] Plaintiffs' attempt to distinguish *Schatz* misses the mark.  The conduct of the law firm in *Schatz* was no different than that of Mayer Brown here – drafting documents that contained representations from the firm's client and relaying representations from the client to the counterparties.  Contrary to Plaintiffs' contention, this case is not more like *Bonavire v. Wampler*, 779 F.2d 1011 (4th Cir. 1985).  There, the attorney made personal representations that the promoter of the fraudulent investment was an "honest, straight-forward businessman" and he "verifi[ed] [the fraudster's] credibility."  *Id*. at 1014, 1016 (quotation marks omitted).  Unlike the attorney in *Bonavire*, Mayer Brown is not alleged to have made statements verifying Refco's credibility.

*representations* and warranties, including any implied warranties." (Emphasis added).[10]  This

sentence makes clear that the parties to the Agreement intended and acknowledged that the

representations in the Agreement itself were the only ones on which the parties could rely or in

fact had relied.  Those representations were to the exclusion of *all other representations*, no

matter the source.

Mayer Brown's argument is not that it is "protected" by the Agreement's non-reliance

clause as a matter of contract law, Opp. at 18-19, but rather that in light of that provision,

Plaintiffs cannot meet the essential requirement of reasonable reliance with respect to the

communications allegedly made by Mr. Collins.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,

493 F.3d 87, 105-08 (2d Cir. 2007); *Emergent Capital Inv. Mgmt., LLC  v. Stonepath Group,

Inc.*, 343 F.3d 189, 195-96 (2d Cir. 2003); *Harsco Corp. v. Segui*, 91 F.3d 337, 345-48 (2d Cir.

1996).  Accordingly, Plaintiffs' invocation of state law for the proposition that integration and

merger clauses do not extend to non-contracting parties, Opp. at 19, is inapposite to Plaintiffs'

federal claims.  *See Stoneridge*, 128 S. Ct. at 771 ("Section 10(b) does not incorporate common-

law fraud into federal law.").  As a matter of substantive federal law, non-reliance clauses negate

reasonable reliance.

In any event, Plaintiffs' state-law authorities are readily distinguishable.  Plaintiffs

chiefly rely on *In re WorldCom, Inc.*, 374 B.R. 94 (Bankr. S.D.N.Y. 2007).  In *WorldCom*, the

third party in question (MCI) maintained that it had "had nothing to do with the transaction"

except to lend two attorneys to the seller.  *Id.* at 108.  The court carefully limited its holding: "the

Integration Clause does not bar [the plaintiff] from asserting a cause of action based upon any

representations that MCI employees may have made *if found to be acting on behalf of MCI*."  *Id.*

---

[10] A copy of the Purchase Agreement is attached as Exhibit A to the Declaration of Thomas G.

9

(emphasis added). The court explained that the integration clause was inapplicable only "to the extent the allegations relate[d] not to each attorney acting on behalf of [the seller] as their principal but on behalf of MCI as their principal." *Id.* at 109. In short, if the attorneys had acted as agents for a party to the transaction, as Mayer Brown did for Refco here, MCI could have properly invoked the integration clause.

Here, the Complaint alleges that Mayer Brown represented Refco in the relevant transaction, Compl. ¶¶ 1, 41, and communicated with the Plaintiffs "[a]t the direction of" Refco officers, *id.* ¶ 41. Nothing in the Complaint suggests that Mayer Brown acted outside the scope of its agency relationship. Accordingly, even under *In re WorldCom*, Mayer Brown is entitled to invoke the non-reliance provision of the Purchase Agreement.[11]

Plaintiffs' assertion that none of the governing federal cases cited by Mayer Brown involved a non-party is simply wrong. *ATSI*, 493 F.3d 87, did apply merger clauses to bar claims

---

Ward ("Ward Decl."), which was filed in conjunction with Mayer Brown's motion to dismiss.

[11] The other state law cases Plaintiffs cite also are distinguishable. *Wittenberg v. Robinov*, 9 N.Y.2d 261 (1961), was distinguished in *Vesey Associates, Inc. v. Regime Realty Corp.*, 232 N.Y.S.2d 754, 756 (Sup. Ct. 1961), *aff'd*, 16 A.D.2d 920 (N.Y. App. Div. 1962), on the basis that *Wittenberg* involved a real estate broker who received a commission. *Troiano v. Tuccio*, 643 N.Y.S.2d 157 (App. Div. 1996), also involved a broker who received money from the plaintiffs. Unlike the brokers in *Wittenberg* and *Troiano*, Mayer Brown had no financial interest of its own in closing the Purchase Agreement. In fact, by doing so, it stood to (and did) lose its client. Plaintiffs also cite *Diodato v. Eastchester Dev. Corp.*, 489 N.Y.S.2d 293 (App. Div. 1985), but that case involved an ambiguous provision, very different from the one at issue here, that could be interpreted to allow reliance on extracontractual statements rather than prohibit it. *Norton v. Drepanos*, No. CA903423, 1994 WL 902881, at *1 (Mass. Super. Ct. Sept. 13, 1994), does not quote the integration clause in question, engages in no significant legal reasoning, and contains too little information about the roles of the parties to be accorded any significance here. Plaintiffs also cite comment d(1) to section 6.01 of the Restatement (Third) of Agency, but more on point is comment e to section 7.01 of the Restatement, which states that "[m]ost privileges held by a principal may be delegated to an agent. . . . To be protected by a privilege held by the principal, an agent must act for the purpose for which the privilege is given to the principal." Here, under the allegations of the Complaint, Mayer Brown acted for the purpose for which the relevant privilege (the non-reliance clause) was given to Mayer Brown's principal.

against entities that were not party to the agreements that contained the clauses.  In that case, ATSI sued entities that had bought securities from it pursuant to written purchase agreements and also sued two entities (CCM and Crown Capital) that were not parties to the purchase agreements.  Plaintiff alleged (among other things) that the defendants made precontractual misrepresentations.  The Second Circuit held that the precontractual misrepresentation claims against *all* defendants, including CCM, were barred by the merger clauses, without making any distinction as to whether they were parties to the agreements.  *Id.* at 107-08.[12]

Plaintiffs point out that the district court did not rely on the merger clauses in dismissing the claims against the non-parties.[13]  But that is irrelevant, as the Second Circuit was entitled to affirm the judgment on any basis supported by the record.  *See, e.g.*, *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003).  Plaintiffs also argue that when the Second Circuit stated that the claims against non-party CCM failed for "[l]argely . . . the same reasons as above," *ATSI*, 493 F.3d at 108, it was referring to a failure to plead falsity and

---

[12] Plaintiffs quibble as to whether the second non-party, Crown Capital, is a subject of the Second Circuit's opinion, Opp. at 21 n.19, but do not and cannot deny that CCM was, which is all that is necessary to establish that non-party status is immaterial.  Plaintiffs also go out of their way to point out that the agreement in which Crown Capital was involved as a non-party included a non-reliance clause that expressly disclaimed reliance on both parties and their agents. *See id.*  However, the agreement in which *CCM* was involved as a non-party made no reference to agents or other non-parties.  Rather, that agreement, like the one at issue here, included a broad general disclaimer and specifically mentioned only parties.  It provided:

> There are no restrictions, promises, warranties, or undertakings, other than those set forth or referred to herein.  This Agreement, the Securities Purchase Agreement, the Escrow Instructions, the Preferred Shares and the Warrants supersede all prior agreements and undertakings among the parties hereto with respect to the subject matter hereof.

*ATSI*, 493 F.3d at 95.  The lack of any reference to agents in this provision did not prevent the Second Circuit from holding that it barred the claim against CCM.

[13] In fact, the district court, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 357 F. Supp. 2d 712 (S.D.N.Y. 2005), did not rely on the merger clauses as to any of the defendants.

loss causation.  Opp. at 20-21.  In fact, the Second Circuit's holding as to the claims of

*precontractual misrepresentations* were based *solely on the merger clauses*; the court discussed

other grounds for dismissal only with respect to separate claims of misrepresentations within the

purchase agreements themselves, claims that did not apply to CCM.  *ATSI*, 493 F.3d at 107-08.[14]

In sum, Plaintiffs have failed to overcome the dispositive effect of Section 3.27 of the

Purchase Agreement on their ability to plead reasonable reliance.

### C.    Even Aside from the Purchase Agreement, Plaintiffs Have Not Adequately Alleged Transaction Causation or Loss Causation.

Even without reference to the Purchase Agreement's non-reliance clause, Plaintiffs' Rule

10b-5(b) claim would fail because it does not plead reasonable reliance in light of Plaintiffs' own

allegations and other information of which the Court may take judicial notice.  Plaintiffs argue

that their conclusory allegation of "but for" causation is sufficient, Opp. at 22, but that allegation

has no significance where Plaintiffs affirmatively allege that they relied on Refco and its

financial statements, insisted on certificates from Refco's officers, and contractually agreed to

limit their reliance to the contractual representations.

