UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

----------------------------------------------------------------x
                                 :

THOMAS H. LEE EQUITY FUND V, L.P.,    :    07 Civ. 6767 (GEL)
THOMAS H. LEE PARALLEL FUND V, L.P.,  :
and THOMAS H. LEE EQUITY (CAYMAN)  :    **DECLARATION OF**
FUND V, L.P.,    :    **GEORGE A. BORDEN IN**
    :    **SUPPORT OF MOTION TO**
               Plaintiffs,    :    **DISMISS OF MAYER BROWN**
      v.    :    **LLP**
    :

MAYER, BROWN, ROWE & MAW LLP,    :
    :
               Defendant.    :
    :
----------------------------------------------------------------x

I, GEORGE A. BORDEN, declare as follows:

    1.    I am a partner of the law firm of Williams & Connolly LLP, attorneys for

Defendant Mayer Brown LLP in the above-captioned matter, and a member in good standing of

the bar of this Court. I submit this declaration in support of the Motion to Dismiss of Mayer

Brown LLP in the above-captioned matter.

    2.    Attached hereto as Exhibit A is a true and correct copy of the executed Letter of

Intent and exhibits between Thomas H. Lee Partners, L.P., Refco Group Ltd., LLC, and Refco

Group Holdings, Inc., dated April 19, 2004 (MB02008893-912).

    3.    Attached hereto as Exhibit B is a true and correct copy of a Memorandum from

Phillip Bennett to Joe Collins regarding Exhibit C, dated May 3, 2004 (MB02004731-32).

    4.    Attached hereto as Exhibit C is a true and correct copy of Refco Group Ltd., LLC

Action of Members by Written Consent, dated January 1, 2003 (MB02225332).

5.    Attached hereto as Exhibit D is a true and correct copy of page 1564 of the

transcript of Scott Schoen's testimony in *United States v. Grant* (05-CR-001192 S.D.N.Y.).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C.
July 2, 2008

George A. Borden (GB-7019)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (fax)

*Attorney for Defendant Mayer Brown LLP*

# EXHIBIT A

THOMAS H. LEE PARTNERS, L.P.

April 16, 2004

Mr. Phillip R. Bennett
President and Chief Executive Officer
Refco Group Ltd., LLC
One World Financial Center
200 Liberty Street, Tower A
New York, New York 10281-1994

Dear Phil:

      This letter will confirm our proposal regarding an investment (the "Investment") by an entity (the "Buyer") to be formed by Thomas H. Lee Equity Fund V, L.P. and its affiliates ("THL") in Refco Group Ltd., LLC (together with its subsidiaries, "Refco" or the "Company"). The Investment and related transactions are referred to herein as the "Transaction". We have reviewed materials supplied by you and your advisers and have had extensive conversations with you and your management team regarding the business and operations of Refco. We have been very impressed with the Company and with your management team, and are pleased to propose the following Transaction, subject to the following terms and conditions.

      1.    Description of Transaction.  For purposes of effecting the Transaction, we propose to you and the other current owners of the Company (the "Sellers") the following terms:

          (a)    Refco would distribute to the Sellers $500 million.

          (b)    Refco would distribute to the Sellers its asset management business (Forstmann-Leff and Tilney, but not Refco Alternative Investments). We would expect that you would not be actively engaged (other than in a board level supervisory capacity) in the management of that business on an ongoing basis.

          (c)    At the close of the Transaction (the "Closing"), the Sellers would receive $1.778 Billion in cash, less the obligations described in footnote 1 below.[1]

---

[1]    Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money (including any prepayment premiums or other fees, costs or expenses associated therewith). In addition, we would expect the Sellers to fund payment by Refco of any existing earn out obligations. We would expect that this can best be accomplished through creation of appropriate escrow arrangements or an alternative acceptable arrangement. The Sellers' obligations referred to in this footnote (1) are referred to herein collectively as the "Seller Obligations". We understand that the secured financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid.

DA1:\367212\06\7VCC061.DOC\77356.0036

MB02008893

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 2
April 16, 2004

      (d)    You would retain (through your S corporation) equity in Refco valued at $472 Million, representing 43% of the equity ownership of the Company before taking account of the management incentive equity plan described below.

We have attached as Exhibit A a memorandum which sets forth in more detail the steps that would be taken to implement the Transaction. This structure has been designed so as to permit:

      (a)    The payment of cash to shareholders other than you in complete termination of their interests, and the payment to you of a significant amount of cash in a partial purchase of your interest.

      (b)    The full deferral by you of your gain with respect to your interest in Refco that your S corporation is "rolling over" as part of the Transaction.

      (c)    Greater flexibility in the financing of the Transaction and in the strategic positioning of the derivatives brokerage and capital markets businesses, including, if we both deemed it desirable in the future, the ability to dispose of one of the operating units without imposition of an entity level tax.

    2.    Sources and Uses. The sources and uses of capital needed to implement the Transaction can be summarized as follows:

| Sources and Uses | | | | |
|---|---|---|---|---|
| **Sources** | | | **Uses** | |
| Excess Cash in Business............ | $ 500 | | Cash Distribution prior to | |
| Senior and Subordinated | | | Closing.................................... | $ 500 |
| Debt ....................................... | 1,250 | | Equity Proceeds (1) .................... | 1,778 |
| THL Equity................................. | 627 | | Bennett Rolled Equity ................. | 472 |
| Bennett Rolled Equity................ | 472 | | Total Enterprise Value | $ 3,000 |
| **Total Sources(3)** | **$2,850** | | Financing, Seller and Buyer | |
| | | | Professional Fees(2) ................. | 100 |
| | | | **Total Uses(3)** | **$2,850** |

(1) Gross amount – includes Seller Obligations described above, estimated as follows: funded debt at February 29, 2004 of $402 Million; prepayment fees and expenses associated with funded debt of $44 Million, and the Company's earn-out obligations.

