UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------

THOMAS H. LEE EQUITY FUND V, L.P. et al.

               Plaintiffs,

    -v-

MAYER BROWN, ROWE & MAW LLP,

               Defendant.

------------------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/23/09

07 Civ. 6767 (GEL)

**OPINION AND ORDER**

Mark C. Hansen, Silvija A. Strikis, James M. Webster III, Rebecca A. Beynon, Kellogg, Huber, Hansen, Todd, Evans & Figel PLLC, Washington D.C., and Greg A. Danilow, Paul Dutka, Christopher R.J. Pace, Seth Goodchild, Weil, Gotshal & Manges LLP, New York, New York, for Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P..

Thomas K. Ward, John K. Villa, George A. Borden, Williams & Connolly LLP, for Defendant Mayer Brown LLP.

GERARD E. LYNCH, District Judge:

This is an action on behalf of Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P., which are investment funds associated with Thomas H. Lee Partners, L.P. ("THL Partners"), a private equity firm (collectively, the "THL Funds"). Together, plaintiffs invested more than $450 million in Refco and acquired the majority of Refco's stock through a leveraged buy-out ("LBO") in August 2004 (the "2004 Purchase"). Following Refco's collapse in the fall of 2005, plaintiffs allegedly

experienced losses in excess of \$245 million. Plaintiffs bring this action against Refco's

principal outside counsel, Mayer Brown, Rowe & Maw LLP ("Mayer Brown"),[1] claiming that

the law firm made numerous misrepresentations to them in connection with the LBO. After the

Supreme Court decided <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S.___,

128 S. Ct. 761 (2008), plaintiffs filed an Amended Complaint reasserting claims under Section

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and state law claims for fraud

and negligent misrepresentation.[2]  Mayer Brown now moves to dismiss all claims pursuant to

Fed. R. Civ. P. 12(b)(6).  The motion will be granted in part and denied in part.

## BACKGROUND

In a recent decision, <u>In re Refco</u>, No. 05 Civ. 8626, 2009 WL 724378 (S.D.N.Y. Mar. 17,

2009), this Court, in dismissing Section 10(b) claims brought by a putative class of plaintiff-

investors against Mayer Brown and Mayer Brown senior partner Joseph Collins, discussed the

fraudulent scheme of so-called "round-trip" loans in which Mayer Brown was alleged to have

participated in order to conceal the true financial circumstances of the international brokerage

---

[1] Plaintiffs allege that Mayer Brown, Rowe & Maw LLP is a "combination" of two legal entities – an Illinois limited liability partnership (Mayer Brown LLP), and a limited liability partnership formed under English law (Mayer Brown International LLP).  (Am. Compl. ¶¶ 11-12.)  Mayer Brown disputes that there is such a combined entity, contending that a combination of two limited liability partnerships has no legal status.  This argument, however, is raised in a footnote and Mayer Brown International has not filed a separate motion to dismiss.  Rather, Mayer Brown International, without further argument, has joined the brief submitted by the Illiniois LLP.  Accordingly, for purposes of this motion, the two Mayer Brown partnerships will be treated as one entity.

[2] Plaintiffs filed their initial complaint against Mayer Brown on July 26, 2007.  All citations are to the Amended Complaint filed on February 20, 2008.  (Doc. # 51.)

firm Refco Inc. and its affiliated companies.  The THL Funds base their allegations, in part, on

the same conduct, arguing that Mayer Brown "helped effectuate" the round-trip loans (Pl. Opp.

at 2) that transformed Refco's uncollectible losses into receivables owed to Refco by third-

parties and that Mayer Brown participated in drafting the documents, specifically the Offering

Memorandum, that were used to induce investors into purchasing Refco's Bonds.  (See Am.

Compl. ¶¶ 21-37.)  The THL Funds also distinguish their claims against Mayer Brown, however,

arguing that unlike the plaintiff-investors, they are seeking to hold Mayer Brown liable for the

lies told directly to them throughout the due diligence process that effectuated the LBO.  The

details of the overall fraudulent scheme are set forth in the Court's recent opinion in In re Refco,

2009 WL 724378, at *1-3, to which the interested reader is referred.  Only those allegations

specifically related to the LBO will be discussed here.  For purposes of this motion, they are

deemed to be true.  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 151 (2d Cir. 2007).

I.      Mayer Brown's Participation in the Due Dilligence for the LBO

In the fall of 2003, the THL Funds began to explore the possibility of purchasing an

interest in Refco.  (Am. Compl. ¶ 38.)  A process of due diligence ensued, which involved a

number of parties.[3]  As Refco's primary outside counsel, Mayer Brown was responsible for

---

[3] As explained in the Amended Complaint (¶ 39), the THL Funds retained a number of professional advisors.  The accounting firm KPMG LLP was engaged to conduct accounting due diligence, including an assessment of Refco's financial statements and a review of work done by Grant Thornton, Refco's independent public accountant.  (Id.)  The law firm Weil Gotshal & Manges was retained to perform legal diligence and to analyze Refco's litigation and regulatory enforcement history.  McKinsey & Company was hired to conduct customer surveys across Refco's business lines and to analyze and forecast industry growth.  (Id.)  Sandler O'Neill, an investment firm specializing in financial services companies, analyzed Refco's position within the market, and Marsh & McLennan assessed risk management and the adequacy of insurance. (Id.)

3

responding to the THL Funds' due diligence requests in connection with the projected purchase. (Am. Compl. ¶¶ 41-42, 79.) Specifically, Mayer Brown handled the drafting and negotiating of the transactional documents, provided information directly to the THL Funds and their advisors, and coordinated access to documents and information being provided by Refco and its affiliates. (Am. Compl. ¶ 41.) Lawyers for Mayer Brown did this work while continuing to negotiate, coordinate, and provide material assistance for the round-trip loans, which they were – through their attendance at meetings and their assistance in drafting and reviewing a "Letter of Intent" for the acquisition – deliberately concealing from the THL Funds. (Am. Compl. ¶¶ 44-49.)

That concealment included both statements and conduct. Throughout the due diligence process, Collins in particular made a number of statements directly to the THL Funds and their counsel, Weil Gotshal & Manges, LLP ("Weil Gotshal"), including informing them that he had "confirmed with" or was "advised by" Refco management that there were no related-party transactions and that all material documents were being produced. (See Am. Compl. ¶¶ 53, 55-56.)[4] As Mayer Brown knew, however, numerous related-party transactions, including the round-trip loans, were not being disclosed to the THL Funds, and documents related to those transactions were not being produced. (Am. Compl. ¶ 52, 66.)

_____

[4] Specifically, the THL Funds allege that Collins stated that he had "confirmed with [Refco CEO Phillip] Bennett] that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI or other affiliates." (Am. Compl. ¶ 53.) Collins also made a number of assurances to Weil Gotshal including that, "'[w]e were advised by Refco Management that all material contracts were either in the Data Room or are being produced," that he had "confirmed" that all of Refco's receivables listed on Refco's balance sheet were "from customers in [the] ordinary course . . . [Refco] has gone through with accountants," and that "[w]e have been advised by Refco that there are no significant indemnification obligations which have not been disclosed already." (Am. Compl. ¶¶ 54-56.)