Contrary to Plaintiffs' characterization, it is not the brevity of the alleged statements by

Mr. Collins that makes them not actionable here, Opp. at 22, but rather their content and all the

surrounding circumstances of which the Court can take judicial notice.  That Plaintiffs were

---

[14] Plaintiffs argue in a footnote, Opp. at 21 n.20, that "many courts have refused to enforce [non-reliance clauses] where, as here, a party was fraudulently induced to enter into the contract." There is no Second Circuit support for such an exception.  In *Harsco*, the Second Circuit clearly stated that if a party disclaims reliance on a contractual representation, it "cannot, in a subsequent action .  .  .  claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."  91 F.3d at 345.  The cases from within this district cited by Plaintiffs address a separate issue – whether there is an exception from the rule where the allegedly misrepresented facts in question are "peculiarly within the defendant's knowledge."  *In re MarketXT Holdings Corp.*, No. 04-12078, 2006 WL 2864963, at *12 (Bankr. S.D.N.Y. Sept. 29, 2006) (quotation marks omitted).  Plaintiffs do not argue that this exception applies, nor could they.

relying on Refco and Refco alone is confirmed by publicly available information concerning

Plaintiffs' reaction when an internal corporate "Deep Throat" emerged during the due diligence

process. A senior THL partner received a call from a Bear Stearns employee who stated that

according to his cousin, a former Refco employee, Refco had been "sloughing off" trading losses

into an unconsolidated foreign subsidiary. *See* Examiner's Report at 293-94. According to the

Refco bankruptcy examiner, Plaintiffs contacted KPMG, the accounting firm assisting them, and

KPMG suggested certain steps to investigate the issue. *Id*. at 294-95. These steps were "likely

fairly simple," and the Examiner concluded that if they had been implemented, they should have

detected the fraud. *Id*. at 295. Plaintiffs, however, did not implement KPMG's suggestions. *Id*.

at 296. Instead, they met personally with Bennett, who assured them that there was no

impropriety, and they believed him. *Id*. at 296-97. At the same meeting, Plaintiffs'

representatives also asked Bennett about the "related party receivable involving RGHI."[15]

According to Plaintiffs' own representative, "Bennett offered to 'rep that both historically and

going forward [RGHI] has had and will have no brokerage accounts with any [Refco] entities, as

further assurance that there are no trades where the losses are being passed away.'" Examiner's

Report at 297. Plaintiffs accepted the offer and went forward with the transaction. Clearly, it

was Bennett on whom Plaintiffs relied in entering into the Purchase Agreement, not Mayer

Brown. Mayer Brown lawyers did not even attend this meeting.

Plaintiffs attempt to support their causation position by switching the focus to the

supposedly "counterfeit" Fourth LLC Agreement, but this, too, is unavailing. Plaintiffs argue

that if Mayer Brown had provided them the supposedly "genuine" Fourth LLC Agreement, this

would have led them to discover "Refco's true financial condition," Opp. at 7, but such

---

[15] Tr. at 1564, *United States v. Grant*, No. 05 Cr. 1192 (Apr. 4, 2008) (testimony of senior THL

speculative theories of causation are out of bounds under *Stoneridge* and a consistent body of Second Circuit law.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008) (central question in causation inquiry is whether alleged violation led *directly* to plaintiff's injuries); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–72 (2d Cir. 1994) (intervention of other independent causes cuts off causal chain).  Here, there were multiple direct and intervening causes of Plaintiffs' unawareness of Refco's financial condition – in particular, the conduct of Bennett and other Refco insiders who purposely concealed it.  Moreover, as pointed out in the opening brief and not denied by Plaintiffs, Plaintiffs' counsel had been aware of the fact supposedly omitted from the "counterfeit" agreement – the existence of the Profits Participation Agreement – since February, and chose not to even request that Agreement.

Plaintiffs' fallback argument is to invoke the presumption of reliance that applies in omissions cases, *see Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), but the *Affiliated Ute* presumption is not applicable here.  That presumption is not available where "positive statements form a central part of the alleged fraud."  *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 218-19 (S.D.N.Y. 2006); *see also Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005).  Here, it is beyond dispute that the "central part" of Plaintiffs' claims is the allegation that Refco's statements about its finances, as relayed to Plaintiffs by Mr. Collins, were false.

## II.    PLAINTIFFS' SCHEME CLAIM FAILS AS A MATTER OF LAW.

Try as they might, Plaintiffs are unable to overcome the dispositive impact of the Supreme Court's decision in *Stoneridge* on their claim for scheme liability under Rule 10b-5(a) and (c).  This likely explains why this theory of liability, which appeared as the second argument

---

Partners partner Scott Schoen), Borden Decl., Ex. D; *see Mangiafico*, 471 F.3d at 398.

in the securities-fraud section of Plaintiffs' brief opposing dismissal of the original complaint, has now dropped to fifth (and last) place in the corresponding section of the brief opposing the current motion.

Plaintiffs begin their discussion of scheme liability not with *Stoneridge* but with this Court's earlier opinion in *In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004). Opp. at 31-32. The *Global Crossing* opinion, however, did not take up the issue of reliance, 322 F. Supp. 2d at 336 ("[p]ostponing" the issue of reliance), which *Stoneridge* now makes clear is critical to any attempt to plead scheme liability. Moreover, we respectfully suggest that any reading of *Global Crossing* that would reach Mayer Brown here would conflict with *Stoneridge*.[16] That is because Plaintiffs admittedly did not know of, and thus did not rely on, any of Mayer Brown's transactional work. *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 216-18 (E.D. Pa. 2008) (holding that a scheme claim against a law firm did not satisfy the reliance requirement as stated in *Stoneridge* where the law firm's transactional work was not known to investors).[17]

Plaintiffs attempt to avoid this fatal defect, and to distinguish *Stoneridge*, by arguing that they "relied upon being told by Mayer Brown that there were no undisclosed related-party transactions, material contracts, or indemnification obligations." Opp. at 33. This argument

_____

[16] Such a reading would also conflict with this Court's standard for pleading deceptive conduct, because Plaintiffs have not set forth how they were deceived by Mayer Brown, as opposed to Refco. *See In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643, 2007 WL 2694469, at *8 (S.D.N.Y. Sept. 13, 2007).

[17] Although both *DVI* and *Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1120 (2008), arose in the context of class certification proceedings, both opinions clearly went to the merits of the theory Plaintiffs invoke here. Class certification was denied in those cases because there was no viable theory of reliance by the market, which acts as the plaintiff's surrogate in a fraud-on-the-market case. Where the defendant's conduct is not known to the plaintiff – either directly or through an intermediary such as the market – there can be no reliance.

improperly conflates Plaintiffs' 10b-5(b) claim with their scheme claim. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005);[18] *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) ("a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made."); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377 (S.D.N.Y. 2006) ("The SEC does not posit how, in any concrete manner, the misstatements it alleges could be construed as a device or scheme."); *In re Global Crossing*, 322 F. Supp. 2d at n.17 (defendant can be held liable only for "specific false statements to the extent that it can be said to have made those statements under Rule 10b-5(b)"); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005) (subsections (a) and (c) of Rule 10b-5 do not provide "a backdoor into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5").  Moreover, to the extent the allegations of misrepresentations may be considered in connection with the scheme claim, they fail for the same reasons already discussed above at part I – the Complaint does not allege that Mayer Brown lawyers made any affirmative misrepresentations, but rather only that they relayed information from Refco.  Any reliance placed on those statements was placed on Refco, not Mayer Brown.

---

[18] Plaintiffs attempt to distinguish *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), which held that no claim under Rule 10b-5(a) or (c) may be maintained when the claim is based solely on misrepresentations or omissions.  *Id*. at 177-78.  Plaintiffs argue that their claim is not based solely on misrepresentations or omissions, Opp. at 32-33, but that assertion ignores their own allegations that make plain that their true complaint is based on misrepresentations and omissions concerning Refco's finances, Compl. ¶¶ 1, 88.  Moreover, Plaintiffs' conclusory allegations of an ill-defined "scheme" are not sufficient to make *Lentell* inapplicable.  In that case, too, the plaintiffs argued strenuously that their claims were not based solely on misrepresentations or omissions.  *See* Br. of Appellant at 68, 72-76, *Lentell*, No. 03-7948, *available at* 2004 WL 3510095.  Those assertions did not square with the allegations in their complaints, and the courts therefore did not accept them.  The same result is called for here.

Plaintiffs also suggest vaguely that they "rel[ied] on Mayer Brown not to engage in conduct such as" "perpetuating the scheme to conceal Refco's massive RGHI Receivable by continuing to engage in secret related-party transactions." Opp. at 33. This open-ended theory cannot be squared with *Stoneridge*. The plaintiffs in *Stoneridge*, too, could have said that they relied on the defendants not to undertake the transactions at issue there, and indeed any plaintiff seeking to bring a scheme claim could allege such "reliance" even if he had no knowledge of the defendant's conduct when he purchased his stock. These word games do not overcome the clear teaching of *Stoneridge* that a plaintiff cannot rely on something of which he is not aware.[19]

Plaintiffs assert that "Mayer Brown took advantage of [their] reliance by continuing the round-trip transactions." Opp. at 33. But, under the facts alleged in the Complaint, Mayer Brown did no such thing. It was Refco that engaged in the transactions; it was Refco that used the transactions to alter its financial results; and, if anyone took advantage of Plaintiffs, it was the Refco sellers. Mayer Brown did not enter into any transaction with Plaintiffs, and it did not receive anything of value from them. Mayer Brown took no "advantage" at Plaintiffs' expense.

Plaintiffs also argue that the causal chain here is shorter than in *Stoneridge* because the plaintiffs in *Stoneridge* had no contact with the defendants (Charter Communications' suppliers) whereas Plaintiffs had contact with Mayer Brown and inquired into Refco's transactions. Opp. at 34-35. Again, Plaintiffs conflate their scheme claim with their 10b-5(b) claim, which fails for the reasons given above. Whether or not statements made by Mayer Brown lawyers are

---

[19] Plaintiffs cite *Burnett v. Rowzee*, __ F. Supp. 2d __, Nos. 07-0393, 07-0641, 2008 WL 638503 (C.D. Cal. Feb. 11, 2008), but that case only demonstrates why the scheme claim here should be dismissed. The *Burnett* court dismissed every scheme allegation under *Stoneridge* except for those by certain investors who "relied, at least in part, on . . . interest payments," which the court had just decided were themselves deceptive acts, that the investors directly received. *Id.* at *6; *see also id.* at *5 (discussing insufficiency of other allegations).

actionable (which they are not), the scheme claim must live or die based on whether Plaintiffs can viably allege that they relied on Mayer Brown's *conduct*, not its statements.