(2) All fees are estimates, and if actual amounts are less, THL Equity and Bennett Rolled Equity will be adjusted proportionately. The fees and expenses of the Sellers and the Company (not to exceed $20 million in the aggregate) would be paid by the Company upon Closing.

(3) In addition, the asset management business (Forstmann-Leff and Tilney, but not Refco Alternative Investments) will be distributed to the Sellers prior to the Closing.

DA1:\367212\06\7VCC06!.DOC\77356.0036

MB02008894

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 3
April 16, 2004

3.    Assumptions; Conduct of Business.  We have based our proposal on the
following assumptions and understandings:  (i) Refco currently has on its balance sheet
approximately $400 Million of intangibles amortizable for tax purposes, of which
approximately $210 relates to the asset management business to be distributed to the Sellers;
(ii) the Company had funded indebtedness as of February 29, 2004 of $402 Million, none of
which will be paid prior to Closing; (iii) since February 29, 2004, the Company has made no
distributions to the Sellers, and prior to the Closing it will make no such distributions (and,
except to fund the acquisition by Forstmann Leff Associates, LLC referred to in paragraph 13
hereof, will not utilize cash, other than cash generated by the asset management business, to
fund the operations of the asset management business) other than a cash distribution of
$500 million, the distribution of the asset management business described above, and the
distribution described in the immediately following sentence; (iv) any existing shareholder
loans will be terminated prior to Closing and funded with cash otherwise payable to the
Sellers, and all existing agreements, contracts or arrangements between the Company and the
Sellers or their affiliates will be terminated (other than employment obligations to you and
indemnification obligations owed to the Sellers in their capacities as directors or officers of
the Company); (v) the business of Refco will be conducted consistent with the past practices
of the Company through Closing; and (vi) there will be no material adverse change in the
Company's business, operations, condition or assets through the Closing.  Notwithstanding
the provisions of clause (iii) of the immediately preceding sentence, the Company may
distribute the $120 million amount that was accrued for distribution as of February 29, 2004;
provided, however, that no more than $12 million of such distribution will be in cash and the
remainder will be made solely through the reduction of amounts payable to the Company
from Sellers.  The Purchase Agreement (as defined in Section 6) will contain appropriate
provisions relating to the deposit into a segregated fund to be maintained between signing of
the Purchase Agreement and Closing of the $500 Million intended to be distributed to the
Sellers or another appropriate mechanic designed to confirm that such amount can be
distributed without leaving the Company with insufficient working capital or impairing its
regulatory capital.  Prior to Closing, Refco may take steps to divest the asset management
business which would otherwise be distributed to the Sellers at Closing, with the net proceeds
of any such divestiture paid to the Sellers.

4.    Senior Management Equity Participation.  It has been our practice to give
senior management of companies in which we invest the opportunity to acquire significant
equity interests.  We would envisage putting in place a plan pursuant to which management in
addition to you could also invest in the Company on the same terms as we invest, and all
senior officers, including you, could acquire additional equity interests on a tax-advantaged
basis through participation in an equity incentive program with time and performance vesting
features.  We have attached as Exhibit B a summary of the terms upon which management
could acquire equity and earn incentive equity.  The incentive equity plan would be allocated
among senior officers  in a manner acceptable to you and us.

5.    Employment and Non-Competition Agreements.  Buyer's execution and
delivery of a Purchase Agreement would be conditioned upon your executing, and Refco

DA1:\367212\06\7VCC06!.DOC\77356.0036

MB02008895

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 4
April 16, 2004

Group Holdings, Inc. and its principals executing, a restrictive covenants agreement pursuant
to which for a period of five years after the Closing (or two years following termination of
your employment with the Company, if later), you would not compete with Refco, solicit or
hire any employee of Refco, or disclose any confidential information of Refco. The Company
would also enter into a three year employment agreement with you, which agreement would
automatically extend for successive one year terms unless terminated by either the Company
or you at least 90 days prior to expiration of the initial three year term or any renewal thereof.
Your employment agreement would contain customary provisions relating to duties and
responsibilities, benefits, termination and severance rights. A supermajority of the Board of
Managers of Refco would have to approve any non-renewal or termination without cause of
your employment agreement; provided, however, that if a Threshold Matter occurs, such
decision would be subject to a vote of a simple majority of the Board of Managers. A
"Threshold Matter" would mean any of the following: (i) for the fiscal years ending
February 28, 2005, 2006 or 2007, the Company fails to achieve at least 85% of the EBITDA
target (which will be an annual target for fiscal year 2005 and a cumulative EBITDA target,
that will include prior years in the period, for fiscal 2006 and 2007), (ii) for any subsequent
fiscal year, the Company fails to achieve at least 80% of the EBITDA target for that year, or
(iii) the Company is in default under the documents governing any of its funded indebtedness.
The EBITDA targets for the first five years after Closing would be those set forth in the
March 19, 2004 projections furnished to us; thereafter the EBITDA target for any year would
be as set forth in the budget approved by the Board of Managers for such year. We would
also expect that your employment agreement would contain customary provisions for
termination for cause, which would not require supermajority approval at any time.

    6.    Purchase Agreement. We have reviewed the draft purchase agreement
provided by Refco's counsel (the "Purchase Agreement"). If this proposal is acceptable to
you, we can promptly prepare a revised Purchase Agreement for review by you and your
counsel. With respect to the indemnification provisions contained in the Purchase
Agreement, we would request the following approach: (i) representations and warranties
would generally survive the Closing until the later to occur of (x) 30 days after receipt of
audited financial statements for the Company for its year ending February, 2005 and (y) June
30, 2005, except for certain representations, such as taxes, which would survive until
expiration of the applicable statute of limitations, and certain other matters, such as title,
capitalization and authority, which would continue without limit; (ii) there would be a
threshold for indemnification claims of $10 Million which, if exceeded, would permit
recovery from the first dollar of loss, with a minimum claim thereunder of not less than
$250,000; and (iii) there would be a cap on indemnification of 30% of the purchase price.
Certain limited matters, such as tax, title, capitalization and authority, would not be subject to
either the threshold or the cap.