4

One such document was a copy of the so-called "Fourth LLC Agreement" a document requested by Weil Gotshal after it discovered an unexecuted copy of the document in the data room. (Am. Compl. ¶ 61.) Instead of turning over the executed document as requested, however – which in conjunction with the Proceeds Participation Agreement to which it referred would have led to the revelation of the RCHI recievables and thus Refco's true financial condition – Collins gave to the THL Funds a counterfeit Fourth LLC Agreement that omitted the incriminating information. (Am. Compl. ¶¶ 58, 61-64, 67.) Other documents, including the Proceeds Participation Agreement and the related "Letter Agreement" were never produced, despite the fact that those documents fell squarely within the THL Funds' diligence requests. (Am. Compl. ¶¶ 57-58.) Toward the end of the LBO process, Mayer Brown also negotiated, drafted, and reviewed the Equity Purchase Agreement (the "2004 Purchase Agreement") that contained representations that there were no related-party transactions, a fact that Mayer Brown knew to be false. (Am. Compl. ¶ 68-74; see also Ward Decl. Ex. A.)

Upon completion of due diligence, plaintiffs consummated the LBO transaction in August 2004 and acquired a majority ownership interest in Refco as well as numerous seats on Refco's Board of Directors.[5] (Am. Compl. ¶ 78.) In early October 2005, Refco's uncollectible debt became public and the company informed investors that they could no longer rely on its financial statements for the preceding four years. (Am. Compl. ¶¶ 83-84.) Refco's stock

---

[5] As a result, the THL entities and affiliated individuals have been named as defendants in several lawsuits alleging securities or tort claims based on THL's own alleged role in the Refco fraud. See, e.g., In re Refco, Inc. Sec. Litig., No. 05 Civ. 8626 (S.D.N.Y.) (GEL); Kirschner v. Thomas H. Lee Partners, L.P., No. 07 Civ. 7074 (S.D.N.Y.) (GEL); In re Refco Capital Markets, Ltd., Brokerage Customer Sec. Litig., No. 06 Civ. 643 (S.D.N.Y.) (GEL); VR Global Partners, L.P. v. Bennett, No. 07 Civ. 8686 (S.D.N.Y.) (GEL); Capital Mgmt. Select Fund Ltd. v. Bennett, No. 07 Civ. 8688 (S.D.N.Y.) (GEL).

plummeted, and on October 17, 2005, Refco filed for Chapter 11 bankruptcy protection. (Am.

Compl. ¶ 85.) This turn of events allegedly caused the THL Funds to suffer millions of dollars

in losses. (Id.)

II.     Plaintiffs' Claims

Plaintiffs allege that Mayer Brown made a number of knowingly false statements directly

to the THL Funds and their counsel, and that Mayer Brown conspired with other Refco

principals to conceal Refco's uncollectible debt by engaging in secret related-party transactions,

namely the so-called round-trip loans. Accordingly, the THL Funds argue that Mayer Brown

should be held primarily liable for securities fraud under Section 10(b), either because of the

misstatements they made directly to the THL Funds, or because they participated in the scheme –

including coordinating the round-trip loan transactions and creating false documents – that

belied Mayer Brown's representations to them during the due diligence process. In the

alternative, plaintiffs contend that, should the Court conclude that the interests that the THL

Funds acquired in the 2004 Purchase were not securities, that their RICO claim is sufficiently

alleged. Finally, plaintiffs allege that they have stated claims for common-law negligent

misrepresentation and fraud. Mayer Brown moves to dismiss all claims pursuant to Fed. R. Civ.

P. 12(b)(6).

**DISCUSSION**

I.      Motions to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the

Court must accept as true all of the factual allegations in the complaint and draw all reasonable

inferences in plaintiffs' favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d

6

Cir. 2007). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S Ct. 1955, 1965 (2007). Ultimately, the plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. This "flexible 'plausibility standard,' . . . obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007), quoting Twombly, 127 S. Ct. at 1968 (emphasis in original). If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 127 S. Ct. at 1974.

While the rules of pleading in federal court usually require only "a short and plain statement" of a plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "stated with particularity," Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted). Accordingly, where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001), quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). A plaintiff pleading fraud based on deceptive conduct "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts

7

were performed, and the effect the scheme had on investors in the securities at issue." In re

Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2006).

II.    Pleading a Violation of Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person,

directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any

security . . . any manipulative or deceptive device or contrivance" in violation of the rules set

forth by the Securities and Exchange Commission ("SEC") for the protection of investors.  15

U.S.C. § 78j.  Pursuant to SEC Rule 10b-5, promulgated thereunder, it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were
> made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court recently articulated the elements necessary to sustain a private cause

of action for securities fraud under § 10(b) and Rule 10b-5:

> In a typical § 10(b) private action a plaintiff must prove (1) a
> material misrepresentation or omission by the defendant; (2)
> scienter; (3) a connection between the misrepresentation or
> omission and the purchase or sale of a security; (4) reliance upon
> the misrepresentation or omission; (5) economic loss; and (6) loss
> causation.

Stoneridge, 128 S. Ct. at 768 (2008), citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336,

341-42 (2005); see also, e.g., Jay Dees Inc. v. Def. Tech. Sys., Inc., No. 05 Civ. 6954, 2008 WL

8

4501652, at *4 (S.D.N.Y. Sept. 30, 2008) (reciting this articulation of the elements from Stoneridge).[6]

The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides that, where misleading statements or omissions under § 10(b) are alleged, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2509-10 (2007). Where plaintiffs allege not a statement or omission, but rather, a fraudulent scheme to affect the price of stocks, it is sufficient to specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004), quoting In re Blech Sec. Litig., 961 F. Supp. 569, 580 (S.D.N.Y. 1997). Thus, in order for a defendant to be held liable for a claim brought under Rule 10b-5, a plaintiff must allege that the defendant made a false or misleading statement or omission that investors attributed to him or her, or that the defendant "participated in [a] fraudulent scheme or other activity proscribed by the securities laws." SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998) (citations omitted).

---

[6] The Second Circuit has formulated a largely indistinguishable list of elements necessary to state a claim for relief under § 10(b) and Rule 10b-5, requiring that plaintiffs prove that defendants "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147 (2d Cir. 2007), quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998).

III.     Sufficiency of the Rule 10b-5(b) Claim

The THL Funds allege that the Mayer Brown Defendants violated § 10(b) and Rule 10b-5(b) when, in responding to the THL Funds' due diligence requests and in negotiating the 2004 Purchase, Mayer Brown made representations directly to the THL Funds and their representatives that were knowingly false when made, as evidenced by the fact that Mayer Brown was contemporaneously engaging in the very transactions that belied those representations. Mayer Brown argues that plaintiffs' allegations are an unjustified attempt to broaden the reach of Rule 10b-5(b) to impose liability on a law firm based on the alleged falsity of its client's statements.