Indeed, Plaintiffs highlight this aspect of the *Stoneridge* opinion, Opp. at 36, yet they fail to identify any non-verbal conduct by Mayer Brown lawyers on which they relied. The only possible causal chain they can argue – and the one suggested in the new portions of the Amended Complaint – is that the manipulation of Refco's financial results, on which Plaintiffs allegedly relied, was the "inevitable consequence" of the transactions on which Mayer Brown worked. Am. Compl. ¶ 92. That, however, is very far from a "one-link chain," Opp. at 35, and it is clearly too attenuated to satisfy *Stoneridge*. As in that case, a corporation (Refco) engaged in a transaction that it then used to misstate its financial statements. *Stoneridge* found that causation was too remote as to the counterparty in that transaction. Here, Mayer Brown was not even the counterparty, but instead drafted documents that Refco and the counterparties used to engage in transactions. Its allegedly deceptive conduct (drafting loan documents) was therefore even one more step removed than that found insufficient in *Stoneridge*. Plaintiffs undoubtedly recognize that fact, as they do not even attempt to argue this theory of causation.[20]

Finally, Plaintiffs seek to distinguish *Stoneridge* on the basis that it is somehow limited to fraud-on-the-market cases. Opp. at 35. Nothing in *Stoneridge* supports that conclusion. The *Stoneridge* opinion disposed of the asserted applicability of the fraud-on-the-market presumption in a short passage, 128 S. Ct. at 769, before turning to the merits of the scheme theory. If Plaintiffs were correct that *Stoneridge* was solely about fraud on the market, the heart of the Court's opinion would have been unnecessary. But they are not correct. *Stoneridge* turned on

---

[20] Plaintiffs also only halfheartedly raise an argument – anticipated in Mayer Brown's Motion, *see* Br. at 29-30 – that *Stoneridge* does not apply in the "the realm of financing business." Opp. at 35 n.30. Plaintiffs offer no support for making such a distinction, and there is none.

the proper application of one of the essential elements of any private claim under Rule 10b-5 –

reliance – to a claim of scheme liability.  That question is independent of fraud on the market.

Whether a plaintiff seeks to satisfy the reliance requirement through a presumption or by direct

reliance, the rule is the same – if the plaintiff (or, in a fraud-on-the-market case, the plaintiff's

surrogate, the market) is unaware of the conduct in question, there can be no reliance.  That rule

is fatal to Plaintiffs' scheme claim here.

## III.    PLAINTIFFS HAVE FAILED TO ALLEGE SPECIFIC FACTS THAT GIVE RISE TO A STRONG INFERENCE OF SCIENTER.

In their Opposition, Plaintiffs abandon any contention that Mayer Brown had the "motive

and opportunity" to commit fraud.  The Amended Complaint does not allege that Mayer Brown

or its attorneys received anything other than routine legal fees for their services.  *See In re Refco,*

*Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645-46 (S.D.N.Y. 2007) (motive must be "concrete and

personal").  Mayer Brown lawyers lacked even the commonplace motivation to retain a client, as

Plaintiffs' purchase was expected to (and did) result in the loss of much of Refco's legal work to

Weil Gotshal, THL Partners' outside counsel.

Because motive is "'not apparent,'" Plaintiffs do not contest that their allegations of

conscious misbehavior or recklessness "'must be correspondingly greater.'"  *Caiafa v. Sea*

*Containers, Ltd.*, 525 F. Supp. 2d 398, 412 (S.D.N.Y. 2007) (quoting *Kalnit v. Eichler*, 264 F.3d

131, 142 (2d Cir. 2001)).  To plead scienter against a law firm, like other entities, plaintiffs must

plead facts that "create a strong inference that *someone* . . . acted with the requisite scienter."

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, __ F.3d __, 2008 WL

2521676, at *4 (2d Cir. June 26, 2008) (emphasis added).[21]  Seeking to meet this standard,

---

[21] Plaintiffs cite several district court decisions from this circuit applying a collective scienter approach, but those cases are no longer good law in light of the Second Circuit's very recent decision in *Dynex*.  Plaintiffs alternatively claim to have pleaded scienter as to both Mr. Collins

Plaintiffs assert that the Amended Complaint "overflows with facts" supporting scienter, but their Opposition belies that claim. Opp. at 5 & 24. Time and again, the Opposition resorts to bare allegations that Mayer Brown "knew" various details of Refco's fraud. *See, e.g.*, *id.* at 26 ("Mayer Brown knew of the RGHI Receivable [and] knew the loans had no business purpose"); *id.* at 29 ("Collins did know of the 'real' LLC Agreement"). The PSLRA requires more. Scienter cannot be based on "'conclusory allegations.'" *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "[A]*ll* of the facts alleged, taken collectively," including the documents incorporated therein, must give rise to an inference that is "cogent and compelling" when weighed against defendant's "plausible nonculpable explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 & 2510 (2007).

A prime example of Plaintiffs' inadequate pleading of scienter is their heavy reliance on the bare allegation that Mayer Brown knew about the RGHI Receivable. *E.g.*, Opp. at 28-29. This allegation establishes nothing because *an* RGHI receivable – RGHI owing money to Refco – was a well-known fact about the company. *See* Compl. ¶ 45 (describing $108 million outstanding loan balance on RGHI-Refco loan); Ward Decl., Ex. G (1998 financial statements recording $252 million receivable). The fraud at Refco – the "monster under the bed" – was the much larger, *hidden* RGHI Receivable that resided in accounts deep inside the books of various Refco subsidiaries. *In re Refco*, 503 F. Supp. 2d at 649, 652; Compl. ¶ 21. Plaintiffs

---

and Mr. Koury, Opp. at 24 n.22, but they have not. Plaintiffs have not alleged Mr. Collins acted with scienter as to any of the statements at issue in this litigation. *See infra* n.26. As to Mr. Koury, the Amended Complaint alleges that he helped prepare documents regarding the back-to-back loans and Plaintiffs' purchase. But there is no allegation that he knew anything at all about inter-company debt at Refco and, as demonstrated below, Plaintiffs have not raised a compelling inference that any attorney was reckless in connection with the schedules to the Purchase Agreement. *See infra* p.25.

acknowledge that Mayer Brown lawyers did not have access to the company's day-to-day financial statements or cash flows.  Opp. at 30.  But that is where Refco's executives hid the RGHI Receivable.  *See* Ward Decl., Ex. B; Compl. ¶ 21.[22]  Nevertheless, Plaintiffs assert that Mayer Brown lawyers were "intimately familiar" with Refco's business and finances.  Opp. at 27; Compl. ¶ 16.  Yet THL Partners – itself a financially sophisticated entity – and battalions of financial and accounting experts it retained spent eight months becoming "intimately familiar" with Refco's finances and, despite the known receivable on Refco's books, did not discover the RGHI Receivable.  *See* Compl. ¶¶ 38-39.

Outside counsel do not become "intimately familiar" with a client's finances.  Providing *legal* services does not require understanding a transaction's business rationale or accounting effects.  Any company that educated its lawyers about such matters would waste money, especially when it has hired employees and retained trained outside professionals (accountants, business consultants, and financial experts) to study those very issues.  *See HA2003 Liquidating Trust v. Credit Suisse Sec. (USA) LLC*, 517 F.3d 454, 457 (7th Cir. 2008) (noting economy's benefit from "allow[ing] specialists to do what they are best at").

Accordingly, Plaintiffs' reference to two isolated encounters with inter-company debt at Refco fails to raise a strong inference that Mayer Brown lawyers knew of the hidden RGHI Receivable.  The Opposition abandons the Amended Complaint's third supposed encounter with inter-company debt: a 1999 handwritten note that Plaintiffs first claimed "demonstrat[ed]

---

[22] For this reason, Plaintiffs miss the mark in asserting that they have adequately pleaded scienter because this Court has once found scienter to be adequately pleaded as to Refco's General Counsel.  *In re Refco*, 503 F. Supp. 2d at 652.  Mayer Brown's position was entirely different from a company's chief inside counsel, who has greater access to the company's finances and serves as another layer between outside counsel and the inner workings of a company.

Collins's awareness" of the receivable. Compl. ¶ 35(e).[23]  Plaintiffs instead focus on losses associated with Refco customer Victor Niederhoffer, and argue those losses were "an early material component of the RGHI Receivable." Opp. at 28.  But whether Refco executives later made the Niederhoffer losses part of the RGHI Receivable is irrelevant.  What matters is whether Mayer Brown lawyers knew either that the Niederhoffer losses were converted to a hidden RGHI receivable or that the Niederhoffer losses led to a receivable at all.  The Amended Complaint incorporates documents that refute both these inferences, and Plaintiffs do not try to rehabilitate them. *Compare* Br. at 40, *with* Opp. at 28.  As to the 2002 PPA transaction with DF Capital, which referred to using $350 million in proceeds to pay down inter-company debt, Plaintiffs simply repeat their allegation.  Opp. at 28 (quoting Compl. ¶ 58).  They offer no reason why this suggested a hidden receivable, given that Refco disclosed the debt to a company investing in Refco, and promised to pay it down.  *Compare* Br. at 41, *with* Opp. at 28-29.  At bottom, Refco's fraud was a financial and accounting fraud that trained financial and accounting professionals did not detect.  Plaintiffs offer no reason why outside lawyers should have accomplished more.

Without a plausible inference that Mayer Brown lawyers knew about the hidden RGHI Receivable, there is no plausible inference that Mayer Brown lawyers knew about the third leg of the "round trip loan transactions" – i.e., RGHI's use of the proceeds from the back-to-back loans to pay down the RGHI Receivable.  Mayer Brown lawyers could not know that a transaction was designed to conceal a problem they did not know existed.