    7.    Board Composition and Committees. The Board of Managers of Refco would
be set at not more than eight members, three of whom, including you, would be designated by
you (but would not include those being cashed out with the proceeds of Buyer's investment),
four of whom would be designated by Buyer, and the other of whom would be an independent

DA1:\3672127069.7VCC061.DOC\77356.0036

MB02008896

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 5
April 16, 2004

person reasonably acceptable to both of us. These same designation rights would apply to all vacancies and resignations on the Board of Managers. If a Threshold Matter were to occur, the Board would be expanded to nine, and we would have the right to designate an additional member. In the event Refco raised equity publicly in the capital markets, the Board of Managers would need to be reconfigured to meet the various regulatory requirements, including those pertaining to independence. There would not be an Executive Committee, and you would have authority and responsibility for operating the business of Refco in the ordinary course. Before signing of the Purchase Agreement, the Board of Managers would adopt a management authorization plan which would clarify those actions which must be approved by the Board of Managers and which would be an exhibit to the Purchase Agreement. There would be Nominating, Compensation and Audit Committees, each of which would have a charter setting forth its responsibilities, consistent with good corporate governance practices, and would be comprised of a cross section of the members of the Board of Managers.

8.    Supermajority Voting Provisions. The limited liability company agreement of Refco (the "LLC Agreement") would be amended to provide that certain actions could not be taken unless approved by holders of a supermajority of the outstanding equity interests in Refco (which supermajority would require the approval of both you and the Buyer). Included in the list of matters as to which supermajority approval would be required would be: (i) liquidation of the Company or causing it to file in bankruptcy, (ii) the effectuation by the Company of its initial public offering of equity securities, (iii) the merger or sale of the Company or the sale by the Company of all or substantially all of its assets and (iv) the termination or hiring of the Company's chief executive officer (other than a termination for "cause", as described above). Such actions would also have to be approved by a supermajority of the members of the Board of Managers (which must include your affirmative vote and that of the Buyer's designated Managers). Such supermajority requirements would fall away upon occurrence of a Threshold Matter. Furthermore, such supermajority approval of a sale or merger of the Company or the sale by the Company of all or substantially all of its assets or the effectuation by the Company of its first public offering of equity securities, would not be required following the third anniversary of the Closing. Both you and the Buyer would also have the benefit of usual and customary equity holder rights, including pre-emptive rights, the right to receive periodic financial information and inspection rights.

9.    Restrictions on Transfer. The LLC Agreement would also be amended to include provisions designed to ensure that the parties' interests remain aligned, and that they have comparable opportunities to achieve liquidity. The parties would agree not to make transfers for three years after Closing without the consent of the other party; provided that during the period between execution of the Purchase Agreement and the first anniversary of the Closing the Buyer would have the right to sell down up to one-third of its original Investment to a transferee reasonably acceptable to you. The requirement for the transferee to be reasonably acceptable to you will not apply in the case of a transfer by us to one or more of our limited partners or the investment affiliate of such limited partner, so long as we retain voting control over the interest so transferred. The Buyer would have the right, with your

MB02008897

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 6
April 16, 2004

reasonable approval, to allocate a proportionate number of its Board Seats to a transferee of
such shares, and such transferee would be required to agree to be bound by all provisions of
the LLC Agreement. Following the third anniversary of the Closing, either party would have
the right to sell to a third party, after extending a right of first offer to the other party, subject
to the right of the other party to participate in the sale to the third party on a pro rata basis.
Furthermore, after such third anniversary, if the Buyer wished to sell the Company to an
unaffiliated party, you would agree to participate in such sale, provided that the consideration
for any such sale is apportioned in accordance with ownership interests. The Buyer would
also have the right, exercisable on multiple occasions after the first to occur of (i) 180 days
after consummation of the first public offering of equity securities of the Company, or (ii) the
third anniversary of the Closing, to request the Company to register its shares for sale to the
public, and would have the right, exercisable at any time, to include a portion of its shares in
an offering initiated by the Company or another shareholder. You and other members of
management would have comparable "piggyback rights" to include your shares in a
registration statement initiated by the Company or another holder (including the Buyer),
subject to usual and customary cutbacks at the discretion of underwriters managing each
offering. Upon consummation of the initial public offering of equity securities by Refco, all
of the corporate governance, voting and transfer provisions would terminate, except that for a
period of three years thereafter, you and the Buyer would agree to extend co-sale rights to one
another, with appropriate exceptions for estate planning transfers.

      10.    Conditions. Consummation of the Investment would be subject to, and where
applicable the Purchase Agreement would contain, the following conditions:

        (a)    The Company shall deliver to THL audited financial statements
meeting the requirements of Regulation S-X with respect to its 2002,
2003 and 2004 fiscal years, which financial statements will be
consistent with the financial statements covering such periods
previously delivered to THL.

        (b)    All of the representations and warranties of the Company and of the
Sellers set forth in the Purchase Agreement shall be true and correct in
all material respects on the Closing, and the Company and the Sellers
shall have complied in all material respects with and performed all
conditions and agreements required to be complied with and performed
at or prior to the Closing.

        (c)    All required consents shall have been obtained and all necessary filings
shall have been made, and where necessary, become effective.

        (d)    There shall have occurred no material adverse change in the business,
operations, conditions or assets of the Company. There shall be no
litigation or governmental actions seeking to enjoin the Transaction or
impose modifications thereto which would be materially adverse.

DA1:\367212\06\7VCC06!.DOC\77356.0036

MB02008898

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 7
April 16, 2004

      (e)    The Company and THL shall have obtained funded debt of not less than $1.25 Billion with which to finance the Transaction on terms substantially not less favorable than those set forth in the financing commitments which will be signed upon execution of the Purchase Agreement.