As this Court recently explained in In re Refco, 2009 WL 724378, at *6, the starting point for this analysis is Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), which held that § 10(b) imposes liability only on persons who, themselves, make a material misstatement or omission, and that there is no liability for aiding and abetting fraudulent conduct. Id. at 177. In Shapiro v. Cantor, 123 F.3d 717 (2d Cir. 1997), the Second Circuit observed that "[i]f Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting . . . *no matter how substantial that aid may be* . . . ." Id. at 720 (emphasis added). This requirement draws a "bright line" between the conduct of a secondary actor and that of a primary violator. Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998). To rise to the level of a primary violation, the secondary actor must not only make a material misstatement or omission, but "the misrepresentation must be attributed to the specific actor at the time of public dissemination," such as in advance of the investment decision,

10

so as not to undermine the element of reliance required for § 10(b) liability.  Lattanzio, 476 F.3d

at 153, quoting Wright, 152 F.3d at 175.  "Allegations of 'assisting,' 'participating in,'

'complicity in' and similar synonyms . . . all fall within the prohibitive bar of Central Bank."

Shapiro, 123 F.3d at 720.

Nor can silence or mere association be construed as nonetheless conveying an actor's

"imprimatur."  Lattanzio, 476 F.3d at 155.

> [U]nderstanding that [a secondary actor] is at work behind the
> scenes does not create an exception to the requirement that an
> actionable misstatement be made by the [secondary actor]  Unless
> [that] understanding is based on [that actor's] articulated
> statement, the source for that understanding – whether it be a
> regulation, an accounting practice, or something else – does not
> matter.

Id. (holding that a securities regulation requiring that the company's accountant review the

quarterly unaudited financial statements did not "associate" the accountant with those statements

to such a degree that, without more, those statements became the accountant's statements).

Plaintiffs argue that their allegations fall squarely within the Central Bank's statement

that, "[a]ny person or entity, including a lawyer, . . . who . . . makes a material misstatement (or

omission) on which a purchaser or seller of securities relies may be liable as a primary violator

under 10b-5."  511 U.S. at 191.  But here, the decisive question is whether the allegations against

Mayer Brown are sufficient to show that the misstatements and omissions made by Mayer

Brown can be attributed to them such that the statements on which the THL Funds relied are the

statements of *Mayer Brown*.  They are not.

Lattanzio explains that only an "articulated statement" of attribution to a secondary actor

is sufficient.  Id.; accord, United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008); see also In re

11

Alstom SA, 454 F. Supp. 2d 187, 204 (S.D.N.Y. 2006) (noting that the attribution requirement is "of particular concern" when plaintiffs seek to hold outside secondary actors like accountants and auditors liable for a corporation's misleading statements). While the THL Funds strive to distinguish Lattanzio on the basis of their face-to-face "understanding" of the relationship between Refco and Mayer Brown, Lattanzio does not turn on this difference.

The misstatements to which the THL Funds refer are to instances prior to the 2004 Purchase in which Collins passed along statements made by Refco principals to representatives of the THL Funds. In each of these instances, plaintiffs' allegations specifically concede that Collins was simply repeating information provided by others without any endorsement or representation that Mayer Brown had, itself, verified or adopted the information provided. That Collins had "confirmed with Bennett that . . . no other undisclosed contracts or arrangements existed (Am. Compl. ¶ 53), or that Collins had assured counsel for the THL Funds that, "[w]e were advised by Refco Management" that documents were being produced or that "there are no significant [undisclosed] indemnification obligations" (Am. Compl. ¶¶ 54-56), is on its face insufficient to "attribute" these statements to Mayer Brown. Collins' statements to the THL Funds can be rejected for reasons that are substantially similar to those discussed by the Court in In re Refco's recent analysis of portions of the Offering Memorandum.[7] See 2009 WL 724378, at *7. In that action, the Court rejected plaintiffs' attempts to attribute statements in that memorandum to Mayer Brown, based on the memorandum's identification of Mayer Brown as

---

[7] The Amended Complaint also features a discussion of Mayer Brown's role in drafting the Offering Memorandum, including that the memorandum was "listed in the [document] as counsel to Refco" (see Am. Compl. ¶ 76), however, this discussion plays no role in the THL Funds' opposition to the motion to dismiss the securities fraud claims.

counsel for Refco. Id. There, as here, Mayer Brown's mere association with statements made by others – here, by relaying a statement that is attributed to the authority of another – is insufficient to make a secondary actor liable under § 10(b).[8]

Plaintiffs' insistence that the statements were made "directly" to the THL Funds does not alter this result. The issue is not who made the misstatement, but to whom the "misstatement is attributed . . . at the time of [its] dissemination." Lattanzio, 476 F.3d at 155. The identity of the speaker is not, as plaintiffs would have it, ipso facto, dispositive of that issue. For Mayer Brown to be liable under Rule 10b-5(b) it is not enough that Mayer Brown conveyed misinformation to the THL Funds. For Mayer Brown to be liable, the statements on which the THL Funds purportedly relied must be the statements of Mayer Brown. When Mayer Brown says only, it had "confirmed with Bennett that . . . no other undisclosed contracts or arrangements existed" (Am. Compl. ¶ 53), the statement that there are no such contracts or arrangements is expressly attributed to Bennett. All Mayer Brown is asserting on its own authority is that Bennett made certain assurances.[9]

---

[8] These circumstances are easily distinguished from those present in Overton v. Todman & Co., CPAs, P.C., 478 F.3d 479 (2d Cir. 2007), in which an accounting firm failed to correct false or misleading statement in a certified opinion that was plainly attributed to the accountant. See id. at 488 (emphasizing the "the duty to correct arises in the circumstances as pled in the securities claim now before us.")

[9] Similarly, the THL Funds cannot establish liability based on the fact that Mayer Brown coordinated access to documents, or that Collins allegedly transmitted a counterfeit Fourth LLC Agreement that omitted incriminating information. That Fourth LLC Agreement, which was authorized by Refco and signed by Bennett, cannot be said to be attributed to Mayer Brown merely because Collins, through his assistant, passed it along. (Am. Compl. ¶ 64.) Even if Collins participated in creating the document, a role that is not pleaded with any particularity, it is attributable only to Bennett and RGHI, who signed contemporaneous board resolutions that "approved and adopted" the agreement. (See Borden Decl. Ex. C.)

To be sure, this does not mean that Collins or Mayer Brown can convey such falsehoods, knowing that they are lies, with impunity. An innocent agent who conveys on behalf of another a message he believes in good faith to be true does nothing wrong; an agent who understands that his employer's statement is a lie, aids and abets the fraud. He remains, however, an aider and abettor under § 10(b), not a primary violator.

Like the plaintiff-investors in In re Refco, the THL Funds make further allegations in an attempt to plead that it was Mayer Brown – and not Refco – on whom they relied. See 2009 WL 724378, at *8. Specifically, the THL Funds allege that "Mayer Brown understood that they would be providing information . . . upon which the THL Funds would rely." (Am. Compl. ¶ 42.) If the question were, is Mayer Brown guilty of securities fraud, the issue would indeed be the state of mind of the Mayer Brown defendants: did they know that they were conveying false information on which the recipient would reasonably rely? But for separating those who are guilty as principals from those who aid and abet, the issue is not what Mayer Brown understood about the importance of the statements to the THL Funds, but rather what the THL Funds understood about to whom the statements were being attributed.