Plaintiffs nonetheless argue that, even if Mayer Brown lawyers did not know the purpose of the back-to-back loans, they acted recklessly because any "reasonable person" would have

---

[23] The handwritten note ("loans to RGH[I]") plainly refers to the attached fiscal year 1998 Refco financial statements, which disclose that RGHI, among others, owed $252 million in "net loans" to the company.  *See* Br. 39-40; Ward Decl., Ex. G.

known that "the inevitable consequence" was that RGHI would use the loan proceeds to pay down a related party receivable. Opp. at 26. Even assuming that a "reasonable person" standard is relevant (it is not),[24] Plaintiffs do not satisfy it. Plaintiffs again rely on the conclusory allegation, already rebutted, that Mayer Brown lawyers knew about the RGHI Receivable. *See id.* They next repeat their conclusory assertion that Mayer Brown attorneys "knew the loans had no business purpose." *Id.* But the Amended Complaint's specific allegations are only that Mayer Brown lawyers did not know Refco's specific business purpose, *see* Compl. ¶ 35(f), which is quite common in corporate transactions.[25] When discussing the characteristics of the loans, Plaintiffs simply repeat that the loans were made at the end of reporting periods and transferred large sums to RGHI. But it is commonplace and unremarkable for sophisticated participants in commodities and foreign exchange markets, like Refco and RGHI, to require large sums of capital, and year- or quarter-end transactions are commonplace too. Plaintiffs largely retreat from the suggestion that the back-to-back nature of the transactions was suspicious, given that back-to-back financing is widespread. *Compare* Br. at 37-38 & n.23, *with* Opp. at 26. They instead observe that "Refco bore all the risk in the transactions." Opp. at 26. But there is nothing unusual about a party taking on more risk to receive more favorable terms in a transaction, and the Refco entities could apportion that risk however they chose.

Plaintiffs' heavy reliance on conclusory characterizations continues when they assert Mr. Collins acted with scienter when forwarding Refco statements towards the end of due diligence.

---

[24] Claims based on what a "reasonable person" would have known can only constitute negligence. Plaintiffs must instead plead sufficient facts to rise a strong inference of actual knowledge or recklessness, which is "a state of mind 'approximating actual intent, and not merely a heightened form of negligence.'" *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (quoting *Novak v. Kasaks*, 997 F. Supp. 425, 430 (S.D.N.Y. 1998)).

[25] *See* Examiner's Report at 245 n.759 (Mr. Collins told the Examiner "there could have been a number of legitimate business purposes for such transactions").

*See id.* at 28.  Outside counsel are, of course, one small part of the due diligence process in complicated corporate transactions, and lawyers cannot keep track of the many aspects of diligence being conducted by dozens of persons.[26]  Plaintiffs claim this argument is "wholly inappropriate in a motion to dismiss," *id.*, but it is their allegations regarding the extensiveness of due diligence that make it so implausible that Mr. Collins could know its full scope, *see* Br. at 42 (citing Compl. ¶¶ 38, 39, 51(a)-(d), 55, 61).  Plaintiffs alternatively argue that Mr. Collins could not have thought that someone else disclosed the back-to-back loans given that Mayer Brown lawyers did not put them on the schedules to the Purchase Agreement.  Opp. at 28.  This ignores the very different purposes served by due diligence and the transaction document itself.  One is intended to educate a party so it can decide whether to go forward with a transaction; the other formalizes the agreement subsequently reached.  It is therefore routine for documents to be exchanged in due diligence that do not appear on a schedule to the final agreement.

The Opposition's reliance on conclusory allegations of scienter continues in Plaintiffs' cryptic discussion of the so-called "counterfeit" LLC Agreement.  *See* Opp. 29-30.  Plaintiffs' sole argument is that Mr. Collins knew the "real" LLC Agreement had been signed in February 2003 (meaning Mr. Collins should have known that the later Refco LLC Agreement was counterfeit).  *See id.*; Compl. ¶ 63.  Plaintiffs nowhere come to grips with their own allegations or the documents on which those allegations are based, both of which make this conclusion implausible:  Plaintiffs had seen an unsigned copy of this "real" LLC Agreement, and Plaintiffs and Mr. Collins both knew he was sending them a "*new* agreement," Compl. ¶ 62 (emphasis

---

[26] As the senior partner in the representation, Mr. Collins would not personally have known the full extent of legal due diligence, let alone all diligence conducted by all parties.  Especially given Plaintiffs' weak allegations that Mr. Collins knew about the back-to-back loans after February 2002, *see* Compl. ¶ 32(h); Br. at 42 n.28, Plaintiffs cannot show scienter as to Mr. Collins without relying improperly on collective scienter.  *Dynex*, 2008 WL 2521676, at *4.

added), which Mr. Collins even date-stamped May 28, 2004. *See* Br. at 44-45. If Mr. Collins was trying to hide an earlier operative agreement, he chose a strange way of doing so.

When Plaintiffs turn to the Purchase Agreement itself, they fare no better. *See* Opp. at 29. After listing six potentially false representations in the Purchase Agreement, the Opposition discusses only Section 3.12, which was allegedly false because the back-to-back loans did not appear on the corresponding schedule. *Compare id.*, *with* Compl. ¶ 70(a)-(f), *and* Br. at 42-44 & nn.29-31. Plaintiffs have no explanation for why a $108 million loan between Refco and RGHI was left off of the schedule other than that the loan "was . . . eliminated before the closing." Opp. at 29. If the repayment of the loan was enough to keep the $108 million loan off the schedule, then Plaintiffs contradict their own argument *in the same paragraph* that Section 3.12 called for historical related party transactions, not just those active at the closing.[27] *See id.* Mayer Brown's argument, of course, is not that Section 3.12 called for disclosure of transactions only in effect at the time of signing, but rather that Section 3.12 is not clear as to whether it calls for *any* transactions between Refco and RGHI. Plaintiffs presumably disagree, but a difference of opinion on contract interpretation is not indicative of fraudulent intent.

## IV.    THE PSLRA BARS PLAINTIFFS' RICO CLAIM.

### A.    Plaintiffs' RICO Allegations Plainly Involve Securities.

After decrying Mayer Brown's supposed attempts to rewrite the Amended Complaint, *e.g.*, Opp. at 4, Plaintiffs try to redraft their own pleading by imagining that they pleaded in the alternative that their 2004 purchase of "equity interests in Refco," Compl. ¶ 78, was not a

---

[27] If historical agreements with RGHI did not have to be disclosed on the schedule, then only the indemnification agreements were potentially captured by Section 3.12. But, if the loan agreements themselves did not belong on the schedule, it is hardly reckless to not realize that a short, ancillary agreement did belong on the schedule. Plaintiffs respond by characterizing the back-to-back loans as "shams," which is a conclusory characterization that lacks support in the Amended Complaint. *See supra.*

purchase of securities, Opp. at 37. Plaintiffs have not so pleaded; but, even if they had, such

pleading would not put their RICO claim beyond the reach of the PSLRA RICO Amendment.

Plaintiffs have pleaded expressly that the equity interests were securities, which they

obviously were. While Federal Rule of Civil Procedure 8(d)(2) permits alternative pleading, it

nevertheless "presumes that each unitary claim must be sufficient standing on its own." *In re*

*Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 407 (S.D.N.Y. 2001) (referring to

former Rule 8(e)(2)). The RICO conspiracy claim "repeat[s] and reallege[s] each of the

allegations contained in paragraphs 1 [through] 85 inclusive," Compl. ¶ 103, including paragraph

40, which – as Plaintiffs do not contest – alleges that Plaintiffs purchased securities under the

standard in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). *See* Opp. at 37 n.34. Nowhere does

Plaintiffs' Amended Complaint "explicitly reject[ ]" the claim that the interests were securities.[28]

*Jones v. Deutsche Bank AG*, No. C 04-05357, 2005 WL 1683614, at *3 (N.D. Cal. July 19,

2005); [29] *see also Sell v. Zions First Nation Bank*, No. CV 05 0684, 2006 WL 322469, at *7 (D.

Ariz. Feb. 9, 2006) (rejecting plaintiffs' effort to postpone determination of whether an interest

was a security under *W.J. Howey*).

The Court need not reach this issue, however, because the PSLRA RICO Amendment

applies to Plaintiffs' RICO claim regardless of whether the 2004 equity interests were securities.

First, Plaintiffs' assertion that there is an "open question [as to] whether . . . [the] fraud directed

---

[28] Plaintiffs point to note 5 as an allegation that the interests they purchased were not securities.
*See* Opp. at 37. But note 5 *again* pleads that Plaintiffs purchased a security under *W.J. Howey*
and then asks the Court to dismiss the RICO claim if it decides that "the interests acquired by the
THL Funds in the 2004 Purchase *are securities*." Compl. ¶ 4 n.5 (emphasis added). Plaintiffs'
post hoc insertion of the word "not," *see* Opp. 37, does not transform note 5 into an allegation
that the interests were not securities.

[29] Plaintiffs also rely on *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875 (10th Cir. 1975).
But *Crowley* did not address pleading; the court simply refused to resolve a *factual* dispute
*raised by defendants* as to whether the instrument in question was a security. *See id.* at 876-77.

against [Plaintiffs] involved securities at all" is untenable.  Opp. at 38.  Plaintiffs plead that the

Refco fraud continued during and after Refco's IPO.  *See* Compl. ¶¶ 22, 31, 32(q), 107(b)-(c),

(f).  And Plaintiffs have pleaded that in that IPO, they "were issued Refco Inc. *common stock* in

an amount equivalent" to the interests they purchased in 2004.  Compl. ¶ 41, *Thomas H. Lee

Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL) (S.D.N.Y. Nov. 14, 2005)

(emphasis added).  There is no question that the fraud of which they complain "involved

securities," and courts have rejected similar "surgical presentation[s] of the cause of action" to

evade the PSLRA RICO Amendment.  *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189

F.3d 321, 330 (3rd Cir. 1999); *see Baron v. Chehab*, No. 05-3240, 2006 WL 156828, at *8 (C.D.

Ill. Jan. 20, 2006) (refusing to "parse" plaintiffs' RICO allegations); *Ling v. Deutsche Bank AG*,

No. 04 CV 4566, 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005) ("whole scheme" barred by

PSLRA if "one predicate act" coincides with securities transaction); *Seippel v. Jenkens &

Gilchrist, P.C.*, 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (disallowing division of the scheme

into "various component acts").