11.    Brokers. The Company, the Sellers and the Buyer shall each make representations and warranties with respect to liability for broker's and investment banker's fees and expenses, and each will agree to indemnify and hold the others harmless from any fee arising on their respective accounts and, in the Sellers' case, on account of the Company.

12.    Due Diligence. We have completed substantial diligence with respect to the Company, but are awaiting receipt of certain items, including the legal, financial and tax items set forth on Exhibit C attached hereto. As previously discussed, our advisors, acting in concert with the Company's management, will also need to meet with the regulators of the principal exchanges on which the Company transacts business, and our consultant, McKinsey & Co., will also need to conduct selected interviews with Refco's customers and clients, the scope, content, and timing of which interviews shall be mutually agreed upon. Execution of the Purchase Agreement will be subject to satisfactory completion of diligence in these areas.

13.    Exclusivity. In consideration of the expenses which will be incurred by us in connection with this letter agreement and the Transaction contemplated hereby, the Company and the Sellers agree that for a period of 45 days, commencing upon your acceptance of this letter agreement, neither the Company nor any Seller will (a) solicit, initiate or negotiate with respect to any inquiries or proposals relating to (i) the acquisition of any of the equity securities or all or any substantial portion of the assets or business of the Company or any of its subsidiaries (including any acquisition structured as a purchase of securities, merger, consolidation or securities exchange), (ii) any business combination with the Company or any of its subsidiaries, or (iii) any recapitalization transaction, including the payment of any extraordinary dividend or distribution to the Sellers, or (b) discuss or disclose either this proposal or any confidential information pertaining to the Company or any of its subsidiaries with or to any person or entity other than us, without our prior written approval. The provisions of clause (ii) of the immediately preceding sentence will not prohibit the Company or any subsidiary from making core business acquisitions of businesses in the ordinary course of business; provided, however, that any such acquisition will not in any way interfere with the Transaction or impair the ability of the Company or the Sellers to complete the Transaction, and provided, further, that the Company shall notify Buyer before entering into any agreement in connection with any such transaction and will provide Buyer with access to diligence materials relating to any such business to be acquired. Buyer agrees that the purchase price will not be reduced on account of the acquisition by Forstmann Leff Associates, LLC (for up to $5.1 million) of the Schroders asset management business as previously disclosed to Buyer.

DA1:\367212\06\7VCC06!.DOC\77356.0036

MB02008899

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 8
April 16, 2004

14.    _Confidentiality_. We previously executed a confidentiality letter dated November 4, 2003, which we acknowledge is still in full force and effect.

15.    _Timing_. We are anxious to proceed with the Transaction. We believe that we can complete negotiation of and execute the Purchase Agreement, with all disclosure schedules, within thirty (30) days after your acceptance of this proposal. Within that period we believe that, working together, we can: (i) obtain an appropriate debt rating from the agencies, (ii) work with your accountants, to commence preparation of the financial statements described in clause 10(a) above, (iii) finalize negotiation of financing commitment letters, (iv) complete our diligence, (v) negotiate a mutually acceptable Employment Agreement with you, and (vi) agree on the terms of the management equity incentive plan. We believe that we can close within 60-90 days after execution of the Purchase Agreement.

16.    _Duration of this Letter_. This proposal shall expire if a copy of this letter, signed by or on behalf of the Company and Sellers, is not returned to Buyer at or prior to 5:00 p.m. on April 19, 2004. In addition, this letter shall expire if the Purchase Agreement is not executed by or on behalf of the Company, the Sellers and the Buyer on or before June 15, 2004, except the provisions of Sections 13, 17, and 18 shall survive such termination.

17.    _Expenses_. If the Transaction contemplated by this letter is consummated, (i) the fees and expenses of Sellers and the Company (not to exceed $20 million in the aggregate) will be paid by the Company upon the Closing, and (ii) Buyer's fees and expenses will be paid out of the financing proceeds upon the Closing. If the Transaction is not consummated, each party shall be responsible for paying its own expenses.

18.    _Effect of this Letter_. This letter sets forth the principal terms to be incorporated in and the manner in which the Buyer, the Sellers and the Company will arrive at the Purchase Agreement. Except for the obligations set forth in Sections 13, 17, and 18 hereof, which shall be legally binding, this letter is not intended to constitute a firm proposal, offer or enforceable agreement to acquire the Investment, and imposes not duty or obligation on anyone to proceed with the Transaction. The parties hereto shall not be legally obligated by any of the terms hereof, other than Sections 13, 17, and 18, unless and until the terms of this letter are embodied in the Purchase Agreement.

19.    _Fees_. Upon consummation of the Transaction, THL will be entitled to receive a transaction fee, and will enter into a management and consulting agreement entitling it to annual management fees consistent with industry practice. The transaction fee will be in the amount of $30 Million, payable at Closing and the annual management fee will be the greater of $2.5 Million or 1% of the prior fiscal year's EBITDA, payable in advance.

20.    _Miscellaneous_. This letter agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. This letter agreement may be amended only by an instrument in

DA1:\367212\06\7VCC06!.DOC\77356.0036

**MB02008900**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 10
April 16, 2004

We believe this letter agreement constitutes an attractive proposal of the terms upon which the Transaction can be effected. We are excited about this investment opportunity, and are eager to proceed. Should you have any questions concerning this proposal, please direct them to any one of Scott Schoen, Scott Jaeckel or George Taylor at the Thomas H. Lee Partners, L.P. (617-227-1050). If this letter is acceptable to you, please sign and return a copy to us at your earliest convenience.

Very truly yours,

THOMAS H. LEE PARTNERS, L.P.

By: _Scott Schoen_
Name: _Scott Schoen_
Title: _Managing Director_

Accepted and agreed
this _____ day of April, 2004.

REFCO GROUP LTD., LLC

By:_____
Title:_____
Name:_____

SELLER:

REFCO GROUP HOLDINGS, INC.