Plaintiffs have pleaded no facts to suggest that Mayer Brown represented to the THL Funds, or that the THL Funds otherwise understood, that Mayer Brown was vetting or endorsing the information it was passing on from Refco's management. Neither the extraordinary awareness of investors found sufficient in Global Crossing, nor facts suggestive that the THL Funds "almost certainly understood [Mayer Brown] to be the speakers," is proffered here. See Global Crossing, 322 F. Supp. 2d at 334 (distinguishing the extraordinary allegations of investors' awareness of Arthur Andersen's accounting strategies sufficient to transcend the

14

proscribed category of aiding and abetting liability); In re Converium Holding AG Sec. Litig.,

No. 04 Civ. 7897, 2006 WL 3804619, at *12 (S.D.N.Y. Dec. 28, 2006). To the contrary, as the

complaint expressly alleges, Collins took care to distance himself and Mayer Brown from the

statements; he did not report that he or Mayer Brown were stating that all the documents had

been provided or that there were no related-party transactions, but that Bennett or Refco had so

stated.

The sole allegation in the complaint that attempts to provide a sufficient factual basis that

plaintiffs reasonably understood Mayer Brown to be speaking on its own authority throughout

the due diligence process refers to Mayer Brown's longstanding representation of Refco.

Plaintiffs contend that as counsel to Refco "[Mayer Brown] would be drawing on its own

extensive knowledge and information built up over the many years that [the firm] had been

working with Refco." (Am. Compl. ¶ 42.) This allegation is insufficient to establish a primary

violation under Global Crossing, see id. at 333 – assuming that case remains good law[10] – and

runs afoul of Lattanzio's clear holding that any claimed "understanding" of Mayer Brown's

relationship with Refco cannot give rise to primary liability because, "[u]nless [the THL Funds']

understanding is based on the [defendant's] articulated statement, the source for that

understanding . . . does not matter." 476 F.3d at 155. Even if what the THL Funds were, in fact,

relying on was that an attorney would not knowingly convey the false statements of his client

_____

[10] Lattanzio does not discuss Global Crossing and there is some question whether Global Crossing and the cases that follow it can be reconciled with Lattanzio's renewed endorsement of Wright and its prohibition against relying on "public understanding" to attribute statements to actors for purposes of Rule 10b-5 liability. See In re Refco, 2009 WL 724378, at *7, n.11. As in that action, however, it is not necessary to reach that issue, because plaintiffs have not pleaded facts that would meet even this "relax[ed]" version of the Wright standard. Global Crossing, 322 F. Supp. 2d at 331.

because doing so would violate the rules of professional conduct, the Second Circuit has already explained that "violation of [such rules] does not establish securities fraud in the civil context." Finnerty, 533 F.3d at 151.

Plaintiffs' position to the contrary – that Mayer Brown is primarily liable for making the statements that were attributable to others – "circumvent[s] the reliance requirements of the Act." Wright, 152 F.3d at 175; Lattanzio, 476 F.3d at 154-55.[11]  Accordingly, Count Two of the Amended Complaint must be dismissed.

IV.    Sufficiency of the Rule 10b-5(a) and (c) Claim

In addition to Mayer Brown's actionable misstatements to the THL Funds and their counsel, plaintiffs posit a "scheme liability" theory based on Mayer Brown's participation in the round-trip loans that transformed Refco's uncollectible losses into receivables owed to Refco by third-parties.[12]  This allegation is identical to the allegation made by plaintiff-investors in In re Refco and Mayer Brown seeks dismissal of this claim for precisely the same reason. Mayer

_____

[11] Plaintiffs lean heavily on Kline v. First Western Gov't Sec., Inc., 24 F.3d 480 (3d Cir. 1994), but in that case the Third Circuit merely rejected the position that the presence of a broad disclaimer in a law firm's opinion letter entitled the law firm to summary judgment on the issue of § 10(b) liability for statements made in the letter. Here, there is no such opinion letter, and whether Mayer Brown "made" any statement it knew would be or intended to be attributed to it is precisely what is at issue. See Kline, 24 F.3d at 490 ("We are dealing here with a situation in which [the law firm], *by authoring its opinion letters*, has elected to speak regarding the transactions at issue") (emphasis added). The fact that Mayer Brown passed along statements made by Refco principals or that it transmitted documents for its clients does not constitute an articulated statement, or transform Kline into a case that is "[s]quarely on point." (Pl. Opp. at 10.)

[12] Specifically sections (a) and (c) of Rule 10b-5 prohibit "employ[ing] any device, scheme or artifice to defraud," or "engag[ing] in any act, practice or course of business which operates . . . as a fraud or deceit upon any person" in connection with the sale of securities.  17 C.F.R. § 240.10b-5(a), (c).

Brown argues, inter alia, that the Supreme Court's decision in Stoneridge forecloses this theory of liability.  For reasons more fully elaborated in In re Refco, they are correct.

In Stoneridge, the Court examined the issue of "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)."  128 S. Ct. at 767.  While finding that, "[c]onduct itself can be deceptive," the Court ultimately concluded that the vendors who knowingly participated in the scheme with the purpose of creating a false appearance about the cable operator's revenues could not be held liable because the vendors' "deceptive acts, which were not disclosed to the investing public [were] too remote to satisfy the requirement of reliance . . . except in an indirect chain . . . too remote for liability."  Id. at 769-70.  Because "[t]he conduct of the secondary actor must satisfy each of the elements or preconditions for liability," a mere allegation of "'scheme liability' . . . does not answer the objection that petitioner did not in fact rely upon [the defendant's] own deceptive conduct."  Id. at 770.

Here, as in Stoneridge and In re Refco, it is undisputed that plaintiffs did not know that Mayer Brown helped facilitate the fraudulent transactions.  Indeed, the Amended Complaint specifically alleges that plaintiffs had no knowledge whatsoever of the fraudulent transactions because "[a]t no time did Refco or Mayer Brown disclose the [uncollectible receivable] or any of the round-trip loan[s]."  (Am. Compl. ¶¶ 37, 44, 45; see also id. ¶ 79.)  Accordingly, no liability can attach because plaintiffs could not have relied on their conduct, just as the plaintiffs in Stoneridge did not know of, and thus could not have relied on, the transactions in that case.  See Stoneridge, 128 S. Ct. at 769.