The caselaw is clear that the RICO Amendment applies even if Plaintiffs did not purchase

securities.  Plaintiffs chiefly rely on *Fleet National Bank v. Boyle*, No. 04CV1277, 2005 WL

2455673 (E.D. Pa. Sept. 12, 2005).  While that court stated it was "not aware of . . . any cases"

that barred a plaintiff from bringing a RICO claim if it had not bought or sold securities, and thus

lacked standing to bring a securities fraud claim, *id.* at *4, Plaintiffs cited such cases in their

Opposition.  Shortly after citing *Boyle*, Plaintiffs expressly acknowledge that *Howard v. AOL,

Inc.*, 208 F.3d 741, 749-50 (9th Cir. 2000), *In re Enron Corp. Securities, Derivative & "ERISA"

Litigation*, 284 F. Supp. 2d 511, 652 (S.D. Tex. 2003), and *Hemispherx Biopharma, Inc. v.

Asensio*, No. Civ. A. 98-5204, 1999 WL 144109, at *4-5 (E.D. Pa. Mar. 15, 1999), each holds

that plaintiffs without standing to bring a securities fraud claim may still be barred from bringing RICO claims by the PSLRA RICO Amendment. Opp. at 42 & n.40. The absence of a purchase or sale of securities was particularly apparent in *Howard*, where plaintiffs were customers, not shareholders, but were still prevented from bringing a RICO claim. 208 F.3d at 746, 749.

These cases rest on clear statutory language, which exempts from RICO "any conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Because it refers to "*any* conduct," *id.* (emphasis added), "the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under [the] securities laws." *In re Enron*, 284 F. Supp. 2d at 620; *see also Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545, at *7 (N.D. Ill. Oct. 8, 2004); *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 731 (D. Del. 2003) (same). Plaintiffs base their cramped reading of the PSLRA RICO Amendment on the absence of the term "in connection with" found in other securities statutes such as Section 10(b). But, as Plaintiffs seem to admit, *see* Opp. 39-41, the Amendment "removed securities fraud as a predicate offense in a civil RICO action," *Bald Eagle*, 189 F.3d at 329-30, and "conduct that is actionable as securities fraud *is* conduct that occurred in connection with the sale of securities," *Sell*, 2006 WL 322469, at *9 (emphasis added). For this reason, courts around the country have used the "in connection with" requirement when analyzing the PSLRA RICO Amendment.[30]

Plaintiffs seek to distinguish *SEC v. Zandford*, 535 U.S. 813 (2002), because that case "unquestionably involved securities," whereas Plaintiffs claim the interests they purchased may

---

[30] *See Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007) (per curiam); *Bald Eagle*, 189 F.3d at 330; *Cook v. Campbell*, 482 F. Supp. 2d 1341, 1350 (M.D. Ala. 2007); *Ling*, 2005 WL 1244689, at *3; *Stechler v. Sidley, Austin Brown & Wood LLP*, 382 F. Supp. 2d 580, 593 (S.D.N.Y. 2005); *Hollinger*, 2004 WL 2278545, at *7-8; *Seippel*, 341 F. Supp. 2d at 372; *In re*

not be securities.  Opp. at 38.  Under *Zandford*, however, "it is enough that the fraud alleged 'coincide' with a securities transaction – *whether by the plaintiff or by someone else*."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (emphasis added); *see also United States v. O'Hagan*, 521 U.S. 642, 656, 660 (1997) (fraud "in connection with" purchase of security even though victim was not a party to transaction).  Beyond the initial offering of Refco stock in 2005 (in which Plaintiffs participated), *see supra* p.27, Plaintiffs also allege that Refco engaged in a "bond offering that raised $600 million *in connection with* [Plaintiffs'] financing of the 2004 Purchase."  Compl. ¶ 76 (emphasis added).  And the offering circular for that bond offering allegedly contained misrepresentations similar to those in the Purchase Agreement.  *Compare id.* ¶ 77, *with id.* ¶¶ 69-70 (alleged misstatements in Purchase Agreement).  Accordingly, the PSLRA RICO Amendment applies to Plaintiffs' allegations even if they have pleaded that the equity interests they purchased in 2004 were not securities.

**B.    The PSLRA Bars RICO Claims Based on Aiding and Abetting a Violation of the Securities Laws.**

Plaintiffs admit that a statute's meaning is governed by the plain meaning of its text.  *See* Opp. at 39-40.  But they do not offer any plausible explanation for how the plain text supports their reading of the PSLRA RICO Amendment, which states "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities" in a RICO claim.  18 U.S.C. § 1964(c).  The statute refers to "*any* conduct," and is not limited to conduct "actionable" by the "person" bringing suit.[31]  Plaintiffs argue that "[b]y its plain terms, the

---

*Enron*, 284 F. Supp. 2d at 622; *Loftin v. KPMG LLP*, No. 02-81166, 2003 WL 22225621, at *6 (S.D. Fla. Sept. 10, 2003).

[31] Plaintiffs assert that the settled meaning of the term "actionable" limits it to civil actions by private litigants.  Opp. at 40 n.37.  *Black's Law Dictionary* makes no mention of any such limitation, defining the term as "[f]urnishing the legal ground for *a* lawsuit or *other legal action*."  *Black's Law Dictionary* 34 (8th ed. 2004) (emphases added).  For this reason, courts

provision applies solely to conduct that 'would have been actionable as fraud' *but for a plaintiff's decision to plead a RICO violation instead of a securities fraud claim*."  Opp. at 40 (emphasis added).  The operative language in the quoted sentence is all inserted by Plaintiffs. Plaintiffs' "plain text" argument is nothing of the sort.[32]

To the extent that the legislative history is relevant, it also supports Mayer Brown's interpretation.  The amendment in question is one part of the PSLRA.  When considering that legislation, one of Congress's key decisions was whether to revive aiding-and-abetting liability after *Central Bank*, and it chose a middle course in which the SEC could bring an enforcement "action" for aiding and abetting.  15 U.S.C. § 78t(e).  Thus, the same legislators who decided to exclude from RICO "conduct that would have been actionable as fraud," 18 U.S.C. § 1964(c) also expressly made aiding and abetting securities fraud "action[able]" only by the SEC, 15 U.S.C. § 78t(e).  There is no reason to think Congress drafted one section of the PSLRA without any consideration for the other.

Plaintiffs cite snippets of legislative history that indicate that Congress wished to eliminate duplicative securities-law and RICO actions, but they do not establish that Congress

---

routinely consider whether conduct is "actionable" by the SEC.  *E.g.*, *Dirks v. SEC*, 463 U.S. 646, 665 (1983); *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 n.2 (S.D.N.Y. 2008).  Plaintiffs' only support for their interpretation comes from a single irrelevant federal statute, the Copyright Act. The Copyright Act does not empower a government agency to bring civil enforcement proceedings.  That "actionable" refers to private civil litigation in that statute proves nothing about the meaning of "actionable" in other statutes, especially those that expressly discuss an agency bringing "actions" pursuant to the statute, such as the PSLRA.  *See* 15 U.S.C. § 78t(e).

[32] Plaintiffs cite *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), as favoring broad interpretation.  But RICO's "liberal construction" clause "is not an invitation to apply RICO to new purposes that Congress never intended."  *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).  And the Court did not mention Plaintiffs' principle in its latest opinion, and instead emphasized that the text of RICO must govern.  *See Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2008 WL 2329761, at *12 (2008) ("we are not at liberty to rewrite RICO to reflect [the petitioner's] – or our – views of good policy").

was concerned "only" with that problem.  *See* Opp. at 40-41.[33]  Plaintiffs' invocation of SEC

Chairman Arthur Levitt's reasons for supporting the PSLRA RICO amendment, Opp. at 39 n.24,

also cannot establish that Congress's sole purpose was the one he advanced.  The current

Chairman of the SEC, who sponsored the PSLRA RICO Amendment, ascribed a broader

purpose to the amendment – preventing the recovery of "damages in cases in which Congress or

the courts have determined that no recovery should be available" – that is inconsistent with

allowing private plaintiffs to bring treble-damage RICO claims for aiding-and-abetting a

securities fraud.  141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox).

    As addressed above, Plaintiffs' view that the PSLRA RICO Amendment only blocks

RICO claims by those with private securities claims cannot be reconciled with either *Howard*,

208 F.3d at 749-50, or *Hemispherx*, 1999 WL 144109, at *4-5.  The Plaintiffs in both cases could

not bring securities claims.  Far from being "duplicative," Opp. at 40, the RICO claims in those

cases were the plaintiffs' only federal remedies.  Nevertheless, in both cases, the plaintiffs'

RICO claims were dismissed in both cases.

    Plaintiffs expend much more effort attempting to distinguish *Fezzani v. Bear, Stearns &*

*Co.*, No. 99 Civ 0793, 2005 WL 500377 (S.D.N.Y. Mar. 2, 2005), and *Payton v. Flynn*, No. 06 C

465, 2006 WL 3087075 (N.D. Ill. Oct. 26, 2006), than defending *Renner v. Chase Manhattan*

*Bank*, No. 98 Civ. 926, 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999), or *OSRecovery, Inc. v. One*

*Groupe International, Inc.*, 354 F. Supp. 2d 357 (S.D.N.Y. 2005).  Plaintiffs try to distinguish

---

[33] Plaintiffs' quotation from Representative Fields's statement concerning the dangers of such duplicative litigation, Opp. at 40, only confirms that Congress could not have intended to "completely eliminat[e] the so-called 'treble damage blunderbuss of RICO . . .' in securities fraud cases" for primary violators (the Refco insiders in this case), but to leave it in place for secondary actors like Mayer Brown.  *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 164 (3d Cir. 1998) (quoting 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995)); *see also Sedima*, 473 U.S.