By:_____
Title:_____
Name:_____

DA1:\367212\03\7VCC03!.DOC\77356.0036

MB02008901

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Mr. Phillip R. Bennett
Page 10
April 16, 2004

    We believe this letter agreement constitutes an attractive proposal of the terms upon which the Transaction can be effected. We are excited about this investment opportunity, and are eager to proceed. Should you have any questions concerning this proposal, please direct them to any one of Scott Schoen, Scott Jaeckel or George Taylor at the Thomas H. Lee Partners, L.P. (617-227-1050). If this letter is acceptable to you, please sign and return a copy to us at your earliest convenience.

                                    Very truly yours,

                                    THOMAS H. LEE PARTNERS, L.P.

                                    By:_____
                                    Name:_____
                                    Title:_____


Accepted and agreed
this _14th_ day of April, 2004.

REFCO GROUP LTD., LLC

By:_____
Title:_____PRESIDENT AND CEO.____
Name:_____PHILLIP BENNETT._____


SELLER:

REFCO GROUP HOLDINGS, INC.

By:_____
Title:_____PRESIDENT AND CEO.____
Name:_____PHILLIP BENNETT._____


DA1:\567212\09\7VCX03!.DOC\77356.0036

MB02008902

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## EXHIBIT A

## Description of Transaction [1]

A.     Pre-Acquisition Steps

1.     THL would form a Delaware limited liability company ("Merger LLC") which, in turn, would set up its own subsidiary Delaware limited liability company ("Finance LLC"). THL would contribute a nominal amount of equity to Merger LLC, in exchange for the entire equity interest in Merger LLC. (See Chart 1.)

2.     Refco would distribute to its current owners (Refco Group Holdings, Inc. and BAWAG Overseas, Inc.): (i) its asset management business (Forstmann-Leff and Tilney but not Refco Alternative Investments) and (ii) $500 million in cash. (See Chart 2.)

B.     Acquisition Steps (see Charts 3 and 4)

1.     THL would purchase, for $627 million in cash, 57% of the Refco membership interests owned by Refco Group Holdings, Inc. (the "S Corp."). Such purchase funds would represent THL's equity contribution to the transaction.

2.     Finance LLC would borrow funds from debt financing sources.

3.     Merger LLC would merge with and into Refco with Refco as the surviving entity (the "Merger"). Pursuant to the Merger:

> (a)     The outstanding membership interests in Merger LLC (which THL acquired for a nominal equity contribution in its formation of Merger LLC, as described above) would convert into a small interest in Refco. When considered together with the Refco membership interests purchased directly by THL from the S Corp (and after giving effect to the conversion of the other Refco interests into cash pursuant to the Merger, as described below), THL's percentage ownership of Refco membership interests would be 57%.

> (b)     All of the Refco membership interests held by BAWAG Overseas Inc. would convert into the right to receive $_____ in cash. (This amount would be reduced by this shareholder's pro rata share of the Shareholder Obligations, as defined in the proposal letter.)

> (c)     A portion of the Refco membership interests held by the S Corp. would convert into the right to receive $_____ in cash. (This

---

[1]   The dollar amounts and percentages are based on assumptions as described in the letter to which this exhibit is attached. The ownership percentages represent primary ownership without giving effect to dilution for the impact of an equity incentive plan for key management.

**MB02008903**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

amount would be reduced by the shareholder's pro rata share of the
Shareholder Obligations, as defined in the proposal letter.) The
remaining portion of the Refco membership interests held by the
S Corp. (representing 43% of the Refco membership interests) would
remain outstanding in the hands of the S Corp. A portion of such cash
would be used by the S Corp. to redeem in full the interest of the S
Corp. stockholder other than Phillip Bennett, and the remainder of such
cash would be distributed to Phillip Bennett.

    (d)    Refco would contribute all of the equity interests in Refco's
subsidiaries to Finance LLC.

    (e)    Finance LLC would distribute the net proceeds of the debt financing to
Refco, which would use such proceeds to fund the cash merger
consideration.

    4.    Refco would have a Section 754 election in effect for the taxable year in which
the Merger occurs.

C.    Post-Acquisition Structure (see Chart 5):

As a result of the Merger:

    1.    THL and the S Corp. would be the sole owners of Refco, with THL owning
57% and the S Corp. owning 43% of the Refco interests, respectively; and

    2.    Refco would be the sole owner of Finance LLC, which in turn would own all
of the subsidiaries that were owned by Refco prior to the transaction (other than those that
hold the asset management business).

D.    Effect of Divestiture of One or More Refco Divisions:

As long as Refco remains a pass-through entity for federal tax purposes, it can dispose
of one or more divisions without attracting an entity level tax. In such case, (i) the built-in
gain based on the value of such division at the time of the THL acquisition would be allocated
to the S Corp. and (ii) the gain based on appreciation of the division after the THL acquisition
would be allocated to the S Corp. and THL based on their respective interests in Refco.

E.    Potential Future Initial Public Offering (an "IPO"):

If a decision is subsequently made for Refco to effect an IPO, the S Corp. and THL
would effect a contribution (or similar transaction) pursuant to which their respective interests
in Refco would be transferred to a C corporation, with THL and the S Corp. becoming pre-
IPO owners of the stock of the C corporation. As long as certain conditions are met, this
contribution transaction would not trigger current tax to THL or Phillip Bennett.

DA1:\367212\06\7VCC061.DOC\77356.0036

MB02008904

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

F.    Accounting Treatment of Transaction:

     The acquisition transaction should receive recapitalization accounting treatment at the Refco level.