The THL Funds' attempt to distinguish Stoneridge is as unavailing as it was for the

17

plaintiff-investors in <u>In Re Refco</u>. The fact that Mayer Brown was not an unrelated customer or supplier, but was known to THL Funds as Refco's counsel does not create an exception to <u>Stoneridge</u> or fail to make Mayer Brown "remote" within its meaning. See <u>In re Refco</u>, 2009 WL 724378, at *9. Nor can the THL Funds argue that because they specifically inquired into Refco's related-party transactions – transactions in which Mayer Brown is alleged to have participated – that Mayer Brown becomes primarily liable under § 10(b). Like the plaintiffs in <u>In re Refco</u>, the THL Funds seek to substitute Mayer Brown's deceitful conduct for their *reliance* on that conduct. But only reliance matters. As this Court recently explained in <u>In re Refco</u>,

> In <u>Stoneridge</u> as well, the transaction at issue – participation by outside vendors in an issuer's patently fraudulent scheme to create fictitious documents and backdate contracts – had no other plausible purpose than to misstate the issuer's financial condition, but this fact was insufficient to establish liability, because irrespective of the obviousness of the fraudulent scheme to the participating defendants, or the importance of their participation to the execution of the scheme, the defendants' conduct was too remote from the investing public to satisfy the reliance element of § 10(b). . . .
>
> Here the scheme to defraud was Refco's effort to hide from its investors the true state of its finances by concealing the uncollectible receivables and it was Refco that engaged in the deceitful practice of making the round-trip loans and reporting them in its financial statements as if they were bona fide loan transactions. However significant a role the Mayer Brown Defendants played in assisting Refco's management to engage in these transactions, and however culpable they may have been to do so with the knowledge that the transactions were ultimately designed as part of a scheme to defraud and practice a deceit upon Refco's shareholders – indeed even if the acts of Collins were, as the Government has charged, criminal – the liability that attaches to those acts is liability for aiding and abetting Refco's schemes and manipulation, not principal liability for executing schemes of the Mayer Brown Defendants' own.

2009 WL 724378, at *10-11.  Accordingly, "even assuming the truth of plaintiffs' factual allegations and granting every reasonable inference therefrom, plaintiffs' evidence would establish only that investors relied on [Refco's] deceptive disclosures concerning transactions" in which Mayer Brown was involved."  In re Parmalat Sec. Litig., 570 F. Supp. 2d 521, 526 (S.D.N.Y. 2008).  Count One of the Amended Complaint must therefore be dismissed.

V.      Sufficiency of the RICO Claim

The THL Funds contend that they have pleaded a RICO claim only in event that the Court determines that the equity interests that the THL Funds acquired in Refco through the 2004 Purchase are not securities and therefore that the securities fraud claim fails as a matter of law. There is, however, no argument before the Court that the equity interests the THL Funds acquired were not securities.[13]  Nevertheless, the THL Funds appear to put forward a second argument – that the RICO claim is viable should the Court find that *they* cannot pursue their securities claim under § 10(b). (Am Compl. ¶ 4 n.5.)  Accordingly, it is with respect to this alternative assertion that Mayer Brown moves to dismiss this count of the Amended Complaint. Mayer Brown argues that Congress has precluded RICO claims based on *any conduct* that would have constituted securities fraud, regardless of whether the plaintiffs themselves could have

[13] Mayer Brown has not moved to dismiss any of plaintiffs' claims on such a ground and plaintiffs have, presumably to support their claims under the Securities Exchange Act, alleged that the 2004 Purchase provided them with an "equity interest" that they further define as an "investment in Refco [that resulted] in control of Refco's business affairs and policies, as well as its day-to-day management . . . [remaining] with [Refco principals]."  (Am. Compl. ¶¶ 4 n.5, 40.) This definition appears to track the definition of an "investment contract" that would be governed by the securities laws. See 15 U.S.C. § 78c(a)(10) (including "investment contract" in the definition of security); see also SEC v. Edwards, 540 U.S. 389, 393 (2004), quoting SEC v. W.J. Howey Co., 328 U.S. 293 (1946) (defining investment contracts as "an investment of money in a common enterprise with profits to come solely from the efforts of others.")

brought a securities fraud claim based on that conduct. Although courts in this district are split on this issue, Mayer Brown has the better of the argument.

Section 107 of the PSLRA, Pub.L. No. 104-67, § 107, bars private causes of action under RICO for predicate acts that describe conduct that would otherwise be actionable as securities fraud. Specifically, the amendment provides that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The Conference Committee Report for § 107 makes clear that the RICO Amendment was intended by Congress to "eliminate securities fraud as a predicate offense in a civil RICO action" and to bar a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." Bald Eagle Area School Dist. v. Keystone Financial, Inc., 189 F.3d 321, 327 (3d Cir. 1999), quoting H.R. Conf. Rep. No. 104-369, at 47 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 746; see also In re Enron Corp. Secs., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 620-22 (S.D. Tex. 2003) (discussing the relevant legislative history in detail).

The THL Funds latch on to the word "actionable" to argue that Congress was concerned not with whether the conduct pleaded as the predicate offenses in the Amended Complaint constitute securities fraud, but rather with preventing private plaintiffs from bringing both securities law and RICO actions within a single lawsuit. Plaintiffs argue that, if this is the case, there is no danger of such duplication here because if the Court finds that Mayer Brown was not primarily liable under § 10(b) and was – at best – an aider and abettor of Refco's securities violations, plaintiffs would be unable to pursue Mayer Brown under Central Bank, and therefore

20

the securities claim would cease to be "actionable." Although several courts, including some in this district, have agreed with this analysis, see, e.g., OSRecovery, Inc. v. One Groupe Intern., Inc., 354 F. Supp. 2d 357 (S.D.N.Y. 2005), this approach is both unpersuasive and against the great weight of precedent.

Under the THL Funds' interpretation of § 107, so long as plaintiffs do not hold "actionable" securities claims – that is, so long as they are pursuing aiders and abettors – they may proceed under RICO. But this approach is treacherous for the reasons articulated by the court in Fezzani v. Bear, Stearns & Co., No. 99 Civ. 0793, 2005 WL 500377, at *4 (S.D.N.Y. Mar. 2, 2005). There, the court analyzed the plain text of the PSLRA and found that the amendment "does not say 'no person may rely on a defendant's conduct actionable as securities fraud to establish a RICO violation against that defendant.' Rather, it is written broadly to bar reliance on any conduct, no matter whose conduct it is." Id. Thus, as in Fazzani, "even were [this] Court to conclude that [Mayer Brown's] conduct merely constituted unactionable aiding and abetting . . . [the] Amended Complaint still relies extensively on [Refco's] . . . fraud to establish [Mayer Brown's] liability under RICO" and therefore falls squarely within the scope of the PSLRA bar. Id. The language of the statute simply does not require that, for a RICO claim to be barred, the plaintiff who sues under RICO must be able to sue under securities laws, or that the conduct "actionable as securities fraud" on which the plaintiff relies to establish the RICO violation must be that of the defendant. The THL Funds' argument to the contrary is problematic for precisely the reasons discussed in Fazzani:

> The RICO amendment was intended to eliminate "the so-called 'treble-damages blunderbuss of RICO' in securities fraud cases." Matthews v. Kidder, Peabody & Co., 161 F.3d 156, 164 (3d Cir. 1998) (quoting 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995)

21

(statement of Rep. Cox)). Were courts to permit RICO claims whenever a plaintiff failed to state a cause of action for securities fraud against a particular defendant, plaintiffs would then have the incentive to present only those facts that, if taken as true (as they must be on a motion to dismiss), would not form the basis of a securities-fraud claim. The plaintiff as master of the complaint, see Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002), could reap the benefits of a RICO claim complete with the threat of treble damages by merely failing to state a cause of action for securities fraud against a particular defendant while relying on others' securities fraud to establish a RICO claim. Armed with the knowledge that aiding and abetting a manipulative or deceptive practice is insufficient under Central Bank, for example, a plaintiff could deliberately plead facts that established no more than that a particular defendant aided and abetted another's securities fraud. Such incentive is particularly strong where, as here, a plaintiff might rely on the securities fraud of those with few assets to obtain treble damages against deeper pockets.