*Fezzani* by arguing that other private plaintiffs could have sued the secondary actors. *See* Opp. at 42. But the *Fezzani* plaintiffs sought to add a RICO claim in the alternative if and only if "the Court [found] any defendant was merely an aider and abettor." 2005 WL 500377, at *3. No other private plaintiff would have had a private cause of action against *those* defendants. *See id.* Nevertheless, *Fezzani* held that the amendment was futile because the PSLRA RICO Amendment applied equally to aiding-and-abetting claims. *See id.* at *4-6. Plaintiffs also cannot distinguish *Payton*'s reasoning as a "passing and unsupported suggestion." Opp. at 42. The discussion was essential to *Payton*'s holding and relied on persuasive authority. 2006 WL 3087075, at *8-9 (citing *Baron*, 2006 WL 156828, at *9 (rejecting *OSRecovery* based on SEC's ability to "bring actions against defendants who aid and abet securities fraud")). Under the better reasoned decisions, therefore, Plaintiffs' RICO claim should be dismissed under the PSLRA RICO amendment even though they cannot maintain claims under the Exchange Act.

## V.    PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM.

### A.    The Complaint Does Not Allege Agreement.

Plaintiffs agree they cannot plead a RICO conspiracy claim without pleading "some factual basis for a finding of a *conscious agreement* among the defendants." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990) (emphasis added); *see* Opp. at 46. Plaintiffs nevertheless argue that Mayer Brown selectively quotes from *Republic of Columbia v. Diageo North America, Inc.*, 531 F. Supp. 2d 365 (E.D.N.Y. 2007), but that case simply explains what it means to plead conscious agreement, *id.* at 428, which Plaintiffs have not done. More fundamentally, Plaintiffs mischaracterize *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), as dismissing a complaint containing only "naked and implausible allegations." Opp. at

at 504 (Marshall, J., dissenting) (noting the "tremendous financial exposure" and reputational harms that force defendants to settle RICO claims that survive motions to dismiss).

47.  Not so – the *Twombly* complaint, like Plaintiffs' Amended Complaint here, contained

several factual allegations.  *See Twombly v. Bell Atl. Corp.*, 313 F. Supp. 2d 174, 177-78

(S.D.N.Y. 2003) (summarizing allegations of two forms of parallel conduct).  The problem in

*Twombly*, as with the complaint here, was that the "few stray statements [that spoke] directly of

agreement" were, "on fair reading . . . merely legal conclusions resting on . . . prior allegations"

that were themselves deficient.  *Twombly*, 127 S. Ct. at 1970.

      Plaintiffs repeat their familiar claims – Mayer Brown documented "sham" loans; drafted

transactional documents containing false representations; and forwarded statements by its client

that it allegedly knew were false, *see* Opp. at 47 – but these allegations do not support an

inference that Mayer Brown intended to enter into a criminal conspiracy.  Plaintiffs plead no

"economic incentive" besides a law firm partner's ordinary and legitimate incentive to earn legal

fees, and they never address the fact that Mayer Brown lawyers stood to lose their client if the

2004 Purchase went forward.  *Twombly*, 127 S. Ct. at 1971.  The "sham" loans were routine

corporate loan documents used by others to hide a financial fraud.  But it is "routine market

conduct" for law firms to leave financial and accounting matters to other trained professionals.

*Id.*; *see also supra* part III (citing *HA2003*, 517 F.3d at 457 (describing division of labor among

outside professionals)).  As to the alleged "lies" told by Mr. Collins or the so-called "counterfeit"

document, it is "routine" for a corporate partner to forward statements made by his client, the

ultimate truth of which depends on facts outside his knowledge.  *Twombly*, 127 S. Ct. at 1971.

Even assuming the disclosure schedules should have disclosed the back-to-back loans,

circulation of incorrect schedules by a Mayer Brown associate does not evince intent to enter a

criminal conspiracy.  In short, there are "natural explanation[s]" for the conduct alleged that fall

far short of a conscious agreement to engage in a criminal conspiracy.  *Id.* at 1972; *see Lippe v.*

*Bairnco Corp.*, 218 B.R. 294, 298-99, 304 (S.D.N.Y. 1998) (describing alleged assistance by law firms in fraud but holding the pleadings were insufficient to plead agreement).[34]

**B.      Plaintiffs Have Not Pleaded an Underlying RICO Violation Because They Fail to Plead Continuity.**

Plaintiffs purport to be surprised that Mayer Brown would raise their inadequate pleading after Bennett, Trosten, and Grant pleaded or were found guilty, Opp. at 48, but none was convicted of a RICO charge and the Amended Complaint must stand or fall on its own allegations. Plaintiffs do not deny that their § 1962(d) conspiracy claim fails if they have not adequately pleaded that Bennett, Trosten, and Maggio engaged in a RICO violation under § 1962(c). Nor do they deny that, under *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), the Court cannot consider predicate acts not pleaded with particularity when evaluating "continuity" for purposes of RICO, *see id.* at 178-79. Having already repleaded their complaint,[35] Plaintiffs still do not plead continuity because no predicate act other than their 2004 Purchase is pleaded with particularity.[36]

---

[34] Plaintiffs' only response to *Lippe* and *Goren v. New Vision International, Inc.*, 156 F.3d 721 (7th Cir. 1998), is simply to repeat their allegations that Mayer Brown knowingly agreed to participate in a criminal conspiracy. *See* Opp. at 47. This is *ipse dixit*, not argument.

[35] Plaintiffs seek to excuse their inadequate pleading by asserting they are at an informational disadvantage. *See* Opp. at 51. Plaintiffs' quarrel seems to be with Rule 9(b) itself. Of course, nothing in Plaintiffs' claims is "peculiarly within" the knowledge of Mayer Brown. *Id.* n.57. Plaintiffs are defendants in other Refco-related litigation in which there has been extensive discovery – including discovery from Refco itself. *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626 (GEL); *Kirschner v. Thomas H. Lee Partners, L.P., et al.*, No. 07 Civ. 7074 (GEL); *Kirschner v. Grant Thornton, et al.*, No. 07 Civ. 11604 (GEL). Moreover, following the 2004 Purchase, individuals associated with Plaintiffs became members of Refco's Board of Directors, and Weil Gotshal, Plaintiffs' counsel, began to represent Refco in many large matters. Plaintiffs have enough information to plead their claims sufficiently.

[36] Although money laundering is not subject to Rule 9(b), plaintiffs must plead all the elements of the crime to establish a predicate act. Plaintiffs point to paragraph 106, but that paragraph does nothing more than list money laundering as a predicate act.

Plaintiffs point to mail- and wire-fraud cases that relax the pleading requirements for communications incidental to a scheme to defraud, *e.g.*, *M'Baye v. N.J. Sports Prod., Inc.*, No. 06 Civ. 3439, 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007), but conspicuously absent from their Opposition is any discussion of the pleading standards for predicate acts of bank fraud. Plaintiffs no doubt recognize that they do not plead these predicate acts with the requisite specificity because the Opposition "nowhere identifies the precise statements" made to any bank. *Leung v. Law*, 387 F. Supp. 2d 105, 115 (E.D.N.Y. 2005); *Benedict v. Amaducci*, No. 92 Civ. 5239, 1995 WL 702444, at *6 (S.D.N.Y. Nov. 28, 1995) (bank fraud pleading failed Rule 9(b) when complaint did not "state which financial institutions received which financial statements at what time"). This failing is critical, because Plaintiffs identify only various "financial institutions" as recipients of Refco's financial information before 2004. Compl. ¶ 34.

In any event, the cases relied on by Plaintiffs regarding mail- and wire-fraud are irrelevant here because Plaintiffs fail to plead adequately the scheme to defraud itself. Under Rule 9(b), allegations of a scheme must include "a detailed description" identifying the scheme's "specific circumstances." *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 320 (S.D.N.Y. 2000) (quotation marks omitted); *see Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995). Pleading a scheme to defraud requires allegations like those required to plead common law fraud. *M'Baye*, 2007 WL 431881, at *7 ("Where the fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall." (quoting *Morin v. Trupin*, 711 F. Supp. 97, 105 (S.D.N.Y. 1989)); *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514, 537-38 (S.D.N.Y. 2001). And fraudulent statements themselves must be pleaded with particularity. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999); *Spira*, 876 F. Supp. at 559. That is to say, a scheme to defraud requires

a "careful enumeration" of the specifics of the underlying fraud.  *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2004 WL 2211650, at *12 (S.D.N.Y. Sept. 30, 2004).

Especially when compared to the detailed pleading in *Zito*, Plaintiffs' allegations are entirely insufficient.  *See id.* at *2-5, *10.  With the arguable exception of acts taken in relation to the Purchase Agreement, the Complaint fails to "set forth the who, what, when, where, and how" for any predicate acts.  *M'Baye*, 2007 WL 431881, at *6 (quotation marks omitted). Plaintiffs concede that they have not identified other specific recipients of Refco's alleged misstatements.  *See* Opp. at 50-51.  Equally fatal is Plaintiffs' failure to identify a single, specific false statement outside the context of their transaction with Refco.  Opp. at 48-52.  Even for conduct after the 2004 Purchase, the best the Amended Complaint can do is refer vaguely to "related party transaction and management sections" in public filings that Plaintiffs summarily allege were false.[37]  Compl. ¶¶ 76, 80.  Just as with the allegations regarding financial statements given to banks, *see id.* ¶ 34, however, no specifics are given as to "what" the statements said or "how" they were false.  *M'Baye*, 2007 WL 431881, at *6.

Thus, even assuming Plaintiffs allege predicate acts relating to the 2004 Purchase, the predicate acts span less than a year – "a period of insufficient length to demonstrate closed-ended continuity."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999). Plaintiffs do not point to any case that has found continuity in such a short period.  Moreover, *Satinwood* prevents consideration of insufficiently pleaded predicate acts in determining

---

[37] Plaintiffs face additional obstacles in basing continuity on any post-LBO predicate acts.  Any predicate acts arising out of the bond offering or the IPO are obviously related to securities and are subject to the PSLRA RICO Amendment.  *See* Opp. at 38 (claiming 2004 Purchase not subject if those interests not securities).  Accordingly, because any fraudulent statements in those documents are "conduct . . . actionable as fraud" by the SEC, *see supra* part IV.B, Plaintiffs cannot base their RICO claim on any post-LBO events.

continuity. 385 F.3d at 178-79. Plaintiffs therefore cannot claim a variety of victims, predicate acts, or schemes, given that the alleged 2004 predicate acts were all similar. *See id.* at 181-82.