MB02008905

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Chart 1

Pre-Acquisition THL Structure



Chart 2

Pre-Acquisition Refco Structure – Distribution of $500 Million Cash and Asset Management Business



DA1\366216

2

DA1:\367212\06\7VCC06!.DOC\77356.0036

MB02008906

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Chart 3



Chart 4



DA1:\367212\06\7VCC06!.DOC\77356.0036

MB02008907

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Chart 5

**Post-Acquisition Structure**



DA1:\367212\06\7VCC061.DOC\77356.0036

MB02008908

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## EXHIBIT B

### Management Equity Ownership Program
### Summary of Potential Structure

**Rollover Program**
- Management would rollover (Phil Bennett) or purchase same equity securities as THL ("Common A" shares)
- We would like to discuss appropriate levels on an individual by individual basis

**Management Incentive Equity Program**
- Management incentive equity program would be structured tax efficiently
  - "Common B" shares provide Management the opportunity to share in value created at Refco
  - Enables long-term capital gain treatment on profits for Management
  - We would like to discuss performance hurdles, appropriate thresholds for vesting and which managers should participate

*Common B share structure*
- Proposed Common B share structure offers significant tax savings to Management versus traditional option program
  - THL, Bennett and Management make upfront equity investment or rollover to acquire Common A shares
  - Common A shares accrete at 8% annual rate
  - Management team acquires at a nominal price incentive Common B shares representing, if fully vested, 5% of the fully diluted share count of A&B shares at closing
  - Vesting would occur over four years, based upon Management's ability to meet financial performance goals set forth in the projections THL received March 19, 2004
- Gains on upfront equity contribution and incentive equity value receive long-term capital gains treatment

The pre-tax value of the Management Incentive Equity Program assuming achievement of the Management Projections and a sale of the business at fiscal year-end 2009 for 9.0x EBITDA is approximately $150 million.

**MB02008909**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## EXHIBIT C

### Pending Legal, Financing And Tax
### Due Diligence Requests

The following are the legal, financial and tax due diligence items that we believe are outstanding. Each of the legal items either (i) was included in prior diligence requests or (ii) was discussed by Weil, Gotshal & Manges LLP ("WGM") and the Company's management on the March 29, 2004 diligence call, and each of the financial and tax diligence items was previously requested by THL or KPMG.

1.    Agreements/Arrangements with Current or Former Employees/Former Owners.  Please supply copies of corporate documents for the owners of Refco Group Ltd., LLC (i.e. Refco Group Holdings, Inc., Bawag Group Overseas and Refco Group Holdings, LLC).  We understand that a merger of Refco Group Holdings, LLC took place; please supply confirmatory documents.

Please also supply any documents relating to arrangements among the owners and affiliates of Refco Group, Ltd., LLC – please include items such as, but not limited to, shareholders/interestholders agreements, voting arrangements and any other arrangements that may be applicable or otherwise relevant in connection with a sale of any part of Refco Group Ltd., LLC or its owners or affiliates.

2.    Debt.  Please supply a copy of the intercompany debt agreement for the $16 million of subordinated debt.

3.    Employee Matters.  We are awaiting a discussion regarding ERISA and other employee benefit matters.  Mercer has delivered a separate request; please include WGM in any planned benefits diligence discussion.

4.    Foreign Subsidiaries.  Please provide a list of all foreign subsidiaries and affiliates and supply copies of the constituent corporate documents of such entities.

5.    Structure Chart and Investments.  Please provide an updated structure chart indicating all affiliate entities of Refco Group Ltd., LLC, including dormant and shell entities and minority investments.  Please also supply documents related to the company's minority investments, including, but not limited to, purchase agreements, shareholders agreements, voting and director arrangements, and similar agreements.

6.    Indemnification Arrangements.  Please provide any agreements (or forms thereof, if a single form is widely used), other than agreements otherwise supplied, that contain significant indemnification obligations on the part of the Company.

7.    Shareholders Agreements.  WGM previously has sent a list of two shareholders agreements it reviewed in the data room (Friedberg Mercantile Group and

**MB02008910**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Carlton Brokerage); please provide copies of any other agreements, or confirmation that no others exist.

8.     IPO Rights.  Please supply a copy of IPO rights (allocation agreement) for Steve Klemen; and please confirm (and supply termination agreement, if applicable) that no further rights are due to former owners of LFG.  Please also confirm that no other person has any similar rights in connection with an IPO.

9.     Customer Contracts.  WGM was referred to Refco's website for copies of customer agreements.  Please provide any other form(s) of such agreements that are in significant use, including those used by acquired businesses that have not yet converted to using the Company's standard forms (including the LFG form, which we understand will be provided).

10.    Joint Venture Arrangements.  Please supply copies of all joint venture arrangements.  KPMG separately has requested copies of Easy Screen.  Please supply any additional agreements in this category or confirm that no such additional agreements exist.

11.    Intellectual Property.  Please refer to prior request from KPMG.  Among other things, KPMG has requested outsourcing agreements between the Company and providers of Phase 3, FSS and GMI; and vendor agreements between the Company and vendors of the following platforms:  ACC, Clear Vision, TT, LeoWeb, PatSystems, XFire and ACE.

12.    Non-Competition/Non-Solicitation Agreements.  The Company confirmed to WGM that it is not bound by any agreements imposing non-competition requirements, and that it is subject to certain agreements with IRB's that contain customer non-solicitation-type obligations.  Please provide copies of a form of such agreements (with copies of any variations from the form with major IRB's).

13.    SEC Inquiry.  Please provide information with respect to the SEC inquiry.

14.    Material Contracts.  Please confirm that there are no other contracts considered material by management that have not been supplied.