Id., see also Howard v. Am. Online, Inc., 208 F.3d 741, 749 (9th Cir. 2000) (finding that the RICO amendment bars reliance on "any conduct" actionable as securities fraud); In re Enron, 284 F. Supp. 2d at 620 ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws.").

In other contexts, courts have not permitted plaintiffs to "undermine the congressional intent behind the RICO Amendment" through "surgical presentations" of the cause of action. Bald Eagle, 189 F.3d at 329-30 (finding that the proper test is whether "the conduct pled as predicate offenses is actionable as securities fraud" and rejecting plaintiffs attempts to "artfully plead"); Burton v. Ken-Crest Servs., Inc., 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001) ("Plaintiff cannot magically revive his claim by picking out discreet details of his allegations and then claiming that they are not actionable as securities fraud"). The fact that this circuit uses a

"bright-line" test to determine whether a defendant is liable for misstatements and omissions under § 10(b) does not, as suggested by OSRecovery, 354 F. Supp. 2d at 369-70, undermine this approach. See id. (citing the bright-line test and finding that "aiding and abetting . . . is not actionable under the securities laws and therefore [it is] actionable under RICO"). The issue is not the clarity of the line for determining aiding and abetting, but rather whether the language of § 107 requires that the RICO plaintiff must be able to sue under the securities laws.

Plaintiffs' position overlooks that the amendment barring RICO claims was made in the same statute that explicitly dealt with the Supreme Court's decision in Central Bank by authorizing only the SEC – not private parties – to bring enforcement actions against aiders and abettors. See PSLRA, Pub. L. No. 104-67, § 104, 109 Stat. 737, 757, codified in 15 U.S.C. § 78t(f). It would be strange indeed if Congress, in a statute that otherwise bars private causes of action under RICO for predicate acts that describe conduct actionable as securities fraud, nevertheless chose to allow enhanced RICO remedies – treble damages and attorneys' fees – against *only* the very parties that Congress simultaneously made immune from private suit under the securities laws. The better interpretation – and the one supported by the plain meaning of § 107 – is that the RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws. Accordingly, Count Three of the Amended Complaint is dismissed.

VI.    Sufficiency of the Common-Law Negligent Misrepresentation and Fraud Claims

Plaintiffs also bring common-law claims against Mayer Brown for negligent misrepresentation and fraud. At the outset, the parties disagree about what law governs these claims. Mayer Brown argues that New York law applies, but the THL Funds contend that the

23

claims are "at least presumptively" governed by Massachusetts law on the basis that both the "loss [was] suffered" and "[m]any of the affirmative misrepresentations and omissions . . . were received and relied upon by the THL Funds at their headquarters and principal place of business in Boston, Massachusetts." (Am. Compl. ¶ 10.)

A federal court sitting in diversity applies the choice of law rules of the forum state, see Klaxon v. Stentor Elec. Mfg., 313 U.S. 487, 496-97 (1947), which in this case is New York. Under New York choice of law rules, the first step is to determine whether there is any actual conflict of law. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). Here, there is a clear conflict between the negligent misrepresentation rules of New York and Massachusetts because under Massachusetts law a plaintiff does not have to plead that it was in privity or near-privity with the defendant to allege negligent misrepresentation.[14]  In New York, by contrast, proof of such a relationship is required.  See Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP ("THL I"), 586 F. Supp. 2d 119, 126-28 (S.D.N.Y. 2008) (discussing that under New York law a plaintiff must allege, inter alia, that the defendant is bound to it "by some relation or duty of care").  As to the fraud claim, although the elements of the claim are similar in both states, under New York law the allegations must be proven by clear and convincing evidence, not merely by a preponderance as under Massachusetts law.  This difference is enough to establish that "a conflict exists." Levin v. Dalva Bros., 459 F.3d 68, 73 (1st Cir. 2006).

---

[14] Under Massachusetts law, a plaintiff need only plead that the defendant: "(1) in the course of [its] business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information," First Marblehead Corp. v. House, 473 F.3d 1, 9 (1st Cir. 2006), quoting Nota Constr. Corp. v. Keyes Assocs., 694 N.E.2d 401, 405 (Mass. App. Ct. 1998) (citation omitted).

24

Where there is such a conflict, New York engages in an "interests analysis," applying the "law of the jurisdiction with the most significant interest in, or relationship to, the dispute." White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006) (citation and internal quotation marks omitted); see also Schultz v. Boy Scouts, 65 N.Y.2d 189, 196 (1985). For tort actions, the jurisdiction with the greatest interest is generally the jurisdiction in which the loss occurred – or where the plaintiff is located. Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 292 (S.D.N.Y. 2000) (citation omitted). Accordingly, the THL Funds argue that, because their loss was suffered in Massachusetts, Massachusetts law necessarily applies. (Pl. Opp. at 54.)  However, where the loss was suffered is not conclusive and does not trump a full interest analysis. See Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (finding that, in the context of fraud, where the loss was suffered was not dispositive where a single state was overwhelmingly the center of gravity of the events at issue and that state's interest in regulating the conduct of work performed there was strong). Rather, the analysis is "flexible" and "intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Fin. One Public Co. Ltd. v. Lehman Bro. Spec. Fin., Inc., 414 F.3d 325, 337 (2d Cir. 2005) (citation and internal quotation marks omitted); accord LaSala v. Bank of Cyprus Pub. Co., 510 F. Supp. 2d 246, 264 (S.D.N.Y. 2007). Further, in weighing interests, New York distinguishes between "conduct regulating" and "loss allocating" rules. Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir.1999); see also Sheldon v. PHH Corp., 135 F.3d 848, 853 (2d Cir. 1998). When the conflict involves rules that regulate conduct – as here – the site of the tort, not the place of the loss, governs. Id.

Applying this guidance, the entirety of the complaint establishes that New York has the "most significant interest in, or relationship to, the dispute." White Plains Coat, 460 F.3d at 284. It is the jurisdiction where the Refco fraud originated and where substantial activities in furtherance of the fraud – including the negligent misrepresentations alleged in the Amended Complaint – were committed. The THL Funds' attempt to isolate a single paragraph of the complaint in which they identify where the loss was suffered is unpersuasive where the complaint, in its entirety, establishes that the overwhelming bulk of events surrounding the alleged negligent misrepresentation and the underlying fraud occurred in New York where Refco was headquartered (¶ 104), where key face-to-face meetings were held (¶ 46), and where the 2004 Purchase Agreement, which contains a New York choice-of-law provision, was signed (Ward Decl. Ex. A. §§ 1.6(a), 9.3). Under these circumstances, it is "unreasonable to allow [Massachusetts] law . . . to dictate the appropriate conduct for accountants or [legal] professionals vis-a-vis non-client third-parties where [substantially] all of the events occurred in New York." HSA Residential Mortg. Serv. of Texas v. Casuccio, 350 F. Supp. 2d 352, 366 (E.D.N.Y. 2003). The fact that the THL Funds have brought negligent misrepresentation and aiding and abetting claims under New York law against Refco's accountant, Grant Thornton, for its failures during precisely the same due diligence process for the LBO only reinforces the Court's conclusion that New York law properly applies. See THL I, 586 F. Supp. 2d at 126.