Plaintiffs finally argue that they have pleaded "open-ended continuity." Opp. at 51-52. But Plaintiffs continue to improperly rely on predicate acts that they have not pleaded with particularity. *See Satinwood*, 385 F.3d at 180-81 (rejecting open-ended continuity based on adequately pleaded predicate acts, and excluding inadequately pleaded acts addressed earlier in opinion); *see also Cofacredit*, 187 F.3d at 244 (rejecting consideration of unproven predicate acts in determining continuity). In any event, Plaintiffs did not invest a nine-figure sum in a company whose "'regular way of operating'" was racketeering. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 186 (2d Cir. 2008) (quoting *Cofacredit*, 187 F.3d at 243). The scheme was designed to convince others to invest in Refco in order to eventually pay off the receivable.[38] Such a scheme contemplates its own end and is therefore "inherently terminable." *E.g.*, *Cofacredit*, 187 F.3d at 244.

Therefore, even if the PSLRA RICO Amendment did not prohibit Plaintiffs' RICO conspiracy claim (which it does, *see supra* part IV), the RICO conspiracy claim still should be dismissed because it has not been adequately pleaded.

## VI.    PLAINTIFFS' COMMON LAW CLAIMS SHOULD BE DISMISSED.

### A.    Plaintiffs' Common Law Claims Are Governed by New York Law.

Relying principally on a line of inapposite cases,[39] Plaintiffs contend their negligent misrepresentation claim is "at least presumptively" governed by Massachusetts, rather than New

---

[38] Plaintiffs observe that Bennett did not pay down the RGHI Receivable until the fraud was discovered. The critical point, however, is that Bennett "believed that [he] would be able to pay the [R]GHI receivable down over time." Bennett Plea Tr. at 18 (Ward Decl., Ex. I).

[39] Specifically, Plaintiffs rely on *Dutton v. Glass*, No. 04 CV 3496, 2005 WL 146503, at *2 (S.D.N.Y. Jan. 20, 2005), and cases cited therein, all but two of which interpret New York's

York, law.[40]  Opp. at 52.  Plaintiffs acknowledge, however, that the Court must apply New

York's "interest analysis" framework, *see* Opp. at 52-54, which is a "flexible" framework

"intended to give controlling effect to the law of the jurisdiction which, because of its

relationship or contact with the occurrence or the parties, has the greatest concern with the

specific issue raised in the litigation."  *LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246,

264 (S.D.N.Y. 2007) (quotation marks omitted).  In cases involving conduct-regulating laws,

courts generally apply the law of the jurisdiction where the tort occurred.  *Id.*  A tort is often said

to have occurred "where the 'last event necessary to make the actor liable occurred.'"  *Id.*

(quotation omitted).  This "last-event" principle does not, however, command "blind adherence."

*Id.* at 265.  Courts applying New York's interest analysis instead consider "[t]he contacts of the

parties and occurrences with[in] each jurisdiction," the policies and governmental interests

underlying each jurisdiction's laws, and the extent to which those policies and interests are

implicated by the relevant contacts and occurrences.  *Id.* at 264 (quotation omitted).

Here, a balancing of relevant contacts and interests favors application of New York law.

The only alleged contact with Massachusetts is that Plaintiffs are headquartered in Massachusetts

and received unspecified misrepresentations there.  *See* Compl. ¶ 10.  By contrast, the Amended

---

borrowing statute.  *See* Opp. at 53.  As both this Court and the New York Court of Appeals have
held, New York's choice-of-law rules do not apply in borrowing-statute cases.  *See Smith v.
Soros*, No. 02 Civ. 4229, 2003 WL 22097990, at *6 (S.D.N.Y. Sept. 5, 2003); *Global Fin. Corp.
v. Triarc Corp.*, 715 N.E.2d 482, 484-85 (N.Y. 1999).  The remaining cases relied on by
Plaintiffs either do not decide the choice-of-law question posed, *see Krock v. Lipsay*, 97 F.3d
640, 646 (2d Cir. 1996), or do not discuss New York contacts or interests comparable to those at
issue in this case, *see Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246,
277-78 (S.D.N.Y. 2002); *BT Triple Crown Merger Co. v. Citigroup Global Mkts. Inc.*, No.
600899/08, 2008 WL 1970900, at *5, *7 (N.Y. Sup. Ct. May 7, 2008).

[40] Because Plaintiffs concede that Massachusetts and New York law do not materially differ on
fraud, *see* Opp. at 55 n.64, the Court may confine its choice-of-law analysis to Plaintiffs'
negligent misrepresentation claim, *see, e.g.*, *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 71
(E.D.N.Y. 2000).

Complaint and incorporated documents make clear that the vast majority (if not all) of the events

and contacts relevant to Plaintiffs' negligent misrepresentation claim took place in New York:

- Refco, Mayer Brown's client and the subject of the alleged misrepresentations to Plaintiffs, had its headquarters in New York. *Id.* ¶ 104.

- Mr. Collins's face-to-face meetings with Plaintiffs' representatives occurred in New York, as did the parties' negotiating sessions. *See id.* ¶¶ 43, 46.

- Paul Koury, the author of many of the emails alleged to have conveyed misrepresentations, was based in New York and sent the referenced emails from Mayer Brown's New York offices. *See id.* ¶¶ 32, 74.

- Plaintiffs' leveraged buyout of RGHI (as well as Refco Inc.'s IPO) closed in New York. *See* Purchase Agreement § 1.6(a).

These events and contacts directly implicate New York's strong interest in defining the scope of

liability for lawyers and other professionals who perform work within New York's borders for

clients who then conduct business with third-party residents of other states. *See, e.g.*, *HSA*

*Residential Mortgage Servs. v. Casuccio*, 350 F. Supp. 2d 352, 365 (E.D.N.Y. 2003) (tracing the

importance of this interest to "the indeterminate nature of the risks" associated with professional

liability and the need to "provide fair and manageable bounds to what otherwise could prove to

be limitless liability" (quotation omitted)).[41] When all or the vast majority of Mayer Brown's

relevant work for Refco took place in New York, it would be "unreasonable to allow

[Massachusetts] law, or any other law, to dictate the appropriate conduct for [Mayer Brown] vis-

---

[41] *See also, e.g.*, *Bank of Cyprus*, 510 F. Supp. at 264-65 (selecting Cyprus law when "the operative events took place almost exclusively in Cyprus" but injury occurred in the United States); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 193-95 (S.D.N.Y. 2006) (applying New York law when the underlying fraud was committed in New York but caused injury elsewhere); *Cromer Fin. Ltd v. Berger*, 137 F. Supp. 2d 452, 492-93 (S.D.N.Y. 2001) (applying New York law though the plaintiffs were injured in Bermuda). Plaintiffs attempt to distinguish these cases on the sole ground that they concerned "whether to apply the law of a United States jurisdiction or the law of a foreign country" (as opposed to another U.S. state). Opp. at 53 n.61. Contrary to Plaintiffs' suggestion, however, none of the cases cited emphasizes "international comity, ascertainability of foreign law, [or] foreseeability of a foreign country's law" as part of the interests analysis. *Id.*

à-vis non-client third-parties" based on the mere happenstance of Plaintiffs' Massachusetts residence. *Id.* at 366. New York law applies.

### B. PLAINTIFFS HAVE NOT STATED A CLAIM FOR COMMON LAW FRAUD.

Plaintiffs rely on irrelevant distinctions in asserting that their common law fraud claim should survive if their securities fraud claims are dismissed. While the PSLRA does not govern state law claims, the PSLRA incorporated the Second Circuit's strong-inference standard, *Novak*, 216 F.3d at 310-11, which arose under Rule 9(b) and applies equally to state law claims, *e.g.*, *Am. Fin. Int'l Group-Asia, LLC v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at *8 (S.D.N.Y. June 14, 2007). Thus *Tellabs* equally "guide[s]" courts in deciding whether plaintiffs have pleaded scienter for common law fraud. *Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *10 & n.5 (S.D.N.Y. July 26, 2007). Similarly, Plaintiffs' observation that a common law claim is not limited to conduct "in connection with" the purchase or sale of securities is irrelevant because Mayer Brown has not sought to dismiss their securities claims on that basis. Plaintiffs' last attempt is to invoke common law conspiracy theory. But that is unavailing when, for reasons already explained, *see supra* parts III & V.A, Plaintiffs have not alleged facts showing that Mayer Brown entered into a "corrupt agreement" to commit fraud or "*intentional*[*ly*] participat[ed] in the furtherance of a plan or purpose" to commit fraud. *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 889, 2004 WL 2903776, at *14 (S.D.N.Y. Dec. 14, 2004) (emphasis added); *see Stock v. Fife*, 430 N.E.2d 845, 849 n.10 (Mass. App. Ct. 1982).

### C. PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM FAILS UNDER NEW YORK OR MASSACHUSETTS LAW.

Plaintiffs all but concede that New York's Martin Act precludes their common law negligent misrepresentation claim under New York law. *See* Opp. at 56. As Mayer Brown explained in its opening brief, the two decisions that Plaintiffs cite in support of their opposition,

*see* Opp. at 57 n.68, "stand as solitary islands in a stream of contrary opinion" and have been overwhelmingly rejected by the majority of federal and state courts in New York.  *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003).  Plaintiffs do not provide any reason for this Court to depart from the well-reasoned analysis of decisions like *Nanopierce*.  Instead Plaintiffs ask the Court to apply Massachusetts law.  Under either New York or Massachusetts law, however, Plaintiffs fail to state a claim for negligent misrepresentation.