MB02008911

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

| Financial information | Taxation |
|---|---|
| ☐ Analysis of receivables as at February 28, 2002, 2003, November 30, 2003 and February 29, 2004 quantifying amounts due from:<br>  • Customers;<br>  • Brokers and dealers;<br>  • Shareholders loans; and<br>  • Other loans, etc.<br>Please indicate balances which are unsecured or partially secured and the reserve amount held for each category; highlighting the specific accounts, amounts receivable and the % reserve held to cover for potential losses.<br>☐ Risk management reports at February 28, 2004, including a scenario analysis of underlying risk exposures.<br>☐ Consolidation schedules or worksheets used to prepare the consolidated balance sheet as at February 28, 2002, 2003 and November 30, 2003 that indicate assets and liabilities at respective subsidiaries and relevant elimination entries.<br>☐ Analysis of the following balance sheet items at February 28, 2003 and November 30, 2003:<br>  ☐ Other assets;<br>  ☐ Accounts payable and other liabilities; and<br>  ☐ Proprietary investments.<br>☐ Analysis of the following income statement items (within each business segment) for the year ended February 28, 2003, nine months ended November 30, 2003 and year ended February 29, 2004:<br>  ☐ Other income;<br>  ☐ Employee compensation and benefits;<br>  ☐ General administration and other expenses; and<br>  ☐ Commissions & brokerage income in the asset management business segment.<br>☐ Details of contingent payments paid or accrued during 2003 relating to acquisitions made in the prior years, and contingent payments lapsed during the year 2003. | ☐ A corporate structure chart/list:<br>  • Identifying each material business entity.<br>  • Its ownership.<br>  • Its classification for US and foreign tax purposes.<br>  • Its country of formation.<br>  • Its income tax filings by jurisdiction.<br>  • A summary of (i) principal functions performed, (ii) where they are performed, (iii) the related persons (if any) for whom performed and (iv) the methods for determining cross border payments and allocation of income.<br>  • Date and form of acquisition.<br>☐ Tax returns/work papers:<br>  • US federal income tax returns for year ending February 1999 through present including short period returns of Refco Group Ltd. and domestic subsidiaries ending on May 1999 merger date and short period return of Refco, Inc,. ending on July 2001 merger date.<br>  • 3 years of state income tax returns.<br>  • 3 years of foreign income tax returns.<br>  • 3 years of transfer pricing studies.<br>  • Support for determination of value of Refco, Inc. for July 2001 merger date including minority shareholder redemption agreement.<br>  • Schedule of intangibles showing tax basis and accumulated amortization as well as owner of intangible.<br>☐ Tax opinions or memoranda of tax advice relating to May 1999 and July 2001 merger transactions.<br>☐ List and description of issues in pending tax examinations, if any, of Refco Group Holdings, Inc. (I.e., S corporation owning Refco Group Ltd., LLC).<br>☐ Summary of current US and foreign tax audits.<br>☐ Contact info for US and foreign tax advisors.<br>☐ Tax accrual work papers for the most recent financial accounting year. |

MB02008912

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT B

*Refco (Royce*

*the Reliance*

**🌀 REFCO**

## MEMORANDUM

TO:        Joe Collins

FROM:      Phillip Bennett

DATE:      May 3, 2004

RE:        Exhibit C

Responses follow:

1.  You will find attached the following:

    — *merger docs*

    • The written consent of RGH LLC to its merger with RGHI and its subsequent dissolution.

2.  We cannot locate a copy of the original Subordinated Loan Agreement, which I believe ran from Refco Group Holdings, Inc. to Refco, Inc. and was dated February 15, 1991. However, we can give evidence to its existence indirectly and in the form of the attached Assignment and Assumption Agreement in which Refco Group Holdings, Inc. transferred its rights under that agreement to Refco Group Ltd. As a result, the internal loan is made from Refco Group Ltd. to Refco, Inc. (now Refco, LLC) with the external obligation running from Refco Group Ltd., to Refco Group Holdings, Inc. I hope this will be sufficient to confirm the existence of that balance. We will continue to look for the original document.

3.  We have prepared a separate schedule on employee matters responsive to the Mercer request list.

4.  The foreign subsidiary listing and constituent corporate documents have been requested on an urgent basis. We would expect them shortly.

5.  Please find enclosed a copy of the complete Organizational Chart of the group. This document is complete as far as we know and has been prepared to the best of our ability. It is conceivable there are dormant entities that have not been identified in this document, but by definition these are not material to current operations.

6.  There are no significant indemnification obligations that have not been noted already.

7.  To be confirmed.

**MB02004731**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP



I would appreciate it if you could send a copy of the LFG/Klemen agreement to Weil for review. In doing so, you can confirm that there are no other similar rights extended to either former owners of LFG or anyone else.

We are trying to obtain samples of other agreements including, for example, LFG documents for review.

10. It is my understanding that all responsive documents under the joint venture arrangement request are in the data room. There are no other joint venture arrangement documents.    *send copies*

11. It is my understanding that all the responsive documents under the intellectual    *send copies*
property request are in the data room. Additionally, we require clarification of the reference to the ACC Agreement, which we don't immediately recognize and would also advise that Leo Webb is a formerly used brand name which is no longer operational or relevant.

12. We assume that the reference to IRBs in paragraph 12 is a reference to IBs. IB    *yes*
Agreements, including those with customer non-solicitation (or non-    *term*
circumvention) agreements are in the data room. We are conducting a search to ensure that no additional IB Agreements containing these restrictions exist. To the best of our knowledge, there are no other agreements, including restrictions of this nature except for the IB Agreements that are provided or which will be    *a speed*
provided in the event that there are additional papers forthcoming.

Our meeting scheduled for May 5 will address the SEC issue.

I can confirm that there are no other material contracts to be disclosed.

I will call you to review each of these responses and the timetable for outstanding issues.

Regards.

kf

MB02004732

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT C

REFCO GROUP LTD., LLC
ACTION OF MEMBERS
BY WRITTEN CONSENT

The undersigned, owner of more than 50% of the voting membership shares of Refco Group Ltd., LLC, a Delaware limited liability company (the "Company"), does hereby give its written consent in lieu of a meeting pursuant to Section 15(g) of the Company's Third Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), to the adoption of the following resolutions:

RESOLVED, that the transfer of 100 voting membership shares of the Company owned by Refco Group Holdings, LLC to Refco Group Holdings, Inc. is hereby approved.

FURTHER RESOLVED, that the Fourth Amended and Restated Limited Liability Company Agreement in the form attached hereto as Exhibit A be, and it hereby is, approved and adopted.