A.     Negligent Misrepresentation

Applying New York law, Mayer Brown first argues that the plaintiffs' claim of negligent misrepresentation is preempted by New York's Martin Act. See N.Y. Gen. Bus. Law §§ 352 et seq. The Martin Act prohibits various fraudulent and deceitful practices in the distribution,

26

exchange, sale and purchase of securities and provides the New York Attorney General with the sole discretion to investigate securities violations within or from the state of New York. Accordingly, private plaintiffs may not pursue causes of action related to securities fraud because their doing so "is not consistent with the legislative scheme underlying the [] Act." CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 276 (1987).[15]

Whether negligent misrepresentation claims are barred by the Martin Act, however, has engendered debate among the courts. The Second Circuit has declined to answer the question, see Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104 (2d Cir. 2001), but it has barred claims for breach of fiduciary duty, see Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001). A number of courts in this district have applied the reasoning in Castellano to claims of negligent misrepresentation, see Marcus v. Frome, 329 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004) (dismissing negligent misrepresentation claim on preemption grounds and collecting cases), but as plaintiffs point out, the New York Court of Appeals has not considered this issue, and intermediate appellate decisions are split on whether common law negligence-based claims survive.

A respected judge in this district has declined to extend the reasoning in Castellano to dismiss negligence claims based on preemption by the Martin Act. Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001) (Cote, J.) (finding that

---

[15] In particular, causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element of the claim are typically preempted by the Martin Act. See, e.g., Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 767, 2003 WL 22052894, at *2-4 (S.D.N.Y. Sept. 2, 2003). Such causes of action are disfavored because allowing a plaintiff to go forward on such a claim "would effectively permit a private action under the Martin Act." Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005).

there "there is nothing in either . . . [relevant] New York Court of Appeals cases . . . or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action" and predicting that the Second Circuit would reject preemption when next confronted with the issue). It is unnecessary to address this issue in the present case, however, because the negligent misrepresentation claim is necessarily dismissed on other grounds, namely that plaintiffs have failed to allege, as they must under New York law, that there was a "near-privity" relationship between the parties.[16]

A near-privity relationship exists where there is: "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." Houbigant, Inc. v. Dev. Specialists, Inc., 229 F. Supp. 2d 208, 216 (S.D.N.Y. 2002), quoting Prudential Ins. Co. v. Dewey, Ballantine, 80 N.Y.2d 377 (1992).

Plaintiffs allege that Mayer Brown had regular, direct, and continuous contact with the THL Funds and their representatives – including face-to-face meetings, telephone conferences, email and other correspondence, and that Mayer Brown provided access to documents related to the 2004 Purchase. (See Am. Compl. ¶¶ 43, 46-48, 53-56.) The THL Funds further allege that they were relying on the information provided by Mayer Brown and that "Mayer Brown knew full well" of that reliance. (Pl. Opp. at 59; Am. Compl. ¶ 42.) This argument fails because while

---

[16] Mayer Brown does not, on this motion, challenge plaintiffs' pleadings with respect to the other elements of the tort of negligent misrepresentation, which are "(1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003).

"face-to-face conversation . . . or other substantive communication between the parties" can give rise to a duty of care, Securities Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 75 (2d Cir. 2000) (internal quotation marks omitted), plaintiffs have alleged no facts that would support that there was "some conduct by [Mayer Brown] . . . evincing its understanding of [the THL Funds'] reliance." Houbigant, 229 F. Supp. 2d at 216.

Nor is the THL Funds' allegation that Mayer Brown would be "drawing on its own extensive knowledge and information built up over the many years [the firm] had been working with Refco" (Am. Compl. ¶ 42) sufficient. In ordinary commercial contexts, liability does not attach as a matter of course for merely negligent statements; rather, it is imposed "only on those persons who possess unique or specialized expertise." Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996). Mayer Brown's history with Refco, without more, does not constitute the type of "specialized expertise" that is required in order to impose a duty of care in this context. See Doehla v. Wathne Limited, Inc., No. 98 Civ. 6087, 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999) (dismissing a negligent misrepresentation claim against a lawyer by non-client where the lawyer did not "hold himself out to be an expert" and "reliance on [his] opinion by the third-party [was not the] 'end and aim' of the engagement of the lawyer"). If it were otherwise, every non-client would have a claim against every law firm who failed to exercise due care in the context of representing a long-standing client in a financial transaction. What Mayer Brown knew about Refco amounts to nothing more than knowledge of the particulars of the company's business and of the true situation underlying the misrepresentations pertaining to that business. As this Court explained in a slightly different context:

> [Lawyers] will almost always have "specialized" knowledge of the
> particulars of their [client's] businesses, and indeed, of the facts

29

> underlying any misrepresentations made in support of desired
> [transactions]. That is why third-parties [like the THL Funds] have
> sophisticated means of assessing those risks that cut across
> industries and areas of technical expertise. The relationship
> between [third-party] and [another party's law firm] is the very
> epitome of an arm's length commercial transaction.

JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004). Accordingly,

New York law does not impose liability for negligent misrepresentations in such a context and

Count Five of the Amended Complaint must be dismissed.

B.    Fraud

Finally, Mayer Brown asserts that plaintiffs' common-law fraud claim must be dismissed,

inter alia, because plaintiffs cannot establish that they justifiably relied on Mayer Brown's

representations regarding Refco's financial condition.[17] Banque Arabe et Internationale

d'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 156 (2d Cir. 1995) (stating that a

plaintiff is "required to establish that [he] actually relied on the disclosure or lack thereof, and

that such reliance was reasonable or justifiable"). In assessing the reasonableness of a plaintiff's

alleged reliance, the court must "consider the entire context of the transaction, including factors

such as its complexity and magnitude, the sophistication of the parties, and the content of any

agreements between them." Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.,

343 F.3d 189, 195 (2d. Cir. 2003), citing Lazard Freres & Co. v. Protective Life Ins. Co., 108

---

[17] To prove common law fraud under New York law, a plaintiff must show that: "(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." Century Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007) (citation and internal quotation marks omitted). Claims of fraud must survive the heightened particularity requirements of Rule 9(b). See Stern v. Gen. Elec. Co., 924 F.2d 472, 476 n.6 (2d Cir. 1991).

F.3d 1531, 1541-43 (2d Cir. 1997).  Although such an inquiry is usually ill-suited for a motion to

dismiss because it is "so fact-intensive," see Schlaifer Nance & Co. v. Estate of Warhol, 119

F.3d 91, 98 (2d Cir. 1997), Mayer Brown argues that the provisions of the 2004 Purchase

Agreement preclude the THL Funds, as sophisticated investors, from claiming justifiable

reliance on Mayer Brown as a matter of law.  This argument is unpersuasive.