As Plaintiffs concede, even if it is not preempted by the Martin Act, their negligent misrepresentation claim against Mayer Brown fails under New York law unless they can demonstrate the existence of a "near privity" relationship, which does not exist here.  *See* Opp. at 58-59.  Plaintiffs also concede that Mayer Brown did not issue any opinion letter to Plaintiffs. *See id*. at 59 n.72.  These concessions are dispositive for the reasons discussed in Mayer Brown's opening brief.  *See* Br. at 59.

Plaintiffs' reliance on *Doehla v. Wathne Ltd.*, No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1996), *Crossland Savings FSB v. Rockwood Insurance Co*., 700 F. Supp. 1274 (S.D.N.Y. 1988), and *Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104 (S.D.N.Y. Mar. 23, 1994), is misplaced for at least two reasons.  First, the courts in *Doehla* and *Friedman dismissed* claims by nonclients against attorneys, supporting Mayer Brown's position. Second, all three decisions recognize that under New York law, attorneys are not ordinarily "liable to the third party for negligent representations, even where they prepare documents knowing that third parties will rely on them" or where they "engage in face to face negotiations with an adversarial party . . . even if that party with the attorney's knowledge relies on the attorney's representation."  *Crossland*, 700 F. Supp. at 1281; *Friedman*, 1994 WL 97104, at *7

41

(no privity where alleged misrepresentations were made in draft contract rather than opinion letter). Liability to a third party in these circumstances would be inconsistent with the attorney's duties to its own client. *Crossland*, 700 F. Supp. at 1282; *Friedman*, 1994 WL 97104, at *6-7; *cf. Aglira v. Julien & Schlesinger, P.C.*, 631 N.Y.S.2d 816 (App. Div. 1995) (attorney owes no duty of care to his adversary).

A narrow exception exists where an attorney issues an opinion letter to a third party because "reliance on the opinion by the third-party is the 'end and aim' of the engagement of the lawyer." *Doehla*, 1999 WL 566311, at *20. In such circumstances, the attorney "expressly states (with her client's consent) that she is rendering a legal service to the third party." *Crossland*, 700 F. Supp. at 1282. Plaintiffs have not alleged that Refco authorized Mayer Brown to render legal services to Plaintiffs, that Mayer Brown understood itself to be rendering any legal services to the Plaintiffs, or that the "end and aim" of Mayer Brown's representation of Refco was reliance by Plaintiffs on Mayer Brown's opinions. Such allegations would be implausible where Plaintiffs employed an army of professionals (including legal counsel) to represent their interests in connection with the 2004 Purchase. *See* Compl. ¶¶ 38-39.

The result is no different under Massachusetts law. As in New York, the general rule in Massachusetts is that "an attorney only owes a duty of care to clients." *Int'l Strategies Group, Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1, 13 (1st Cir. 2007). While Massachusetts courts recognize a narrow exception when an attorney knew or reasonably should have foreseen that a nonclient would rely on his services, no duty to a nonclient will be imposed if it "would potentially conflict with the duty the attorney owes to his or her client." *Id.* (quoting *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 609 (1st Cir. 1996)). It is not necessary "that an actual conflict arise" – "*a potential conflict . . . is sufficient* to defeat the non-client's . . . claim." *Antonellis*,

42

80 F.3d at 609 (emphasis added). The potential conflict between Refco and Plaintiffs clearly defeats Plaintiffs' negligent misrepresentation claim against Mayer Brown.

The First Circuit's decision in *Greenberg Traurig* is instructive. In that case the plaintiff's claims arose from its loss of about $4 million, which it had invested in Corporation of the Bank House ("COB"). *See* 482 F.3d at 4-5. COB squandered the plaintiff's investment through a series of fraudulent transfers and by engaging in a Ponzi scheme. *Id.* When the plaintiff confronted COB about the missing funds, COB's attorney advised it that he was working diligently to recover the missing funds. *Id.* at 5. Two years later the attorney had neither recovered the funds nor taken any legal action to recover them. *Id.* The plaintiff claimed that its foreseeable reliance on the attorney's representations created a duty of care as its "forbearance [was] . . . induced by [COB's attorney]." *Id.* at 7. The First Circuit rejected this claim "for the simple reason that [the plaintiff] and COB were potentially adverse parties . . . since [the plaintiff] invested in COB's scheme." *Id.* at 13; *see also Antonellis,* 80 F.3d at 611 (possible conflict existed between attorney's alleged duty to disclose unrecorded mortgage to non-client purchaser and the duty of confidentiality he owed to his client, the seller); *Fistel v. Favaloro*, 828 N.E.2d 549, 550-51 (Mass App. Ct. 2005) (rejecting purchaser's suit against lending bank's attorney because "bank's attorney at all times had an independent and potentially conflicting duty to his client"); *Nat'l Bank of Can. v. Hale & Dorr, LLP*, No. 2000000296, 2004 WL 1049072, at *5-6 (Mass. Super. Ct. Apr. 28, 2004) ("competing interests" between lender and the borrower "negated any duty" that borrower's attorney may have owed to lender).

There is no question that Plaintiffs and Refco, as adversaries in a major business transaction, had – at the very least – potentially conflicting interests with respect to the 2004

43

Purchase.  The existence of a potential conflict defeats Plaintiffs' negligent misrepresentation

claim under Massachusetts law. [42]

## VII.    STRONG POLICY REASONS CALL FOR DISMISSAL OF ALL OF PLAINTIFFS' CLAIMS.

In a case such as this one brought against a third party, in which the essential elements of

liability have not been alleged under federal or state law, the cautionary policies expressed by

Congress in the PSLRA and by the Supreme Court in *Stoneridge*, *Central Bank*, *Dura*, *Tellabs*,

and *Dabit* are especially important.  Allowing Plaintiffs to shift hundreds of millions of dollars in

a lost investment, which Plaintiffs undertook with their eyes wide open, to an outside law firm

that did not receive any proceeds from Refco's sale of securities or any compensation to

underwrite this massive risk, would confer "insurance against market losses" contrary to

Congress's intent and contrary to the policy of state common law.  *Dura*, 544 U.S. at 345.  As

Judge Easterbrook recently explained for the Seventh Circuit in *HA2003 Liquidating Trust*,

another case where managers ignored warnings about investment risks and then sued a third

party professional based on its statements during acquisition negotiations, "[t]his suit is nothing

---

[42] The authority cited by Plaintiffs, *see* Opp. at 58 n.71, is easily distinguishable.  In *Kirkland Construction v. James*, 658 N.E.2d 699, 701 (Mass. App. Ct. 1995), the court gave substantial weight to allegations that the attorney made personal assurances to plaintiff to induce entry into a contract.  This reasoning does not aid Plaintiffs here because it is unreasonable as a matter of law for a party to rely on his adversary's counsel in a business transaction.  *See Antonellis*, 80 F.3d at 612 n.5 (distinguishing *Kirkland*); *Schlecht v. Smith*, No. 92-30099, 1994 WL 621594, at *7 (D. Mass. Nov. 7, 1994) (unreasonable for the lender, a "seasoned businessman" who had been represented by his own counsel in similar transactions, to rely on the borrower's counsel).  Thus, any purported reliance by Plaintiffs – all sophisticated investors who were in fact represented by their own counsel – on Refco's attorneys is unreasonable as a matter of Massachusetts law.

*Cheswell, Inc. v. Premier Homes & Land Corp.*, 319 F. Supp. 2d 144 (D. Mass. 2004), is similarly distinguishable.  The court's holding in *Cheswell* turned on the fact that the attorney performed only "a ministerial task" that was not sufficiently adversarial in nature to make reliance unreasonable.  *Id.* at 151.  By contrast, Plaintiffs do not allege Mayer Brown's role in the 2004 transaction was limited to ministerial matters.

but an attempt to find a deep pocket to reimburse investors for the costs of managers' blunders. But CSFB did not write an insurance policy against managers' errors of business judgment." 517 F.3d at 457-58. The court of appeals added that "Insurance is cheaper (free, really) when achieved via the stock market. . . . Diversification protects investors without the costs of insurance and litigation." *Id*. at 458.

An institutional investor like THL Partners, and those that invest with it, does not give back the gains when it sells a stock at a profit before disclosure of adverse corporate news, so allowing it to sue a third party for uncompensated insurance when a particular investment declines in value – a game of "heads I win, tails you lose" – is a serious abuse of the litigation process, a point on which academic commentators are now in agreement. *See, e.g.*, Janet Cooper Alexander, *Rethinking Damages in Securities Class Actions*, 48 Stan. L. Rev. 1487, 1502 (1996); Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 339-41 (1991). Allowing this opportunistic litigation to go forward would "disserve the goals of fair dealing and efficiency in the securities markets." *Cent. Bank,* 511 U.S. at 188.

## CONCLUSION

For the reasons stated above and in Mayer Brown LLP's opening brief, the Amended Complaint should be dismissed.

Dated: Washington, D.C.
      July 2, 2008

                                      Respectfully submitted,

                                  _____

                                  John K. Villa (admitted *pro hac vice*)
                                  George A. Borden (GB-7019)
                                  Thomas G. Ward (TW-6255)
                                  WILLIAMS & CONNOLLY LLP
                                  725 Twelfth St., N.W.
                                  Washington, D.C.  20005
                                  (202) 434-5000
                                  (202) 434-5029 (fax)
                                  *Attorneys for Defendant Mayer Brown LLP*

## CERTIFICATE OF SERVICE

I, George A. Borden, hereby certify that on this 2nd day of July, 2008, I caused true and correct copies of the Reply Memorandum in Support of Motion to Dismiss of Mayer Brown LLP, and the Declaration of George A. Borden in Support of Motion to Dismiss of Mayer Brown LLP and exhibits annexed thereto to be filed electronically.  Notice of these filings will be electronically mailed to all parties registered with the Court's electronic filing system.

George A. Borden (GB-7019)