FURTHER RESOLVED, that the officers and managers of the Company are hereby authorized to take all action necessary, advisable, or proper to carry out and perform the purpose and intent of the foregoing resolutions.

This Consent shall be filed with the minutes of the members of the Company.

IN WITNESS WHEREOF, the undersigned has executed this Consent as of January 1, 2003.

REFCO GROUP HOLDINGS, INC.

By_____
    Name:  Phillip R. Bennett
    Title:   President

5041299.1  28-May-04 19:42 03210817

MB02225332

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT D

United States of America v. Tone Grant                                                    4/4/2008

Page 1474

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,            New York, N.Y.

     v.                    S4 05 Cr. 1192 (NRB)

TONE GRANT,

     Defendant.

------------------------------x

April 4, 2008
9:00 a.m.


Before:

HON. NAOMI REICE BUCHWALD,

District Judge


APPEARANCES

MICHAEL J. GARCIA
   United States Attorney for the
   Southern District of New York
BY:  NEIL BAROFSKY
   CHRISTOPHER GARCIA
   Assistant United States Attorneys

ZUCKERMAN SPAEDER, LLP
   Attorneys for Defendant
BY:  ROGER ZUCKERMAN
   AITAN GOELMAN
   NORMAN EISEN

SOUTHERN DISTRICT REPORTERS, P.C.

United States of America v. Tone Grant                                                    4/4/2008

Page 1563

1  A. Yes.
2        MR. EISEN: May I have my question back, please.
3        (Record read)
4  Q. Were you candid with him about your concern, Mr. Schoen?
5  A. Yes.
6  Q. Was it unusual for Mr. Lee, the founder of your firm, to
7  attend meetings in the due diligence process for Refco?
8  A. In Refco, he did attend meetings in the diligence process.
9  Q. How many previous meetings had he attended, do you
10 remember?
11 A. Several meetings and a luncheon or two with Mr. Bennett.
12 Q. Why did you want Mr. Lee at this meeting?
13 A. We were close to the time of signing the transaction and an
14 issue had been raised that we wanted to take seriously and I
15 asked him to join me.
16 Q. Did Mr. Bennett give you great comfort when he explained
17 what had happened with the losses -- did he give you great
18 comfort when he explained, gave you an answer to the
19 allegations?
20 A. Yes.
21 Q. Didn't the subject of RGHI also come up at this meeting?
22 A. Yes.
23 Q. Do you sometimes refer to -- did you sometimes refer to
24 RGHI as the S Corp.?
25 A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 1564

1  Q. Explain to the jury, please, what is an S Corp.?
2  A. It's a partnership, a passthrough. It doesn't pay taxes
3  itself but its owners pay taxes.
4  Q. Did you discuss at this meeting the question of the related
5  party receivable involving RGHI that's the subject of this
6  case?
7  A. I believe we did.
8  Q. And did you also ask for assurance from Mr. Bennett that
9  there were no trades where the losses were being passed away
10 involving RGHI?
11 A. I'd have to refresh my recollection.
12 Q. Would you please look at Defense Exhibit 145.
13 A. I have it.
14 Q. Is that an email from you?
15 A. Yes.
16 Q. And is it to Scott Jaeckel?
17 A. It's to Scott Jaeckel and CCed to other members of our team
18 and our legal counsel.
19 Q. And it's dated Wednesday, June 2?
20 A. Yes.
21 Q. And did you, in fact, send that email?
22 A. Yes, I did.
23      MR. EISEN: Your Honor, we'd move Exhibit 145.
24      MR. GARCIA: No objection, your Honor.
25      THE COURT: Received.

SOUTHERN DISTRICT REPORTERS, P.C.

Page 1565

1        (Defendant's Exhibit 145 received in evidence)
2        MR. EISEN: Ray, may we see it please.
3  Q. Okay. And would you read the first sentence to me, please,
4  sir?
5  A. "The meeting went very well."
6  Q. And then it says Phil -- that's a reference to Mr. Bennett,
7  right?
8  A. Yes.
9  Q. "Phil was very constructive."
10       Then it has three points. It says three things of
11 notes, does it not?
12 A. Yes, it does.
13 Q. Now, let me ask, if you'll go to the bottom of the
14 document, "Phil also offered."
15       Do you see that sentence?
16 A. Yes.
17 Q. Would you read that -- would you read that sentence to the
18 jury please.
19 A. "Phil also offered to rep that both historically and going
20 forward the S Corp. has had and will have no brokerage accounts
21 with any Royce entities, as further assurance that there are no
22 trades where the losses are being passed away."
23 Q. "As further assurance that there are no trades where the
24 losses are being passed away," does that refresh your
25 recollection that he assured you that there were no trades

SOUTHERN DISTRICT REPORTERS, P.C.

Page 1566

1  where the losses were being passed away from Refco to the S
2  Corp.?
3  A. Yes.
4  Q. Have you since come to learn that that was a lie?
5  A. I don't know whether it was trades that were being passed
6  away.
7  Q. Well have you since come to learn that there are losses
8  that were passed away from Refco to the S Corp., RGHI?
9  A. We've come to learn that there were losses at Refco that
10 were assumed by RGHI as a receivable.
11 Q. And that, in fact, is one of the things that -- one of the
12 many lies that Mr. Bennett told you in that 2003 to 2005
13 period, is it not?
14      MR. GARCIA: Asked and answered.
15      THE COURT: It's okay. Answer it.
16      THE WITNESS: Yes.
17 Q. Now, when you confronted Mr. Bennett at this meeting --
18 pardon me. Strike that.
19       When you raised this issue with frankness with
20 Mr. Bennett at this meeting, did he seem nervous to you?
21 A. No.
22 Q. In fact, did he seem calm, sir?
23 A. He was very calm and comfortable.
24 Q. Ultimately, I think you testified when you confronted him
25 in 2005 with the allegations about related party losses at RGHI

SOUTHERN DISTRICT REPORTERS, P.C.