In the 2004 Purchase Agreement, the THL Funds agreed to contractual provisions stating

that the "representations and warranties made in this agreement are in lieu of and are exclusive

of *all other representations* and warranties, including any implied warranties."  (Ward Decl. Ex.

A § 3.27 (emphasis added).)  Mayer Brown argues that, in so agreeing, the THL Funds

proclaimed that the representations in the agreement were the only ones on which they could

rely, or in fact, had relied in taking part in the LBO.  Accordingly, Mayer Brown asserts that the

THL Funds cannot, now, hold them liable for assurances made by Collins, draft representations

that were exchanged during the course of negotiations, or documents not received during due

diligence.  This line of argument overlooks both relevant facts and law.

The gravamen of the THL Funds' claim is not that they relied on some stray remark or

extra-contractual representation made by Mayer Brown.  The THL Funds maintain that they

relied to their detriment on the very representations that saturated the 2004 Purchase Agreement.

(Am. Compl. ¶¶ 114, 117.)  As Mayer Brown itself argues in defending themselves against

plaintiffs' federal securities law claims, the representations made by Mayer Brown to the THL

Funds were, in fact, nothing more than the recitation by Collins and Mayer Brown of the

representations being made by Bennett and Refco.  Indeed, the critical representations by

Bennett, relayed by Collins, that there were no undisclosed related-party transactions are the

31

exact representations made in the 2004 Purchase Agreement itself that Mayer Brown now says are the only representations on which the THL Funds were entitled justifiably to rely.  (See Ward Decl. Ex. A. §§ 3.10, 3.12.)  These representations were, according to the allegations of the complaint, known by the Mayer Brown defendants to be false and fraudulent, and the truth was concealed by a fraudulent scheme in which Mayer Brown was allegedly intimately involved. (Am. Compl. ¶ 117.)

Nor is this a case in which the plaintiffs, in a written contract, specifically disclaimed reliance on certain representations, such that the plaintiffs cannot, in a subsequent action for fraud, claim they were fraudulently induced to enter into the agreement by the very representations on which they had disclaimed reliance. See Harsco Corp. v. Segui, 91 F.3d 337, 345-47 (2d Cir. 1996) (requiring a disclaimer as to "the very representation [the party] has disclaimed reliance upon").  Even if, as Mayer Brown argues, a non-party is protected by an agreement's non-reliance and integration clauses, that fact is of no help to them here.  An agreement induced on knowingly false pretenses, "constitutes fraud and, despite the so-called merger clause, [the THL Funds are] free to prove that was induced by false and fraudulent misrepresentations to . . . execute the [2004 Agreement]."  Sabo v. Delman, 3 N.Y.2d 155, 162 (1957); see also Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993) (holding, under New York law, that "a general merger clause is ineffective . . . [where] a party was induced to enter the contract by means of fraud").  Far from being specifically disclaimed in the 2004 Purchase Agreement, the concealment of the related-party transactions and the underlying RGHI receivables go to the heart of that Agreement.  Nothing in New York law prevents the THL Funds from suing Mayer Brown on the theory that the THL Funds relied on false

32

representations made by Refco *that Mayer Brown, with knowledge of their falsity, helped Refco to make*, and the falsity of which Mayer Brown helped Refco to conceal.

Thus, while the THL Funds' claims under the federal securities law fail because the THL Funds cannot show that they relied on statements attributable to Mayer Brown, such that Mayer Brown is, for purposes of federal law, merely an aider and abettor of Refco's fraud, no such attribution is needed here. Under New York law, plaintiffs may sue defendants who aided and abetted a fraud. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006).[18]   The Amended Complaint is replete with allegations that Mayer Brown's statements and conduct assisted the execution of Refco's fraudulent scheme, which culminated in the 2004 Purchase Agreement. Specifically, plaintiffs allege that Mayer Brown acted behind the scenes to help Refco to accomplish the concealment of the RGHI receivables by means of the fraudulent round-trip loans, and that Collins further aided the scheme by selectively producing documents and conveying Bennett's false representations, including representations that the Purchase Agreement expressly states are relied upon by the THL Funds. (See e.g., Am. Compl. ¶¶ 20-37, 41, 44, 47-49, 52-57.) The Purchase Agreement's false representations, false warrantees, and

---

[18] To establish liability under New York law for aiding and abetting fraud, plaintiffs must prove: "(1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292, quoting Winnick, 406 F. Supp. 2d at 252 (S.D.N.Y. 2005) (internal quotation marks omitted); see also Schlaifer Nance, 119 F.3d at 98 (aiding and abetting fraud must be proven by clear and convincing evidence). The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud. Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York courts and federal courts in this district have required actual knowledge") The "substantial assistance" requirement is satisfied "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (internal quotations and citation omitted).

33

false disclosures, the falsity of which the Mayer Brown Defendants are alleged to have helped conceal, and any doubts about which Collins is alleged to have helped assuage by conveying the false assurances of Bennett's and Refco, are precisely what induced the THL Funds to enter into the 2004 Purchase.  (Am. Compl. ¶¶ 70, 79, 116.)

Mayer Brown's argument that it cannot be held liable for the "host of misrepresentations made *by Refco*, both during due diligence and in the Purchase Agreement" (Def. Mem. 6), has the point exactly backwards.  Mayer Brown's assistance in perpetrating the fraud at Refco, namely maintaining the illusion that there were no related-party transactions concealing Refco's uncollectible debt, is precisely the course of conduct that the 2004 Purchase Agreement memorialized and on which the THL Funds relied in entering the LBO. (Am. Compl. ¶¶ 68-75.) Mayer Brown's substantial and knowing participation in perpetrating the Refco fraud – if proven as alleged – including its help effectuating the round-trip loans that transformed Refco's uncollectible losses into receivables owed to Refco by third-parties its statements and in assisting Refco's misconduct throughout the due diligence process, all aided and abetted the fraud on which the THL Funds relied.

Finally, it is of no help to Mayer Brown that the THL Funds, in an effort to avoid application of the rule of Central Bank and Stoneridge, have carefully refrained from using the words "aiding and abetting" and have simply alleged a claim against Mayer Brown for fraud. "Fraud by a primary actor" and "aiding and abetting fraud" are not separate and distinct torts, but merely different ways in which a defendant can be liable for its participation in defrauding a plaintiff.  The pleading requirements of Rules 8 and 9 of the Federal Rules of Civil Procedure do not require plaintiffs to place particular labels on their causes of action on peril of dismissal.

That the Amended Complaint characterizes the claim as one for fraud as a principal, and for not aiding and abetting fraud, is of no consequence.  Plaintiffs have adequately pleaded facts stating a valid legal claim under New York law against Mayer Brown, and with the particularity necessary to survive the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  See Armstrong v. McAlpin, 699 F.2d 79, 92-93 (2d Cir.1983) (applying Rule 9(b) to claim for aiding and abetting fraud).  Accordingly, the motion to dismiss Count Four must be denied.

## CONCLUSION

For the reasons stated above, Mayer Brown's motion to dismiss is denied with respect to the claim of fraud and granted in all other respects.

SO ORDERED:

Dated: New York, New York
       March 23, 2009

GERARD E. LYNCH
United States District Judge

35